## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SIO2 MEDICAL PRODUCTS, INC., *et al.*,[1] | ) | Case No. 23-10366 (JTD) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**MOTION OF DEBTORS FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion:[2]

### Preliminary Statement

1.     As discussed in the First Day Declarations, the Debtors filed these chapter 11 cases in the midst of a severe liquidity crisis and inability to obtain out-of-court financing to bridge their products to commercialization.  Consequently, the Debtors and Oaktree Capital Management, L.P. (collectively with its affiliated investment funds and affiliates, "<u>Oaktree</u>") entered into a restructuring support agreement (including all exhibits and schedules attached thereto, and amended, restated, and supplemented from time to time the "<u>Restructuring Support Agreement</u>")

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510).  The location of the Debtors' principal place of business and service address in these chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

[2]     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the (a) *Declaration of Yves Steffen, Chief Executive Officer of SiO2 Medical Products Inc., in Support of Chapter 11 Filing and First Day Motions* (the "<u>Steffen Declaration</u>") and (b) *Declaration of R. Seth Bullock, Interim Chief Financial Officer of SiO2 Medical Products, Inc., in Support of Chapter 11 Filing and First Day Motions* (the "<u>Bullock Declaration</u>"), filed contemporaneously herewith (collectively the "<u>First Day Declarations</u>").  Capitalized terms not defined herein shall have the meanings ascribed to such terms in the First Day Declarations.

to pursue a restructuring of their business (either through a plan of reorganization or the sale of the business as a going concern) to maximize the value of their estates for their stakeholders. To effectuate the transactions contemplated by the Restructuring Support Agreement, the Debtors require immediate access to capital to avoid irreparable harm to their estates. The Debtors have filed these chapter 11 cases with approximately $4.1 million of cash. Part and parcel of the Restructuring Support Agreement is Oaktree's commitment to provide postpetition financing to allow the Debtors to conduct a fulsome marketing process for their business.

2.     As discussed in the Cowan Declaration,[3] the Debtors, with the assistance of their proposed investment banker, Lazard Frères & Co. LLC ("Lazard"), worked closely with the Capital Raise Committee to procure an out-of-court solution among their Company's existing stakeholders. The Capital Raise Committee, along with the Company's advisors, pursued all viable financing and capital raising options from existing stakeholders and third-parties, was laser focused on avoiding a chapter 11 filing, and prioritized seeking a comprehensive out-of-court capital structure solution along with sufficient funding to reach commercialization. As that process was in motion, the Capital Raise Committee also sought bridge financing in case the comprehensive out-of-court solution could not be completed prior to exhausting liquidity. When it became clear that a neither a comprehensive solution nor bridge financing would materialize, the Capital Raise Committee authorized the Debtors' advisors to engage with respect to a comprehensive in-court restructuring. As a result of the liquidity crunch, the Debtors requested that the First Lien Term Loan Lenders consent to amend the First Lien Credit Agreement with

---

[3]     *Declaration of Tyler W. Cowan in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying The Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, attached hereto as **Exhibit A**.

respect to the covenant to maintain a minimum liquidity of $15 million in order to fund operations and prepare for the present chapter 11 filing from existing cash, which was otherwise held in a restricted account (which consent was voluntarily granted by the First Lien Term Loan Lenders).

3.      As part of their preparation for an in-court process, the Debtors engaged with numerous parties to potentially fund these chapter 11 cases.  Specifically, Lazard contacted approximately eight third-party financial institutions and four existing investors to determine whether any of these parties would be willing to provide postpetition financing to the Debtors.  No party other than Oaktree has provided the Debtors with an executable out-of-court or postpetition financing facility.

4.      After extensive, arm's-length negotiations with Oaktree, the Debtors were able to secure the proposed $120 million debtor-in-possession term loan credit facility (the "DIP Facility"), including $60 million in new-money loans, secured by a perfected first priming lien on substantially all of the Debtors' assets except for a perfected junior priority lien on all DIP Collateral that secures obligations that are subject to Permitted Prior Liens. The DIP Facility will also roll up up to $60 million of the Debtors' prepetition obligations under their First Lien Term Loan Facility on a dollar-for-dollar basis with the funding of the New Money Loans (the "Roll-up Amount").  Oaktree was unwilling to move forward on any proposal that did not include the Roll-up Amount.

5.      The DIP Facility and Restructuring Support Agreement are complementary and together provide a structure for the Debtors' marketing process.  The DIP Facility is expressly linked to certain case milestones, which are consistent with the timeline set forth in the Restructuring Support Agreement and provide a structure for the Debtors' anticipated chapter 11 process, allowing the parties to continue developing and pursuing a comprehensive marketing

process for the Debtors' business. These milestones were required by Oaktree as a condition to providing the DIP Facility.

6.     The DIP Facility is critical to the Debtors' ability to fund its operations and fund the marketing process while providing sufficient liquidity without creating a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases. Indeed, no other party within the Debtors' capital structure came forward with an *actionable* financing proposal. Accordingly, the DIP Facility is an essential component to funding the Debtors' operations and providing a path to emergence and is critical to reassure customers and vendors and protect operations. The proposed DIP Facility is in the best interests of the Debtors and is necessary to avoid irreparable harm to the Debtors and their estates and therefore should be approved.

## Relief Requested

7.     The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit B** (the "Interim DIP Order"), and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"):[4]

- *DIP Facility*: authorizing the Debtors to obtain credit under the DIP Facility in the aggregate principal amount of $120 million, pursuant to the terms and conditions set forth in that Multi-Draw Senior Secured Super-Priority Priming Debtor-In-Possession Credit Agreement (as amended, restated, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement") by and among the Borrowers, the Guarantors, Oaktree Fund Administration, LLC, as administrative agent and collateral agent (in such capacity, the "DIP Agent") for and on behalf of the relevant lender(s) (collectively, the "DIP Lender(s)")";

- *DIP Documents*: authorizing the Debtors to enter into the DIP Facility, substantially in the form annexed as Schedule 1 to the Interim DIP Order attached hereto, the Security Agreement (as defined in the DIP Facility), and certain ancillary documentation (together with the DIP Facility and the DIP Credit Agreement, the "DIP Documents") and all of the Debtors' secured

---

[4]     The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

obligations arising thereunder (the "DIP Obligations");

- **Security and Priority**:  authorizing the Debtors to grant, subject and subordinate solely to any Prior Perfected Liens and the Carve Out (each as defined in the Interim DIP Order), senior liens and superpriority administrative expense status to the DIP Lender(s) to secure the DIP Obligations, including continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim DIP Order);

- **Automatic Stay**:  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders; and

- **Final Hearing**:  scheduling a final hearing to consider entry of the Final DIP Order.

8.      In support of this motion, the Debtors submit the Cowan Declaration.

### Jurisdiction and Venue

9.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 4001 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

**Background**

12.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no official committees have been appointed or designated.

**Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[5]**

13.     The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower**<br>4001(c)(1)(B) | SiO2 Medical Products, Inc.<br><br>*See* DIP Credit Agreement, Intro |
| **Guarantors**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Advanced Bioscience Labware, Inc. and Advanced Bioscience Consumables, Inc. (collectively, the "DIP Guarantors," and together with the Borrower, the "DIP Obligors" or "Loan Patties").<br><br>*See* DIP Credit Agreement, Intro |
| **DIP Lenders**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Certain affiliates, managed funds, or accounts of Oaktree Capital Management, L.P. (collectively the "DIP Lenders").<br><br>*See* DIP Credit Agreement, Intro |

---

[5]     The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Credit Agreement and the Interim Order.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the DIP Orders, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The date that is (a) 120 days after the Petition Date (or such later date as may be agreed in writing by the Majority Lenders) unless the Final DIP Order Date has occurred on or prior to such date, (b) the date of consummation of any sale of all or substantially all Specified Assets pursuant to section 363 of the Bankruptcy Code, (c) the Chapter 11 Plan Effective Date, (d) the Maturity Date, (e) the occurrence of any Event of Default under the DIP Credit Agreement or the other Loan Documents, (f) the date of entry of an order by the Court approving (i) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (ii) a motion seeking the appointment or election of a trustee, receiver, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business, or if the Borrower or any Guarantor files a motion or other pleading seeking such conversion or dismissal unless otherwise consented to in writing by the Lenders, (g) the date the Court orders the conversion of any Chapter 11 Case to a liquidation pursuant to chapter 7 of the Bankruptcy Code, (i) if the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto and (j) the date on which the Loans are accelerated or otherwise declared (or become) due and payable in accordance with the terms of the DIP Credit Agreement (whether automatically, or upon any Event of Default or as otherwise provided in the DIP Credit Agreement).<br><br>*See* DIP Credit Agreement, "Termination Date," Section 1.01. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | $120 million in the aggregate in the form of a term loan credit facility.<br>*See* DIP Credit Agreement, Section 2.01. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The obligation of the Lenders to make any Loan (including on the Closing Date) shall be subject to the fulfillment and satisfaction of all of the following conditions:<br><br>• <u>Closing Date.</u>  The Closing Date shall have occurred.<br><br>• <u>No Default</u>.  No Default or Event of Default shall exist at the time of, or immediately result from, the making of such Loan.<br><br>• <u>Milestones.</u>  Each Milestone required to be satisfied prior to the date of such Borrowing shall have been satisfied (or waived) in accordance with the terms of the DIP Credit Agreement.<br><br>• <u>Representations and Warranties</u>.  Before, at the time of and after giving effect to such Loan and the use of proceeds thereof, each representation and warranty by any Obligor or any of its Subsidiaries contained in the DIP Credit Agreement or in any other Loan Document shall be true, correct and complete in all material respects (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties shall have been true, correct and complete in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).<br><br>• <u>Budget</u>.  There shall be an Approved Budget in full force and effect on and as of each of (i) the Borrowing Date for such Loan, and (ii) the time that such Loan is funded.<br><br>• <u>Delivery of Notes.</u>  The Administrative Agent shall have received a Note to the extent requested by any Lender pursuant to Section 2.04 for the Loans duly executed and delivered by a Responsible Officer of the Borrower.<br><br>• <u>No Orders, Injunctions, Etc.</u>  There shall not exist any proceeding, order, injunction or decree of any Governmental Authority (including the Bankruptcy Court) or in any |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | court restraining or prohibiting (or attempting to restrain or prohibit) the funding of the Loan under the DIP Credit Agreement. |

- <u>Use of Proceeds.</u>  The proceeds of such Loan shall be directed and requested for use in accordance with Section 2.05.

- <u>Fees.</u>  The payment by the Borrower of the fees required to be paid pursuant to Section 5.06 to the Administrative Agent and the Lenders on such Borrowing Date and all other fees required to be paid on such Borrowing Date pursuant to the DIP Credit Agreement and the other Loan Documents and all costs and expenses required to be paid on such Borrowing Date (including pursuant to Section 14.03) pursuant to the DIP Credit Agreement and the other Loan Documents (which amounts, at the sole option of the Lenders, may be offset against the proceeds of such Loan).

- <u>Notice of Borrowing.</u>  The Administrative Agent shall have received a duly executed written notice form the Borrower complying with the requirements of Section 2.01(b).

- <u>Funding Date Certificate.</u>  The Administrative Agent shall have received a Funding Date Certificate, dated as of the Closing Date and in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by a Responsible Officer of the Borrower.

- <u>DIP Orders.</u>  The Interim DIP Order (in the case of Loans made prior to the entry of the Final DIP Order) or the Final DIP Order (in the case of Loans made after the entry of the Final DIP Order) (1) shall be in full force and effect, (2) shall not have been reversed, vacated or stayed, (3) shall not have become the subject of any appeal or challenge, and (4)  shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Lenders.

- <u>No Material Adverse Effect.</u>  There shall not have occurred since the Petition Date any development or event which, individually or in the aggregate with other such circumstances, has had or could reasonably be expected to have, a Material Adverse Effect (except to the extent relating to the Chapter 11 Cases).

- <u>DIP Draw Conditions.</u>  In the case of a Borrowing of any New Money Loans, in addition to the above, the following shall be satisfied (or waived as provided in the DIP Credit Agreement):

  - the aggregate principal amount of all New Money Loans requested by the Borrower on such Borrowing Date shall not exceed the amount identified in the Approved Budget (subject to Permitted Variances) as being required by the Obligors and their Subsidiaries to finance disbursements during the period specified in the Approved Budget (unless such Lender consents thereto);

  - the making of such New Money Loans, and the use of proceeds therefrom, shall comply with the Approved Budget, the DIP Draw Conditions and with the DIP Credit Agreement in all respects; and

  - the Administrative Agent shall have received a Notice of Borrowing in connection with the applicable New Money Loans in accordance with the requirements of the DIP Credit Agreement.

Each Notice of Borrowing (or, in the case of the Borrowing of Loans not constituting New Money Loans, each deemed request by the Borrower for a Loan) shall constitute a representation by the Borrower that the foregoing conditions are satisfied (or, as applicable, have been waived) on and as of each of (i) the date of such Notice of Borrowing, (ii) the

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | requested Borrowing Date, and (iii) the date on which such Loan is funded or made (or deemed funded or made, as applicable).<br><br>*See* DIP Credit Agreement, Section 6.02. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | At all times prior to the occurrence of an Event of Default (as defined below), interest on the DIP Loans shall accrue at a per annum rate equal to 14%.  Interest shall be paid monthly in arrears on the first Business Day of each calendar month (each, an "Interest Payment Date") payable (i) in the case of New Money Loans, in cash and (ii) in the case of Roll-Up Loans, in kind by capitalizing and adding such interest to the outstanding principal amount of the Roll-Up Loans on such Interest Payment Date ("Roll-Up PIK Interest").  The Roll-Up PIK Interest shall be automatically capitalized on the applicable Interest Payment Date by adding the amount thereof to the outstanding principal amount of the Roll-Up Loans.<br><br>Upon the occurrence and during the continuance of an Event of Default, unless otherwise waived by the DIP Lenders, the Interest Rate on all DIP Obligations (including interest on overdue principal, interest and other amounts) shall accrue at an additional 2% per annum.<br><br>*See* DIP Credit Agreement, Section 3.02. |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | Subject to usual and customary provisions to be set forth in the DIP Orders and the DIP Credit Agreement, proceeds of the DIP Loans and Cash Collateral will be used only for the following purposes, in each case, in accordance with and subject to the Approved Budget (as defined below) then in effect, subject to Permitted Variances:  (a) for working capital and general corporate purposes of the Obligors; (b) to fund costs and expenses related to the Chapter 11 Cases, including for the avoidance of doubt, the fees of professionals retained by the company in the Chapter 11 Cases; (c) to fund the payment of interest, fees, costs, and expenses related to the DIP Facility, including the reasonable and documented fees and expenses of the Lender Professionals (such fees and expenses, the "DIP Professional Fees"); and (d) to finance disbursements.<br><br>*See* DIP Credit Agreement, Section 2.05. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | - Adequate Protection for the Prepetition First Lien Secured Parties.  The Debtors have agreed to provide the Prepetition First Lien Secured Parties adequate protection of their interests in the Prepetition First Lien Collateral (including Cash Collateral), solely to the extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "First Lien Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition First Lien Collateral, the Carve Out, the Debtors' use of the Prepetition First Lien Collateral (including Cash Collateral), and the imposition of the automatic stay (each Prepetition First Lien Lender's claim for such First Lien Diminution in Value, a "Prepetition First Lien Adequate Protection Claim").<br><br>  - Prepetition First Lien Adequate Protection Liens.  As security for any First Lien Diminution in Value of the Prepetition First Lien Collateral, subject and subordinate only to the Carve Out, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim DIP Order (together, the "Prepetition First Lien Adequate Superpriority Claims"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final DIP Order granting such relief, any proceeds or property recovered from Avoidance Actions. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • <u>Prepetition First Lien Adequate Protection Superpriority Claims</u>.  As further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Prepetition First Lien Adequate Protection Claims shall be, subject and subordinate to the Carve Out, allowed superpriority administrative expense claims in each of the Chapter 11 Cases.<br><br>• <u>Prepetition First Lien Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to pay (1) postpetition monthly interest payments in kind to the Prepetition First Lien Term Loan Agent, on behalf of the Prepetition First Lien Lenders, in an amount equal to the accrued and unpaid interest at the non-default interest rate and as otherwise provided under the Prepetition First Lien Term Loan Facility (including, for the avoidance of doubt, payment of all prepetition accrued and unpaid interest under the Prepetition First Lien Term Loan Facility); *provided* that unless otherwise required by the Prepetition First Lien Term Loan Agent, all such postpetition interest may be "paid-in-kind" by adding accrued and unpaid interest to the outstanding principal amount of the Prepetition First Lien Secured Obligations on the last business day of each month (which capitalized interest shall constitute principal for all purposes under the Prepetition First Lien Term Loan Facility), and (2) in accordance with the terms of paragraph 20 of the Interim DIP Order, all reasonable and documented fees and expenses.<br><br>• <u>Right to Seek Additional Adequate Protection</u>.  Subject to any applicable intercreditor agreement, the Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition First Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition First Lien Collateral during the Chapter 11 Cases.<br><br>• <u>Other Covenants</u>.  The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order approving the Debtors' cash management motion or any further Court order.  The Debtors shall comply with the covenants contained in the DIP Credit Agreement regarding conduct of business, including preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations, and intellectual property rights material to the conduct of their business and the maintenance of properties and insurance.<br><br>• <u>Reporting Requirements</u>.  As additional adequate protection to the Prepetition First Lien Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Credit Agreement and shall provide all such reports, documents, and other information to the Prepetition First Lien Term Loan Agent.<br><br>• <u>Adequate Protection for the Prepetition Second Lien Secured Parties</u>.  The Debtors have agreed to provide the Prepetition Second Lien Secured Parties adequate protection of their interests in the Prepetition Second Lien Collateral (including Cash Collateral), solely to the extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "<u>Second Lien Diminution in Value</u>" and together with the First Lien Diminution in Value, the "<u>Diminution in Value</u>"), resulting from the imposition of the priming DIP Liens on the Prepetition Second Lien Collateral, the Carve Out, the Debtors' use of |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | the Prepetition Second Lien Collateral (including Cash Collateral), and the imposition of the automatic stay (each Prepetition Second Lien Loan Party's claim for such Second Lien Diminution in Value, a "<u>Prepetition Second Lien Adequate Protection Claim</u>") and together with the Prepetition First Lien Adequate Protection Claims, the "<u>Adequate Protection Claims</u>."<br><br>• <u>Prepetition Second Lien Adequate Protection Liens</u>. As security for any Second Lien Diminution in Value of the Prepetition Second Lien Collateral and the DIP Liens, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim DIP Order (together, the "<u>Prepetition Second Lien Adequate Protection Liens,</u>" and together with the Prepetition First Lien Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final DIP Order granting such relief, all proceeds or property recovered from Avoidance Actions. Subject to the Interim DIP Order the Prepetition Second Lien Adequate Protection Liens shall be (A) with respect to the Prepetition Second Lien Priority Collateral, whether now existing or hereafter arising or acquired, subject and subordinate only to the Carve Out, the DIP Liens, the Prepetition First Lien Adequate Protection Liens, Prepetition First Priority Liens, and the Permitted Prior Liens, (B) with respect to assets that did not constitute Prepetition Second Lien Priority Collateral but were subject to Permitted Prior Liens, subject and subordinate only to the Carve Out, the DIP Liens, the Prepetition First Lien Adequate Protection Liens, Prepetition First Priority Liens and the Permitted Prior Liens and (C) with respect to Previously Unencumbered Property, subject and subordinate only to the Carve Out, the DIP Liens, the Prepetition First Lien Adequate Protection Liens, and the Permitted Prior Liens.<br><br>• <u>Prepetition Second Lien Adequate Protection Superpriority Claims</u>. As further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Prepetition Second Lien Adequate Protection Claims shall be allowed superpriority administrative expense claims (the "<u>Prepetition Second Lien Adequate Protection Superpriority Claims</u>") in each of the Chapter 11 Cases and such claims shall be payable from and have recourse to all prepetition property and post-petition property of the Debtors and shall be senior to any and all Other Administrative Expense Claims to the extent of any Second Lien Diminution in Value, but subject and junior to the Carve-Out, Prepetition First Lien Adequate Protection Claims, Prepetition First Lien Claims, and the DIP Superpriority Claims.<br><br>• <u>Second Lien Adequate Protection Payments</u>. As further adequate protection, the Debtors are authorized and directed to pay all reasonable and documented fees and expenses, subject to the applicable cap.<br><br>• <u>Right to Seek Additional Adequate Protection</u>. Subject to any applicable intercreditor agreement, section 507(b) of the Bankruptcy Code, and further Court order, the Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Second Lien Secured Parties to request further or alternative forms of adequate |

11

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | protection at any time or the rights of the Debtors or any other party to contest such request.<br><br>*See* Interim Dip Order ¶¶ 9, 10, 13, 20. |
| **Repayment Features**<br>Local Rule 4001-2(a)(i)(E) | The DIP Credit Agreement will contain mandatory and voluntary prepayment provisions determined in accordance with the Documentation Principles (including with respect to proceeds of debt and asset sales, insurance/condemnation events and other extraordinary receipts); *provided* that each prepayment or other payment of any DIP Loans shall be accompanied by payment in cash of the DIP Termination Payment due thereon.<br><br>*See* DIP Credit Agreement, Section 3.03. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Debtors agree to pay to the DIP Agent any amounts due in accordance with the terms of the fee letters, in accordance with the applicable terms thereof.<br><br>*See* DIP Credit Agreement, Section 5.06(a). |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br><br>**Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | <ul><li>The Debtors shall deliver to the Lenders, not less than two business days prior to the Closing Date, a weekly cash flow forecast for the 13-week period that (a) sets forth, on a line-item, cumulative and aggregate basis, the Debtors' projections for all weekly receipts and disbursements/expenditures (including debt service costs and operating disbursements) expected to be collected, incurred, or made (as the case may be) by the Debtors, in each case, during the period beginning with the calendar week ending on Friday of the week in which the Petition Date occurs and (b) is in all respects in form and substance reasonably satisfactory to the Lenders (such budget, as attached to the Credit Agreement in effect on the Closing Date, the "Initial Budget")</li><li>Not later than 1:00 p.m. New York City time every other Friday occurring after the Petition Date and thereafter commencing with Friday of the calendar week immediately after the Closing Date, (the "Budget Reporting Deadline"), the Debtors shall deliver to the Administrative Budget a supplement to the Approved Budget then in effect (each, a "Budget Supplement"), covering the (13) thirteen-week period commencing with Friday of the calendar week immediately preceding such Budget Reporting Deadline (provided that at any time following any agreement by the Majority Lenders to the use of an assumed effective date for purposes of the Budget Supplement, the Majority Lenders may request, and the Borrower shall agree to, the modification of the assumed effective date used for such purposes), the form, scope and level of detail of which Budget Supplement shall be consistent with the Initial Budget, and which Budget Supplement shall be otherwise in form and substance satisfactory to the Lenders in their sole discretion (as confirmed and approved in writing (including via email) by the DIP Agent) (each Budget Supplement, if, but solely if and upon, approved in accordance with the foregoing, an "Updated Budget"). For the avoidance of doubt, no Updated Budget shall become the Approved Budget unless and until approved by the Lenders, at their sole discretion which approval shall be deemed granted upon receipt by the Borrower or its counsel of written notice (which may be via email) of such consent from the Lenders or the Administrative Agent (at the Lenders' direction) (such approval or consent in accordance with the foregoing, the "Lender Consent"), and in the event that such Updated Budget is not so approved by the Lenders, the prior Approved Budget shall remain in effect; *provided*, however, that neither the Administrative Agent nor any of the Lenders shall have any obligation to approve any Budget Supplement or any</li></ul> |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Updated Budget, and, no modification to any Updated Budget or any Approved Budget, or any reforecasting of any information relating to any period covered by any other Updated Budget or any Approved Budget, as the case may be, shall in any event be effective without Lender Consent. |
| | • "Approved DIP Budget": (a) the Initial Budget, at all times, until superseded by an Updated Budget in accordance with (and subject to receipt of DIP Lender Consent and all other approvals required pursuant to) the DIP Credit Agreement, and (b) as of any time of determination thereafter, the most recent Budget Supplement (if any) that constitutes the Updated Budget in effect as of such time in accordance with (and subject to) receipt of DIP Lender Consent and all other approvals required pursuant to the DIP Credit Agreement; *provided*, that no Budget Supplement or other cash flow forecast shall in any event constitute an Approved DIP Budget unless, in addition to being in accordance with the terms hereof, the same is also sufficient to constitute the "Approved DIP Budget" for purposes of (and as such term or equivalent is defined in) the DIP Orders. |
| | • Not later than 1:00 p.m. New York City time every Friday (commencing with Friday of the week immediately following the week in which the Petition Date occurs) (each such Friday, a "Variance Report Deadline"), and on each Friday thereafter, the Obligors shall deliver to the Lenders a variance report, in each case, in form, scope and detail reasonably satisfactory to the Lenders (each such report, a "Variance Report") showing the difference, on a line-item basis, between (a)(i) actual operating and non-operating disbursements (excluding professional fees and expenses) for the immediately preceding calendar week (the "Applicable Period") and (ii) budgeted operating and non-operating disbursements (excluding professional fees and expenses) for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period) (such variance, a "Disbursements Variance"), (b)(i) actual operating and non-operating disbursements (excluding professional fees and expenses) plus actual operating receipts for the Applicable Period and (ii) budgeted operating and non-operating disbursements (excluding professional fees and expenses) plus actual operating receipts for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period), (such variance, a "Disbursements Plus Receipts Variance"), and (c)(i) actual professional fees and expenses for the Applicable Period and (ii) budgeted professional fees and expenses for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period), and the available cash on hand for the end of such week, in each case, for prior week, together with a reasonably detailed explanation of such Disbursements Variance, Disbursements Plus Receipts Variance and Professional Fee Variance. |
| | • The Loan Parties shall not permit the total Disbursement Variance (except for Restructuring Costs and Supplemental Fees (as defined in the Approved DIP Budget in effect for such Applicable Period)), on a rolling four-week basis, for any Applicable Period to exceed 15% (the foregoing, the "Permitted Variance") (the foregoing, as further set forth in the DIP Credit Agreement, the "DIP Budget Variance Covenant"). |
| | DIP Credit Agreement, Sections 8.02, 9.24. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Credit Agreement will contain defaults and events of default (each, an "Event of Default") determined in accordance with the Documentation Principles, including the additional defaults and events of default set forth on Annex II of the DIP Term Sheet.<br><br>Upon the occurrence of any Event of Default, then, and in every such event, and at any time thereafter during the continuance of such event but in all events subject to the applicable |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | DIP Order then in effect, the Administrative Agent may, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations, including the Termination Payments, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Obligor. <br><br> DIP Credit Agreement, Section 11.01, 11.02. |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | Under the DIP Credit Agreement, each Obligor, jointly and severally indemnifies the Administrative Agent (and any sub-agent thereof), the Lenders and their respective Affiliates, directors, officers, employees, attorneys, agents, advisors and controlling parties (each, an "Indemnified Party") from and against, and agrees to hold them harmless against, any and all Claims and Losses of any kind including reasonable and documented out of pocket fees and disbursements of any counsel for each Indemnified Party (limited to one legal counsel in each relevant jurisdiction), that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to (i) Agreement or any of the other Loan Documents or the Transactions, (ii) any use made or proposed to be made with the proceeds of the Loans, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Obligor or any of its Subsidiaries, or (iv) any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory, whether or not such investigation, litigation or proceeding is brought by any Obligor, any of its Subsidiaries, shareholders or creditors, an Indemnified Party or any other Person, or an Indemnified Party is otherwise a party thereto, and whether or not any of the conditions precedent set forth in Section 6 are satisfied or the other transactions contemplated by the DIP Credit Agreement are consummated, except to the extent such Claim or Loss is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  No Obligor shall assert any claim against any Indemnified Party, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to the DIP Credit Agreement or any of the other Loan Documents or any of the Transactions or the actual or proposed use of the proceeds of the Loans.  The Borrower, its Subsidiaries and Affiliates and their respective directors, officers, employees, attorneys, agents, advisors and controlling parties are each sometimes referred to in the DIP Credit Agreement as a "Borrower Party".  No Lender shall assert any claim against any Borrower Party, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to the DIP Credit Agreement or any of the other Loan Documents or any of the Transactions or the actual or proposed use of the proceeds of the Loans.  This Section shall not apply to Taxes other than Taxes relating to a non-Tax Claim or Loss. <br><br> *See* DIP Credit Agreement, Section 14.03(b). |
| **Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | The Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the Restructuring Support Agreement and shall, subject to the availability of the Bankruptcy Court, achieve the following milestones: <br><br> • no later than one (1) day after the Petition Date, the Debtors shall file an Acceptable Plan of Reorganization and related disclosure statement (the "Disclosure Statement"), the Disclosure Statement Motion, the Bidding Procedures, and the Bidding Procedures Motion; |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order; |
| | • no later than thirty-six (36) days after the Petition Date, the Bankruptcy Court shall have entered a Final DIP Order, a final order approving the Bidding Procedures, and an order approving the Disclosure Statement (each in form and substance satisfactory to the Consenting Stakeholders); |
| | • no later than fifty-five (55) days after the Petition Date, delivery by the Debtors to the Consenting Stakeholders of a go-forward business plan acceptable to the Consenting Stakeholders in their sole discretion, which shall include, in each case in form and substance acceptable to the Consenting Stakeholders (i) a substantially complete analysis of the liabilities proposed to be compromised through the chapter 11 cases, (ii) a substantially complete analysis of all matters relating to the assumption and assignment of all material contracts of the Debtors, including all material government contracts, intellectual property agreements, and any other material contracts of the kind or type described in section 363(c)(1)(a) of the Bankruptcy Code, including that no such contracts are subject to the consent of the contract counter-party in connection with such assumption and assignment or that, to the extent such consent is required, that such consent has been obtained or is reasonably likely to be obtained, (iii) a substantially complete analysis of the secured, administrative, and priority unsecured claims reasonably assertable against the Debtors, and (iv) a substantially complete analysis of claims reasonably assertable against the Debtors that are not or may not be dischargeable upon consummation of the Plan (the "Business Plan Milestone"); provided that the Business Plan Milestone shall only be met if the quantum and nature of any such claims or liabilities and all other information set forth in (i) through (iv) above is acceptable to the Consenting Stakeholders in all material respects; |
| | • no later than sixty (60) days after the Petition Date, the Bid Deadline shall have occurred; |
| | • no later than sixty-five (65) days after the Petition Date, the Auction (as defined in the Restructuring Support Agreement), if needed, shall have occurred; |
| | • no later than seventy-eight (78) days after the Petition Date, a hearing to consider confirmation of an acceptable Plan of Reorganization (the "Confirmation Hearing") shall have occurred, or, if the Initial Plan Sponsors have elected to pursue the Credit Bid Sale Restructuring, a hearing to consider approval of the proposed sale pursuant to section 363 pursuant to the Credit Bid Sale Restructuring (the "Sale Hearing"); |
| | • no later than two (2) days after the Confirmation Hearing, the Bankruptcy Court shall have entered a final order confirming the Plan of Reorganization (the "Confirmation Order"), in form and substance satisfactory to the Consenting Stakeholders (the "Confirmation Milestone"), or, if the Initial Plan Sponsors have elected to pursue the Credit Bid Sale Restructuring, a final order approving the sale pursuant to section 363 pursuant to the Credit Bid Sale Restructuring; and |
| | • no later than ten (10) days after entry of the Confirmation Order, the Plan Effective Date shall have occurred, or, if the Initial Plan Sponsors have elected to pursue the Credit Bid Sale Restructuring, closing of the Credit Bid Sale Restructuring shall have occurred. |
| | *See* DIP Credit Agreement, Section 8.03. |
| **Entities with Interests in Cash Collateral** | The following secured parties have an interest in Cash Collateral: |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(b)(l)(B)(i) | • DIP Secured Parties<br><br>• Prepetition Secured Parties<br><br>*See* Interim DIP Order ¶ E. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(f) | The DIP Orders shall include a customary professional fee "carve out" (the "<u>Carve Out</u>") of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in these chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, all as detailed in the Interim DIP Order.<br><br>*See* Interim DIP Order ¶ 11. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | The DIP Liens shall have the following priorities (subject in all cases to the Carve Out):<br><br>• <u>First Priority Lien On Any Unencumbered Property</u>.  Subject and subordinate only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition First Priority Liens or Permitted Prior Liens including (in each case, to the extent not subject to valid, perfected, and non-avoidable liens), all prepetition property and postpetition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including unencumbered cash (and any investment of such cash) of the Debtors (wherever held); all equipment, all goods, all inventory, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors (except to the extent any DIP Liens thereon would be prohibited by the applicable lease after giving effect to any applicable law regarding the enforceability of such prohibitions); patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing and, subject to entry of the Final DIP Order, all proceeds and property recovered in respect of Avoidance Actions (collectively, the "<u>Previously Unencumbered Property</u>"); <u>provided</u>, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law (including to the extent applicable law respects restrictions on the attachment of liens under the terms of applicable non-residential real property leases and agreements), the liens granted pursuant to the Interim DIP Order shall attach solely to the Debtors' economic rights, including any and all proceeds of the foregoing.<br><br>• <u>Liens Priming the Prepetition Liens</u>.  Subject and subordinate only to the Carve Out and Permitted Prior Liens, pursuant to section 364(d)(1) of the Bankruptcy Code, a |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all assets and property of the Debtors, subject to paragraph 8(c) of the Interim DIP Order; provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law (including to the extent applicable law respects restrictions on the attachment of liens under the terms of applicable non-residential real property leases and agreements), the liens granted pursuant to the Interim DIP Order shall attach solely to the Debtors' economic rights, including any and all proceeds of the foregoing. <br><br> • Liens Junior to Certain Other Liens.  Subject and subordinate only to the Carve Out and Permitted Prior Liens, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of paragraph 8 of the Interim DIP Order, as to which the liens and security interests in favor of the DIP Lenders will be as described in such clauses). <br><br> *See* Interim DIP Order ¶ 8. |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) <br><br> Local Rule 4001-2(a)(i)(C) | In light of the DIP Secured Parties' agreement to extend credit to the Debtors, the DIP Secured Parties have negotiated for, and the Debtors believe the DIP Secured Parties have negotiated for, and will seek in the Final DIP Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code in respect of the DIP Collateral, subject to the Carve-Out. <br><br> *See* Interim DIP Order, ¶ H. |
| **Section 552(b)** <br> Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-2(a)(i)(h) | The Prepetition First Lien Secured Parties shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code and the Prepetition First Lien Secured Parties have negotiated for, and the Debtors believe the Prepetition First Lien Secured Parties are entitled to, and will seek in the Final DIP Order, a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code, which shall not apply to the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring, or profits of any of the DIP Collateral (including the Prepetition Collateral). <br><br> *See* Interim DIP Order ¶ 41. |
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br><br> Local Rule 4001-2(a)(i)(B) | The DIP Orders shall contain stipulations by the Debtors with respect to the Prepetition Secured Obligations and the Prepetition Liens (including that the Prepetition First Lien Obligations and Prepetition Second Lien Obligations are valid and enforceable) that are usual and customary and otherwise satisfactory to the DIP Lenders (the "Stipulations"), and challenge provisions with respect to the Stipulations, in each case, as are usual and customary and otherwise reasonably satisfactory to the DIP Lenders. <br><br> *See* Interim DIP Order ¶ E. |
| **Waiver/Modification of Applicability of Non-bankruptcy Law Relating to Perfection or Enforceability of Liens** <br> Bankruptcy Rule 4001(c)(1)(B)(vii) | As of the Petition Date, the Prepetition First Priority Liens, (A) have been properly recorded and are valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Collateral (as defined in the Prepetition First Lien Term Loan Facility, the "Prepetition First Lien Collateral"), (B) are not subject to any offset, contest, objection, recovery, recoupment, reduction, defense, counterclaim, subordination, recharacterization, disgorgement, disallowance, avoidance, challenge, or any other claim or Cause of Action of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or other applicable law, (C) were granted to or for the benefit of the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations or consideration secured or obtained thereby, and (D) without giving effect to the Interim DIP Order, are senior with priority over any and all other liens on or security interests in the Prepetition First Lien Collateral, subject only to the relative rights and priorities set forth in the Intercreditor Agreement.<br><br>Prepetition Second Priority Liens: As of the Petition Date, liens and security interests securing the Prepetition Second Lien Term Loan Facility (the "Prepetition Second Priority Liens," and together with the Prepetition First Priority Liens, the "Prepetition Liens"), (A) have been properly recorded and are valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Collateral (as defined in the Prepetition Second Lien Term Loan Facility, the "Prepetition Second Lien Collateral", together with the Prepetition First Lien Collateral, the "Prepetition Collateral"), (B) are not subject to any offset, contest, objection, recovery, recoupment, reduction, defense, counterclaim, subordination, recharacterization, disgorgement, disallowance, avoidance, challenge, or any other claim or Cause of Action of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or other applicable law, (C) were granted to or for the benefit of the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations or consideration secured or obtained thereby, and (D) without giving effect to this Interim DIP Order, are senior with priority over any and all other liens on or security interests in the Prepetition Second Lien Collateral, subject only to Prepetition First Priority Liens and the relative rights and priorities set forth in the Intercreditor Agreement.<br><br>*See* Interim DIP Order ¶ E(iii). |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(B) | Sixty days following the entry of the Interim DIP Order.<br><br>*See* Interim DIP Order ¶ 14. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including:<br><br>• the execution, delivery, and performance of the DIP Loan Documents, including the DIP Credit Agreement, the Security Agreement (as defined in the DIP Credit Agreement) and any other Security Documents (as defined in the DIP Credit Agreement);<br><br>• the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders may reasonably agree), it being understood that no further Court approval shall be required for amendments, waivers, consents, or other modifications to and under the DIP Loan Documents or the DIP Obligations that do not shorten the maturity of the extensions |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; |
| | • the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Loan Documents, including (x) all fees and other amounts owed to the DIP Agent and the DIP Lenders and (y) all reasonable and documented costs and expenses as may be due from time to time, including the fees payable to the DIP Lenders for the New Money Loan Commitment Payment and the Termination Payment (each as defined in the DIP Credit Agreement), the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and the Interim DIP Order (whether incurred before or after the Petition Date), subject to Court approval; and |
| | • the performance of all other acts required under or in connection with the DIP Loan Documents, including pursuant to the Escrow Agreement. |
| | *See* Interim DIP Order ¶ 3(d). |

## The Debtors' Prepetition Capital Structure and Need for the DIP Facility

**I.    Prepetition Capital Structure.**

14.    As of the Petition Date, the Debtors have an aggregate principal amount of approximately $430 million in funded debt obligations, consisting of (a) the First Lien Term Loans, (b) the Second Lien Term Loans, and (c) certain secured financing secured by certain specified assets, (d) Promissory Notes (as defined herein), and (e) Convertible Indebtedness.

15.    SiO2 is a borrower under twelve debt facilities, each as more fully described below:

| *Funded Debt* | *Approximate     Outstanding Principal Amount* |
|---|---|
| **First Lien Term Loans** | **$225 million** |
| **Second Lien Term Loans** | **$35 million** |
| **Other Secured Debt** | **$57 million** |
| **Promissory Notes** | **$24 million** |
| **Three Convertible Debt Instruments** | **$89 million** |
| **Total Debt Obligations** | **$430 million** |

16.    The Company also has 182,020 shares of preferred stock and 57,500 shares of common stock issued and outstanding as of the Petition Date.

### A.    First Lien Term Loans.

17.    On December 21, 2021, the Debtors entered into that certain Credit Agreement and Guaranty as amended by the First Amendment and Limited Waiver to Credit Agreement and Guaranty, dated as of May 9, 2022, the Second Amendment and Limited Waiver to Credit Agreement and Guaranty, dated as of July 20, 2022, the Third Amendment and Limited Waiver to Credit Agreement and Guaranty and First Amendment to Security Agreement, dated as of December 7, 2022, the Letter Agreement, dated as of March 10, 2023, the Letter Agreement, dated as of March 17, 2023, the Letter Agreement, dated as of March 28, 2023, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof (the "First Lien Credit Agreement"), by and among (a) SiO2, as borrower, (b) Advanced Bioscience Consumables, Inc. and Advanced Bioscience Labware, Inc., as subsidiary guarantors, (c) the lenders party thereto from time to time (the "First Lien Term Loan Lenders"), and (d) Oaktree Fund Administration, LLC, as administrative agent for the First Lien Term Loan Lenders.

18.    The First Lien Term Loans are guaranteed by SiO2's Debtor subsidiaries Advanced Bioscience Consumables, Inc. and Advanced Bioscience Labware Inc.

19.    As of the Petition Date, term loans in an aggregate principal amount of approximately $225 million (the "First Lien Term Loans") are outstanding under the First Lien Credit Agreement, with a maturing on December 21, 2026.  The First Lien Term Loans are secured on a first priority basis by substantially all of the assets of the Debtors party to the First Lien Credit Agreement.

**B.      Second Lien Term Loans.**

20.      On December 7, 2022, the Debtors entered into that certain Second Lien Credit Agreement and Guaranty as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof (the "Second Lien Credit Agreement") by and among (a) SiO2, as borrower, (b) Advanced Bioscience Consumables, Inc. and Advanced Bioscience Labware, Inc., as subsidiary guarantors, (c) the lenders party thereto from time to time (the "Second Lien Term Loan Lenders"), and (d) Salzufer Holding Inc., as administrative agent for the Second Lien Term Loan Lender.  The Second Lien Term Loans are guaranteed by SiO2's subsidiaries Advanced Bioscience Consumables, Inc and Advanced Bioscience Labware, Inc.

21.      As of the Petition Date, term loans in an aggregate principal amount of approximately $35 million (the "Second Lien Term Loans") remain outstanding under the Second Lien Credit Agreement, with a maturity date of March 22, 2027.  The Second Lien Term Loans are subordinated to the First Lien Term Loans and are secured on a second priority basis by substantially all of the assets of the Debtors party to the Second Lien Credit Agreement pursuant to that certain Subordination and Intercreditor Agreement dated as of December 7, 2022, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof by and among Oaktree Fund Administration, LLC, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement, Salzufer Holding Inc., in its capacity as administrative agent under the Second Lien Credit Agreement, SiO2 and the Loan Parties under the First Lien Credit Agreement and Second Lien Credit Agreement.

**C.** **Other Secured Debt.**

22. The Debtors are party to certain financings secured by specified assets (the "Other Secured Debt"), including:

A. ***Renasant AR and Inventory Line.*** On February 26, 2021, the Company entered into that certain Amended and Restated Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Renasant AR and Inventory Credit Agreement") with Renasant Bank, as lender, which currently provides for (a) a purchased receivables credit facility (the "Renasant Receivables Facility") in an amount of up to $15 million and (b) a revolving credit facility (the "Renasant Inventory Line") in an amount of up to $10 million. The Renasant Receivables Facility is secured by a first priority lien on certain accounts receivable of the Company, and the Renasant Inventory Line is secured by a first priority lien on certain inventory of the Company. As of the Petition Date, $0 remains outstanding under the Renasant Receivables Facility, and approximately $10 million remains outstanding under the Renasant Inventory Line. The Renasant AR and Inventory Credit Agreement has a maturity date of April 6, 2023.

B. ***Southern States CapEx Line.*** On February 3, 2020, the Company entered into that certain Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Southern States Capital Expenditure Loan") with Southern States Bank, as lender. The Southern States Capital Expenditure Loan is

secured by a first priority lien on certain equipment, inventory and other property of the Company purchased with the proceeds thereof, certain contract rights related to equipment lines of the Company financed thereby and deposit accounts of the company held at Southern States Bank.  As of the Petition Date, approximately $12 million remains outstanding under the Southern States Capital Expenditure Loan, with a maturity date of August 5, 2025.

C. ***Southern States CARES Loan.***  On December 30, 2020, the Company entered into that certain Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Southern States CARES Loan") with Southern States Bank, as lender.  The Southern States CARES Loan is secured by a first priority lien on certain equipment, inventory and other property of the Company purchased with the proceeds thereof and deposit accounts of the company held at Southern States Bank.  As of the Petition Date, approximately $20 million remains outstanding under the Southern States CARES Loan, with a maturity date of December 30, 2030.

D. ***Klinge Equipment Note***.  On January 17, 2020, the Company entered into that certain Secured Promissory Note (the "Klinge Equipment Note") with Klinge Biopharma GmbH, as lender.  The Klinge Equipment Note is secured by a first priority lien on certain equipment of the Company financed thereby.  As of the Petition Date, approximately $14 million remains outstanding under the Klinge Equipment Note, with a maturity date of December 31, 2026.

**D.      Promissory Notes.**

23.      The Debtors are party to certain promissory notes issued from time to time (the "Promissory Notes"), including:

A.  That certain unsecured subordinated promissory note, dated as of May 9, 2022, with an aggregate principal amount of $7.9 million, by and among the Company and JMC Glass, with a maturity date of April 30, 2023;

B.  That certain unsecured subordinated promissory note, dated as of May 9, 2022, with an aggregate principal amount of $10.5 million, by and among the Company and Santo Holding GmbH, with a maturity date of April 30, 2023;

C.  That certain subordinated promissory note, with an aggregate principal amount of approximately $2.3 million, by and among the Company and A. Enterprises, LLC; and

D.  That certain senior promissory note, with an aggregate principal amount of $3.2 million, by and among the Company and A. Enterprises, LLC.

**E.      Convertible Indebtedness.**

24.      SiO2 has also issued convertible promissory notes (the "Convertible Promissory Notes") from time to time.   The Convertible Promissory Notes currently outstanding total approximately $89 million in the aggregate and mature on (a) April 30, 2023, (b) December 31, 2023, and (c) December 31, 2024, as applicable.   The Convertible Promissory Notes include the outstanding senior convertible notes issued by SiO2 pursuant to (x) that certain Single Promissory Note Purchase Agreement, dated as of April 6, 2018, by and among SiO2 and the other parties thereto, (y) that certain Promissory Note Purchase Agreement & Credit Facility, dated as of April

6, 2018, by and among SiO2 and the other parties thereto, and (z) that certain 2019 Promissory Note Purchase Agreement & Credit Facility, dated as of September 24, 2019 by and among SiO2 and the other parties thereto.

### F.    Equity.

25.    SiO2 is a privately-held company with a total capital raise of over $800 million. The Company has issued nine series and subseries of preferred stock and approximately 57,000 outstanding shares of common stock.  Series A Preferred Stock includes the following subseries: (a) Original Investor Series A Preferred Stock, issued to Patiro Holding AG ("Patiro"), JMC Glass, LLC ("JMC"), and Bernhard Hampl ("Bernhard"); (b) Original Investor 2017 Series A Preferred Stock, issued to Patiro, JMC, and Bernhard; (c) RSA 2017 Series A Preferred Stock, issued to the Teachers' Retirement System of Alabama and the Employees' Retirement System of Alabama; (d) Patiro 2017 Series A Preferred Stock, issued to Patiro; (e) Enterprises 2017 Preferred Stock issued to A Enterprises, LLC; and (f) Subseries 6 Series A Preferred Stock with no shares issued or outstanding.  The Company also Series B Preferred Stock issued to Doosan Corporation and Series C Preferred Stock issued to Patiro.  The common stock is held by Robert S. Abrams, with approximately 10,000 shares, and A. Enterprises, LLC., with approximately 47,500 shares.

## II.    Alternative Sources of Financing Are Not Readily Available.

26.    The Debtors do not have any alternative sources of financing readily available with terms better than those included in the DIP Facility.  The Debtors and their advisors engaged with numerous parties to potentially fund these chapter 11 cases.  Specifically, Lazard contacted approximately eight third-party financial institutions and four existing investors to determine whether any of these parties would be willing to provide postpetition financing to the Debtors. *See*

Cowan Decl. ¶ 8.  No party other than Oaktree provided the Debtors with an executable out-of-court or postpetition financing facility.  *Id.*

27.     The terms of the DIP Facility are reasonable under the circumstances.  The DIP Facility is the product of good-faith, robust arm's-length negotiations and is necessary for the Debtors to maximize value on behalf of their constituents in these chapter 11 cases.  *See* Cowan Decl. ¶ 9.  Accordingly, the DIP Facility is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasonable business judgment.  *See* Cowan Decl. ¶ 14.

## Basis for Relief

**III.    The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

### A.    Entry into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment.

28.     The Court should authorize the Debtors, as a sound exercise of their business judgment, to execute and deliver the DIP Documents and to obtain access to the DIP Facility. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

29.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

30.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable.  Certainly, many of them favor the DIP Lender(s).  But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  Courts may also appropriately take into consideration noneconomic benefits to a debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to

obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

31.      The Debtors' decision to move forward with the DIP Facility is a sound exercise of their business judgment following an arm's-length process and careful evaluation of alternatives. Specifically, the Debtors and their advisors determined that postpetition financing will create adequate liquidity necessary for the administration of these chapter 11 cases and to conduct a robust marketing process. The Debtors negotiated the DIP Credit Agreement and other DIP Documents with the DIP Lender(s) in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances. *See* Cowan Decl. ¶ 14. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a sound exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

32.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. More specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the Collateral (as defined in the Interim DIP Order), which include substantially all of the Debtors' assets.

33.      The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain

unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

A. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.*, by allowing a lender only an administrative claim;

B. the credit transaction is necessary to preserve the assets of the estate; and

C. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC*, 457 B.R. at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

34.     As described above and as set forth in the Cowan Declaration, the Debtors recognized that it would be particularly difficult to secure financing because time was limited, all of the Debtors' cash and material assets are encumbered by existing liens under their prepetition debt, and their prepetition lenders indicated that they would not consent to a "priming" DIP financing provided by a third party. *See* Cowan Decl. at Decl. ¶ 7. In light of this, the Debtors and Lazard understood that to obtain third-party DIP financing, the Debtors might require engaging in a protracted and costly priming fight or valuation dispute with their prepetition lenders at the very outset of these chapter 11 cases. *Id.* And regardless of the prospects of success, the expense and disruption associated with complex litigation on the first day would seriously

jeopardize the Debtors' reorganization efforts, as already strained liquidity would be required to fund such a fight. *Id.*

35.     Absent the DIP Facility, which will provide sufficient liquidity to administer these chapter 11 cases, *see See* Bullock Decl. ¶ 12, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate, all as more fully set forth below. For all these reasons, the Debtors have met the standard for obtaining postpetition financing.

36.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court may:

> authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lender(s) is reasonable and appropriate.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

37.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*,

100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

38.     The Debtors do not believe that alternative sources of financing are reasonably available given the circumstances and the Debtors' unsuccessful solicitation of alternative financing proposals. *See* Cowan Decl. ¶ 11.  The Debtors have searched for actionable alternative proposals and, in this regard, the market has spoken.   There are no better options. *See* Cowan Decl. ¶ 14.  Thus, the Debtors have determined that the DIP Facility provides the most favorable terms while reducing execution risks and providing the incremental liquidity necessary to conduct a robust marketing process during the chapter 11 cases.  *Id.*  Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path to pursue a value-maximizing marketing and sale process. Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.     The Roll-Up is Appropriate.**

39.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in

the Third Circuit that such transactions should be approved when they are supported by a sound

business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the

Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b)

of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business

justification for the proposed transaction).  The business judgment rule shields a debtor's

management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business

by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

     40.     Repaying prepetition debt (often referred to as a "roll-up") is a common feature in

debtor-in-possession financing arrangements.  The importance of "roll-up" features in DIP

facilities has been repeatedly recognized by courts in this district and others, and such courts have

granted relief similar to the relief requested herein.  *See, e.g.*, *In re Extraction Oil & Gas, Inc.*, No.

20-11548 (CSS) (authorizing an approximately $50 million DIP facility including a $20 million

roll-up); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Jul. 23, 2019)

(authorizing an approximately $240 million DIP facility, including a $100 million roll-up of the

prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim

order); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an

approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding

principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim

order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018)

(authorizing approximately $338 million DIP and a roll-up of approximately $150 million,

including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores,*

*Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order).[6]

41.    As set forth above, the DIP Credit Agreement provides that, subject to entry of the Interim Order, the DIP Facility will be used to roll up up to $60 million of the Debtors' prepetition debt under their capital structure.  This repayment is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP Facility.  Without continued access to the additional liquidity provided under the DIP Facility necessary to fund the administration of these chapter 11 cases and the sale process.

42.    As discussed herein and in the Cowan Declaration, these fees and the Roll-Up Amount were the subject of arm's-length and good-faith negotiations between the Debtors and Oaktree, are integral components of the overall terms of the DIP Facility, and were required by Oaktree as considerations for the extension of postpetition financing. *See* Cowan Declaration ¶ 12.  Given volatility in the Debtors' receipts, the Debtors' projected cash burn, and the fact no other party has put forward an actionable financing proposal, among other reasons, the Roll-Up pursuant to the Interim Order is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and ultimately in the best interest of all stakeholders given the alternatives.

## IV.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lender(s) Under the DIP Documents.

43.    Under the DIP Credit Agreement, the Debtors will, subject to Court approval, pay certain fees to each of the DIP Agent and DIP Lender(s).  These fees are customary and reasonable under the circumstances.  Additionally, they are comparable to fees agreed upon in similar DIP

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

financings.  There is ample justification for this Court to approve the payment of such fees, which are part of the DIP Documents.  Thus, they should not be viewed separately but rather as a part of the overall, substantial benefits provided under the DIP Facility.

**V.      The DIP Lender(s) Should Be Deemed Good-Faith Lenders Under Section 364(e) of the Bankruptcy Code.**

44.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

45.     As explained herein and the Cowan Declaration, the DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lender(s) offered the most favorable terms on which to obtain vital postpetition financing, and (b) arm's-length, good-faith negotiations between the Debtors, DIP Agent, and DIP Lender(s).  The DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and the DIP Documents. Furthermore, no consideration is being provided to any party to the DIP Documents other than as described herein.

46.     Accordingly, the Court should find that the DIP Lender(s) are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded therein.

## VI.    The Automatic Stay Should Be Modified on a Limited Basis.

47.    The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Agent to file financing statements, security agreements, mortgages, leasehold mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens (as defined in the Interim DIP Order).  The proposed Interim DIP Order further provides that the automatic stay be modified to the extent necessary to implement the terms of the Interim DIP Order.

48.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Town Sports Int'l, LLC*, No. 12-12168 (CTG) (Bankr. D. Del. Oct. 2, 2020) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same); *In re APC Auto. Tech. Intermediate Holdings Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Jun. 3, 2020) (same).[7]

## VII.    Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.

49.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

50.    For the reasons noted above and in the Cowan Declaration and Bullock Declaration, the Debtors have an immediate need for the liquidity provided by the DIP Facility. *See* Bullock Decl. ¶ 10.  The proposed DIP Facility is critical to the Debtors' ability to fund its operations and the marketing process while providing sufficient liquidity without creating a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases. *See* Cowan Decl. ¶ 14.  *See also* Bullock Decl. ¶ 6.  The DIP Facility is an essential component to funding the Debtors and providing a path to emergence and is critical to reassure customers and vendors and protect operations.  *Id.*

51.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## **Request for Final Hearing**

52.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after twenty-one days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## **Notice**

53.    The Debtors will provide notice of this motion to:  (a) the United States Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United

States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) First Lien Credit Agreement Agent and counsel thereto; (j) the Second Lien Credit Agreement Agent and counsel thereto; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

54.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request that the Court enter the DIP Orders, (a) granting the

relief requested herein and (b) granting such other relief as the Court deems appropriate under the

circumstances.

Dated:  March 29, 2023

/s/ Justin R. Alberto

Seth Van Aalten (*pro hac vice* pending)
Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
Stacy L. Newman (No. 5044)
**COLE SCHOTZ P.C.**
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:     (302) 652-3131
Facsimile:     (302) 652-3117
Email:          svanaalten@coleschotz.com
                jalberto@coleschotz.com
                preilley@coleschotz.com
                snewman@coleschotz.com

-and-

Brian Schartz, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          bschartz@kirkland.com

-and-

Joshua M. Altman (*pro hac vice* pending)
Dan Latona (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          josh.altman@kirkland.com
                dan.latona@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*