## EXHIBIT B

**Proposed Interim DIP Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SIO2 MEDICAL PRODUCTS, INC., *et al.*,[1] | ) | Case 23-10366 (JTD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: [•]** |
|  | ) |  |
|  | ) |  |

---

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING;
(II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES; (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING
FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

Upon the *Motion of Debtors for Entry of Interim and Final DIP Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Modifying the Automatic Stay; (VI) Scheduling Final Hearing; and (VII) Granting Related Relief* [Docket No. [•]] (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (the "Interim DIP Order") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510). The location of the Debtors' principal place of business and service address in these chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Motion or the DIP Credit Agreement (as defined herein).

and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rules 2002-1(b), 4001-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), among other things:

    (i)    authorizing SiO2 Medical Products, Inc., in its capacity as borrower (the "<u>DIP Borrower</u>"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the Debtors, other than the DIP Borrower, the "<u>DIP Guarantors</u>," and together with the DIP Borrower, the "<u>DIP Loan Parties</u>") on a joint and several basis, the DIP Borrower's obligations in connection with a multi-draw senior secured super-priority priming term loan debtor-in-possession credit facility in the aggregate principal amount of up to $120 million (the "<u>DIP Facility</u>," and the commitments thereunder, the "<u>DIP Commitments</u>" and the loans made thereunder, the "<u>DIP Loans</u>") subject to the terms and conditions set forth in that certain *Multi-draw Senior Secured Super-priority Priming Debtor-in-Possession Credit Agreement and Guaranty* attached hereto as **<u>Exhibit A</u>** (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among the DIP Borrower, as borrower, the DIP Guarantors, as guarantors, the several financial institutions or entities from time to time party thereto as Lenders (as defined in the DIP Credit Agreement) (the "<u>DIP Lenders</u>"), and Oaktree Fund Administration, LLC, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, the "<u>DIP Agent</u>," and together with the DIP Lenders and all holders of all other DIP Obligations (as defined below), the "<u>DIP Secured Parties</u>"), consisting of:

        (a)    <u>New Money Loans</u>. A multi-draw senior secured super-priority priming term loan debtor-in-possession credit facility in an aggregate principal amount not to exceed $60 million (the "<u>New Money Loan Commitments</u>" and the term loans made thereunder, the "<u>New Money Loans</u>"), consisting of, subject to the DIP Credit Agreement:

            (1)    upon entry of the Interim DIP Order, one or more draws in an aggregate principal amount not exceeding $12,327,000 (the "<u>Interim New Money Loans</u>"); *provided* that each such draw shall be limited to the amount necessary to finance disbursements projected to be made during the two-week period commencing with the date of the applicable draw as set forth in the Approved Budget (as defined in the DIP Credit Agreement) (subject to Permitted Variances) in effect at the time such draw is requested; and

            (2)    upon entry of the Final DIP Order (as defined below), additional draws in an aggregate principal amount that will not, when combined with amounts advanced prior to such date, exceed the

remaining unfunded New Money Loan Commitments (the "Final New Money Loans"), *provided* that each such draw shall be limited to the amount necessary to finance disbursements projected to be made during the two-week period commencing with the date of the applicable draw as set forth in the Approved Budget (subject to Permitted Variance) in effect at the time such draw is requested; and

(b)    Roll-Up Loans. Upon approval of the Interim DIP Order, concurrently with each borrowing of New Money Loans, the DIP Lenders shall be entitled to roll up their ratable share of Prepetition First Lien Secured Obligations in an amount equal to 100% of the amount of New Money Loans borrowed under such New Money Loan borrowing (the "Roll-Up Amount"), consisting of a portion of the aggregate principal amount of Prepetition First Lien Secured Obligations outstanding under the Prepetition First Lien Term Loan Agreement as of the date of such New Money Loan borrowing along with all accrued and unpaid interest, premiums and fees thereon (including the Prepayment Premium (as defined in the Prepetition First Lien Term Loan Facility (as defined below)) as of the date of such New Money Loan borrowing (the aggregate amount of all Prepetition First Lien Secured Obligations rolled up by the DIP Lenders shall be the "Roll-Up Loans", and the obligations thereunder, the "DIP Roll-Up Obligations", and the Prepetition First Lien Secured Obligations that are not rolled up into the Roll-Up Loans shall be the "Remaining Prepetition First Lien Secured Obligations"). Subject to entry of the Final DIP Order, the Roll-Up Loans shall be automatically deemed funded pursuant to the DIP Credit Agreement (on a cashless, dollar-for-dollar basis) and shall constitute DIP Obligations on the day of such roll-up becomes effective, without constituting a novation, and shall satisfy and discharge an equal amount of Prepetition First Lien Secured Obligations as if a payment in such amount had been made under the Prepetition First Lien Term Loan Facility on such date. The Roll-Up Loans shall be deemed to be made by each DIP Lender (the "Roll-Up Lenders") in an amount equal to such DIP Lender's pro rata share of the aggregate amount of the Prepetition First Lien Secured Obligations owing to all Roll-Up Lenders on the Closing Date and the outstanding aggregate amount of the Prepetition First Lien Secured Obligations held by any such DIP Lender shall be automatically and irrevocably deemed reduced by the amount of the Roll-Up Loans.

(ii)    authorizing the Debtors to execute, deliver, and perform under the DIP Credit Agreement, the security agreement, and any other related documents, including pledge agreements, mortgages, guaranties, promissory notes, certificates, instruments, and such other documents that may be reasonably necessary, desirable or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agent (collectively, as such may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Loan Documents"), each of which shall be in form and substance satisfactory to the DIP Secured Parties; and to perform such

other acts as may be reasonably necessary, desirable or appropriate in connection with the DIP Loan Documents;

(iii)    granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (a) DIP Liens (as defined below) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3),  and (d) of the Bankruptcy Code, which DIP Liens shall be, subject to the Carve Out (as defined below), senior to all liens, security interests, and pledges on the DIP Collateral, except for only Permitted Prior Liens (as defined below) and (b) DIP Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code, subject and subordinate to the Carve Out;

(iv)    authorizing and directing the Debtors to pay all principal, interest, fees, costs, expenses, and other amounts payable under the DIP Loan Documents as such become due and payable, as provided and in accordance therewith;

(v)    authorizing the Debtors to use Cash Collateral (as defined below), including any Cash Collateral in which any or all of the Prepetition Secured Parties (as defined below) have a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim DIP Order, or otherwise, in accordance with the Interim DIP Order, the Approved Budget, and the DIP Loan Documents (including the DIP Credit Agreement);

(vi)    authorizing the Debtor to perform such other and further acts as may be necessary or desirable in connection with the Interim DIP Order, the DIP Loan Documents (including the DIP Credit Agreement) and the transactions contemplated hereby and thereby, subject to the Interim DIP Order and the Approved Budget;

(vii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim DIP Order;

(viii)    granting adequate protection to the Prepetition Secured Parties as provided in this Interim DIP Order;

(ix)    scheduling a final hearing (the "Final Hearing") within thirty days of entry of this Interim DIP Order to consider entry of a final order that grants all of the relief requested in the Motion on a final basis (the "Final DIP Order"), and approving the form of notice with respect to the Final Hearing; and

(x)    providing for the immediate effectiveness of this Interim DIP Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the Motion, the *Declaration of Yves Steffen, Chief Executive Officer of*

*SiO2 Medical Products, Inc.,  in Support of Chapter 11 Filing and First Day Motions* [Docket No.

[•]] (the "First Day Declaration"), the *Declaration of Tyler Cowan in Support of Motion of Debtors*

*for Entry of Interim and Final DIP Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Modifying The Automatic Stay; (VI) Scheduling Final Hearing; and (VII) Granting Related Relief* [Docket No. [•]] (the "Cowan Declaration"), the *Declaration of R. Seth Bullock, Interim Chief Financial Officer of SiO2 Medical Products, Inc., in Support of Chapter 11 Filing and First Day Motions* [Docket No. [•]] (the "Bullock Declaration") and evidence submitted or proffered at the hearing on the Motion held on [•], 2023 (the "Interim Hearing"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and the Court having determined that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having determined that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the Motion, the First Day Declaration, the Cowan Declaration, the Bullock Declaration,  and the arguments of counsel at the Interim Hearing; and the Court having found that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rules 4001 and 6003; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates, creditors, and other parties in interest; and it appearing that the Debtors' entry into the DIP Facility is a sound and prudent exercise of the Debtors' business judgment; and the Court having found that proper and adequate notice of the Motion and Interim Hearing thereon has been given under the

circumstances and that no other or further notice is necessary for the interim relief requested in the Motion; and the Court having found that good and sufficient cause exists for the granting of the relief requested in the Motion after having given due deliberation to the Motion and all of the proceedings had before the Court in connection with the Motion, **THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.  <u>Petition Date</u>. On March [29], 2023 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"), commencing the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>").

B.  <u>Debtors in Possession</u>. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

C.  <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue of the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, 7007-1, 9013-1, 9013-4, and 9014-2.

---

[3]    Where appropriate in this Interim DIP Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

D.     Committee. As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not yet appointed an official committee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, "Committee").

E.     Debtors' Stipulations. In requesting the DIP Facility and the use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lenders and the Prepetition Secured Parties to agree to provide, or consent to, the DIP Facility, the Debtors' access to the Cash Collateral, and subordination of the Prepetition First Priority Liens and the Prepetition Second Priority Liens to the Carve Out and the DIP Liens (which DIP Liens shall be subject and subordinate to the Carve Out) and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral, subject to the rights of the parties-in-interest (other than the Debtors) set forth in paragraph 14 hereof, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows (collectively, the "Debtors' Stipulations"):

Debtors' Stipulations for Prepetition First Lien Secured Parties

(i)     Prepetition First Lien Term Loan Facility. Pursuant to that certain Credit Agreement and Guaranty, dated as of December 21, 2021 (as amended, or otherwise modified from time to time prior to, and as in effect on, the date hereof, the "Prepetition First Lien Term Loan Facility"), by and among, SiO2, as borrower, the subsidiaries of SiO2 party thereto as Subsidiary Guarantors (as defined therein), the lenders party thereto (the "Prepetition First Lien Lenders"), and Oaktree Fund Administration, LLC, as administrative agent (the "Prepetition First Lien Term Loan Agent," and together with the Prepetition First Lien Lenders, the "Prepetition First Lien Secured Parties"), the Debtors incurred indebtedness to the Prepetition First Lien Lenders (the "Prepetition First Lien Claims").

(ii)    Prepetition First Lien Secured Obligations. As of the Petition Date, each of the Debtors was justly and lawfully indebted and liable to the Prepetition First Lien Lenders, without defense, counterclaim, or offset of any kind, in the aggregate amount of not less than $[•] on account of principal amount of loans outstanding under the Prepetition First Lien Term Loan Facility (including interest that was payable in kind and added to the principal amount in accordance with the Prepetition First Lien Term Loan Facility prior to the Petition Date), plus any and all unpaid interest (including default interest), premium (including $[•] of the

Prepayment Fee (as defined in the Prepetition First Lien Term Loan Facility) that became due and payable on the Petition Date), reimbursement obligations, fees, costs, expenses (including attorneys' fees, financial advisors' fees, related expenses, and disbursements), charges, disbursements, indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, in each case, to the extent provided in the Prepetition First Lien Term Loan Facility (the "Prepetition First Lien Secured Obligations").

(iii)   Prepetition First Priority Liens: As of the Petition Date, liens and security interests securing the Prepetition First Lien Term Loan Facility (the "Prepetition First Priority Liens"), (A) have been properly recorded and are valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Collateral (as defined in the Prepetition First Lien Term Loan Facility, the "Prepetition First Lien Collateral"), (B) are not subject to any offset, contest, objection, recovery, recoupment, reduction, defense, counterclaim, subordination, recharacterization, disgorgement, disallowance, avoidance, challenge, or any other claim or Cause of Action[4] of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or other applicable law, (C) were granted to or for the benefit of the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations or consideration secured or obtained thereby, and (D) without giving effect to this Interim DIP Order, are senior with priority over any and all other liens on or security interests in the Prepetition First Lien Collateral, subject only to the relative rights and priorities set forth in the Intercreditor Agreement (as defined below).

(iv)   Prepetition First Lien Collateral. To secure the Prepetition First Lien Secured Obligations, the Debtors entered into certain security agreements and other instruments, including the Security Agreement, dated as of December 21, 2021, and the other Security Documents (as defined in the Prepetition First Lien Term Loan Facility) (collectively, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including any related mortgages and deeds of trust, the "Prepetition First Lien Collateral Documents"). Pursuant to the Prepetition First Lien Collateral Documents, the Debtors granted to the Prepetition First Lien Term Loan Agent, for

---

[4]   As used in this Interim DIP Order, "Causes of Action" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, or offset of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the entry of this Interim DIP Order, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.

the benefit of their respective Prepetition First Lien Secured Parties, the Prepetition First Priority Liens on the Prepetition First Lien Collateral.

(v)    <u>Cash Collateral</u>. Subject to certain exceptions set out in the Prepetition First Lien Term Loan Facility, any and all of the Debtors' cash, including all amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition First Lien Collateral or deposited into the Debtors' banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition First Lien Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").

(vi)    <u>Bank Accounts</u>. The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "<u>Cash Management Order</u>").

(vii)    <u>No Control</u>. None of the Prepetition First Lien Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Prepetition First Lien Secured Obligations.

(viii)    <u>Prepetition First Lien Secured Obligations</u>. The Prepetition First Lien Secured Obligations owing to the Prepetition First Lien Secured Parties (including, from and after the deemed funding of the Roll-Up Loans, the Remaining Prepetition First Lien Secured Obligations) constitute legal, valid, and binding obligations of the Debtors and their non-Debtor affiliate, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition First Lien Secured Obligations owing to the Prepetition First Lien Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any cases under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").

(ix)    <u>Prepetition First Priority Liens</u>. The Prepetition First Priority Liens granted to the Prepetition First Lien Term Loan Agent on behalf of the Prepetition First Lien Secured Parties (including from and after the deemed funding of the Roll-Up Loans and the Prepetition First Lien Term Loan Facility, which shall continue in effect to secure the Remaining Prepetition First Lien Secured Obligations) (1) constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement

arising from section 362 of the Bankruptcy Code), and perfected first-priority security interests in and liens on the Prepetition First Lien Collateral, (2) encumber all of the Prepetition First Lien Collateral, as the same existed on the Petition Date, (3) were granted to, or for the benefit of, the applicable Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby, (4) are entitled to adequate protection as set forth herein, and (5) are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(x)     <u>No Challenges/Claims</u>. No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition First Priority Liens or Prepetition First Lien Secured Obligations exist, and no portion of the Prepetition First Priority Liens or Prepetition First Lien Secured Obligations is subject to any challenge or defense including impairment, set-off, avoidance, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (equitable or otherwise), attack, offset, defense, counterclaims or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their respective estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition First Lien Term Loan Facility, the Prepetition First Lien Secured Obligations, the Prepetition First Priority Liens, or otherwise, whether arising at law or at equity, including any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

(xi)    <u>Enforceability of the Intercreditor Agreement and Subordination Agreement</u>. The Prepetition First Lien Term Loan Agent, the Debtors and Salzufer Holding, Inc. (the "<u>Prepetition Second Lien Term Loan Agent</u>") are party to that certain Subordination and Intercreditor Agreement, dated as of December 7, 2022, as amended from time to time prior to the date hereof (the "<u>Intercreditor Agreement</u>"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Loan Parties with respect to, among other things, the Prepetition First Lien Collateral. The Prepetition First Lien Term Loan Agent, Santo Holding (Deutschland) GmbH and JMC Glass, LLC are further party to that certain Subordination Agreement, dated as of September 8, 2022 (the "<u>Subordination Agreement</u>"). Pursuant to section 510(a) of the Bankruptcy Code, the Intercreditor Agreement, the Subordination Agreement and any other applicable intercreditor or subordination provisions contained in the Prepetition First Lien Term Loan Facility, (A) shall remain in full force and effect, (B) continue to govern the relative obligations, priorities, rights, and remedies of the Prepetition First Lien Secured

Parties and the Prepetition Second Lien Loan Parties with respect to any shared or common collateral, and (C) shall not be deemed to be amended, altered, or modified by the terms of this Interim DIP Order except to the extent expressly set forth below.

(xii)  <u>Default</u>. The Debtors are in default under the Prepetition First Lien Term Loan Facility, and an event of default has occurred under the Prepetition First Lien Term Loan Facility.

(xiii)  <u>Good Faith</u>. The Prepetition First Lien Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of granting the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents relating to any and all transactions contemplated by the foregoing.

<u>Debtors' Stipulations for Prepetition Second Lien Secured Parties</u>

(i)  <u>Prepetition Second Lien Term Loan Facility</u>. Pursuant to that certain Second Lien Credit Agreement and Guaranty, dated as of December 7, 2022 (as amended,  or otherwise modified from time to time prior to, and as in effect on, the date hereof, the "<u>Prepetition Second Lien Term Loan Facility</u>," and together with the Prepetition First Lien Term Loan Facility, the "<u>Prepetition Term Loan Facilities</u>") , by and among, SiO2, as borrower, the subsidiaries of SiO2 party thereto as Subsidiary Guarantors (as defined therein), the lenders party thereto (the "<u>Prepetition Second Lien Lenders</u>") and Prepetition Second Lien Term Loan Agent (together with the Prepetition Second Lien Lenders, the "<u>Prepetition Second Lien Secured Parties</u>," and together with the Prepetition First Lien Secured Parties, the "<u>Prepetition Secured Parties</u>"), the Debtors incurred indebtedness to the Prepetition Second Lien Lenders.

(ii)  <u>Prepetition Second Lien Secured Obligations</u>. As of the Petition Date, each of the Debtors was justly and lawfully indebted and liable to the Prepetition Second Lien Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate amount of not less than $36,281,000 on account of principal amount of loans outstanding under the Prepetition Second Lien Term Loan Facility (including interest that was payable in kind and added to the principal amount in accordance with the Prepetition Second Lien Term Loan Facility prior to the Petition Date), plus any and all unpaid interest (including default interest), premium [(including $[•] of the Prepayment Fee that became due and payable on the Petition Date)], reimbursement obligations, fees, costs, expenses (including attorneys' fees, financial advisors' fees, related expenses, and disbursements), charges, disbursements, indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, in each case, to the extent provided in the Prepetition Second Term Loan Facility (the "<u>Prepetition Second Lien Secured Obligations</u>," and together

with the Prepetition First Lien Secured Obligations, the "<u>Prepetition Secured Obligations</u>").

(iii)  <u>Prepetition Second Priority Liens</u>: As of the Petition Date, liens and security interests securing the Prepetition Second Lien Term Loan Facility (the "<u>Prepetition Second Priority Liens</u>," and together with the Prepetition First Priority Liens, the "<u>Prepetition Liens</u>"), (A) have been properly recorded and are valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Collateral (as defined in the Prepetition Second Lien Term Loan Facility, the "<u>Prepetition Second Lien Collateral</u>", together with the Prepetition First Lien Collateral, the "<u>Prepetition Collateral</u>"), (B) are not subject to any offset, contest, objection, recovery, recoupment, reduction, defense, counterclaim, subordination, recharacterization, disgorgement, disallowance, avoidance, challenge, or any other claim or Cause of Action of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or other applicable law, (C) were granted to or for the benefit of the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations or consideration secured or obtained thereby, and (D) without giving effect to this Interim DIP Order, are senior with priority over any and all other liens on or security interests in the Prepetition Second Lien Collateral, subject only to Prepetition First Priority Liens and the relative rights and priorities set forth in the Intercreditor Agreement.

(iv)  <u>Prepetition Second Lien Collateral</u>. To secure the Prepetition Second Lien Secured Obligations, the Debtors entered into certain security agreements and other instruments, including the Security Agreement, dated as of December 21, 2021, and the other Security Documents) (collectively, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including any related mortgages and deeds of trust, the "<u>Prepetition Second Lien Collateral Documents</u>"). Pursuant to the Prepetition Second Lien Collateral Documents, the Debtors granted to the Prepetition Second Lien Term Loan Agent, for the benefit of their respective Prepetition Second Lien Secured Parties, the Prepetition Second Priority Liens on the Prepetition Second Lien Collateral subject to the terms of the Intercreditor Agreement.

(v)  <u>Cash Collateral</u>. Subject to certain exceptions set out in the Prepetition Second Lien Term Loan Facility and subject to the Intercreditor Agreement, any and all of the Debtors' cash, including all amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Second Lien Collateral or deposited into the Debtors' banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition Second Lien Secured Parties' Cash Collateral.

(vi)     <u>Bank Accounts</u>. The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to the Cash Management Order.

(vii)    <u>No Control</u>. None of the Prepetition Second Lien Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Prepetition Second Lien Secured Obligations.

(viii)   <u>Prepetition Second Lien Secured Obligations</u>. The Prepetition Second Lien Secured Obligations owing to the Prepetition Second Lien Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Second Lien Secured Obligations owing to the Prepetition Second Lien Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases.

(ix)     <u>Prepetition Second Priority Liens</u>. The Prepetition Second Priority Liens granted to the Prepetition Second Lien Term Loan Agent on behalf of the Prepetition Second Lien Secured Parties (1) constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected second-priority security interests in and liens on the Prepetition Second Lien Collateral, (2) encumber all of the Prepetition Second Lien Collateral, as the same existed on the Petition Date, (3) were granted to, or for the benefit of, the applicable Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby, (4) are entitled to adequate protection as set forth herein, and (5) are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(x)      <u>No Challenges/Claims</u>. No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Second Priority Liens or Prepetition Second Lien Secured Obligations exist, and no portion of the Prepetition Second Priority Liens or Prepetition Second Lien Secured Obligations is subject to any challenge or defense including impairment, set-off, avoidance, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (equitable or otherwise), attack, offset, defense, counterclaims or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their respective Estates have no valid Claims (as such term is defined in section

101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Prepetition Second Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Second Lien Term Loan Facility, the Prepetition Second Lien Secured Obligations, the Prepetition Second Priority Liens, or otherwise, whether arising at law or at equity, including any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

(xi) <u>Default</u>. The Debtors are in default under the Prepetition Second Lien Term Loan Facility, and an event of default has occurred under the Prepetition Second Lien Term Loan Facility.

(xii) <u>Good Faith</u>. The Prepetition Second Lien Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of granting the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents relating to any and all transactions contemplated by the foregoing.

F. <u>Cash Collateral</u>. All of the Debtors' cash (subject to certain exceptions set out in the Prepetition Term Loan Facilities), including any cash in deposit accounts of the Debtors, wherever located, as well as all proceeds of the Prepetition Term Loan Facilities held by the Prepetition First Lien Term Loan Agent, constitutes Cash Collateral of the Prepetition Secured Parties. For the avoidance of doubt, the DIP Lenders and Prepetition Secured Parties each consent to the Debtors' use of the cash in the Liquidity Reserve Account (as defined in the Prepetition First Lien Term Loan Facility) and the DIP Lenders consent to Renasant Bank's release of such amounts from the Liquidity Reserve Account to a bank account at the Debtors' direction, in each case, subject to the Approved Budget, the DIP Loan Documents, this Interim DIP Order and the Final DIP Order.

G. <u>Findings Regarding Postpetition Financing and Use of Cash Collateral</u>.

(a)      The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing to provide financing to the Debtors subject to: (i) for the Interim New Money Loans, entry of this Interim DIP Order and, for the Final New Money Loans, the Final DIP Order; (ii) Court approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; (iii) satisfaction or waiver of the closing conditions set forth in the DIP Loan Documents; and (iv) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Secured Parties are extending credit to the Debtors pursuant to the DIP Loan Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim DIP Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(b)      The Debtors have an immediate and critical need to obtain (i) postpetition financing pursuant to the DIP Facility and (ii) permission to use Cash Collateral (solely to the extent consistent with the Approved Budget, subject to any Permitted Variance set forth herein and in the DIP Credit Agreement), in order to, among other things, permit the orderly continuation of the operation of their business, to maintain business relationships, to make capital expenditures, to pay professional fees, to satisfy other working capital and operational needs, to pursue a restructuring of the Debtors' business (either through a plan of reorganization or the sale of the business as a going concern), for the benefit of the Debtors' stakeholders. The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers requires the availability of working capital from the DIP Facility and Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and financing to preserve the value of their businesses without the ability to borrow under the DIP Facility and use Cash

Collateral. The Debtors and their estates will be immediately and irreparably harmed if the financing under the DIP Facility is not obtained pursuant to the terms of this Interim DIP Order and, as applicable, the DIP Loan Documents, or if the Debtors are unable to use Cash Collateral. Entry of this Interim DIP Order is necessary and appropriate to avoid such harm to the Debtors, their estates, and other parties in interest.

(c)     The Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility. The Debtors are unable to obtain, pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, (i) unsecured credit allowable under section 503(b) of the Bankruptcy Code as an administrative expense, (ii) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (iii) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. The Debtors are further unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without as provided for herein (x) granting to the DIP Secured Parties the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claim (as defined below), (y) granting the Prepetition First Lien Secured Parties the rights, remedies, privileges, benefits and protections provided herein, including the First Lien Adequate Protection Liens, and (z) granting to the Prepetition Second Lien Secured Parties the rights, remedies, privileges, benefits and protections provided herein, including the Second Lien Adequate Protection Liens in each case, subject to the Carve Out as provided in this Interim DIP Order. The Roll-Up Loans are an integral part of the DIP Facility, without which the DIP Lenders would be unwilling to extend the New Money Loan Commitments.

(d)     The DIP Facility and this Interim DIP Order have been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, including all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim DIP Order or any provision hereof is vacated or reversed or modified on appeal, and any liens or claims granted to, or payments made to, the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such reversal or modification of this Interim DIP Order shall be governed in all respects by the original provisions of this Interim DIP Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(e)     Subject to paragraph 13 below, the Debtors have agreed to provide to each of the Prepetition First Lien Secured Parties (including, from and after the deemed funding of the Roll-Up Loans, the Prepetition First Lien Secured Parties with respect to the Prepetition First Priority Liens, which shall continue in effect to secure the Remaining Prepetition First Lien Secured Obligations), and Prepetition Second Lien Secured Parties with respect to the Prepetition Second Priority Liens, which shall continue in effect to secure the Prepetition Second Lien Secured Obligations pursuant to sections 105, 361, 362,  and 363(e) of the Bankruptcy Code, adequate

protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in the value thereof.

(f)     In light of the Prepetition Secured Parties' agreement to subordinate their respective liens and superpriority claims to the DIP Obligations and the Carve Out and to permit the use of their Cash Collateral as set forth herein, upon entry of the Final DIP Order, each of the Prepetition Secured Parties shall be entitled to, the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the DIP Collateral or such Prepetition Collateral, as applicable.

(g)     Holders constituting Majority Lenders (as such term is defined in the Prepetition First Lien Term Loan Facility) and Majority Lenders (as such term is defined in the Prepetition Second Lien Term Loan Facility) have consented to, conditioned on the entry of this Interim DIP Order, the Debtors' incurrence of the DIP Facility, and proposed use of Cash Collateral on the terms and conditions set forth in this Interim DIP Order, including the terms of the adequate protection provided for in this Interim DIP Order.

H.     Section 506(c). In light of the DIP Secured Parties' agreement to extend credit to the Debtors on the terms described herein, the DIP Secured Parties have negotiated for and the Debtors and DIP Secured Parties will seek in the Final DIP Order a waiver of the provisions of section 506(c) of the Bankruptcy Code in respect of the DIP Collateral, subject to the Carve Out.

I.     Business Judgment and Good Faith Pursuant to Section 364(e). The terms and conditions of the DIP Facility, the DIP Loan Documents, and the fees paid and to be paid thereunder to the DIP Secured Parties, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured postpetition financing to debtors

in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Good cause has been shown for entry of this Interim DIP Order, and entry of this Interim DIP Order is in the best interests of the Debtors and their estates, creditors, and other stakeholders. The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors. Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made or extended in good faith by the DIP Secured Parties, within the meaning of section 364(e) of the Bankruptcy Code and shall be entitled to the full protection of section 364(e). The Prepetition Secured Parties have agreed to the use of Cash Collateral in good faith, and the Prepetition Secured Parties shall be entitled to the full protection of sections 363(m) of the Bankruptcy Code in the event that this Interim DIP Order or any provision hereof is reversed or modified on appeal. Based on the Motion, the First Day Declaration, the Cowan Declaration, and the Bullock Declaration, and on the record presented at the Interim Hearing, the terms of the DIP Facility are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

J.     <u>Notice</u>. Proper, timely, adequate, and sufficient notice of the interim relief requested in the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, whether by facsimilie, email, overnight courier, and or hand delivery, to certain parties in interest, including: (a) the United States Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors

operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Prepetition First Lien Term Loan Agent and counsel thereto; (j) the Second Lien Credit Agreement Agent and counsel thereto; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. No other or further notice of the Motion with respect to the relief requested at the Interim Hearing or entry of this Interim DIP Order is or shall be required.

K.      <u>Immediate Entry</u>. The Debtors have requested immediate entry of this Interim DIP Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003. Absent entry of this Interim DIP Order, the Debtors' businesses, and estates would be immediately and irreparably harmed. This Court concludes that entry of this Interim DIP Order is in the best interests of the Debtors' respective estates and stakeholders and sufficient cause exists for immediate entry of this Interim DIP Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      <u>Interim Financing Approved</u>. The Motion is GRANTED on an interim basis as set forth herein.

2.      <u>Objections Overruled</u>. Any objections, reservations of rights, or other statements with respect to entry of the Interim DIP Order, to the extent not withdrawn or resolved, are OVERRULLED on the merits.

3.      <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)    The DIP Borrower and the DIP Guarantors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Loan Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates, and agreements as may be reasonably required or requested by the DIP Secured Parties or the Prepetition First Lien Secured Parties to implement the terms or effectuate the purposes of this Interim DIP Order and the DIP Loan Documents and to effectuate the funding of the Roll-Up Loans and deemed repayment of a corresponding amount of Prepetition First Lien Secured Obligations. To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Loan Documents in good faith, and in all respects such DIP Loan Documents shall be, subject to the terms of this Interim DIP Order and the Final DIP Order, consistent with the terms of the DIP Credit Agreement and otherwise reasonably acceptable to the DIP Agent (acting at the direction of the required lenders under and pursuant to the DIP Credit Agreement (the "Required DIP Lenders")) and the Required DIP Lenders. Upon entry of this Interim DIP Order, the Interim DIP Order, the DIP Credit Agreement, and other DIP Loan Documents shall govern and control the DIP Facility. The DIP Agent is hereby authorized to execute and enter into its respective obligations under the DIP Loan Documents, subject to the terms and conditions set forth therein and this Interim DIP Order. Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Loan Documents and this Interim DIP Order, the terms and conditions of this Interim DIP Order shall govern and control.

(b)    Upon entry of this Interim DIP Order, the DIP Borrower is hereby authorized to borrow, and the DIP Guarantors are hereby authorized to guaranty, borrowings up

to an aggregate principal amount of $12,327,000 of New Money Loans, which will be made available to the DIP Borrower on or after the date of this Interim DIP Order, subject to, and in accordance with, this Interim DIP Order.

(c)     Pursuant to the terms of this Interim DIP Order and the DIP Loan Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Loan Documents and this Interim DIP Order, and in accordance with the Approved Budget, subject to any Permitted Variance as set forth in this Interim DIP Order and the DIP Loan Documents. Attached as **Exhibit B** hereto and incorporated herein by reference is a budget prepared by the Debtors and approved by the Required DIP Lenders in accordance with the DIP Credit Agreement (the "Initial Budget"), which, for the avoidance of doubt, shall constitute an "Approved Budget."

(d)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including:

(1)     the execution, delivery, and performance of the DIP Loan Documents, including the DIP Credit Agreement, the Security Agreement (as defined in the DIP Credit Agreement), and any other Security Documents (as defined in the DIP Credit Agreement);

(2)     the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the

Debtors, the DIP Agent, and the Required DIP Lenders may reasonably agree), it being understood that no further Court approval shall be required for amendments, waivers, consents, or other modifications to and under the DIP Loan Documents or the DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(3)     the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Loan Documents, including (x) all fees and other amounts owed to the DIP Agent and the DIP Lenders and (y) all reasonable and documented costs and expenses as may be due from time to time, including the fees payable to the DIP Lenders for the New Money Loan Commitment Payment and the Termination Payment (each as defined in the DIP Credit Agreement), the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Interim DIP Order (whether incurred before or after the Petition Date), including, for the avoidance of doubt, (a) Sullivan & Cromwell LLP (as counsel to the DIP Lenders), Young Conaway Stargatt & Taylor LLP (as local bankruptcy counsel to the DIP Lenders), Houlihan Lokey Capital, Inc., and any other professionals necessary to represent the interests of the DIP Lenders in connection with the Chapter 11 Cases (collectively, the "DIP Lender Advisors"); and (b) Sullivan & Cromwell LLP, as counsel to the DIP Agent; and, to the extent necessary to exercise its rights and fulfill its obligations under the DIP Loan Documents, one counsel to the DIP Agent in each local jurisdiction, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph 20 of this Interim DIP Order; and

(4)     the performance of all other acts required under or in connection with the DIP Loan Documents, including pursuant to the Escrow Agreement.

(e)     Upon entry of this Interim DIP Order and subject and subordinate to the Carve Out, such DIP Loan Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of this Interim DIP Order for all purposes

during the Chapter 11 Cases and any Successor Cases. No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim DIP Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All payments or proceeds remitted (a) to or on behalf of the DIP Agent on behalf of any DIP Secured Parties or (b) subject to paragraph 13 below, to or on behalf of any Prepetition First Lien Secured Parties or Prepetition Second Lien Secured Parties, in each case, pursuant to the DIP Loan Documents, the provisions of this Interim DIP Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under sections 506(c) and the "equities of the case" exception of section 552(b), in each case subject to the entry of the Final DIP Order granting such relief).

(f)    The DIP Guarantors are hereby authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim DIP Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

4.    <u>Approved Budget</u>. The proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the DIP Loan Documents and the Approved Budget, subject to the Permitted Variance. The Debtors shall comply in all respects with the terms of the DIP Loan Documents with respect to, among other things, the delivery and compliance with the Approved

Budget and all obligations related thereto, including by delivering to the Prepetition First Lien Term Loan Agent and the Prepetition Second Lien Term Loan Agent the Initial Budget and any subsequent Budget Supplement (each as defined in the DIP Credit Agreement), each of which shall be subject to the approval by the DIP Lenders as set forth in the DIP Credit Agreement.

5.     <u>Budget and Variance Reporting</u>. The Debtors will deliver to the DIP Agent, the Prepetition First Lien Term Loan Agent, the Prepetition Second Lien Term Loan Agent, and the DIP Lender Advisors a supplement to the Approved Budget then in effect (each, a "<u>Budget Supplement</u>"), in addition to a variance report, in each case, in form, scope and detail satisfactory to the Required DIP Lenders, at such times as required and set forth in the DIP Credit Agreement.

6.     <u>Access to Records</u>. The Debtors shall provide the DIP Lender Advisors, the Prepetition First Lien Term Loan Agent, the Prepetition Second Lien Term Loan Agent with all reporting and other information required to be provided to the DIP Agent under the DIP Loan Documents. In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Loan Documents, upon reasonable advance notice to counsel to the Debtors (email being sufficient), at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (a) inspect the Debtors' assets, and (b) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to such information as they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would

not be permitted by any applicable requirements of law or any binding agreement entered into prior to the date of this Interim DIP Order that would violate confidentiality obligations.

7.     <u>DIP Superpriority Claims</u>. Subject and subordinate only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims of the DIP Secured Parties against each of the Debtors' estates (the "<u>DIP Superpriority Claims</u>") (without the need to file any proof of claim) to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise to the extent allowable under the Bankruptcy Code, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions (as defined below)), including, subject to and upon entry of the Final DIP Order,  any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "<u>Avoidance Actions</u>"). Except as set forth in this Interim DIP Order or the Final DIP Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

8.     <u>DIP Liens</u>. As security for the DIP Obligations, effective and perfected upon the date of this Interim DIP Order, and without the necessity of the execution, recordation of filings

by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified in clause (a) and (b) below being collectively referred to as the "DIP Collateral"), subject and subordinate only to (x) valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior to the liens or security interests of the Prepetition First Lien Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition First Lien Term Loan Facility, liens on assets that did not constitute Prepetition First Lien Collateral and liens that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, including that certain note of Klinge Biopharma GmbH in the approximate principal amount of $11,972,971 which is secured by certain equipment, solely with respect to such equipment (the "Permitted Prior Liens"), and (y) the Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim DIP Order and the DIP Loan Documents, the "DIP Liens"):

(a)      First Priority Lien On Any Unencumbered Property. Subject and subordinate only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition First Priority Liens or Permitted Prior Liens including (in each case, to the extent not subject to valid, perfected, and non-avoidable liens), all prepetition property and postpetition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether

arising from section 552(b) of the Bankruptcy Code or otherwise, including unencumbered cash (and any investment of such cash) of the Debtors (wherever held); all equipment, all goods, all inventory, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors (except to the extent any DIP Liens thereon would be prohibited by the applicable lease after giving effect to any applicable law regarding the enforceability of such prohibitions); patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing and, subject to entry of the Final DIP Order, all proceeds and property recovered in respect of Avoidance Actions (collectively, the "Previously Unencumbered Property"); provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law (including to the extent applicable law respects restrictions on the attachment of liens under the terms of applicable non-residential real property leases and agreements), the liens granted pursuant

to this Interim DIP Order shall attach solely to the Debtors' economic rights, including any and all proceeds of the foregoing.

(b)      Liens Priming the Prepetition Liens. Subject and subordinate only to the Carve Out and Permitted Prior Liens, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all assets and property of the Debtors, subject to paragraph (c) below; provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law (including to the extent applicable law respects restrictions on the attachment of liens under the terms of applicable non-residential real property leases and agreements), the liens granted pursuant to this Interim DIP Order shall attach solely to the Debtors' economic rights, including any and all proceeds of the foregoing.

(c)      Liens Junior to Certain Other Liens. Subject and subordinate only to the Carve Out and Permitted Prior Liens, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 8, as to which the liens and security interests in favor of the DIP Lenders will be as described in such clauses).

9.      Adequate Protection for the Prepetition First Lien Secured Parties.

(a)      Subject to paragraph 13 below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, the Debtors have agreed to provide the Prepetition First Lien Secured Parties adequate protection of their interests in the Prepetition First Lien Collateral (including Cash Collateral), solely to the

extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "First Lien Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition First Lien Collateral, the Carve Out, the Debtors' use of the Prepetition First Lien Collateral (including Cash Collateral), and the imposition of the automatic stay (each Prepetition First Lien Lender's claim for such First Lien Diminution in Value, a "Prepetition First Lien Adequate Protection Claim"). On account of such Prepetition First Lien Adequate Protection Claims, the Prepetition First Lien Term Loan Agent, for the benefit of itself and the Prepetition First Lien Secured Parties for which it serves as Prepetition Agent, is hereby granted the following (collectively, the "Prepetition First Lien Adequate Protection Obligations"):

(b)     Prepetition First Lien Adequate Protection Liens. As security for any First Lien Diminution in Value of the Prepetition First Lien Collateral, subject and subordinate only to the Carve Out and the DIP Liens, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim DIP Order (together, the "Prepetition First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final DIP Order granting such relief, any proceeds or property recovered from Avoidance Actions. Subject to the terms of this Interim DIP Order, the Prepetition First Lien Adequate Protection Liens shall be (A) with respect to the Prepetition First Lien Collateral, whether now existing or hereafter arising or acquired, subject and subordinate only to the Carve Out, the Permitted Prior Liens and the DIP Liens, (B) with respect to assets that did not constitute Prepetition First Lien Collateral but were

subject to Permitted Prior Liens, subject and subordinate only to the Carve Out, the DIP Liens and the Permitted Prior Liens and (C) with respect to Previously Unencumbered Property, subject and subordinate only to the Carve Out and the DIP Liens. The Prepetition First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code). Upon the deemed funding of the Roll-Up Loans pursuant to the terms of this Interim DIP Order, the Prepetition First Lien Adequate Protection Liens shall continue to secure the Remaining Prepetition First Lien Secured Obligations.

(c)      Prepetition First Lien Adequate Protection Superpriority Claims. As further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Prepetition First Lien Adequate Protection Claims shall be, subject and subordinate to the Carve Out, allowed superpriority administrative expense claims in each of the Chapter 11 Cases ("Prepetition First Lien Adequate Protection Superpriority Claims"). The Prepetition First Lien Adequate Protection Superpriority Claims shall be payable from and have recourse to all prepetition property and postpetition property of the Debtors and shall be senior to any and all other administrative expense claims in such Chapter 11 Cases now existing or hereafter arising, of any kind or nature whatsoever, including administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final DIP Order granting such relief), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code ("Other Administrative Expense Claims") to the extent of any First Lien Diminution in Value and subject to the DIP Superpriority Claims.

(d)     <u>Prepetition First Lien Adequate Protection Payments</u>. As further adequate protection, the Debtors are authorized and directed to pay (1) postpetition monthly interest payments in kind to the Prepetition First Lien Term Loan Agent, on behalf of the Prepetition First Lien Lenders, in an amount equal to the accrued and unpaid interest at the non-default interest rate and as otherwise provided under the Prepetition First Lien Term Loan Facility (including, for the avoidance of doubt, payment of all prepetition accrued and unpaid interest under the Prepetition First Lien Term Loan Facility); *provided* that unless otherwise required by the Prepetition First Lien Term Loan Agent, all such postpetition interest may be "paid-in-kind" by adding accrued and unpaid interest to the outstanding principal amount of the Prepetition First Lien Secured Obligations on the last business day of each month (which capitalized interest shall constitute principal for all purposes under the Prepetition First Lien Term Loan Facility), and (2) in accordance with the terms of paragraph 20 of this Interim DIP Order, all reasonable and documented fees and expenses (the "First Lien <u>Adequate Protection Fees</u>") of the Prepetition First Lien Secured Parties, whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 3(d)(3) hereof, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Interim DIP Order, including, for the avoidance of doubt, of (i) Sullivan & Cromwell LLP, as counsel to the DIP Agent, Prepetition First Lien Term Loan Agent and Prepetition First Lien Secured Parties, (ii) Young Conaway Stargatt & Taylor, LLP, and (iii) Houlihan Lokey Capital, Inc. (all payments described in (1) and (2) hereof, the "First Lien <u>Adequate Protection Payments</u>"). None of the First Lien Adequate Protection Fees or First Lien Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any

interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(e)    <u>Right to Seek Additional Adequate Protection</u>. Subject to any applicable intercreditor agreement and further Court order, this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition First Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any First Lien Diminution in Value of their interests in the Prepetition First Lien Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any First Lien Diminution in Value of their respective interests in the Prepetition First Lien Collateral (including the Cash Collateral).

(f)    <u>Other Covenants</u>. The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order approving the Debtors' cash management motion or any further Court order. The Debtors shall comply with the covenants contained in the DIP Credit Agreement regarding conduct of business, including preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations, and intellectual property rights material to the conduct of their business and the maintenance of properties and insurance.

(g)    <u>Reporting Requirements</u>. As additional adequate protection to the Prepetition First Lien Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Credit Agreement and shall provide all such reports, documents, and other information to the Prepetition First Lien Term Loan Agent.

(h)    <u>Miscellaneous</u>. Except for the Carve Out and as otherwise provided in paragraph 7, the Prepetition First Lien Adequate Protection Liens and Prepetition First Lien Adequate Protection Claims granted to the Prepetition First Lien Secured Parties pursuant to this Interim DIP Order shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including pursuant to section 551 or otherwise, and shall not be subordinate to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including pursuant to section 364 or otherwise in the Chapter 11 Cases or any Successor Cases, including any subsequently converted Chapter 11 Case of the Debtors to a case under Chapter 7 of the Bankruptcy Code.

10.    <u>Adequate Protection for the Prepetition Second Lien Secured Parties</u>.

(a)    Subject to paragraph 13 below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, the Debtors have agreed to provide the Prepetition Second Lien Secured Parties adequate protection of their interests in the Prepetition Second Lien Collateral (including Cash Collateral), solely to the extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "<u>Second Lien Diminution in Value</u>" and together with the First Lien Diminution in Value, the "<u>Diminution in Value</u>"), resulting from the imposition of the priming DIP Liens on the Prepetition Second Lien Collateral, the Carve Out, the

Debtors' use of the Prepetition Second Lien Collateral (including Cash Collateral), and the imposition of the automatic stay (each Prepetition Second Lien Loan Party's claim for such Second Lien Diminution in Value, a "Prepetition Second Lien Adequate Protection Claim") and together with the Prepetition First Lien Adequate Protection Claims, the "Adequate Protection Claims"). On account of such Prepetition Second Lien Adequate Protection Claims, the Prepetition Second Lien Term Loan Agent, for the benefit of itself and the Prepetition Second Lien Secured Parties, is hereby granted the following adequate protection obligations (collectively, the "Prepetition Second Lien Adequate Protection Obligations," and together with the Prepetition First Lien Adequate Protection Obligations, the "Adequate Protection Obligations").

(b)     Prepetition Second Lien Adequate Protection Liens. As security for any Second Lien Diminution in Value of the Prepetition Second Lien Collateral and the DIP Liens, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim DIP Order (together, the "Prepetition Second Lien Adequate Protection Liens," and together with the Prepetition First Lien Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final DIP Order granting such relief, all proceeds or property recovered from Avoidance Actions. Subject to the terms of this Interim DIP Order, the Prepetition Second Lien Adequate Protection Liens shall be (A) with respect to the Prepetition Second Lien Priority Collateral, whether now existing or hereafter arising or acquired, subject and subordinate only to the Carve Out, the DIP Liens, the Prepetition First Lien Adequate Protection Liens, Prepetition First Priority Liens, and the Permitted Prior Liens, (B) with respect

to assets that did not constitute Prepetition Second Lien Priority Collateral but were subject to Permitted Prior Liens, subject and subordinate only to the Carve Out, the DIP Liens, the Prepetition First Lien Adequate Protection Liens, Prepetition First Priority Liens and the Permitted Prior Liens and (C) with respect to Previously Unencumbered Property, subject and subordinate only to the Carve Out, the DIP Liens, the Prepetition First Lien Adequate Protection Liens, and the Permitted Prior Liens. The Prepetition Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code); provided that in no event shall the Prepetition Second Lien Adequate Protection Liens be senior or pari passu with the DIP Liens, the Prepetition First Lien Adequate Protection Liens or the Prepetition First Priority Liens.

(c)    Prepetition Second Lien Adequate Protection Superpriority Claims. As further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Prepetition Second Lien Adequate Protection Claims shall be allowed superpriority administrative expense claims (the "Prepetition Second Lien Adequate Protection Superpriority Claims") in each of the Chapter 11 Cases, and such claims shall be payable from and have recourse to all prepetition property and post-petition property of the Debtors and shall be senior to any and all Other Administrative Expense Claims to the extent of any Second Lien Diminution in Value, but subject and junior to the Carve-Out, Prepetition First Lien Adequate Protection Claims, Prepetition First Lien Claims, and the DIP Superpriority Claims.

(d)    Second Lien Adequate Protection Payments. As further adequate protection, the Debtors are authorized and directed to pay in accordance with the terms of

paragraph 20 all reasonable and documented fees and expenses (the "Second Lien Adequate Protection Fees," and together with the First Lien Adequate Protection Fees, the "Adequate Protection Fees") of the Prepetition Second Lien Secured Parties, whether incurred before or after the Petition Date, including all reasonable and documented fees and expenses of its counsel and other professionals retained by or for the benefit of the Prepetition Second Lien Secured Parties, provided, that such counsel shall be limited to (i) Katten Muchin Rosenman LLP, as counsel to the Prepetition Second Lien Term Loan Agent and Prepetition Second Lien Secured Parties, and (ii) Delaware counsel for the Prepetition Second Lien Term Loan Agent (all payments described hereof, the "Second Lien Adequate Protection Payments,") and together with the First Lien Adequate Protection Payments, the "Adequate Protection Payments"); provided further, that the Second Lien Adequate Protection Payments shall be limited to fees and expenses incurred (x) on behalf of the Prepetition Second Lien Agent  or (y) in connection with facilitating the Chapter 11 Cases or the related restructuring support agreement and in any event shall not exceed $250,000. None of the Second Lien Adequate Protection Fees or Second Lien Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(e)    Right to Seek Additional Adequate Protection. Subject to any applicable intercreditor agreement and further Court order, this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Second Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate

protection provided to the Prepetition Second Lien Secured Parties is insufficient to compensate for any Second Lien Diminution in Value of their interests in the Prepetition Second Lien Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Second Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Second Lien Secured Parties against any Second Lien Diminution in Value of their respective interests in the Prepetition Second Lien Collateral (including the Cash Collateral).

(f)    <u>Miscellaneous</u>. Except for (i) the Carve Out, and (ii) as otherwise provided in paragraphs 7 and 9, the Prepetition Second Lien Adequate Protection Liens and Prepetition Second Lien Adequate Protection Claims granted to the Prepetition Second Lien Secured Parties pursuant to this Interim DIP Order shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including pursuant to section 551 or otherwise, and shall not be subordinate to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including pursuant to section 364 or otherwise in the Chapter 11 Cases or any Successor Cases, including any subsequently converted Chapter 11 Case of the Debtors to a case under Chapter 7 of the Bankruptcy Code.

11.    <u>Carve Out</u>.

(a)    <u>Priority of Carve Out</u>. Subject to the terms and conditions contained in this paragraph 11, each of the DIP Liens, DIP Superpriority Claims, Prepetition First Priority Liens, Prepetition Second Priority Liens, Adequate Protection Liens, and Adequate Protection Claims shall each be subject to and subordinate to payment of the Carve Out. The Carve Out shall have

such priority claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Collateral.

        (b)      <u>Definition of Carve Out</u>. As used in this Interim DIP Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (and any monthly, restructuring, or sale fees to the extent earned prior to the date of the Carve Out Trigger Notice) (the "<u>Allowed Professional Fees</u>") incurred by (or payable to) persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery of the Carve Out Trigger Notice by the DIP Agent at the direction of the Required DIP Lenders or at the direction of the Prepetition First Lien Secured Parties (as defined below)  (whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,500,000 incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or at the direction of the Prepetition First Lien Secured Parties (as defined below) after repayment of the DIP Obligations in full) of the Carve Out Trigger Notice (as defined below), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of

any prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses  (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) to the Debtors, their lead restructuring counsel (Kirkland & Ellis LLP and Cole Schotz PC), the U.S. Trustee, the Prepetition First Lien Term Loan Agent, and counsel to the Committee (to the extent one has been appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(a) Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given to the Debtors with a copy to counsel to the Committee (if any) (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facility (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding DIP New Money Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date,

the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP New Money Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP New Money Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding DIP New Money Loan Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP

Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP New Money Loan Commitments have been terminated, in which case any such excess shall be paid to the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Loans have been indefeasibly paid in full, in cash, and all DIP New Money Loan Commitments have been terminated, in which case any such excess shall be paid to the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim DIP Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 10, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 10, prior to making any payments to the DIP Agent or the Prepetition First Lien Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Interim DIP Order,

(i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, and (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim DIP Order, the DIP Facility, or in any Prepetition First Lien Term Loan Facility, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition First Lien Secured Obligations.

(b)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(c)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, the DIP Lenders, the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases. Nothing in this Interim DIP Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar- for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim DIP Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

12.    <u>Establishment of Escrow Account</u>. Upon entry of the Interim DIP Order and until the Termination Date, the Debtors shall deposit into escrow in the bank account ending in 7626 the Professional Fees on a weekly basis in the amounts and in accordance with the schedule as set forth in the Approved Budget, including fees billed by the hour, fees billed by the month, and on account of any transaction fees (only to the extent earned prior to the Termination Date), as same may be described in any engagement letter between the Debtors and its professionals, and expenses; *provided* that such amounts shall not be construed as a limit or cap on the allowable amount of Professional Fees. Any and all amounts in the escrow account shall be held in trust for the benefit of Professional Persons and shall not be subject to any cash sweep and/or foreclosure provisions in the DIP Documents or in this Interim DIP Order. The Debtors shall use funds held in such escrow account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; <u>provided</u> that when all Allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the escrow account shall revert to the Debtors for use in a manner consistent with the DIP Credit Agreement and this Interim DIP Order.

13.     <u>Reservation of Rights of the DIP Agent, DIP Lenders, Prepetition First Lien Secured Parties, and Prepetition Second Lien Secured Parties</u>. Subject only to the Carve Out and Permitted Prior Liens, notwithstanding any other provision in this Interim DIP Order or the DIP Loan Documents to the contrary, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties to seek any other or supplemental relief in respect of the Debtors,  including the right to seek additional adequate protection at and following the Final Hearing; <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the Carve Out, and the claims and liens of the DIP Secured Parties granted under this Interim DIP Order and the DIP Loan Documents and in the case of the Prepetition Second Lien Secured Parties, the claims and liens of the Prepetition First Lien Secured Parties granted under this Interim DIP Order and the Loan Documents (as defined in the Prepetition First Lien Term Loan Facility the "Prepetition First Lien Loan Documents"); (b) any of the rights of the DIP Secured Parties,  the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties under the DIP Loan Documents, the Prepetition First Lien Term Loan Facility,  the Prepetition Second Lien Term Loan Facility, any intercreditor agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including the right of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties (subject to this Interim DIP Order and the Intercreditor Agreement) to request modification of the automatic stay of section 362 of the Bankruptcy Code or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties,  the Prepetition First Lien Secured Parties  or Prepetition Second Lien Secured Parties. The delay in or failure of the DIP Secured Parties the

Prepetition First Lien Secured Parties and/or the Prepetition Second Lien Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties',  the Prepetition First Lien Secured Parties' and/or the Prepetition Second Lien Secured Parties' rights and remedies; provided that the Prepetition Second Lien Secured Parties' rights and remedies shall be exercised in a manner consistent with the Intercreditor Agreement..  Notwithstanding anything herein to the contrary, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Debtors, the Committee (if any), or any other party in interest to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim DIP Order.

14.     Reservation of Certain Committee and Third-Party Rights and Bar of Challenges and Claims. Subject to the Challenge Period (as defined herein), the stipulations, admissions, waivers, and releases contained in this Interim DIP Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date. The stipulations, admissions, and waivers contained in this Interim DIP Order, including the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court,  has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations, including regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any of the Prepetition First

Lien Secured Parties  or Prepetition Second Lien Secured Parties; (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition First Lien Secured Obligations or Prepetition Second Lien Secured Obligations; (c) asserting or prosecuting any so-called "lender liability" claims, avoidance actions or any other claim, counter claim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Prepetition First Lien Secured Parties, or Prepetition Second Lien Secured Parties  or their respective representatives (any such claim, a "Challenge") and (ii) in which the Court enters a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed Challenge. A Challenge must be filed on or prior to sixty days following entry of this Interim DIP Order (the "Challenge Period" and the date of expiration of the Challenge Period, the "Challenge Period Termination Date"). Upon the occurrence of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is withdrawn or filed and overruled): (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition First Lien Secured Obligations and Prepetition Second Lien Secured Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Chapter 11 Cases and any Successor Cases; (c) the Prepetition First Priority Liens and Prepetition Second Lien Priority Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected liens and security interests, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and

admissions contained in this Interim DIP Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition First Lien Secured Parties' and Prepetition Second Lien Secured Parties' claims, liens, and interests contained in this Interim DIP Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any Successor Cases. Furthermore, if any such Challenge is timely and properly filed under the Bankruptcy Rules then (a) any claim or action that is not brought shall forever be barred and (b) the stipulations and admissions contained in this Interim DIP Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such Challenge prior to the Challenge Period Termination Date (and solely as to the plaintiff party that timely filed such Challenge and not, for the avoidance of doubt, any other party-in-interest). Nothing in this Interim DIP Order vests or confers on any person (as defined in the Bankruptcy Code), including any Committee appointed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including any challenges (including a Challenge) with respect to the Prepetition First Lien Term Loan Facility, the Prepetition First Priority Liens, the Prepetition First Lien Secured Obligations, Prepetition Second Lien Term Loan Facility, the Prepetition Second Priority Liens, the Prepetition Second Lien Secured Obligations and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest; provided, however, that nothing herein prohibits the Prepetition First Lien Secured Parties and/or Prepetition Second Lien Secured

Parties from contesting any request to obtain standing on any other grounds that applicable law permits.

15.    <u>Termination Date</u>. On the Termination Date (as defined in the DIP Credit Agreement), consistent with Section 11 of the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable and all New Money Loans will terminate; (b) all authority to use Cash Collateral shall cease; <u>provided</u>, <u>however</u>, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved Budget, subject to any Permitted Variance provided for in the DIP Credit Agreement; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Loan Documents in accordance with this Interim DIP Order.

16.    <u>Events of Default</u>. The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (collectively, the "<u>Events of Default</u>"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim DIP Order, (b) the failure of the Debtors to comply with any of the Required Milestones (as defined below),  or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement, in each case unless waived by the Required DIP Lenders or DIP Agent, as applicable.

17.    <u>Milestones</u>. The Debtors' failure to comply with those certain case milestones referred to in the definition of "Milestones" in the DIP Credit Agreement (collectively, the "<u>Required Milestones</u>") shall constitute an "Event of Default" in accordance with the terms of the

DIP Credit Agreement unless waived by the Required DIP Lenders in accordance with the terms of the DIP Loan Documents.

18.    <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default or other applicable Termination Date (as defined in the DIP Credit Agreement), unless such Event of Default or Termination Date has been waived by the DIP Agent or Required DIP Lenders, as applicable, of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from, the Court,  subject to the terms of this Interim DIP Order and the Remedies Notice Period (defined below), (a) the DIP Agent (at the direction of the Required DIP Lenders) may send a Carve Out Trigger Notice to the parties set forth in Paragraph 10(b) declaring (i) all DIP Obligations owing under the DIP Loan Documents to be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens, DIP Superpriority Claims or the DIP Obligations, (iv) the Carve Out shall be triggered, (v) the DIP Lenders shall be paid the DIP Termination Payment as provided in the DIP Loan Documents and (vi) interest under the DIP Facility shall accrue at the default rate, as provided in the DIP Loan Documents and (b) subject to paragraph 13(b), the Prepetition First Lien Term Loan Agent (at the direction of the applicable required lenders) may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral. The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition First Lien

Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "Remedies Notice Period"): (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Interim DIP Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out; (b) subject to the foregoing clause (a), the applicable Prepetition First Lien Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the Prepetition First Lien Term Loan Facility and this Interim DIP Order with respect to the Debtors' use of Cash Collateral; *provided*, that the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of this Interim DIP Order during any Remedies Notice Period only to make payroll and fund critical expenses necessary to preserve the Prepetition Collateral, in each case in accordance with the terms of the Approved Budget and this Interim DIP Order; and (c) subject to the foregoing clause (a) and (b) and the Intercreditor Agreement, the applicable Prepetition Second Lien Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the Prepetition Second Lien Term Loan Facility and this Interim DIP Order with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the sole purpose of contesting, on any basis,  whether an Event of Default has occurred or is continuing; provided, however, that nothing herein limits the Court's ability to hear other matters it deems appropriate at such hearing; *provided*, *further*, *however*, that nothing in this Interim DIP Order shall prejudice the rights of the Debtors to seek non-consensual use of Cash Collateral. Upon Court order prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, Prepetition First Lien Secured Parties, and Prepetition Second Lien Secured

Parties, shall be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders),  the Prepetition First Lien Secured Parties, and Prepetition Second Lien Secured Parties,  shall be permitted to exercise all remedies set forth herein, in the DIP Loan Documents,  the Prepetition First Lien Loan Documents, and the Prepetition Second Lien Loan Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim DIP Order.

19.    <u>Limitation on Charging Expenses Against Collateral</u>. No expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, or the DIP Lenders or (b) subject to entry of the Final DIP Order granting such relief, the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition  Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

20.    <u>Use of Cash Collateral</u>. The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim DIP Order and in accordance with the Approved Budget (subject to Permitted Variances as set forth in this Interim DIP Order and the DIP Loan Documents), including cash in the Liquidity Reserve Account, and including to make payments on account of the Adequate Protection Obligations and

Second Lien Adequate Protection Obligations provided for in this Interim DIP Order, from the date of this Interim DIP Order through and including the date of termination of the DIP Credit Agreement.

      21.   <u>Expenses and Indemnification</u>.

      (a)   The Debtors are hereby authorized to pay, in accordance with this Interim DIP Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Loan Documents as such amounts become due and without need to obtain further Court approval, including closing, arrangement or commitment payments (including all payments and other amounts owed to the DIP Lenders), administrative agent's fees and collateral agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in paragraphs 3(d)(3), 9(f) and 10(d) of this Interim DIP Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim DIP Order or the DIP Loan Documents. Notwithstanding the foregoing, the Debtors are authorized to pay on the Closing Date (as defined in the DIP Loan Documents) all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agent, the Prepetition First Lien Term Loan Agent, the Prepetition First Lien Lenders,  the Prepetition Second Lien Term Loan Agent and Prepetition Second Lien Lenders, incurred on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agent, the Prepetition First Lien Term Loan Agent, the Prepetition First Lien Lenders the Prepetition Second Lien Term Loan Agent or Prepetition Second Lien Lenders to be subject to the procedures set forth in paragraph 20(b), <u>provided</u> that the DIP Lenders, the DIP Agent, the Prepetition First Lien Term Loan Agent, the

Prepetition First Lien Lenders, the Prepetition Second Lien Term Loan Agent or Prepetition

Second Lien Lenders shall deliver courtesy copies of such invoices to counsel for the U.S. Trustee.

(b)     The Debtors shall be jointly and severally obligated to pay all fees and

expenses described above, which obligations owed to the DIP Secured Parties shall constitute DIP

Obligations. The Debtors shall pay the reasonable and documented professional fees, expenses,

and disbursements of professionals to the extent provided for in paragraphs 3(d)(3), 9(c), and 10(d)

of this Interim DIP Order (collectively, the "Lender Professionals" and each, a "Lender

Professional") no later than ten business days (the "Review Period") after the receipt by counsel

for the Debtors, any Committee appointed in these chapter 11 cases, or the U.S. Trustee of each of

the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee

applications or complying with the U.S. Trustee Guidelines, including such amounts arising before

the Petition Date. Invoiced Fees shall be in the form of an invoice summary for professional fees

and categorized expenses incurred during the pendency of the Chapter 11 Cases, and such invoice

summary shall not be required to contain time entries, but shall include a general, brief description

of the nature of the matters for which services were performed, which may be redacted or modified

to the extent necessary to delete any information subject to the attorney-client privilege, any work

product doctrine, privilege or protection, common interest doctrine privilege or protection, any

other evidentiary privilege or protection recognized under applicable law, or any other confidential

information, and the provision of such invoices shall not constitute any waiver of the attorney-

client privilege, work product doctrine, privilege or protection, common interest doctrine privilege

or protection, or any other evidentiary privilege or protection recognized under applicable law;

*provided* that at any time a Lender Professional seeks payment of Invoiced Fees from the Debtors,

the Debtors reserve their rights to request additional detail regarding the services rendered and

expenses incurred by such Lender Professional, subject to any attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.

(c)     The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, any Committee that may be appointed in these Chapter 11 Cases, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten days' prior written notice to the submitting party of any hearing on such motion or other pleading). Any hearing to consider such an objection to the payment of any fees, costs,  or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of the objection. For the avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(d)     In addition, the Debtors hereby indemnify each of the DIP Lenders, the DIP Agent, the Prepetition First Lien Term Loan Agent, and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each,  an "Indemnified Person") and hold them harmless from and against all costs, expenses (including reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Credit Agreement,  the applicable Prepetition First Lien Term Loan Facility, or Prepetition Second Lien Term Loan Facility. No Indemnified Person shall

have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non- appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's bad faith, gross negligence or willful misconduct. In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; provided, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.

22.     No Third-Party Rights. Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

23.     Section 507(b) Reservation. Subject only to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in Collateral, respectively, during the Chapter 11 Cases or in any Successor Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties, respectively,  against any Diminution in Value, as applicable,  of their respective interests in the Collateral (including the Cash Collateral).

24.     Insurance. Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and

the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Agent as loss payee or additional insured, as applicable, thereunder.

25.     <u>No Waiver for Failure to Seek Relief</u>. The failure or delay of the DIP Agent or the Required DIP Lenders to exercise rights and remedies under this Interim DIP Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

26.     <u>Perfection of the DIP Liens, Adequate Protection Liens and Second Lien Adequate Protection Liens</u>.

(a)     Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 8 hereof, the Adequate Protection Liens granted pursuant to paragraph 9 hereof, and the Second Lien Adequate Protection Liens granted pursuant ot paragraph 10 hereof, the DIP Agent, the Prepetition First Lien Term Loan Agent, and Prepetition Second Lien Term Loan Agent, are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether the DIP Agent, the Prepetition First Lien Term Loan Agent, or Prepetition Second Lien Term Loan Agent shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Interim DIP Order. If the DIP Agent, the Prepetition First Lien Term Loan Agent or Prepetition Second Lien Term Loan Agent, (at the direction of the applicable required lenders) determines to file or execute any financing

statements, agreements, notice of liens, or similar instruments (which, in each case, shall be at the sole cost and expense of the Debtors), the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent,  Prepetition First Lien Term Loan Agent or Prepetition Second Lien Term Loan Agent (at the direction of the applicable required lenders), and the automatic stay shall be modified solely to allow such filings as provided for in this Interim DIP Order.

(b)    A certified copy of this Interim DIP Order may, at the direction of the applicable Required DIP Lenders, be filed with or recorded in filing or recording offices by the DIP Agent or the Prepetition First Lien Term Loan Agent in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim DIP Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim DIP Order.

(c)    Subject to entry of the Final DIP Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, shall be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law, and any such provision shall have no force and effect with respect to the granting of the DIP Liens,  the First Lien Adequate Protection Liens, and Second Lien Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any

Debtor in accordance with the terms of the DIP Credit Agreement or this Interim DIP Order, subject to applicable law.

26.    <u>Release</u>. Each of the Debtors and the Debtors' estates, each on its own behalf and on behalf of each of their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully and forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of this Interim DIP Order, each of the DIP Secured Parties (solely in their capacities as DIP Secured Parties) and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "<u>Related Parties</u>"), and effective upon entry of the Final DIP Order granting such relief, but subject to the rights and limitations set forth in paragraph 13 of this Interim DIP Order, each of the Prepetition Secured Parties and each of their respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition First Lien Secured Obligations, the Prepetition First Priority Liens, the Prepetition First Lien Term Loan Facility, the Prepetition Second Lien Obligations, the Prepetition Second Priority Liens, and the Prepetition

Second Lien Term Loan Facility, as applicable, including: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties,  the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties; provided that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Loan Documents, this Interim DIP Order, and the Final DIP Order and provided further that the release described in subclause (iii) of this paragraph with respect to any Prepetition First Lien Secured Obligations that have been rolled up shall subject to entry of the Final Order and the rights and limitations of set forth in paragraph 13 of this Interim DIP Order.

27.     Credit Bidding. The DIP Agent (at the direction of the Required DIP Lenders) and, subject to entry of the Final DIP Order and pursuant to the terms of the Restructuring Support Agreement, the Prepetition First Lien Term Loan Agent applicable required lenders) and the Prepetition Second Lien Term Loan Agent (at the direction of the applicable required lenders) (as to the Prepetition First Lien Term Loan Agent and Prepetition Second Lien Term Loan Agent, subject to the preservation of rights provided in paragraph 13 shall each have the unqualified right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, in the case of the DIP Agent, the Roll-Up Loans, in the case of the Prepetition First Lien Term Loan Agent, the First Lien Adequate Protection Claims, if any, and in the case of the Prepetition Second Lien Term Loan Agent, the Second Lien Adequate Protection Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral,  including sales occurring pursuant to section 363(k) of the Bankruptcy Code (including any sale contemplated under the order approving the *Motion*

*of Debtors for Entry of Interim and Final Orders (i) Authorizing The Debtors to Obtain Postpetition Financing, (ii) Granting Liens Superpriority Administrative Expense Status, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing, and (v) Granting Related Relief)* or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii); provided, that any credit bid by the Prepetition Second Lien Term Loan Agent shall be subject to the Intercreditor Agreement, including section 6(d) of such agreement.

28.    <u>Preservation of Rights Granted Under this Interim DIP Order.</u>

(a)    Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all New Money Loan Commitments are terminated, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition First Lien Term Loan Facility, the Prepetition Second Lien Term Loan Facility, or this Interim DIP Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in paragraph 25 herein.

(b)    In the event this Interim DIP Order or any provision hereof is reversed or modified on appeal, any liens or claims granted to the DIP Secured Parties or the respective Prepetition Secured Parties hereunder arising prior to the effective date of any such reversal or modification of this Interim DIP Order shall be governed in all respects by the original provisions of this Interim DIP Order, including entitlement to all rights, remedies, privileges, and benefits

granted herein, and the respective Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)      Unless and until all DIP Obligations, Prepetition First Lien Secured Obligations, Prepetition Second Lien Secured Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash, and all New Money Loan Commitments are terminated, it shall be an Event of Default if any of the Debtors seek or consent to, directly or indirectly (i) except as permitted under the DIP Loan Documents or, if not provided for therein, with the prior written consent of the DIP Agent,  the Required DIP Lenders, and the Prepetition First Lien Loan Agent (acting at the direction of the applicable required lenders), (x) any modification, stay, vacatur, or amendment of this Interim DIP Order, (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Prepetition First Lien Adequate Protection Superpriority Claims, the Prepetition First Lien Secured Obligations, the Prepetition Second Lien Adequate Protection Superpriority Claims, or the Prepetition Second Lien Secured Obligations, or (z) any other order allowing use of the DIP Collateral,  or the Prepetition Collateral; (ii) any lien on any of the DIP Collateral or Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens,  the Prepetition First Priority Liens or Prepetition Second Priority Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim DIP Order; (iv) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing

any of the Chapter 11 Cases; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(d)     Notwithstanding any order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Claims, the Second Lien Adequate Protection Liens, the Second Lien Adequate Protection Claims, and the other administrative claims granted pursuant to this Interim DIP Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim DIP Order until all DIP Obligations are indefeasibly paid in full in cash (otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders)) and all Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, First Lien Adequate Protection Liens, First Lien Adequate Protection Claims, the Second Lien Adequate Protection Liens, the Second Lien Adequate Protection Claims, and the other administrative claims granted pursuant to this Interim DIP Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Interim DIP Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Claims, the Second Lien Adequate Protection Liens, the Second Lien Adequate Protection Claims, and all other rights and remedies of the DIP Agent, the

DIP Lenders, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties granted by the provisions of this Interim DIP Order and the DIP Loan Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases or any Successor Cases terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code,  any remaining DIP Obligations, First Lien Adequate Protection Obligations or Second Lien  Adequate Protection Obligations. The terms and provisions of this Interim DIP Order and the DIP Loan Documents shall continue and be binding in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Claims, the Second Lien Adequate Protection Liens, the Second Lien Adequate Protection Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties granted by the provisions of this Interim DIP Order shall continue in full force and effect until the DIP Obligations and the respective Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders)).

(f)     Other than as set forth in this Interim DIP Order, subject and subordinate to the Carve-Out, none of the DIP Liens, First Lien Adequate Protection Liens  or Second Lien

Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and none of the DIP Liens, the Adequate Protection Liens, or the Second Lien Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

26.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything to the contrary set forth in this Interim DIP Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral (including Cash Collateral), or the Carve Out or proceeds thereof may be used: (a) to investigate (including by way of examinations or discovery proceedings), analyze, initiate, assert, prosecute, join, commence, threaten, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties,  the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties,  the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties (each in their capacities as such) under the DIP Loan Documents, the Prepetition First Lien Term Loan Facility, the Prepetition Second Lien Term Loan Facility, or this Interim DIP Order, including for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Chapter 11 Cases

in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties,  the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties to recover on the DIP Collateral,  the Prepetition Collateral,  or seeking affirmative relief against any of the DIP Secured Parties,  the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties related to the DIP Obligations,  Prepetition First Lien Secured Obligations or Prepetition Second Lien Secured Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations,  the Prepetition First Lien Secured Obligations, or the Prepetition Second Lien Secured Obligations, or the DIP Agent's, the DIP Lenders', the Prepetition First Lien Secured Parties' or the Prepetition Second Lien Secured Parties' liens or security interests in the DIP Collateral,  or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties,  the Prepetition First Lien Secured Parties, Prepetition Second Lien Secured Parties, or the DIP Agent's, the DIP Lenders,' the Prepetition First Lien Secured Parties' or Prepetition Second Lien Secured Parties' respective liens on or security interests in the DIP Collateral,  or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties,  the Prepetition First Lien Secured Parties, or Prepetition Second Lien Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations,  the Prepetition First Lien Secured Obligations, or the Prepetition Second Lien Secured Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including

the Prepetition First Priority Liens and Prepetition Second Priority Liens) held by or on behalf of each of the Prepetition First Lien Secured Parties or Prepetition Second Lien Secured Parties related to the Prepetition First Lien Secured Obligations or Prepetition Second Lien Secured Obligations, respectively, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition First Lien Secured Obligations, the Prepetition First Priority Liens, Prepetition Second Lien Secured Obligations or Prepetition Second Priority Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, (y) any of the Prepetition First Priority Liens or any other rights or interests of any of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Secured Obligations or the Prepetition First Priority Liens, or (z) any of the Prepetition Second Priority Liens or any other rights or interests of any of the Prepetition Second Lien Secured Parties related to the Prepetition Second Lien Secured Obligations or the Prepetition Second Priority Liens, provided that no more than $25,000 of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including the Cash Collateral, may be used by any Committee appointed in these Chapter 11 Cases, if any, during the Challenge Period (as defined below) solely to investigate, but not object to, challenge, prosecute, or litigate (including by way of formal discovery) the validity, enforceability, perfection, priority, or extent of the Prepetition First Priority Liens or Prepetition Second Priority Liens, any potential Challenge against the Prepetition First Lien Secured Parties or Prepetition Second Lien Secured Parties..  For the avoidance of doubt, nothing in this paragraph 26 shall prohibit the Debtors from

responding to, objecting to, or complying with discovery requests by a statutory unsecured creditors' committee (if any) appointed in the chapter 11 cases, in whatever form, made in connection with any such investigation, the payment of any professional fees related thereto, or from contesting or challenging whether an Event of Default or Termination Date, as applicable, has in fact occurred, from the proceeds of the DIP Loans

27.     Conditions Precedent. No DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Loan Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

28.     Use of DIP Facility Proceeds. From and after the Petition Date, the Debtor shall be permitted to use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim DIP Order and the DIP Loan Documents, and only in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim DIP Order and the DIP Loan Documents.

29.     No Monitoring Obligation. Neither the DIP Agent nor DIP Lenders shall have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Agent and DIP Lenders may rely upon each Debtor's representations that the use of the DIP Facility at any time is in accordance with the requirements of the DIP Orders and the DIP Loan Documents, including but not limited to the Approved Budget.

30.     Repayment of DIP Superpriority Claims. Notwithstanding anything to the contrary herein or in the other DIP Loan Documents, the Debtors shall indefeasibly pay to each holder of a DIP Superpriority Claim cash equal to the full amount of such DIP Superpriority Claim on the effective date of a chapter 11 plan, unless such holder of a DIP Superpriority Claim consents to a

different treatment with respect to such DIP Superpriority Claim. The requirements set forth in this paragraph 29 may not be amended without the prior written consent of each holder of a DIP Superpriority Claim adversely affected thereby.

31.     <u>Intercreditor Provisions</u>. The Prepetition First Term Loan Agent and Prepetition Second Lien Term Loan Agent are each a party to the Intercreditor Agreement and the Subordination Agreement. Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of, or entered into as permitted by and in accordance with, the Intercreditor Agreement, the Subordination Agreement,  the Prepetition First Lien Term Loan Facility and the Prepetition Second Lien Term Loan Facility shall (i) remain in full force and effect, and (ii) not be deemed to be amended, altered or modified by the terms of this Interim DIP Order or the DIP Loan Documents, in each case, unless expressly set forth herein or therein; <u>provided</u> that nothing in this Interim DIP Order shall be deemed to provide liens to any Prepetition First Lien Loan Party or Prepetition Second Lien Loan Party on any assets of the Debtors except as set forth herein.

32.     <u>Proceeds of Subsequent Financing</u>. If the Debtor, any trustee, any examiner, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Loan Documents) and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Secured Parties, all cash proceeds derived from such credit or debt shall

immediately be turned over to the DIP Secured Parties to be distributed in accordance with this Interim DIP Order and the DIP Loan Documents.

33.     <u>Payments Held in Trust</u>. Except as expressly permitted in this Interim DIP Order or the DIP Loan Documents, including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Loan Documents, and termination of the DIP Facility in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall immediately turn over such proceeds to the DIP Secured Parties, for application in accordance with the DIP Credit Agreement and this Interim DIP Order.

34.     <u>Binding Effect; Successors and Assigns</u>. The DIP Loan Documents and the provisions of this Interim DIP Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, any Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors in the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case) to the extent permitted by applicable law and shall inure to the benefit of the DIP Secured Parties,  the applicable Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties; <u>provided</u> that, except to the extent expressly

set forth in this Interim DIP Order, the Prepetition First Lien Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

35.     <u>Limitation of Liability</u>. In determining to make any loan under the DIP Loan Documents or permitting the use of Cash Collateral the DIP Secured Parties,  the Prepetition First Lien Secured Parties, and Prepetition Second Lien Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim DIP Order or in the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, any Prepetition First Lien Secured Parties, or any Prepetition Second Lien Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

36.     <u>No Requirement to File Claim for DIP Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses in the Chapter 11 Case or any Successor Cases with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure

to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim DIP Order, or applicable law. Notwithstanding the foregoing, each of the DIP Agent or the DIP Lenders may, in its sole discretion, but is not required to, file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Case for any claim allowed herein. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party- in-interest or their respective successors-in-interest.

37.     No Requirement to File Claim for Prepetition First Lien Secured Obligations. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses in the Chapter 11 Cases or any Successor Cases under section 503(b) of the Bankruptcy Code, neither the Prepetition First Lien Term Loan Agent nor any other Prepetition First Lien Loan Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition First Lien Secured Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of the Prepetition First Lien Term Loan Facility or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition First Lien Term Loan Agent's or any other Prepetition First Lien Loan Party's rights, remedies, powers, or privileges under the Prepetition First Lien Term Loan Facility, this Interim DIP Order, or applicable law. Notwithstanding the foregoing,

each of the Prepetition First Lien Secured Parties may, in its sole discretion, but is not required to, file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Case for any claim allowed herein. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

38.    <u>No Requirement to File Claim for Prepetition Second Lien Secured Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses in the Chapter 11 Cases or any Successor Cases under section 503(b) of the Bankruptcy Code, neither the Prepetition Second Lien Term Loan Agent nor any other Prepetition Second Lien Loan Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Second Lien Secured Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of the Prepetition Second Lien Term Loan Facility or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition Second Lien Term Loan Agent's or any other Prepetition Second Lien Loan Party's rights, remedies, powers, or privileges under the Prepetition Second Lien Term Loan Facility, this Interim DIP Order, or applicable law. Notwithstanding the foregoing, each of the Prepetition Second Lien Secured Parties may, in its sole discretion, but is not required to, file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Case for any claim allowed herein. The provisions set forth in this paragraph are intended solely for the purpose of administrative

convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest

39.    <u>No Marshaling</u>. Subject to and up on entry of the Final DIP Order, the DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to the Final DIP Order, the DIP Loan Documents,  the Prepetition First Lien Term Loan Facility, and the Prepetition Second Lien Term Loan Facility notwithstanding any other agreement or provision to the contrary, and subject to entry of the Final DIP Order granting such relief, the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral and proceeds of the Prepetition Collateral shall be received and applied pursuant to this Interim DIP Order, the DIP Loan Documents,  the Prepetition First Lien Term Loan Facility and Prepetition Second Lien Term Loan Facility, notwithstanding any other agreement or provision to the contrary.

40.    <u>Application of Proceeds of DIP Collateral</u>. Subject to entry of a Final DIP Order granting such relief, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

41.    <u>Equities of the Case</u>. The Prepetition First Lien Secured Parties shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code and the Prepetition First Lien Secured Parties have negotiated for, and the Debtors believe the Prepetition First Lien Secured Parties are entitled to, and will seek in the Final DIP Order, a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code, which shall not apply to the Prepetition

First Lien Secured Parties with respect to proceeds, product, offspring, or profits of any of the DIP Collateral (including the Prepetition Collateral).

42.     <u>Necessary Actions</u>. The Debtor is authorized and directed, on a final basis, to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim DIP Order

43.     <u>Final Hearing</u>. The Final Hearing on the Motion shall be held on **[•], 2023**, **at 10:00 a.m.**, prevailing Eastern Time. Any objections or responses to entry of the Final DIP Order shall be filed on or before **4:00 p.m., prevailing Eastern Time, on [•], 2023**, and shall be served on: the Debtors, c/o [•], [•] (Attn: [•]); (b) proposed counsel to the Debtors (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Brian Schartz, P.C. (bschartz@kirkland.com) (ii) Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois, 60654, Attn.: Joshua M. Altman (josh.altman@kirkland.com), Dan Latona (dan.latona@kirkland.com), and Nicholas Krislov (nick.krislov@kirkland.com); and (iii) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn.: Justin R. Alberto, Patrick Reilley and Stacy Newman;; (d) counsel to the DIP Lenders and Prepetition First Lien Lenders, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 (Attn: Ari Blaut (blauta@sullcrom.com) and Benjamin Beller (bellerb@sullcrom.com)); (e) co-counsel to the DIP Lenders and Prepetition First Lien Lenders, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19802 (Attn: Pauline K. Morgan (pmorgan@ycst.com) and Ryan M. Bartley (rbartley@ycst.com)); (f) counsel to the DIP Agent and the Prepetition First Lien Term Loan Agent, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 (Attn: Ari Blaut (blauta@sullcrom.com) and Benjamin Beller (bellerb@sullcrom.com)) (g) counsel to the Second Lien Administrative Agent, Katten Muchin Rosenman LLP, 50 Rockefeller

Plaza, New York, New York, 10020, (Attn: Steven Reisman (sreisman@katten.com) and Shaya Rochester (srochester@katten.com)); and (h) counsel to any statutory committee appointed in these Chapter 11 Cases. In the event no objections to entry of the Final DIP Order on the Motion are timely received, this Court may enter such Final DIP Order without need for the Final Hearing.

44.    <u>Effect of this Interim DIP Order</u>. This Interim DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

45.    Bankruptcy Rule 6003(b) has been satisfied.

46.    The requirements of Bankruptcy Rule 6004(a) are waived, or are inapplicable due to Bankruptcy Rules 4001(b)(2) and (c)(2).

47.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim DIP Order shall be immediately effective and enforceable upon entry of this Interim DIP Order.

<u>Headings</u>. All paragraph headings used in this Interim DIP Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the

interpretation hereof.

48.    <u>Retention of Jurisdiction</u>. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim DIP Order.

## EXHIBIT A

**DIP Credit Agreement**

**MULTI-DRAW SENIOR SECURED SUPER-PRIORITY PRIMING
DEBTOR-IN-POSSESSION CREDIT AGREEMENT AND GUARANTY**

**dated as of [_____], 2023**

**by and among**

**SiO2 MEDICAL PRODUCTS, INC.,**
**as the Borrower, and as Debtor and Debtor-in-Possession under the Chapter
11 Bankruptcy Code**

**THE SUBSIDIARY GUARANTORS FROM TIME TO TIME PARTY
HERETO,**
**as the Subsidiary Guarantors,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
**as the Lenders,**

**and**

**OAKTREE FUND ADMINISTRATION, LLC,**
**as the Administrative Agent**

**U.S. $60,000,000**

# TABLE OF CONTENTS

SECTION 1. DEFINITIONS ......................................................................................................2

    1.01    Certain Defined Terms ...................................................................................2

    1.02    Accounting Terms and Principles ................................................................37

    1.03    Interpretation ...............................................................................................37

    1.04    Division .......................................................................................................39

SECTION 2. THE COMMITMENT AND THE LOANS ........................................................39

    2.01    Loans ...........................................................................................................39

    2.02    Borrowing Procedures .................................................................................41

    2.03    Funding of Borrowings ...............................................................................41

    2.04    Notes ...........................................................................................................41

    2.05    Use of Proceeds ..........................................................................................42

    2.06    Termination of Commitments; Voluntary Reduction of Commitments ...............42

SECTION 3. PAYMENTS OF PRINCIPAL AND INTEREST, ETC. .....................................42

    3.01    Scheduled Repayments and Prepayments Generally; Application .......................42

    3.02    Interest ........................................................................................................42

    3.03    Prepayments ................................................................................................43

SECTION 4. PAYMENTS, ETC. ............................................................................................45

    4.01    Payments .....................................................................................................45

    4.02    Computations ..............................................................................................46

    4.03    Set-Off ........................................................................................................46

SECTION 5. YIELD PROTECTION, TAXES, FEES, ETC. ...................................................47

    5.01    Additional Costs .........................................................................................47

    5.02    Illegality .....................................................................................................48

    5.03    Taxes ..........................................................................................................48

    5.04    Mitigation Obligations ................................................................................52

    5.05    Survival ......................................................................................................53

    5.06    Fees ............................................................................................................53

SECTION 6. CONDITIONS ...................................................................................................54

    6.01    Conditions to Closing Date and Initial Borrowing ................................................54

    6.02    Conditions Precedent to all Borrowings ................................................................57

SECTION 7. REPRESENTATIONS AND WARRANTIES ....................................................59

# TABLE OF CONTENTS
(continued)

| 7.01 | Power and Authority | 59 |
| 7.02 | Authorization; Enforceability | 59 |
| 7.03 | Governmental and Other Approvals; No Conflicts | 59 |
| 7.04 | Financial Statements; Material Adverse Change | 60 |
| 7.05 | Properties | 60 |
| 7.06 | No Actions or Proceedings | 62 |
| 7.07 | Compliance with Laws and Agreements | 63 |
| 7.08 | Taxes | 63 |
| 7.09 | Full Disclosure | 63 |
| 7.10 | Investment Company Act and Margin Stock Regulation | 63 |
| 7.11 | [Reserved] | 63 |
| 7.12 | Subsidiaries | 64 |
| 7.13 | Indebtedness and Liens | 64 |
| 7.14 | Material Agreements | 64 |
| 7.15 | Restrictive Agreements | 64 |
| 7.16 | Real Property | 64 |
| 7.17 | Pension Matters | 64 |
| 7.18 | Regulatory Approvals | 65 |
| 7.19 | Transactions with Affiliates | 66 |
| 7.20 | OFAC; Anti-Terrorism Laws | 66 |
| 7.21 | Anti-Corruption | 66 |
| 7.22 | Necessary Permits, Etc. | 67 |
| 7.23 | Priority of Obligations | 67 |
| 7.24 | Royalty and Other Payments | 67 |
| 7.25 | Non-Competes | 67 |
| 7.26 | Security Interest | 67 |
| 7.27 | Capitalization Table | 67 |
| 7.28 | Budget | 67 |
| 7.29 | DIP Budget | 68 |
| 7.30 | Orders | 68 |
| 7.31 | Bankruptcy Matters | 68 |
| SECTION 8. AFFIRMATIVE COVENANTS | | 68 |
| 8.01 | Financial Statements and Other Information | 68 |

# TABLE OF CONTENTS
### (continued)

| 8.02 | Other Reporting | 70 |
|------|-----------------|----|
| 8.03 | Milestones | 72 |
| 8.04 | Bankruptcy Related Matters | 72 |
| 8.05 | Priority of Liens and Claims | 73 |
| 8.06 | Notices of Material Events | 73 |
| 8.07 | Existence | 74 |
| 8.08 | Payment of Obligations | 75 |
| 8.09 | Insurance | 75 |
| 8.10 | Books and Records; Inspection Rights | 75 |
| 8.11 | Compliance with Laws and Other Obligations | 76 |
| 8.12 | Maintenance of Properties, Etc. | 76 |
| 8.13 | Licenses | 76 |
| 8.14 | [Reserved] | 76 |
| 8.15 | Use of Proceeds | 76 |
| 8.16 | Further Assurances | 77 |
| 8.17 | Termination of Non-Permitted Liens | 77 |
| 8.18 | [Reserved] | 77 |
| 8.19 | Maintenance of Permits, Etc. | 78 |
| 8.20 | Maintenance of Regulatory Approvals, Contracts, Intellectual Property, Etc. | 78 |
| 8.21 | ERISA Compliance | 78 |
| 8.22 | Cash Management | 78 |
| SECTION 9. NEGATIVE COVENANTS | | 79 |
| 9.01 | Indebtedness | 79 |
| 9.02 | Liens | 80 |
| 9.03 | Fundamental Changes and Acquisitions | 82 |
| 9.04 | Lines of Business | 82 |
| 9.05 | Investments | 82 |
| 9.06 | Restricted Payments | 83 |
| 9.07 | Payments of Indebtedness | 83 |
| 9.08 | Change in Fiscal Year | 84 |
| 9.09 | Sales of Assets, Etc. | 84 |
| 9.10 | Transactions with Affiliates | 85 |

# TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| 9.11 | Restrictive Agreements | 85 |
| 9.12 | Modifications and Terminations of Material Agreements and Organic Documents | 86 |
| 9.13 | Outbound Licenses | 86 |
| 9.14 | [Reserved]. | 86 |
| 9.15 | Hazardous Material | 86 |
| 9.16 | Accounting Changes | 87 |
| 9.17 | Compliance with ERISA | 87 |
| 9.18 | Sanctions; Anti-Corruption Use of Proceeds | 87 |
| 9.19 | Foreign Subsidiaries | 88 |
| 9.20 | [Reserved] | 88 |
| 9.21 | Transfers to Non-Obligors | 88 |
| 9.22 | No Swiss Subsidiary Debt | 88 |
| 9.23 | Payments to Insiders | 88 |
| 9.24 | Budget Covenant | 88 |
| 9.25 | Capital Expenditures | 88 |
| 9.26 | [Chapter 11 Case | 88 |
| 9.27 | KERP Payments | 89 |
| SECTION 10. | [RESERVED] | 90 |
| SECTION 11. | EVENTS OF DEFAULT | 90 |
| 11.01 | Events of Default | 90 |
| 11.02 | Remedies | 96 |
| 11.03 | Additional Remedies | 96 |
| 11.04 | [Reserved] | 99 |
| 11.05 | [Reserved] | 99 |
| 11.06 | Credit Bidding | 100 |
| SECTION 12. | THE ADMINISTRATIVE AGENT | 100 |
| 12.01 | Appointment and Duties | 100 |
| 12.02 | Binding Effect | 102 |
| 12.03 | Use of Discretion | 102 |
| 12.04 | Delegation of Rights and Duties | 102 |
| 12.05 | Reliance and Liability | 103 |
| 12.06 | Administrative Agent Individually | 104 |

# TABLE OF CONTENTS
### (continued)

12.07   Lender Credit Decision ...........................................................................104

12.08   Expenses; Indemnities ...........................................................................104

12.09   Resignation of the Administrative Agent ...........................................105

12.10   Release of Collateral or Guarantors ....................................................106

12.11   Additional Secured Parties.....................................................................106

12.12   Agent May File Proofs of Claim...........................................................107

12.13   Acknowledgements of Lenders..............................................................107

SECTION 13. GUARANTY ............................................................................................110

13.01   The Guaranty ...........................................................................................110

13.02   Obligations Unconditional .....................................................................110

13.03   Discharge Only Upon Payment in Full.................................................112

13.04   Additional Waivers; General Waivers ..................................................112

13.05   Reinstatement...........................................................................................114

13.06   Subrogation ..............................................................................................114

13.07   Remedies ..................................................................................................114

13.08   Instrument for the Payment of Money ..................................................115

13.09   Continuing Guarantee .............................................................................115

13.10   Contribution with Respect to Guaranteed Obligations .......................115

13.11   [Reserved]................................................................................................115

SECTION 14. MISCELLANEOUS ................................................................................116

14.01   No Waiver .................................................................................................116

14.02   Notices ......................................................................................................116

14.03   Expenses, Indemnification, Etc..............................................................116

14.04   Amendments, Etc. ...................................................................................117

14.05   Successors and Assigns...........................................................................118

14.06   Survival ....................................................................................................120

14.07   Captions....................................................................................................121

14.08   Counterparts, Effectiveness....................................................................121

14.09   Governing Law .........................................................................................121

14.10   Jurisdiction, Service of Process and Venue ..........................................121

14.11   Waiver of Jury Trial ................................................................................122

14.12   Waiver of Immunity.................................................................................122

14.13   Entire Agreement .....................................................................................122

# TABLE OF CONTENTS
### (continued)

14.14  Severability ................................................................................................122

14.15  No Fiduciary Relationship .........................................................................122

14.16  Confidentiality ...........................................................................................122

14.17  Interest Rate Limitation .............................................................................123

14.18  Judgment Currency .....................................................................................123

14.19  USA PATRIOT Act ....................................................................................124

14.20  Acknowledgement and Consent to Bail-In of Affected Financial
       Institutions...................................................................................................124

**TABLE OF CONTENTS**
(continued)

## SCHEDULES AND EXHIBITS

Schedule 1            -        Loans Schedule
Schedule 2            -        Products
Schedule 7.05(b)      -        Certain Intellectual Property
Schedule 7.06(b)      -        Environmental Matters
Schedule 7.08         -        Taxes
Schedule 7.12         -        Information Regarding Subsidiaries
Schedule 7.13(a)      -        Existing Indebtedness
Schedule 7.13(b)      -        Existing Liens
Schedule 7.14         -        Material Agreements
Schedule 7.15         -        Restrictive Agreements
Schedule 7.16         -        Real Property Owned or Leased by Obligors
Schedule 7.17         -        Pension Matters
Schedule 7.18(c)      -        Adverse Findings
Schedule 7.19         -        Transactions with Affiliates
Schedule 9.01(b)      -        Existing Indebtedness
Schedule 9.01(g)      -        Capital Lease Obligations
Schedule 9.02(b)      -        Existing Liens
Schedule 9.05         -        Existing Investments
Schedule 9.10         -        Transactions with Affiliates
Schedule 9.11         -        Restrictive Agreements


Exhibit A             -        Form of Note
Exhibit B             -        Form of Borrowing Notice
Exhibit C             -        Form of Guarantee Assumption Agreement
Exhibit D-1           -        Form of U.S. Tax Compliance Certificate (For Foreign Lenders|
                               That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-2           -        Form of U.S. Tax Compliance Certificate (For Foreign Participants
                               That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-3           -        Form of U.S. Tax Compliance Certificate (For Foreign Participants
                               That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-4           -        Form of U.S. Tax Compliance Certificate (For Foreign Lenders
                               That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit E             -        Form of Compliance Certificate
Exhibit F             -        Form of Assignment and Assumption
Exhibit G             -        [Reserved]
Exhibit H             -        [Reserved]
Exhibit I             -        [Reserved]
Exhibit J             -        Funding Date Certificate
Exhibit K             -        Initial Budget
Exhibit L             -        Milestones

## MULTI-DRAW SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT AND GUARANTY

This MULTI-DRAW SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT AND GUARANTY, dated as of [_____], 2023 (as amended, amended and restated, supplemented or otherwise modified, this "***Agreement***"), is entered into by and among **SiO2 MEDICAL PRODUCTS, INC.**, a Delaware corporation and a debtor and debtor-in-possession in the Chapter 11 Cases (the "***Borrower***"), certain Subsidiaries of the Borrower that are also debtors and debtors-in-possession in the Chapter 11 Cases that may be required to provide Guarantees from time to time hereunder (each a "***Subsidiary Guarantor***" and collectively, the "***Subsidiary Guarantors***"), the lenders from time to time party hereto (each a "***Lender***" and collectively, the "***Lenders***"), and **OAKTREE FUND ADMINISTRATION, LLC**, as administrative agent for the Lenders (in such capacity, the "***Administrative Agent***").

WITNESSETH:

WHEREAS, on [_____], 2023, (the "***Petition Date***"), the Borrower and each direct and indirect Subsidiary of the Borrower (other than the Permitted Swiss Subsidiary) (each a "***Debtor***" and collectively, the "***Debtors***") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") initiating their respective jointly administered cases under Chapter 11 of the Bankruptcy Code (Case No. [•]) (collectively, the "***Chapter 11 Cases***"), and each Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has asked the Lenders to provide the Borrower with a multi-draw senior secured super-priority priming term loan debtor-in-possession credit facility (the "***DIP Facility***"), consisting of (a) $60,000,000 of "new money" term loans that will be made available to the Borrower pursuant to the terms, and subject to the conditions set forth, in this Agreement and the DIP Orders and (b) an equal amount of "roll-up" term loans in an aggregate amount equal to up to $60,000,000 comprising a portion of the aggregate principal amount of Prepetition First Lien Term Loan Debt outstanding under the Prepetition First Lien Term Loan Credit Agreement as of the Closing Date, which amount shall include accrued and unpaid interest, premiums and fees (including the Prepayment Premium (as defined herein)) thereon (the "***Roll-Up Loan Amount***"), which Roll-Up Loans will be deemed "rolled up" as term loans hereunder on a dollar-for-dollar basis pursuant to the terms, and subject to the conditions set forth, in this Agreement and the DIP Orders;

WHEREAS, the Lenders are willing to make term loans to the Borrower, subject to the terms and conditions set forth in this Agreement and the DIP Orders; and

WHEREAS, the Obligations of the Borrower are guaranteed by the Guarantors and, subject to the Carve-Out, secured by Liens on the Collateral, in each case, as set forth in, and subject to, the Loan Documents and the DIP Orders.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein, the Parties hereby agree as follows:

## SECTION 1.
## DEFINITIONS

**1.01**         ***Certain Defined Terms***. As used herein, the following terms have the following respective meanings:

"***Acceptable Plan***" has the meaning set forth in **Section 11.01(r)**.

"***Acceptable Sale***" has the meaning set forth in **Section 11.01(r)**.

"***Acquisition***" means any transaction, or any series of related transactions, by which any Person (for purposes of this definition, an "***acquirer***") directly or indirectly, by means of amalgamation, merger, purchase of assets, purchase of Equity Interests, or otherwise, (i) acquires all or substantially all of the assets of any other Person, (ii) acquires an entire business line or unit or division of any other Person, (iii) with respect to any other Person that is managed or governed by a Board, acquires control of Equity Interests of such other Person representing more than fifty percent (50%) of the ordinary voting power (determined on a fully-diluted basis) for the election of directors of such Person's Board, (iv) acquires control of more than fifty percent (50%) of the Equity Interests in any other Person (determined on a fully-diluted basis) that is not managed by a Board or (v) the acquisition of, or the right to use, develop or sell (in each case, including through exclusive licensing), any product, product line or Intellectual Property of or from any other Person, excluding, for the avoidance of doubt, non-exclusive licenses of Intellectual Property in the Ordinary Course.

"***Administrative Agent***" has the meaning set forth in the preamble hereto.

"***Affected Financial Institution***" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"***Affiliate***" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"***Agreement***" has the meaning set forth in the preamble hereto.

"***Allocable Amount***" has the meaning set forth in **Section 13.10(b)**.

"***Anti-Terrorism Laws***" means any laws relating to terrorism or money laundering, including, without limitation, (i) the Money Laundering Control Act of 1986 (e.g., 18 U.S.C. §§ 1956 and 1957), (ii) the Bank Secrecy Act of 1970 (e.g., 31 U.S.C. §§ 5311 – 5330), as amended by the Patriot Act, (iii) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("***OFAC***"), (iv) the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and implementing regulations by the United States Department of the Treasury, (v) any law prohibiting or directed against terrorist activities or the financing of terrorist activities (e.g., 18 U.S.C. §§ 2339A and 2339B), or (vi) any similar laws enacted in the United States, European Union or any other jurisdictions in which the parties to this agreement operate, and all other present and future legal

requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war.

"*Applicable Period*" has the meaning set forth in **Section 8.02**.

"*Approved Budget*" means (a) the Initial Budget, at all times, until superseded by an Updated Budget in accordance with (and subject to receipt of Lender Consent and all other approvals required pursuant to) **Section 8.02** as of any time of determination thereafter, the most recent Budget Supplement (if any) that constitutes the Updated Budget in effect as of such time in accordance with (and subject to receipt of) Lender Consent and all other approvals required pursuant to **Section 8.02**; provided, that, no Budget Supplement or other cash flow forecast shall in any event constitute an Approved Budget unless, in addition to being in accordance with the terms hereof, the same is also sufficient to constitute the "Approved Budget" for purposes of (and as such term or equivalent is defined in) the DIP Orders.

"*Asset Sale*" has the meaning set forth in **Section 9.09**.

"*Assignment and Assumption*" means an assignment and assumption entered into by a Lender and an assignee of such Lender substantially in the form of **Exhibit F**, or such other form as agreed by the Administrative Agent.

"*Arm's Length Transaction*" means, with respect to any transaction, the terms of such transaction shall not be less favorable to the Borrower or any of its Subsidiaries than commercially reasonable terms that would be obtained in a transaction with a Person that is an unrelated third party.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy."

"*Bankruptcy Court*" has the meaning set forth in the preamble to this Agreement.

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" means 31 C.F.R. § 1010.230.

"***Benefit Plan***" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Obligor or Subsidiary thereof incurs or otherwise has any obligation or liability, contingent or otherwise.

"***Bidding Procedures***" has the meaning set forth in the Chapter 11 Plan.

"***Bidding Procedures Order***" means the order of the Bankruptcy Court approving the Bidding Procedures and establishing deadlines for the submission of bids and conducting an auction in accordance therewith.

"***Board***" means, with respect to any Person, the board of directors or equivalent management or oversight body of such Person or any committee thereof authorized to act on behalf of such board (or equivalent body).

"***Borrower***" has the meaning set forth in the preamble hereto.

"***Borrower Party***" has the meaning set forth in **Section 14.03(b)**.

"***Borrowing***" means any borrowing of Loans on the Closing Date or any Borrowing Date.

"***Borrowing Date***" means the date that any Borrowing is funded by the applicable Lenders.

"***Borrowing Notice***" means a written notice substantially in the form of **Exhibit B**.

"***Budget Reporting Deadline***" has the meaning set forth in **Section 8.02.**

"***Budget Supplement***" has the meaning set forth in **Section 8.02**.

"***Business Day***" means a day (other than a Saturday or Sunday) on which commercial banks are not authorized or required to close in New York City.

"***Capital Expenditures***" means, for any period, the aggregate of all expenditures (including that portion of Capitalized Lease Obligations attributable to that period) made in respect of the purchase, construction or other acquisition of fixed or capital assets, in each case determined in accordance with GAAP.

"***Capital Lease Obligations***" means, as to any Person, the obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real and/or personal property, the amount of the liability in respect thereof that would at that time be required to be capitalized on a balance sheet in accordance with GAAP.

"***Carve-Out***" has the meaning assigned to such term in the Interim DIP Order (with respect to the period prior to entry of the Final DIP Order) or the Final DIP Order (from and after the date on which the Final DIP Order is entered).

"***Cash Equivalents***" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii)

issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any United States dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed one year.

"***Casualty Event***" means the damage, destruction or condemnation, as the case may be, of property of the Borrower or any of its Subsidiaries in excess of $2,000,000.

"***Change of Control***" means an event or series of events:

(i)    as a result of which (A) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Act, but excluding any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any Plan) other than the Permitted Investors becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all Equity Interests that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "***option right***")), directly or indirectly, of fifty percent (50%) or more of the Equity Interests of the Borrower entitled to vote for members of the Board of the Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such person or group has the right to acquire pursuant to any option right) or (B) the Permitted Abrams Holders cease to collectively own a majority of the Equity Interests of the Borrower entitled to vote for members of the Board of the Borrower that the Permitted Abrams Holders held as of the Closing Date (and taking into account all Equity Interests that the Permitted Abrams Holders right to acquire pursuant to any option right), or

(ii)    as a result of which, during any period of twelve (12) consecutive months, commencing after the Closing Date, a majority of the members of the Board of the Borrower cease to be composed of individuals (x) who were members of such Board on the first day of such period, (y) whose election or nomination to such Board was approved by individuals referred to in **clause (x)** above in this subsection (ii) constituting at the time of such election or nomination at least a majority of such Board or equivalent governing body or (z) whose election or nomination to such Board was approved by individuals referred to in **clauses (x)** and **(y)**

above in this subsection (ii) constituting at the time of such election or nomination at least a majority of such Board; or

       (iii) that results in the sale, including without limitation any exclusive licensing, of all or substantially all of the assets or businesses of the Borrower and its Subsidiaries, taken as a whole; or

       (iv) that results in the Borrower's failure to own, directly or indirectly, beneficially and of record, one-hundred percent (100%) of all issued and outstanding Equity Interests of each Subsidiary Guarantor and the Permitted Swiss Subsidiary.

 "*charges*" has the meaning set forth in **Section 14.17**.

 "*Chapter 11 Cases*" as defined in the recitals to this Agreement.

 "*Chapter 11 Order*" means any order of the Bankruptcy Court in the Chapter 11 Cases in form and substance, and on terms and conditions, reasonably satisfactory (other than the DIP Orders, which shall be satisfactory to the Majority Lenders in their sole discretion) to the Majority Lenders (including, without limitation, as applicable, the Interim DIP Order, Final DIP Order, the First Day Orders, and the Second Day Orders).

 "*Chapter 11 Plan*" means any plan of reorganization or liquidation (as the case may be) in any or all of the Chapter 11 Cases.

 "*Chapter 11 Plan Effective Date*" means, with respect to any Chapter 11 Plan, the date of "substantial consummation" (as such term is defined in Section 1101 of the Bankruptcy Code) of any Chapter 11 Plan; provided, that, for purposes of this Agreement, "substantial consummation" shall in any event be deemed to occur no later than the effective date of such Chapter 11 Plan.

 "*Chapter 11 Unsecured Creditors Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases, pursuant to Section 1102 of the Bankruptcy Code, if any.

 "*Claims*" means (and includes) any claim, demand, complaint, grievance, action, application, suit, cause of action, order, charge, indictment, prosecution, judgement or other similar process, whether in respect of assessments or reassessments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including fees and disbursements of legal counsel, and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

 "*Closing Date*" means the date on which the conditions precedent specified in **Section 6.01** are satisfied (or waived in accordance with **Section 14.04**).

 "*Closing Date Property*" means each of the Property and the properties located at 2250 Riley St., Auburn, AL and any other real property owned by the Obligors as of the Closing Date.

"***Coating Building***" means the coating facility to be constructed upon that certain real property owned by the City of Auburn, AL and located on Paul Parks Blvd, Auburn, AL, in the County for use by the Borrower and its Subsidiaries.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"***Collateral***" has the meaning given to it in the Security Agreement, the DIP Orders and each other applicable Loan Document.

"***Company Competitor***" means (i) any competitor of the Borrower or any of its Subsidiaries primarily operating in the same line of business as the Borrower or any of its Subsidiaries and (ii) any of such competitor's Affiliates (other than any Person that is a bona fide debt fund primarily engaged in the making, purchasing, holding or other investing in commercial loans, notes, bonds or similar extensions of credit or securities in the Ordinary Course) that, in the case of each of clauses (i) and (ii), are identified by name in writing by the Borrower to the Administrative Agent from time to time.

"***Compliance Certificate***" has the meaning set forth in **Section 8.01(b)**.

"***Connection Income Taxes***" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"***Contracts***" means any contract, license, lease, agreement, obligation, promise, undertaking, understanding, arrangement, document, commitment, entitlement or engagement under which a Person has, or will have, any liability or contingent liability (in each case, whether written or oral, express or implied, and whether in respect of monetary or payment obligations, performance obligations or otherwise).

"***Control***" means, in respect of a particular Person, the possession by one or more other Persons, directly or indirectly, of the power to direct or cause the direction of the management or policies of such particular Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"***Controlled Account***" has the meaning set forth in **Section 8.22(a)**.

"***Copyright***" means published and unpublished works of authorship whether or not copyrightable, including software, website and mobile content, data, databases, and other compilations of information, in each case, whether or not registered, and any and all copyrights in and to the foregoing, together with all common law rights and moral rights therein, and all copyrights, copyright registrations and applications for copyright registrations, including all renewals, extensions, restorations, derivative works and reversions thereof and all common law rights, moral rights and other rights whatsoever accruing thereunder or pertaining thereto throughout the world.

"***County***" means Lee County, Alabama, and any political subdivision succeeding to the powers thereof.

"***Default***" means any Event of Default and any event that, upon the giving of notice, the lapse of time or both, would constitute an Event of Default.

"***Default Rate***" has the meaning set forth in **Section 3.02(b)**.

"***Deposit Account***" means any "Deposit Account," as such term is defined in Article 9 of the UCC (and all accounts and sub-accounts relating to any of the foregoing).

"***Debtor***" has the meaning set forth in the preamble to this Agreement.

"***Designated Jurisdiction***" means any country or territory to the extent that such country or territory is the subject of country- or territory-wide Sanctions.

"***DIP Draw Conditions***" has the meaning set forth in **Section 2.01(a)(i).**

"***DIP Facility***" has the meaning set forth in the preamble hereto.

"***DIP Facility Upfront Loans***" has the meaning set forth in **Section 2.01(a)(i).**

"***DIP Motion***" means the motion and proposed form of Interim DIP Order filed by the Obligors with the Bankruptcy Court on the Petition Date seeking approval, on an interim and final basis, of (among other things) the DIP Facility, and authorization for the use of cash collateral (including such terms and conditions relating to adequate protection in connection therewith), in each case, in form and substance acceptable to the Administrative Agent and the Lenders.

"***DIP Orders***" mean collectively, the Interim DIP Order and the Final DIP Order and separately, the Interim DIP Order or the Final DIP Order, as the context requires.

"***DIP Superpriority Claims***" has the meaning set forth in the DIP Orders.

"****Disbursements Variance***" has the meaning set forth in **Section 8.02(b)**.

"***Disqualified Equity Interests***" means, with respect to any Person, any Equity Interest of such Person that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable or requires such Person to use efforts to redeem such Equity Interests (in each case, other than solely for Qualified Equity Interests), including pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments of dividends or other distributions in cash or other securities that would constitute Disqualified Equity Interests, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date; <u>provided</u> that the Series B Preferred Stock of the Borrower issued to Doosan Corporation (as in effect on the Closing Date and without giving effect to any modifications except as permitted in accordance with **Section 9.12(a)**) shall not constitute Disqualified Equity Interests.

"***Disqualified Lender***" means any Person designated by the Borrower as a "Disqualified Lender" by written notice delivered to the Administrative Agent on or prior to the date of this Agreement.

"***Division***" has the meaning set forth in **Section 1.04**.

"***Dollars***" and "***$***" means lawful money of the United States of America.

"***Domestic Subsidiary***" means any Subsidiary that is a corporation, limited liability company, partnership or similar business entity incorporated, formed or organized under the laws of the United States, any state of the United States or the District of Columbia.

"***Doosan Documents***" means collectively, the Preferred Stock Purchase Agreement, dated as of December 15, 2021, and the Collaboration Agreement, the Amended and Restated Investors' Rights Agreement, the Amended and Restated Stockholders Right of First Refusal and Co-Sale Agreement, and the Amended and Restated Stockholders Voting Agreement, each dated as of December 20, 2021, by and among the Borrower and Doosan Corporation, in each case, as amended or otherwise modified from time to time in accordance with this Agreement.

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in **clause (a)** of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in **clause (a)** or **(b)** of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Eligible Transferee***" means and includes (i) any commercial bank, (ii) any insurance company, (iii) any finance company, (iv) any financial institution, (v) any Person that is a bona fide debt fund primarily engaged in the making, purchasing, holding or other investing in commercial loans, notes, bonds or similar extensions of credit or securities in the Ordinary Course, (vi) with respect to any Lender, any of its Affiliates or such Lender's or Affiliate's managed funds or accounts, and (vii) any other "accredited investor" (as defined in Regulation D of the Securities Act) that is principally in the business of managing investments or holding assets for investment purposes; provided that, an Eligible Transferee shall not include (x) any Company Competitor or Disqualified Lender or (y) any Person that primarily invests in distressed debt or other distressed financial assets; provided; further that (A) neither **clause (x)** or **(y)** above shall apply retroactively to any Person that previously acquired an assignment or participation interest hereunder to the extent such Person was not a Company Competitor or a Person of the type described in clause (y) above at the time of the applicable assignment or participation, as the case may be, and (B) with respect to both **clauses (x)** and **(y)** above, the Administrative Agent shall not have any duty or obligation to carry out due diligence in order to

identify or determine whether a Person would be excluded as an Eligible Transferee as a result of the application of either such clause.

"***Environmental Claims***" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, information request, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of, or liability relating to, any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment, arising out of a violation of Environmental Law or any Hazardous Materials Activity.

"***Environmental Law***" means all laws (including common law and any federal, state, provincial or local governmental law), rule, regulation, order, writ, judgment, notice, requirement, binding agreement, injunction or decree, whether U.S. or non-U.S., relating in any way to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) to the extent related to Hazardous Materials Activity, occupational safety and health, industrial hygiene, land use, natural resources or the protection of human, plant or animal health or welfare, in any manner applicable to the Borrower or any of its Subsidiaries or any Facility.

"***Environmental Liability***" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Obligor or any of its Subsidiaries directly or indirectly resulting from or based upon (i) violation of any Environmental Law, (ii) the generation, use, presence, emission, discharge, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (iii) exposure to any Hazardous Materials, (iv) the release or threatened release of any Hazardous Materials into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Equity Interests***" means, with respect to any Person (for purposes of this defined term, an "***issuer***"), all shares of, interests or participations in, or other equivalents in respect of such issuer's capital stock, including all membership interests, partnership interests or equivalent, and all debt or other securities directly or indirectly exchangeable, exercisable or otherwise convertible into, such issuer's capital stock, whether now outstanding or issued after the Closing Date, and in each case, however designated and whether voting or non-voting.

"***Equivalent Amount***" means, with respect to an amount denominated in one currency, the amount in another currency that could be purchased by the amount in the first currency determined by reference to the Exchange Rate at the time of determination.

"***ERISA***" means the United States Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means, collectively, any Obligor, Subsidiary thereof, and any Person under common control, or treated as a single employer, with any Obligor or Subsidiary thereof, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**_ERISA Event_**" means (i) a reportable event as defined in Section 4043 of ERISA with respect to a Title IV Plan, excluding, however, such events as to which the PBGC by regulation has waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event; (ii) the applicability of the requirements of Section 4043(b) of ERISA with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, to any Title IV Plan where an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such plan within the following thirty (30) days; (iii) a withdrawal by any Obligor or any ERISA Affiliate thereof from a Title IV Plan or the termination of any Title IV Plan resulting in liability under Sections 4063 or 4064 of ERISA; (iv) the withdrawal of any Obligor or any ERISA Affiliate thereof in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by any Obligor or any ERISA Affiliate thereof of notice from any Multiemployer Plan that it is insolvent pursuant to Section 4245 of ERISA; (v) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Title IV Plan or Multiemployer Plan; (vi) the imposition of liability on any Obligor or any ERISA Affiliate thereof pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the failure by any Obligor or any ERISA Affiliate thereof to make any required contribution to a Plan, or the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Title IV Plan (whether or not waived in accordance with Section 412(c) of the Code) or the failure to make by its due date a required installment under Section 430 of the Code with respect to any Title IV Plan or the failure to make any required contribution to a Multiemployer Plan; (viii) the determination that any Title IV Plan is considered an at-risk plan or a plan in endangered to critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; (ix) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan; (x) the imposition of any liability under Title I or Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or any ERISA Affiliate thereof; (xi) an application for a funding waiver under Section 303 of ERISA or an extension of any amortization period pursuant to Section 412 of the Code with respect to any Title IV Plan; (xii) the occurrence of a non-exempt prohibited transaction under Section 406 or 407 of ERISA for which any Obligor or any Subsidiary thereof may be directly or indirectly liable; (xiii) a violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary or disqualified person for which any Obligor or any ERISA Affiliate thereof may be directly or indirectly liable; (xiv) the occurrence of an act or omission which could give rise to the imposition on any Obligor or any ERISA Affiliate thereof of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Sections 409, 502(c), (i) or (l) or 4071 of ERISA; (xv) the assertion of a material claim (other than routine claims for benefits) against any Plan or the assets thereof, or against any Obligor or any Subsidiary thereof in connection with any such plan; (xvi) receipt from the IRS of notice of the failure of any Qualified Plan to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Qualified Plan to fail to qualify for exemption from taxation under Section 501(a) of the Code; (xvii) the imposition of any lien (or the fulfillment of the conditions for the imposition of any lien) on any of the rights, properties or assets of any

Obligor or any ERISA Affiliate thereof, in either case pursuant to Title I or IV, including Section 302(f) or 303(k) of ERISA or to Section 401(a)(29) or 430(k) of the Code; or (xviii) the establishment or amendment by any Obligor or any Subsidiary thereof of any "welfare plan", as such term is defined in Section 3(1) of ERISA, that provides post-employment welfare benefits in a manner that would increase the liability of any Obligor.

"***ERISA Funding Rules***" means the rules regarding minimum required contributions (including any installment payment thereof) to Title IV Plans, as set forth in Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"***Erroneous Payment***" has the meaning set forth in **Section 12.13(a)**.

"***Erroneous Payment Deficiency Assignment***" has the meaning set forth in **Section 12.13(d)**.

"***Erroneous Payment Impacted Loans***" has the meaning set forth in **Section 12.13(d)**.

"***Erroneous Payment Return Deficiency***" has the meaning set forth in **Section 12.13(d)**.

"***EU Bail-In Legislation Schedule***" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"***Event of Default***" has the meaning set forth in **Section 11.01**.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"***Exchange Rate***" means, as of any date, the rate at which any currency may be exchanged into another currency, as set forth on the relevant Reuters screen at or about 11:00 a.m. (Eastern time) on such date. In the event that such rate does not appear on the Reuters screen, the "Exchange Rate" shall be determined by reference to such other publicly available service for displaying exchange rates as may be reasonably designated by the Administrative Agent.

"***Excluded Accounts***" means (i) deposit accounts exclusively used for payroll, payroll Taxes and other employee wage and benefit payments to or for the benefit of any Obligor's employees which shall not exceed the amount necessary for the Borrower to fully-fund its next complete payroll cycle, (ii) [reserved], (iii) accounts used exclusively for bona fide insurance purposes in the Ordinary Course, (iv) cash collateral for Permitted Liens to the extent such cash collateral is permitted under **Section 9.02**, (v) [reserved]; and (vi) the Borrower's account ending in XXX9219 at Regions Bank for so long as (x) it is used by the Borrower to support credit card obligations of the Obligors in the Ordinary Course otherwise permitted by the terms hereof and (y) the aggregate amount on deposit in such account does not exceed $300,000 at any time.

"***Excluded Taxes***" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch

profits Taxes, in each case, (x) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivisions thereof) or (y) that are Other Connection Taxes, (ii) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or New Money Loan Commitment pursuant to a law in effect on the date on which (1) such Lender acquires such interest in the Loan or New Money Loan Commitment or (2) such Lender changes its lending office, except in each case to the extent that, pursuant to **Section 5.03**, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with **Section 5.03(f)**, and (iv) any withholding Taxes imposed under FATCA.

"***Facility***" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased or operated by any Obligor or any of its Subsidiaries.

"***FATCA***" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"***Federal Funds Effective Rate***" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; underline(provided) that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"***Fee Letter***" means the Fee Letter, dated as of the Closing Date, by and between Borrower and the Administrative Agent (as amended, modified or replaced from time to time).

"***Final DIP Order***" means an order of the Bankruptcy Court in the Chapter 11 Cases, which order (a) shall be in form and substance, and on terms and conditions, satisfactory to the Majority Lenders, (b) shall, subject to the foregoing, authorize and approve, on a final basis, among other things, the DIP Facility and the transactions related thereto (including the making of the Loans, the Roll-Up Loans, and the incurrence of the Obligations), the Debtors' use of cash collateral, and the grant of adequate protection, (c) shall be in full force and effect, and (d) (i) shall not have been reversed, vacated, or stayed and (ii) shall not have been amended, supplemented or otherwise modified since entry thereof by the Bankruptcy Court.

"***Final DIP Order Date***" means the date on which the Final DIP Order is approved and entered by the Bankruptcy Court.

"***First Day Motions***" means any "first day" motions and pleadings to be filed by the Obligors with the Bankruptcy Court on the Petition Date in connection with the Chapter 11 Cases, including, without limitation, the DIP Motion, each of which shall be in form and substance reasonably acceptable to the Administrative Agent.

"***First Day Orders***" means any order entered by the Bankruptcy Court in respect of First Day Motions.

"***Foreign Lender***" means a Lender that is not a U.S. Person.

"***Foreign Subsidiary***" means any Subsidiary that is not a Domestic Subsidiary.

"***Funding Date Certificate***" means a certificate substantially in the form of **Exhibit J**.

"***GAAP***" means generally accepted accounting principles in the United States of America, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board and in such other statements by such other entity as may be in general use by significant segments of the accounting profession that are applicable to the circumstances as of the date of determination. All references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements delivered pursuant to **Section 7.04**.

"***Governmental Approval***" means any consent, authorization, approval, order, license, franchise, permit, certification, accreditation, registration, clearance or exemption that is issued or granted by or from (or pursuant to any act of) any Governmental Authority, including any application or submission related to any of the foregoing.

"***Governmental Authority***" means any nation, government, branch of power (whether executive, legislative or judicial), state, province or municipality or other political subdivision thereof and any entity exercising executive, legislative, judicial, monetary, regulatory or administrative functions of or pertaining to government, including without limitation regulatory authorities, governmental departments, agencies, commissions, bureaus, officials, ministers, courts, bodies, boards, tribunals and dispute settlement panels, and other law-, rule- or regulation-making organizations or entities of any state, territory, county, city or other political subdivision of any country, in each case whether U.S. or non-U.S.

"***Guarantee***" of or by any Person (the "***guarantor***") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "***primary obligor***") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) as an account party in respect of any letter of credit or letter of

guaranty issued to support such Indebtedness or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course.

"*Guarantee Assumption Agreement*" means a Guarantee Assumption Agreement substantially in the form of **Exhibit C** by an entity that, pursuant to **Section 8.16**, is required to become a "Subsidiary Guarantor."

"*Guaranteed Obligations*" has the meaning set forth in **Section 13.01**.

"*Guarantor Payment*" has the meaning set forth in **Section 13.10(a)**.

"*Guaranty*" means the Guaranty made by the Subsidiary Guarantors under **Section 13** in favor of the Secured Parties (including any Guaranty assumed by an entity that is required to become a "Subsidiary Guarantor" pursuant to a Guarantee Assumption Agreement).

"*Hazardous Material*" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or would reasonably be expected to pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"*Hazardous Materials Activity*" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, release, threatened release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, recycling, disposition or handling of any Hazardous Materials, and any investigation, monitoring, corrective action or response action with respect to any of the foregoing.

"*Healthcare Laws*" means, collectively, all Laws and Product Authorizations applicable to the business of any Obligor or the Project, whether U.S. or non-U.S., regulating the distribution, dispensing, importation, exportation, quality, manufacturing, labeling, promotion and provision of and payment for drugs, medical or healthcare products, items and services, including, without limitation, 45 C.F.R. et seq. ("*HIPAA*"); Section 1128B(b) of the Social Security Act, as amended; 42 U.S.C. § 1320a-7b (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute"; § 1877 of the Social Security Act, as amended; 42 U.S.C. § 1395nn (Limitation on Certain Physician Referrals), commonly referred to as "Stark Statute"; all applicable Good Manufacturing Practice requirements addressed in the U.S. Food and Drug Administration's Quality System Regulation (21 C.F.R. Part 820); all rules, regulations and guidance with respect to the provision of Medicare and Medicaid programs or services (42 C.F.R. Chapter IV et seq.); 10 U.S.C. §§1071 – 1110(b) (the "*TRICARE Program*"); 5 U.S.C. §§ 8901 – 8914 ("*FEHB Plans*"); and all rules, regulations and guidance promulgated under or pursuant to any of the foregoing, including any non-U.S. equivalents.

"*Hedging Agreement*" means any interest rate exchange agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"*Indebtedness*" of any Person means, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments, (iii) all obligations of such Person upon which interest charges are customarily paid, (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (v) all obligations of such Person in respect of the deferred purchase price of property or services (excluding deferred compensation and accounts payable incurred in the Ordinary Course and not overdue by more than ninety (90) days), (vi) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (vii) all Guarantees by such Person of Indebtedness of others, (viii) all Capital Lease Obligations of such Person, (ix) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (x) obligations under any Hedging Agreement, currency swaps, forwards, futures or derivatives transactions, (xi) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (xii) all obligations under any earn-out and guaranteed minimum milestone and other payments of such Person under any license or other agreements (but excluding any payments based on sales under any such license or other agreement), (xiii) any Disqualified Equity Interests of such Person, (xiv) any Off-Balance Sheet Liability and (xv) all other obligations required to be classified as indebtedness of such Person under GAAP; <u>provided</u> that, notwithstanding the foregoing, Indebtedness shall not include accrued expenses, deferred rent, deferred taxes, deferred compensation or customary obligations under employment agreements, in each case, that are not overdue by more than forty-five (45) days. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"*Indemnified Party*" has the meaning set forth in **Section 14.03(b)**.

"*Indemnified Taxes*" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation and (ii) to the extent not otherwise described in **clause (i)**, Other Taxes.

"*Information Certificate*" means the Information Certificate delivered pursuant to **Section 6.01(m)**.

"*Initial Budget*" means a 13-week cash flow forecast for the 13-week period that (a) sets forth, on a line-item, cumulative and aggregate basis, the Debtor's projections for all weekly receipts and disbursements/expenditures (including debt service costs and operating disbursements) expected to be collected, incurred or made (as the case may be) by the Debtors, in each case, during the period beginning with the calendar week ending on Friday of the week in which the Petition Date occurs, and (b) is in all respects in form and substance reasonably satisfactory to the Lenders. For the avoidance of doubt, Exhibit B to the Interim DIP Order shall constitute the Initial Budget as approved by the Lenders (and a copy thereof is attached as Exhibit K hereto).

"*Insolvency Proceeding*" means (i) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (ii) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of any Person's creditors generally or any substantial portion of such Person's creditors, in each case undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"*Intellectual Property*" means all intellectual property or proprietary rights of any kind anywhere in the world, including any rights in or to Patents, Trademarks, Copyrights, Trade Secrets, whether U.S. or non-U.S.

"*Interest Payment Date*" has the meaning set forth in **Section 3.02(c)**

"*Interest Rate*" means 14.00% *per annum*.

"*Interim DIP Order*" means an order of the Bankruptcy Court in the Chapter 11 Cases in connection with the DIP Motion, which order shall (a) be in form and substance, and on terms and conditions, satisfactory to the Majority Lenders, (b) subject to the foregoing, authorize and approve, on an interim basis, among other things, the DIP Facility and all other matters set forth in, and transactions contemplated by, the DIP Motion, (including the DIP Facility, the making of the Loans, the New Money Loan Upfront Payment, the Termination Payment, and the incurrence of all other Obligations in accordance with the terms hereof, the Debtors' use of cash collateral, and the grant of adequate protection), (c) be in full force and effect, and (d) not have been reversed, vacated, stayed or amended, supplemented or otherwise modified (unless the Majority Lenders shall have previously consented thereto in writing).

"*Invention*" means any novel, inventive or useful art, apparatus, method, process, machine (including any article or device), manufacture or composition of matter, or any novel, inventive and useful improvement in any art, method, process, machine (including article or device), manufacture or composition of matter.

"*Investment*" means, for any Person: (i) the acquisition (whether for cash, property, services or securities or otherwise) of any debt or Equity Interests, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (ii) the making of any deposit with, or advance, loan, assumption of debt or other extension of credit to, or capital contribution in any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person), but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days arising in connection with the sale of inventory or supplies by such Person in the Ordinary Course; (iii) investments between or among the Borrower, its Subsidiaries or any Affiliates, consisting of cost sharing, transfer pricing or similar transactions (including any related intercompany balances and any capitalization of such balances); (iv) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or

extended to such Person or (v) the consummation of, or entering into any agreement to consummate, any Acquisition.  The amount of an Investment shall be the amount actually invested (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on such Person's good faith estimate of the fair market value of such asset or property at the time such Investment is made), minus, solely to the extent such original Investment consisted of cash, the amount of cash received or returned for such Investment, without adjustment for subsequent increases or decreases in the value of such Investment or write-ups, write-downs or write-offs with respect thereto; provided that in no event shall such amount be less than zero or increase any basket or amount pursuant to **Section 9.05** above the fixed amount set forth therein.

"***IRS***" means the U.S. Internal Revenue Service or any successor agency, and to the extent relevant, the U.S. Department of the Treasury.

"***Key Person***" means each of Ken Kelly, Chief Operations Officer of Borrower; Ahmad Taha, Chief Innovation Officer of Borrower; Yves Steffen, Chief Executive Officer of Borrower; Mike Harrison, Chief Accounting Officer of Borrower; Chris Weikart, Chief Scientific Officer of Borrower and Thomas Schwartz, Chief Commercial Officer of Borrower.

"***Law***" means, collectively, all U.S. or non-U.S. federal, state, provincial, territorial, municipal or local statute, treaty, rule, guideline, regulation, ordinance, code or administrative or judicial precedent or authority, including any interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority (including, any order of the Bankruptcy Court, pursuant to the Bankruptcy Code or otherwise in connection with the Chapter 11 Cases), in each case whether or not having the force of law.

"***Lenders***" has the meaning set forth in the preamble hereto.

"***Lender Professionals***" are (a) Sullivan & Cromwell LLP, New York counsel to the Lenders, (b) Young Conaway Stargatt & Taylor, LLP, Delaware counsel to the Lenders, (c) Houlihan Lokey, Inc., (c) such other local counsel and special counsel to the Lenders and/or the Administrative Agent (as applicable) as shall be deemed necessary or advisable by them, subject to the Borrower's consent (such consent not to be unreasonably withheld), and (d) such other consultants, and financial and other advisors to, accountants, and other professionals of, the Lenders as shall be deemed necessary or advisable by the Lenders, subject to the Borrower's consent (such consent not to be unreasonably withheld).

"***Lender Parties***" means collectively, the Lenders and the Lender Professionals (and, each individually, a "***Lender Party***").

"***Lender Consent***" has the meaning set forth in **Section 8.02.**

"***Lien***" means (a) any mortgage, lien, license, pledge, hypothecation, charge, security interest, or other encumbrance of any kind or character whatsoever, whether or not filed, recorded or otherwise perfected under applicable Law, or any lease, title retention agreement, mortgage, restriction, easement, right-of-way, option or adverse claim (of ownership or

possession) (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any other encumbrance on title to real property, any option or other agreement to sell, or give a security interest in, such asset and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes of any jurisdiction)) or any preferential arrangement that has the practical effect of creating a security interest and (b) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"***Loan***" means each and any New Money Loan, Roll-Up Loan, DIP Facility Upfront Loan, and any other loan made (or deemed made) hereunder or pursuant hereto from time to time.

"***Loan Documents***" means, collectively, this Agreement, the Notes, the Security Documents, the DIP Orders, the Fee Letter, any Guarantee Assumption Agreement, and any subordination agreement, intercreditor agreement or other present or future document, instrument, agreement or certificate delivered to the Administrative Agent (for itself or for the benefit of any other Secured Party) in connection with this Agreement or any of the other Loan Documents, in each case, as amended or otherwise modified.

"***Loss***" means judgments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any Claim or any proceeding relating to any Claim.

"***Majority Lenders***" means, at any time, Lenders having at such time in excess of fifty percent (50%) of the aggregate New Money Loan Commitments (or, if such New Money Loan Commitments are terminated, the outstanding principal amount of the Loans) then in effect.

"***Margin Stock***" means "margin stock" within the meaning of Regulations U and X.

"***Material Adverse Change***" and "***Material Adverse Effect***" mean a material adverse change in or effect on (i) the business, financial performance, operations, condition of the assets or liabilities of the Borrower and its Subsidiaries taken as a whole, (ii) the ability of any Obligor to perform its obligations under the Loan Documents, as and when due, (iii) the legality, validity, binding effect or enforceability of the Loan Documents or (iv) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent or the Secured Parties under any of the Loan Documents, in each case, other than as a result of the events and conditions related and/or leading up to the commencement of the Chapter 11 Cases, or any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases.

"***Material Agreement***" means any Contract that would be required to be disclosed (including amendments thereto) under regulations promulgated under the Securities Act of 1933 or Securities Exchange Act of 1934, as may be amended, if the Borrower was a publicly reporting company subject to the requirements of the Securities Exchange Act of 1934. For the avoidance of doubt, employment and management contracts shall not be Material Agreements.

"*Material Indebtedness*" means, at any time, any Indebtedness of any Obligor or Subsidiary thereof, the outstanding principal amount of which, individually or in the aggregate, exceeds $5,000,000 (or the Equivalent Amount in other currencies).

"*Material Intellectual Property*" means all Intellectual Property, whether currently owned by (or purported to be owned by) or licensed to (or purported to be licensed to) the Borrower or any of its Subsidiaries, or acquired, developed or obtained by or otherwise licensed to the Borrower or any of its Subsidiaries after the Closing Date that is, in each case, material to any current, planned or anticipated business of the Borrower and its Subsidiaries.

"*Maturity Date*" means the date that is 120 days after the Petition Date, provided if such day is not a Business Day, then the immediately preceding Business Day.

"*Maximum Rate*" has the meaning set forth in **Section 14.17**.

"*Milestone*" has the meaning set forth on **Exhibit L** hereto.

"*Multiemployer Plan*" means any multiemployer plan, as defined in Section 400l(a)(3) of ERISA, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"*Net Cash Proceeds*" means, (i) with respect to any Casualty Event experienced or suffered by any Obligor or any of its Subsidiaries, the amount of cash proceeds received (directly or indirectly) from time to time by or on behalf of such Person after deducting therefrom only (w) reasonable costs and expenses related thereto incurred by such Obligor or such Subsidiary in connection therewith, (x) Taxes (including transfer Taxes or net income Taxes) paid or payable in connection therewith, (y) reasonable reserves established for liabilities estimated to be payable in respect of such Casualty Event and deposited into escrow with a third party escrow agent on terms reasonably acceptable to the Administrative Agent or set aside in a separate Deposit Account that is subject to a control agreement in favor of the Administrative Agent and (z) any amounts required to be used to prepay Permitted Indebtedness pursuant to **Sections 9.01(g)** secured by the assets subject to such Casualty Event (other than (A) Indebtedness owing to the Administrative Agent or any Lender under this Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset); and (ii) with respect to any Asset Sale by any Obligor or any of its Subsidiaries, the amount of cash proceeds received (directly or indirectly) from time to time by or on behalf of such Person after deducting therefrom only (w) reasonable costs and expenses related thereto incurred by such Obligor or such Subsidiary in connection therewith, (x) Taxes (including transfer Taxes or net income Taxes) paid or payable in connection therewith, (y) reasonable reserves established for liabilities estimated to be payable in respect of such Asset Sale and deposited into escrow with a third party escrow agent on terms reasonably acceptable to the Administrative Agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of the Administrative Agent and (z) any amounts required to be used to prepay Permitted Indebtedness pursuant to **Sections 9.01(g)** secured by the assets subject to such Asset Sale (other than (A) Indebtedness owing to the Administrative Agent or any Lender under this Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset); provided that, in each case of **clauses (i)** and **(ii)**, costs and expenses shall only be deducted to the extent, that the amounts so deducted are (x) actually paid

to a Person that is not an Affiliate of any Obligor or any of its Subsidiaries and (y) properly attributable to such Casualty Event or Asset Sale, as the case may be.

"***New Money Loan Cap***" means $60,000,000.

"***New Money Loan Commitment***" shall mean the amount in U.S. Dollars set opposite each Lender's name under the heading "New Money Loan Commitment" as set forth on Schedule 1 or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed or reduced from time to time pursuant to the terms hereof; <u>provided</u>, that the aggregate amount of the New Money Loan Commitment shall not exceed the New Money Loan Cap.

"***New Money Loan Commitment Termination Date***" means the earliest to occur of (a) the Termination Date and (b) the date on which the New Money Loan Commitments are reduced to zero, or otherwise terminate or expire, or are cancelled, in each case, in accordance with the terms hereof.

"***New Money Loan Upfront Payment***" shall mean the payment (for the account of each Lender holding a New Money Loan Commitment) required to be made by the Borrower on the Closing Date and otherwise in accordance with **Sections 2.01(a)(i)** and **5.06(c)** hereof, in an amount equal to 5.00% of such Lender's New Money Commitment as of the Closing Date.

"***New Money Loans***" means Loans made hereunder pursuant to a funding of cash by Lenders having New Money Loan Commitments.

"***Note***" means a promissory note, in substantially the form of **Exhibit A** hereto, executed and delivered by the Borrower to any Lender in accordance with **Section 2.04**.

"***NY UCC***" means the UCC as in effect from time to time in New York.

"***Oaktree Lender***" means any Lender that is an Affiliate or managed fund or account of Oaktree Capital Management, L.P.

"***Obligations***" all (a) principal of, and premium, if any, on the Loans (including all Roll-Up Loans (including any Roll-Up PIK Interest accrued and capitalized), all New Money Loans, all DIP Facility Upfront Loans and Loans resulting from, and deemed made in connection with payment of, the New Money Loan Upfront Payment and the Termination Payment), and, without limiting the foregoing, all obligations and indebtedness with respect to the New Money Loan Upfront Payment and the Termination Payment, (b) interest (including interest accruing after the Termination Date or other maturity of the Loans, and Post-Petition Interest), expenses, fees, indemnification obligations and other amounts payable by Obligors under Loan Documents and all charges accruing during the Chapter 11 Cases, and (c) other Indebtedness obligations and liabilities of any kind owing by the Obligors pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any insolvency proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

"*Obligors*" means, collectively, the Borrower and the Subsidiary Guarantors and their respective successors and permitted assigns.

"*OFAC*" has the meaning assigned to such term in the definition of "Anti-Terrorism Laws."

"*Off-Balance Sheet Liability*" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"*Ordinary Course*" means, taking into account the Chapter 11 Cases, in respect of any obligation of, transaction involving, action taken by, or agreement or arrangement entered into by, any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice or otherwise undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in, or any requirement of, any Loan Document or applicable Law; provided, that, (i) any of the foregoing that occurs on or at any time after the Petition Date shall only be deemed to be in the Ordinary Course if and to the extent that the same constitutes "Ordinary Course" pursuant to section 363 of the Bankruptcy Code, and (ii) any payment, disbursement or liability made or arising as of the Petition Date shall only be deemed to be in the Ordinary Course if, in addition to satisfying the foregoing requirements, the same shall be in accordance with the Approved Budget.

"*Organic Document*" means, for any Person, such Person's formation documents, including, as applicable, its certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts, investor rights agreements, voting rights agreements, co-sale agreements and similar arrangements applicable to such Person's Equity Interests, or any equivalent document of any of the foregoing.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 5.04**).

"*Participant*" has the meaning set forth in **Section 14.05(e)**.

-22-

"***Participant Register***" has the meaning set forth in **Section 14.05(e)**.

"***Patents***" means all patents and patent applications, including (i) the Inventions and improvements described and claimed therein, (ii) the reissues, divisions, continuations, renewals, extensions, and continuations in part thereof, and (iii) all rights whatsoever accruing thereunder or pertaining thereto throughout the world.

"***Patriot Act***" has the meaning set forth in **Section 14.19**.

"***Payment in Full***" means with respect to the Loans and all other Obligations (other than contingent indemnification or other contingent obligations as to which no claim has been asserted), (a) the indefeasible payment thereof in full in cash in accordance with the Loan Documents or as otherwise consented to in writing by the Lenders (including in connection with any transaction pursuant to which all or substantially all of the Debtors' property and assets are sold, transferred or otherwise disposed of (including pursuant to Section 363 of the Bankruptcy Code)), including with respect to the Termination Payments, and all interest, fees and other amounts (including Post-Petition Interest); provided, that, notwithstanding the foregoing, "Payment in Full" shall not be deemed to occur, and no Loans shall be deemed to have been paid in full, unless and until such time as all New Money Loan Commitments shall have irrevocably, permanently and finally expired, or shall have been so terminated, cancelled and discharged. "Payment in Full" shall also include any reference to "payment in full", "paid in full", "repaid in full", "prepaid in full", "redeemed in full" or any other term or word of similar effect used in this Agreement or any other Loan Document.

"***Payment Recipient***" has the meaning set forth in **Section 12.13(a)**.

"***PBGC***" means the United States Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"***Permits***" means all licenses, permits and certificates of the Borrower and any of its Affiliates used or useful in connection with the ownership, operation, use or occupancy of the Property or the Project.

"***Permitted Abrams Holders***" means (i) Robert S. Abrams and his Affiliates, including A. Enterprises, LLC, (ii) any child, stepchild, grandchild, spouse, sibling, daughter-in-law, son-in-law, sister-in-law or brother-in-law, including adoptive relationships, (iii) any trust for the benefit of such individuals identified in clause (ii), (iv) the estate of Robert S. Abrams (including the beneficiaries thereof).

"***Permitted Cash Equivalent Investments***" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States or any member states of the European Union or any agency or any state thereof having maturities of not more than one (1) year from the date of acquisition, (ii) commercial paper maturing no more than two hundred seventy (270) days after the date of acquisition thereof and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc., (iii) certificates of deposit maturing no more than one (1) year after issue that are issued by any bank organized under the Laws of the United States, or any state thereof, or the District of Columbia, or any U.S. branch of a foreign bank having, at the date of acquisition thereof, combined capital and surplus of not less than

$500,000,000 and (iv) any money market or similar funds that exclusively hold any of the foregoing.

"***Permitted Exclusive License***" means that certain (i) Agreement for a License and Supply Agreement from SiO2 to Santo, dated as of August 5, 2015, by and between the Borrower and Santo, (ii) Letter Agreement Regarding Exclusive Licenses to SiO2 Technology, dated as of July 11, 2017, by and between Santo and the Borrower and (iii) License Agreement Confirmation and Right to Manufacture Agreement, entered into as of August 20, 2020, by and among the Borrower, Santo and Klinge Biopharma GmbH.

"***Permitted Hedging Agreement***" means a Hedging Agreement entered into by any Obligor in such Obligor's Ordinary Course for the purpose of hedging interest rate risks (and not for speculative purposes) and in an aggregate notional amount for all such Hedging Agreements in excess of 50%, but not more than 100%, of the aggregate principal amount of Loans outstanding at such time.

"***Permitted Indebtedness***" means any Indebtedness permitted under **Section 9.01**.

"***Permitted Investors***" means (i) the Permitted Abrams Holders, (ii) Patiro Holding AG and its Affiliates, (iii) JMC Glass, LLC and its Affiliates, (iv) Bernhard Hampl, and (v) The Teachers' Retirement System of Alabama and the Employees' System of Alabama and their respective Affiliates; provided that Patiro Holding AG and its Affiliates shall cease to be Permitted Investors if at any time they collectively beneficially own, directly or indirectly, seventy percent (70%) or more of the Equity Interests of the Borrower entitled to vote for members of the Board of the Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such persons have the right to acquire pursuant to any option right).

"***Permitted Licenses***" are outbound non-exclusive licenses for the use of the Intellectual Property of any Borrower or any of their Subsidiaries to non-Affiliates on arm's length terms entered into in the Ordinary Course.

"***Permitted Liens***" means any Liens permitted under **Section 9.02**.

"***Permitted Swiss Subsidiary***" means a single wholly-owned Subsidiary of the Obligors organized under the laws of Switzerland that at all times individually constitutes or holds less than one percent (1%) of the Borrower's consolidated total assets and generates less than one percent (1%) of the Borrower's consolidated total revenue measured over the most recent fiscal period for which financial statements were required to have been delivered pursuant to **Section 8.01(a)** or (**b**). If at any time the Permitted Swiss Subsidiary constitutes or holds one percent (1%) or more of the Borrower's consolidated total assets or generates one percent (1%) or more of the Borrower's consolidated total revenue, it shall constitute an immediate breach of **Section 9.21** and an Event of Default.

"***Permitted Swiss Subsidiary Operating Expenses***" means (x) cash payroll expenses for employees of the Permitted Swiss Subsidiary for the next 30 day payroll period and (y) cash operating expenses in connection with offices of the Permitted Swiss Subsidiary in an amount not to exceed $55,000 per month, in each case, incurred in the Ordinary Course and due or payable within 30 days of such payment.

"*Permitted Variance*" has the meaning set forth in **Section 9.24**.

"*Person*" means any individual, corporation, company, voluntary association, partnership, limited liability company, joint venture, trust, unincorporated organization or Governmental Authority or other entity of whatever nature.

"*Petition Date*" has the meaning set forth in the recitals to this Agreement.

"*Plan*" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"*Post-Petition Interest*" means with respect to any Loans or other Obligations hereunder, all interest, fees, expenses and other charges accruing after the filing of any petition under the Bankruptcy Law, or the commencement of any Insolvency Proceeding relating to any Obligor and/or any of its Subsidiaries (including, as applicable, the Chapter 11 Cases), whether or not a claim for post-filing or post-petition interest is allowed or allowable under the Bankruptcy Law or in any such Insolvency Proceeding.

"*Prepayment Premium*" means the Prepayment Premium (as defined in the Prepetition First Lien Term Loan Agreement) owed to the Prepetition First Lien Lenders.

"*Prepayment Price*" has the meaning set forth in **Section 3.03.**

"*Prepetition Credit Facility Debt*" means the Prepetition First Lien Term Loan Debt, the Prepetition Klinge Debt, the Prepetition Second Lien Term Loan Debt, the Prepetition Renesant Debt and the Prepetition Southern States Bank Debt.

"*Prepetition Debt*" means (a) all Prepetition Credit Facility Debt and (b) to extent permitted pursuant to **Section 9.01(b)**, all other Indebtedness incurred prior to, and outstanding as of, the Petition Date.

"*Prepetition First Lien Lenders*" shall mean the Lenders under the Prepetition First Lien Term Loan Agreement and their respective successors and assigns.

"*Prepetition First Lien Loan Parties*" shall mean the Obligors under the Prepetition First Lien Term Loan Agreement.

"*Prepetition First Lien Term Loan Agreement*" means that certain Credit Agreement and Guaranty, dated as of December 21, 2021 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), by and among the Prepetition First Lien Loan Parties, the lenders party thereto from time to time and the Prepetition First Lien Term Loan Agent.

"***Prepetition First Lien Term Loan Agent***" means Oaktree Fund Administration, LLC, as administrative agent under the Prepetition First Lien Term Loan Agreement, and each of its successors and permitted assigns.

"***Prepetition First Lien Term Loan Debt***" means all Indebtedness, obligations, liabilities and indebtedness of every kind, nature and description owing by the Obligors to the Prepetition First Lien Term Loan Agent and Prepetition First Lien Lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition First Lien Term Loan Documents (including the "Prepayment Fee" and all other "Obligations" as defined thereunder).

"***Prepetition First Lien Term Loan Documents***" shall mean, collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition First Lien Term Loan Agreement; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with, to or in favor of the Prepetition First Lien Term Loan Agent or any Prepetition First Lien Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition First Lien Term Loan Document".

"***Prepetition First Lien Term Loan Secured Parties***" shall mean, collectively, the Prepetition First Lien Lenders, the Prepetition First Lien Term Loan Agent and the other Secured Parties (as such term is defined under the Prepetition First Lien Term Loan Documents).

"***Prepetition First Lien Term Loans***" means the Loans under and defined in the Prepetition First Lien Term Loan Agreement.

"***Prepetition Klinge Promissory Note***" means the Secured Promissory Note dated as of January 17, 2020  (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date) by and between Klinge Biopharma Gmbh and the Borrower.

"***Prepetition Klinge Loan Documents***" shall mean, collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition Klinge Promissory Note; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with, to or in favor of Klinge Biopharma Gmbh in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition Klinge Loan Document"

"***Prepetition Klinge Debt***" means all Indebtedness, obligations, liabilities and indebtedness of every kind, nature and description owing by the Borrower to the Klinge Biopharma Gmbh, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition Klinge Loan Documents (including all "Obligations" as defined thereunder).

"***Prepetition Loan Documents***" shall mean the Prepetition First Lien Term Loan Documents, the Prepetition Second Lien Term Loan Documents and the Prepetition Renesant

Loan Documents, the Prepetition Klinge Loan Documents and the Prepetition Southern States Bank Loan Documents collectively, and each of them individually, as the context may require.

"***Prepetition Loan Agreements***" shall mean the Prepetition First Lien Term Loan Agreement, the Prepetition Second Lien Term Loan Agreement and the Prepetition Renesant Credit Facility, collectively, and each of them individually, as the context may require.

"***Prepetition Renesant Lenders***" shall mean the lenders under the Prepetition Renesant Credit Facility and their respective successors and assigns.

"***Prepetition Renesant Loan Parties***" shall mean the Borrower under the Prepetition Renesant Credit Facility.

"***Prepetition Renesant Credit Facility***" means that certain Amended and Restated Credit Agreement, dated as of February 26, 2021 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), by and among the Borrower and Renesant Bank.

"***Prepetition Renesant Debt***" means all Indebtedness, obligations, liabilities and indebtedness of every kind, nature and description owing by the Borrower to the Prepetition Renesant Lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition Renesant Loan Documents (including all "Obligations" as defined thereunder).

"***Prepetition Renesant Loan Documents***" shall mean, collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition Renesant Credit Facility; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with, to or in favor of any Prepetition Renesant Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition Renesant Loan Document".

"***Prepetition Renesant Secured Parties***" shall mean the Prepetition Renesant Lenders.

"***Prepetition Second Lien Lenders***" shall mean the lenders under the Prepetition Second Lien Term Loan Agreement and their respective successors and assigns.

"***Prepetition Second Lien Loan Parties***" shall mean the Obligors under the Prepetition Second Lien Term Loan Agreement.

"***Prepetition Second Lien Term Loan Agreement***" means that certain Credit Agreement and Guaranty, dated as of December 7, 2022 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), by and among the Prepetition Second Lien Loan Parties, the lenders party thereto from time to time and the Prepetition Second Lien Term Loan Agent.

"***Prepetition Second Lien Term Loan Agent***" means Salzufer Holding Inc., as administrative agent under the Prepetition Second Lien Term Loan Agreement, and each of its successors and permitted assigns.

"***Prepetition Second Lien Term Loan Debt***" means all Indebtedness, obligations, liabilities and indebtedness of every kind, nature and description owing by the Obligors to the Prepetition Second Lien Term Loan Agent and Prepetition Second Lien Lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition Second Lien Term Loan Documents (including all "Obligations" as defined thereunder).

"***Prepetition Second Lien Term Loan Documents***" shall mean, collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition Second Lien Term Loan Agreement; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with, to or in favor of the Prepetition Second Lien Term Loan Agent or any Prepetition Second Lien Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition Second Lien Term Loan Document".

"***Prepetition Second Lien Term Loan Secured Parties***" shall mean, collectively, the Prepetition Second Lien Lenders, the Prepetition Second Lien Term Loan Agent and the other Secured Parties (as such term is defined under the Prepetition Second Lien Term Loan Documents).

"***Prepetition Southern States Bank CAPEX Loan Agreement***" shall mean, that certain Credit Agreement dated as of February 3, 2020 (as amended or otherwise modified from time to time prior to, and in effect on, the Petition Date), by and among the Borrower and Southern States Bank.

"***Prepetition Southern States Bank CAPEX Non-Revolving Line of Credit Note***" shall mean, that certain Note dated as of February 3, 2020, by and among the Borrower and Southern States Bank.

"***Prepetition Southern States Bank Credit Facility***" shall mean (a) the Prepetition Southern States Bank CAPEX Loan Agreement, (b) the Prepetition Southern States Bank CAPEX Non-Revolving Line of Credit Note and (c) the Prepetition Southern States Bank USDA CARES Loan Agreement.

"***Prepetition Southern States Bank Debt***" means all Indebtedness, obligations, liabilities and indebtedness of every kind, nature and description owing by the Borrower to the Prepetition Southern States Bank Lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition Southern States Bank Loan Documents (including all "Obligations" as defined thereunder).

"***Prepetition Southern States Bank Lenders***" shall mean the lenders under the Prepetition Southern States Bank Loan Documents and their respective successors and assigns.

"***Prepetition Southern States Bank Loan Documents***" shall mean, collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended renewed, restated or replaced): (a) the Prepetition Southern States Bank CAPEX Loan Agreement, (b) the Prepetition Southern States Bank CAPEX Non-Revolving Line of Credit

Note (c) Prepetition Southern States Bank USDA CARES Loan Agreement and (d) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with to or in favor of any Prepetition Southern States Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition Southern States Bank Loan Document."

"***Prepetition Southern States Bank USDA CARES Loan Agreement***" shall mean, that certain Credit Agreement dated as of December 30, 2020 (as amended or otherwise modified from time to time prior to, and in effect on, the Petition Date), by and among the Borrower and Southern States Bank.

"***Prepetition Subordination and Intercreditor Agreement***" means each of (i) that certain Subordination and Intercreditor Agreement, dated as of December 7, 2022, by and among the Prepetition First Lien Term Loan Agent and Prepetition Second Lien Term Loan Agent, as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date and (ii) that certain Subordination Agreement, dated as of September 8, 2022, by and among the Prepetition First Lien Term Loan Agent, Santo Holding (Deutschland) GmbH and JMC Glass, LLC, as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date.

"***Prepetition Secured Obligations***" shall mean the "Obligations" as defined under the Prepetition Loan Documents.

"***Prepetition Secured Parties***" shall mean, collectively, the Prepetition First Lien Term Loan Secured Parties, the Prepetition Second Lien Term Loan Secured Parties and the Prepetition Renesant Secured Parties (and each of them individually, a "Prepetition Secured Party").

"***Product***" means (i) those products (and described in reasonable detail) on **Schedule 2** attached hereto, and (ii) any current or future product developed, distributed, dispensed, imported, exported, labeled, promoted, manufactured, licensed, marketed, sold or otherwise commercialized by any Obligor or any of its Subsidiaries, including any such product in development or which may be developed.

"***Product Authorizations***" means any and all Governmental Approvals, whether U.S. or non-U.S. (including all applicable Product Standards, supplements, amendments, pre- and post-approvals, governmental price and reimbursement approvals and approvals of applications for regulatory exclusivity) of any Regulatory Authority, in each case, necessary to be held or maintained by, or for the benefit of, any Obligor or any of its Subsidiaries for the ownership, use or commercialization of any Product or for any Product Commercialization and Development Activities with respect thereto in any country or jurisdiction.

"***Product Commercialization and Development Activities***" means, with respect to any Product, any combination of research, development, manufacture, import, use, sale, licensing, importation, exportation, shipping, storage, handling, design, labeling, marketing, promotion, supply, distribution, testing, packaging, purchasing or other commercialization activities, receipt of payment in respect of any of the foregoing (including, without limitation, in respect of

licensing, royalty or similar payments), or any similar or other activities the purpose of which is to commercially exploit such Product.

"***Product Standards***" means all safety, quality and other specifications and standards applicable to any Product, including all pharmaceutical, biological and other standards promulgated by Standards Bodies.

"***Prohibited Payment***" means any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment) to any officer, employee or ceremonial office holder of any government or instrumentality thereof, political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing that is prohibited under any Law for the purpose of influencing any act or decision of such payee in his official capacity, inducing such payee to do or omit to do any act in violation of his lawful duty, securing any improper advantage or inducing such payee to use his influence with a government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality.

"***Project***" means the prefilled syringe production facility located on the Property, infrastructure for such facility and amenities related thereto, as they may at any time exist.

"***Property***" means the real property situated in the County upon which the Project is located.

"***Proportionate Share***" means, with respect to any Lender, the percentage obtained by dividing (i) the sum of the New Money Loan Commitment (or, if the New Money Loan Commitments are terminated, the outstanding principal amount of the Loans) of such Lender then in effect by (ii) the sum of the New Money Loan Commitments (or, if the New Money Loan Commitments are terminated, the outstanding principal amount of the Loans) of all Lenders then in effect.

"***Qualified Equity Interest***" means, with respect to any Person, any Equity Interest of such Person that is not a Disqualified Equity Interest.

"***Qualified Plan***" means an employee benefit plan (as defined in Section 3(3) of ERISA) other than a Multiemployer Plan (i) that is or was at any time maintained or sponsored by any Obligor or any ERISA Affiliate thereof or to which any Obligor or any ERISA Affiliate thereof has ever made, or was ever obligated to make, contributions, and (ii) that is intended to be tax qualified under Section 401(a) of the Code.

"***Recipient***" means any Lender or any other recipient of any payment to be made by or on account of any Obligation.

"***Receipts Variance***" has the meaning set forth in **Section 8.02(b)**.

"***Register***" has the meaning set forth in **Section 14.05(d)**.

"***Regulation T***" means Regulation T of the Board of Governors of the Federal Reserve System, as amended.

"***Regulation U***" means Regulation U of the Board of Governors of the Federal Reserve System, as amended.

"***Regulation X***" means Regulation X of the Board of Governors of the Federal Reserve System, as amended.

"***Regulatory Approvals***" mean, with respect to a Product, the approval of the applicable Regulatory Authority necessary for the testing, manufacturing, use, storage, supply, promotion, marketing or sale of such Product for a particular indication in a particular jurisdiction.

"***Regulatory Authority***" means any Governmental Authority, whether U.S. or non-U.S., that is concerned with or has regulatory or supervisory oversight with respect to any Product or any Product Commercialization and Development Activities relating to any Product.

"***Related Parties***" or "***Related Persons***" has the meaning set forth in **Section 14.16**.

"***Resignation Effective Date***" has the meaning set forth in **Section 12.09**.

"***Resolution Authority***" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"***Responsible Officer***" of any Person means each of the president, chief executive officer, chief financial officer and similar officer of such Person.

"***Restricted Payment***" means (a) any dividend or other distribution (whether in cash, Equity Interests or other property) with respect to any Equity Interests of any Obligor or any of its Subsidiaries, (b) any payment (whether in cash, Equity Interests or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests of any Obligor or any of its Subsidiaries, or any option, warrant or other right to acquire any such Equity Interests of any Obligor or any of its Subsidiaries or (c) the making of any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Prepetition Debt (other than Prepetition First Lien Term Loan Debt) subordinated to the Obligations as to right and time of payment, as to lien priority, or as to other rights and remedies thereunder.

"***Restrictive Agreement***" means any Contract or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of any Obligor or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its properties or assets (other than (x) customary provisions in Contracts (including without limitation leases and in bound licenses of Intellectual Property) restricting the assignment thereof and (y) restrictions or conditions imposed by any Contract governing secured Permitted Indebtedness permitted under **Section 9.01(g)**, to the extent that such restrictions or conditions apply only to the property or assets securing such Indebtedness), or (ii) the ability of any Obligor (other than the Company) or any of its Subsidiaries to make Restricted Payments with respect to any of their respective Equity

Interests or to make or repay loans or advances to any other Obligor or any of its Subsidiaries or such other Obligor or to Guarantee Indebtedness of any other Obligor or any of its Subsidiaries thereof or such other Obligor.

"***Restructuring Costs***" means, collectively, any and all (a) fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus interest at the statutory rate; (b) allowed fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code; (c) amounts paid on account of the Adequate Protection (as defined in the DIP Orders); (d) fees or expenses incurred by the Lender Professionals; and (e) fees or expenses of any patient care ombudsman appointed by the Court pursuant to section 333 of the Bankruptcy Code.

"***Restructuring Support Agreement***" means that certain Restructuring Support Agreement, dated as of the Petition Date, by and among the Debtors and certain Holders of Claims and Interests (each as defined in the Chapter 11 Plan), including all exhibits and schedules attached thereto, as may be amended in accordance with its terms.

"***Roll-Up Loans***" has the meaning set forth in **Section 2.01(a)**.

"***Roll-Up PIK Interest***" has the meaning set forth in **Section 3.02(c)**.

"***Roll-Up Principal Amount***" means, with respect to each Roll-Up Loan incurred pursuant to **Section 2.01(a)** on each Borrowing Date, the amount of Prepetition First Lien Term Loans that, together with all accrued and unpaid interest, premiums and fees (including the Prepayment Premium) payable thereon pursuant to the terms of the Prepetition First Lien Term Loan Agreement (subject to the terms of the Interim DIP Order and Final DIP Order, as applicable), equal the amount of New Money Loans borrowed by the Borrower on such Borrowing Date.

"***Sanction***" means any international economic or financial sanction or trade embargo imposed, administered or enforced from time to time by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union or its Member States, His Majesty's Treasury or other relevant sanctions authority where the Borrower is located or conducts business.

"***Sanctioned Person***" means, at any time, (i) any Person listed in any Sanctions-related list of designated Persons maintained by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union or its Member States, Her Majesty's Treasury, or other relevant sanctions authority, (ii) any Person organized or resident in a Designated Jurisdiction or (iii) any Person fifty percent (50%) or more owned or is controlled by any such Person or Persons described in the foregoing **clause (i) or (ii)**.

"***Santo***" means Santo Holding (Deutschland) GmbH, a company incorporated under the laws of Germany.

"***Second Day Motions***" means any "second day" motions and pleadings to be filed by the Obligors with the Bankruptcy Court on or after the Petition Date in connection with the Chapter

11 Cases, each of which shall be in form and substance reasonably acceptable to the Administrative Agent.

"***Second Day Orders***" means any order entered by the Bankruptcy Court in respect of Second Day Motions.

"***Secured Parties***" means the Administrative Agent, the Lenders, the holders of all other Obligations and all Indemnified Persons.

"***Securities Act***" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"***Security Agreement***" the Security Agreement executed and delivered on the Closing Date pursuant to which, among other things, the Obligors party thereto grant to the Administrative Agent for the benefit of the Secured Parties a security interest and Lien in all of their Collateral to secure the Obligations and the Guarantors party thereto provide guaranties to the Administrative Agent for the benefit of the Secured Parties, as amended, restated, supplemented or otherwise modified from time to time.

"***Security Documents***" means, collectively, the Security Agreement, each Real Property Security Document, and each other security document, control agreement or financing statement required or recommended to perfect Liens in favor of the Secured Parties for purposes of securing the Obligations.

"***Specified Assets***" means all assets related to the Debtors' business and operations.

"***Specified Key Person***" means each of Ken Kelly, Chief Operations Officer of Borrower; Ahmad Taha, Chief Innovation Officer of Borrower and Yves Steffen, Chief Executive Officer of Borrower.

"***Standard Bodies***" means any of the organizations that create, sponsor or maintain safety, quality or other standards, including ISO, ANSI, CEN and SCC and the like.

"***Subordinated Loans***" means the Indebtedness outstanding under (i) the Prepetition Loan Documents (other than the Prepetition First Lien Term Loan Documents), (ii) that certain Unsecured Subordinated Promissory Note dated as of May 9, 2022 by and among the Borrower, as the borrower, and Santo Holding (Deutschland) GmhH, as lender, and (iii) that certain Unsecured Subordinated Promissory Note dated as of May 9, 2022 by and among the Borrower, as the borrower, and JMC Glass, LLC, as lender, as in effect on the Closing Date and without giving effect to any waiver, amendment, termination, replacement or modification unless such waiver, amendment, termination, replacement or modification is acceptable in form and substance to the Majority Lenders.

"***Subsidiary***" means, with respect to any Person (the "***parent***") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other

entity (i) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests are, as of such date, owned, controlled or held, directly or indirectly, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more direct or indirect subsidiaries of the parent or by the parent and one or more direct or indirect subsidiaries of the parent. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"*Subsidiary Guarantors*" means each Subsidiary of the Borrower identified under the caption "SUBSIDIARY GUARANTORS" on the signature pages hereto and each Subsidiary of the Borrower that becomes, or is required to become, a "Subsidiary Guarantor" after the Closing Date pursuant to **Section 8.16**.

"*Supplemental Fees*" shall have the meaning ascribed to such term in the Approved Budget in effect for the then Applicable Period.

"*Swiss Law Share Pledge*" means a pledge agreement in favor of the Administrative Agent, for the benefit of the Secured Parties, in respect of all outstanding issued Equity Interests of the Permitted Swiss Subsidiary, which shall be delivered in accordance with, and enforceable pursuant to, the laws of Switzerland.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Term Loan*" has the meaning assigned to such term in **Section 2.01**.

"*Termination Date*" means the earliest of the following: (a) the date that is 120 days after the Petition Date (or such later date as may be agreed in writing by the Majority Lenders) unless the Final DIP Order Date has occurred on or prior to such date, (b) the date of consummation of any sale of all or substantially all Specified Assets pursuant to section 363 of the Bankruptcy Code, (c) the Chapter 11 Plan Effective Date, (d) the Maturity Date, (e) the occurrence of any Event of Default under this Agreement or the other Loan Documents, (f) the date of entry of an order by the Bankruptcy Court approving (i) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (ii) a motion seeking the appointment or election of a trustee, receiver, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business, or if the Borrower or any Guarantor files a motion or other pleading seeking such conversion or dismissal unless otherwise consented to in writing by the Lenders, (g) the date the Bankruptcy Court orders the conversion of any Chapter 11 Case to a liquidation pursuant to chapter 7 of the Bankruptcy Code, (i) if the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto and (j) the date on which the Loans are accelerated or otherwise declared (or become) due and payable in accordance with the terms of this Agreement (whether automatically, or upon any Event of Default or as otherwise provided hereunder).

"***Termination Payment***" means each payment required to be made by the Borrower (for the account of the applicable Lenders) with respect to any Termination Payment Triggering Event, pursuant to **Section 5.06(d)** and the other applicable provisions hereof, which payment shall be in a Dollar amount equal to (a) in the case of any Termination Payment Triggering Event described in clause (a) of the definition thereof, 5.00% of the aggregate principal amount of the New Money Loans being prepaid, repaid, paid or redeemed (as applicable) at such time, and (b) in the case of any other Termination Payment Triggering Event, 5.00% of all New Money Loans outstanding as of such time.

"***Termination Payment Triggering Event***" means the occurrence of any of the following (without duplication): (a) subject to the provisions of **Section 3**, the making of any prepayment, repayment, payment or redemption (as applicable) of all or any portion of the Loans, whether before or after the occurrence of any Default or Event of Default or the Termination Date; (b) the occurrence of the Termination Date or the termination of this Agreement for any reason; (c) the acceleration of all or any portion of the Loans or other Obligations for any reason, or the occurrence of any other event or circumstance that causes any Loan or other Obligation to become (or to be declared) due and payable for any reason (including upon an Event of Default, pursuant to **Section 11.01** hereof, by operation of law, or otherwise); (d) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any Loan or other Obligation for any reason, including in any Insolvency Proceeding, any foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure, or the making of a distribution of any kind in any Insolvency Proceeding to the Lenders (whether directly or indirectly, including through the Administrative Agent or any other distribution agent), in full or partial satisfaction of any Loan or other Obligation and (e) any full or partial termination of any New Money Loan Commitments (except a voluntary reduction of New Money Loan Commitments consented to by the Lenders).

"***Termination Conditions***" has the meaning set forth in **Section 13.03**.

"***Title IV Plan***" means an employee benefit plan (as defined in Section 3(3) of ERISA) other than a Multiemployer Plan (i) that is or was at any time maintained or sponsored by any Obligor or any ERISA Affiliate thereof or to which any Obligor or any ERISA Affiliate thereof has ever made, or was obligated to make, contributions, and (ii) that is or was subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA.

"***Trade Secrets***" means all know-how, trade secrets and other proprietary or confidential information, any information of a scientific, technical, or business nature in any form or medium, Inventions and Invention disclosures, all documented research, developmental, demonstration or engineering work (including all novel manufacturing methods), and all other technical data and information related thereto.

"***Trademarks***" means all trade names, trademarks and service marks, trade dress, corporate names, logos, Internet domain names, IP addresses, social media handles, uniform resource locators and other indicia of origin, trademark and service mark registrations, and applications for trademark and service mark registrations, whether or not registered, and any and all common law rights thereto, including (i) all renewals of trademark and service mark registrations and (ii) all rights whatsoever accruing thereunder or pertaining thereto throughout

the world, together, in each case, with the goodwill of the business connected with the use thereof and symbolized thereby.

"**_Transactions_**" means (a) the negotiation, preparation, execution, delivery and performance by each Obligor of this Agreement and the other Loan Documents to which such Obligor is (or is intended to be) a party, the making of the Loans hereunder, and all other transactions contemplated pursuant to this Agreement and the other Loan Documents, including the creation of the Liens pursuant to the Security Documents, and (b) the payment of all fees and expenses incurred or paid by the Obligors in connection with the foregoing.

"**_Treasury Rate_**" means, as of any date of determination, the yield to maturity as of such date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the date of determination to the date that is 18 months after the Closing Date; provided, however, that if the period from such date to the date that is 18 months after the Closing Date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"**_UCC_**" means, with respect to any applicable jurisdictions, the Uniform Commercial Code as in effect in such jurisdiction, as may be modified from time to time.

"**_UK Financial Institutions_**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**_UK Resolution Authority_**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**_United States_**" or "**_U.S._**" means the United States of America, its fifty states and the District of Columbia.

"**_Updated Budget_**" has the meaning set forth in **Section 8.02(a).**

"**_U.S. Person_**" means a "United States Person" within the meaning of Section 7701(a)(30) of the Code.

"**_U.S. Tax Compliance Certificate_**" has the meaning set forth in **Section 5.03(f)(ii)(B)(3)**.

"**_Variance Report_**" has the meaning set forth in **Section 8.02(b).**

"**_Variance Report Deadline_**" has the meaning set forth in **Section 8.02(b).**

"*Withdrawal Liability*" means, at any time, any liability incurred (whether or not assessed) by any ERISA Affiliate and not yet satisfied or paid in full at such time with respect to any Multiemployer Plan pursuant to Section 4201 of ERISA.

"*Withholding Agent*" means the Borrower and the Administrative Agent.

"*Write-Down and Conversion Powers*" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.02**　　　　**Accounting Terms and Principles**. Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under **Section 10** and any definitions used in such calculations) shall be made, in accordance with GAAP. Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Borrower and its Subsidiaries, in each case without duplication. If the Borrower requests an amendment to any provision hereof to eliminate the effect of (a) any change in GAAP or the application thereof or (b) the issuance of any new accounting rule or guidance or in the application thereof, in each case, occurring after the date of this Agreement, then the Lenders and Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change or issuance with the intent of having the respective positions of the Lenders and Borrower after such change or issuance conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, (i) the provisions in this Agreement shall be calculated as if no such change or issuance has occurred and (ii) the Borrower shall provide to the Lenders a written reconciliation in form and substance reasonably satisfactory to the Lenders, between calculations of any baskets and other requirements hereunder before and after giving effect to such change or issuance. For purposes of the definition of Indebtedness and related covenants, GAAP will be deemed to treat any operating lease as an operating lease and not a capital lease, regardless of any change in GAAP as a result of ASU 2016-02, Leases (Topic 842) by the Financial Accounting Standards Board to the extent such operating lease was so treated under GAAP as in effect for any fiscal year of Borrower beginning before December 15, 2018.

**1.03**　　　　**Interpretation**. For all purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires,

　　　　　　(a)　　　the terms defined in this Agreement include the plural as well as the singular and vice versa;

(b)        words importing gender include all genders;

(c)        any reference to a Section, Annex, Schedule or Exhibit refers to a Section of, or Annex, Schedule or Exhibit to, this Agreement;

(d)        any reference to "this Agreement" refers to this Agreement, including all Annexes, Schedules and Exhibits hereto, and the words herein, hereof, hereto and hereunder and words of similar import refer to this Agreement and its Annexes, Schedules and Exhibits as a whole and not to any particular Section, Annex, Schedule, Exhibit or any other subdivision;

(e)        references to days, months and years refer to calendar days, months and years, respectively;

(f)        all references herein to "include" or "including" shall be deemed to be followed by the words "without limitation";

(g)        the word "from" when used in connection with a period of time means "from and including" and the word "until" means "to but not including";

(h)        the words "asset" and "property" shall be construed to have the same meaning and effect and to refer broadly to any and all assets and properties, whether tangible or intangible, real or personal, including cash, securities, rights under contractual obligations and permits and any right or interest in any such assets or property;

(i)        accounting terms not specifically defined herein (other than "property" and "asset") shall be construed in accordance with GAAP, subject to **Section 1.02**;

(j)        the word "will" shall have the same meaning as the word "shall";

(k)        where any provision in this Agreement or any other Loan Document refers to an action to be taken by any Person, or an action which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or, to the knowledge of such Person, indirectly; and

(l)        references to any Lien granted or created hereunder or pursuant to any other Loan Document securing any Obligations shall deemed to be a Lien for the benefit of the Secured Parties.

Unless otherwise expressly provided herein, references to organizational documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto permitted by the Loan Documents. Any definition or reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

If any payment required to be made pursuant to the terms and conditions of any Loan Document falls due on a day which is not a Business Day, then such required payment date shall be extended to the immediately following Business Day. For purposes of determining compliance

with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Obligors and their Subsidiaries will be deemed to be equal to 100% of the outstanding principal amount thereof or payment obligations with respect thereto at the time of determination thereof, or with respect to any Hedging Agreements, the amount that would be payable if the agreement governing such Hedging Agreements were terminated on the date of termination.

1.04        **Division**. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws) (a "***Division***"), if (a) any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

**SECTION 2.**
**THE COMMITMENT AND THE LOANS**

2.01        **Loans**.

(a)        <u>Roll-Up Loans</u>

(i)        Subject to the entry of and the terms and conditions of the Interim DIP Order and the Final DIP Order, as applicable, effective immediately and automatically upon each Borrowing Date, and without any further action by any party to this Agreement or the other Loan Documents, the Bankruptcy Court or any other Person, (x) an aggregate amount of Prepetition First Lien Term Loan Debt equal to 100% of the New Money Loans borrowed by the Borrower on such Borrowing Date (the "***Roll-Up Amount***"), consisting of a portion of the aggregate Prepetition First Lien Term Loans outstanding under the Prepetition First Lien Term Loan Agreement as of such Borrowing Date together with all accrued and unpaid interest, premiums and fees payable with respect to such portion of the Prepetition First Lien Term Loans as of such Borrowing Date (including the Prepayment Premium), shall be automatically deemed (on a cashless dollar-for-dollar basis) to constitute U.S. Dollar-denominated term loans under this Agreement in a principal amount equal to such Roll-Up Amount (the "***Roll-Up Loans***") based upon each such Lender's pro rata share, which Roll-Up Loans shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder on such Borrowing Date and (y) from and after the Closing Date, the outstanding aggregate amount of the Prepetition First Lien Obligations held by the Prepetition First Lien Term Loan Lenders shall be automatically deemed reduced by the Roll-Up Principal Amount; it being understood that the sum of the Roll-Up Principal Amount and all accrued and unpaid interest, premiums and fees thereon (including the Prepayment Premium) shall equal the amount of Roll-Up Loans incurred on such Borrowing Date so that the aggregate Prepetition First Lien Term Loan Debt outstanding as of such Borrowing Date shall be reduced by the Roll-Up Amount incurred on such Borrowing Date.

(b)        <u>New Money Loans</u>

(i)       Subject to the satisfaction of the applicable conditions precedent set forth in **Section 6** as well as the DIP Draw Conditions, and subject further to the other terms hereof, and relying upon the representations and warranties set forth herein, the Lenders agree to severally, but not jointly, make the following New Money Loans to the Borrower (unless the Termination Date shall have occurred):

(A)       during the period commencing on or after entry of the Interim DIP Order to but excluding the date of entry of the Final DIP Order (such period, the "***Interim Availability Period***"), the Borrower may request New Money Loans to finance disbursements projected to be made during the two (2) week period commencing with the date of the applicable draw, as set forth in the Approved Budget (subject to Permitted Variances) in effect at the time such draw is requested, subject to the provisions of the Interim DIP Order; provided, that, the aggregate amount of New Money Loans that shall be made during the Interim Availability Period shall not exceed $12,327,000 (or, if less, the maximum amount of new money loans approved pursuant to the Interim DIP Order) and

(B)       during the period commencing on or after entry of the Final DIP Order to but excluding the Termination Date (such period, the "***Final Availability Period***"), the Borrower may request New Money Loans to finance disbursements projected to be made during the two (2) week period commencing with the date of the applicable draw, as set forth in the Approved Budget (subject to Permitted Variances) in effect at the time such draw is requested, subject to the provisions of the Final DIP Order; provided, that, the aggregate amount of New Money Loans that shall be made during the Final Availability Period shall not exceed the remaining unfunded New Money Loan Commitments (or, if less, the maximum amount of new money loans approved pursuant to the Final DIP Order).

Notwithstanding the foregoing, (A) the Lenders shall not be required to fund New Money Loans on more than one Borrowing Date in any two (2) week period, (B) the Lenders shall not be required to fund any amount of any New Money Loan that exceeds the amount required to finance disbursements due and payable within two (2) weeks of such draw that have been set forth in the Approved Budget (subject to Permitted Variances), (C) no Lender shall be required to fund any amount of any New Money Loan that exceeds its then-outstanding unfunded New Money Loan Commitment, (D) no Lender shall be required to fund any amount of any New Money Loan if and to the extent that the Bankruptcy Court has not granted requisite approval of the Roll-Up Loans in the applicable DIP Order, (E) after the initial Borrowing of New Money Loans, no Lender shall be required to fund any amount of any New Money Loan as part of any subsequent Borrowing unless a Budget Supplement shall have been delivered to the Lenders immediately prior to such subsequent borrowing and such Budget Supplement shall have been approved by the Lenders and become the Approved Budget in effect as of the time of such Borrowing, and (F) no Lender shall be required to fund any amount of any New Money Loan unless each of the Milestones that were required to be satisfied prior to such time shall have been satisfied, and no Event of Default exists at the time of such Borrowing (the conditions set forth in clauses (A) - (F) above, the "***DIP Draw Conditions***"). Each Lender's New Money Loan Commitment shall automatically and permanently be reduced, on a dollar-for-dollar basis, by the amount of New Money Loans funded by it, and no amount of Loans that shall have been repaid or prepaid at any time may be re-borrowed. For the avoidance of doubt, in no event shall the Lenders be required to fund any Loans if such funding would cause the aggregate principal amount of Loans outstanding hereunder to exceed the

aggregate amount authorized pursuant to the Interim DIP Order (in the case of New Money Loans made prior to the Final DIP Order Date) or the Final DIP Order (in the case of New Money Loans made as of the Final DIP Order Date).

(ii)    In furtherance of **Section 5.06(c)**, on the Closing Date, the Borrower shall be required to pay the New Money Loan Upfront Payment for the account of the Lenders, which payment shall be effectuated pursuant to a deemed making by the Lenders of Loans on the Closing Date in an aggregate principal amount equal to the amount of the New Money Loan Upfront Payment (the "***DIP Facility Upfront Loans***"), which DIP Facility Upfront Loans shall have the same pricing, rights, privileges and other terms as otherwise attach to as all New Money Loans (whether or not any New Money Loans are outstanding as of such time), but shall be made automatically and immediately upon and concurrently with the occurrence of the Closing Date, without requirement for any cash to be advanced by any Lender.  The Borrower hereby agrees that they shall be deemed to have incurred the DIP Facility Upfront Loans automatically as of the Closing Date, by operation of the provisions hereof, without any further action by any Person, and that all DIP Facility Upfront Loans shall be outstanding as of such time, and interest shall accrue thereon in the same manner as interest would accrue on New Money Loans if any were made on such date.

(iii)    Once repaid, no Loan (or portion thereof) may be reborrowed.

**2.02**    **Borrowing Procedures**. In the case of a Borrowing, the Borrower shall give the Administrative Agent at least three (3) Business Day's prior written notice at the Administrative Agent's Office prior to 1:00 p.m. (EST) (other than the Borrowing to occur on the Closing Date, for which such written notice shall be delivered at least two (2) Business Days prior to such Borrowing) (the "***Notice of Borrowing***") in the case of a Borrowing (or such shorter period of time as consented to by the Majority Lenders).  Such Notice of Borrowing shall specify (i) the aggregate principal amount of New Money Term Loans to be borrowed, (ii) the date of the Borrowing (which shall be a Business Day) (the "***Borrowing Date***") and (iii) wire instructions for the account where funds should be sent.  The Administrative Agent shall promptly give each Lender written notice of the proposed Borrowing of New Money Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing.

**2.03**    **Funding of Borrowings**. Promptly following receipt of a written Notice of Borrowing, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing. Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof solely by wire transfer of immediately available funds, by 2:00 p.m. (Eastern time), to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. Upon receipt of all funds the Administrative Agent will make such Loans available to the Borrower promptly by wire transfer of the amounts so received, in like funds, to an account designated by the Borrower in the Notice of Borrowing.

**2.04**    **Notes**. If requested by any Lender, the Loan of such Lender shall be evidenced by one or more Notes. The Borrower shall prepare, execute and deliver to the Lender such promissory note(s) substantially in the form attached hereto as **Exhibit A**.

**2.05**        **Use of Proceeds**. The proceeds of New Money Loans, and cash and Cash Equivalents of the Obligors, shall, in each case, only be permitted to be used by the Obligors or their Subsidiaries: (a) for working capital and general corporate purposes of the Obligors; (b) to fund costs and expenses related to the Chapter 11 Cases, including for the avoidance of doubt, the fees of professionals retained by the company in the Chapter 11 Cases; (c) to fund the payment of interest, fees, costs, and expenses related to the DIP Facility, including the reasonable and documented fees and expenses of the Lender Professionals (such fees and expenses, the "DIP Professional Fees"); and (d) to finance disbursements, in each case, in accordance with the Approved Budget, subject to Permitted Variances, this Agreement, and the Chapter 11 Orders.

**2.06**        **Termination of Commitments; Voluntary Reduction of Commitments**. New Money Loan Commitments (if any remain unused, after giving effect to any funding of Loans on such date) shall automatically terminate on the Termination Date.  Upon at least two (2) Business Days (or such shorter period as Administrative Agent may agree at the direction of the Majority Lenders) prior written notice to Administrative Agent at any time, the Borrower may, at its option, terminate any New Money Loan Commitments.  Any notice of termination given by Borrower shall be irrevocable.

**SECTION 3.**
**PAYMENTS OF PRINCIPAL AND INTEREST, ETC.**

**3.01**        **Scheduled Repayments and Prepayments Generally; Application**. The Borrower hereby promises to pay to the Administrative Agent for the account of each Lender (as such amounts may in each case be reduced from time to time in accordance with **Section 3.03**) on the Maturity Date, all outstanding Obligations in full (together with accrued and unpaid interest and any other accrued and unpaid charges thereon and all other obligations due and payable by the Borrower under this Agreement, including the Termination Payment). Except as otherwise provided in this Agreement, each payment (including each repayment and prepayment) by the Borrower (other than fees payable pursuant to the Fee Letter) will be deemed to be made ratably in accordance with the Lenders' Proportionate Shares. On any date occurring prior to the Maturity Date that payment or prepayment in full of the Loans hereunder occurs, the Borrower shall pay in full all outstanding Obligations, which shall include the Termination Payment.

**3.02**        **Interest**.

        (a)        **Interest Generally**. The outstanding principal amount of the Loans shall accrue interest from the date made to repayment (whether by acceleration or otherwise and whether voluntary or mandatory) at the Interest Rate.

        (b)        **Default Interest**. Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, the Interest Rate shall increase automatically by two percent (2.0%) *per annum* (the Interest Rate, as increased pursuant to this **Section 3.02(b)**, being the "***Default Rate***"). If any Obligation (including, without limitation, fees, costs and

expenses payable hereunder) is not paid when due (giving effect to any applicable grace period) under any applicable Loan Document, the amount thereof shall accrue interest at the Default Rate.

(c)     **Interest Payment Dates**. Interest shall be paid monthly in arrears on the first Business Day of each calendar month (each, an "***Interest Payment Date***") payable (i) in the case of New Money Loans, in cash and (ii) in the case of Roll-Up Loans, in kind by capitalizing and adding such interest to the outstanding principal amount of the Roll-Up Loans on such Interest Payment Date ("***Roll-Up PIK Interest***"). The Roll-Up PIK Interest shall be automatically capitalized on the applicable Interest Payment Date by adding the amount thereof to the outstanding principal amount of the Roll-Up Loans.  For purposes of this Agreement and the other Loan Documents, the amounts so capitalized pursuant to this **Section 3.02** shall constitute a portion of the principal amount outstanding of the Roll-Up Loans hereunder and shall bear interest in accordance with this **Section 3** and all references herein or in any other Loan Document to the principal amount of the Loans or Roll-Up Loans, as applicable, shall include all interest accrued and capitalized as a result of any payment of PIK Interest.

**3.03**     **Prepayments**.

(a)     **Optional Prepayments.**

(i)     Subject to prior written notice pursuant to **clause (ii)** below, the Borrower shall have the right upon written notice to the Administrative Agent pursuant to **Section 3.03(a)(ii)** below to optionally prepay in whole or in part the outstanding principal amount of the Loans on any Business Day for an amount equal to the sum of (A) the aggregate principal amount of the Loans being prepaid, (B) any accrued but unpaid interest on the principal amount of the Loans being prepaid, (C) the Termination Payment with respect to such amount being prepaid and (D) other unpaid amounts then due and owing pursuant to this Agreement and the other Loan Documents (such aggregate amount, the "***Prepayment Price***"); provided that each partial prepayment of principal of Loans shall be in an aggregate amount at least equal to $5,000,000 and integral multiples of $1,000,000 in excess thereof (or, if less, the remaining principal amount of the outstanding Loans hereunder).

(ii)     A notice of optional prepayment shall be effective only if received by the Administrative Agent not later than 2:00 p.m. (Eastern time) on a date not less than three (3) (nor more than five (5)) Business Days prior to the proposed prepayment date; provided that a notice of optional prepayment may state that such notice is conditional upon the occurrence of an identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Each notice of optional prepayment shall specify the proposed prepayment date, the Prepayment Price, the principal amount to be prepaid and any conditions to prepayment (if applicable).

(b)     **Mandatory Prepayments.**

(i)     **Mandatory Prepayments for Casualty Events or Asset Sales**. Upon the occurrence of any Casualty Event or Asset Sale (that is not otherwise permitted by **Section 9.09**), the Borrower shall make a mandatory prepayment of the Loans in an amount

equal to the sum of (i) one hundred percent (100%) of the Net Cash Proceeds received by the Borrower or any of its Subsidiaries with respect to such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, as the case may be, (ii) any accrued but unpaid interest on any principal amount of the Loans being prepaid and (iii) the Termination Payment with respect to such amount being prepaid; <u>provided</u> that, with the prior written consent of the Majority Lenders, so long as no Default has occurred and is continuing or shall result therefrom, if, within fifteen (15) Business Days following the occurrence of any such Casualty Event or Asset Sale as a result of which the Borrower or any of its Subsidiaries receives Net Cash Proceeds in an aggregate amount less than $10,000,000 and $30,000,000 in the aggregate for all such Casualty Events or Asset Sales over the term of this Agreement), a Responsible Officer of the Borrower delivers to the Administrative Agent a notice to the effect that the Borrower or the applicable Subsidiary intends to apply the Net Cash Proceeds from such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, to reinvest in the business of the Borrower or any of its Subsidiaries (a "***Reinvestment***"), then such Net Cash Proceeds of such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event may be applied for such purpose in lieu of such mandatory prepayment to the extent such Net Cash Proceeds of such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event are actually applied for such purpose; <u>provided</u>, <u>further</u>, that, if such Casualty Event or Asset Sale occurs with respect to any Obligor, such Reinvestment shall be made in the business of an Obligor; <u>provided</u>, <u>further</u>, that, in the event that Net Cash Proceeds have not been so applied within three hundred sixty-five (365) days (the "***Reinvestment Period***") following the occurrence of such Casualty Event or Asset Sale (or, if the Borrower or any of its Subsidiaries has entered into a binding commitment prior to the last day of such Reinvestment Period to reinvest such proceeds no later than one hundred eighty (180) days following the last day of the Reinvestment Period, one hundred eighty (180) days after the expiry of the Reinvestment Period), the Borrower shall no later than the end of such period make a mandatory prepayment of the Loans in an aggregate amount equal to the sum of (i) one hundred percent (100%) of the unused balance of such Net Cash Proceeds received by any Obligor or any of its Subsidiaries with respect to such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, (ii) any accrued but unpaid interest on any principal amount of the Loans being prepaid and (iii) the Termination Payment with respect to such amount being prepaid.

(ii)    **Mandatory Prepayments for Debt Issuances**. Immediately upon receipt by any Obligor or any of its Subsidiaries of proceeds from any issuance, incurrence or assumption of Indebtedness other than Permitted Indebtedness, on or after the Closing Date, the Borrower shall prepay the Loans and other Obligations in an amount equal to 100% of the cash proceeds received, *plus* the Termination Payment, if applicable.

(iii)    [reserved]

(iv)    **Notice**. The Borrower shall provide the Administrative Agent with notice of any mandatory prepayment not later than 2:00 p.m. (New York City time) on a date not less than one (1) Business Day (or such shorter period agreed by the Administrative Agent) prior to the proposed prepayment date. Each notice of mandatory prepayment shall specify the proposed prepayment date, the Prepayment Price, the principal amount to be prepaid and the subsection under which the prepayment is required.

(c)     **Application**. All prepayments of the Loans shall be applied to principal installments on the Loans in the inverse order of maturity. Each such prepayment shall be accompanied by all accrued and unpaid interest on the Loans so prepaid, through the date of such prepayment and any applicable Termination Payment.

(d)     [reserved]

(e)     **Partial Prepayments**. Prepayments shall be accompanied by accrued interest to the extent required by **Section 3.02**.

**SECTION 4.**
**PAYMENTS, ETC.**

**4.01        Payments**

(a)     **Payments Generally**. Each payment of principal, interest and other amounts to be made in cash by the Obligors under this Agreement or any other Loan Document shall be made (i) in Dollars, in immediately available funds, without deduction, set off or counterclaim, to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, to the deposit account of the Administrative Agent designated by the Administrative Agent by notice to the Borrower, and (ii) not later than 2:00 p.m. (Eastern time) on the date on which such payment is due (each such payment made after such time on such due date may, in the Administrative Agent's discretion, be deemed to have been made on the next succeeding Business Day).

(b)     **Application of Payments**. Notwithstanding anything herein to the contrary, following the occurrence and continuance of an Event of Default, all payments shall be applied as follows, in all cases subject to the applicable DIP Order then in effect:

(i)     first, to the payment of that portion of the Obligations constituting unpaid fees, indemnities, expenses or other amounts (including fees and disbursements and other charges of the Lender Professionals) payable to the Administrative Agent in its capacity as such;

(ii)     second, to the payment of that portion of the Obligations constituting unpaid fees, indemnities, costs, expenses and other amounts (other than principal and interest, but including fees and disbursements and other charges of counsel payable under **Section 14.03**, and any Termination Payment) payable to the Lenders arising under the Loan Documents, ratably among them in proportion to the respective amounts described in this clause (ii) payable to them;

(iii)     third, to the payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause (iii) payable to them;

(iv)     fourth, to the payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause (iv) payable to them;

(v)      fifth, in reduction of any other Obligation then due and owing, ratably among the Administrative Agent and the Lenders based upon the respective aggregate amount of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

(vi)      sixth, the balance, if any, after all Obligations have been indefeasibly paid in full, to the Borrower or such other Person as may be lawfully entitled to or directed by the Borrower to receive the remainder.

(c)      **Non-Business Days**. If the due date of any payment under this Agreement (whether in respect of principal, interest, fees, costs or otherwise) would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall continue to accrue and be payable for the period of such extension; provided that if such next succeeding Business Day would fall after the Maturity Date, payment shall be made on the immediately preceding Business Day.

**4.02      Computations**. All computations of interest and fees hereunder shall be computed on the basis of a year of three hundred and sixty (360) days and actual days elapsed during the period for which payable.

**4.03      Set-Off**.

(a)      **Set-Off Generally**.  Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent, each of the Lenders and each of their Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law and subject to the applicable DIP Order then in effect, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than escrow, trust and tax accounts) at any time held and other indebtedness at any time owing by the Administrative Agent, any Lender and any of their Affiliates to or for the credit or the account of any Obligor against any and all of the Obligations, whether or not such Person shall have made any demand and although such obligations may be unmatured. Any Person exercising rights of set off hereunder agrees promptly to notify the Borrower after any such set-off and application; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Administrative Agent, the Lenders and each of their Affiliates under this **Section 4.03** are in addition to other rights and remedies (including other rights of set-off) that such Persons may have.

(b)      **Exercise of Rights Not Required**. Nothing contained in **Section 4.03(a)** shall require the Administrative Agent, any Lender or any of their Affiliates to exercise any such right or shall affect the right of such Persons to exercise, and retain the benefits of exercising, any such right with respect to any other indebtedness or obligation of any Obligor.

(c)      **Payments Set Aside.** To the extent that any payment by or on behalf of any Obligor is made to the Administrative Agent or any Lender, or the Administrative Agent, any Lender or any Affiliate of the foregoing exercises its right of setoff pursuant to this **Section 4.03**, and such payment or the proceeds of such setoff or any part thereof is subsequently

invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, such Lender or such Affiliate in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any Insolvency Proceeding or otherwise, then (i) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (ii) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

## SECTION 5.
## YIELD PROTECTION, TAXES, FEES, ETC.

**5.01**          **Additional Costs**.

(a)          **Change in Law Generally**. If, on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), the adoption of any Law, or any change in any Law, or any change in the interpretation or administration thereof by any court or other Governmental Authority charged with the interpretation or administration thereof, or compliance by the Administrative Agent or any of the Lenders (or its lending office) with any request or directive (whether or not having the force of law) of any such Governmental Authority, shall impose, modify or deem applicable any reserve (including any such requirement imposed by the Board of Governors of the Federal Reserve System), special deposit, contribution, insurance assessment or similar requirement, in each case that becomes effective after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), against assets of, deposits with or for the account of, or credit extended by, a Lender (or its lending office) or shall impose on a Lender (or its lending office) any other condition affecting the Loans or the New Money Loan Commitment, and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining the Loans, or to reduce the amount of any sum received or receivable by such Lender under this Agreement or any other Loan Document, or subject any Lender to any Taxes on its Loan, New Money Loan Commitment or other obligations, or its deposits, reserves, other liabilities or capital (if any) attributable thereto by an amount reasonably deemed by such Lender in good faith to be material (other than (i) Indemnified Taxes, (ii) Taxes described in **clauses (ii)** through **(iv)** of the definition of Excluded Taxes and (iii) Connection Income Taxes), then the Borrower shall pay to such Lender on demand such additional amount or amounts as will compensate such Lender for such increased cost or reduction.

(b)          **Change in Capital Requirements**. If a Lender shall have determined that, on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), the adoption of any Law regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, in each case that becomes effective after the Closing Date (or, with

respect to any Lender, such later date on which such Lender becomes a party to this Agreement), has or would have the effect of reducing the rate of return on capital of a Lender (or its parent) as a consequence of a Lender's obligations hereunder or the Loans to a level below that which a Lender (or its parent) could have achieved but for such adoption, change, request or directive by an amount reasonably deemed by it to be material, then the Borrower shall pay to such Lender on demand such additional amount or amounts as will compensate such Lender (or its parent) for such reduction.

(c)     **Notification by Lender**. Each Lender promptly will notify the Borrower of any event of which it has knowledge, occurring after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), which will entitle such Lender to compensation pursuant to this **Section 5.01**. Before giving any such notice pursuant to this **Section 5.01(c)** such Lender shall designate a different lending office if such designation (x) will, in the reasonable judgment of such Lender, avoid the need for, or reduce the amount of, such compensation and (y) will not, in the reasonable judgment of such Lender, be materially disadvantageous to such Lender. A certificate of such Lender claiming compensation under this **Section 5.01**, setting forth the additional amount or amounts to be paid to it hereunder, shall be conclusive and binding on the Borrower in the absence of manifest error.

(d)     Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to constitute a change in Law for all purposes of this **Section 5.01**, regardless of the date enacted, adopted or issued.

**5.02**     **Illegality**. Notwithstanding any other provision of this Agreement, in the event that on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement) the adoption of or any change in any Law or in the interpretation or application thereof by any competent Governmental Authority shall make it unlawful for a Lender or its lending office to make or maintain the Loans (and, in the opinion of such Lender, the designation of a different lending office would either not avoid such unlawfulness or would be disadvantageous to such Lender), then such Lender shall promptly notify the Borrower thereof, following which if such Law shall so mandate, the Loans shall be prepaid by the Borrower on or before such date as shall be mandated by such Law.

**5.03**     **Taxes**.

(a)     **Payments Free of Taxes**. Any and all payments by or on account of any Obligation shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws and, if such Tax is an Indemnified Tax, then the sum payable by such Obligor shall be increased as necessary so that

after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this **Section 5**) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      **Payment of Other Taxes by the Borrower**. Without duplication of any obligations under **Section 5.03(a)** the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Laws, or at the option of the Administrative Agent, timely reimburse it for the payment of any Other Taxes.

(c)      **Evidence of Payments**. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this **Section 5.03**, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)      **Indemnification by the Borrower**. Without duplication of any obligations under **Section 5.03(a)** and **(b)** the Borrower shall reimburse and indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this **Section 5**) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(e)      **Indemnification by the Lender**. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this **Section 5.03(e)**.

(f)      **Status of Lenders**.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the

Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Law as reasonably requested by the Borrower as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two (2) sentences, the completion, execution and submission of such documentation (other than such documentation set forth in **Sections 5.03(f)(ii)(A), (ii)(B),** and **(ii)(D)**) shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 (or successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E as applicable (or successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E as applicable (or successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI (or successor form);

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit D-1** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign

corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "***U.S. Tax Compliance Certificate***") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E as applicable (or successor forms); or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY (or successor form), accompanied by IRS Form W-8ECI (or successor form), IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), a U.S. Tax Compliance Certificate, substantially in the form of **Exhibit D-2** or **D-3**, IRS Form W-9 (or successor form), and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Exhibit D-4** on behalf of each such direct and indirect partner.

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)    if a payment made to a Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this **clause (D)**, "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(E)    if the Administrative Agent is a U.S. Person, it shall deliver to the Borrower on or prior to the date on which it becomes the Administrative Agent under this Agreement with two duly completed copies of Form W-9. If the Administrative Agent is not a U.S. Person, it shall provide to the Borrower on or prior to the date on which it becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower): (A) two executed copies of Form W-8ECI with respect to any amounts payable to the Administrative Agent for its own account, and (B) two executed copies of Form W-8IMY with respect to any amounts payable to the Administrative Agent for

the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a U.S. Person with respect to such payments as contemplated by Section 1.1441-1(b)(2)(iv) of the United States Treasury Regulations).

Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     **Treatment of Certain Tax Benefits**. If any party to this Agreement determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this **Section 5** (including by the payment of additional amounts pursuant to this **Section 5**), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this **Section 5** with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this **Section 5.03(g)** (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this **Section 5.03(g)**, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this **Section 5.03(g)** the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This **Section 5.03(g)** shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

**5.04**     **Mitigation Obligations**. If the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to **Section 5.01** or **Section 5.03**, then such Lender shall (at the request of the Borrower) use commercially reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the sole reasonable judgment of such Lender, such designation or assignment and delegation would (i) eliminate or reduce amounts payable pursuant to **Section 5.01** or **Section 5.03**, as the case may be, in the future, (ii) not subject such Lender to any unreimbursed cost or expense and (iii) not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and

expenses incurred by any Lender in connection with any such designation or assignment and delegation.

**5.05**     **Survival**. Each party's obligations under this **Section 5** shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the New Money Loan Commitments and the repayment, satisfaction or discharge of all Obligations under any Loan Document.

**5.06**     **Fees**.

(a)     Agent Fees. The Borrower shall pay to the Administrative Agent, for its own account, an annual, non-refundable agency fee and all such other amounts to be paid in accordance with the Fee Letter. The Borrower agrees that such agency fees once paid, will not be refundable under any circumstances. All such agency fees will be paid in cash in Dollars and shall not be subject to any reduction by way of setoff, counterclaim or otherwise.

(b)     No Refunds. No fees or other amounts payable hereunder (including the New Money Loan Upfront Payment and Termination Payment) shall be refundable under any circumstances.

(c)     New Money Loan Upfront Payment. The Borrower shall pay to each Lender holding a New Money Loan Commitment the New Money Loan Upfront Payment on the Closing Date, which New Money Loan Upfront Payment shall be paid pursuant to, and as further set forth in, **Section 2.01(b)(ii).**

(d)     Termination Payment.

(i)     As additional consideration for structuring and arranging the DIP Facility, committing to the New Money Loan Commitments, and on account of such other accommodations provided to the Borrower by the Lenders, and otherwise in connection with the transactions occurring pursuant hereto, the Borrower shall be liable to the Lenders to pay the Termination Payment (as set forth below) in connection with any Termination Payment Triggering Event. Each Termination Payment shall be deemed earned in full immediately and automatically upon such Lender executing this Agreement, and shall be paid in cash immediately upon the occurrence of any Termination Payment Triggering Event.

(ii)     If any Termination Payment becomes due and payable as set forth in this **Section 5.06(d)**, then the Termination Payment, as applicable, shall immediately and without further action constitute part of the Obligations payable by the Borrower (and guaranteed by the Guarantors) in respect of the Loans, which Obligations are guaranteed by the Guarantors and secured by the Collateral, and constitutes liquidated damages, not unmatured interest or a penalty, as the actual amount of damages to the Lenders as a result of the relevant event set forth in clause (i) of this **Section 5.06(d)** would be impracticable and extremely difficult to ascertain. Without limiting the generality of the foregoing, it is further understood and agreed that (i) upon the occurrence of any event set forth in this **Section 5.06(d)**, the Termination Payment shall be automatically and immediately due and payable as of the earliest such date, and shall constitute part of the Obligations payable by the Borrower (and guaranteed by the Guarantors) in respect of the Loans, which Obligations are secured by the Collateral, (ii) the Termination Payment shall also

be automatically and immediately due and payable if, and upon such time as, any Loans or Obligations are satisfied, released or discharged by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means at a time when any Termination Payment would otherwise have been due and payable in accordance with this paragraph, and the Termination Payment shall constitute a part of the Obligations at the time. THE BORROWER AND EACH GUARANTOR EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING TERMINATION PAYMENT IN CONNECTION WITH ANY PREPAYMENT, ACCELERATION OR MATURITY OF THE LOANS OR THE COMMENCEMENT OF ANY INSOLVENCY PROCEEDING. The Borrower and each Guarantor expressly agrees (to the fullest extent that it may lawfully do so) that: (A) the Termination Payment is reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the Termination Payment shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower and Guarantors giving specific consideration in this transaction for such agreement to pay the Termination Payment; and (D) the Borrower and each Guarantor shall each be estopped hereafter from claiming differently than as agreed to in this paragraph. The Obligors expressly acknowledge that their agreement to pay the Termination Payment hereunder is a material inducement to the Lenders to provide the DIP Facility and the New Money Loan Commitments, and to make the Loans and enter into this Agreement.

## SECTION 6.
## CONDITIONS

**6.01    Conditions to Closing Date and Initial Borrowing**. The occurrence of the Closing Date, and the effectiveness of this Agreement, are subject to the satisfaction or waiver of each of the conditions precedent set forth in this **Section 6.01**.

(a)    **Loan Documents**. The Administrative Agent shall have received each Loan Document required to be executed by the appropriate Obligor on the Closing Date and delivered by each applicable Obligor in such number as reasonably requested by the Administrative Agent (which may be delivered by facsimile or other electronic means for the purposes of satisfying this **clause (a)** on the Closing Date) and such Loan Documents shall be in form and substance satisfactory to the Administrative Agent and the Lenders and their respective counsels.

(b)    **[Reserved]**.

(c)    **Secretary's Certificate, Etc.** The Administrative Agent shall have received from each Obligor (x) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (y) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Responsible Officer, as to:

(i)    resolutions of each such Person's Board then in full force and effect authorizing the execution, delivery and performance of each Loan Document to be executed by such Person and the Transactions;

(ii)    the incumbency and signatures of Responsible Officers authorized to execute and deliver each Loan Document to be executed by such Person; and

(iii)    the full force and validity of the certificate of incorporation and by-laws (or equivalent documents) of such Person and copies thereof;

upon which certificates shall be in form and substance reasonably satisfactory to the Administrative Agent and upon which the Administrative Agent and the Lenders may conclusively rely until they shall have received a further certificate of the Responsible Officer of any such Person cancelling or amending the prior certificate of such Person.

(d)    **Initial Budget**. The Administrative Agent and the Lenders shall have received from the Obligors the Initial Budget, and the same shall be sufficient to constitute the Approved Budget in effect as of such time;

(e)    **Chapter 11.** The Obligors shall have commenced the Chapter 11 Cases in the Bankruptcy Court and Petition Date shall have occurred on [_____], 2023;

(f)    **Debtors-in-Possession.** Each Obligor shall be a debtor and debtor-in-possession in the Chapter 11 Cases, in each case, as otherwise satisfactory to the Majority Lenders;

(g)    **Bankruptcy Court Motions.** Not later than the date that is one (1) Business Day after the Petition Date, the Obligors shall have filed with the Bankruptcy Court (i) the First Day Motions, the DIP Motion, and (ii) all other motions and other documents necessary or desirable to be filed with or submitted to the Bankruptcy Court in connection with the Chapter 11 Cases, by such time as required pursuant to the Bankruptcy Code (or as requested by the Bankruptcy Court), in a form and in substance reasonably satisfactory to the Majority Lenders;

(h)    **First Day Orders; DIP Order**. Not later than the date that is three (3) calendar days following the Petition Date, the First Day Orders and the Interim DIP Order shall have been entered by the Bankruptcy Court;

(i)    **Payments**. The Obligors shall have made no payments after the Petition Date on account of any Indebtedness or other obligations arising prior to the Petition Date unless such payment is made pursuant to a Chapter 11 Order and subject to Permitted Variances, in accordance with the Approved Budget;

(j)    **Interim DIP Order.** The Interim DIP Order (i) shall have been entered by the Bankruptcy Court in the Chapter 11 Cases not later than three (3) calendar days after the Petition Date, (ii) shall be in full force and effect on the Closing Date, (iii) shall not have been vacated or reversed, (iv) shall not be subject to a stay, and (v) shall not have been modified or amended in any respect without the prior written consent of the Majority Lenders;

(k)     **Liens.** The Interim DIP Order shall be effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid, binding, enforceable and fully and automatically perfected Lien on the Collateral, on the basis and with the priority set forth therein;

(l)     **Milestones.** Each Milestone required to be satisfied prior to the Closing Date shall have been satisfied (or waived) in accordance with the terms hereof;

(m)     **Information Certificate**. The Administrative Agent shall have received a fully completed Information Certificate in form and substance reasonably satisfactory to the Administrative Agent, dated as of the Closing Date, duly executed and delivered by a Responsible Officer of the Borrower. All documents and agreements required to be appended to the Information Certificate, shall be in form and substance reasonably satisfactory to the Administrative Agent, shall have been executed and delivered by the requisite parties and shall be in full force and effect.

(n)     **Security Documents**. All actions necessary to establish that the Administrative Agent (for the benefit of the Secured Parties) will have perfected first priority interests and Liens in the Collateral (subject to the DIP Orders) under the Loan Documents shall have been taken.

(o)     **Lien Searches**. The Administrative Agent shall be satisfied with Lien searches regarding the Borrower and the Subsidiary Guarantors made as of a date reasonably close to the Closing Date.

(p)     **Opinions of Counsel**. The Administrative Agent shall have received a duly executed legal opinion of counsel to the Obligors dated as of the Closing Date, in form and substance reasonably acceptable to the Administrative Agent.

(q)     **Fee Letter**. The Administrative Agent shall have received an executed counterpart of the Fee Letter, duly executed and delivered by the Borrower.

(r)     **Closing Fees, Expenses, Etc**. The Borrower shall have paid to the applicable Persons the fees of the Administrative Agent and the Lenders required to be paid pursuant to **Section 5.06** and all other fees required to be paid on the Closing Date pursuant to this Agreement and the other Loan Documents and all costs and expenses required to be paid on the Closing Date (including pursuant to **Section 14.03(a)**) pursuant to this Agreement and the other Loan Documents (which amounts, upon the agreement of the Borrower and Administrative Agent, may be offset against the proceeds of the Borrowing on the Closing Date).

(s)     **Know Your Customer**. The Administrative Agent shall have received, as applicable, all documentation and other information required by bank regulatory authorities under applicable "know your customer" and Anti-Terrorism Laws.

(t)     **No Default**. No event shall have occurred or be continuing or would result from the making of such initial Borrowing or the use of proceeds thereof that would constitute a Default or Event of Default.

(u)      **Representations and Warranties**.  The representations and warranties contained in this Agreement and in the other Loan Documents delivered pursuant to **Section 6.01(a)** shall be true and correct in all material respects (unless such representations are already qualified by reference to materiality, Material Adverse Effect or similar language, in which case such representations and warranties shall be true and correct in all respects) on and as of the Closing Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all respects on and as of such earlier date.

(v)      **Beneficial Ownership Certificate**.  To the extent requested by any Lender or the Administrative Agent, the Borrower shall have provided to such Lender and the Administrative Agent all documentation and other information so requested, including a duly executed W-9 of the Borrower (or such other applicable tax form), in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification, in each case prior to the Closing Date.

(w)      **New Money Loan Upfront Payment**. The Borrower shall have paid to the Lenders the New Money Loan Upfront Payment substantially contemporaneously with the Closing Date;

**6.02      Conditions Precedent to all Borrowings**. The obligation of the Lenders to make any Loan hereunder (including on the Closing Date) shall be subject to the fulfillment and satisfaction of all of the following conditions:

(a)      **Closing Date.**  The Closing Date shall have occurred.

(b)      **No Default.** No Default or Event of Default shall exist at the time of, or immediately result from, the making of such Loan.

(c)      **Milestones.**  Each Milestone required to be satisfied prior to the date of such Borrowing shall have been satisfied (or waived) in accordance with the terms hereof.

(d)      **Representations and Warranties.**  Before, at the time of and after giving effect to such Loan and the use of proceeds thereof, each representation and warranty by any Obligor or any of its Subsidiaries contained herein or in any other Loan Document shall be true, correct and complete in all material respects (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties shall have been true, correct and complete in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

(e)      **Budget.**  There shall be an Approved Budget in full force and effect on and as of each of (i) the Borrowing Date for such Loan, and (ii) the time that such Loan is funded.

(f)      **Delivery of Notes**. The Administrative Agent shall have received a Note to the extent requested by any Lender pursuant to **Section 2.04** for the Loans duly executed and delivered by a Responsible Officer of the Borrower.

(g)     **No Orders, Injunctions, Etc.**  There shall not exist any proceeding, order, injunction or decree of any Governmental Authority (including the Bankruptcy Court) or in any court restraining or prohibiting (or attempting to restrain or prohibit) the funding of the Loan hereunder.

(h)     **Use of Proceeds**.   The proceeds of such Loan shall be directed and requested for use in accordance with **Section 2.05**.

(i)     **Fees.**  The payment by the Borrower of the fees required to be paid pursuant to **Section 5.06** to the Administrative Agent and the Lenders on such Borrowing Date and all other fees required to be paid on such Borrowing Date pursuant to this Agreement and the other Loan Documents and all costs and expenses required to be paid on such Borrowing Date (including pursuant to **Section 14.03**) pursuant to this Agreement and the other Loan Documents (which amounts, upon the agreement of the Borrower and Administrative Agent, may be offset against the proceeds of such Loan).

(j)     **Notice of Borrowing.**  The Administrative Agent shall have received a duly executed written notice form the Borrower complying with the requirements of **Section 2.01(a)(i)**.

(k)     **Funding Date Certificate.**  The Administrative Agent shall have received a Funding Date Certificate, dated as of the Closing Date and in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by a Responsible Officer of the Borrower.

(l)     **DIP Orders.** The Interim DIP Order (in the case of Loans made prior to the entry of the Final DIP Order) or the Final DIP Order (in the case of Loans made after the entry of the Final DIP Order) (1) shall be in full force and effect, (2) shall not have been reversed, vacated or stayed, (3) shall not have become the subject of any appeal or challenge, and (d) shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Lenders.

(m)     **No Material Adverse Effect.** There shall not have occurred since the Petition Date any development or event which, individually or in the aggregate with other such circumstances, has had or could reasonably be expected to have, a Material Adverse Effect (except to the extent relating to the Chapter 11 Cases).

(n)     **DIP Draw Conditions**.  In the case of a Borrowing of any New Money Loans, in addition to the above, the following shall be satisfied (or waived as provided herein):

(i)     the aggregate principal amount of all New Money Loans requested by the Borrower on such Borrowing Date shall not exceed the amount identified in the Approved Budget (subject to Permitted Variances) as being required by the Obligors and their Subsidiaries to finance disbursements during the period specified in the Approved Budget (unless such Lender consents thereto);

(ii)     the making of such New Money Loans, and the use of proceeds therefrom, shall comply with the Approved Budget (subject to Permitted Variances), the DIP Draw Conditions and with this Agreement in all respects; and

(iii)    the Administrative Agent shall have received a Notice of Borrowing in connection with the applicable New Money Loans in accordance with the requirements of this Agreement.

Each Notice of Borrowing (or, in the case of the Borrowing of Loans not constituting New Money Loans, each deemed request by the Borrower for a Loan) shall constitute a representation by the Borrower that the foregoing conditions are satisfied (or, as applicable, have been waived) on and as of each of (i) the date of such Notice of Borrowing, (ii) the requested Borrowing Date, and (iii) the date on which such Loan is funded or made (or deemed funded or made, as applicable).

## SECTION 7.
## REPRESENTATIONS AND WARRANTIES

The Borrower and each other Obligor hereby jointly and severally represents and warrants to the Administrative Agent and each Lender on the Closing Date, each Borrowing Date and any other date such representation and warranty is required to be made under the Loan Documents, as set forth below:

**7.01**        **Power and Authority**. Each Obligor and each of its Subsidiaries (i) is duly organized and validly existing under the laws of its jurisdiction of organization, (ii) has all requisite corporate or other power, and has all Governmental Approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except to the extent that failure to have the same could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (iii) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary except where failure so to qualify could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (iv) has full power, authority and legal right to enter into and perform its obligations under each of the Loan Documents to which it is a party and, in the case of the Borrower, to borrow the Loans hereunder.

**7.02**        **Authorization; Enforceability**. Each Transaction to which an Obligor is a party (or to which it or any of its assets or properties is subject) are within such Obligor's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational action (subject to the DIP Orders) including, if required, approval by all necessary holders of Equity Interests. This Agreement has been duly executed and delivered by each Obligor (subject to the DIP Orders) and constitutes, and each of the other Loan Documents to which it is a party when executed and delivered by such Obligor (subject to the DIP Orders) will constitute, a legal, valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights and (ii) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**7.03**        **Governmental and Other Approvals; No Conflicts**. Subject to the DIP Orders, none of the execution, delivery and performance by each Obligor of the Loan Documents to

which it is a party or the consummation by each Obligor of the Transactions (i) requires any Governmental Approval of, registration or filing with, or any other action by, any Governmental Authority or any other Person, except for (x) such as have been obtained or made and are in full force and effect and (y) filings and recordings in respect of perfecting or recording the Liens created pursuant to the Security Documents, (ii) will violate (1) any Law, (2) any Organic Document of any Obligor or any of its Subsidiaries or (3) any order of any Governmental Authority, that in the case of **clause (ii)(1)** or **clause (ii)(3)**, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, (iii) other than in connection with the commencement of the Chapter 11 Cases, will violate or result in a default under any Material Agreement binding upon any Obligor or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (iv) will result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of any Obligor or any of its Subsidiaries.

**7.04      Financial Statements; Material Adverse Change**. Financial Statements. The Borrower has heretofore furnished to the Administrative Agent (who shall forward to the Lenders) consolidated financial statements required to be delivered pursuant to this Agreement. Such financial statements present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of the Borrower and its Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements of the type described in **Section 8.01(a)**.

**7.05      Properties**.

(a)      **Property Generally**. Each Obligor and each of its Subsidiaries has good and marketable fee simple title to, or valid leasehold interests in, all its real and personal property material to its business, including all Material Intellectual Property, subject only to Permitted Liens and except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.  There are no condemnation proceedings pending or, to the best of the Obligors' knowledge, threatened, to acquire by power of condemnation or eminent domain any portion of any Obligor's assets or properties, or any interest therein, or to enjoin or similarly prevent the construction and/or use of any of such assets and properties.

(b)      **Intellectual Property**.

(i)      The Obligors are the sole and exclusive legal and beneficial owners of all right, title and interest in and to all Material Intellectual Property and all other Intellectual Property that is, in each case, owned or purported to be owned by the Obligors, free and clear of any Liens or Claims other than Permitted Liens.  The Obligors own or have sufficient and valid, written rights to use all Material Intellectual Property.  Without limiting the foregoing, and except as set forth in **Schedule 7.05(b)(i)**:

(A)      other than (1) customary restrictions in in-bound licenses of Intellectual Property and non-disclosure Contracts, or (2) as would have been or is permitted by **Section 9.09**, there are no judgments, covenants not to sue, grants, Liens (other than Permitted Liens), or other Claims, agreements or arrangements relating to any Material Intellectual

Property, which materially restrict any Obligor or any of its Subsidiaries with respect to its use, enforcement, or other exploitation of any Material Intellectual Property;

(B)     the operation and conduct of the business of by the Borrower or any of its Subsidiaries, including their use of their respective Material Intellectual Property, does not, in any material respect, violate, infringe or constitute a misappropriation of Intellectual Property rights of any other Person;

(C)     (1) there are no pending Claims, or Claims threatened in writing, against any Obligor or any of their Subsidiaries asserted by any other Person relating to Intellectual Property, including any material Claims alleging ownership, invalidity or unenforceability of any Material Intellectual Property, or infringement, misappropriation, or violation of such Person's Intellectual Property rights in any material respect; and (2) neither any Obligor nor any of their Subsidiaries has received any notice from, or Claim by, any Person that the operation and conduct of the businesses of the Borrower or any of its Subsidiaries (including their use of Material Intellectual Property), infringes upon, violates or constitutes a misappropriation of, any Intellectual Property of any other Person in each case of **clause (1)** and **(2)**, that would reasonably be expected to result in material liability to any Obligor or any of their Subsidiaries;

(D)     to the knowledge of any Borrower and their Subsidiaries, no Material Intellectual Property is being infringed, violated, or misappropriated by any other Person in any material respect; and neither such Obligor nor any of its Subsidiaries has put any other Person on notice of such actual or potential infringement, violation or misappropriation of any such Material Intellectual Property, and neither any Obligor nor any of their Subsidiaries has not initiated any Claim with respect to any such Material Intellectual Property;

(E)     all current and former employees and contractors that have developed Material Intellectual Property for or on behalf of any Obligor or any of their Subsidiaries has executed written confidentiality and invention assignment Contracts with such Obligor or Subsidiary, as applicable, that irrevocably and presently assign to such Obligor or Subsidiary, as applicable, all rights of such employees and contractors to any such Material Intellectual Property; and

(F)     each Obligor and each of its Subsidiaries has taken reasonable precautions to protect the secrecy, confidentiality and value of its Material Intellectual Property consisting of Trade Secrets.

(ii)     With respect to Material Intellectual Property consisting of Patents, except as set forth in **Schedule 7.05(b)(ii)**, and without limiting the representations and warranties in **Section 7.05(b)(i)**:

(A)     each of the issued claims in such Patents are valid and enforceable;

(B)     subsequent to the issuance of such Patents, no Obligor nor any of its Subsidiaries or predecessors-in-interest, has filed any disclaimer or made or permitted any other voluntary reduction in the scope of the Inventions claimed in such Patents;

(C)     to the knowledge of the Obligor, no allowable or allowed subject matter of such Patents is subject to any competing conception claims of allowable or allowed subject matter of any patent applications or patents of any third party and have not been the subject of any interference, and are not and have not been the subject of any re-examination, opposition or any other post-grant proceedings, nor is any Obligor or its Subsidiaries aware of any basis for any such interference, re-examination, opposition, *inter partes* review, post grant review, or any other post-grant proceedings;

(D)     no such Patents have ever been finally adjudicated to be invalid, unpatentable or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, and, with the exception of publicly available documents in the applicable patent office with respect to any such Patents, no Obligor nor any of its Subsidiaries has received any written notice asserting that such Patents are invalid, unpatentable or unenforceable; and

(E)     all maintenance fees, annuities, and the like due or payable on or with respect to any such Patents have been timely paid or the failure to so pay could not reasonably be expected to result in a Material Adverse Change.

**7.06     No Actions or Proceedings**.

(a)     **Litigation**. Other than the commencement of the Chapter 11 Cases, there is no litigation, investigation or proceeding pending or, to the knowledge of any Obligor or any of its Subsidiaries threatened in writing, with respect to such Obligor or any such Subsidiaries by or before any Governmental Authority or arbitrator that, (i) if adversely determined, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (ii) involves this Agreement or any other Loan Document.

(b)     **Environmental Matters**. No Obligor nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, except for any such failure to comply with such Environmental Law or failure to obtain, maintain or comply with a permit that could not reasonably be expected to have a Material Adverse Effect, (ii) has become subject to any Environmental Liability that could reasonably be expected to have a Material Adverse Effect, (iii) except as disclosed on **Schedule 7.06(b)**, has received any Environmental Claim, or has knowledge that any is threatened, (iv) has entered into any agreement in which such Obligor or any Subsidiary has assumed or undertaken material responsibility or obligations of any other person with respect to any Environmental Liability or (v) has knowledge of any basis for any other material Environmental Liability.

(c)     **Labor Matters**. No Obligor or any of its Subsidiaries has engaged in unfair labor practices as defined in 29 U.S.C. §§ 152(8) and 158 of the National Labor Relations Act and there are no pending or threatened in writing labor actions, disputes, grievances, arbitration proceedings, or similar Claims or actions involving the employees of any Obligor or any of its Subsidiaries, in each case that could reasonably be expected to have a Material Adverse Effect. There are no strike or work stoppages in existence or threatened in writing against any Obligor and to the knowledge of such Obligor, no union organizing activity is taking

place. There are no collective bargaining agreements covering employees of any Obligor or any of its Subsidiaries.

**7.07**        **Compliance with Laws and Agreements**. Except as a result of, and in connection with, the Chapter 11 Cases, each Obligor is in compliance with all Laws and all Contracts binding upon it or its property, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Except as a result of, and in connection with, the Chapter 11 Cases, no material default has occurred and is continuing under such Contracts. The Obligors and their Subsidiaries are in material compliance with all applicable Healthcare Laws.

**7.08**        **Taxes**. Except as set forth on **Schedule 7.08**, each Obligor and its Subsidiaries has timely filed or caused to be filed all tax returns and reports required to have been filed and has paid or caused to be paid all taxes required to have been paid by it, except (a) taxes that are being contested in good faith by appropriate proceedings and for which such Obligor or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP or (b) to the extent that the failure to do so would not reasonably be expected to have an Material Adverse Effect.

**7.09**        **Full Disclosure**. None of the reports, financial statements, certificates or other written information furnished by or on behalf of the Obligors or any of their Subsidiaries to the Administrative Agent (on behalf of itself and the Lenders) in connection with the negotiation of this Agreement and the other Loan Documents or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of material fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u> that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, and it being understood that such projected financial information and all other forward looking information are not to be viewed as facts and that actual results during the period or periods covered thereby may differ from such projected results and that the differences may be material. Except as a result of, and in connection with, the Chapter 11 Cases, as of the Closing Date, there are no agreements, instruments and corporate or other restrictions to which any Obligor is subject, or other matters known to the Borrower that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**7.10**        **Investment Company Act and Margin Stock Regulation**.

(a)        **Investment Company Act**. No Obligor is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(b)        **Margin Stock**. No Obligor is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying Margin Stock, and no part of the proceeds of the Loans will be used to buy or carry any Margin Stock in violation of Regulation T, U or X.

**7.11**        **[Reserved]**

**7.12**         **Subsidiaries**. Set forth on **Schedule 7.12** is a complete and correct list of all direct and indirect Subsidiaries of the Borrower. Each such Subsidiary is duly organized and validly existing under the jurisdiction of its organization shown in said **Schedule 7.12**, and the percentage ownership by each Obligor of each such Subsidiary thereof is as shown in said **Schedule 7.12**.

**7.13**         **Indebtedness and Liens**. Set forth on **Schedule 7.13(a)** is a complete and correct list of all Indebtedness of each Obligor and each of its Subsidiaries outstanding as of the Closing Date. Set forth on **Schedule 7.13(b)** is a complete and correct list of all Liens granted by the Obligors and each of their respective Subsidiaries with respect to their respective property and outstanding as of the Closing Date.

**7.14**         **Material Agreements**. Except as a result of, and in connection with, the Chapter 11 Cases, or as otherwise as set forth on **Schedule 7.14**, no Obligor or any of its Subsidiaries is in material default under any Material Agreement, nor does any Obligor have knowledge of (i) any Claim against it or any of its Subsidiaries for any material breach of any such Material Agreement or (ii) any material default by any party to any such Material Agreement.

**7.15**         **Restrictive Agreements**. Except as set forth in **Schedule 7.15**, no Obligor or any of its Subsidiaries is subject to any Restrictive Agreement, except (i) those permitted under **Section 9.11**, (ii) restrictions and conditions imposed by Law or by this Agreement, (iii) any stockholder agreement, charter, by-laws, or other organizational documents of an Obligor or any of its Subsidiaries as in effect on the Closing Date and (iv) limitations associated with Permitted Liens.

**7.16**         **Real Property**. **Schedule 7.16** correctly sets forth all real property that is owned or leased by the Obligors, indicating in each case whether the respective property is owned or leased, the identity of the owner and lessee (if applicable) and the location of the respective property. Except as set forth in **Schedule 7.16**, no Obligor owns or leases (as tenant thereof) any real property.

**7.17**         **Pension Matters**. **Schedule 7.17** sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, (i) all Title IV Plans, (ii) all Multiemployer Plans and (iii) all material Benefit Plans. Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Laws so qualifies. Except for those that could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Laws, (y) there are no existing or pending (or to the knowledge of any Obligor or any of its Subsidiaries, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Obligor or Subsidiary thereof incurs or otherwise has or could have an obligation or any liability or Claim and (z) no ERISA Event is reasonably expected to occur. The Borrower and each of its ERISA Affiliates has met all applicable requirements under the ERISA Funding Rules with respect to each Title IV Plan, and no waiver of the minimum funding standards under the ERISA Funding Rules has been applied for or obtained. As of the most recent valuation date for any Title IV Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least sixty percent (60%), and neither any Obligor nor any

of its ERISA Affiliates knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage to fall below sixty percent (60%) as of the most recent valuation date. As of the Closing Date, no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding. No ERISA Affiliate would have any Withdrawal Liability as a result of a complete withdrawal from any Multiemployer Plan on the date this representation is made.

**7.18**          **Regulatory Approvals**.

(a)          Each Obligor and each of its Subsidiaries holds, and will continue to hold, either directly or through licensees and agents, all Product Authorizations necessary or required for the Borrower and each of its Subsidiaries to conduct, in all material respects, their respective operations and businesses in the manner currently conducted and to conduct its Product Commercialization and Development Activities.

(b)          No Obligor or its Subsidiaries has received any written notice from any Governmental Authority that (i) it is considering suspending, revoking or materially limiting any Product Authorization or (ii) it is not likely to approve any applications made to such Governmental Authority with respect to any of the Products or any Material Agreement.  The Obligors and their Subsidiaries have made all material required and notices, registrations and reports (including field alerts or other reports of adverse experiences) and other filings with respect to each such Person's Products and Product Commercialization and Development Activities.

(c)          Except as set forth on **Schedule 7.18(c)**, and without limiting the generality of any other representation or warranty made by any Obligor hereunder or under any other Loan Document: (i) no Obligor, nor any of its Subsidiaries nor, to the knowledge of any Obligor, any of their respective agents, suppliers, licensors or licensees have received any inspection reports, warning letters or notices or similar documents with respect to any Product or any Product Commercialization and Development Activities from any Regulatory Authority within the last two (2) years that asserts material lack of compliance with any applicable Healthcare Laws or Product Authorizations; (ii) no Obligor, nor any of its Subsidiaries nor, to the knowledge of any Obligor, any of their respective agents, suppliers, licensors or licensees have received any material notification from any Regulatory Authority within the last two (2) years, asserting that any Product or any Product Commercialization and Development Activities lacks a required Product Authorization; (iii) there is no pending regulatory action, investigation or inquiry (other than non-material routine or periodic inspections or reviews) against any Obligor, any of its Subsidiaries or, to the knowledge of any Obligor, any of their respective suppliers, licensors or licensees with respect to any Product or any Product Commercialization and Development Activities, and, to the knowledge of any Obligor, there is no basis in fact for any material adverse regulatory action against such Obligor or any of its Subsidiaries or, to the knowledge of any Obligor, any of their respective suppliers agents, licensors or licensees with respect to any Product or any Product Commercialization and Development Activities; and (iv) without limiting the foregoing, (A) (1) there have been no material product recalls, safety alerts, corrections, withdrawals, marketing suspensions, removals or the like conducted, undertaken or issued by any Obligor or any of its Subsidiaries, whether voluntary, at the request, demand or order of any Regulatory Authority or otherwise, with respect to any Product, any Product

Commercialization and Development Activities or any Product Authorization within the last two (2) years, (2) no such product recall, safety alert, correction, withdrawal, marketing suspension, removal or the like has been requested, demanded or ordered by any Regulatory Authority within the last two (2) years, and, to the knowledge of any Obligor, there is no basis in fact for the issuance of any such product recall, safety alert, correction, withdrawal, marketing suspension, removal or the like with respect to any Product or any Product Commercialization and Development Activities, and (B) no criminal, injunctive, seizure, detention or civil penalty action has been commenced or threatened in writing by any Regulatory Authority within the last two (2) years with respect to or in connection with any Product or any Product Commercialization and Development Activities, and there are no consent decrees (including plea agreements) that relate to any Product or any Product Commercialization and Development Activities, and, to the knowledge of each Obligor, there is no basis in fact for the commencement of any criminal injunctive, seizure, detention or civil penalty action by any Regulatory Authority relating to any Product or any Product Commercialization and Development Activities or for the issuance of any consent decree.  No Obligor nor any of its Subsidiaries, nor, to the knowledge of any Obligor, any of their respective agents, suppliers, licensees or licensors, is employing or utilizing the services of any individual, in connection with Product Commercialization and Development Activities, who has been debarred from any federal healthcare program.

**7.19**      **Transactions with Affiliates**. Except as set forth on **Schedule 7.19**, no Obligor nor any of its Subsidiaries has entered into, renewed, extended or been a part to, any transaction (including the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate.

**7.20**      **OFAC; Anti-Terrorism Laws**.

(a)      Neither the Borrower nor any of its Subsidiaries is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the Anti-Terrorism Laws.

(b)      Neither the Borrower nor any of its Subsidiaries, nor, to the knowledge of the Borrower, any of their respective directors, officers, or employees (i) is currently the target of any Sanctions, (ii) is located, organized or residing in any Designated Jurisdiction in violation of Sanctions, or (iii) is or has been (within the previous five (5) years) engaged in any transaction with, or for the benefit of, any Person who is now or was then the target of Sanctions or who is located, organized or residing in any Designated Jurisdiction, in violation of Sanctions. No Loan, nor the proceeds from any Loan, has been or will be used, directly or, to the knowledge of the Borrower, indirectly, to lend, contribute or provide to, or has been or will be otherwise made available for the purpose of funding, any activity or business in any Designated Jurisdiction in violation of Sanctions or for the purpose of funding any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions, in violation of Sanctions, or in any other manner that will result in any violation by any party to this Agreement of Sanctions.

**7.21**      **Anti-Corruption**. Neither the Borrower nor any of its Subsidiaries, nor, to the knowledge of the Borrower, any of their respective directors, officers or employees, directly or,

to the knowledge of the Borrower, indirectly, has (i) materially violated or is in material violation of any applicable anti-corruption Law, or (ii) made, offered to make, promised to make or authorized the payment or giving of, directly or, to the knowledge of the Borrower, indirectly, any Prohibited Payment.

**7.22     Necessary Permits, Etc.** The Borrower possesses (or will file for) all franchises, trademarks, Permits, licenses, consents, agreements and governmental approvals that are necessary or required by any Governmental Authority in order to carry on its business and to construct and operate the Project.  The Borrower has not received any notice of default or termination of any such Permit, license, consent, approval or agreement, or any notice of noncompliance therewith.

**7.23     Priority of Obligations**. Pursuant to the DIP Orders, all Obligations constitute superpriority obligations of the Obligors, and except for any obligations which have priority under applicable Law, rank senior in right of payment with all other unsubordinated Indebtedness of the Obligors.

**7.24     Royalty and Other Payments**. Except as set forth on **Schedule 7.24**, no Obligor, nor any of its Subsidiaries, is obligated to pay any royalty, milestone payment, deferred payment or any other contingent payment in respect of any Product.

**7.25     Non-Competes**. Neither the Borrower, any other Obligor, nor any of their respective Subsidiaries, nor any of their respective directors, officers or employees, is subject to a non-compete agreement that prohibits or will interfere with any of the Product Commercialization and Development Activities, including the development, commercialization or marketing of any Product.

**7.26     Security Interest**. Subject to the entry of the DIP Orders, this Agreement and the DIP Orders are effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding, enforceable first-priority Lien on and security interest in all right, title and interest of the Obligors in the Collateral, in each case, subject to the Carve Out and junior only to any Permitted Senior Liens (other than as expressly provided in the DIP Orders).  Pursuant to the terms of the DIP Orders and subject to the entry of the DIP Orders,  no filings or other action (including the taking of possession or control) are or shall at any time be necessary to perfect, preserve or protect such Liens and security interests; provided, that, notwithstanding the foregoing, the Obligors shall have executed and delivered the Security Agreement and made (or authorized the making by any Agent of) all filings, in each case, to the extent deemed reasonably necessary and/or appropriate, and requested, by any Agent or the Majority Lenders.

**7.27     Capitalization Table**. **Schedule 7.27** sets forth a true, complete and correct capitalization table of the Borrower, including a description of all outstanding equity interests (including any warrants or options to acquire, or instruments convertible into, equity interests) and indebtedness of the Borrower and the holders thereof.

**7.28     Budget**.  Each of the Initial Budget attached as Exhibit K, each Approved Budget, each Budget Supplement and each Updated Budget is based upon good faith estimates and

assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made.

**7.29**        **DIP Budget**.  The Initial Budget, which was delivered to Administrative Agent and the Lenders at least two (2) calendar days prior to, and which shall be in effect as of, the Closing Date, was prepared in good faith based upon assumptions the Borrower believes to be reasonable assumptions on the date of delivery thereof.

**7.30**        **Orders**.  The Interim DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Majority Lenders, amended or modified and no appeal of such Interim DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.  After entry of the Final DIP Order, the Final DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Majority Lenders, amended or modified and no appeal of such Final DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

**7.31**        **Bankruptcy Matters**.

         (a)        The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of the DIP Orders was given, and (y) the hearing for the approval of the Interim DIP Order has been held by the Bankruptcy Court.

         (b)        After the entry of the DIP Orders, the Obligations will constitute a DIP Superpriority Claim (as defined in the DIP Orders) and the liens securing the Obligations shall be senior secured, valid, enforceable, and automatically and properly perfected priming liens on the Collateral, having the priorities set forth in the DIP Orders, subject in all respects to the Carve-Out and other exceptions set forth in the DIP Orders and the Loan Documents.

**SECTION 8.**
**AFFIRMATIVE COVENANTS**

         Each Obligor covenants and agrees with the Administrative Agent and the Lenders that, until the New Money Loan Commitments have expired or been terminated and all Obligations have been indefeasibly Paid in Full in cash:

**8.01**        **Financial Statements and Other Information**. The Borrower will furnish to the Administrative Agent:

         (a)        as soon as available and in any event within forty-five (45) days after the end of each fiscal quarter (i) the consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such fiscal quarter and (ii) the related consolidated statements of income, shareholders' equity and cash flows of the Borrower and its Subsidiaries for such quarter and the portion of the fiscal year through the end of such fiscal quarter, in each case prepared in accordance with GAAP consistently applied, all in reasonable detail and setting forth in comparative form the figures for the corresponding period in the preceding fiscal year, together with (iii) a certificate of a Responsible Officer of the Borrower stating that (x) such financial

statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as at such date and (y) the results of operations of the Borrower and its Subsidiaries for the period ended on such date have been prepared in accordance with GAAP consistently applied, subject to changes resulting from normal, year-end audit adjustments and except for the absence of notes; provided that documents required to be furnished pursuant to this **Section 8.01(a)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR" (with the related certificate separately delivered);

(b)    as soon as available and in any event, with respect to the fiscal year ending December 31, 2022, within two hundred ten (210) days after the end of such fiscal year and, with respect to each fiscal year ending thereafter, within one hundred twenty (120) days after the end of each such fiscal year (i) the consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such fiscal year and (ii) the related consolidated statements of income, shareholders' equity and cash flows of the Borrower and its Subsidiaries for such fiscal year, in each case prepared in accordance with GAAP consistently applied, all in reasonable detail and setting forth in comparative form the figures for the previous fiscal year, accompanied by a report and opinion thereon of Ernst & Young or another firm of independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards, and in the case of such consolidated financial statements, certified by a Responsible Officer of the Borrower;

(c)    together with the financial statements required pursuant to **Sections 8.01(a)** and **(b)**, a compliance certificate signed by the chief financial or accounting Responsible Officer of the Borrower as of the end of the applicable accounting period (which delivery may be by electronic communication including fax or email and shall be deemed to be an original, authentic counterpart thereof for all purposes) substantially in the form of **Exhibit E** (a "*Compliance Certificate*") including details of any issues that are material that are raised by auditors and any occurrence or existence of any event, circumstance, act or omission that would cause any representation or warranty contained in **Section 7.07**, **Section 7.18** or **Section 7.23** to be incorrect in any material respect (or in any respect if such representation or warranty is qualified by materiality or by reference to Material Adverse Effect or Material Adverse Change) if such representation or warranty were to be made at the time of delivery of a Compliance Certificate;

(d)    after being prepared by the Borrower and approved by its Board, and promptly following the Administrative Agent's request therefor, a consolidated financial forecast for the Borrower and its Subsidiaries for the fiscal year to which such forecast relates; provided that, for each fiscal year, on or before the seventy-fifth (75th) day following the beginning of such fiscal year, the Borrower shall prepare, and its Board shall approve such consolidated financial forecast for such fiscal year, and the Borrower shall notify the Administrative Agent promptly after the Board has given such approval;

(e)    promptly after the same are released, copies of all press releases; provided that documents required to be furnished pursuant to this **Section 8.01(e)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(f)        promptly, and in any event within five (5) Business Days after receipt thereof by an Obligor thereof, copies of each notice or other correspondence received from any securities regulator or exchange to the authority of which the Borrower may become subject from time to time concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of such Obligor; provided that documents required to be furnished pursuant to this **Section 8.01(f)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(g)        promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of each Obligor and its Subsidiaries, and copies of all annual, regular, periodic and special reports and registration statements which any Obligor or its Subsidiaries may file or be required to file with any securities regulator or exchange to the authority of which such Obligor or such Subsidiary, as applicable, may become subject from time to time; provided that documents required to be furnished pursuant to this **Section 8.01(g)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(h)        the information regarding insurance maintained by the Borrower and its Subsidiaries as required under **Section 8.09**;

(i)        as soon as possible and in any event within five (5) Business Days after the Borrower obtains knowledge of any Claim against the Borrower or any of its Subsidiaries relating to any of its products or inventory involving more than $2,500,000 (or the Equivalent Amount in other currencies), written notice thereof from a Responsible Officer of the Borrower which notice shall include a statement setting forth details of such return, recovery, dispute or claim;

(j)        [Reserved];

(k)        [Reserved];

(l)        [Reserved]; and

(m)        such other information respecting the businesses, financial performance, operations or condition of the assets or liabilities of the Obligors (including with respect to the Collateral), taken as a whole, as the Administrative Agent may from time to time reasonably request.

**8.02        Other Reporting**.

(a)        Not later than 1:00 p.m. New York City time every other Friday occurring after the Petition Date and thereafter (commencing with Friday of the calendar week immediately after the Closing Date, (the "***Budget Reporting Deadline***"), the Debtors shall deliver to the Administrative Agent a supplement to the Approved Budget then in effect (each, a "***Budget Supplement***"), covering the (13) thirteen-week period commencing with Friday of the calendar week immediately preceding such Budget Reporting Deadline (provided that at any time following any agreement by the Majority Lenders to the use of an assumed effective date for purposes of the Budget Supplement, the Majority Lenders may request, and the Borrower

shall agree to, the modification of the assumed effective date used for such purposes), the form, scope and level of detail of which Budget Supplement shall be consistent with the Initial Budget, and which Budget Supplement shall be otherwise in form and substance satisfactory to the Lenders in their sole discretion (as confirmed and approved in writing (including via email) by the DIP Agent) (each Budget Supplement, if, but solely if and upon, approved in accordance with the foregoing, an "*Updated Budget*"). For the avoidance of doubt, no Updated Budget shall become the Approved Budget unless and until approved by the Lenders, at their sole discretion (which approval shall be deemed granted upon receipt by the Borrower or its counsel of written notice (which may be via email) of such consent from the Lenders or the Administrative Agent (at the Lenders' direction) (such approval or consent in accordance with the foregoing, the "*Lender Consent*"), and in the event that such Updated Budget is not so approved by the Lenders, the prior Approved Budget shall remain in effect; provided, however, that neither the Administrative Agent nor any of the Lenders shall have any obligation to approve any Budget Supplement or any Updated Budget, and, no modification to any Updated Budget or any Approved Budget, or any reforecasting of any information relating to any period covered by any other Updated Budget or any Approved Budget, as the case may be, shall in any event be effective without Lender Consent.

(b)     Not later than 1:00 p.m. New York City time every Friday (commencing with Friday of the week immediately following the week in which the Petition Date occurs) (each such Friday, a "*Variance Report Deadline*"), and on each Friday thereafter, the Obligors shall deliver to the Lenders a variance report, in each case, in form, scope and detail reasonably satisfactory to the Lenders (each such report, a "*Variance Report*") showing the difference, on a line-item basis, between (a)(i) actual operating and non-operating disbursements (excluding professional fees and expenses) for the immediately preceding calendar week (the "*Applicable Period*") and (ii) budgeted operating and non-operating disbursements (excluding professional fees and expenses) for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period) (such variance, a "*Disbursements Variance*"), (b)(i) actual operating and non-operating disbursements (excluding professional fees and expenses) plus actual operating receipts for the Applicable Period and (ii) budgeted operating and non-operating disbursements (excluding professional fees and expenses) plus actual operating receipts for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period), (such variance, a "*Disbursements Plus Receipts Variance*"), and (c)(i) actual professional fees and expenses for the Applicable Period and (ii) budgeted professional fees and expenses for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period), and the available cash on hand for the end of such week, in each case, for prior week, together with a reasonably detailed explanation of such Disbursements Variance, Disbursements Plus Receipts Variance and Professional Fee Variance.

(c)     The Obligors shall arrange for a teleconference with Lenders or their authorized representatives to take place at least once per week, at a reasonable time during reasonable business hours, until Payment in Full occurs, which teleconference shall (i) require, at the election of the Majority Lenders, participation by at least one senior officer of Borrower's management team and/or professional advisors to the Borrower, and (ii) be intended for purposes of discussing Borrower and its Subsidiaries' financials (including any budget proposed to be the Approved Budget, Variance Reports and any projections) and such other information and matters reasonably related thereto or requested by any Lender; provided, that such teleconference shall

not be required in any week if and to the extent that the Administrative Agent shall have previously waived or postponed the same by written notice to the Borrower.

**8.03     Milestones**. Such Obligor shall, and shall cause each of its Subsidiaries to, satisfy the requirements with respect to each Milestone (including by the time, to the extent, and in the manner required thereby), or as otherwise agreed to by the Administrative Agent in writing.

**8.04     Bankruptcy Related Matters**. Such Obligor shall, and shall cause each of its Subsidiaries to:

(a)     Cause all proposed (i) First Day Orders, (ii) Second Day Orders, (iii) orders related to or affecting the Obligations and/or the Loan Documents, the Prepetition Debt and applicable loan documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (iv) any disclosure statement related thereto, (v) orders concerning the financial condition of the Debtors, or other Indebtedness of the Debtors and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors, to be in accordance with the terms of this Agreement, to the extent applicable.

(b)     Comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases.

(c)     Deliver to the Administrative Agent and the Lender Professionals not less than two (2) Business Days (or, if and solely to the extent that, as a result of exigent circumstances, there is a need to file on an expedited basis, prior to such filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents (other than retention applications, emergency motions, and ministerial motions) to be filed by or on behalf of the Obligors with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect any of the Secured Parties, or distributed by or on behalf of the Obligors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest), and shall consult in good faith with the Lender Professionals and the Majority Lenders regarding the form and substance of any such document.

(d)     If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent and to the Lender Professionals promptly as soon as available, copies of all filed pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Obligors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest).

(e)     Provide written notice to the Lenders (via the Administrative Agent) and the Lender Professionals not less than five (5) Business Days (or such shorter period as may be consented to in writing by the Majority Lenders or by the Administrative Agent, acting at the Majority Lenders' direction) prior to any assumption or rejection of any Debtor's or any Subsidiary's contracts pursuant to Section 365 of the Bankruptcy Code, and no such contract or

lease shall be assumed or rejected if the Administrative Agent informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

**8.05**      **Priority of Liens and Claims**. Such Obligor shall, and shall cause each of its Subsidiaries to, cause the Obligations to, upon and at all times as of entry of the Interim DIP Order (including upon and at all times as of entry of the Final DIP Order) (i) constitute DIP Superpriority Claims having the priority and rights set forth in the DIP Orders and (ii) be secured by a valid, binding, continuing, enforceable and perfected first priority (subject only to the Carve-Out and any other liens expressly permitted by the DIP Orders) security interest in, and Lien, on all Collateral.

**8.06**      **Notices of Material Events**. The Borrower will furnish to the Administrative Agent written notice of the following (x) with respect to **clause (a)** below within three (3) Business Days and (y) with respect to **clause (b)** through **(n)** below, within five (5) Business Days, in each case, after a Responsible Officer of the Borrower first learns of or acquires knowledge with respect to:

(a)      the occurrence of any Default or Event of Default;

(b)      the occurrence of any event with respect to the property or assets of the Borrower or any of its Subsidiaries resulting in a Loss aggregating $2,500,000 (or the Equivalent Amount in other currencies) or more;

(c)      (i) any proposed acquisition of stock, assets or property by the Borrower or any of its Subsidiaries that could reasonably be expected to result in material Environmental Liability, and (ii) any spillage, leakage, discharge, disposal, leaching, migration or release of any Hazardous Material by the Borrower or any of its Subsidiaries required to be reported to any Governmental Authority or that would reasonably be expected to result in material Environmental Liability;

(d)      the assertion of any Environmental Claim by any Person against, or with respect to the activities of, the Borrower or any of its Subsidiaries and any alleged liability or non-compliance with any Environmental Laws or any permits, licenses or authorizations issued pursuant to Environmental Laws which could reasonably be expected to have a Material Adverse Effect;

(e)      the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (other than in connection with the commencement of the Chapter 11 Cases) against or affecting the Borrower or any of its Affiliates;

(f)      (i) the intention of any ERISA Affiliate to file any notice of intent to terminate any Title IV Plan, a copy of such notice and (ii) the filing by any ERISA Affiliate of a request for a minimum funding waiver under Section 412 of the Code with respect to any Title IV Plan or Multiemployer Plan, in each case in writing and in reasonable detail (including a description of any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto);

(g)      (i) the termination of any Material Agreement other than in accordance with its terms and not as a result of a breach or default, (ii) the receipt by the Borrower or any of its Subsidiaries of any notice of a breach or default under any Material Agreement (and a copy thereof) asserting a default by such Obligor or any of its Subsidiaries where such alleged default would permit such counterparty to terminate such Material Agreement, (iii) the entering into of any new Material Agreement by any Obligor (and a copy thereof) or (iv) any material amendment to a Material Agreement that would be adverse in any material respect to the Lenders (and a copy thereof); <u>provided</u>, that the Borrower shall not be required to provide such notice if such documents become publicly available on "EDGAR" within the time period notice would otherwise be required pursuant to this **Section 8.06**;

(h)      any material change in accounting policies or financial reporting practices by the Borrower or any of its Subsidiaries;

(i)      any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other material labor disruption against or involving an Obligor;

(j)      any Contract entered into by the Borrower or any of its Subsidiaries in connection with any Claim of actual or alleged infringement, misappropriation or violation of any Intellectual Property by or against the Borrower or any of its Subsidiaries;

(k)      the creation, development or other acquisition (including any in-bound exclusive licenses) of any Material Intellectual Property by the Borrower or any Subsidiary after the Closing Date;

(l)      any change to any Obligor's or any of its Subsidiaries' ownership of any Controlled Account, by delivering the Administrative Agent a notice setting forth a complete and correct list of all such accounts as of the date of such change;

(m)      to the extent not otherwise required to be delivered to the Administrative Agent and the Lenders, copies of all notices, reports, certificates or other information provided by the Borrower or its Affiliates to the lenders or agents under Prepetition Loan Documents; and

(n)      any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this **Section 8.06** shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto. Nothing in this **Section 8.06** is intended to waive, consent to or otherwise permit any action or omission that is otherwise prohibited by this Agreement or any other Loan Document.

**8.07**      **Existence**. Such Obligor shall, and shall cause each of its Subsidiaries to, preserve, renew and maintain in full force and effect its legal existence; <u>provided</u> that the foregoing shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under **Section 9.03**.

**8.08** **Payment of Obligations**. Such Obligor will, and will cause each of its Subsidiaries to, pay and discharge its obligations, including (i) all material Taxes, fees, assessments and governmental charges or levies imposed upon it or upon its properties or assets prior to the date on which penalties attach thereto, and all lawful claims for labor, materials and supplies which, if unpaid, might become a Lien upon any properties or assets of the Borrower or any of its Subsidiaries, except to the extent (A) such Taxes, fees, assessments or governmental charges or levies or such claims are being contested in good faith by appropriate proceedings and are adequately reserved against in accordance with GAAP and (B) the failure to do so would not reasonably be expected to have an Material Adverse Effect, and (ii) all lawful claims which, if unpaid, would by law become a Lien upon its property not constituting a Permitted Lien (with respect to each of clauses (i) and (ii), unless the Lenders disapproved of paying such amount in connection with approving the Approved Budget).

**8.09** **Insurance**. Such Obligor will, and will cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses, including, without limitation, commercial property, liability and business interruption coverage in amounts and with scope no less protective to the Obligors than such coverage as in effect on the Closing Date.  Upon the request of the Administrative Agent, the Borrower shall furnish the Administrative Agent from time to time with (i) material information as to the insurance carried by it and, if so requested, copies of all such insurance policies and (ii) a certificate from the Borrower's insurance broker or other insurance specialist stating that all premiums then due on the policies relating to insurance on the Collateral have been paid and that such policies are in full force and effect. Receipt of notice of termination or cancellation of any such insurance policies or reduction of coverages or amounts thereunder shall entitle the Secured Parties to renew any such policies, cause the coverages and amounts thereof to be maintained at levels required pursuant to the first sentence of this **Section 8.09** or otherwise to obtain similar insurance in place of such policies, in each case, the Borrower will be responsible for the reasonable and documented cost of such insurance (to be payable on demand). The amount of any such reasonable and documented expenses shall accrue interest at the Default Rate if not paid on demand and shall constitute "Obligations."  Such Obligor shall cause each such policy of insurance (with respect to each such policy outstanding as of the Closing Date, within the time period set forth in **Section 8.22(b)**) to (i) name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear, and (ii) in the case of each casualty insurance policy (including business interruption, if any) contain a lender loss payable clause or endorsement naming the Administrative Agent, on behalf of the Secured Parties, as loss payee thereunder and providing for at least thirty (30) days' prior written notice to the Agent of any material modification or cancellation of such policy, and otherwise reasonably satisfactory in form and substance to the Administrative Agent.

**8.10** **Books and Records; Inspection Rights**. Such Obligor will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct (in all material respects) entries are made of all dealings and transactions in relation to its business and activities. Such Obligor will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or the Lenders, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition (financial or otherwise) with its officers

and independent accountants, during normal business hours (but not more often than once per quarter unless an Event of Default has occurred and is continuing) as the Administrative Agent or the Lenders may request; provided that such representative shall use its commercially reasonable efforts to minimize disruption to the business and affairs of the Borrower as a result of any such visit, inspection, examination or discussion. Notwithstanding anything to the contrary contained herein, no Obligor nor any of its Subsidiaries will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to any Lender (or their respective representatives or contractors) is prohibited by any applicable Law or any binding agreement with a third party (so long as such agreement is not entered into in contemplation of this Agreement) or (iii) that is subject to attorney-client or similar privilege, which could reasonably be expected to be lost or forfeited if disclosed to the Administrative Agent or any Lender. The Borrower shall pay all reasonable and documented costs of all such inspections.

**8.11**     **Compliance with Laws and Other Obligations**. Such Obligor will, and will cause each of its Subsidiaries to, (i) comply with all Laws (including Anti-Terrorism Laws, Sanctions and Environmental Laws) applicable to it and its business activities, (ii) comply in all material respects with all Healthcare Laws and Governmental Approvals applicable to it and its business activities and (iii) maintain in full force and effect, remain in compliance with, and perform all obligations under all Material Agreements to which it is a party, except, in the case of **clause (i)** and **(iii)** above, where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Within 60 days after the Closing Date, each Obligor shall institute (if not already in effect) and thereafter maintain in effect and enforce policies and procedures reasonably designed to promote compliance by such Obligor, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Terrorism Laws and Sanctions.

**8.12**     **Maintenance of Properties, Etc.** Such Obligor shall, and shall cause each of its Subsidiaries to, maintain and preserve all of its assets and properties, including all assets and properties, whether tangible or intangible, necessary or useful in the conduct of its business in good working order and condition in accordance with the general practice of other Persons of similar character and size, ordinary wear and tear and damage from casualty or condemnation excepted and except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**8.13**     **Licenses**. Such Obligor shall, and shall cause each of its Subsidiaries to, obtain and maintain all Governmental Approvals necessary in connection with the execution, delivery and performance of the Loan Documents, the consummation of the Transactions or the operation and conduct of its business and ownership of its properties, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**8.14**     **[Reserved]**

**8.15**     **Use of Proceeds**. The proceeds of the Loans will be used only as provided in **Section 2.05**. No part of the proceeds of the Loans will be used, whether directly or indirectly,

for any purpose that entails a violation of any of the Regulations of the Board of Governors of the Federal Reserve System, including Regulations T, U and X.

**8.16** **Further Assurances**.

(a) **Subsidiaries.** Each Person that is a Subsidiary of Borrower (other than the Permitted Swiss Subsidiary) at any time shall be required to be a Subsidiary Guarantor at all times and shall be subject to all terms and conditions hereof applicable to the Obligors.

(b) **Further Assurances.**

(i) such Obligor will take such action from time to time as shall reasonably be requested by the Administrative Agent to effectuate the purposes and objectives of this Agreement and the Security Agreement;

(ii) in the event that such Obligor creates, develops or otherwise acquires Intellectual Property during the term of this Agreement, then the provisions of this Agreement and the Security Agreement shall and hereby does automatically apply thereto and any such Intellectual Property shall automatically constitute and hereby does constitute part of the Collateral under the Security Documents, without further action by any party, in each case from and after the date of such creation, development or acquisition;

without limiting the generality of the foregoing, each Obligor will, and will cause each Person that is required to be a Subsidiary Guarantor to, take such action from time to time (including joining the Security Agreement and delivering shares of stock together with undated transfer powers executed in blank, applicable control agreements and other instruments) as shall be reasonably requested by the Administrative Agent to create, in favor of the Secured Parties, perfected security interests and Liens in substantially all of the personal property of such Obligor as collateral security for the Obligations; provided that any such security interest or Lien shall be subject to the relevant requirements of the Security Documents; provided further, other than executing the Security Agreement, the Obligors shall not be required to take any action in respect of granting or perfecting a Lien unless reasonably requested by the Administrative Agent. Provided, further that, without limiting the right of the Administrative Agent to require a Lien or security interest in any newly acquired or created Subsidiary or asset, upon the prior written request of the Borrower, the Borrower and the Administrative Agent shall consult, in good faith, as to whether the cost of obtaining a Lien or security interest thereon would be unreasonably excessive relative to the benefit thereof.

**8.17** **Termination of Non-Permitted Liens**. In the event that any Obligor shall become aware of, or be notified by the Administrative Agent or any Lender of the existence of, any outstanding Lien against any assets or property of such Obligor or any of its Subsidiaries, which Lien is not a Permitted Lien, such Obligor shall use its commercially reasonable efforts to promptly terminate or cause the termination of such Lien. This provision shall not limit any rights or remedies the Administrative Agent and Lenders have upon the occurrence and during the continuance of an Event of Default.

**8.18** **[Reserved]**

**8.19**    **Maintenance of Permits, Etc.** The Borrower shall obtain, maintain and do all things necessary to preserve in full force and effect all permits, licenses, authorizations, approvals, franchises, certificates and accreditations which are necessary for the proper conduct of its businesses.

**8.20**    **Maintenance of Regulatory Approvals, Contracts, Intellectual Property, Etc.** Each Obligor shall, and shall cause each of its Subsidiaries (to the extent applicable) to, (i) maintain in full force and effect all Regulatory Approvals, Material Agreements, Material Intellectual Property and other rights, interests or assets (whether tangible or intangible) reasonably necessary for the businesses of Obligor and its Subsidiaries, except as would not reasonably be expected to have a Material Adverse Effect, (ii) maintain in full force and effect, and pay all costs and expenses relating to, such Regulatory Approvals, Material Agreements and Material Intellectual Property owned, used or controlled by such Obligor or any such Subsidiary, except as would not be reasonably expected to have a Material Adverse Effect, (iii) promptly after obtaining knowledge thereof, notify the Administrative Agent of any infringement, misappropriation or other violation by any Person of any Material Intellectual Property, and use commercially reasonable efforts to stop, curtail or abate such infringement, misappropriation or other violation if determined appropriate by the Borrower in the exercise of its business judgment and (iv) promptly after obtaining knowledge thereof, notify the Administrative Agent of any Claim by any Person that the conduct of the business of any Obligor or any of its Subsidiaries has infringed, misappropriated or otherwise violated any Intellectual Property of such Person, where such Claim could reasonably be expected to have a Material Adverse Effect.

**8.21**    **ERISA Compliance**. Such Obligor shall comply, and shall cause each of its Subsidiaries to comply, with the provisions of ERISA with respect to any Plans to which such Obligor or such Subsidiary is a party as an employer in all material respects.

**8.22**    **Cash Management**. Subject to the terms of any Chapter 11 Order, such Obligor shall, and shall cause each of its Subsidiaries to, if requested by the Administrative Agent:

(a)    maintain at all times after the Closing Date, all of the aggregate amount of cash of the Borrower and its Subsidiaries, in each case, in deposit accounts, disbursement accounts, investment accounts (and other similar accounts) and lockboxes with a bank or financial institution within the U.S. which has executed and delivered to the Administrative Agent an account control agreement, in form and substance reasonably acceptable to the Administrative Agent (each such deposit account, disbursement account, investment account (or similar account) and lockbox, a "***Controlled Account***"); each such Controlled Account shall be a cash collateral account, with all cash, checks and other similar items of payment in such account securing payment of the Obligations, and each Obligor shall have granted a Lien to the Administrative Agent, for the benefit of the Secured Parties, over such Controlled Accounts;

(b)    deposit promptly, and in any event no later than five (5) Business Days after the date of receipt thereof, all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all accounts and other rights and interests into Controlled Accounts; and

(c)      at any time after the occurrence and during the continuance of an Event of Default, at the request of the Administrative Agent, each Obligor shall cause all payments constituting proceeds of accounts to be directed into lockbox accounts under agreements in form and substance satisfactory to the Administrative Agent.

# SECTION 9.
# NEGATIVE COVENANTS

Each Obligor covenants and agrees with the Administrative Agent and the Lenders that, until the New Money Loan Commitments have expired or been terminated and all Obligations (other than inchoate indemnification and expense reimbursement obligations for which no claim has been made), have been indefeasibly Paid in Full in cash:

**9.01**      **Indebtedness**. Such Obligor will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, whether directly or indirectly, except:

(a)      the Obligations;

(b)      Indebtedness existing on the date hereof that was outstanding immediately prior to the Petition Date and set forth on **Schedule 9.01(b)**;

(c)      accounts payable to trade creditors for goods and services and current operating liabilities (not the result of the borrowing of money) incurred in the Ordinary Course of such Obligor's or such Subsidiary's business in accordance with customary terms and paid within the specified time;

(d)      Indebtedness consisting of guarantees resulting from the endorsement of negotiable instruments for collection in the Ordinary Course;

(e)      Indebtedness of an Obligor owing to any other Obligor;

(f)      Guarantees by any Obligor of Permitted Indebtedness of any other Obligor;

(g)      Ordinary Course Capital Lease Obligations and equipment financing in existence on the Petition Date and set forth on **Schedule 9.01(g)**;

(h)      Other Indebtedness in an aggregate outstanding principal amount not to exceed  $100,000 (or the Equivalent Amount in other currencies) to the extent set forth in the Approved Budget;

(i)      Indebtedness in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created, or related to obligations or liabilities incurred, in the Ordinary Course, including in respect of workers compensation claims, health, disability or other employee benefits or property, leases, commercial contracts, Indebtedness permitted pursuant to **Section 9.01(s)**, casualty or liability insurance or self-insurance or other

reimbursement-type obligations regarding workers compensation claims, collectively in an aggregate outstanding principal amount not to exceed the amount set forth in the Approved Budget;

(j)      Indebtedness arising in connection with the financing of insurance premiums in the Ordinary Course with respect to insurance policies in place as of the Petition Date (or any similar replacement policies obtained in the Ordinary Course);

(k)      Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations arising in the Ordinary Course, in an amount not to exceed the amount set forth in the Approved Budget;

(l)      Indebtedness in respect of netting services, overdraft protections, business credit cards, purchasing cards, payment processing, automatic clearinghouse arrangements, arrangements in respect of pooled deposit or sweep accounts, check endorsement guarantees, and otherwise in connection with deposit accounts or cash management services, in each case, in the Ordinary Course not to exceed the amount set forth in the Approved Budget; and

(a)      adequate protection claims expressly granted or permitted by any DIP Order, subject in all cases to the terms and conditions related to such Liens set forth in such applicable DIP Order.

**9.02      Liens**. Such Obligor will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist, whether directly or indirectly, any Lien on any property now owned by it or such Subsidiary, except:

(a)      Liens securing the Obligations;

(b)      any Lien on any property or asset of such Obligor or any of its Subsidiaries existing on the date hereof and set forth on **Schedule 9.02(b)**; provided that (i) no such Lien shall extend to any other property or asset of such Obligor or any of its Subsidiaries, (ii) such Liens shall have the priorities set forth in the DIP Orders and (iii) any such Lien shall secure only those obligations which it secures on the date hereof;

(c)      Liens securing Indebtedness permitted under **Section 9.01(g)** existing immediately prior to the Petition Date; provided that such Liens are restricted solely to the collateral described in **Section 9.01(g)**;

(d)      Liens imposed by any Law arising in the Ordinary Course, including (but not limited to) carriers', warehousemen's, landlords', and mechanics' liens, liens relating to leasehold improvements and other similar Liens arising in the Ordinary Course and which (x) secure obligations that are not overdue by more than thirty (30) days or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property subject to such Liens and for which adequate reserves have been made if required in accordance with GAAP, provided, that the aggregate amount of obligations secured by such Liens shall not exceed $50,000;

(e)        pledges or deposits made in the Ordinary Course in connection with bids, contract leases, appeal bonds, workers' compensation, unemployment insurance or other similar social security legislation;

(f)        Liens securing Taxes, assessments and other governmental charges, the payment of which is not yet due or is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted and for which such reserve or other appropriate provisions, if any, as shall be required by GAAP shall have been made; provided, that the aggregate amount of obligations secured by such Liens shall not exceed the amount set forth in the Approved Budget;

(g)        servitudes, easements, rights of way, restrictions and other similar encumbrances on real property imposed by any Law and Liens consisting of zoning or building restrictions, easements, licenses, restrictions on the use of real property or minor imperfections in title thereto existing on the Petition Date which, in the aggregate, are not material, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any of the Obligors or any of their Subsidiaries;

(h)        with respect to any real property, (i) such defects or encroachments as might be revealed by an up-to-date survey of such real property; (ii) the reservations, limitations, provisos and conditions expressed in the original grant, deed or patent of such property by the original owner of such real property pursuant to all applicable Laws; and (iii) rights of expropriation, access or user or any similar right conferred or reserved by or in any Law, in each case, existing on the Petition Date and which, in the aggregate for **clauses (i)**, **(ii)** and **(iii)**, are not material, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any of the Obligors or its Subsidiaries;

(i)        Bankers liens, rights of setoff and similar Liens incurred on deposits made in the Ordinary Course;

(j)        Liens securing Indebtedness permitted under **Sections 9.01(h), (j), (k)** and **(l)**;

(k)        any judgment lien or lien arising from decrees or attachments not constituting an Event of Default;

(l)        Liens arising from precautionary UCC financing statement filings regarding operating leases of personal property and consignment arrangements entered into in the Ordinary Course;

(m)        other Liens not securing borrowed money which secure obligations in an aggregate amount not to exceed $50,000 (or the Equivalent Amount in other currencies) at any time outstanding;

(n)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and incurred in the Ordinary Course;

        (o)       Permitted Licenses and Permitted Exclusive Licenses;

        (p)       Liens on cash and Permitted Cash Equivalent Investments securing obligations under Permitted Hedging Agreements; <u>provided</u>, that the aggregate amount of such obligations secured by such Liens shall not exceed the amount set forth in the Approved Budget;

        (q)       (i) Liens to secure payment of workers' compensation, employment insurance, old age pensions, social security and other like obligations incurred in the Ordinary Course (other than Liens imposed by ERISA) and (ii) deposits in respect of letters of credit, bank guarantees or similar instruments issued for the account of any Obligor or any Subsidiary in the Ordinary Course supporting obligations of the type set forth in **clause (i)** above; and

        (r)       Adequate protection Liens expressly granted or permitted by any DIP Order, subject in all cases to the terms and conditions related to such Liens set forth in such applicable DIP Order.

**9.03**        **Fundamental Changes and Acquisitions**. Such Obligor will not, and will not permit any of its Subsidiaries to, (i) enter into any transaction of merger, amalgamation or consolidation (or otherwise merge, amalgamate or consolidate), (ii) liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), (iii) sell or issue any of its Disqualified Equity Interests or (iv) make any Acquisition or otherwise acquire any business or substantially all the property from, or Equity Interests of, or be a party to any Acquisition of, any Person.

**9.04**        **Lines of Business**. Such Obligor will not, and will not permit any of its Subsidiaries to, engage in any business other than the business engaged in on the date hereof by such Persons or a business reasonably related, incidental or complementary thereto or reasonable extensions thereof, it being understood that such extensions include the manufacture, market and sale of foldable display cover windows for multiple applications in collaboration with Doosan Corporation, and other applications and products that combine Borrower's intellectual property with Doosan Corporation's technology, subject to and in accordance with the Doosan Documents.

**9.05**        **Investments**. Such Obligor will not, and will not permit, whether directly or indirectly, any of its Subsidiaries to, make, directly or indirectly, or permit to remain outstanding any Investments except:

        (a)       Investments (but without giving effect to the cash return provision contained in the definition thereof) outstanding on the Closing Date and identified in **Schedule 9.05**;

        (b)       operating deposit accounts with banks (or similar deposit-taking institutions) that are maintained by Obligors and are Controlled Accounts;

        (c)       extensions of credit in the nature of accounts receivable or notes receivable arising from the sales of goods or services in the Ordinary Course in an aggregate amount not to exceed the amount set forth in the Approved Budget;

        (d)       Permitted Cash Equivalent Investments;

(e)       Investments by an Obligor (i) in another Obligor or (ii) in the Permitted Swiss Subsidiary consisting of cash solely for the purpose of funding Permitted Swiss Subsidiary Operating Expenses, in accordance with, and in an amount not to exceed the amount set forth in the Approved Budget;

(f)       Permitted Hedging Agreements in an aggregate amount not to exceed the amount set forth in the Approved Budget;

(g)       Investments consisting of prepaid expenses, negotiable instruments held for collection or deposit, security deposits with utilities, landlords and other like Persons and deposits in connection with workers' compensation and similar deposits, in each case, made in the Ordinary Course, in an aggregate amount not to exceed the amount set forth in the Approved Budget;

(h)       Investments received in connection with any Insolvency Proceedings in respect of any customers, suppliers or clients and in settlement of delinquent obligations of, and other disputes with, customers, suppliers or clients;

(i)       [reserved];

(j)       the increase in value of any Investment otherwise permitted pursuant to this **Section 9.05**;

(k)       other Investments made in the Ordinary Course, in an aggregate amount not to exceed the amount set forth in the Approved Budget; and

(l)       Investments permitted under **Section 9.03**.

Notwithstanding anything in this Agreement to the contrary, (i) the Borrower shall not, and shall not permit any of its Subsidiaries to (x) directly or indirectly transfer, by means of contribution, sale, assignment, lease or sublease, license or sublicense, or other disposition of any kind, any Material Intellectual Property or any Specified Asset held by the Borrower or any other Obligor to any Person other than the Borrower or a Subsidiary Guarantor, or (y) permit any Person other than the Borrower or a Subsidiary Guarantor to hold any interest in any Material Intellectual Property or any Specified Asset (other than pursuant to non-exclusive intercompany licenses), and (ii) no Material Intellectual Property or Specified Asset held by the Borrower or a Subsidiary Guarantor shall be contributed as an Investment to any Subsidiary other than a Subsidiary Guarantor.

**9.06       Restricted Payments**. No Obligor shall, nor shall it permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payments except dividends paid by any Subsidiary to any Obligor.

**9.07       Payments of Indebtedness**.

(a)       Such Obligor will not, and will not permit any of its Subsidiaries to, whether directly or indirectly, make any payments in respect of any Indebtedness other than (i) payments of the Obligations, (ii) scheduled payments of other Indebtedness to the extent

permitted pursuant to the Approved Budget, (iii) payments of Indebtedness secured by a Permitted Lien if the sole asset securing such Indebtedness has been sold or otherwise disposed of in a manner permitted under this Agreement, in each case, subject to the Approved Budget.

(b)     No Obligor shall, and no Obligor shall permit any of its Subsidiaries to, directly or indirectly (i) prepay, pay, redeem or repay or take any action, with respect to the Prepetition Loan Documents that is in violation or breach of any Prepetition Subordination and Intercreditor Agreement or (ii) amend, restate, supplement, change, extend, refinance, replace or otherwise modify (or waive or consent to any diversions from, or actions or inactions affecting) any Prepetition Loan Document in violation or breach of any Prepetition Subordination and Intercreditor Agreement or that is materially adverse to any of the Secured Parties or the Prepetition First Lien Term Loan Secured Parties.

**9.08**        **Change in Fiscal Year**. Such Obligor will not, and will not permit any of its Subsidiaries to, change the last day of its fiscal year from that in effect on the Closing Date.

**9.09**        **Sales of Assets, Etc.** Such Obligor will not, and will not permit any of its Subsidiaries to, sell, lease or sublease (as lessor or sub-lessor), sale and leaseback, assign, convey, exclusively license (in terms of geography or field of use), transfer, or otherwise dispose of any of its businesses, assets or property of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired (including accounts receivable and Equity Interests of Subsidiaries), or forgive, release or compromise any amount owed to such Obligor or Subsidiary, in each case, in one transaction or series of transactions (any thereof, an "*Asset Sale*"):

(a)     sales, transfers and other dispositions of receivables in connection with the compromise, settlement or collection thereof in the Ordinary Course in an aggregate amount not to exceed the amount set forth in the Approved Budget;

(b)     sales of inventory in the Ordinary Course in an Arm's-Length Transaction;

(c)     the forgiveness, release or compromise of any amount owed to any Obligor or Subsidiary in the Ordinary Course;

(d)     Permitted Licenses and Permitted Exclusive Licenses;

(e)     transfers of assets, rights or property by any Subsidiary Guarantor to any other Obligor;

(f)     dispositions (including by way of abandonment or cancellation) of any equipment and other tangible property that is obsolete or worn out or no longer used or useful in the Business disposed of in the Ordinary Course;

(g)     dispositions resulting from Casualty Events;

(h)     the unwinding of any Hedging Agreements permitted by **Section 9.05** pursuant to its terms;

(i)    in connection with any transaction permitted under **Section 9.03** or **9.05**:

(j)    subject to the prior written consent of the Majority Lenders, so long as no Event of Default has occurred and is continuing, other Asset Sales consummated after the Closing Date with a fair market value not in excess of $500,000 (or the Equivalent Amount in other currencies) in the aggregate; and

(k)    subject to the prior written consent of the Majority Lenders, dispositions in the Ordinary Course consisting of the abandonment of intellectual property rights (other than Material Intellectual Property) which, in the reasonable good faith determination of Borrower, are not material to the conduct of the business of the Obligors and the Subsidiaries.

**9.10**    **Transactions with Affiliates**. Such Obligor will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction to sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, unless such arrangement or transaction (i) is an Arm's-Length Transaction and is of the kind which would be entered into by a prudent Person in the position of the Borrower with another Person that is not an Affiliate; underline provided that, in connection with any such transaction involving aggregate consideration or payments of at least $1,000,000, such transaction shall have been approved by the Lenders in their sole discretion, (ii) is between or among one or more Obligors, on the one hand, and, on the other hand, one or more Obligors, (iii) constitutes customary compensation and indemnification of, and other employment arrangements with, directors, officers, and employees of any Obligor or its Subsidiaries in the Ordinary Course (solely to the extent that payment thereof is in accordance with the Approved Budget), (iv) constitutes payment of customary fees, reimbursement of expenses, and payment of indemnification to officers and directors and customary payment of insurance premiums on behalf of officers and directors by the Obligors or their Subsidiaries, in each case, in the Ordinary Course (solely to the extent that payment thereof is in accordance with the Approved Budget), (v) constitutes adequate protection granted to the Prepetition Second Lien Term Loan Secured Parties pursuant to, or otherwise permitted by, any DIP Order or (vi) are the transactions set forth on **Schedule 9.10**.

**9.11**    **Restrictive Agreements**. Such Obligor will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any Restrictive Agreement other than (i) restrictions and conditions imposed by applicable Laws or by the Loan Documents, (ii) Restrictive Agreements listed on **Schedule 9.11,** (iii) limitations associated with Permitted Liens or any document or instrument governing any Permitted Lien, (iv) any documentation (as in effect on the Closing Date and without giving effect to any modifications) governing indebtedness referenced in **Section 9.01(g)**, (v) customary provisions in leases, Permitted Licenses, Permitted Exclusive Licenses and other Contracts restricting the assignment thereof or restricting the assignment or sublease or sublicense of the property leased, licensed or otherwise the subject thereof; (vi) [Reserved]; (vii) [Reserved]; (viii) restrictions or conditions imposed by any agreement relating to purchase money Indebtedness and other secured Indebtedness or to leases and licenses permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness or the property leased or licensed; (ix) customary provisions in contracts for the disposition of any assets; underline provided that the restrictions in any such contract shall apply only to the assets or Subsidiary that is to be

disposed of and such disposition is permitted hereunder; and (x) customary provisions regarding confidentiality or restricting assignment, pledges or transfer of any Permitted License or any Permitted Exclusive License or any other agreement entered into in the Ordinary Course.

**9.12** **Modifications and Terminations of Material Agreements and Organic Documents**. Such Obligor will not, and will not permit any of its Subsidiaries to:

(a) waive, amend, terminate, replace or otherwise modify any term or provision of any Organic Document in any way or manner adverse to the interests of the Administrative Agent and the Lenders, provided that for purposes of this **clause (a)**, any amendment, modification or waiver to Section 6 of the certificate of incorporation of the Borrower shall be deemed adverse to the Administrative Agent and the Lenders;

(b) waive, amend, replace or otherwise modify any term or provision of any Prepetition Loan Document or any other Material Agreement in a manner adverse to the rights and remedies the Administrative Agent and the Lenders hereunder;

(c) (x) take or omit to take any action that results in the termination of, or permits any other Person to terminate, any Material Agreement or such Obligor's rights under Material Intellectual Property or (y) take any action that permits any Material Agreement or such Obligor's rights under Material Intellectual Property to be terminated by any counterparty thereto prior to its stated date of expiration, in each such case if such action or omission could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(d) enter into, waive, terminate, replace or otherwise modify any joint venture agreement, distribution agreement, collaboration agreement or any agreement similar to any of the foregoing, in each case, that involves the disposition of Collateral or the assignment or exclusive licensing of any Material Intellectual Property, unless such agreement is acceptable in form and substance to the Majority Lenders;

(e) waive, amend, modify, replace, supplement or restate in any manner any Subordinated Loan without the prior written consent of the Administrative Agent and the Majority Lenders; or

(f) waive, amend, modify, replace, supplement or restate in any manner in contradiction of any Prepetition Subordination and Intercreditor Agreement any Prepetition Debt without the prior written consent of the Administrative Agent and the Lenders.

**9.13** **Outbound Licenses**. No Obligor shall, nor shall it permit any of its Subsidiaries to, enter into or become or remain bound by any outbound exclusive license of Intellectual Property, except for Permitted Exclusive Licenses.

**9.14** **[Reserved].**

**9.15** **Hazardous Material**. (a) Such Obligor will not, and will not permit any of its Subsidiaries to, use, generate, manufacture, install, treat, release, store or dispose of any Hazardous Material, except in compliance with all applicable Environmental Laws and as would not result in Environmental Liability except as could not, individually or in the aggregate,

reasonably be expected to result in a Material Adverse Effect. If the Administrative Agent at any time has a reasonable basis to believe that there is any material violation by an Obligor of any Environmental Law or the presence or release of any Hazardous Material which could result in an Environmental Liability that could be reasonably expected to result in a Material Adverse Effect, each Obligor shall, and shall cause each Subsidiary to, (i) prepare an environmental assessment of such condition, including where appropriate environmental testing, and the preparation of such environmental report, at the Borrower's sole cost and expense, as the Administrative Agent may reasonably request with respect to any affected parcel of real property subject to a Security Document that is a mortgage, deed of trust or similar instrument, which shall be conducted by Persons reasonably acceptable to the Administrative Agent and shall be in form and substance reasonably acceptable to the Administrative Agent, and (ii) if such report is not delivered within thirty (30) days, permit the Administrative Agent or its representatives to have access to all such real property for the purpose of conducting, at the Borrower's sole cost and expense, such environmental audits and testing as the Administrative Agent shall reasonably deem appropriate.

**9.16** **Accounting Changes**. Such Obligor will not, and will not permit any of its Subsidiaries to, make any significant change in accounting treatment or reporting practices, except as required or permitted by GAAP.

**9.17** **Compliance with ERISA**. No ERISA Affiliate shall cause or suffer to exist (i) any event that could result in the imposition of a Lien with respect to any Title IV Plan or Multiemployer Plan or (ii) any other ERISA Event that could, in the aggregate, reasonably be expected to result in a Material Adverse Effect. No Obligor or any of its Subsidiaries shall cause or suffer to exist any event that could result in the imposition of a Lien with respect to any Benefit Plan.

**9.18** **Sanctions; Anti-Corruption Use of Proceeds**.

(a) Neither the Borrower or any of its Subsidiaries or their respective agents shall (i) conduct any business or engage in any transaction or dealing with any Sanctioned Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to any Sanctions; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Sanctions, the Patriot Act or any other Anti-Terrorism Law.

(b) The Borrower will not, directly or, to the knowledge of the Borrower, indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable anti-corruption Law, or (ii) (A) for the purpose of funding any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of country- or territory-wide Sanctions, in violation of Sanctions or (B) in any other manner that would result in a violation of Sanctions by any party to this Agreement.

**9.19**        **Foreign Subsidiaries**. Such Obligor will not, and will not permit any of its Subsidiaries to, form any Subsidiary, or acquire any Equity Interests in any Subsidiary, that is a (i) Foreign Subsidiary or (ii) Domestic Subsidiary of a Foreign Subsidiary, other than the Permitted Swiss Subsidiary.

**9.20**        **[Reserved]**

**9.21**        **Transfers to Non-Obligors**. Notwithstanding anything in this Agreement to the contrary, from and after the Closing Date, neither the Borrower nor any of its Subsidiaries shall sell, lease, license or otherwise transfer any assets to the Permitted Swiss Subsidiary or any other Subsidiary that is not an Obligor without the prior written consent of the Lenders, other than permitted Investments in the Permitted Swiss Subsidiary consisting of Permitted Swiss Subsidiary Operating Expenses in accordance with the Approved Budget.

**9.22**        **No Swiss Subsidiary Debt**. Notwithstanding anything in this Agreement to the contrary, from and after the Closing Date, neither the Borrower nor any of its Subsidiaries will permit the Permitted Swiss Subsidiary to, create, incur, assume or permit to exist any Indebtedness or issue any Equity Interests to any party other than the Obligors, whether directly or indirectly, without the prior written consent of the Lenders.

**9.23**        **Payments to Insiders**. Notwithstanding anything to the contrary herein, neither the Borrower nor any of its Subsidiaries shall make any payments whether in cash, property or other consideration to any of its or their directors, officers, equityholders or any other Persons who are "insiders" pursuant to Section 101(31) of the Bankruptcy Code or Affiliates of any of the foregoing, in each case, other than (a) salaries and compensation to employees of any Obligor in the Ordinary Course, (b) reasonable, documented, out-of-pocket travel expenses of the members of the Board of Borrower incurred in connection with attending Board meetings that require in-person attendance or making site visits at the Borrower's offices in Auburn, Alabama, in each case, not exceeding the amount set forth in the Approved Budget.

**9.24**        **Budget Covenant**. The Obligors shall not permit the Disbursements Plus Receipts Variance or the Disbursements Variance (other than Restructuring Costs and Supplemental Fees), on a rolling four-week basis, for any Applicable Period to exceed 15% (such percentage, the "***Permitted Variance***" and the requirements set forth in this **Section 9.24**, the "***Budget Covenant***").

**9.25**        **Capital Expenditures**.  The Obligors shall not (a) permit the aggregate amount of Capital Expenditures made by the Obligors to exceed the amount set forth therefor in the Approved Budget, or (b) make any payment on account of, or incur any obligation with respect to, any Capital Expenditure, except if (i) no Default shall exist or be continuing at the time of, or after giving effect to, the same, and (ii) the type and amount of such Capital Expenditure is set forth in the Approved Budget, and such payment is made in accordance with the Approved Budget.

**9.26**        **Chapter 11 Case**. The Obligors shall not:

(a)        Other than the claims and Liens of the Administrative Agent arising from this Agreement, and other than the adequate protection claims as permitted in the DIP Orders, as

applicable, and except for the Carve-Out and Permitted Liens, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other DIP Superpriority Claim which is *pari passu* with, or senior to the claims and Liens of, the Administrative Agent and Lenders.

(b)     Make or permit to be made any amendment or change to the DIP Orders, as applicable, without the consent of the Majority Lenders.

(c)     Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Administrative Agent, any Lender or any Prepetition Secured Party with respect to any Loan Document or any Prepetition Loan Document, or any of the liens, claims, rights, benefits or protections granted hereunder or thereunder, or any of the transactions contemplated hereby or thereby.

(d)     Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by a Chapter 11 Order after notice and a hearing, and (b) are expressly permitted by, and in compliance with, the terms of the Loan Documents (including the Budget Covenant and the Approved Budget, subject to any Permitted Variance), or otherwise with the prior written consent of the Majority Lenders.

(e)     File any material motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Debtors (other than emergency motions, retention applications, and ministerial motions) without consulting with the Lenders and providing the Lenders prior (in any case, not less than two (2) Business Days' (or as soon as reasonably practicable under the circumstances if two (2) Business Days in advance is not reasonably practicable)) notice and the opportunity to review and comment on each such motion.

(f)     Subject to the applicable DIP Order, object to, contest, delay, prevent, or interfere in any manner with, the exercise of any rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence and during the continuance of an Event of Default.

**9.27**     **KERP Payments**. No Obligor shall make any key employee retention payment or other bonus, incentive or similar payment unless the Lenders shall have previously consented thereto in writing.

**SECTION 10.**
**[Reserved]**

**SECTION 11.**
**EVENTS OF DEFAULT**

**11.01**　　　　**Events of Default**. Each of the following events shall constitute an "***Event of Default***":

　　　　(a)　　**Principal Payment Default**. The Borrower or any other Obligor shall fail to pay any principal of the Loan or the Termination Payment (or portion thereof), when and as the same shall become due and payable, whether at the due date thereof, at a date fixed for prepayment thereof or otherwise.

　　　　(b)　　**Other Payment Defaults**. Any Obligor shall fail to pay interest or any other Obligation (other than an amount referred to in **Section 11.01(a)**) when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days.

　　　　(c)　　**Representations and Warranties**. Any representation or warranty made or deemed made by or on behalf of any Obligor or any of its Subsidiaries in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof, shall: (i) prove to have been incorrect or misleading in any respect when made or deemed made to the extent that such representation or warranty contains any materiality or Material Adverse Effect qualifier; or (ii) prove to have been incorrect or misleading in any material respect when made or deemed made to the extent that such representation or warranty does not otherwise contain any materiality or Material Adverse Effect qualifier.

　　　　(d)　　**Certain Covenants**. Any Obligor shall fail to observe or perform any covenant, condition or agreement contained in **Sections 8.02**, **8.03**, **8.04**, **8.05**, **8.06** (other than **8.06(m))**, **8.07** (with respect to the Borrower's existence), **8.15**, **8.16**, **8.17**, **8.20**, **8.22**, **8.26**, or **Section 9**.

　　　　(e)　　**Other Covenants**. Any Obligor shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in **Section 11.01(a)**, (**b**) or (**d**)) or any other Loan Document, and, in the case of any failure that is capable of cure, such failure shall continue unremedied for a period of fifteen (15) or more days.

　　　　(f)　　**Payment Default on Other Indebtedness**. Any Obligor or any of its Subsidiaries shall fail to make any payment (whether of principal or interest or otherwise, and regardless of amount) in respect of any obligation required to be made by the DIP Orders, when and as the same shall become due and payable after giving effect to any applicable grace or cure period, if any, specified in the documents relating thereto on the date of such failure.

(g)    **Other Defaults on Other Indebtedness**. (i) Any material breach of, or "event of default" or similar event under, any Contract governing any Material Indebtedness or the Second Lien Indebtedness shall occur and such breach or "event of default" or similar event shall continue unremedied, uncured or unwaived after the expiration of any grace or cure period thereunder, or (ii) any event or condition occurs (x) that results in any Indebtedness becoming due prior to its scheduled maturity or (y) that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf to cause such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this **Section 11.01(g)** shall not apply to (x) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any conversion of any convertible Indebtedness or satisfaction of any condition giving rise to or permitting a conversion of any convertible Indebtedness; provided that the Borrower has the right to settle any such Indebtedness into Equity Interests of the Borrower (and nominal cash payments in respect of fractional shares and cash payments in respect of accrued and unpaid interest in accordance with the express terms or conditions thereof) and (z) with respect to any Indebtedness consisting of Hedging Agreements, termination events or equivalent events pursuant to the terms of such Hedging Agreements and not as a result of any default thereunder by any Obligor or any Subsidiary provided that this **Section 11.01(g)** shall not apply to any Indebtedness of the Obligors under the Chapter 11 Cases that was incurred prior to the Petition Date unless such Indebtedness has been accelerated and the enforcement of remedies with respect to such Indebtedness shall not have been stayed by the commencement of the Chapter 11 Cases.

(h)    **Insolvency, Bankruptcy, Etc**. Other than the commencement of the Chapter 11 Cases,

(i)    Any Obligor or any of its Subsidiaries becomes insolvent, or generally does not or becomes unable to pay its debts or meet its liabilities as the same become due, or admits in writing its inability to pay its debts generally, or declares any general moratorium on its indebtedness, or proposes a compromise or arrangement or deed of company arrangement between it and any class of its creditors.

(ii)    Any Obligor or any of its Subsidiaries commits an act of bankruptcy or makes an assignment of its property for the general benefit of its creditors or makes a proposal (or files a notice of its intention to do so).

(iii)    Any Obligor or any of its Subsidiaries institutes any proceeding seeking to adjudicate it an insolvent, or seeking liquidation, dissolution, winding-up, reorganization, compromise, arrangement, adjustment, protection, moratorium, relief, stay of proceedings of creditors generally (or any class of creditors), or composition of it or its debts or any other relief, under any Law, whether U.S. or non-U.S., now or hereafter in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors or at common law or in equity, or files an answer admitting the material allegations of a petition filed against it in any such proceeding.

(iv)      Any Obligor or any of its Subsidiaries applies for the appointment of, or the taking of possession by, a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, voluntary administrator, receiver and manager or other similar official for it or any substantial part of its property.

(v)      Any Obligor or any of its Subsidiaries takes any action, corporate or otherwise, to approve, effect, consent to or authorize any of the actions described in this **Section 11.01(h)**, or otherwise acts in furtherance thereof or fails to act in a timely and appropriate manner in defense thereof.

(vi)      Any petition is filed, application made or other proceeding instituted against or in respect of any Obligor or any of its Subsidiaries:

(A)      seeking to adjudicate it as insolvent;

(B)      seeking a receiving order against it;

(C)      seeking liquidation, dissolution, winding-up, reorganization, compromise, arrangement, adjustment, protection, moratorium, relief, stay of proceedings of creditors generally (or any class of creditors), deed of company arrangement or composition of it or its debts or any other relief under any Law, whether U.S. or non-U.S., now or hereafter in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors or at common law or in equity; or

(D)      seeking the entry of an order for relief or the appointment of, or the taking of possession by, a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, voluntary administrator, receiver and manager or other similar official for it or any substantial part of its property, and such petition, application or proceeding continues undismissed, or unstayed and in effect, for a period of forty-five (45) days after the institution thereof; <u>provided</u> that if an order, decree or judgment is granted or entered (whether or not entered or subject to appeal) against such Obligor or such Subsidiary thereunder in the interim, such grace period will cease to apply; <u>provided</u>, <u>further</u>, that if such Obligor or Subsidiary files an answer admitting the material allegations of a petition filed against it in any such proceeding, such grace period will cease to apply.

(vii)      Any other event occurs which, under the Laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in this **Section 11.01(h)**.

*provided*, *however*, that the Chapter 11 Cases shall not constitute an Event of Default pursuant to this clause (h).

(i)      **Judgments**. One or more judgments for the payment of money in an aggregate amount in excess of $5,000,000 (or the Equivalent Amount in other currencies) (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage) shall be rendered against any Obligor or any of its Subsidiaries or any combination thereof and the same shall remain undischarged for a period of forty-five (45) calendar days during which execution shall not be

effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Obligor to enforce any such judgment.

(j)    **ERISA**. An ERISA Event shall have occurred that when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount in excess of $5,000,000 (or the Equivalent Amount in other currencies).

(k)    **Change of Control**. A Change of Control shall have occurred.

(l)    **[Reserved]**.

(m)    **Key Person Events.** At any time, (i) two (2) or more Key Persons cease to be employed by the Borrower or (ii) one (1) or more Specified Key Persons cease to be employed by the Borrower. A Key Person or Specified Key Person shall be deemed not actively employed if they have resigned or provided notice of resignation or any period they are subject to any "gardening" or similar leave.

(n)    **[Reserved]**

(o)    **Impairment of Security, Etc.** Subject in all respects to any applicable post-closing periods and certain other time periods under the Loan Documents for any Obligor or Subsidiary to take perfection actions, if any of the following events occurs: (i) any Lien created by the DIP Order or any of the Security Documents shall at any time not constitute a valid and perfected Lien on the applicable Collateral in favor of the Secured Parties, free and clear of all other Liens (other than Permitted Liens) except due to the action or inaction of the Administrative Agent, (ii) except for expiration in accordance with its terms, any of the Security Documents or any Guarantee of any of the Obligations (including that contained in **Section 13**) shall for whatever reason cease to be in full force and effect, (iii) any Obligor shall, directly or indirectly, contest in any manner such effectiveness, validity, binding nature or enforceability of any such Lien or any Loan Document, or (iv) any injunction, whether temporary or permanent, shall be rendered against any Obligor that prevents the Obligors from selling or manufacturing any of their other material and commercially available products in the United States.

(p)    **Governmental Consent**. Any authorization of a Government Authority necessary for the execution, delivery or performance of any Loan Document or for the validity or enforceability of the Obligations under any Loan Document is not given, is withdrawn or ceases to remain in full force or effect.

(q)    **Loan Documents, Etc.** The validity of any Loan Document shall be contested by any Obligor or any of its Subsidiaries, or any applicable Law shall purport to render any material provision of any Loan Document invalid or unenforceable or shall purport to prevent or materially delay the performance or observance by any Obligor or any of its Subsidiaries of the Obligations; any Obligor denies or contests the validity or enforceability of any Obligations, or the perfection or priority of any Lien granted to the Administrative Agent; any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by Agent and Lenders and other than in accordance with the terms of this Agreement); any lien created hereunder or under the DIP Orders ceases to be a valid and perfected lien (other

than as a result of any action or inaction by the Administrative Agent and other than by reason of a release of Collateral in accordance with the terms hereof or thereof or Payment in Full) or the Obligations cease to be DIP Superpriority Claims.

        (r)     **Chapter 11 Cases.** There shall have occurred any of the following in the Chapter 11 Cases:

        (i)     the failure to meet any of the Milestones set forth herein unless (x) such failure is solely the result of any act, omission, or delay on the part of any of the Lenders seeking termination or (y) such Milestone is waived or extended by the Majority Lenders in writing;

        (ii)     the Obligors propose, support, or file any, plan of liquidation, asset sale of all or any material portion of the Obligors' assets or plan of reorganization other than what is considered to be consistent with the Restructuring Support Agreement, in the Lenders' sole discretion, an acceptable plan of liquidation or reorganization (an "*Acceptable Plan*") or an acceptable sale of assets (an "*Acceptable Sale*"); <u>provided</u>, that an Acceptable Plan and Acceptable Sale shall include any plan of reorganization or asset sale that provides for the indefeasible Payment in Full in cash of the Obligations and the Prepetition First Lien Term Loan Debt on the effective date thereof;

        (iii)     the Obligors fail to provide the Lenders with draft copies of all motions, notices, statements, schedules, applications, reports and other papers the Obligors intend to file with the Bankruptcy Court in connection with the plan or sale process within a reasonable period of time prior to the date such party intends to file any of the foregoing and fail to consult in advance in good faith with the Lenders regarding the form and substance of any such proposed filing with the Bankruptcy Court;

        (iv)     the Obligors file any document necessary to effectuate an Acceptable Plan or Acceptable Sale without the consent of the Lenders;

        (v)     any Obligor or any of its officers publicly announces, or communicates in writing to any other person or entity (other than the Administrative Agent, the Lenders and their respective Affiliates and representatives), its intention not to support or pursue an Acceptable Plan or an Acceptable Sale;

        (vi)     The Bankruptcy Court enters an order, or any Obligor files any motion or any request for relief (other than with the consent of the Lenders) that seeks, to (a) dismiss any of the Chapter 11 Cases, (b) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appoint a trustee or examiner with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code; or (d) terminate the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

        (vii)     the Bankruptcy Court enters an order granting relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) to authorize any party to proceed against any material asset of the Obligors or in such a manner that would adversely affect the Obligors' ability to operate their businesses in the ordinary course;

(viii)    the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of an executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease, other than an assumption or rejection that is consented to in writing by the Lenders;

(ix)    after entry by the Bankruptcy Court of any DIP Order, Confirmation Order, or an order approving a sale of the Specified Assets, such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended, in each case, in a manner materially inconsistent with the terms set forth herein or without the consent of the Lenders;

(x)    the imposition of any material award, claim, fine, penalty, or other monetary judgment by any governmental entity, including the Bankruptcy Court, against any Obligor that would not be dischargeable pursuant to the Bankruptcy Code, the Confirmation Order or any other order of the Bankruptcy Court;

(xi)    the failure of the Debtors to comply with the DIP Orders, including failure to make adequate protection payments when due, which remains uncured for a period of five (5) Business Days after the receipt of written notice of such event or is not otherwise waived in accordance with the terms thereof;

(xii)    (a) the Obligors engage in or publicly support any challenge to the validity, security, perfection, priority, extent or enforceability of the Loan Documents, the Obligations, the Liens securing the Obligations, the Prepetition First Lien Term Loan Documents or the Liens securing Prepetition First Lien Term Loan Debt, including without limitation seeking to equitably subordinate, invalidate, disallow, avoid, recharacterize, limit or otherwise impair such liens or claims, or (b) the Debtors engage in any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against any of the Lenders or the Prepetition Secured Parties;

(xiii)    the entry of a judgment or order by the Bankruptcy Court sustaining any defense, objection or challenge to the validity, security, perfection, priority, extent or enforceability of the DIP Documents, the Obligations, the Liens securing the Obligations, the Prepetition First Lien Term Loan Documents or the Liens Securing Prepetition First Lien Term Loan Debt or (ii) invalidating, disallowing avoiding, subordinating, recharacterizing, limiting or otherwise impairing any of the Obligations, DIP Superpriority Claims, any Liens securing the Obligations, the Prepetition Secured Obligations or the Prepetition Liens;

(xiv)    the entry of any order in any of the Chapter 11 Cases surcharging any of the DIP Collateral or Prepetition Collateral with respect to the Lenders or Prepetition Secured Parties, as applicable, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xv)    the consensual use of prepetition cash collateral is terminated, or the entry of an order by the Bankruptcy Court terminating or modifying the use of cash collateral, in each case, without the prior written consent of the Lenders;

(xvi)    the reversal or modification of the Roll-Up Loans provided for hereunder by the Bankruptcy Court without the consent of the Lenders;

(xvii)   subject to the applicable DIP Order then in effect, the Obligors fail to pay any of the fees and expenses of the Lender Professionals as and when due pursuant to the terms of any applicable engagement letters, fee reimbursement letters, the Bankruptcy Code, any Order, or any other orders of the Bankruptcy Court and such failure to pay is not cured within five (5) Business Days after the Obligors receive notice hereof from the Administrative Agent or any Lender; and

(xviii)  the modification of the Approved Budget in a manner not acceptable to the Lenders in their sole discretion.

**11.02    Remedies**.

(a)     Upon the occurrence of any Event of Default, then, and in every such event, and at any time thereafter during the continuance of such event but in all events subject to the applicable DIP Order then in effect, the Administrative Agent may, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations, including the Termination Payments, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Obligor.

**11.03    Additional Remedies**.

(a)     If an Event of Default has occurred and is continuing, if any Obligor shall be in default under a Material Agreement, the Administrative Agent shall, subject to the DIP Orders, have the right (but not the obligation) to cause the default or defaults under such Material Agreement to be remedied (including without limitation by paying any unpaid amount thereunder) and otherwise exercise any and all rights of such Obligor, as the case may be, thereunder, as may be necessary to prevent or cure any default. Without limiting the foregoing, upon any such default, each Obligor shall promptly execute, acknowledge and deliver to the Administrative Agent such instruments as may reasonably be required of such Obligor to permit the Administrative Agent to cure any default under the applicable Material Agreement or permit the Administrative Agent to take such other action required to enable the Administrative Agent to cure or remedy the matter in default and preserve the interests of the Administrative Agent. Any amounts paid by the Administrative Agent pursuant to this **Section 11.03** shall be payable in accordance with **Section 14.03(a)**, shall accrue interest at the Default Rate if not paid when due, and shall constitute "Obligations."

(b)     If any Event of Default exists, subject to the DIP Orders, the Administrative Agent may in its discretion (and shall upon written direction of Majority Lenders) do any one or more of the following from time to time (in addition to any and all other things as provided elsewhere in this Agreement):

(i)      terminate, reduce or condition any New Money Loan Commitment;

(ii)     require the Obligors to cash collateralize then Obligations; and

(iii)    exercise any other rights, remedies, powers and privileges afforded under the Loan Documents or any other agreement, pursuant to the applicable DIP Order then in effect and any other Chapter 11 Order, by law (including under the Bankruptcy Code and other applicable Law), at equity and otherwise, including the rights and remedies of a secured party under the UCC notwithstanding anything contained herein to the contrary and for the avoidance of doubt, consistent with the DIP Orders, under no circumstances shall the Administrative Agent or any Lender take any actions in respect of the Collateral except in accordance with the DIP Orders.

(c)    Neither the Administrative Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Obligor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof. All of the rights and remedies of the Administrative Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any applicable Law.  To the extent it may lawfully do so, each Obligor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 calendar days before such Asset Sale or other disposition.

(d)    Subject to the DIP Orders, to the extent that any applicable Law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Obligor acknowledges and agrees that, subject to the Chapter 11 Orders, the Administrative Agent shall be deemed to have complied with such duties even if it shall:

(i)    fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Administrative Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)    fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other applicable Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(iii)    fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)    advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Obligor, for expressions of interest in acquiring any such Collateral;

(v)     exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Administrative Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)     dispose of assets in wholesale rather than retail markets;

(vii)     disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)     purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of any Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of any Collateral.

(e)     Accounts and Payments in Respect of General Intangibles.

(i)     In addition to, and not in substitution for, any other provision in this Agreement, if required by the Administrative Agent at any time during the continuance of an Event of Default, subject to the Chapter 11 Orders (including the DIP Orders), on and after the date on which at least one deposit account or securities account has been established, any payment of accounts or payment in respect of general intangibles, when collected by any Obligor, shall be promptly (and, in any event, within two (2) Business Days) deposited by such Obligor in the exact form received, duly indorsed by such Obligor to the Administrative Agent, in a Control Account, subject to withdrawal by the Administrative Agent as provided herein. Until so turned over, such payment shall be held by such Obligor in trust for the Administrative Agent, segregated from other funds of such Obligor. Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(ii)     Subject to the Chapter 11 Orders (including the DIP Orders), at any time during the continuance of an Event of Default:

a.     each Obligor shall, upon the Administrative Agent's written request, deliver to the Administrative Agent all original and other documents evidencing, and relating to, the contractual obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invokes and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Administrative Agent and that payments in respect thereof shall be made directly to the Administrative Agent;

b.     the Administrative Agent may, without notice, at any time during the continuance of an Event of Default, limit or terminate the authority of any Obligor to

collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the name of others, communicate with account debtors to verify with them to the Administrative Agent's reasonable satisfaction the existence, amount and terms of any account or amounts due under any general intangible.  In addition, the Administrative Agent may at any time enforce such Obligor's rights against such account debtors and obligors of general intangibles; and

c.    each Obligor shall take all actions, deliver all documents and provide all information necessary or reasonably requested by the Administrative Agent to ensure any Internet domain name is registered.

(iii)    Anything herein to the contrary notwithstanding, each Obligor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  No Obligor shall have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Loan Document or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of any Obligor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

(f)    Unless otherwise expressly provided in this Agreement, upon the occurrence and during the continuance of an Event of Default, subject to the Chapter 11 Orders (including the DIP Orders), all proceeds of any Collateral received by any Obligor hereunder in cash or Cash Equivalents shall be held by such Obligor in trust for the Administrative Agent and the Lenders, segregated from other funds of such Obligor, and shall, promptly upon receipt by any Obligor, be turned over to the Administrative Agent in the exact form received (with any necessary endorsement).

(g)    Each Obligor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Obligations and the fees and disbursements of any attorney employed by the Administrative Agent or any Lender to collect such deficiency.

(h)    Each Obligor acknowledges that the purpose of **Section 11.03** is, among other things, to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not being indicated in such clauses.

**11.04**        **[Reserved]**.

**11.05**        **[Reserved]**.

**11.06**        **Credit Bidding**.

Subject to the DIP Orders and the Bidding Procedures Order, the Obligors and the Lenders hereby irrevocably authorize the Administrative Agent, based upon the written instruction of the Majority Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363 of the Bankruptcy Code or any similar laws in any other jurisdictions to which an Obligor is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Lenders shall be entitled to be, and shall be, subject to the entry of the Final DIP Order, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of the Administrative Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of the Administrative Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase). Except as provided above and otherwise expressly provided for herein or in the other Loan Documents, the Administrative Agent will not execute nor deliver a release of any Lien on any Collateral. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release any such Liens on particular types or items of Collateral pursuant to, and in accordance with, this **Section 11.06**. Each Secured Party whose Obligations are credit bid under this **Section 11.06** shall be entitled to receive interests in the Collateral or any other asset acquired in connection with such credit bid (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (y) the amount of the Obligations of such Secured Party that were credit bid in such credit bid, by (z) the aggregate amount of all Obligations that were credit bid in such credit bid.

## SECTION 12.
## THE ADMINISTRATIVE AGENT

**12.01**        **Appointment and Duties**. Subject in all cases to clause (c) below:

(a)        **Appointment of the Administrative Agent**. Each of the Lenders hereby irrevocably appoints Oaktree Fund Administration, LLC (together with any successor Administrative Agent pursuant to **Section 12.09**) as the Administrative Agent hereunder and authorizes the Administrative Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Obligor or any of its Subsidiaries, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Administrative Agent under such Loan Documents and (iii) exercise such

powers as are reasonably incidental thereto. Except as expressly set forth herein, the provisions of this **Section 12** are solely for the benefit of the Administrative Agent and the Lenders, and no Obligor or any Affiliate thereof shall have rights as a third-party beneficiary of any such provisions.

(b)     **Duties as Collateral and Disbursing Agent**. Without limiting the generality of **Section 12.01(a)**, the Administrative Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents (including in any proceeding described in **Section 11.01(h)** or any other bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to the Administrative Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in **Section 11.01(h)** or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Secured Party), (iii) act as collateral agent for each Secured Party for purposes of acquiring, holding, enforcing and perfecting all Liens created by the Loan Documents and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to the Administrative Agent and the other Secured Parties with respect to the Collateral, whether under the Loan Documents, applicable Laws or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided that the Administrative Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for the Administrative Agent and the Lenders for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Obligor with, and cash and Permitted Cash Equivalent Investments held by, such Lender, and may further authorize and direct the Lenders to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to the Administrative Agent, and each Lender hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)     **Limited Duties**. The Lenders and the Obligors hereby each acknowledge and agree that the Administrative Agent, subject only to the notice provisions set forth in **Section 12.09**, may resign from such role at any time for any reason or no reason whatsoever. Without limiting the foregoing, the parties hereto further acknowledge and agree that under the Loan Documents, the Administrative Agent (i) is acting solely on behalf of the Lenders (except to the limited extent provided in **Section 12.11**), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "the Administrative Agent", the terms "agent", "administrative agent" and "collateral agent" and similar terms in any Loan Document to refer to the Administrative Agent, which terms are used for title purposes only, (ii) is not assuming any duty or obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Secured Party and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document (fiduciary or otherwise), in each case, regardless of whether a Default

has occurred and is continuing, and each Lender hereby waives and agrees not to assert any claim against the Administrative Agent based on the roles, duties and legal relationships expressly disclaimed in this **clause (c)**. Without in any way limiting the foregoing, the Administrative Agent shall not, except as expressly set forth in this Agreement and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Obligor or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

**12.02**        **Binding Effect**. Each Lender agrees that (i) any action taken by the Administrative Agent or the Majority Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by the Administrative Agent in reliance upon the instructions of the Majority Lenders (or, where so required, such greater proportion) and (iii) the exercise by the Administrative Agent or the Majority Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

**12.03**        **Use of Discretion**.

              (a)        **No Action without Instructions**. The Administrative Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except (subject to **clause (b)** below) any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to written instructions from the Majority Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

              (b)        **Right Not to Follow Certain Instructions**. Notwithstanding **Section 12.03(a)** or any other term or provision of this **Section 12**, the Administrative Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Administrative Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Administrative Agent, any other Secured Party) against all liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Administrative Agent or any Related Person thereof or (ii) that is, in the opinion of the Administrative Agent, in its sole and absolute discretion, contrary to any Loan Document, Law or the best interests of the Administrative Agent or any of its Affiliates or Related Persons, including, for the avoidance of doubt, any action that may be in violation of the automatic stay in connection with any Insolvency Proceeding.

**12.04**        **Delegation of Rights and Duties**. The Administrative Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party). The Administrative Agent and any such Person may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. Any such Person and its Related Parties shall benefit from this **Section 12** to the extent provided by the Administrative Agent; provided, however, that the exculpatory provisions of this **Section 12** shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and of

any such sub-agent, and shall apply to their respective activities in connection with their activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**12.05** **Reliance and Liability**.

(a) The Administrative Agent may, without incurring any liability hereunder, (i) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Obligor) and (ii) rely and act upon any notice, request, certificate, consent, statement, instrument, document or other writing (including and electronic message, Internet or intranet website posting or other distribution), telephone message or conversation or oral conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.

(b) Neither the Administrative Agent nor any of its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Lender and the Borrower hereby waive and shall not assert (and the Borrower shall cause each other Obligor to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the fraudulent conduct or behavior of the Administrative Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment or order by a court of competent jurisdiction) in connection with the duties expressly set forth herein. Without limiting the foregoing, the Administrative Agent:

(i) shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of, or with the consent of, the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in **Section 14.04**) or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent);

(ii) shall not be responsible to any Secured Party for the (a) validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (b) due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii) makes no warranty or representation, and shall not be responsible, to any Secured Party for, and shall not have any duty to ascertain or inquire into, any statement,

document, information, certificate, report, representation or warranty made or furnished by or on behalf of any Related Person, in or in connection with any Loan Document or any transaction contemplated therein, whether or not transmitted by the Administrative Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Administrative Agent in connection with the Loan Documents, including, for the avoidance of doubt, the satisfaction of any condition set forth in **Section 6** of this Agreement or elsewhere herein (other than to confirm receipt of items expressly required to be delivered to the Administrative Agent); and

(iv)    shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document or whether any condition set forth in any Loan Document is satisfied or waived, including, without limiting the generality of the foregoing, as to the financial condition of any Obligor or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower, any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case the Administrative Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in **clauses (i)** through **(iv)** above, each Lender and the Borrower hereby waives and agrees not to assert (and the Borrower shall cause each other Obligor to waive and agree not to assert) any right, claim or cause of action it might have against the Administrative Agent based thereon.

**12.06    Administrative Agent Individually**. The Administrative Agent and its Affiliates may make loans and other extensions of credit to, acquire stock and stock equivalents of, accept deposits from, act as the financial advisor for or in any other advisory capacity for, or engage in any kind of business with, any Obligor or Affiliate thereof as though it were not acting as the Administrative Agent and may receive separate fees and other payments therefor. To the extent the Administrative Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Majority Lender", and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, the Administrative Agent or such Affiliate, as the case may be, in its individual capacity as Lender or as one of the Majority Lenders, respectively.

**12.07    Lender Credit Decision**. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any Lender or any of their Related Persons or upon any document solely or in part because such document was transmitted by the Administrative Agent or any of its Related Persons, conducted its own independent investigation of the financial condition and affairs of each Obligor and has made and continues to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.

**12.08    Expenses; Indemnities**.

(a)    Each Lender agrees to reimburse the Administrative Agent and each of its Related Persons (to the extent not reimbursed by any Obligor) promptly upon demand for such Lender's Proportionate Share of any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Obligor) that may be incurred by the Administrative Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding or otherwise) of, or legal advice in respect of its rights or responsibilities under, any Loan Document.

(b)    Each Lender further agrees to indemnify the Administrative Agent (or any sub-agent thereof) and any Related Persons of the Administrative Agent (or any such sub-agent) (to the extent not indefeasibly paid by any Obligor), from and against such Lender's aggregate Proportionate Share of the liabilities (including taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to on or for the account of any Lender) that may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub-agent) in any matter relating to or arising out of, in connection with or as a result of any Loan Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub-agent) under or with respect to any of the foregoing; _provided_ that no Lender shall be liable to the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub-agent) to the extent such liability has resulted primarily from the gross negligence or willful misconduct of the Administrative Agent (or any sub-agent thereof) or, as the case may be, such Related Person of the Administrative Agent (or any sub-agent thereof), as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

**12.09    Resignation of the Administrative Agent**.

(a)    At any time upon not less than 30 days' prior written notice, the Administrative Agent may resign as the "the Administrative Agent" hereunder, in whole or in part (in the sole and absolute discretion of the Administrative Agent). If the Administrative Agent delivers any such notice, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be (i) a Lender holding at least thirty percent (30%) of the outstanding principal amount of the Loans or any Affiliate thereof or (ii) any other financial institution consented to by the Borrower (provided that the consent of the Borrower shall not be required to the extent an Event of Default has occurred and is continuing). If a successor Administrative Agent has not been appointed on or before the effectiveness of the resignation of the resigning Administrative Agent (or such earlier date as shall be agreed by the Majority Lenders) (the "**_Resignation Effective Date_**"), then the resigning Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint any Person reasonably chosen by it as the successor Administrative Agent, notwithstanding whether the Majority Lenders have appointed a successor or the Borrower has consented to such successor. Whether or not a successor has been appointed, such resignation shall become effective on the Resignation Effective Date.

(b)        Effective from the Resignation Effective Date, (i) the resigning Administrative Agent shall be discharged from its duties and obligations under the Loan Documents to the extent set forth in the applicable resignation notice, (ii) the Lenders shall assume and perform all of the duties of the Administrative Agent until a successor Administrative Agent shall have accepted a valid appointment hereunder, (iii) the resigning Administrative Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to (x) any actions taken or omitted to be taken while such resigning Administrative Agent was, or because the Administrative Agent had been, validly acting as the Administrative Agent under the Loan Documents or (y) any continuing duties such resigning Administrative Agent will continue to perform, and (iv) subject to its rights under **Section 12.04**, the resigning Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as the Administrative Agent under the Loan Documents. Effective immediately upon its acceptance of a valid appointment as the Administrative Agent, a successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the resigning Administrative Agent under the Loan Documents.

**12.10**        **Release of Collateral or Guarantors**. Each Lender hereby consents to the release and hereby directs the Administrative Agent to release, and the Administrative Agent hereby agrees, (or, in the case of **Section 12.10(b)**, release or subordinate) the following:

(a)        [reserved]; and

(b)        any Lien held by the Administrative Agent for the benefit of the Secured Parties against (i) any Collateral that is disposed of by an Obligor in an Asset Sale permitted by the Loan Documents (including pursuant to a valid waiver or consent), (ii) any property subject to a Lien described in **Section 9.02(c)** and (iii) all of the Collateral and all Obligors, upon (x) termination of the New Money Loan Commitments and (y) payment and satisfaction in full of all Loans and all other Obligations that the Administrative Agent has been notified in writing are then due and payable.

Each Lender hereby directs the Administrative Agent, and the Administrative Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guarantees and Liens when and as directed in this **Section 12.10** and deliver to the Borrower, at the expense of the Borrower, any portion of such Collateral so released pursuant to this **Section 12.10** that is in possession of the Administrative Agent.

**12.11**        **Additional Secured Parties**. The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender as long as, by accepting such benefits, such Secured Party agrees, as among the Administrative Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Administrative Agent, shall confirm such agreement in a writing in form and substance acceptable to the Administrative Agent) this **Section 12** and the decisions and actions of the Administrative Agent and the Majority Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) to the same extent a Lender is bound; <u>provided</u> that, notwithstanding the foregoing, (i)

such Secured Party shall be bound by **Section 12.08** only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of Proportionate Share or similar concept, (ii) each of the Administrative Agent and each Lender shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (iii) such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

**12.12**     **Agent May File Proofs of Claim**.  In case of the pendency of any Insolvency Proceeding or any other judicial proceeding relating to any Obligor, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower or any other Obligor) shall be entitled and empowered (but not obligated) by intervention or such proceeding or otherwise:

          (a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under **Section 14.03**) allowed in such judicial proceeding; and

          (b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent under **Section 14.03**.

**12.13**     **Acknowledgements of Lenders**.

          (a)     If the Administrative Agent notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "***Payment Recipient***"), that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding **clause (b)**) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds,

whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "***Erroneous Payment***") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this **clause (a)** shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding **clause (a)**, each Lender, or any Person who has received funds on behalf of a Lender, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or other such recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case: (i) (A) in the case of immediately preceding **clauses (x) or (y)**, an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding **clause (z)**), in each case, with respect to such payment, prepayment or repayment; and (ii) such Lender shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this **Section 12.13(b)(ii)**.

(c)    Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender from any source, against any amount due to the Administrative Agent under immediately preceding **clause (a)** or under the indemnification provisions of this Agreement.

(d)    In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding **clause (a)**, from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "***Erroneous Payment Return Deficiency***"), upon the

Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its New Money Loan Commitments) with respect to which such Erroneous Payment was made (the "***Erroneous Payment Impacted Loans***") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not New Money Loan Commitments) of the Erroneous Payment Impacted Loans, the "***Erroneous Payment Deficiency Assignment***") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its New Money Loan Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the New Money Loan Commitments of any Lender and such New Money Loan Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender under the Loan Documents with respect to each Erroneous Payment Return Deficiency.

(e)        The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Obligor, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Obligor for the purpose of making such Erroneous Payment.

(f)        To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)    Each party's obligations, agreements and waivers under this **Section 12.13** shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the New Money Loan Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## SECTION 13.
## GUARANTY

**13.01**        **The Guaranty**. The Subsidiary Guarantors hereby unconditionally jointly and severally guarantee to the Administrative Agent and the Lenders, and their successors and assigns, the full and punctual payment in full or performance (whether at stated maturity, by acceleration or otherwise) of the Obligations, including (i) principal of and interest on the Loans, (ii) all fees and other amounts and Obligations from time to time owing to the Administrative Agent and the Lenders by the Borrower and each other Obligor under this Agreement or under any other Loan Document, in each case strictly in accordance with the terms hereof and thereof and (iii) the punctual and faithful performance, keeping, observance and fulfillment by the Borrower and Subsidiary Guarantors of all the agreements, conditions, covenants and obligations of the Borrower and Subsidiary Guarantors contained in the Loan Documents (such obligations being herein collectively called the "***Guaranteed Obligations***"). The Subsidiary Guarantors hereby further jointly and severally agree that if the Borrower or any other Obligor shall fail to pay any amount in full when due or perform any such obligation (whether at stated maturity, by acceleration or otherwise), the Subsidiary Guarantors will promptly pay the same or perform such obligation at the place and in the manner specified herein or in the relevant Loan Document, as the case may be, without any demand or notice whatsoever, and that in the case of any extension of time of payment or performance or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full or performed when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**13.02**        **Obligations Unconditional**.  The obligations of the Subsidiary Guarantors under **Section 13.01** shall constitute a guaranty of payment and performance and not of collection and are absolute and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations under this Agreement or any other agreement or instrument referred to herein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by all applicable Laws, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this **Section 13.02** that the obligations of the Subsidiary Guarantors hereunder shall be absolute and unconditional, joint and several, under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Subsidiary Guarantors hereunder, which shall remain absolute and unconditional as described above:

(a)        at any time or from time to time, without notice to the Subsidiary Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein shall be done or omitted;

(c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be extended, modified, supplemented or amended in any respect, or any right under this Agreement or any other agreement or instrument referred to herein shall be waived or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)    any lien or security interest granted to, or in favor of, the Secured Parties as security for any of the Guaranteed Obligations shall fail to be perfected or preserved;

(e)    any modification or amendment of or supplement to this Agreement or any other Loan Document, including any such amendment which may increase the amount of, or the interest rates applicable to, any of the Guaranteed Obligations guaranteed hereby;

(f)    any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, or any Insolvency Proceeding or other similar proceeding affecting the Borrower, any Subsidiary Guarantor or any other guarantor of the Guaranteed Obligations, or any of their respective assets, or any resulting release or discharge of any obligation of the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations;

(g)    the existence of any claim, setoff or other rights which any Subsidiary Guarantor may have at any time against the Borrower, any other Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, the Administrative Agent, any Secured Party or any other Person, whether in connection herewith or in connection with any unrelated transactions; *provided* that, notwithstanding any other provisions in this Guaranty, nothing in this Guaranty shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(h)    the unenforceability or invalidity of the Guaranteed Obligations or any part thereof or the lack of genuineness, enforceability or validity of any agreement relating thereto or with respect to the collateral, if any, securing the Guaranteed Obligations or any part thereof, or any other invalidity or unenforceability relating to or against the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, for any reason, related to this Agreement or any other Loan Document, or any provision of applicable Law, decree, order or regulation of any jurisdiction purporting to prohibit the payment of any of the Guaranteed Obligations by the Borrower, any Subsidiary Guarantor or any other guarantor of the Guaranteed Obligations;

(i)    the disallowance, under any state or federal bankruptcy, insolvency or similar law, of all or any portion of the claims of the Secured Parties or the Administrative Agent for repayment of all or any part of the Guaranteed Obligations;

(j)    the failure of any other guarantor to sign or become party to this Agreement or any amendment, change, or reaffirmation hereof;

(k)       any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the Guaranteed Obligations or any part thereof, any other guaranties with respect to the Guaranteed Obligations or any part thereof, or any other obligation of any person or entity with respect to the Guaranteed Obligations or any part thereof, or any nonperfection or invalidity of any direct or indirect security for the Guaranteed Obligations; or

(l)       any other act or omission to act or delay of any kind by the Borrower, such Subsidiary Guarantor, any other guarantor of the Guaranteed Obligations, the Administrative Agent, any Secured Party or any other Person or any other circumstance whatsoever which might, but for the provisions of this **Section 13.02**, constitute a legal or equitable discharge of any Subsidiary Guarantor's obligations hereunder.

The Subsidiary Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Administrative Agent or any Lender exhaust any right, power or remedy or proceed against the Borrower or any other Subsidiary Guarantor under this Agreement or any other agreement or instrument referred to herein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.

**13.03      Discharge Only Upon Payment in Full**. Subject to any prior release herefrom of any Subsidiary Guarantor by the Administrative Agent in accordance with (and pursuant to authority granted to the Administrative Agent under) the terms of this Agreement, each Subsidiary Guarantor's obligations hereunder shall remain in full force and effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full in cash (other than inchoate indemnification and expense reimbursement obligations for which no claim has been made) and all other financing arrangements among the Borrower or any Subsidiary Guarantor and the Secured Parties under or in connection with this Agreement and each other Loan Document shall have terminated (herein, the "***Termination Conditions***"), and until the prior and complete satisfaction of the Termination Conditions all of the rights and remedies under this Guaranty and the other Loan Documents shall survive.

**13.04      Additional Waivers; General Waivers**.

(a)      *Additional Waivers.*  Notwithstanding anything herein to the contrary, each of the Subsidiary Guarantors hereby absolutely, unconditionally, knowingly, and expressly waives:

(i)       any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof;

(ii)       (A) notice of acceptance hereof; (B) notice of any other financial accommodations made or maintained under the Loan Documents or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to each Subsidiary Guarantor's right to make inquiry of the Administrative Agent and the Secured Parties to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any adverse change in the financial condition of the Borrower or of any other

fact that might increase such Subsidiary Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Subsidiary Guarantor under this Guaranty or under the other Loan Documents) and demands to which each Subsidiary Guarantor might otherwise be entitled;

(iii)    its right, if any, to require the Administrative Agent and the Secured Parties to institute suit against, or to exhaust any rights and remedies which the Administrative Agent and the Secured Parties now have or may hereafter have against, any other guarantor of the Guaranteed Obligations or any third party, or against any collateral provided by such other guarantors or any third party; and each Subsidiary Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid) of any other guarantor of the Guaranteed Obligations or by reason of the cessation from any cause whatsoever of the liability of any other guarantor of the Guaranteed Obligations in respect thereof;

(iv)    (A) any rights to assert against the Administrative Agent and the Secured Parties any defense (legal or equitable), set-off, counterclaim, or claim which such Subsidiary Guarantor may now or at any time hereafter have against any other guarantor of the Guaranteed Obligations or any third party liable to the Administrative Agent and the Secured Parties; (B) any defense, set-off, counterclaim or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity or enforceability of the Guaranteed Obligations or any security therefor; (C) any defense such Subsidiary Guarantor has to performance hereunder, and any right such Subsidiary Guarantor has to be exonerated, arising by reason of: (1) the impairment or suspension of the Administrative Agent's and the Secured Parties' rights or remedies against any other guarantor of the Guaranteed Obligations; (2) the alteration by the Administrative Agent and the Secured Parties of the Guaranteed Obligations; (3) any discharge of the obligations of any other guarantor of the Guaranteed Obligations to the Administrative Agent and the Secured Parties by operation of law as a result of the Administrative Agent's and the Secured Parties' intervention or omission; or (4) the acceptance by the Administrative Agent and the Secured Parties of anything in partial satisfaction of the Guaranteed Obligations; and (D) the benefit of any statute of limitations affecting such Subsidiary Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Subsidiary Guarantor's liability hereunder; and

(v)    any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by the Administrative Agent and the other Secured Parties; or (B) any election by the Administrative Agent and the other Secured Parties under any provision of any state or federal bankruptcy, insolvency or similar law to limit the amount of, or any collateral securing, its claim against the Subsidiary Guarantors.

(b)    *General Waivers*.  Each Subsidiary Guarantor irrevocably waives, to the fullest extent permitted by law, any notice not provided for herein.

**13.05**        **Reinstatement**. The obligations of the Subsidiary Guarantors under this **Section 13** shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Guaranteed Obligations is at any time rescinded, annulled, avoided, set aside, invalidated, declared to be fraudulent or must be otherwise restored or repaid by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization, equitable cause or otherwise, and the Subsidiary Guarantors jointly and severally agree that they will indemnify the Secured Parties on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Persons in connection with such rescission, repayment or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any state or federal bankruptcy, insolvency or similar law. The provisions of this **Section 13.05** shall survive termination of this Guaranty.

**13.06**        **Subrogation**. The Subsidiary Guarantors hereby jointly and severally agree that, until the prior and complete satisfaction of all Termination Conditions, they (i) shall have no right of subrogation with respect to the Guaranteed Obligations and (ii) waive any right to enforce any remedy which the Secured Parties or the Administrative Agent now have or may hereafter have against the Borrower, any endorser or any other guarantor of all or any part of the Guaranteed Obligations or any other Person, and each Subsidiary Guarantor waives any benefit of, and any right to participate in, any security or collateral that may from time to time be given to the Secured Parties and the Administrative Agent to secure the payment or performance of all or any part of the Guaranteed Obligations or any other liability of the Borrower to the Secured Parties.  Should any Subsidiary Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights prior to complete satisfaction of the Termination Conditions, each Subsidiary Guarantor hereby expressly and irrevocably (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set-off that such Subsidiary Guarantor may have prior to the complete satisfaction of the Termination Conditions, and (B) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until all Termination Conditions are satisfied in full. Each Subsidiary Guarantor acknowledges and agrees that this subordination is intended to benefit the Administrative Agent and the Secured Parties and shall not limit or otherwise affect such Subsidiary Guarantor's liability hereunder or the enforceability of this Guaranty, and that the Administrative Agent, the Secured Parties and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this **Section 13.06**.

**13.07**        **Remedies**. Subject to the DIP Orders, the Subsidiary Guarantors jointly and severally agree that, as between the Subsidiary Guarantors, on one hand, and the Administrative Agent and the Lenders, on the other hand, the obligations of the Borrower under this Agreement and under the other Loan Documents may be declared to be forthwith due and payable as provided in **Section 11** (and shall be deemed to have become automatically due and payable in the circumstances provided in **Section 11**) for purposes of **Section 13.01** notwithstanding any stay, injunction or other prohibition, including any such stay upon an Insolvency Proceeding, preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Subsidiary Guarantors for purposes of **Section 13.01**.

**13.08** **Instrument for the Payment of Money**. Each Subsidiary Guarantor hereby acknowledges that the guarantee in this **Section 13** constitutes an instrument for the payment of money, and consents and agrees that the Administrative Agent and the Lenders, at their sole option, in the event of a dispute by such Subsidiary Guarantor in the payment of any moneys due hereunder, shall have the right to proceed by motion for summary judgment in lieu of complaint pursuant to N.Y. Civ. Prac. L&R § 3213.

**13.09** **Continuing Guarantee**. The guarantee in this **Section 13** is a continuing guarantee, and shall apply to all Guaranteed Obligations whenever arising.

**13.10** **Contribution with Respect to Guaranteed Obligations**.

(a) To the extent that any Subsidiary Guarantor shall make a payment under this Guaranty (a "***Guarantor Payment***") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Subsidiary Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Subsidiary Guarantor if each Subsidiary Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Subsidiary Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Subsidiary Guarantors as determined immediately prior to the making of such Guarantor Payment, *then*, following the prior and complete satisfaction of the Termination Conditions, such Subsidiary Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Subsidiary Guarantor for the amount of such excess, *pro rata* based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b) As of any date of determination, the "***Allocable Amount***" of any Subsidiary Guarantor shall be equal to the maximum amount of the claim which could then be recovered from such Subsidiary Guarantor under this Agreement without rendering such claim voidable or avoidable under any state or federal bankruptcy, insolvency or similar law or other applicable Law.

(c) This **Section 13.10** is intended only to define the relative rights of the Subsidiary Guarantors, and nothing set forth in this **Section 13.10** is intended to or shall impair the obligations of the Subsidiary Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement.

(d) The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Subsidiary Guarantor or Subsidiary Guarantors to which such contribution and indemnification is owing.

(e) The rights of the indemnifying Subsidiary Guarantors against other Subsidiary Guarantors under this **Section 13.10** shall be exercisable only upon the prior and complete satisfaction of the Termination Conditions.

**13.11** **[Reserved]**.

# SECTION 14.
## MISCELLANEOUS

**14.01**        **No Waiver**. No failure on the part of the Administrative Agent or the Lenders to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

**14.02**        **Notices**. All notices, requests, instructions, directions and other communications provided for herein (including any modifications of, or waivers, requests or consents under, this Agreement) or in the other Loan Documents shall be given or made in writing (including by telecopy or email) delivered, if to the Borrower, another Obligor, the Administrative Agent or any Lender, to its address specified on the signature pages hereto or its Guarantee Assumption Agreement, as the case may be, or at such other address as shall be designated by such party in a written notice to the other parties. Except as otherwise provided in this Agreement or therein, all such communications shall be deemed to have been duly given upon receipt of a legible copy thereof, in each case given or addressed as aforesaid. All such communications provided for herein by telecopy shall be confirmed in writing promptly after the delivery of such communication (it being understood that non-receipt of written confirmation of such communication shall not invalidate such communication).

**14.03**        **Expenses, Indemnification, Etc.**

        (a)        **Expenses**. Each Obligor, jointly and severally, agrees to pay or reimburse (i) the Administrative Agent and the Lenders and their respective Affiliates for all of their reasonable and documented out of pocket costs and expenses (including the reasonable and documented out of pocket fees, expenses, charges and disbursements of the Lender Professionals, and any sales, goods and services or other similar taxes applicable thereto, and reasonable and documented printing, reproduction, document delivery, communication and travel costs) in connection with (w) the Prepetition First Lien Term Loan Documents, (x) the negotiation, preparation, execution and delivery of this Agreement and the other Loan Documents and the making of the Loans (exclusive of post-closing costs), (y) post-closing costs (including, without limitation, costs of the administration of this Agreement and the other Loan Documents) and (z) the negotiation or preparation of any modification, supplement or waiver of any of the terms of this Agreement or any of the other Loan Documents (whether or not consummated); and (ii) each of the Administrative Agent and the Lenders for all of their documented out of pocket costs and expenses (including the fees and expenses of any legal counsel) in connection with the enforcement, exercise or protection of their rights in connection with this Agreement and the other Loan Documents, including their rights under this **Section 14.03**, or in connection with the Loans made hereunder, including such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

        (b)        **Indemnification**. Each Obligor, jointly and severally, hereby indemnifies the Administrative Agent (and any sub-agent thereof), the Lenders and their respective Affiliates, directors, officers, employees, attorneys, agents, advisors and controlling parties (each, an

"*Indemnified Party*") from and against, and agrees to hold them harmless against, any and all Claims and Losses of any kind including reasonable and documented out of pocket fees and disbursements of any counsel for each Indemnified Party (limited to one legal counsel in each relevant jurisdiction), that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to (i) Agreement or any of the other Loan Documents or the Transactions, (ii) any use made or proposed to be made with the proceeds of the Loans, (ii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Obligor or any of its Subsidiaries, or (iv) any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory, whether or not such investigation, litigation or proceeding is brought by any Obligor, any of its Subsidiaries, shareholders or creditors, an Indemnified Party or any other Person, or an Indemnified Party is otherwise a party thereto, and whether or not any of the conditions precedent set forth in **Section 6** are satisfied or the other transactions contemplated by this Agreement are consummated, except to the extent such Claim or Loss is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. No Obligor shall assert any claim against any Indemnified Party, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to this Agreement or any of the other Loan Documents or any of the Transactions or the actual or proposed use of the proceeds of the Loans. The Borrower, its Subsidiaries and Affiliates and their respective directors, officers, employees, attorneys, agents, advisors and controlling parties are each sometimes referred to in this Agreement as a "*Borrower Party*". No Lender shall assert any claim against any Borrower Party, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to this Agreement or any of the other Loan Documents or any of the Transactions or the actual or proposed use of the proceeds of the Loans. This Section shall not apply to Taxes other than Taxes relating to a non-Tax Claim or Loss governed by this **Section 14.03(b)**.

**14.04**        **Amendments, Etc.** Except as otherwise expressly provided in this Agreement, any provision of this Agreement and any other Loan Document may be modified or supplemented only by an instrument in writing signed by the Borrower, the Administrative Agent and the Majority Lenders; <u>provided</u> that:

(a)        any such modification or supplement that is disproportionately adverse to any Lender as compared to other Lenders or subjects any Lender to any additional obligation shall not be effective without the consent of such affected Lender;

(b)        the consent of all of the Lenders shall be required to:

(i)        amend, modify, discharge, terminate or waive any of the terms of this Agreement or any other Loan Agreement if such amendment, modification, discharge, termination or waiver would increase the amount of the Loans or New Money Loan Commitments, reduce the fees payable hereunder, reduce interest rates or other amounts payable with respect to the Loans, extend any date fixed for payment of principal (it being understood that the waiver of any prepayment of Loans shall not constitute an extension of any date fixed for payment of principal), interest or other amounts payable relating to the Loans or extend the repayment dates of the Loans;

(ii)      amend, modify, discharge, terminate or waive any Security Document if the effect is to release all or substantially all of the Collateral subject thereto other than pursuant to the terms hereof or thereof; or

(iii)     amend this **Section 14.04** or the definition of "Majority Lenders".

**14.05      Successors and Assigns**.

(a)      **General**. The provisions of this Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the parties hereto or thereto and their respective successors and assigns permitted hereby or thereby, except that no Obligor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent. Any Lender may assign or otherwise transfer any of its rights or obligations hereunder or under any of the other Loan Documents (i) to an assignee in accordance with the provisions of **Section 14.05(b)**, (ii) by way of participation in accordance with the provisions of **Section 14.05(e)**, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of **Section 14.05(f)**. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in **Section 14.05(e)** and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      **Assignments by Lender**. Any Lender may at any time assign to one or more Eligible Transferees (or, if an Event of Default has occurred and is continuing, to any Person) all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) and the other Loan Documents; provided that (i) no such assignment shall be made to any Obligor, any Affiliate of any Obligor, any employees or directors of any Obligor at any time and (ii) no such assignment shall be made without the prior written consent of the Administrative Agent. The consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to an Eligible Transferee described in **clause (vi)** of the definition thereof); provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received written notice thereof; provided further that the consent of the Borrower shall not be required for any assignment to (x) Oaktree Capital Management, L.P. or any of its managed funds or accounts or  (y) any Affiliate of the foregoing.  Subject to the recording thereof by the Administrative Agent pursuant to **Section 14.05(d)**, and to receipt by the Administrative Agent of a processing and recordation fee in the amount of $3,500 (provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment) from and after the date such Assignment and Assumption is recorded in the Register, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of the Lender under this Agreement and the other Loan Documents, and correspondingly the assigning Lender shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and

Assumption covering all of the Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) and the other Loan Documents but shall continue to be entitled to the benefits of **Section 5** and **Section 14.03**. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this **Section 14.05(b)** shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with **Section 14.05(e)**.

(c)     **Amendments to Loan Documents**. Each of the Administrative Agent, the Lenders and the Obligors agrees to enter into such amendments to the Loan Documents, and such additional Security Documents and other instruments and agreements, in each case in form and substance reasonably acceptable to the Administrative Agent, the Lenders and the Obligors, as shall reasonably be necessary to implement and give effect to any assignment made under this **Section 14.05**.

(d)     **Register**. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the New Money Loan Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior written notice. Notwithstanding anything to the contrary, any assignment of any Loan shall be effective only upon appropriate entries with respect thereto being made in the Register. This **Section 14.05(d)** shall be construed so that Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 165(j), 871(h)(2) and 881(c)(2), and 4701 of the Code.

(e)     **Participations**. Any Lender may at any time, without the consent of, or notice to, the Borrower, sell participations to any Eligible Transferee (other than a natural person or any Obligor or any of its Affiliates or Subsidiaries) (each, a "*Participant*") in all or a portion of the Lender's rights and/or obligations under this Agreement (including all or a portion of the New Money Loan Commitment and/or the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with such Lender in connection therewith. Any agreement or instrument pursuant to which any Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that would (i) increase or extend the term of such Lender's New Money Loan Commitment, (ii) extend the date fixed for the payment of principal of or interest on the Loans or any portion of any fee hereunder payable to the Participant, (iii) reduce the amount of any such payment of principal, or (iv) reduce the rate at which interest is payable thereon to a level below the rate at which the Participant is entitled to receive such interest. Subject to **Section 14.05(f)**, the Borrower agrees

that each Participant shall be entitled to the benefits of **Section 5.01** or **5.03** (subject to the requirements and limitations therein, including the requirements under **Section 5.03(f)** (it being understood that the documentation required under **Section 5.03(f)** shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Section 14.05(b)**; provided that such Participant (i) agrees to be subject to the provisions of **Section 5.04** as if it were an assignee under **Section 14.05(b)** and (ii) shall not be entitled to receive any greater payment under **Section 5.01** or **5.03**, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after the Participant acquired the applicable participation. To the extent permitted by Law, each Participant also shall be entitled to the benefits of **Section 4.03(a)** as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "***Participant Register***"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)        **Limitations on Rights of Participants**. A Participant shall not be entitled to receive any greater payment under **Section 5.01** or **5.03** than such Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(g)        **Certain Pledges**. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**14.06**        **Survival**. The obligations of the Borrower under Sections 5.01, 5.02, 5.03, 14.03, 14.05, 14.06, 14.09, 14.10, 14.11, 14.13, and 14.14 and the obligations of the Subsidiary Guarantors under Section 13 (solely to the extent guaranteeing any of the obligations under the foregoing Sections) shall survive the repayment of the Obligations and the termination of the New Money Loan Commitments and, in the case of the Lenders' assignment of any interest in the New Money Loan Commitments or the Loans hereunder, shall survive, in the case of any event or circumstance that occurred prior to the effective date of such assignment, the making of such assignment, notwithstanding that the Lenders may cease to be "Lenders" hereunder. In addition, each representation and warranty made, or deemed to be made by a Borrowing Notice, herein or pursuant hereto shall survive the making of such representation and warranty.

**14.07**        **Captions**. The table of contents and captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

**14.08**        **Counterparts, Effectiveness**. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or electronic transmission (in PDF format) shall be effective as delivery of a manually executed counterpart hereof. This Agreement shall become effective when counterparts hereof executed on behalf of the Obligors, the Administrative Agent and the Lender shall have been received by the Administrative Agent.

**14.09**        **Governing Law**. This Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed in accordance with, the law of the State of New York, without regard to the conflict of law provisions thereof.

**14.10**        **Jurisdiction, Service of Process and Venue**.

        (a)        **Submission to Jurisdiction**. Each party hereby irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or tort or otherwise, against such other party in any way relating to this Agreement or any Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof. Each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of the Bankruptcy Court and, solely to the extent that the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over any matter of the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable Law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

        (b)        **[Reserved]**.

        (c)        **Waiver of Venue, Etc**. Each party hereto irrevocably waives to the fullest extent permitted by law any objection that it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document and hereby further irrevocably waives to the fullest extent permitted by law any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. A final judgment (in respect of which time for all appeals has elapsed) in any such suit, action or proceeding shall be conclusive and may be enforced in any court to the jurisdiction of which such party is or may be subject, by suit upon judgment.

**14.11**         **Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**14.12**         **Waiver of Immunity**. To the extent that any Obligor may be or become entitled to claim for itself or its property or revenues any immunity on the ground of sovereignty or the like from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment or execution of a judgment, and to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), such Obligor hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity with respect to its obligations under this Agreement and the other Loan Documents.

**14.13**         **Entire Agreement**. This Agreement and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof, including any confidentiality (or similar) agreements. EACH OBLIGOR ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT IN DECIDING TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS OR IN TAKING OR NOT TAKING ANY ACTION HEREUNDER OR THEREUNDER, IT HAS NOT RELIED, AND WILL NOT RELY, ON ANY STATEMENT, REPRESENTATION, WARRANTY, COVENANT, AGREEMENT OR UNDERSTANDING, WHETHER WRITTEN OR ORAL, OF OR WITH ADMINISTRATIVE AGENT OR THE LENDERS OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. TO THE EXTENT THAT ANY SPECIFIC PROVISION HEREOF IS INCONSISTENT WITH THE APPLICABLE DIP ORDER, THE APPLICABLE DIP ORDER SHALL CONTROL.

**14.14**         **Severability**. If any provision hereof is found by a court to be invalid or unenforceable, to the fullest extent permitted by any Law the parties agree that such invalidity or unenforceability shall not impair the validity or enforceability of any other provision hereof.

**14.15**         **No Fiduciary Relationship**. The Borrower acknowledges that the Administrative Agent and the Lenders have no fiduciary relationship with, or fiduciary duty to, the Borrower arising out of or in connection with this Agreement or the other Loan Documents, and the relationship between the Lenders and the Borrower is solely that of creditor and debtor. This Agreement and the other Loan Documents do not create a joint venture among the parties.

**14.16**         **Confidentiality**. The Administrative Agent and each Lender agree to keep confidential all non-public information provided to them by any Obligor pursuant to this Agreement that is designated by such Obligor as confidential in accordance with its customary procedures for handling its own confidential information; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (i) to the Administrative Agent, any other Lender, any Affiliate of a Lender or any Eligible Transferee or other assignee permitted under **Section 14.05(b)**, (ii) subject to an agreement to comply with the provisions of this Section, to any actual or prospective direct or indirect counterparty to any

Hedging Agreement (or any professional advisor to such counterparty), (iii) to its employees, officers, directors, agents, attorneys, accountants, trustees and other professional advisors or those of any of its affiliates (collectively, its "***Related Parties***" or "***Related Persons***"), (iv) upon the request or demand of any Governmental Authority or any Regulatory Authority (including the Bankruptcy Court) purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (v) in response to any order of any court or other Governmental Authority (including the Bankruptcy Court) or as may otherwise be required pursuant to any Law, (vi) if requested or required to do so in connection with any litigation or similar proceeding, (vii) that has been publicly disclosed (other than as a result of a disclosure in violation of this **Section 14.16**), (viii) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (ix) in connection with the exercise of any remedy hereunder or under any other Loan Document, (x) on a confidential basis to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers of other market identifiers with respect to the Loans or (xi) to any other party hereto; provided that, in the case of disclosure pursuant to **clauses (iv), (v)** and **(vi)** above, the Administrative Agent or applicable Lender, as applicable, shall promptly provide notice to the Borrower to the extent reasonable and not prohibited by Law or any applicable Governmental Authority.

**14.17**          **Interest Rate Limitation**. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable Law (collectively, "***charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") that may be contracted for, charged, taken, received or reserved by the Administrative Agent and the Lender holding such Loan in accordance with applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all charges payable in respect thereof, shall be limited to the Maximum Rate. To the extent lawful, the interest and charges that would have been paid in respect of such Loan but were not paid as a result of the operation of this **Section 14.17** shall be cumulated and the interest and charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the amount collectible at the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate for each day to the date of repayment, shall have been received by such Lender. Any amount collected by such Lender that exceeds the maximum amount collectible at the Maximum Rate shall be applied to the reduction of the principal balance of such Loan so that at no time shall the interest and charges paid or payable in respect of such Loan exceed the maximum amount collectible at the Maximum Rate.

**14.18**          **Judgment Currency**.

          (a)          If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency, the parties hereto agree, to the fullest extent permitted by Law, that the rate of exchange used shall be that at which, in accordance with normal banking procedures, the Administrative Agent could purchase Dollars with such other currency at the buying spot rate of exchange in the New York foreign exchange

market on the Business Day immediately preceding that on which any such judgment, or any relevant part thereof, is given.

(b)     The obligations of the Obligors in respect of any sum due to the Administrative Agent hereunder and under the other Loan Documents shall, notwithstanding any judgment in a currency other than Dollars, be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in such other currency the Administrative Agent may, in accordance with normal banking procedures, purchase Dollars with such other currency. If the amount of Dollars so purchased is less than the sum originally due to the Administrative Agent in Dollars, the Borrower agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent against such loss. If the amount of Dollars so purchased exceeds the sum originally due to the Administrative Agent in Dollars, the Administrative Agent shall remit such excess to the Borrower.

**14.19     USA PATRIOT Act**. The Administrative Agent and the Lenders hereby notify the Obligors that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "***Patriot Act***"), they are required to obtain, verify and record information that identifies the Obligors, which information includes the name and address of each Obligor and other information that will allow such Person to identify such Obligor in accordance with the Patriot Act.

**14.20     Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

BORROWER:

**SiO₂ MEDICAL PRODUCTS, INC.**

By: _____

    Name:

    Title:

Address for Notices:

2250 Riley Street

Auburn, AL 36822

With a copy to:

Mary Kogut, P.C.

Kirkland & Ellis LLP

609 Main Street

Houston, Texas 77002

[Signature Page to Credit Agreement and Guaranty]

SUBSIDIARY GUARANTORS:

**ADVANCED BIOSCIENCE LABWARE, INC.**


By: _____
      Name:
      Title:


Address for Notices:
2250 Riley Street
Auburn, AL 36822

With a copy to:
Mary Kogut, P.C.
Kirkland & Ellis LLP
609 Main Street
Houston, Texas 77002

**ADVANCED BIOSCIENCE
CONSUMABLES, INC.**


By: _____
      Name:
      Title:

Address for Notices:
2250 Riley Street
Auburn, AL 36822

With a copy to:
Mary Kogut, P.C.
Kirkland & Ellis LLP
609 Main Street
Houston, Texas 77002

**ADMINISTRATIVE AGENT**:

**OAKTREE FUND ADMINISTRATION, LLC**

By:   Oaktree Capital Management, L.P.
Its:   Managing Member

By:   _____
     Name:
     Title:

By:   _____
     Name:
     Title:

Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**LENDERS**:

**OAKTREE-TCDRS STRATEGIC CREDIT, LLC**

By:   Oaktree Capital Management, L.P.
Its:   Manager

By:   _____
    Name:
    Title:


By:   _____
    Name:
    Title:

Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**OAKTREE-NGP STRATEGIC CREDIT, LLC**

By:  Oaktree Capital Management, L.P.
Its:  Manager

By:  _____
      Name:
      Title:


By:  _____
      Name:
      Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:    Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**OAKTREE-MINN STRATEGIC CREDIT LLC**

By:  Oaktree Capital Management, L.P.
Its:  Manager

By:  _____

    Name:
    Title:


By:  _____

    Name:
    Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:  Oaktree Agency
Email:  Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

## OAKTREE-FORREST MULTI-STRATEGY LLC – SERIES A

By:  Oaktree Capital Management, L.P.
Its:  Manager

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:  Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**OAKTREE-TBMR STRATEGIC CREDIT FUND C, LLC**

By:  Oaktree Capital Management, L.P.
Its:  Manager

By:  _____
      Name:
      Title:


By:  _____
      Name:
      Title:

Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**OAKTREE-TBMR STRATEGIC CREDIT FUND F, LLC**

By:  Oaktree Capital Management, L.P.
Its:  Manager

By:  _____
     Name:
     Title:


By:  _____
     Name:
     Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

### OAKTREE-TBMR STRATEGIC CREDIT FUND G, LLC

By:  Oaktree Capital Management, L.P.
Its:  Manager

By:  _____

    Name:
    Title:


By:  _____

    Name:
    Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**OAKTREE-TSE 16 STRATEGIC CREDIT, LLC**

By:   Oaktree Capital Management, L.P.
Its:   Manager

By:   _____
      Name:
      Title:


By:   _____
      Name:
      Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**INPRS STRATEGIC CREDIT HOLDINGS, LLC**

By:   Oaktree Capital Management, L.P.
Its:   Manager

By:   _____
     Name:
     Title:


By:   _____
     Name:
     Title:

Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

**Oaktree Gilead Investment Fund AIF (Delaware), L.P.**

By:  Oaktree Fund AIF Series, L.P. – Series T
Its:  General Partner

By:  Oaktree Fund GP AIF, LLC
Its:  Managing Partner

By:  Oaktree Fund GP III, L.P.
Its:  Managing Member

By:  _____
     Name:
     Title:


By:  _____
     Name:
     Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**Oaktree PRE Life Sciences Fund, L.P.**

By:  Oaktree Pre Life Sciences Fund GP, L.P.
Its:  General Partner

By:  Oaktree Fund GP IIA, LLC
Its:  General Partner

By:  Oaktree Fund GP II, L.P.
Its:  Managing Member

By:  _____
　　　Name:
　　　Title:


By:  _____
　　　Name:
　　　Title:

Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:　Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**Oaktree Global Credit Plus Fund, L.P.**

By:   Oaktree Fund GP, LLC
Its:   General Partner

By:   Oaktree Fund GP I, L.P.
Its:   Managing Member

By:   _____

    Name:
    Title:


By:   _____

    Name:
    Title:

Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**Oaktree Strategic Income II, Inc.**

By:   Oaktree Fund Advisors, LLC
Its:   Investment Adviser

By:   _____
      Name:
      Title:


By:   _____
      Name:
      Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**OAKTREE SPECIALTY LENDING CORPORATION**

By:   Oaktree Fund Advisors, LLC
Its:   Investment Advisor

By:   _____
    Name:
    Title:


By:   _____
    Name:
    Title:


Address for Notices:
Oaktree Fund Administration, LLC
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn:   Oaktree Agency
Email: Oaktreeagency@alterdomus.com

With a copy to:
Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Fl.
Los Angeles, CA 90071
Attn: Aman Kumar
Email: AmKumar@oaktreecapital.com

With a copy to:
Sullivan & Cromwell LLP
Attn: Ari B. Blaut
125 Broad St.
New York, NY 10004
Email: blauta@sullcrom.com

[Signature Page to Credit Agreement and Guaranty]

**Schedule 1**

**New Money Loan Commitments**

| Lender | Commitment | Pro Rata Share |
|---|---|---|
| [•] | [•] | [•] |
| **TOTAL:** | **$60,000,000** | **100.0000%** |

[Signature Page to Credit Agreement and Guaranty]

# **EXHIBIT B**

## **Initial Budget**

| Forecast Week | Wk-1 | Wk-2 | Wk-3 | Wk-4 | Wk-5 | Wk-6 | Wk-7 | Wk-8 | Wk-9 | Wk-10 | Wk-11 | Wk-12 | Wk-13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | **3/31** | **4/7** | **4/14** | **4/21** | **4/28** | **5/5** | **5/12** | **5/19** | **5/26** | **6/2** | **6/9** | **6/16** | **6/23** | **Total** |
| **13-Week Budget (USD '000)** | | | | | | | | | | | | | | |
| Receipts | $ - | $ - | $ - | $ - | $ - | 600 | 439 | 32 | $ - | $ - | 1,167 | $ - | 300 | $ 2,538 |
| Disbursements | (732) | (1,503) | (570) | (1,507) | (544) | (1,329) | (408) | (1,530) | (490) | (1,294) | (279) | (1,348) | (521) | (12,055) |
| Operating Cash Flow | (732) | (1,503) | (570) | (1,507) | (544) | (729) | 31 | (1,499) | (490) | (1,294) | 888 | (1,348) | (221) | (9,517) |
| Non-Operating Cash Flow | (797) | - | (95) | - | (902) | - | (95) | - | (105) | (797) | (95) | - | - | (2,885) |
| **Net Cash Flow** | **$ (1,528)** | **$ (1,503)** | **$ (665)** | **$ (1,507)** | **$ (1,446)** | **$ (729)** | **$ (64)** | **$ (1,499)** | **$ (595)** | **$ (2,090)** | **793** | **$ (1,348)** | **$ (221)** | **$ (12,403)** |
| Chapter 11 Adjustments | (4,555) | (250) | (482) | (230) | (617) | - | (482) | (230) | (4,339) | - | (482) | (230) | (4,715) | (16,611) |
| **Net Cash Flow After Chapter 11 Adjustments** | **$ (6,083)** | **$ (1,753)** | **$ (1,147)** | **$ (1,737)** | **$ (2,064)** | **$ (729)** | **$ (545)** | **$ (1,729)** | **$ (4,934)** | **$ (2,090)** | **311** | **$ (1,578)** | **$ (4,936)** | **$ (29,014)** |
| ( + ) Beginning Cash | 4,142 | (1,941) | (3,694) | (4,841) | (6,578) | (8,642) | (9,370) | (9,916) | (11,644) | (16,579) | (18,669) | (18,358) | (19,936) | 4,142 |
| Net Cash Flow | (6,083) | (1,753) | (1,147) | (1,737) | (2,064) | (729) | (545) | (1,729) | (4,934) | (2,090) | 311 | (1,578) | (4,936) | (29,014) |
| **Ending Cash Before DIP Borrowings** | **$ (1,941)** | **$ (3,694)** | **$ (4,841)** | **$ (6,578)** | **$ (8,642)** | **$ (9,370)** | **$ (9,916)** | **$ (11,644)** | **$ (16,579)** | **$ (18,669)** | **$ (18,358)** | **$ (19,936)** | **$ (24,872)** | **$ (24,872)** |
| DIP Loan Balance | 9,011 | 9,011 | 12,327 | 12,327 | 15,539 | 15,539 | 18,154 | 18,154 | 26,232 | 26,232 | 27,689 | 27,689 | 58,415 | 58,415 |
| **Ending Cash After DIP Borrowings** | **$ 7,069** | **$ 5,317** | **$ 7,486** | **$ 5,749** | **$ 6,897** | **$ 6,168** | **$ 8,238** | **$ 6,509** | **$ 9,654** | **$ 7,563** | **$ 9,331** | **$ 7,753** | **$ 33,543** | **$ 33,543** |