**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SIO2 MEDICAL PRODUCTS, INC., *et al.*,[1] | ) | Case No. 23-10366 (JTD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF YVES STEFFEN,**
**CHIEF EXECUTIVE OFFICER OF SIO2 MEDICAL PRODUCTS, INC.,**
**IN SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MOTIONS**

I, Yves Steffen, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of SiO2 Medical Products, Inc. ("SiO2," together with the other above-captioned debtors and debtors in possession, the "Debtors," and, collectively with their non-Debtor affiliate, the "Company").

2.      I have served as Chief Executive Officer of SiO2 since August 1, 2022.  I earned my Bachelor of Engineering from the University of Applied Sciences Basel (FHBB) and have over 20 years of experience in the pharmaceutical industry.  I started working for SiO2 in March of 2022 when I became the General Manager of Europe and Head of Commercial Development as part of the Company's efforts to expand its European presence.  Prior to joining SiO2, I held various leadership and engineering positions at other major companies in the pharmaceutical industry, including SHL Medical, Novartis, and Cilag AG (a Johnson & Johnson Company).

3.      As Chief Executive Officer, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am above eighteen years of age and

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510).  The location of the Debtors' principal place of business and service address in these chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

competent to testify. I submit this declaration to assist the Court and interested parties in understanding why the Debtors filed these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested in the motions filed along with the petitions (collectively, the "First Day Motions"). The facts set forth in each First Day Motion are incorporated herein by reference.

4.      The statements set forth in this declaration are based upon my personal knowledge and experience, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team and third-party advisors. I am authorized to submit this declaration on behalf of the Debtors and, if called upon to testify, I could and would testify to the facts set forth herein.

## Introduction[2]

5.      SiO2 is a material life sciences company that—after raising and investing over $800 million in facilities, equipment, and research and development over the last 10 years—is at the precipice of mass-commercialization of its breakthrough materials science technology that is poised to revolutionize the pharmaceutical industry. The Company holds 245 patents, and its commercial technology fuses the benefits of glass and plastic without any of the drawbacks of either, providing increased durability and stability in the most extreme conditions. As described more fully below, this technology unlocks substantial value for customers, including improved patient safety and increased product shelf life. Major pharmaceutical players are testing the Company's vials, syringes, tubes, and other offerings, and the Company anticipates large-scale adoption in the relative near term.

---

[2]      Capitalized terms used but not defined shall have the meanings ascribed to them elsewhere in this declaration.

6.     Despite the Company's breakthrough advances in technology, which are likely to lead to increased patient safety, it has yet to meet the anticipated commercialization timeline for its products.  While management believes that many significant players are interested in investing new capital into the Company, the Company's legacy capital structure, which includes 12 debt facilities, convertible debt, and nine types of preferred stock, each with various consent and other rights, has made raising capital extremely challenging, especially in the current market environment.  The Company's relatively limited current revenue—approximately $50 million in 2022—cannot support its current operational overhead and debt load, which required $13 million in interest payments over the same period.  The Company has spent much of the last year trying to raise capital despite these capital structure issues, but neither third-parties nor existing equity holders—those with the most to lose under the circumstances—have come to the table with new capital.

7.     Notably, the Company focused its efforts over the last few years on production of vials for the COVID-19 vaccine as part of Operation Warp Speed.  The Company now has capacity to deliver on targets contemplated by earlier government grants, but those production levels are no longer needed.[3] The Company will likely need to retool its equipment for future client demand.

8.     Now, with only approximately $4.1 million in cash on hand, including restricted amounts, the Company has filed these chapter 11 cases to address its capital structure and reorganize its operations, allowing a new owner to bring the products to market.  Significantly, the Debtors filed these chapter 11 cases with a clear path to emergence.  The Debtors and certain

---

[3]     As discussed further below, the Company has obtained nearly $200 million in financing from the U.S. federal government in connection with its response to the COVID 19 pandemic and spent an ***additional*** approximately $240 million in cost sharing and additional costs.  The Company is considering, among other things, whether it may apply for any contract modifications or equitable adjustments to the government grants which may result in increased government grants to cover some of the additional costs.

affiliates and funds of Oaktree Capital Management, L.P. (the "Initial Plan Sponsors" or "Oaktree"), which holds all of the Company's first lien debt, have developed a comprehensive restructuring on an accelerated timeline (the "Restructuring") memorialized in the restructuring support agreement attached hereto as **Exhibit A** (the "Restructuring Support Agreement").  The Restructuring contemplates saving the SiO2 business—including nearly 250 jobs—through these chapter 11 cases.  The Restructuring has three main components:  *First*, Oaktree has agreed to provide a $120 million ($60 million new-money) superpriority debtor-in-possession financing facility (the "DIP Facility," and the claims created by the DIP Facility, the "Allowed DIP Claims"), to fund these chapter 11 cases.  *Second*, Oaktree committed to serve as the Initial Plan Sponsor and equitize its Allowed DIP Claims and Allowed First Lien Term Loan Claims into 100% ownership of Reorganized SiO2 through a chapter 11 plan (substantially in the form filed contemporaneously herewith, the "Plan"), subject to the Company meeting certain milestones.  *Third*, Oaktree agreed to subject its recovery under the Plan to an auction process pursuant to court-approved bidding procedures, whereby any party may submit a bid to acquire 100% of the New Common Stock of Reorganized SiO2 through the Plan.  Oaktree has agreed that it will not participate in the auction process.  The floor for bids is therefore approximately $349.1 million, which is the anticipated amount of Oaktree's Allowed DIP and First Lien Term Loan Claims.  Nonetheless, Oaktree has indicated that it may consent to a recovery different than what is currently contemplated under the Plan, and the Debtors therefore encourage all interested parties to engage in the process, even if they may have a lower preliminary bid.  There is no break-up fee or expense reimbursement contemplated to be paid to Oaktree in its role.  The Company's proposed investment banker in these chapter 11 cases, Lazard Frères & Co. LLC ("Lazard"), has already started a robust marketing process for the sale of the Company.

9.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' capital structure and ownership; and

- **Part III** discusses the Debtors' current liquidity situation and financing efforts to date.

## I.     Company History and Business Operations.

### A.     Company History.

10.     SiO2 was formed in 2012, when Company founder Robert Abrams was approached by the Children's Hospital at Stanford University to utilize cutting edge research to produce a solution to sub-visible particles found in traditional glass syringes and vials.  Such particles produced severe adverse reactions in pre-mature babies, and a solution would have the potential to save the lives of 20-25 babies each year at that hospital alone.  As a result of SiO2's efforts over the next ten years, the Company now has produced chemically and thermally (up to 121°C) stable materials with leading durability and purity standards, decreasing sub-visible particles to virtually zero.

11.     SiO2 is headquartered in Auburn, Alabama (pictured below).  In 2022, the Company founded SiO2 Material Science Europe AG, a Swiss subsidiary in Arlesheim, Switzerland, with aspirations to expand into the European market and open a state-of-the-art pilot plant manufacturing facility.



12.     Since its inception, the Company has quickly grown its portfolio of innovative solutions, expanded its high-quality range of products, and increased its reach within the pharmaceutical and biotechnological industries.    A timeline of the Company's expansion highlights is shown below:



13.     The Company holds 245 patents for innovative solutions across applications including: hybrid materials, barrier coating, molecular biology preservation, and quality control processes.    The Company's technologies are utilized in the consumer healthcare, pharma and biotech, and molecular diagnostics industries and allow increased beneficial properties including: increased strength, decreased extractables and particles, and adaptability for extreme temperatures and high pH levels.

**B.      The Company's Operations.**

**1.      The Company's Research and Production Model.**

14.      The Company's business model, coupled with its logistical capabilities, provides the Company with a competitive advantage while improving inventory efficiency for customers. The Company possesses unique expertise in plastic molding and proprietary barrier technology to create and manufacture custom solutions utilizing the Company's innovative materials. The patented coating system is flexible and can be applied to any rigid container geometry. The creativity and unique qualities of these products have led leading companies across a variety of industries to approach the Company about its product offerings.

15.      Specifically, the Company assists consumer goods producers to develop containers with increased durability and temperature resistance and helps biopharma companies create more durable and stable drug and vaccine containment systems. Such biopharma solutions have the ability to save millions of dollars in the supply chain and provide safer products to healthcare providers by decreasing breakage and contaminants.

**2.      The Company's Product Line.**

16.      The Company's products are delivered ready to use, sterile, and fit industry-standard dimensions and specifications. The product lines typically fall into four key areas:  syringes, vials, blood tubes, and customization.

- *Syringes*.  SiO2 creates syringes with barrier and non-silicon lubricant. The Company designs coatings to provide inert drug contact surface irrespective of container geometry. The products are molded from engineered polymers and incorporate a thin, glass-like barrier coating system to the inside of the specific container. The dimensional consistency is fourteen times better than glass, improving dose accuracy and device performance. Additionally, the Company's syringes are more durable and less susceptible to breakage than glass syringes, reducing risk during the manufacturing and shipping process. Syringes account for approximately 48% of the Company's 2022 revenue.

- ***Vials***.  SiO2 designs vials with patented glass barrier technology that is chemically, mechanically, and thermally stable across a broad range of extreme conditions.  The vials can withstand 1,500 pounds of direct force which potentially saves millions of dollars from breaking on filling lines and minimizes loss in the supply chain.  The vials are also shatterproof, making them safe for use by healthcare staff and patients.  The vials are designed for specifically desired characteristics, while providing increased durability, versatility, and uniformity.  Vials account for approximately 33% of the Company's 2022 revenue.

- ***Blood Tubes***.  SiO2 produces blood collection tubes to optimize blood integrity and preservation.  The tubes are suitable for storage in any temperature, are impact and shatter resistant, and have a two-year shelf life—double that of any plastic tube on the market.  The Company's blood collection tubes are the only tubes that have glass barriers and vacuum retention properties of glass and the automation friendly qualities of plastic.  Blood Tubes account for approximately 11% of the Company's 2022 revenue.

- ***Customization***.  SiO2 offers customized packaging mechanisms by a team specializing in designing the ideal container for customers that require a bespoke primary packaging delivery mechanism for certain pharmaceuticals.  Specifically, the services offered include:  design, proof of concept, validation, certifications, molding, and final container volume manufacturing.  Customization accounts for approximately 1% of the Company's 2022 revenue but is expected to increase significantly over the next three years.



SYRINGES        VIALS        BLOOD TUBES        CUSTOMIZATION

17.    In addition to the Company's four main product lines, the Company's portfolio also includes various devices used in the healthcare and biotech industries, including cosmetic tubes, auto-injector cartridges, active pharmaceutical ingredient bottles, and custom cell and gene therapy containers.  Such other applications account for approximately 7% of revenue.

### 3.      Manufacturing.

18.     The Company's manufacturing facilities are state-of-the-art, sustainable, and environmentally conscious (all running on renewable energy), fulfilling the Company's sustainability initiatives.  SiO2's manufacturing process uses almost no water and approximately ten times less heat energy than traditional glass-manufacturing.



19.     The Company's products are manufactured at four different manufacturing sites, including a fully-owned research manufacturing center in Auburn, Alabama where the Company manufactures vials, syringes, and certain non-pharmaceutical products.   The Auburn manufacturing center is approximately three-hundred-thousand square feet across multiple buildings and has received over $400 million in investment.  The Auburn manufacturing center also houses the Company's research and development facilities for various coating technologies.

20.     In addition, the Company founded a Swiss subsidiary in Arlesheim, Switzerland in 2022 in order to retain certain employees working from Switzerland and to better service European customers.   The Company has developed plans to open a new, state-of-the-art pilot plant manufacturing facility there.   Currently, the Company envisions that the Swiss plant, if

constructed, would build verified and validated samples of customer-requested custom design delivery systems quickly and effectively.  Eventually, the Swiss plant will convert into a full-scale commercial plant.

### 4.    Employees.

21.    As of the Petition Date, the Company employs approximately 250 individuals globally.  The majority of the Company's employees are engaged in research and development and related engineering, manufacturing, quality control, and supply chain functions, each of which is essential to the Company's efforts to scale its output and capitalize on its leading IP.  In addition, the Company periodically retains independent contractors and consultants to supplement their workforce and address targeted projects.

22.    The Company is managed by individuals with extensive experience in their respective fields and positions, including decades of experience in plastics and materials engineering and manufacturing, commercialization, and new product development.  Additionally, the Company retains a board of scientific advisors and industry board, each of which is composed of scientists, engineers, professors, and previous heads of leading biopharma and material sciences companies.  These board members advise the Company on strategies and effectuate operational initiatives related to the scientific aspects of the Company's business and intellectual property.

### C.    Intellectual Property.

23.    Since its founding, the Company has developed a differentiated portfolio of valuable intellectual property.  As of the Petition Date, the Company owns 245 patents, has over 30 unique patent applications pending, and has more than 8,000 patent use cases, with patent expiration dates as far out as 2041.  In addition to pharma and medical uses, the Company's intellectual property portfolio has broad uses in many consumer applications, including food

safety, beauty products, recyclable or environmentally friendly products, and consumer packaging solutions.

24.    SiO2's flagship technology platform uses a modified plasma enhanced chemical vapor deposition ("PECVD") process to apply multiple layers of a barrier coating to any polymer or plastic substance.  The layers combined are less than five hundred nanometers–or one hundred times thinner than a human hair–and provide a highly effective barrier to environmental gases and leachates.  The PEVCD process can apply multiple layers of the Company's proprietary coating to any polymer or plastic.  An illustration of the coating process is depicted below:



## II.    The Company's Capital Structure and Ownership.

### A.    The Debtors' Organizational Structure.

25.    The Company's current organizational structure is reflected below:



SiO2 Medical Products, Inc. Organizational Chart

*Borrower under all Debt Facilities
**Guarantors under all Debt Facilities

**B.    The Debtors' Capital Structure.**

26.    As of the Petition Date, the Debtors have an aggregate principal amount of approximately $430 million in funded debt obligations, consisting of (a) First Lien Term loans, (b) Second Lien Term Loans, (c) certain secured financing secured by certain specified assets, (d) Promissory Notes (as defined herein), and (e) Convertible Indebtedness.

27.    SiO2 is a borrower under twelve debt facilities, each as more fully described below:

| *Funded Debt* | *Approximate Outstanding Principal Amount* |
|---|---|
| **First Lien Term Loans** | **$225 million** |
| **Second Lien Term Loans** | **$35 million** |
| **Other Secured Debt** | **$57 million** |
| **Promissory Notes** | **$24 million** |
| **Three Convertible Debt Instruments** | **$89 million** |
| **Total Debt Obligations** | **$430 million** |

28.    The Company also has 148,214.46 shares of preferred stock and 57,350.65 shares of common stock issued and outstanding as of the Petition Date.

### 1. First Lien Term Loan.

29. On December 21, 2021, the Debtors entered into that certain Credit Agreement and Guaranty as amended by the First Amendment and Limited Waiver to Credit Agreement and Guaranty, dated as of May 9, 2022, the Second Amendment and Limited Waiver to Credit Agreement and Guaranty, dated as of July 20, 2022, the Third Amendment and Limited Waiver to Credit Agreement and Guaranty and First Amendment to Security Agreement, dated as of December 7, 2022, the Letter Agreement, dated as of March 10, 2023, the Letter Agreement, dated as of March 17, 2023, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof (the "First Lien Credit Agreement"), by and among (a) SiO2, as borrower, (b) Advanced Bioscience Consumables, Inc. and Advanced Bioscience Labware, Inc., as subsidiary guarantors, (c) the lenders party thereto from time to time (the "First Lien Term Loan Lenders"), and (d) Oaktree Fund Administration, LLC, as administrative agent for the First Lien Term Loan Lenders.

30. The First Lien Term Loans are guaranteed by SiO2's Debtor subsidiaries Advanced Bioscience Consumables, Inc. and Advanced Bioscience Labware Inc.

31. As of the Petition Date, term loans in an aggregate principal amount of approximately $225 million (the "First Lien Term Loans") are outstanding under the First Lien Credit Agreement, with a maturing on December 21, 2026. The First Lien Term Loans are secured on a first priority basis by substantially all of the assets of the Debtors party to the First Lien Credit Agreement.

### 2. Second Lien Term Loans.

32. On December 7, 2022, the Debtors entered into that certain Second Lien Credit Agreement and Guaranty, dated as of March 10, 2023, and as may be further amended, restated,

supplemented, or otherwise modified from time to time in accordance with the terms thereof (the "Second Lien Credit Agreement") by and among (a) SiO2, as borrower, (b) Advanced Bioscience Consumables, Inc. and Advanced Bioscience Labware, Inc., as subsidiary guarantors, (c) the lenders party thereto from time to time (the "Second Lien Term Loan Lenders"), and (d) Salzufer Holding Inc., as administrative agent for the Second Lien Term Loan Lender. The Second Lien Term Loans are guaranteed by SiO2's subsidiaries Advanced Bioscience Consumables, Inc and Advanced Bioscience Labware, Inc.

33.     As of the Petition Date, term loans in an aggregate principal amount of approximately $35 million (the "Second Lien Term Loans") remain outstanding under the Second Lien Credit Agreement, with a maturity date of March 22, 2027. The Second Lien Term Loans are subordinated to the First Lien Term Loans and are secured on a second priority basis by substantially all of the assets of the Debtors party to the Second Lien Credit Agreement pursuant to that certain Subordination and Intercreditor Agreement dated as of December 7, 2022, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof by and among Oaktree Fund Administration, LLC, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement, Salzufer Holding Inc., in its capacity as administrative agent under the Second Lien Credit Agreement, SiO2 and the Loan Parties under the First Lien Credit Agreement and Second Lien Credit Agreement.

### 3.     Other Secured Debt.

34.     The Debtors are party to certain financings secured by specified assets (the "Other Secured Debt"), including:

A.     ***Renasant AR and Inventory Line.*** On February 26, 2021, the Company entered into that certain Amended and Restated Credit Agreement (as amended, restated,

amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Renasant AR and Inventory Credit Agreement") with Renasant Bank, as lender, which currently provides for (a) a purchased receivables credit facility (the "Renasant Receivables Facility") in an amount of up to $15 million and (b) a revolving credit facility (the "Renasant Inventory Line") in an amount of up to $10 million. The Renasant Receivables Facility is secured by a first priority lien on certain accounts receivable of the Company, and the Renasant Inventory Line is secured by a first priority lien on certain inventory of the Company. As of the Petition Date, $0 remains outstanding under the Renasant Receivables Facility, and approximately $10 million remains outstanding under the Renasant Inventory Line. The Renasant AR and Inventory Credit Agreement is in the process of being amended to extend the maturity date to April 6, 2023.

B. ***Southern States CapEx Line.*** On February 3, 2020, the Company entered into that certain Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Southern States Capital Expenditure Loan") with Southern States Bank, as lender. The Southern States Capital Expenditure Loan is secured by a first priority lien on certain equipment, inventory and other property of the Company purchased with the proceeds thereof, certain contract rights related to equipment lines of the Company financed thereby and deposit accounts of the company held at Southern States Bank. As of the Petition Date, approximately $12

million remains outstanding under the Southern States Capital Expenditure Loan, with a maturity date of August 5, 2025.

C. ***Southern States CARES Loan***. On December 30, 2020, the Company entered into that certain Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Southern States CARES Loan") with Southern States Bank, as lender.  The Southern States CARES Loan is secured by a first priority lien on certain equipment, inventory and other property of the Company purchased with the proceeds thereof and deposit accounts of the company held at Southern States Bank.  As of the Petition Date, approximately $20 million remains outstanding under the Southern States CARES Loan, with a maturity date of December 30, 2030.

D. ***Klinge Equipment Note***. On January 17, 2020, the Company entered into that certain Secured Promissory Note (the "Klinge Equipment Note") with Klinge Biopharma GmbH, as lender.  The Klinge Equipment Note is secured by a first priority lien on certain equipment of the Company financed thereby.  As of the Petition Date, approximately $14 million remains outstanding under the Klinge Equipment Note, with a maturity date of December 31, 2026.

**4.      Promissory Notes.**

35.      The Debtors are party to certain promissory notes issued from time to time (the "Promissory Notes"), including:

A. that certain unsecured subordinated promissory note, dated as of May 9, 2022, with an aggregate principal amount of $7.9 million, by and among the Company and JMC Glass, with a maturity date of April 30, 2023;

B. that certain unsecured subordinated promissory note, dated as of May 9, 2022, with an aggregate principal amount of $10.5 million, by and among the Company and Santo Holding GmbH, with a maturity date of April 30, 2023;

C. that certain subordinated promissory note, with an aggregate principal amount of approximately $2.3 million, by and among the Company and A. Enterprises, LLC.

D. that certain senior promissory note, with an aggregate principal amount of $3.2 million, by and among the Company and A. Enterprises, LLC.

### 5. Convertible Indebtedness.

36.     SiO2 has also issued convertible promissory notes (the "Convertible Promissory Notes") from time to time.  The Convertible Promissory Notes currently outstanding total approximately $89 million in the aggregate and mature on (a) July 31, 2023, and (b) December 31, 2024, as applicable.  The Convertible Promissory Notes include the outstanding senior convertible notes issued by SiO2 pursuant to (x) that certain Single Promissory Note Purchase Agreement, dated as of April 6, 2018, by and among SiO2 and the other parties thereto, (y) that certain Promissory Note Purchase Agreement & Credit Facility, dated as of April 6, 2018, by and among SiO2 and the other parties thereto, and (z) that certain 2019 Promissory Note Purchase Agreement & Credit Facility, dated as of September 24, 2019 by and among SiO2 and the other parties thereto.

### C. The Company's Ownership Structure.

37.     SiO2 is a privately-held company with a total capital raised of over $800 million. The Company has issued nine series and subseries of preferred stock and 57,350.65 outstanding

shares of common stock.  Series A Preferred Stock includes the following subseries: (a) Original Investor Series A Preferred Stock, issued to Patiro Holding AG ("Patiro"), JMC Glass, LLC ("JMC"), and Bernhard Hampl ("Bernhard"); (b) Original Investor 2017 Series A Preferred Stock, issued to Patiro, JMC, and Bernhard; (c) RSA 2017 Series A Preferred Stock, issued to the Teachers' Retirement System of Alabama and the Employees' Retirement System of Alabama; (d) Patiro 2017 Series A Preferred Stock, issued to Patiro; (e) Enterprises 2017 Preferred Stock issued to A Enterprises, LLC; and (f) Subseries 6 Series A Preferred Stock with no shares issued or outstanding.   The Company also issued Series B-2 Preferred Stock issued to Doosan Corporation and Series C-1 Preferred Stock issued to Patiro.

38.     As of the Petition Date, the common stock is held by Robert S. Abrams, with approximately 10,000 shares, and A. Enterprises, LLC (an entity controlled by Robert S. Abrams), with approximately 47,500 shares.  The ownership structure is depicted below:

| Preferred Stock | Holder | Number of Shares |
|---|---|---|
| Series C-1 Preferred Stock | Patiro Holding AG | 21,496.04 |
| Series B-2 Preferred Stock | Doosan Corporation | 15,371.55 |
| Original Investor Series A Preferred Shares | Patiro Holding AG | 26,377.91 |
| | JMC Glass, LLC | 6,594.48 |
| | Bernhard Hampl | 659.44 |
| Original Investor 2017 Series Preferred Shares | Patiro Holding AG | 7,072.69 |
| | JMC Glass, LLC | 1,768.07 |
| | Bernhard Hampl | 176.76 |
| RSA 2017 Series A Preferred Shares | The Teacher's Retirement System of Alabama | 17,964.51 |
| | The Employees' Retirement System of Alabama | 8,848.19 |
| Patiro 2017 Series A Preferred Shares | Patiro Holding AG | 13,089.01 |
| Enterprises 2017 Series A Preferred Shares | A. Enterprises, LLC | 28,795.81 |
| Common Stock | Holder | Number of Shares |
| | A. Enterprises, LLC | 47,458.65 |
| | Robert S. Abrams | 9,892 |
| Warrants to Purchase Common Stock | Holder | Number of Shares |
| | 31 affiliates of Oaktree Fund Administration, LLC | 9,442.05 |

## III.   Events Leading to These Chapter 11 Cases.

39.     In its relatively short history, SiO2 has made significant strides in bringing its proprietary pharmaceutical and biotechnological materials to market. But, like many high-growth companies, SiO2 has required significant funding to support operations, which has been exacerbated by additional expenses and strategy shifts after SiO2 entered into large-scale contracts with the U.S. Government to pursue the domestic development and distribution of a vaccine in the

wake of the COVID-19 pandemic.  The expenses related to these contracts, the rapid shifts in product demands, and the Company's unsustainable capital structure, among other things, resulted severely limited liquidity.

### A.    The Company's Rapid Growth and Capital Structure.

40.    The Company's early technological breakthroughs in the pharmaceutical and biotechnological industries led to a massive expansion of its intellectual property portfolio, from one patent in 2012 to 245 today.  This development has been capital intensive.  Since its founding, the Company has raised and invested more than $800 million to support its business.  The Company's funding approach was atypical for high-growth, pre-revenue companies, which generally obtain early-stage funding through equity-linked capital raises.  Rather, SiO2 has a significant amount of secured and convertible debt with cash interest obligations.  Additionally, the Company's various series of preferred equity and related rights mean that stakeholders have potentially competing interests and consent rights with respect to corporate actions and ability to raise additional capital.  Despite the significant promise of the Company's technology, the Company's revenue at this stage is insufficient to cover cash-based debt obligations and fund operations, causing the Company to default on certain of its current debt obligations.

41.    The liquidity crunch required the First Lien Term Loan Lenders to consent to amend the First Lien Credit Agreement with respect to minimum liquidity of $15 million in order to fund operations and prepare for the present chapter 11 filing.  Additionally, the Company has debt payments of approximately $42.1 million upcoming in 2023.  In the last 12 months, the Company has had negative cash flow of $83 million.

**B.**      **Government Funding and COVID-19 Pandemic Response.**

42.      The Company's present liquidity crisis can be traced, at least in part, to government contracts the Company was awarded in the wake of the COVID-19 pandemic, and the rapid ensuing change in government and customer demand.  To fight COVID-19, the U.S. government sought to accelerate production and distribution of the COVID-19 vaccine through grants made to private companies through Operation Warp Speed.  The Company's capacity to develop safe and durable vaccine containment vials provided opportunity for the Company to receive government funding to combat COVID-19.  On June 5, 2020, the Company entered into a fixed-support type Technology Investment Agreement (the "TIA") with the U.S. Army Contracting Command-Aberdeen Proving Ground, Research Triangle Park Division on behalf of the Biomedical Advanced Research and Development Authority ("BARDA"), that provided $143 million of government funding to the Company committed to develop a U.S-based hybrid pharmaceutical vial for the development and distribution of a COVID-19 vaccine.  The TIA is subject to various requirements, including a cost-sharing obligation of $128 million for the Company.

43.      The Company used that government funding to expand its existing manufacturing capabilities to be able to produce approximately 120 million 10 ml vials per year in accordance with its new BARDA contract obligations.  The Company's vials were to be primarily used by Moderna (but would be applicable across other platforms).

44.      While the TIA helped the Company increase its manufacturing capabilities, the funds were insufficient to keep pace with Moderna's evolving vial quality demands.  In November 2020, the Company submitted a request for equitable adjustment (the "REA"), seeking an additional approximately $78 million to address Moderna's vial quality requirements.  After

negotiations, the REA was approved on July 5, 2021, providing the Company with $64.6 million in additional government funding pursuant to TIA Modification 5 ("Modification 5"). Modification 5 designated $32.9 million for an expedited timeline and increased quality requirements, $27.2 million for an expansion of the Company's coating facility, and $4.5 million for an expansion of the Company's warehouse capacity.  The Company was required to self-fund any additional costs of adapting to Moderna's requirements, and to date has spent $111.3 million to maintain such standards.[4]  The timeline for the construction of the coating facility expansion was extended to December 2024 by TIA Modification 8 signed in January of 2023.

45.    To date, BARDA has provided advance funding of $16.3 million under the TIA for initial work on the coating facility expansion, and the TIA provides for $10.9 million in additional funding to complete that facility.[5]  Additionally, on July 18, 2022, the Company was awarded another round of government funding to construct and equip a sterilization building, with the promise of receiving $45 million in government funding while obligating the Company to provide $13 million in cost sharing.  The cooperative agreement provides for a construction/build-period of 30 months ending in January of 2025.

46.    While the government funding was significant, the Company incurred significant recurring and one-time costs in excess of the amounts funded by the government to adapt its manufacturing capabilities to Moderna's evolving specifications.    Moderna's new vial

---

[4]    The Company has considered requesting additional funding through the execution of another REA.  However, the process would take several months to receive approval and the Company believes there is a low likelihood that the U.S. Government would grant the request, in part because the Company has been informed that additional government funds are not currently available.

[5]    The Company does not currently anticipate that it will satisfy its Phase 1 construction milestones pursuant to Modification 8 of the TIA.

requirements cost the Company an incremental $66.6 million in recurring expenses and $44.7 million in one-time expenses for a total of $111.3 million.

47.     Had the U.S. government's anticipated demand of 120 million 10 ml vials per year been realized, this investment may have been worthwhile.  But, by the time the Company's capacity was online, COVID-19 vaccine distribution switched from 10 ml vials to other distributions methods (such as 1 ml syringes), and vaccine-demand significantly tapered.  To date, despite having the capacity to create 120 million 10 ml vials per year, the Debtors have only produced and shipped approximately 17.2 million 10ml vials for commercial sale.  These product lines now sit largely unused.

48.     Converting existing manufacturing facilities to a new product line takes considerable time and resources to complete and meet customers' unique and exact requirements and standards.  For example, it takes nine to eighteen months to create sample products, submit batches for testing, and have the products analyzed and validated by third-parties.  Additionally, due to the specifications for each customer, lines generally cannot be simultaneously utilized for multiple products.  While the Company is not required to be regulated by the Food and Drug Administration or similar regulatory bodies, many of their customers are, and any deviation in product or material quality may impact approvals or quality control metrics.  Although the Company has made significant progress in searching for new customers and products, the Company does not have sufficient capital to retrofit existing manufacturing lines for these new customers.

**C.     Second Lien Facility.**

49.      Facing significant liquidity constraints in the fall of 2022, the Company sought additional capital from existing and third-party lenders to extend their runway.  Despite a broad

marketing process, the Company was only able to raise $35 million, which came from funds affiliated with their existing lender and substantial equity holder, Athos KG ("Athos"). Athos funded this incremental capital into a second lien facility in December of 2022, envisioning that this capital would serve as a bridge to a fulsome capital raise. The Second Lien Term Loan had capacity for an additional $25 million in funding should that be needed to close a comprehensive out-of-court capital raise. Unfortunately, no additional capital raise materialized, and no party was willing to fund an incremental $25 million into the Second Lien Term Loan prior to the filing of these chapter 11 cases.

**D.    The Capital Raise Committee.**

50.    Pursuant to the terms of the Second Lien Term Loan, the Company's board of directors (the "Board") was required appoint a capital raise committee with independent and disinterested members to (a) evaluate and monitor of the Company's capital structure, assets, liabilities, obligations, operations, liquidity, resources, and general financial condition to determine the Company's financial needs; and (b) evaluate, investigate, negotiate, and make recommendations to the Board with respect to a financing or capital raising transactions and/or other strategic alternatives for the Company and its stakeholder (the "Capital Raise Committee"). On November 30, 2022, the Board formed the Capital Raise Committee, subject to further determination regarding its composition. On January 25, 2023, Neal Goldman, Alexander Greene, and Bruce Koepfgen were appointed to the Board as independent directors and were appointed to serve on the Capital Raise Committee along with Paul Meister and myself. That remains the composition of the Capital Raise Committee today.

51.    The Capital Raise Committee, along with the Company's advisors, has pursued all viable financing and capital raising options from existing stakeholders and third-parties. The

Capital Raise Committee was laser focused on avoiding a chapter 11 filing. It prioritized seeking a comprehensive out-of-court capital structure solution along with sufficient funding to reach commercialization. As that process was in motion, the Capital Raise Committee also sought bridge financing in case the comprehensive solution could not be completed prior to exhausting liquidity. When it became clear that a neither a comprehensive solution nor a bridge financing would likely materialize, the Capital Raise Committee authorized advisors to engage with Oaktree regarding a comprehensive in-court restructuring (while simultaneously pursuing out-of-court options).

52.    Another key function of the Capital Raise Committee is to serve as an independent investigatory body with respect to any claims the Company may hold. The Capital Raise Committee is investigating certain estate claims and causes of action and will act as it determines is appropriate regarding any such claims to discharge its duties to the Company. To be clear, the releases contemplated by the current Plan and the Restructuring Support Agreement remain subject in all respects to the outcome of the Capital Raise Committee's investigation, and the Company's Board and Capital Raise Committee reserves all rights to modify those releases in accordance with their fiduciary duties and the Restructuring Support Agreement.

**E.    Marketing and Sale Process.**

53.    In late 2022, the Company retained Lazard to assist with capital raise and marketing process. Lazard worked closely with the Capital Raise Committee to seek an out-of-court solution. Since turning to a chapter 11 process, the Capital Raise Committee asked Lazard to expand its efforts toward a more wide-spread marketing process. Lazard, with the assistance of the Capital Raise Committee, developed a Confidential Information Memorandum and began contacting various potential buyers prior to the chapter 11 cases. Now that the Company's chapter 11 process is public and the Company is seeking approval of bidding procedures to conduct a marketing

process, Lazard intends to expand its marketing efforts to a fulsome list of potential buyers and will speak to any party interested in purchasing the Company, within the confines of the bidding procedures. The marketing process proposed in these chapter 11 cases will ensure that the Debtors maximize the value of their estates.

### F. Retention of Advisors and Contingency Planning.

54. Given the Company's ongoing liquidity issues, the Company retained strategic advisors to assist with the financing process, sale process, and the eventual contingency preparation. On October 28, 2022, the Company retained Kirkland & Ellis LLP ("Kirkland") as restructuring counsel to assist with contingency planning in the event that the Company was unable to secure the requisite financing. In Q1 2023, the Company expanded Lazard's scope of services to assist with certain investment banking services in connection with any potential financing, restructuring, and/or sale of the Company. On February 16, 2023, the Company retained A&M to assist the Company with its accounting and finance functions, including financial planning, and with its possible restructuring plans or strategic alternatives for maximizing the enterprise value of the Company's various lines of business, with me serving as the managing director responsible for the relationship.

### IV. The Restructuring Negotiations, Restructuring Support Agreement, the Plan, and the Proposed Debtor in Possession Financing.[6]

### A. The Restructuring Negotiations.

55. In light of the Debtors' mounting liquidity challenges and inability to raise additional funds, the Debtors, with the assistance of their advisors, engaged Oaktree and Athos in an effort to develop a joint restructuring proposal (for either in-court or out-of-court

---

[6] Capitalized terms used but not defined in this section shall have the meanings set forth in the Restructuring Support Agreement.

implementation).  While Athos and Oaktree engaged in preliminary conversations, they could not bridge the outstanding issues to a mutually agreeable transaction.  By mid-March 2023, discussions between the two parties had broken down completely, and it was clear neither of the parties was willing to provide financing of any type on an out-of-court basis.

56.     In light of the dire liquidity situation and limited possibility of an out-of-court solution, the Company engaged with the Oaktree regarding the terms of a possible in-court transaction, which is now memorialized in the Restructuring Support Agreement, the proposed $120 million DIP Facility, and the Bidding Procedures.  Athos was aware of the ongoing discussions with Oaktree and determined not to engage.

57.     The decision to enter into the Restructuring Support Agreement and commence these chapter 11 cases is the culmination of two months of negotiations and strategic review, including regular meetings of the Debtors', Capital Raise Committee, management, and advisors. Ultimately, the boards of each Debtor determined that the Restructuring embodied in the Restructuring Support Agreement is the ***only viable path forward*** for the Debtors at this time and thus provides the best path to maximize value for all stakeholders, preserve the Company's operations, and give the Company an opportunity for future growth.

**B.     The Restructuring Support Agreement and the Plan.**

58.     After weeks of negotiations, prior to commencing these chapter 11 cases, the Debtors and the Initial Plan Sponsors, entered into the Restructuring Support Agreement.

59.     The material terms of the restructuring transactions memorialized in the Restructuring Support Agreement and Plan are as follows:[7]

---

[7]     Capitalized terms used but not defined in this section shall have the meanings set forth in the Restructuring Support Agreement or Plan, as applicable.

- Certain affiliates, managed funds, or accounts of Oaktree Capital Management, L.P. (such funds, the "DIP Lenders") will commit to fund the DIP Facility in the aggregate amount of $120 million on the terms set forth in the DIP Documents.

- The DIP Facility provides for $60 million in new money loans and a $60 million roll-up of Prepetition Term Loans held by the DIP Lenders.

- The Plan provides for the Initial Plan Sponsors to receive 100% of the New Common Stock issued as of the Plan Effective Date through an equitization of some or all of the Allowed DIP Claims and Allowed First Lien Term Loan Claims (with any portion of the Allowed DIP Claims and Allowed First Lien Term Loan Claims not so equitized rolled into the Exit Term Loan Facility) (the "Equitization Restructuring").

- In the event of a Toggle Trigger the Initial Plan Sponsors may elect, in consultation with the Debtors, to implement the Restructuring Transactions through a credit bid of some or all of the Allowed DIP Claims and Allowed First Lien Term Loan Claims to purchase all, substantially all, or one or more subsets of the assets of the Debtors through a sale pursuant to section 363 of the Bankruptcy Code on terms and conditions satisfactory to the Initial Plan Sponsors (the "Credit Bid Sale Restructuring").  In the event the Initial Plan Sponsors pursue a Credit Bid Sale Restructuring, the Initial Plan Sponsors and the Debtors shall determine an amount of cash to remain in the proposed Debtors' estates, (or for the Initial Plan Sponsors to fund to the Debtors' estates), at or prior to closing of the Credit Bid Sale Restructuring which shall include (1) all Allowed Professional Fees (as defined in the DIP Order) incurred or payable prior to the closing of the Credit Bid Sale Restructuring, (2) a wind down budget consisting of (a) estimated professional fees to be incurred after the closing of the Credit Bid Sale Restructuring and (b) other agreed reasonable and ordinary expenses necessary to effectuate a wind down, and (3) all accrued and unpaid wages (and related employee claims), taxes, and other similar agreed reasonable and ordinary course of business costs and expenses incurred by the Debtors prior to the closing of Credit Bid Sale Restructuring in the chapter 11 cases that are not otherwise assumed as part of the Credit Bid Sale Restructuring.

- The Restructuring Support Agreement and the Plan shall constitute a stalking horse bid in the Equitization Restructuring and the Restructuring Support Agreement shall constitute a stalking horse bid in the Credit Bid Sale Restructuring described below, in each case subject to the terms therein, for purposes of the bidding procedures (the "Bidding Procedures") substantially in the form attached to the Restructuring Support Agreement as Exhibit F and shall be subject to higher or better bids pursuant to the Bidding Procedures.

- The DIP Lenders will receive, in consideration for their DIP claims, (i) where an Initial Plan Sponsor is the Plan Sponsor, on account of Allowed DIP Loans (which shall include fees and interest) New Common Stock in accordance with

the Stalking Horse Bid; or (ii) where any other party is the Plan Sponsor, payment in full, in Cash, on the Effective Date or such other terms agreed by the Required DIP Lenders.

- The First Lien Term Loan Lenders will receive either: (i) where an Initial Plan Sponsor is the Plan Sponsor, their pro rata share of New Common Stock and/or their pro rata share of the Exit Term Loan Facility, or such other treatment as agreed by such holders, (ii) where any party other than the Initial Plan Sponsors is the Plan Sponsor, payment in full, in cash on the Plan Effective Date or such other treatment as agreed to by such holders.

- The Second Lien Term Loan Lenders will receive their *pro rata* share of Additional Value (if any).

- General unsecured claims will receive their *pro rata* share of Additional Value (if any) after payment of Allowed Second Lien Term Loan Claims in full.

60. ***Milestones***.[8]    To effectuate this comprehensive restructuring and ensure the Debtors' emergence from chapter 11, it is imperative that the Debtors meet the following milestones contained in the Restructuring Term Sheet:

- No later than one (1) day after the Petition Date, the Debtors shall file an acceptable Plan of Reorganization and related disclosure statement (the "Disclosure Statement");

- No later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- No later than thirty-six (36) days after the Petition Date, the Bankruptcy Court shall have entered a Final DIP Order, a final order approving the Bidding Procedures, and an order approving the Disclosure Statement (each in form and substance satisfactory to the Consenting Stakeholders, as defined in the Restructuring Support Agreement);

- no later than fifty-five (55) days after the Petition Date, delivery by the Debtors to the Consenting Stakeholders of a go-forward business plan acceptable to the Consenting Stakeholders in their sole discretion, which shall include, in each case in form and substance acceptable to the Consenting Stakeholders (i) a substantially complete analysis of the liabilities proposed to be compromised through the chapter 11 cases, (ii) a substantially complete analysis of all matters relating to the assumption and assignment of all material contracts of the

---

[8]    Capitalized terms used but not defined in this section shall have the meanings set forth in the DIP Credit Agreement and attached as Exhibit D to the Restructuring Support Agreement.

Debtors, including all material government contracts, intellectual property agreements, and any other material contracts of the kind or type described in section 363(c)(1)(a) of the Bankruptcy Code, including that no such contracts are subject to the consent of the contract counter-party in connection with such assumption and assignment or that, to the extent such consent is required, that such consent has been obtained or is reasonably likely to be obtained, (iii) a substantially complete analysis of the secured, administrative, and priority unsecured claims reasonably assertable against the Debtors, and (iv) a substantially complete analysis of claims reasonably assertable against the Debtors that are not or may not be dischargeable upon consummation of the Plan;

- No later than sixty (60) days after the Petition Date, the Bid Deadline (as defined in the Restructuring Support Agreement) shall have occurred;

- No later than sixty-five (65) days after the Petition Date, the Auction (as defined in the Restructuring Support Agreement), if needed, shall have occurred;

- No later than seventy-eight (78) days after the Petition Date, a hearing to consider confirmation of an acceptable Plan of Reorganization shall have occurred, or, if the Initial Plan Sponsors have elected to pursue the Credit Bid Sale Restructuring (as defined in the Restructuring Support Agreement), a hearing to consider approval of the proposed sale pursuant to section 363 pursuant to the Credit Bid Sale Restructuring;

- No later than two (2) days after the hearing to consider confirmation of an acceptable Plan, the Bankruptcy Court shall have entered a final order confirming the Plan in form and substance satisfactory to the Consenting Stakeholders (the "Confirmation Order"), or if the Initial Plan Sponsors have elected to pursue a Credit Bit Sale Restructuring, a final order approving the sale pursuant to section 363 pursuant to the Credit Bid Sale Restructuring; and

- no later than ten (10) days after entry of the Confirmation Order, the Plan Effective Date shall have occurred, or, if the Initial Plan Sponsors have elected to pursue the Credit Bid Sale Restructuring, closing of the Credit Bid Sale Restructuring shall have occurred.

61.    Implementation the transactions contemplated by the Restructuring Support Agreement will position the Debtors for long-term success and save jobs.  Without the certainty of outcome provided by the Restructuring Support Agreement, it is unlikely that the Debtors would be able to develop products, which would have a substantial, deteriorative effect on the Debtors business.  Moreover, without the clear path to emergence from chapter 11 provided by the

Restructuring Support Agreement, certain of the Debtors' key counterparties may refuse to transact with the Debtors altogether.  After an extensive review process, the Debtors have determined that the Restructuring Support Agreement is the best possible path forward to ensure that the Debtors' business continues as a going concern.  For these reasons and the other reasons described in this Declaration, I believe that the Restructuring Support Agreement represents the most value maximizing path forward for the Debtors.

*  *  *  *  *  *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 29, 2023

By: /s/ Yves Steffen
Name: Yves Steffen
Title: Chief Executive Officer