## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) |
| SiO2 MEDICAL PRODUCTS, INC. et al,[1] | ) Case No. 23-10366 (JTD) |
| | ) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Related Docket No: 226** |
| | ) |

### DECLARATION OF ROBERT S. ABRAMS IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

I, Robert S. Abrams, hereby declare under penalty of perjury:

1.      I am currently 88 years old and live in New York City.

2.      I founded SiO2 Medical Products, Inc. ("SiO2" or the "Company," and, together with its above-captioned affiliates, the "Debtors") as a division of CV Holdings in 2008. On January 25, 2015, SiO2 became an independent company by purchasing some of the assets of my previous company, Capitol Vial, Inc. From SiO2's inception until July 2022, I served as its CEO and Chairman. I currently serve as a director of SiO2.

3.      Until recently, I spent the vast majority of my time in Auburn, Alabama, where SiO2 is headquartered, researching and developing SiO2's cutting edge medical and biotech products. Over the last twelve months, we have perfected a number of SiO2's products and it is now poised to introduce its breakthrough technology to the world.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510). The location of the Debtors' principal place of business and service address in these chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

4.      I also control A. Enterprises, LLC ("A. Enterprises"), which is a SiO2 shareholder and an obligee on two outstanding promissory notes issued by the Debtors in the amount of $2.3 million and $3.2 million.

5.      Between my personally held shares and those held by A. Enterprises, I currently own 100% of the Debtors' common stock and 28,795.81 shares of Enterprises 2017 Series A Preferred Shares. These shares carry majority voting control of SiO2 and its subsidiaries. I held voting control of SiO2 and its subsidiaries from its inception until July 2022, when I was fraudulently induced to step down as CEO and surrender voting control by granting a proxy for my shares, as described below.

6.      I have been denied access to information in the Company's possession, including information stored on my Company computer and email account, at the Company's premises, and on the Company's network. SiO2 employees that I or my lawyers contacted for information have refused to disclose information, claiming they were so instructed by the Debtors' bankruptcy lawyers.

7.      These obstructionist actions are inconsistent with, and contrary to, my rights and interests as a Si02 Director and Si02 shareholder, and I understand they are contrary to the status quo expected of a debtor-in-possession bankruptcy. I have been completely shut out of my company that I founded and built. I consider such actions to be in bad faith.

8.      Over the last decade, the Company has always had an ability to raise money to meet any economic challenge and bankruptcy was not even a consideration. In April of 2022, the Company was worth $3.2 billion based on the sale of stock to third parties and new patents obtained.  Before the bankruptcy filing, in early 2023, the Company failed to pursue available monies due from the federal government. As explained below, I also ceased pursuing available

2

capital for the Company based on the promises made to Si02 by those who caused the filing of this bankruptcy.

9.       Below is a recitation of what I consider to be wrongful acts by Debtors' management and controlling investors. I have provided as much detail as possible, though some of the facts are in the sole possession of others including the Debtors and their counsel.

**Under my leadership, SiO2 built its state-of-the-art manufacturing facilities and developed its revolutionary products.**

10.      As its founder, I built SiO2 and its predecessor from the ground up. I founded Si02 to develop a critical need for production of glass-lined syringes and vials.

11.      From SiO2's inception through 2022—roughly fourteen years—I ran SiO2's research and development. During that time, SiO2 built its patent portfolio, which currently consists of 245 currently-issued patents, over 30 unique pending patent applications, more than roughly 8,000 patent use cases, and about 750 more patents in process. Si02's technological advancements have resulted in the development of critical life-saving products through utilization of its patent portfolio.

12.      Over the years, I have funded SiO2 and its predecessor with hundreds of millions of my own money and raised hundreds of millions more from others to fund Si02's operations.

13.      I also raised sufficient capital to fund Si02's operations for over a decade. In 2012, I raised over $70 million in debt from the Retirement System of Alabama to help launch SiO2's Auburn, Alabama manufacturing facility, and Si02 repaid it in full, including interest, in an amount totaling $132 million by December 31, 2021.

76758560.1

14.    Around December 2021, I raised $100 million in funding for Si02 from Korean company, Doosan Corporation. As part of this capital raise, SiO2 was valued at roughly $2 billion.

15.    After spending more than fourteen years perfecting SiO2's products, the Company is now on the brink of commercializing its technology, which makes SiO2 extremely valuable and the timing of the filing of this bankruptcy dubious.

**An acquisition offer SiO2 received in 2020 implied a valuation of more than $1 billion.**

16.    Around 2020, prior to the Doosan Corporation transaction, a publicly-traded multinational medical technology company (the "Potential Acquirer") approached SiO2 to discuss potentially acquiring SiO2's biotech products only.

17.    SiO2 expressed interest in the proposed transaction, spurring the Potential Acquirer to conduct due diligence. After completing its diligence, the Potential Acquirer offered to purchase SiO2's assets for an initial $750 million payment followed by an earnout on terms that would makes the total deal worth approximately $1 billion to $1.5 billion. Again, this valuation was for the biotech portion of the company only. SiO2's board, however, rejected the offer, feeling it undervalued SiO2.

**In 2022, the Company was Defrauded by Thomas Strüngmann**

18.    My personally held shares and A. Enterprises' shares combined carry with them majority voting control of SiO2. I exercised this majority voting control of SiO2 from its inception in 2015 until July 2022, when I was fraudulently induced by one of the Company's investors, Thomas Strüngmann ("Strüngmann"), to relinquish voting control in exchange for funding that Strüngmann promised to the Company, but never delivered or intended to deliver evidenced by his own statements and actions.

4

19.    Strüngmann is a wealthy German businessman. My understanding is that Strüngmann and his brother, Andreas, were early backers of German firm BioNTech, which partnered with Pfizer to make a vaccine for Covid-19. Strüngmann currently controls two of SiO2's investors—Patiro Holdings AG ("Patiro") and Athos KG ("Athos").

20.    Strüngmann began investing in SiO2 around 2015. In the Spring of 2022, Strüngmann and I, as Si02's CEO, began discussing the possibility of his making a further investment in SiO2.

21.    On or around June 28, 2022, I met with Strüngmann and several other people at Strüngmann's Munich office. At the meeting, and in the presence of others, Strüngmann agreed to invest $50 million of equity in Si02 at an equity value of $500 million.

22.    Before the meeting had finished, Strüngmann asked to speak to me alone in another room. The two of us spent approximately thirty minutes privately discussing terms for his desire for additional funding for Si02—beyond the initial $50 million investment Strüngmann had agreed to.

23.    During this conversation, Strüngmann and I, as Si02's CEO, agreed that Strüngmann would also invest $70 million in or about September 2022 and would raise another $170 million in new equity for Si02 before year end. As to the $170 million, Strüngmann told me he would attempt to raise as much of it as possible from third parties, including his personal contacts. Together, these two investments of $70 million and $170 million constituted $240 million in new equity. When combined with Strüngmann's agreement to immediately invest $50 million, this constituted $290 million in new capital—more than enough to fund SiO2 until it became significantly profitable.

24.     In exchange for Strüngmann's promise to provide this new capital to Si02, I agreed to step down as SiO2's CEO and gave Strüngmann voting control of the Biotech division of the company <u>only</u> by granting him proxy rights to vote my and A. Enterprises' shares.

25.     Strüngmann selected Yves Steffen ("Steffen") to replace me as SiO2's CEO. At the time, Steffen was a SiO2 employee working in Europe who had only been with the company a very short time. I believed that Steffen was loyal to SiO2.

26.     As part of the deal, Strüngmann further instructed me to cease my ongoing efforts to raise funds for the Debtors. The reason he gave for this was that he was prepared to arrange for all necessary investments himself and did not want me attracting other investors.

27.      Strüngmann and I, as CEO of Si02, also agreed that Strüngmann would run the Debtors' biotech and vaccine businesses only. Strüngmann said he had no interest in the rest of the Debtors' business, which was comprised of seven other research and development product divisions, which I would run exclusively. Strüngmann's only involvement with these divisions would be through his charging a 5% fee of their profits to compensate him for use of the biotech and vaccine businesses' patents.

28.     I was not represented by counsel during any part of my June 28, 2022 meeting with Strüngmann, including our private discussion after the larger meeting with other individuals present.

29.     Based on Si02's agreement with Strüngmann and his representations to me during our private discussion, I broke off ongoing discussions with other potential sources of capital for Si02. This included private and sovereign funds from Saudi Arabia and The United Arab Emirates ("UAE"). I had been in negotiations with the Saudi funds for approximately eight

6

months and had exchanged term sheets for an equity investment of between $200-$300 million. I had also exchanged a term sheet with the UAE fund.

30.     Also based on the Si02's agreement with Strüngmann and his representations to me, I executed the Amended & Restated Stockholders Voting Agreement on July 5, 2022, which gave Strüngmann's company, Patiro, a proxy to vote both my personal shares and A. Enterprises' shares. This gave Strüngmann voting control over SiO2.

31.     Strüngmann did not perform his end of the bargain. When Si02 requested the money, he stated that he never intended to invest any more money. After investing the initial $50 million, he provided none of the $70 million he had promised. He invested $35 million later under different terms and conditions. He likewise failed to raise the additional $170 million equity investment for the Company.

32.     At a Board meeting in the Fall of 2022, Strüngmann denied that he ever promised that he: (1) would invest $70 million later in 2022; (2) would raise another $170 million in new equity before year end; or (3) attempt to raise as much of the $170 million as possible from third parties, including his personal contacts.

33.     It makes no sense for me to have given a proxy for Strüngmann to vote my shares and to have stopped negotiating with the sovereign funds, without these exact promises made to Si02 in paragraph 32.

34.     It was the time between roughly June 28, 2022 and roughly July 4, 2022 that deserves particular strict scrutiny by an examiner. During this period of time, Strüngmann obtained my proxy by fraud and without consideration based on his false promises made to Si02

7

and me regarding his commitments above. As a result, anything that occurred afterwards resulting from Strüngmann's use of my fraudulently obtained proxy is also a fraud.

**With Strüngmann's newly acquired voting control, he and Steffen immediately begin steering the Company towards an unnecessary bankruptcy.**

35.     Instead, after gaining voting control of SiO2, Strüngmann and Steffen—who is beholden to Strüngmann—immediately began pursuing bankruptcy. In fact, they had begun speaking with current bankruptcy counsel several months earlier, around April 2022.[2]

36.     With my proxy and Oaktree's support, Strüngmann had control of the Board.

37.     Rather than aiding the Debtors' fundraising efforts, by instructing me to cease raising funds from other investors, Strüngmann actively hindered the Debtors' ability to raise capital. I believe that Strüngmann did this to create a false liquidity crisis in order to justify a bankruptcy designed to personally benefit himself, even though it was against Si02's best interests.

**Steffen's inexplicable failure to apply for $111 million in government reimbursement.**

38.     In early 2023, the Company failed to pursue money from the federal government, owed for work performed by SiO2 related to the Covid-19 pandemic.

39.     In January 2023, I began working to submit a request for equitable adjustment ("REA") to the U.S. government for $111,457,080 in costs SiO2 incurred in manufacturing vials for the government's Operation Warp Speed program for production of a Covid-19 vaccine. I

---

[2] There are numerous misstatements in the Steffen declaration, which are provable by documentation that is being withheld from me.

prepared a draft application, which I sent to Steffen, SiO2's CEO, to be filed with the federal government.

40.     I personally hired and paid the fees of an attorney—one of the leading experts on government reimbursement—for the purpose of advising me on whether SiO2 was entitled to request this reimbursement. Although there was no guarantee that the government would grant the request, the attorney told me that he considered it a routine submission and payment was highly likely. According to him, if the submission had been filed by January 24, 2023, SiO2 would have known by March 24, 2023 whether the U.S. government would pay some or all of the much-needed $111 million.

41.     Steffen, the CEO hand-picked by Strüngmann, inexplicably refused to make this filing with the federal government. In roughly February 2023, I flew to Auburn, Alabama to ensure that Steffen would file the application with the federal government. After I confronted Steffen, he promised me that he would file the application. He did not. Instead, Steffen began making excuses for why he did not make the filing.

42.      On March 22, 2023, Steffen emailed an explanation of why he did not make the reimbursement request. That email is attached to this Declaration as Exhibit 1.

43.     Steffen lists several considerations including the amount of work needed to submit and negotiate the request and its potential to "jeopardize the Company's relationship with the government and future contract opportunities."  I was aware that many companies had hundreds of requests for repayment from the federal government pending at the same time and their relationship with the federal government was not jeopardized.

44.     I consider Steffen's attempted justifications for failing to file the REA to be pretextual. First, even if it would require effort to submit and negotiate the request, the size of the potential reimbursement—$111 million in new capital—more than justifies the cost and effort. Second, it is ironic Steffen would cite the Company's relationship with the government and the potential for future contract opportunities as a reason not to submit the request. Requesting more money has nothing to do with the potential for future contact opportunities – those are separate matters of separate divisions and separate people of the government at separate locations.

45.     I believe the real reason that Steffen did not submit the reimbursement request is that it would undermine his and Strüngmann's plan to create a fake liquidity crisis to justify putting the Company into bankruptcy.

**Strüngmann approves the bankruptcy using his ill-gotten proxy**

46.     On or around September 25, 2022, Strüngmann met in London with a representative from Oaktree and Steffen.

47.     I did not attend the meeting. I assumed that Steffen would represent the interests of SiO2 at the meeting. Afterwards, when I asked SiO2's CEO Steffen what had occurred at the meeting, he told me that he could not tell me. I was very surprised by this response.

48.     Oaktree controls one board seat, meaning that, with Oaktree's support and my proxy, Strüngmann possessed the requisite board votes needed to pass a board resolution supporting the bankruptcy plan and putting it to a shareholder vote. Strüngmann could then use his voting control to pass an Action by Written Consent of the Shareholders to authorize the bankruptcy.

49.     SiO2's bankruptcy petition attached a Written Consent of the Shareholders to authorize the bankruptcy, which is signed by Patiro acting by proxy on behalf of me and my company, A. Enterprises. I would never have given Strüngmann (or his entity) a proxy if I thought it would result in a bankruptcy filing.

50.     I believe that, if appointed, an examiner would find that Strüngmann has made arrangements for him to control some or all of the post-bankruptcy Company or its assets.

******

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 28, 2023                                    _Robt S. Abrams_

Robert S. Abrams

76758560.1