# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SIO2 MEDICAL PRODUCTS, INC. et al,[1] | ) Case No. 23-10366 (JTD) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) **Hearing Date: May 16, 2023 at 3:00 p.m.** |
| | ) **Obj. Deadline: May 9, 2023 at 4:00 p.m.** |
| . | ) Re: 19, 45, 186, & 212 |

## LIMITED OBJECTION OF A. ENTERPRISES, LLC AND ROBERT S. ABRAMS TO THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF REORGANIZATION, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF

A. Enterprises, LLC and Robert S. Abrams (collectively, "Abrams"), by their undersigned attorneys, hereby file this limited objection (the "Limited Objection") to the *Motion of Debtors for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [D.I. 45] (the "Motion"), which seeks approval of the *Disclosure Statement for the Joint Chapter*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510). The location of the Debtors' principal place of business and service address in these Chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

1

*11 Plan of Reorganization of SiO2 Medical Products, Inc., and its Debtor Affiliates* [D.I. 19] (the "<u>Disclosure Statement</u>").[2] In support of this Limited Objection, Abrams states as follows:

## PRELIMINARY STATEMENT

1. Section 1125 of the Bankruptcy Code requires a debtor to provide creditors with a disclosure statement that contains "adequate information" so creditors can cast their votes to accept or reject a proposed chapter 11 plan on an informed basis. Here, the Disclosure Statement does not contain the basic information required and the information unsecured creditors need to evaluate the Plan and their proposed treatment thereunder.

2. The 72-page Disclosure Statement contains placeholders for crucial information, including claim amounts, estimated recovery percentages, and the liquidation analysis. The Disclosure Statement also offers creditors no insight into certain prepetition conduct, which may be a source of potentially extremely valuable claims for the estates that would inure to the benefit of creditors.

3. This lack of information is particularly troubling where, as here, the Debtors entered chapter 11 with a restructuring support agreement outlining the terms of a plan of reorganization that appears to benefit only a single creditor constituency, which was developed without the participation of other creditors. And, it is precisely these creditors who did not participate in the plan process that are left in the dark by the Disclosure Statement.

4. Abrams respectfully submits that the Disclosure Statement lacks clarity and sufficient disclosure regarding issues of central and material importance to the Debtors' creditors—which are necessary and required under the Bankruptcy Code for parties to make an informed decision regarding the Plan. Therefore, Abrams respectfully submits that the Disclosure

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

Statement cannot be approved in its present form and must be revised to include a discussion of the critical matters described herein and their potentially significant value to, and impact upon, the Debtors' estates and creditors' recoveries.

## BACKGROUND

**A.     The Bankruptcy Proceedings**

5. On March 29, 2023 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors cases are jointly administered for procedural purposes only (the "Chapter 11 Cases").

6. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[3] No trustee or examiner has been appointed in the Chapter 11 Cases. On or about April 13, 2023, an official committee of unsecured creditors was appointed. D.I. 118.

7. On the Petition Date, the Debtors filed their Disclosure Statement and their *Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and its Debtor Affiliates* [D.I. 18]. In connection therewith, the Debtors entered into a Restructuring Support Agreement with certain affiliates and funds of Oaktree Capital Management, L.P. ("Oaktree").

**B.     Abrams, the Debtors, and Events Leading to Bankruptcy**

8. Robert S. Abrams founded SiO2 Medical Products, Inc. ("SiO2" or the "Company") to develop products to fill a critical need for production of glass-lined syringes and vials. The Company developed critical technology and its numerous advancements in this field through utilization of an intellectual property portfolio consisting of 245 currently-issued patents,

---

[3] Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

3

more than 30 unique pending patent applications, and more than 8,000 patent use cases. Potential acquirers recognized this value and as recently as 2020, a potential acquirer valued the Company at around $1-1.5 billion for its biotech products alone, although the Company's board of directors rejected that valuation as too low.

9. Mr. Abrams also controls A. Enterprises, LLC ("A. Enterprises"), an obligee on two outstanding promissory notes issued by the Debtors in the amount of $2.3 million and $3.2 million. Between his individually held shares and those held by A. Enterprises, Abrams is the holder of 100% of the Debtors' common stock and 28,795.81 shares of A. Enterprises' 2017 Series A Preferred Shares.

10. During his time as CEO, Mr. Abrams personally contributed to the Company, along with its predecessor, hundreds of millions of dollars and also raised hundreds of millions of dollars from others to fund the Company's operations.

11. In the months leading up to July 2022, Abrams began to solicit funding from Thomas Strüngmann ("Strüngmann"), who controls two of the Company's investors, Patiro Holdings AG ("Patiro") and Athos KG ("Athos"). In a June 2022 meeting with others present, Strüngmann agreed to invest $50 million in the Company, valuing the Company's pre-money equity at $500 million (the "$50 Million Agreement").

12. Toward the end of this June 2022 meeting, Strüngmann and Mr. Abrams spoke privately, discussing terms for additional funding that Strüngmann wanted to put into the Company beyond the initial $50 million investment. During this conversation, Strüngmann agreed to invest $70 million in or about September 2022 and to raise $170 million in additional funding before year-end (the "$240 Million Agreement"). In exchange, Abrams was required (i) to step down as the Company's CEO, to be replaced by Yves Steffen ("Steffen") at Strüngmann's behest; (ii) to

4

give Strüngmann voting control of the biotech division of the Company by granting Patiro proxy rights to vote Abrams's and A. Enterprises's shares; (iii) to provide a 5% fee of the profits only of the other seven divisions of the Company; and (iv) to cease ongoing fundraising efforts.

13.     In July 2022, in accordance with and in reliance on the agreement reached with Strüngmann, Mr. Abrams (i) stepped down as CEO, (ii) broke off the ongoing alternative funding discussions with certain Saudi and UAE funds, and (iii) executed the Amended & Restated Stockholders Voting Agreement on July 5, 2022 (the "Proxy"), which gave Patiro a proxy to vote both Abrams's and A. Enterprises's shares, thus giving Strüngmann voting control over the Company and leading to his designees' appointment to the Board.

14.     Since July 2022, Strüngmann and his hand-picked CEO, Steffen, have embarked on a knowingly destructive path aimed at driving the Company into an unnecessary bankruptcy just as the Company was poised to commercialize its valuable products.

15.     Despite Mr. Abrams's performance under the $240 Million Agreement, Strüngmann, failed to perform his obligations.  Although Strüngmann funded the initial $50 million to the Company pursuant to the $50 Million Agreement, he provided none of the $70 million he had promised pursuant to the $240 Million Agreement.[4]  Strüngmann also failed to raise the additional $170 million for the Company.

16.     At this same time, Steffen separately failed to apply to the United States government for over $100 million in monies due to the Company because of the money the Company had spent on a government contract.

17.     Strüngmann then used his board seats and ill-gotten proxy to authorize the filing of this bankruptcy proceeding and commence a rushed postpetition sale and confirmation process.

---

[4] Strüngmann did invest $35 million at a later date, but under different terms and conditions.

The Company allegedly engaged in a vaguely-described prepetition marketing effort beginning in "Q1 2023." And, postpetition, the Company has pursued an expedited marketing process and auction with a $349.1 million bidding floor—purportedly the amount of Oaktree's Allowed DIP and First Lien Term Loan Claims. In the absence of a bid, the Company will follow through with the Restructuring Support Agreement with Oaktree, pursuant to which Oaktree will exchange its $120 million ($60 million new-money) super-priority debtor-in-possession financing facility claims and its asserted aggregate prepetition financing claim, together totaling approximately $349.1 million, for all or substantially all of the equity in the reorganized Company. Under this process, absent bidders, Oaktree—as prepetition first-lien lender, post-petition DIP lender, and the proposed Plan sponsor—will acquire the Company's business in a transaction that provides zero recovery to unsecured creditors and equity holders.

18.  On March 30, 2023, as a result of Strüngmann's control of the Company's board of directors and the Proxy, Abrams was removed as Chairman of the Board.[5]

19.  The Disclosure Statement provides no information to creditors about these events that resulted in the bankruptcy filing. The Disclosure Statement also does not provide any insight into whether the Debtors have conducted an investigation into the conduct of Strüngmann and his designees, Athos and Patiro, during the period of May 2022 through the Petition Date, or explored any of the resulting and potentially extremely valuable claims of causes of action that belong to the estates.

---

[5] Although Mr. Abrams remains a director and shareholder of the Company, he has been denied access to information in the Company's possession, and employees have refused to disclose relevant information to him stating that they were instructed to withhold information from Mr. Abrams by the Debtors' bankruptcy attorneys. Such obstructionist actions are inconsistent with, and contrary to, Mr. Abrams' rights as a director and shareholder, and are contrary to the best interests of the Company.

20. Indeed, the Debtors acknowledge that they are "at the precipice of mass-commercialization of its breakthrough materials science technology that is poised to revolutionize the pharmaceutical industry," and that they "anticipate large-scale adoption in the relative near future." The value of the potential claims against Strüngmann, Athos and Patiro cannot be minimized and may very well be measured by the loss to the Debtors' creditors and other investors of the value of this anticipated near-term large-scale adoption and commercialization.

## ARGUMENT

### A. The Disclosure Statement Does Not Provide the Minimum Information Required by the Bankruptcy Code

21. Section 1125(b) of the Bankruptcy Code requires a disclosure statement to contain "adequate information" so that creditors can make an informed judgment regarding the plan. Section 1125 defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

11 U.S.C. § 1125(a)(1).

22. It is critical that the disclosure statement contain this minimum "adequate information," because creditors rely on the disclosure statement to vote on the plan. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *Oneida Motor*

*Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988). As the Third Circuit has explained: "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" *Oneida*, 848 F.2d at 417; *see Ryan Operations*, 81 F.3d at 362 (noting that with respect to a disclosure statement, "the importance of full and honest disclosure cannot be overstated."); *see also In re Crowthers McCall Pattern Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("Given the necessity for adequate information in the Disclosure Statement and paramount position section 1125 occupies in the Chapter 11 process, there is little, if any, room for harmless error.").

23.     The preparation and the filing of a disclosure statement is a "critical step in the reorganization of a Chapter 11 debtor" and has been described as "the pivotal concept in reorganization of a Chapter 11 debtor." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2006) (citing *Oneida*, 848 F.2d at 417).

24.     "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *Oneida*, 848 F.2d at 417. As such, the Bankruptcy Code does not set forth specifically the information that a disclosure statement must include, but certain courts have identified the following non-exclusive list: (a) the circumstances that gave rise to the filing of the bankruptcy petition; (b) a complete description of the available assets and their value; (c) the anticipated future of the debtor, with accompanying financial projections; (d) the source of the information provided in the disclosure statement; (e) the condition and performance of the debtor while in chapter 11; (f) information regarding claims against the estate, including those allowed, disputed, and estimated; (g) a liquidation analysis setting forth the estimated return that creditors

would receive under chapter 7; (h) the accounting and valuation methods used to produce the financial information in the disclosure statement; (i) information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor; (j) a summary of the plan of reorganization; (k) an estimate of all administrative expenses, including attorneys' fees and accountants' fees; (l) the collectability of any accounts receivable; (m) Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan; (n) information relevant to the risks being taken by the creditors and interest holders; (o) the actual or projected value that can be obtained from avoidable transfers; (p) the existence, likelihood and possible success of nonbankruptcy litigation; (q) the tax consequences of the plan; and (r) the relationship of the debtor with affiliates. *In re Ferretti*, 128 B.R.16, 18-19 (Bankr. D.N.H. 1991); *see also In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988) (setting forth substantially similar list); 7 COLLIER ON BANKRUPTCY ¶ 1125.02[2] (16th Ed.) (collecting cases setting forth substantially similar lists).

25.    The Bankruptcy Code's "adequate information" requirement is intended and designed to help creditors in their negotiations with debtors over proposed plans. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988); *see also In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988) ("[I]t is important for these average investors/general unsecured creditors that the Disclosure Statement contain simple and clear language delineating the consequences of the proposed plan on their claims and the possible Code alternatives so that they can intelligently accept or reject the Plan."); *In re Ferretti*, 128 B.R. at 19 ("In short, a proper disclosure statement must clearly and succinctly inform the average unsecured

creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.").

26. Here, the Disclosure Statement as proposed fails to provide creditors with the necessary tools or information to evaluate the Plan and certainly does not provide creditors with adequate information to negotiate with the Debtors. Instead, creditors are left wondering what they will receive under the Plan, with no insight into the events orchestrated by Strüngmann and his designees during the period from May 2022 through the Petition Date that precipitated the bankruptcy, and without any information regarding what potentially substantial claims the estates may hold relating to these actions or how those claims may impact creditor recoveries. The Disclosure Statement should be revised to include this information in a form so that ordinary, non-lawyer claimants can understand and evaluate the terms of the Plan and the assets of the estates, including litigation assets that could bring significant value to these estates and their creditors. Creditors should not be left wondering or in the dark after reviewing the Disclosure Statement, as they are here.

27. The Disclosure Statement also does not include the Liquidation Analysis, Exhibit D, which is marked "[t]o come." The Disclosure Statement therefore fails to address an important and fundamental question for creditors—whether they are better off under the Plan, or instead, in a chapter 7 liquidation. The Disclosure Statement claims that the Plan satisfies the "best interests" test and bases this assertion on an analysis provided by the Debtors' advisors, which is absent. The Disclosure Statement, as filed, does not provide creditors with the ability to consider what would be available under a liquidation and to compare that to the proposed Plan.

**CONCLUSION**

28.     For the reasons set forth above, the Disclosure Statement should be revised, as described herein, to satisfy the mandatory disclosure requirements of Section 1125 of the Bankruptcy Code by providing creditors with sufficient information regarding potentially valuable estate claims and creditors' proposed treatment under the Plan.

**WHEREFORE**, A. Enterprises, LLC and Robert S. Abrams respectfully request that the Court require the revisions to the Disclosure Statement described in this Limited Objection, and grant such other relief as this Court deems fair and appropriate.

| | |
|---|---|
| Dated: May 9, 2023<br>Wilmington, Delaware | Respectfully submitted,<br><br>/s/ *Matthew G. Summers*<br>Matthew G. Summers (No. 5533)<br>Laurel D. Roglen (No 5759)<br>BALLARD SPAHR LLP<br>919 N. Market Street, 11th Floor<br>Wilmington, DE 19801<br>Telephone: (302) 252-4428<br>E-mail: summersm@ballardspahr.com<br>       roglenl@ballardspahr.com<br><br>    and<br><br>Richard J. Cooper*<br>David H. Botter*<br>Manuel Silva*<br>Katharine Ross*<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza, New York NY 10006<br>Telephone: (212) 225-2276<br>Email:  rcooper@cgsh.com<br>       dbotter@cgsh.com<br>       msilva@cgsh.com<br>       kross@cgsh.com<br>(*Motion for *pro hac vice* admission to be filed)<br><br>*Counsel to A. Enterprises, LLC and Robert S. Abrams* |