## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SIO2 MEDICAL PRODUCTS, INC, *et al.*,[1]<br><br><br><br>                                    Debtors. | Chapter 11<br><br>Case No. 23-10366 (JTD)<br><br>(Jointly Administered)<br><br>Re: D.I. 372<br><br>**Hearing: July 18, 2023 at 11:00 a.m.**<br><br>**Obj. Deadline: July 10, 2023; extended for U.S. Trustee until July 13, 2023 at noon** |

### UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF JOINT CHAPTER 11 PLAN OF SiO2 MEDICAL PRODUCTS, INC., AND ITS DEBTOR AFFILIATES

Andrew R. Vara, the United States Trustee for Region 3 ("U. S. Trustee"), through his counsel, files this objection (the "Objection") to confirmation of the *Joint Chapter 11 Plan of SiO2 Medical Products, Inc. and its Debtor Affiliates (*the "Plan"), and in support of his Objection, states:

### PRELIMINARY STATEMENT

1.    The proposed Plan should not be confirmed for several reasons.  First, the Plan imposes non-consensual third-party releases ("Third-Party Releases") on numerous non-debtor

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510). The location of the Debtors' principal place of business and service address in these chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

1

parties, and a related-parties clause expands the universe of those who will be stripped of their claims against non-debtors by way of a labyrinth of terms and definitions. The vast majority of the "Related Parties" and "Affiliates," as defined in the Plan, did not receive a ballot with an opt-out form, nor did they receive notice of confirmation of the proposed Plan because they are not creditors or equity holders of the Debtors. They include, by way of example, all current and former employees of all creditors who are defined as "Releasing Parties", and all current and former employees of all *affiliates* of all creditors who are Releasing Parties. The opt-out mechanism in these cases provides nothing but an illusion of consent, and there is no basis in these cases for the approval of such non-consensual Third-Party Releases under the Bankruptcy Code.

2.      The U.S. Trustee further objects to confirmation of the Plan because it includes a provision that wrongly treats the entire Plan, and all distributions made thereunder, as a settlement of all claims and interests held by the Debtors' creditors and equity holders.

3.      In addition, the Plan seeks to extend this Court's jurisdiction through the imposition of a "gatekeeping" function pursuant to which, post-Effective Date, parties would be required to come to this Court to pursue claims against a list of parties, including the Reorganized Debtors, even after the Debtors' cases are closed.

4.      Finally, the Plan's reporting and quarterly fee provisions are insufficient to ensure compliance with 28 U.S.C. § 1930(a)(6).

5.      For these reasons, and others set forth below, the U.S. Trustee respectfully submits that the Plan should not be confirmed in its current form.[2]

---

[2]      The U.S. Trustee's counsel has provided additional comments to Debtors' counsel regarding the Plan that are not addressed in this Objection. The U.S. Trustee believes such comments have been resolved through the Debtors' agreement to make certain modifications to the Plan. To the extent such modifications are not made, the U.S. Trustee reserves the right to supplement this Objection, or to assert additional objections at the Confirmation Hearing.

**JURISDICTION, VENUE, AND STANDING**

6.    This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334.  Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

7.    Pursuant to 28 U.S.C. § 586, the U. S. Trustee is charged with the administrative oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  This duty is part of the U. S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that UST has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

8.    Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in chapter 11 cases, and to comment on such plans and disclosure statements.  In addition, pursuant to 11 U.S.C. § 307, the U. S. Trustee has standing to be heard with regard to this Objection.

**FACTUAL BACKGROUND**

**A.  General Background**

9.    The above-captioned Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court on March 29, 2023 (the "Petition Date").  On that same day the Debtors filed their *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") and Plan, attached to which was a restructuring support agreement (the "RSA") between the Debtors and

3

their prepetition/debtor in possession lender Oaktree.  Debtors have not sought Court approval of the RSA.

10.     The *Motion of Debtors for Entry of an Order (I) Establishing Bidding Procedures, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* (D.I. 17) (the "<u>Bidding Procedures Motion</u>") was also filed on the Petition Date.

11.     On April 13, 2023, the U.S. Trustee appointed an official committee of unsecured creditors (the "<u>Committee</u>").

12.     Since the Petition Date, changes were made to the bidding procedures and the sale process was extended.  Ultimately, no bids were received by the Debtors.

13.     On June 9, 2023, this Court entered an Order approving the adequacy of the Disclosure Statement and the Solicitation Procedures (the "<u>Solicitation Order</u>"). (D.I. 378).  Also on June 9, 2023, the Debtors filed the solicitation version of the Plan.  (D.I. 372).

14.     Pursuant to the Solicitation Order, the Plan Supplement was due on July 3, 2023. Debtors' original Plan Supplement was filed on June 30, 2023.  (D.I. 416).  Exhibit C to the Plan Supplement, the list of assumed executory contracts and unexpired leases, was amended on July 4, 2023 (D.I. 418) and further amended on July 12, 2023.  (D.I. 433).

15.     The Solicitation Order set July 10, 2023 as the voting and "opt-out" deadline and the plan confirmation objection deadline.  The Voting Report is to be filed on July 14, 2023 and the Confirmation Hearing is set for July 18, 2023.

**B. <u>Relevant Solicitation and Plan Provisions Regarding Third-Party Releases</u>**

16.     The Plan sets out ten (10) classes of claims and interests.  Plan, Article III.A.1.
Classes 1, 2, and 7 – 10 are not entitled to vote, and are either unimpaired and presumed to accept
the plan or impaired and deemed to reject the plan.  *Id.*  Members of classes 1, 2 and 7 -10 received
either a "Form of Unimpaired Non-Voting Status Notice" or a "Form of Impaired Non-Voting
Status Notice".  *See* Solicitation Order, Exs. 4 and 5.  Both Forms advised members of these six (6)
non-voting classes of their right to opt-out of the Third-Party Releases, discussed further below.

17.     Classes 3 – 6 are impaired and entitled to vote.  Exhibit 3 to the Solicitation Order
was entitled "Joint Ballot for Voting to Accept or Reject the Joint Chapter 11 Plan of SiO2 Medical
Products, Inc. and Its Debtor Affiliates and Opt-Out of Releases."  As set forth therein, a party
could opt-out of the Third-Party Releases if they either (i) voted to reject the Plan or (ii) did not
vote on the Plan.  On the other hand, parties voting in favor of the Plan were advised:

> **PLEASE TAKE NOTICE THAT IF YOU VOTE IN FAVOR OF THE PLAN,
> YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE
> PLAN AND CANNOT OPT OUT OF THE RELEASES CONTAINED
> THEREIN. ANY OPT OUT OF THE RELEASES CONTAINED IN THE
> PLAN SUBMITTED ON YOUR BEHALF WILL NOT BE COUNTED.**

18.     In order to understand the Third-Party Release provisions, several defined terms
in the Plan are important.

> a.  "***Related Party***" means, with respect to any Person or Entity, other than the
> Debtors, each of, and in each case in its capacity as such, current and former
> directors, managers, officers, members of any governing body, equity holders
> (regardless of whether such interests are held directly or indirectly), affiliated
> investment funds or investment vehicles, managed accounts or funds,
> predecessors, participants, successors, assigns, subsidiaries, affiliates, partners,
> limited partners, general partners, principals, members, management
> companies, fund advisors or managers, employees, agents, trustees, advisory
> board members, financial advisors, attorneys (including any other attorneys or
> professionals retained by any current or former director or manager in his or her
> capacity as director or manager of an Entity), accountants, investment bankers,

5

consultants, representatives, and other professionals and advisors of such Person or Entity and any such Person's or Entity's respective heirs, executors, estates, and nominees; *provided, however* that notwithstanding the foregoing or anything herein to the contrary, no Non-Released Party shall be a Related Party under the Plan.

b. "***Released Party***" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) Oaktree, including, for the avoidance of doubt, the Initial Plan Sponsors and Holders of First Lien Term Loan Claims; (d) any ultimate Plan Sponsor; (e) the DIP Lenders and the DIP Agent; (f) the Agents; (g) Athos, including, for the avoidance of doubt, Holders of Second Lien Term Loan Claims and Holders of Athos Subordinated Claims; (h) all Holders of Claims; (i) the Debtors' employees (which, for the avoidance of doubt, shall not include any Non Released Party); (j)  the Reorganized Debtors go forward vendors and customers, other than BARDA and Moderna; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); (l) each Related Party of each Entity in clause (a) through this clause (l); and (m) each Debtor Related Party of each entity in clause (a) and (b); provided, however, that in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation; provided, further, however that notwithstanding the foregoing or anything herein to the contrary, no Non Released Party shall be a Released Party under the Plan.  For the avoidance of doubt, the Abrams Entities shall not be Released Parties in their capacities as guarantors under the Southern States Capex Credit Agreement and the Southern States CARES Credit Agreement, as the case may be.

c. "***Releasing Parties***" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) Oaktree, including, for the avoidance of doubt, the Initial Plan Sponsors and Holders of First Lien Term Loan Claims; (d) any ultimate Plan Sponsor; (e) the DIP Lenders; (f) the Agents; (g) Athos, including, for the avoidance of doubt, Holders of Second Lien Term Loan Claims and Holders of Athos Subordinated Claims; (h) all Holders of Claims; (i) all Holders of Interests; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clause (a) through this clause (k) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided*, *however*, that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the release contained in the Plan; (y) timely objects to the Third Party Release and

such objection is not withdrawn before Confirmation; or (z) is a Non-Released Party.[3]

Plan, Article I.A., ¶¶ 157, 158 and 159.

19.    Article VIII.F of the Plan provides as follows with respect to a Third-Party Release:

**Notwithstanding anything contained in this Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable law, each Released Party (other than the Debtors or the Reorganized Debtors) is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and all of the Releasing Parties (other than the Debtors or the Reorganized Debtors), from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors,**

---

[3]    Debtors have agreed to make certain modifications to the definition of "Releasing Parties." The associated issues have therefore not been addressed in this Objection. To the extent such changes are not made, the U.S. Trustee reserves the right to raise such objections at the Confirmation Hearing.

the Debtors' in- or out-of-court restructuring efforts, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before and during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) the Liquidation Trust Claims, (ii) the Non-Released Parties, and (iii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing, the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable

**consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release. For the avoidance of doubt, no Non-Released Party shall be a Released Party under the Plan.**

## LEGAL ARGUMENT

### A. The Plan Cannot Be Confirmed Because It Extinguishes Direct Claims Against Non-Debtors Held by Parties Related to the Releasing Parties, Without Their Consent

20.     Although the Plan as solicited includes an "opt-out" for members of classes 3 – 6, the ability to opt-out is not afforded to categories of persons and entities that are merely related to the main Releasing Parties, or to their affiliates (the "Related Parties").  Such Related Parties include, for example, the employees and professionals of each creditor who falls under the definition of a Releasing Party, as well as the employees and professionals of each *affiliate* of each creditor who falls under the definition of Releasing Party.  Such Related Parties also include those who may fall under such broad and vaguely defined categories as "agents," "consultants," "representatives" and "other professionals" of Releasing Parties.

21.     The releases to be imposed on the Related Parties are not limited to claims they could assert derivatively through the Releasing Party to which they relate.  Nor are they limited to claims that the party to whom they relate could release on their behalf under agency law.  Rather, the broad release language also covers direct claims held by each Related Party against each Released Party, as long as such claims are based on or relate to, or arise from, in whole or in part, the Debtors.  *See* Plan, Article VIII.F.

22.     The Debtors have not obtained affirmative consent from any of the Related Parties

9

to waive their direct claims against the Released Parties.  The Third-Party Releases to be forced on the Related Parties are non-consensual under any view of consent.  Therefore, the Plan can be confirmed only if the proposed non-consensual releases of the Related Parties satisfy the standards set forth in *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000) and *Millennium Lab Holdings II*, 945 F.3d 126 (3rd Cir. 2019), *cert. denied sub nom., ISL Loan Tr. v. Millennium Lab Holdings*, 19-115, 2020 WL 2621797 (U.S. May 26, 2020).  In *Continental*, the Court described "hallmarks of permissible non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Id.* at 214.  In *Millennium Labs,* the Court reiterated that there are "exacting standards that must be satisfied if such releases and injunctions are to be permitted." *Id.* at 139.

23.    In *Genesis Health Ventures,* 266 B.R. 591 (Bankr. D. Del. 2001), this Court elaborated that, under *Continental*, fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release.  *Id.* at 608; *see also In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del 2010).  Here, the Related Parties are receiving no consideration whatsoever in exchange for the releases to be imposed on them, because they are not themselves creditors or interest holders of the Debtors.

24.    In addition to the lack of consent, none of the Related Parties received the Solicitation Package, a Ballot, the Confirmation Hearing Notice, or any other document that would have alerted them that the Plan will strip away their rights to pursue direct claims against numerous non-debtors, including the Debtors' current and former directors, officers, employees, agents, and others.  The Related Parties did not receive any such notice because they are not parties in interest in these cases, but are merely related to a creditor of the Debtors that falls within the definition of "Releasing Party."  They will not receive the notice due process requires.  *See Folger Adam*

10

*Security, Inc. v. DeMatteis/MacGregor*, 209 F.3d 252, 265 (3d Cir. 2000) ("[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'") (citations omitted). In fact, no notice was provided at all, nor could there be because the identity and contact information of the Related Parties of the Debtors' creditors would not be known to the Debtors.

25.     Because the Plan would impose a release in favor of non-debtors on Related Parties without their knowledge, consent, or ability to opt-out, the Plan should not be confirmed in its current formulation.

**B. The Plan Cannot be Confirmed Because Creditors Who Vote in Favor of the Plan Cannot Opt-Out of the Third-Party Release**

26.     Here, a party voting in favor of the Plan cannot opt-out of the Third-Party Release. At the same time, though, parties presumed to accept the Plan, and who are therefore not entitled to vote, do have the right to opt-out of the Third-Party Release. *See* ¶ 16 above. All parties should be entitled to opt-out of the Third-Party Releases, including those that actually vote in favor of the Plan.

**C. The Plan Is Not a Settlement Subject to Approval Under Bankruptcy Rule 9019**

27.     Article VII.A. of the Plan, entitled "Compromise and Settlement of Claims, Interest and Controversies," provides:

> Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule

9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims, Interests, and Causes of Action.

Plan, Article VIII.A.

28.     Bankruptcy Rule 9019(a) confers discretion on the bankruptcy court to approve a compromise or settlement on motion after notice and a hearing.  Fed. R. Bankr. P. 9019(a).  "In making its evaluation, the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Washington Mut.*, 442 B.R. at 328 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

29.     Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to propose "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A). Thus, section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims other parties may have against it.  *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 409, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate).

30.     Black's Law Dictionary defines "settlement" as "an *agreement ending a dispute* or lawsuit."  Black's Law Dictionary (10th ed. 2014) (emphasis added).  It defines "agreement" as "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."  Black's Law Dictionary (10th ed. 2014).

31.     While a plan may incorporate a settlement, a plan and a settlement are not one and the same.  What may be permissible under a negotiated settlement agreement that is considered

"fair, reasonable, and in the best interest of the estate" is different than what may be permissible under a plan, which is subject to the requirements of sections 1123 and 1129 of the Bankruptcy Code.

32.     Other than the RSA, the Plan does not reference any discrete settlement agreements with parties in interest.  Rather, the language in Article VIII.A and Article VIII.F suggests that the Plan itself is a settlement agreement subject to approval under the Bankruptcy Code.  Sending a plan to impaired creditors for a vote is not the same thing as parties negotiating a settlement among themselves.

33.     For these reasons, in order for the Plan to be confirmed, Article VIII.A and portions of Article VIII.F must be removed.

### D.  The Injunction Includes an Improper "Gatekeeper" Provision

34.     Article VIII.H of the Plan, entitled "Injunction" includes the following provision:

> The injunctions set forth above shall extend to any successors of the Debtors, the Reorganized Debtors, the Released Parties, and the Exculpated Parties and their respective property and interests in property.  No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.E, Article VIII.F, and Article VIII.G hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

> The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

35.     The effect of this language is to create a "gatekeeper" role for this Court.  It forces a non-debtor who wishes to pursue a claim against another non-debtor to come to this Court – and only this Court – for a determination of whether such claim is a "colorable claim."  Thereafter, this Court would have the "sole and exclusive jurisdiction to adjudicate the underlying colorable Claim

or Causes of Action." These rules would apply even after these bankruptcy cases have been closed, thereby requiring the non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

36. The proposed required procedure, which is akin to that to be followed under *Barton v. Barbour*, 104 U.S. 126 (1881), prior to suing a bankruptcy trustee**,** should not be permitted. The defense of "release" is an affirmative defense to a cause of action asserted in a court of law or other tribunal. Affirmative defenses cannot be adjudicated prior to the filing of the action to which such defense relates. Moreover, as to claims between non-debtors, there is no reason why the court in which the relevant action has been filed cannot make the determination as to whether the claim was released under the Plan.

37. A similar provision was rejected by Judge Owens in *In re Gulf Coast Health Care, LLC*, et al., Case No. 21-11336, where she noted "the plan says what it says and other courts should be entitled to exercise their authority to interpret it." Further, "imposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed." (*See Gulf Coast,* 5/4/22 Tr. At 30:18 – 23, attached hereto as Exhibit A.)

38. There is no basis for the gatekeeper provision and, in order for the Plan to be confirmed, it must be removed.

**E.** **The Plan's Reporting and Statutory Fee Provisions Are Not Sufficient to Ensure Reporting and Payment of Quarterly Fees as Required Under Applicable Law**

39. Article II.F of the Plan addresses the payment of statutory fees:

> All fees due and payable by the Debtors pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.

40.     The Plan cannot be confirmed because as currently drafted this section potentially violates 28 U.S.C. § 1930(a)(6).  Specifically, the Plan fails to require that both the Reorganized Debtors and the Liquidation Trust shall file separate UST Form 11-PCR reports and pay quarterly fees after the Effective Date through the date a Reorganized Debtor's case is closed.  Such a result is contrary to the language and intent of section 1930(a)(6), as well as the overwhelming weight of case law interpreting section 1930(a)(6).  For the following reasons, confirmation of the Plan should be denied absent satisfactory revisions.

41.     Section 1930(a)(6) provides in relevant part that "a quarterly fee shall be paid to the United States trustee . . . in each case under chapter 11 . . . for each quarter (including any fraction thereof) until the case is converted or dismissed . . . ," and that the fee is to be calculated on "disbursements" made in the case during the quarter.  28 U.S.C. § 1930(a)(6).  Payment of quarterly fees is mandatory in every chapter 11 case from the quarter in which the petition is filed until the quarter in which the case is closed by final decree.  *See, e.g., Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),* 402 F.3d 416, 418 (3d Cir. 2005); *United States Trustee v. Gryphon Stonemason*, 166 F.3d 552, 554 (3d Cir. 1999).

42.     As it is not defined in the Bankruptcy Code, the term "disbursements" in section 1930(a)(6) must be given its "'ordinary, contemporary, common meaning.'"  *Genesis*, 402 F.3d at 421 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  In interpreting section 1930(a)(6), the Third Circuit has held that "'[d]isburse' is defined as 'to expend' or 'to pay out.'"  *Id*. (quoting Websters' Third New International Dictionary 644 (1976)).  More recently, other Circuit Courts of Appeals have acknowledged that, as used in section 1930(a)(6), the term "disbursement" means "money paid out."  *See, e.g., In re Buffets, L.L.C.*, 979 F.3d 366, 373 (5th Cir. 2020) ("A disbursement is money paid out.") (citing MERRIAM-WEBSTER DICTIONARY (2016)); *Cranberry*

15

*Growers Coop. v. Layng (In re Cranberry Growers Coop.),* 930 F.3d 844, 850 (7th Cir. 2019) ("The dictionary definition of 'disbursement' is '[m]oney paid out; expenditure.'") (quoting The American Heritage Dictionary of the English Language (5th ed. 2018)) (alteration in original).

43. As "disbursement" means "money paid out," section 1930(a)(6) quarterly fees are calculated upon payments of money during a quarter in a chapter 11 case; they are not calculated upon the transfer of non-cash assets such as causes of action.   This is consistent with the interpretation that Circuit Courts of Appeals, including the Third Circuit, have given the term "moneys disbursed" for purposes of determining a trustee's commission under 11 U.S.C. § 326(a). *See, e.g., Tamm v. U.S. Tr. (In re Hokulani Square, Inc.),* 776 F.3d 1083, 1086 (9th Cir. 2015) (holding that, because "'disburse' means to 'pay out,'" trustees may only calculate their commission on transactions using "some form of generally accepted medium of exchange") (quoting Black's Law Dictionary 561 (10th ed. 2014)); *Staiano v. Cain (In re Lan Assocs. XI, L.P.),* 192 F.3d 109, 118-19 (3d Cir. 1999) (holding that trustees may only calculate their commission "on moneys actually disbursed" and not on transfers of "property and other types of consideration" such as credit bids).

44. In sum, all post-confirmation payments of money in the Debtors' cases should be included as "disbursements" for purposes of section 1930(a)(6).

45. Section 1930(a)(6) contains relatively few material terms.  It requires a "fee" to be "paid to the United States trustee" every quarter "in each case under title 11" based on "disbursements."  See 28 U.S.C. § 1930(a)(6).  Congress did not specify the entity that must make the disbursements in question, the purpose for which the disbursements must be made, or the source from which the disbursements must originate.  Although Congress could have placed such

limitations on the section 1930(a)(6) disbursements as "by the debtor," "in payment of the debtor's expenses," or "from estate funds," it made the policy determination not to do so.

46.     As a result, Circuit Courts of Appeals, including the Third Circuit, broadly interpret "disbursements" to include all payments made in a chapter 11 case during a quarter, regardless of who made the payment. *See, e.g., Cranberry Growers*, 930 F.3d at 850-53 (holding that "disbursements" include a debtor's customers' direct payment of the debtor's revolving line of credit); *Genesis*, 402 F.3d at 422 (holding that the quarterly fee owed in a debtor's case is calculated on all "[p]ayments made on behalf of [the] debtor, whether directly or indirectly").

47.     Similarly, Circuit Courts of Appeals broadly interpret "disbursements" to include all payments made in a chapter 11 case during a quarter, regardless of the purpose for which the payment was made. *See, e.g., Cranberry Growers,* 930 F.3d at 850-53; *Cash Cow Servs. of Fla. LLC v. U.S. Tr. (In re Cash Cow Servs. of Fla. LLC)*, 296 F.3d 1261, 1265 (11th Cir. 2002), *cert. denied*, 537 U.S. 1161 (2003) (holding that "disbursements" include consumer loans made by the debtor); *In re Jamko, Inc.,* 240 F.3d 1312, 1316 (11th Cir, 2001) (holding that "disbursements" include "all disbursements made during the entire process," including but not limited to "ordinary operating expenses" and "payments made to creditors").

48.     Additionally, Circuit Courts of Appeals broadly interpret "disbursements" to include all payments made in a chapter 11 case during a quarter, regardless of the source of the payment. *See, e.g., Cash Cow*, 296 F.3d at 1265 (holding that "disbursements" for purposes of section 1930(a)(6) are not "limit[ed] . . . to only 'payments' or capital flowing from the bankruptcy estate"); *Robiner v. Danny's Mkts., Inc.,* 266 F.3d 523, 526 (6th Cir. 2001) ("Congress contemplated that disbursements will encompass all payments to third parties directly attributable to the existence of the bankruptcy proceeding . . . .   In other words, the technical source of the

payments . . . is apparently inconsequential."); *Jamko,* 240 F.3d at 1313, 1316 (holding that all payments "made during the entire process" are included in calculating the quarterly fees, "from whatever source"); *Tighe v. Celebrity Home Entm't, Inc. (In re Celebrity Home Entm't, Inc.),* 210 F.3d 995, 998 (9th Cir. 2000) (holding that, although disbursements include all payments from the bankruptcy estate, "that does not [mean] that disbursements are limited to payments from a bankruptcy estate").

49.    Under the foregoing authority, every payment made in a chapter 11 case during a quarter—regardless of who makes the payment, why the payment is made, or what the source of the payment may be—must be included in calculating quarterly "disbursements" for purposes of section 1930(a)(6).

### F.   Miscellaneous Issues

50.    Article VI.J of the Plan includes the following provision regarding recoupment:

> In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

51.    Consistent with practice relating to sales, this provision needs to omit the enjoining of the recoupment defense.  *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252 (3rd Cir. 2000) (preserving the defense of recoupment).

52.    Article V concerns the treatment of Executory Contracts and Unexpired Leases.  It provides that Debtors/Reorganized Debtors have until ninety (90) days after the Plan's Effective date to make a final determination to assume and assign contracts and leases and to reject the rest. The list of assumed contracts found in the Plan Supplement has already been amended twice.

53.     The language currently in Article V is not clear as to exactly when and how counterparties will learn of the fate of their contracts and leases.  Of greater concern, there needs to be a precise mechanism by which cure issues may be addressed by this Court, even after the Effective Date, if will take an additional three months to make final decisions.  Further, there must be clear procedures by which counterparties to rejected contracts and leases are advised and instructed as to the deadline for filing a proof of claim.

### RESERVATION OF RIGHTS

54.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate motion and/or conduct any and all discovery as may be deemed necessary or as may be required, and to assert such other grounds as may become apparent upon further factual discovery.

## **CONCLUSION**

WHEREFORE, the U.S. Trustee respectfully requests that the Court (i) not confirm the

Plan unless and until the issues raised above are resolved and (ii) grant any such other and

further relief that the Court deems just and proper.


Dated: July 13, 2023
       Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**

By:  /s/ *Linda Richenderfer*
      Linda Richenderfer (DE 4138)
      Trial Attorney
      United States Department of Justice
      Office of the United States Trustee
      J. Caleb Boggs Federal Building
      844 King Street, Suite 2207, Lockbox35
      Wilmington, Delaware 19801
      Phone: (302) 573-6492
      Fax:   (302) 573-6497
      Email: linda.richenderfer@usdoj.gov

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE


                                    .  Chapter 11
IN RE:                              .
                                    .  Case No. 21-11336(KBO)
GULF COAST HEALTH CARE, LLC,        .
et al,                              .
                                    .  824 Market Street
                                    .  Wilmington, Delaware 19801
                     Debtors.   .
. . . . . . . . . . . . . . .   .  Wednesday, May 4, 2022

                    TRANSCRIPT OF VIDEO HEARING RE:
                     CONFIRMATION - COURT DECISION
                  BEFORE THE HONORABLE KAREN B. OWENS
                    UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Debtors:            David R. Hurst, Esq.
                            Daniel M. Simon, Esq.
                            Emily C. Keil, Esq.
                            MCDERMOTT, WILL & EMERY, LLP


For the U.S. Trustee:       Joseph Cudia, Esq.
                            Juliet Sarkessian, Esq.
                            Richard Schepacarter, Esq.
                            OFFICE OF THE U.S. TRUSTEE


For the Official Committee
of Unsecured Creditors:     David Kurzweil, Esq.
                            Eric Howe, Esq.
                            Joseph Davis, Esq.
                            Nancy Peterman, Esq.
                            GREENBERG TRAURIG, LLP




(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Leslie Murin, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

APPEARANCES VIA ZOOM:  (Continued)

For Barrow Street Capital:   Alana Page, Esq.
                             Kelly A. Cornish, Esq.
                             Matthew Stachel, Esq.
                             Miriam Levi, Esq.
                             PAUL, WEISS, RIFKIND, WHARTON
                              & GARRISON, LLP

For the United States:       Alexis Daniel, Esq.
                             Augustus Curtis, Esq.
                             U.S. DEPARTMENT OF JUSTICE

For Vista Clinical
Diagnostics, LLC:            Andrew Ballentine, Esq.
                             SHUMAKER, LOOP & KENDRICK, LLP

For the Florida
Plaintiffs:                  Andrew Brown, Esq.
                             Jesse Noa, Esq.
                             R. Stephen McNeill, Esq.
                             POTTER, ANDERSON & CORROON, LLP

                             Blair Mendes, Esq.
                             MENDES, REINS & WILANDER, PLLC

                             James Wilkes, II, Esq.
                             WILKES & ASSOCIATES, PA

For Regions Bank:            Cory Falgowski, Esq.
                             BURR & FORMAN, LLP

For Affiliate:               DANTE SKOURELLOS, ESQ.

For the Estates of
Domenica B. Castellano,
Francis I. Einstein,
Robert F. Einstein, Sr.,
Shelley A. Tambling:         Douglas Candeub, Esq.
                             MORRIS JAMES, LLP


(Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)

For OHI Asset Funding
(DE), LLC and the Omega
Landlords:                        Eric Schwartz, Esq.
                                  Jonathan Weyland, Esq.
                                  MORRIS, NICHOLS, ARSHT
                                   & TUNNELL, LLP

                                  Jason Hufendick, Esq.
                                  Robert Lemons, Esq.
                                  Shreya Gulati, Esq.
                                  WEIL, GOTSHAL & MANGES, LLP

                                  Leighton Aiken, Esq.
                                  FERGUSON BRASWELL FRASER
                                   KUBASTA, PC

For Omnicare, Inc. and
its Affiliates:                   Geoffrey Goodman, Esq.
                                  Tamar Dolcourt, Esq.
                                  FOLEY & LARDNER, LLP

For New Ark Capital, LLC:         James Muenker, Esq.
                                  Jason Hopkins, Esq.
                                  Stuart Brown, Esq.
                                  DLA PIPER, LLP (US)

For Medline Industries,
Inc.:                             Jordana Renert, Esq.
                                  LOWENSTEIN SANDLER, LLP

For Bradford:                     KIMBERLY GIANIS, ESQ.

Patient Care Ombudsman:           MARK FISHMAN

Also Appearing:                   Dara Cooley, Esq.
                                  DARA COOLEY LAW, PA

                                  Jason Gerstein
                                  Matt Shelton
                                  Scott Vogel
                                  GULF COAST HEALTH CARE

                                  Allison Axenrod
                                  CRG FINANCIAL, LLC

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:               Ben Jones
                              Swapna Deshpande
                              ANKURA CONSULTING GROUP, LLC

                              Caroline Salls
                              NEW GENERATION RESEARCH

                              Clifford Zucker
                              Earnestiena Cheng
                              Narendra Ganti
                              FTI CONSULTING

                              Eric Roth
                              HEALTH CARE NAVIGATOR, LLC

                              Jeff Kaplan
                              "BCAS"

                              Lindsay Simon
                              "BANKRUPTCY PROF"

                              Ryan Martin
                              "CCM"

                              Deanne Graham, *Pro Se*

                              James Morrison, *Pro Se*

                              Julie Gutzmann, *Pro Se*

                              Ray Mulry, *Pro Se*

                              Ryan Lin, *Pro Se*

                              Sheryl Wolf, *Pro Se*

                              Becky Yerak
                              WALL STREET JOURNAL

                              Daniel Gill
                              BLOOMBERG LAW

                              Jason DiBattista
                              LEVFIN INSIGHTS

                              Jessica Steinhagen
                              REORG RESEARCH

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:              Maria Chutchian
                             REUTERS

                             Richard Archer
                             LAW 360

                             Taylor Harrison
                             DEBTWIRE

<u>INDEX</u>

<u>Page</u>

<u>COURT DECISION</u>                                          7

1          (Proceedings commence at 3:30 p.m.)

2               THE COURT:  Good morning, everyone.  This is Judge

3     Owens.  This is the time that we are gathered to hear the

4     ruling in Gulf Coast.

5               Before I begin, I guess I ask the parties:  Is

6     there anything we need to take are of ahead of time?

7               THE COURT:  Okay.

8               UNIDENTIFIED:  Nothing from the debtors, Your

9     Honor.

10               THE COURT:  Okay.  Great.

11               Okay.  As I mentioned, we're here on the Court's

12     ruling on confirmation of the debtors' plan, as modified,

13     found at Docket Number 1217.

14               The confirmation proceedings lasted four days; and,

15     during such time, the Court heard credible and competent

16     testimony from Mr. Jones, the debtors' Chief Restructuring

17     Officer, as well as Mr. Vogel, the debtor's independent

18     manager; Mr. Chermayeff, a representative of Barrow Street

19     Capital, and Ms. Kjontvedt, on behalf of Epiq, the debtors'

20     administrative advisor, assisting the debtors with, among

21     other things, tabulating the votes cast on the plan.

22               In addition, approximately 91 exhibits were

23     admitted into the record by the parties and considered by the

24     Court.

25               And finally, there was voluminous briefing on the

1   contested confirmation issues filed by interested parties and

2   extensive argument was had.

3          The plan embodies a settlement between the debtors

4   and their key stakeholders; namely, the committee, Omega, and

5   certain affiliates and insiders known as the "contribution

6   parties, that was reached following the parties' voluntary

7   agreement to mediate with former Judge Peck.  It provides for

8   an aggregate guaranteed minimum recovery of at least $10

9   million to holders of general unsecured claims in Class 7.A

10  and litigation claimants, mostly PLGL plaintiffs, in Class

11  7.B.

12         Following further discussions among the parties

13  during the confirmation proceedings, the minimum guarantee

14  was increased to 11.5 million, with the additional 11 point -

15  excuse me --  with the additional 1.5 million earmarked for

16  Class 7.B, to ensure equality of distribution among that

17  subclass following the assumption of several settlement

18  agreements.

19         Additional future amounts may flow to the estates

20  for distributions for unsecured creditors following the

21  liquidation of certain business interruption and D&O

22  insurance policies.

23         Mr. Jones testified that, as a result of the

24  guaranteed funds, claim waivers, and redirection of proceeds

25  agreed to by Omega and the contribution parties, allowed

1    claims of creditors in Class 7.A are projected to receive a

2    recovery of approximately 19 percent, with those in 7.B to

3    receive approximately 21 percent.

4         Mr. Jones further explained that these projected

5    recoveries for unsecured creditors would not be available

6    absent the voluntary contributions of Omega and the

7    contribution parties.

8         Specifically, New Ark, the service providers, and

9    the equity sponsors, collectively known as the "contribution

10   parties," have agreed to contribute 14.75 million in cash to

11   fund a certain amount of allowed professional fee claims and

12   the guaranteed minimum to unsecured creditors.

13        New Ark has also agreed to redirect any recoveries

14   that it is to receive on account of its Section 507(b)

15   priority claim arising from the debtors' use of its cash

16   collateral during the Chapter 11 cases, as well as certain

17   recoveries it's to receive on account of its secured pre-

18   petition claim.

19        Moreover, the service providers agree to waive

20   recoveries on account of their pre-petition claims.

21        Omega has agreed to 1 million for allowed

22   professional fee claims and up to 1 million of business

23   interruption insurance proceeds, if obtained, for the

24   unsecured creditors.  It has also agreed to waive repayment

25   of its DIP financing claim and redirect any recoveries that

1     it's to receive on account of pre- and post-petition claims

2     for the benefit of the unsecured claimants.

3         In toto, the debtors estimate that Omega and the

4     contribution parties have contributed to the plan up to 16.7

5     million of new money, a waiver of approximately 48 million of

6     post-petition DIP, administrative, and priority claims that

7     arose when all the parties knew they would never be repaid,

8     and a waiver or redirection of 124 million of pre-petition

9     claims.

10        Without the agreements to redirect proceeds and

11    waive claims, the debtors' current Class 7 unsecured

12    creditors would be substantially diluted and would only share

13    in approximately 31 percent of the funds available to

14    unsecured creditors in a non-consensual Chapter 11 scenario.

15    Under the current plan, they receive a 100 percent of the

16    guaranteed amount.

17        The unrebutted evidence also indicates that the

18    debtors have little to no available assets with which to fund

19    a plan or a Chapter 7 liquidation, save for potential causes

20    of action stemming from certain insider or affiliate

21    transactions with some of the contribution parties.  As a

22    result of the limited assets and significant amount of claims

23    projected to be allowed against the estates, Mr. Jones

24    testified that the debtors would need to obtain somewhere

25    north of 175 million in litigation proceeds on those causes

1    of action to guarantee the plan's projected minimum recovery

2    to unsecured creditors; 75 million would need to be obtained

3    just to permit any recovery to unsecured creditors in a

4    Chapter 7 scenario.

5           The need for and benefits of the current plan

6    settlement is explained and supported by, among other things,

7    the hypothetical Chapter 7 waterfalls prepared by Mr. Jones

8    and his team as material information was garnered.  Those are

9    found at Debtor Exhibits 19 and 20.  The waterfall and the

10   assumptions underlying it have not been meaningfully

11   challenged.

12          In return for and as a condition to their plan

13   contributions, Omega and the contribution parties have

14   demanded releases for themselves and certain related parties

15   from the debtors, as well as non-consensual releases from the

16   litigation creditors in Class 7.B.

17          Also included in the plan's definition of "third-

18   party released parties" are all the PLGL codefendants and

19   their related parties, which would capture certain former

20   debtor employees and current and former officers.  Pursuant

21   to the plan, creditors who vote in favor of the plan are also

22   giving a release of third-party released parties, but that

23   release is consensual.

24          The plan termsheet found at Debtors' Exhibit 17,

25   executed by the debtors, the creditors' committee, Omega, and

1   the contribution parties, following their successful

2   mediation, memorializes the parties' terms, including the

3   demand for and requirement of the plan's non-consensual

4   third-party releases.

5        The Court also heard testimony from Mr. Chermayeff

6   as to why Barrow Street wants the releases for itself and its

7   related parties, and why it conditions its plan contributions

8   on their inclusion in the plan; namely, they wish to buy

9   peace and finality, a position the debtors' representatives

10   believe New Ark, the service providers, and all of their

11   related parties take, as well.

12        In agreeing to the releases, Mr. Vogel, the

13   debtors' independent manager, with the sole authority to

14   pursue, settle, and release the debtors' causes of action,

15   testified credibly that he believed that it was in the best

16   interests of the debtors' estates, fair and reasonable to do

17   so because the releases are a necessary inducement for the

18   plan contributions of Omega and the contribution parties,

19   without which the current plan could not be proposed, and

20   without which unsecured creditors would receive no

21   distribution.

22        Supporting that conclusion was Mr. Vogel's

23   understanding of the nature and value of the debtors' assets

24   available to fund creditor recoveries; namely, the affiliate

25   and insider causes of action and the amount and priority of

1   claims, as set forth in Mr. Jones' waterfall scenarios.

2          To gain an understanding of the affiliate and

3   insider causes of action, Mr. Vogel led and controlled an

4   investigation into the estate's causes of action related to

5   the affiliate and insider transactions.  The investigation

6   was independent, sufficient in scope, and conducted by able

7   and experienced professionals.  No real challenge has been

8   made to these conclusions.  The investigation yielded a

9   report that concluded that, at best, the causes of action

10  would yield approximately 64.3 million for the estates.

11         While the objecting parties attempted to discredit

12  some of the conclusions in the investigation report,

13  including the ultimate recovery conclusions, they neither

14  shared with the Court the results of their own investigation,

15  if one was undertaken, nor offered their own valuation

16  conclusions and analysis.

17         Moreover, their targeted challenges to the report

18  failed to seriously impact the material conclusion reached by

19  Mr. Vogel that led to his decision to enter into the plan

20  settlement, that the plan's guaranteed distribution to

21  unsecured creditors resulting from the contributions of the

22  released parties will likely yield far better recoveries to

23  creditors than those that could be achieved absent the plan

24  settlement.

25         Again, the waterfall indicates that 175 million of

1    litigation proceeds, approximately 2.8 times more than the

2    debtors' high value estimate, would need to be obtained to

3    yield the same result as the plan.  And even if there was

4    credible evidence that 175 million could be obtained in

5    litigation, which there isn't, the Court cannot discount the

6    risk of that litigation, the likelihood of recovery against

7    the defendants, and the time value of money, all additional

8    considerations of Mr. Vogel in reaching his decision to

9    approve the plan settlement on behalf of the debtors.

10       Mr. Jones also offered his support for the plan for

11   the same reasons as Mr. Vogel.  Moreover, in support of the

12   plan, the committee filed a statement, representing that it

13   conducted its own investigation into potential estate claims

14   and causes of action, including those that may exist against

15   the contributing parties.  Like Mr. Vogel, the committee used

16   the results of this investigation, as well as Mr. Jones'

17   waterfall, to negotiate with the Omega --  with Omega and the

18   contribution parties, and agreed to the proposed plan.

19       For similar reasons as the debtors, the committee

20   concluded that the settlement and its guarantee to unsecured

21   creditors is the best possible outcome for creditors under

22   the circumstances.

23       With respect to the six voting classes of impaired

24   claims, all but Class 7.B, the litigation claimants, and

25   those subject to the non-consensual third-party releases

1     voted to accept the plan.

2          While the debtors maintain that Class 7.B accepted

3     the plan, I find that the second ballot cast by Millenia

4     after the voting deadline, which tilted the subclass' vote in

5     favor of the plan, was inappropriately accepted by the

6     debtors, pursuant to the disclosure statement order.

7     Millenia cast its first ballot, which rejected the plan,

8     shortly before the voting deadline.  It has been asserted,

9     but not proven, that Millenia then realized that it submitted

10    its ballot in error as rejecting, when it really wished to

11    accept.  Millenia then sent a second ballot, this time

12    accepting, within two hours after the voting deadline.

13          The debtors agreed to, quote, "waive" the voting

14    deadline and accept that second ballot.  Ms. Kjontvedt

15    testified that there were no defects or irregularities with

16    respect to Millenia's first ballot, but that she accepted the

17    late-filed second ballot after consulting the debtors and

18    reviewing Paragraph 28 of the disclosure statement order.

19          Regardless of Ms. Kjontvedt's belief that accepting

20    Millenia's ballot was appropriate, the terms of the

21    disclosure statement order do not allow its acceptance.  The

22    parties' arguments on this topic were confined to the

23    application of Paragraphs 22 and 28 through 30 of the

24    disclosure statement order.

25          The facts of the Millenia changed vote do not fit

into the circumstances described in Paragraphs 29 or 30 of

the order because Millenia's vote was not withdrawn, which is

Paragraph 29, and the second ballot changing Millenia's vote

was not cast before the voting deadline, and there's no

evidence suggesting that the voting deadline was extended for

Millenia, let alone prior to its expiration, which would

cover Paragraphs 22 and 30.

Moreover, Paragraph 28 does not apply because Ms.

Kjontvedt testified in her capacity as a professional, with

extensive experience with vote tabulation, that the original

Millenia ballot did not contain any defects or irregularities

for the debtors to waive.

Accordingly, with Millenia's accepted vote removed,

54 Class 7.B creditors voted to reject the plan and 53 voted

to accept, resulting in a 50.74 rejecting percentage.

Fifty-two of the fifty-four rejecting creditors

filed objections to the plan that were still extant at the

closing of the confirmation proceedings.

In addition, the Office of the United States

Trustee objected to confirmation of the plan.

All objecting parties object to the inclusion of

the non-consensual third-party releases, with the litigation

creditors focusing mainly on those to be granted in favor of

the insider affiliate contribution parties.

In addition, the litigation creditors object to the

1    debtors' release of those parties, the plan's Class 7

2    subclassification of unsecured creditors, the debtors'

3    allocation of the settlement proceeds between the subclasses,

4    the debtors' best interests test analysis, the good faith of

5    the debtors in proposing the plan, the proposed litigation

6    claims procedures, and the original identity of the

7    litigation claimants trustee.  Excuse me.

8         In addition to the inclusion of the non-consensual

9    third-party releases, the U.S. Trustee also raised limited

10   objections to a number of specific plan provisions.  All but

11   one of those were consensually resolved by the parties

12   following the close of the confirmation proceedings.

13        After considering the evidence and legal position

14   of the parties, I have determined that the debtors have not

15   met their burden necessary to confirm the plan with non-

16   consensual third-party releases.  My decision was not easily

17   reached, but it is one that the law requires.

18        The contributions of Omega and the contribution

19   parties, either on behalf of themselves or other related

20   release parties, are substantial, and have enabled a recovery

21   to unsecured creditors when one otherwise would not exist,

22   and those enabling contributions are conditioned on the grant

23   of releases embodied in the plan.

24        The evidence presented was also sufficient to show

25   that the settlement embodied in the plan was achieved during

1    arm's length, good faith negotiations among the debtors, the

2    committee, Omega, and the contribution parties, and that the

3    debtors' decision to enter into the settlement was the result

4    of reasonable and appropriate business judgment, based on an

5    independent, full and fair investigation into the settled

6    debtor claims and appropriate waterfall analysis, which was

7    updated regularly as material information came to light, and

8    the consideration of other relevant facts and circumstances

9    that support a firm settlement with the litigation targets

10   today.

11         However, while those conclusions lend support for

12   the Court's approval of the debtors' releases of their claims

13   against the nondebtors, they cannot, by themselves, support

14   approval of the non-consensual third-party releases.

15         These types of releases are not broadly sanctioned.

16   They require satisfaction of, quote, "exacting standards" set

17   forth by the Third Circuit in Continental.  Those standards

18   require that the Court conclude, based on specific supportive

19   factual findings, that the non-consensual third-party

20   releases are not only necessary to the success of the

21   debtors' reorganization, but also fair to the releasing

22   creditors and given to them in exchange for reasonable

23   consideration.  Here, critical factors that courts in this

24   circuit traditionally rely on to conclude that a plan's

25   inclusion of non-consensual third-party releases is

1    appropriate are missing.

2            At the outset, I'll note that, while the parties

3    did not focus their presentations on the propriety of the

4    third-party releases granted to Omega, the D&Os, and the

5    employees, many or all of the factors that I will discuss

6    with respect to the contribution parties are also missing

7    with respect to the other released parties.

8            For instance, Omega is making a substantial

9    contribution to the plan, but nothing else in the record

10   supports the receipt of non-consensual third-party releases.

11   There is no record supporting the third-party release of the

12   debtors' former employees.  And debtors admit that all

13   parties are willing to remove them and continue with the

14   proposed plan.  While the D&Os may meet some of the criteria

15   necessary to justify their inclusion as non-consensual

16   released parties, such as identity of interest, no evidence

17   was introduced in support.

18           So, with respect to the contribution parties,

19   first, the debtors do not share an indication of interest

20   with the released parties.

21           Moreover, the debtors did not file these cases due

22   to the PLGL litigation sought to be permanently enjoined.

23   There is no evidence suggesting that the PLGL codefendants

24   and any other relevant released party will be unable to

25   defend themselves in that litigation, unable to satisfy

1    judgments against them if obtained, or could look to the

2    debtors' estates for indemnification, contribution, or the

3    like.  The only justification for the release is the desire

4    by the contribution parties to achieve peace and finality in

5    exchange for their contributions to the plan.  While I

6    appreciate and understand that desire, it is not a sufficient

7    basis to justify a release of the third-party claims, given

8    the totality of the circumstances.

9         Moreover, while the debtors cite to cases for the

10   proposition that parties may share an indication of interest

11   simply by possessing a common goal of confirming a plan and

12   consummating the transactions embodied therein, those cases

13   are a slim minority and I disagree with them.  If that were

14   the indication of interest test, every plan in which a debtor

15   advocates for the inclusion of non-consensual releases on

16   behalf of a third party could satisfy the test.  Moreover,

17   I'm puzzled as to the relevancy of a shared common goal to

18   Continental's required questions of necessity and fairness.

19        Additionally, and perhaps more critically, the

20   affected PLGL plaintiffs in Class 7.B have not overwhelming

21   voted to accept the settlement and release of their claims as

22   embodied in the plan.  As courts have acknowledged, this is

23   often the best evidence of fairness of a plan's third-party

24   release to releasing parties.

25        Support is commonly garnered through negotiation

1    with the affected creditors or a representative body.  But

2    here, the litigation creditors had no voice in the plan

3    settlement process or the allocation of the contributed

4    funds, either directly or through a seat on the committee.

5         Moreover, while their projected recovery under the

6    plan is more than what they would be entitled to a Chapter 7,

7    the releasing creditors are receiving nowhere close to

8    payment in full.  And at worst, the evidence suggests that

9    Class B --  7.B creditors are not receiving anything on

10   account of the released claims against the third parties by

11   the released parties.  Rather, the evidence suggests that the

12   contributions made by the contribution parties were made on

13   account of the estate's viable causes of action against them.

14        Indeed, no separate analysis was performed by the

15   debtors or the committee as to the value of the third-party

16   released claims at the time the settlement was achieved.  And

17   as will be explained, the debtors, with the support of the

18   all trade committee, worked to allocate the guaranteed

19   amount, so that creditors in Class 7.A, with likely no

20   pending third-party claims, and those in in 7.B with third-

21   party claims, would receive the same or close to the same pro

22   rata distribution of the plan's guaranteed funds.  No other

23   evidence has been provided by the debtors to suggest a

24   valuation of the third-party PLGL claims or to explain how

25   any of the guaranteed amount to be distributed under the plan

1    is on account of those claims.

2          The debtors argue that the third-party claims

3    against the contribution parties are derivative in nature

4    and, thus, are to be released under the release the estates

5    are granting to the contributing parties.  As such, they

6    argue that the third-party claims have *de minimis* value and

7    should not be entitled to disturb plan settlement.

8          The direct derivative issue is complex, not

9    appropriately and fully briefed, and concurrent --  and

10   currently is undecided.  The creditors vigorously dispute the

11   debtors' positions from a legal standpoint and also highlight

12   the debtors' own earlier attempt during these cases to extend

13   the stay to the PLGL lawsuits as not estate claims and the

14   debtors' pre-petition history of sharing the defense of the

15   PLGL lawsuits in State Court with the relevant contribution

16   party codefendants.  These facts certainly confuse the issue

17   even further.

18         As made clear by the Circuit in Continental, third-

19   party releasing creditors must receive consideration on

20   account of the third-party released claims they are forced to

21   give up under a debtor's plan, and it is insufficient for

22   them to receive as consideration only a distribution on

23   account of their claims against the debtor.

24         It is the debtors' burden to establish necessity

25   and fairness, and they have not done so here.  As explained

1   by the Third Circuit in its Millennium Lab decision, in

2   rendering a decision on a request to include non-consensual

3   third-party releases in a plan, I must exercise caution and

4   diligence and am obligated to approach their inclusion with

5   the utmost care.  I have done so, and I am unable to conclude

6   that there is sufficient justification for the non-consensual

7   third-party releases proposed in the plan.  Excuse me.

8       While the debtors believe that the plan as proposed

9   cannot go forward without the non-consensual third-party

10  releases, I'll briefly address the remaining issues.

11      The litigation claimants object to the debtors'

12  release of, among others, the contribution parties.  As

13  explained by Judge Carey in his 2010 Spansion decision,

14  courts may approve such releases after considering the facts

15  and equities of each case.

16      Section 1123(b)(3)(A) permits debtors to release

17  estate claims against nondebtor third parties if the release

18  is a valid exercise of the debtor's business judgment, is

19  fair, reasonable, and in the best interest of the estate.

20  While a court can use the five Master Mortgage factors as a

21  guidepost to make that determination, all need not be present

22  for a court to approve a proposed release, and they are not

23  the exclusive set of factors a court may consider in reaching

24  a decision.

25      For the reasons already described, the debtors'

agreement to release the nondebtor parties outlined in the

plan is fair, reasonable, and in the best interest of the

estates and is a valid exercise of their business judgment.

Moreover, the committee, serving as estate

fiduciary, supports the releases, and five of the six voting

classes voted overwhelmingly in favor of the plan, including

the debtors' releases contained therein.  That is

unsurprising, since the plan as proposed is the only pathway

for a recovery to unsecured creditors and provides a home

run, value-maximizing transaction on account of the debtors'

assets in exchange for the releases, thus achieving

recoveries for unsecured creditors beyond what they could

expect in both a Chapter 7 liquidation and a non-consensual

Chapter 11 plan scenario.

The litigation creditors assert that the debtors

have not sufficiently satisfied the best interests test of

Section 1129(a)(7) because the analysis excludes the value of

third-party claims proposed to be non-consensually released

under the plan.  The Court is not approving those releases.

But even if it was, I disagree that a valuation of released

third-party claims asserted against nondebtors is required

under the best interests test.

Persuasive case law, including Judge Drain's

decision in Purdue Pharma, explains why the plain language of

the Code does not require it.  The Code mandates a comparison

between the amount objecting creditors would receive under

the plan on account of their claims against the debtors and

what they would receive on account of such claims if the

debtor were liquidated in a Chapter 7.  That conclusion is

also supported by the Delaware District Court in its 2012

W.R. Grace decision.

The litigation creditors argue that the plan

improperly separates the Class 7 unsecured claims into two

subclasses.  Classification of similar claims or interests

must be reasonable to satisfy Sections 1129(a)(1) and 1122.

The evidence shows that the debtors separately classified the

Class 7.A and 7.B claims to enable quicker distributions to

those creditors in Class 7.A who have mostly asserted

liquidated, undisputed claims, unlike a sizeable portion of

the litigation claimants in Class 7.B.  The 7.B claims would

complicate and delay distributions to Class 7.A claimants if

the classes were combined because 7.B claims will need to be

reconciled and may be estimated.

Moreover, the record reflects that the claimants

placed in 7.B are those with third-party claims subject to

the proposed non-consensual releases.  Placing them in a

subclass made it easier to narrow and identify the affected

creditors and I think, most importantly to the classification

analysis, gave them a voice in the proceeding.

If Class 7.B claimants were lumped with Class 7.A

creditors into one divided Class 7, it is undisputed that the

litigation creditors rejecting the plan would be diluted by a

large number of accepting voters that would carry the

undivided class.  As such, it was reasonable and appropriate

for the debtors to place the 7.B claimants into their own

class and give them a separate voice in these proceedings.

Several objecting parties point out a *de minimis*

number of creditors who may have been misclassified between

Classes 7.A and 7.B.  But any misclassification did not cause

any harm because the Class 7.B creditors rejected the plan.

Class 7.B has voted to reject the plan.

Accordingly, Section 1129(a)(8) has not been satisfied and

the debtors must show that the plan does not unfairly

discriminate and it's fair and equitable with respect to

Class 7.B.

The litigation creditors argue that the plan

unfairly discriminates between them and the equal priority

creditors of Class 7.A because the allocation of the

guaranteed funds for distribution to unsecured creditors was

done incorrectly and will result in Class 7.B receiving a

lower percentage recovery from the estates on account of

their allowed claims than those similarly situated in Class

7.A.

Moreover, they argue that creditors in Class 7.A

were given the opportunity to avoid the third-party releases,

1  whereas they were not.  The latter point is moot given my

2  ruling today on the releases.

3  Mr. Jones' testimony reflects that, after the

4  settlement was reached and the guaranteed minimum was

5  earmarked for unsecured creditors, the debtors undertook a

6  process of reconciling the asserted unsecured claims to

7  determine a projected aggregate of likely allowed claims in

8  each Class 7 subclass to divide sufficient funds between the

9  subclasses, so that each Class 7 creditor would receive the

10 same pro rata recovery.  Debtors' Exhibit 21 reflects the

11 ultimate result of that exercise with 63 percent of the

12 guaranteed minimum allocated to Class 7.A and the remaining

13 37 percent to Class B.

14 With respect to litigation claims in 7.B that are

15 disputed and unliquidated, Mr. Jones and his team, with the

16 assistance of personnel from HCN who have historically

17 overseen the debtors' claim and litigation matters, and thus

18 possess relevant knowledge regarding the subject claims,

19 analyzed the historical five-year settlement history and

20 other various factors they determined to be key markers of

21 settlement value to determine ranges of likely claim

22 recoveries.  Prior judgment amounts were unavailable to

23 consider because none exist.

24 The desire and approach taken by the debtors to

25 divide the funds to ensure an equal pro rata recovery to all

1    unsecured creditors is commendable.  However, for reasons

2    explored by the litigation creditors during the confirmation

3    proceedings, there is a likely chance that the debtors'

4    estimates of the total claims pool of Class 7.B will be

5    incorrect and that the percentage recoveries to allowed

6    claimants in that class will be lower than 7.A.

7            The magnitude of any such disparity, however, is

8    unknown.  The estimate of aggregate 7.B claim amounts ranges

9    from the debtors' high estimate of 24.1 million to

10   approximately forty-eight --  488.7 million, representing the

11   aggregate of scheduled claims and asserted proofs of claim

12   that have not been objected to or estimated.

13           Nonetheless, even if the magnitude was sufficient

14   shown to be material, the discrimination would not rise to a

15   level --  to an unfair level.  The recoveries to creditors in

16   this case result from contributions of third parties.  Absent

17   the contributions of Omega and the contribution parties,

18   Class 7.B creditors would receive no recoveries on account of

19   their claims.  Accordingly, as explained by the Exide,

20   Nuverra, and Genesis Health decisions, any presumption of

21   unfairness as a result of possible material unequal

22   recoveries between creditors in Class 7.A and 7.B would be

23   rebutted.

24           In determining when a plan is proposed in good

25   faith, courts consider the totality of circumstances,

1    focusing more on the process of plan development than to the

2    context of the plan.  Good faith is shown when the plan has

3    been proposed for the purpose of reorganizing the debtor,

4    preserving the value of the estate, and delivering that value

5    to creditors.

6            On the other hand, good faith has been found to be

7    lacking if the plan is proposed with ulterior motives.  While

8    some of the objecting litigation creditors have argued that

9    the debtors lacked good faith in proposing the plan, that

10   objection is not sustainable given the facts adduced at trial

11   underlying the process undertaken to value estate causes of

12   action, analyze possible pathways to creditor recovery,

13   engage in substantive negotiations with key stakeholders

14   regarding a plan settlement with the assistance of an

15   experienced judicial mediator, all while facing extreme

16   liquidity constraints, and continuing to refine the

17   settlement and augment recoveries to unsecured creditors

18   embodied in the plan throughout the confirmation proceedings.

19           Circumstantial evidence relied upon by the

20   objecting parties to support an argument of bad faith,

21   including possible problems with the subclassification of

22   certain Class 7 claims, the Class 7.B vote tabulation, and

23   the assumption of certain 7.B settlements, is not

24   sufficiently persuasive to contradict the Court's conclusion

25   that the debtors acted in good faith when proposing the plan.

1          As related by the parties yesterday via joint email

2     to the Court, all but one of the remaining objections raised

3     by the U.S. Trustee in its formal objection had been

4     resolved.

5          The open objection relates to the debtors' request

6     in Article X(5) -- or excuse me --  10(f) to serve as the

7     exclusive gatekeeper post-confirmation with respect to

8     released claims.  In particular, the debtors had requested

9     that I retain sole and exclusive authority to determine

10    whether a claim or cause of action against a released party

11    arises from or is related to a debtor-released claim or a

12    third-party released claim and, in doing so, authorize such

13    party to bring the claim against the relevant release party.

14         I will sustain the U.S. Trustee's objection on this

15    point.  I see no reason to retain exclusive jurisdiction for

16    a determination that has been requested of me.  The

17    confirmation order says what it says, and the other courts

18    should be entitled to -- or excuse me --  the plan says what

19    it says, and other courts should be entitled to exercise

20    their authority to interpret it.

21         Imposing such a requirement could also impose an

22    unnecessary administrative hurdle and cost the parties when

23    these cases are closed.

24         That takes us to the last objection regarding the

25    trust procedures and trustee identification.  The litigation

creditors objected to the debtors' litigation claims

procedures and the identity of the litigation clams trustee,

as set forth in the plan supplement.  The debtors wish to

resolve the objections with the litigation claimants.

Given that it's unclear whether the plan will move

forward in these cases; and, if so, what form it will take, I

will not address these issues as they are not ripe.

For similar reasons, the Court --  myself --  has

not reviewed the debtors' revised proposed confirmation

order, but will do so, if appropriate, at a future time.

To the extent that the parties raise other

objections to confirmation of the plan that I have not

specifically addressed, they are overruled.

The plan, the evidence adduced in favor of

confirmation and the legal briefing support the conclusion

that the debtors have met all other confirmation requirements

of the Code, including those of Section 1122, 1123, and 1129,

and would be entitled to approval of their plan absent the

non-consensual third-party releases.

Thank you for enduring that lengthy oral ruling.  I

know that this is a lot of information for the parties to

process, and you may not have an understanding of how you

wish to move forward.  I guess I would suggest to the

parties, if they would like it, I'm happy to put a date on

the calendar in the near future for a status conference, or

1  you could reach out to my chambers and let me know whether

2  that would be something that the parties are interested in

3  doing.

4          MR. SIMON:  Thank you, Your Honor.

5          THE COURT:  Mr. Simon.

6          MR. SIMON:  Thank you, Your Honor.  Obviously it's

7  a lot to digest.  So perhaps we should convene with the

8  parties and come back to you as --  in connection with next

9  steps, and we'll reach out accordingly.

10          THE COURT:  Okay.  I have some time next week, so,

11  if you want to save any of that time or reserve any of that

12  time --

13          MR. SIMON:  Sure.

14          THE COURT:  -- just email Ms. Lopez and she will

15  get it on the calendar.

16          MR. SIMON:  Okay.

17          THE COURT:  Okay.

18          MR. SIMON:  Thank you, Your Honor.  We appreciate

19  that.

20          THE COURT:  All right.  Thank you all very much.

21  And I apologize, for some reason, my throat was acting up the

22  moment I took the bench today.  So, hopefully, you were able

23  to hear and understand that ruling.

24          And unless there's anything further, we will

25  adjourn for the day.

1          Mr. McNeill, I see that you're on the line.  Is

2     there anything that we need to talk about?

3          MR. MCNEILL:  No, Your Honor.  I just was putting

4     my face on the screen to thank Your Honor for your ruling.

5          THE COURT:  Okay.  Thank you, all, very much.  I

6     look forward to hearing from you all in the near future.  We

7     can consider this hearing adjourned.  Take care.  Have a good

8     night.

9          COUNSEL:  Thank you, Your Honor.  Thank you.

10        (Proceedings concluded at 4:04 p.m.)

11                              *****

1                          CERTIFICATION

2          I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8

9

10

11     _____        May 4, 2022

12     Coleen Rand, AAERT Cert. No. 341

13     Certified Court Transcriptionist

14     For Reliable

## **CERTIFICATE OF SERVICE**

I, Linda Richenderfer, hereby certify that I served copies of the *United States Trustee's Objection to Confirmation of Joint Chapter 11 Plan of SiO2 Medical Products, Inc. and its Debtor Affiliates* through the CM/ECF notification system and by email on July 13, 2023.


*s/Linda Richenderfer*

Linda Richenderfer