## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SIO2 MEDICAL PRODUCTS, INC., *et al.*,[1] | ) | Case No. 23-10366 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF FOURTH AMENDED PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** the documents contained herein are provided in accordance with the *Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc. and Its Debtor Affiliates* [Docket No. 372] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan")[2] and the Restructuring Support Agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, on June 30, 2023, the Debtors filed the *Plan Supplement* [Docket No. 416] (as may be amended from time to time, the "Initial Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT**, on July 4, 2023, the Debtors filed the *First Amended Plan Supplement* [Docket No. 418] (as may be amended from time to time, the "First Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT**, on July 12, 2023, the Debtors filed the *Second Amended Plan Supplement* [Docket No. 433] (as may be amended from time to time, the "Second Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT**, on July 14, 2023, the Debtors filed the *Third Amended Plan Supplement* [Docket No. 459] (as may be amended from time to time, the "Third Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT**, on July 19, 2023, the Court entered *Findings of Fact, Conclusions of Law, and Order Confirming the Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtor Affiliates* [Docket No. 478] (the "Confirmation Order").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this *Fourth Amended Plan Supplement* (as may be amended from time to time, the "Fourth Amended Plan

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510). The location of the Debtors' principal place of business and service address in these chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

[2]   Capitalized terms used but not defined herein have the same meaning as set forth in the Plan.

Supplement," and together with the Initial Plan Supplement, the First Amended Plan Supplement, the Second Amended Plan Supplement, and the Third Amended Plan Supplement, the "Plan Supplements") with the Court in support of confirmation of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Fourth Amended Plan Supplement contains current drafts of the following documents (which remain subject to ongoing negotiations among the Debtors and interested parties in accordance with the Plan and the Restructuring Support Agreement), as may be modified, amended, or supplemented from time to time.

| | |
|---|---|
| **Exhibit A** | New Organizational Documents |
| **Exhibit A-1** | Redline to New Organizational Documents Filed on June 30, 2023 |
| **Exhibit B** | Exit Financing Documents |
| **Exhibit B-1** | Redline to Exit Financing Documents Filed on June 30, 2023 |
| **Exhibit C** | Assumed Executory Contracts and Unexpired Leases List |
| **Exhibit C-1** | Redline to Assumed Executory Contracts and Unexpired Leases List Filed on July 12, 2023 |
| **Exhibit E** | Liquidation Trust Agreement |
| **Exhibit E-1** | Redline to Liquidation Trust Agreement Filed on June 30, 2023 |
| **Exhibit F** | Restructuring Transactions Memorandum |
| **Exhibit F-1** | Redline to Restructuring Transactions Memorandum Filed on July 14, 2023 |
| **Exhibit G** | Members of the New Board |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents, or portions thereof, contained in the Plan Supplements remain subject to ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto. The respective rights of the Debtors, Oaktree Capital Management, L.P. and/or any of its affiliates or funds (collectively, "Oaktree"), the Official Committee of Unsecured Creditors and certain other parties-in-interest are expressly reserved, subject and pursuant to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplements, and any of the documents and designations contained herein in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any other order of the Bankruptcy Court. The posting/filing of the forms of the documents included in the Plan Supplements shall not be deemed as acceptance of such document by any party to the Restructuring Support Agreement or a waiver of any of the rights of any such party under the Restructuring Support Agreement, the Plan, the Bankruptcy Code or otherwise. Each of the documents contained in the Plan Supplements, or amendments thereto, are subject to modification until the Effective Date and to the consent and approval rights provided in the Plan and the Restructuring Support Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** the Plan Supplements shall be deemed incorporated into and part of the Plan as if set forth therein in full. The documents contained in the Plan Supplements are integral to, and are considered part of, the Plan. The documents contained in the Plan Supplements are considered to be approved pursuant to the Confirmation Order. In the event of a conflict between the Plan and the Plan Supplements, the Plan Supplements, as applicable, shall control in accordance with Article I.G of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan Supplements and related documents may be obtained free of charge: (i) by request to the Debtors' counsel via email and (ii) at the website of the Debtors' claims and noticing agent, Donlin Recano & Company, Inc., https://www.donlinrecano.com/Clients/smp/Index. In addition, copies can also be downloaded for a fee from the Court's website, https://ecf.deb.uscourts.gov, referencing Case. No. 23-10366 (JTD). To access documents on the Court's website, you will need a PACER password and login which can be obtained at https://www.pacer.psc.uscourts.gov.

Dated:  August 3, 2023

*/s/ Justin R. Alberto*

Seth Van Aalten (admitted *pro hac vice*)
Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
Stacy L. Newman (No. 5044)
**COLE SCHOTZ P.C.**
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:     (302) 652-3131
Facsimile:      (302) 652-3117
Email:            svanaalten@coleschotz.com
                     jalberto@coleschotz.com
                     preilley@coleschotz.com
                     snewman@coleschotz.com

-and-

Brian Schartz, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            brian.schartz@kirkland.com

-and-

Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            dan.latona@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

## Exhibit A

**New Organizational Documents**

This <u>Exhibit A</u> includes the following New Organizational Documents of Reorganized SiO2:

- Exhibit A(i): Bylaws of Reorganized SiO2

Certain documents, or portions thereof, contained in this <u>Exhibit A</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Restructuring Support Agreement.

## Exhibit A(i)

**Bylaws of Reorganized SiO2**

**AMENDED AND RESTATED BYLAWS**

**OF**

**SiO2 MEDICAL PRODUCTS, INC.**

**EFFECTIVE AUGUST 3, 2023**

# TABLE OF CONTENTS

**Page**

**ARTICLE I OFFICES** ...................................................................................................1
    Section 1.1    Registered Office .....................................................................1
    Section 1.2    Additional Offices....................................................................1

**ARTICLE II MEETINGS OF STOCKHOLDERS** ...................................................1
    Section 2.1    Place of Meeting ......................................................................1
    Section 2.2    Annual Meetings......................................................................1
    Section 2.3    Notice of Annual Meetings......................................................1
    Section 2.4    List of Stockholders.................................................................1
    Section 2.5    Special Meetings......................................................................1
    Section 2.6    Notice of Special Meetings......................................................2
    Section 2.7    Business at Special Meetings...................................................2
    Section 2.8    Quorum....................................................................................2
    Section 2.9    Voting......................................................................................2
    Section 2.10   Proxies....................................................................................2
    Section 2.11   Conduct of Meetings; Organization.........................................3
    Section 2.12   Order of Business....................................................................3
    Section 2.13   Action by Consent...................................................................3

**ARTICLE III BOARD OF DIRECTORS**...................................................................4
    Section 3.1    Number ....................................................................................4
    Section 3.2    Term ........................................................................................4
    Section 3.3    Board Meetings........................................................................4
    Section 3.4    Regular Meetings.....................................................................4
    Section 3.5    Special Meetings......................................................................4
    Section 3.6    Actions Without a Meeting.......................................................4
    Section 3.7    Waivers of Notice ....................................................................4
    Section 3.8    Quorum; Telephone Meeting....................................................4
    Section 3.9    Powers.....................................................................................5
    Section 3.10   Committees..............................................................................5
    Section 3.11   Minutes of Committees............................................................6
    Section 3.12   Compensation..........................................................................6
    Section 3.13   Conflict of Interest ..................................................................6

**ARTICLE IV NOTICES**..............................................................................................7
    Section 4.1    Notice to Stockholders.............................................................7
    Section 4.2    Notice to Directors..................................................................7
    Section 4.3    Waiver of Notice .....................................................................7

**ARTICLE V OFFICERS**.............................................................................................7
    Section 5.1    Officers ...................................................................................7
    Section 5.2    Compensation..........................................................................8
    Section 5.3    Term of Office; Removal; Vacancies .......................................8

i

Section 5.4    Duties of Officers ..................................................................8

**ARTICLE VI CERTIFICATES OF STOCK** ..................................................**9**
Section 6.1    Certificates ...........................................................................9
Section 6.2    Signatures ...........................................................................10
Section 6.3    Lost, Stolen or Destroyed Certificates ..............................10
Section 6.4    Transfer of Stock ...............................................................10
Section 6.5    Record Date ........................................................................10
Section 6.6    Registered Stockholders ....................................................11

**ARTICLE VII INDEMNIFICATION** ..........................................................**11**
Section 7.1    Indemnification ..................................................................11
Section 7.2    Advancement of Expenses ..................................................12
Section 7.3    Insurance .............................................................................12
Section 7.4    Binding Effect ....................................................................12
Section 7.5    Procedural Rights ...............................................................12
Section 7.6    Survival of Right ................................................................13

**ARTICLE VIII GENERAL PROVISIONS** ..................................................**13**
Section 8.1    Dividends ............................................................................13
Section 8.2    Reserves ..............................................................................13
Section 8.3    Checks .................................................................................13
Section 8.4    Fiscal Year ..........................................................................13
Section 8.5    Seal......................................................................................13
Section 8.6    Contracts .............................................................................13
Section 8.7    Voting of Corporation's Securities .....................................13
Section 8.8    Electronic Signatures.. .......................................................14

**ARTICLE IX AMENDMENT OF BYLAWS** ...............................................**14**
Section 9.1    Procedure ............................................................................14

4890-5257-0989 v.7

# ARTICLE I
# OFFICES

**Section 1.1    Registered Office.** The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware, or such other place as the board of directors may designate.

**Section 1.2    Additional Offices.** The Corporation may also have offices at such other places both within and without the State of Delaware as the board of directors may from time to time determine or the business of the Corporation may require.

# ARTICLE II
# MEETINGS OF STOCKHOLDERS

**Section 2.1    Place of Meeting.** All meetings of the stockholders for the election of directors shall be held at such place as may be fixed from time to time by the board of directors, or at such other place either within or without the State of Delaware as shall be designated from time to time by the board of directors and stated in the notice of the meeting. Meetings of stockholders for any other purpose may be held at such time and place, within or without the State of Delaware, as shall be stated in the notice of the meeting.

**Section 2.2    Annual Meetings.** Annual meetings of stockholders shall be held each year at such time and place as determined by the board of directors of the Corporation and stated in the notice of the meeting, at which meeting the stockholders shall elect a board of directors in accordance with the requirements of Section 2.9 hereof and transact such other business as may properly be brought before the meeting.

**Section 2.3    Notice of Annual Meetings.** Unless otherwise required by law, written notice of the annual meeting stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

**Section 2.4    List of Stockholders.** The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least ten (10) days ending on the day before the meeting date, either on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or during ordinary business hours, at the principal executive offices of the Corporation. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders.

**Section 2.5    Special Meetings.** Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by law or by the Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), may be called by the chairman, or, in the absence of the chairman, by the president or the secretary at the request in writing of a majority of the board

of directors or at the request in writing of stockholders who own a majority of the shares of the issued and outstanding capital stock of the Corporation (on an as-converted to common stock basis) then entitled to vote at a meeting of the stockholders ("Special Meeting Requisite Percentage") and who have continuously held the Special Meeting Requisite Percentage for a one-year period ending on the date of the Secretary's receipt of the Special Meeting Request. Such request shall state the purpose or purposes of the proposed meeting.

**Section 2.6    Notice of Special Meetings.** Unless otherwise required by applicable law, written notice of a special meeting stating the place, date and time of the meeting and the purpose or purposes for which the meeting is called, shall be given, subject to <u>Section 4.3</u> hereof, not less than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting.

**Section 2.7    Business at Special Meetings.** Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice or in the waiver of such notice pursuant to <u>Section 4.3</u> hereof.

**Section 2.8    Quorum.** The holders of one vote more than fifty percent (i.e., 50% plus one share) of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws. When a quorum is once present to organize a meeting, it shall not be broken by the subsequent withdrawal of any stockholders or their proxies. At any meeting of stockholders, whether annual or special, or any adjournment thereof, including any such meeting at which a quorum shall not be present or represented, the stockholders entitled to vote thereat, whether present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record as of the new record date entitled to vote at the meeting.

**Section 2.9    Voting.** When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy at such meeting shall decide any question, including elections of directors by the stockholders of the Corporation, brought before such meeting, except to the extent a different vote is required by applicable law, the Certificate of Incorporation or these Bylaws. Each stockholder shall have the right to participate and vote in an annual or special meeting by means of conference telephone, video conference or other communications equipment by means of which all persons participating in the meeting can hear each other. For purposes of these Bylaws, a majority of votes cast shall mean that the number of votes cast "for" a director's election exceeds the number of votes cast "against" that director's election (with "abstentions" not counted as a vote cast either "for" or "against" that director's election).

**Section 2.10    Proxies.** Unless otherwise provided in the Certificate of Incorporation each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy

2

in the manner authorized by Section 212 of the General Corporation Law of the State of Delaware for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.

**Section 2.11    Conduct of Meetings; Organization.**

(a)    The board of directors may adopt by resolution such rules and regulations for the conduct of each meeting of stockholders as it shall deem appropriate. If the board of directors determines that any requirement in these Bylaws, the Certificate of Incorporation or any other applicable legal requirement has not been satisfied as to any nomination or other business proposed to be brought before a meeting of stockholders, then the board of directors may elect to (i) waive such deficiency with respect to such proposed nomination or other business, (ii) notify the stockholder of, and provide the stockholder with an opportunity to cure, such deficiency, or (iii) decline to allow the proposed nomination or other business to be transacted at the meeting, even if the Corporation has received proxies or votes in respect of those matters (which proxies and votes shall also be disregarded).

(b)    At each meeting of stockholders, the chairman, or in the absence of the chairman, the president, or if there is no president or if there be one and the president is absent, a vice president, and in case more than one vice president shall be present, that vice president designated by the board of directors (or in the absence of any such designation, the most senior vice president, based on age, present), shall act as chairman of the meeting. The secretary, or in his or her absence, one of the assistant secretaries, shall act as secretary of the meeting. In case none of the officers above designated to act as chairman or secretary of the meeting, respectively, shall be present, a chairman or a secretary of the meeting, as the case may be, shall be chosen by a majority of the votes cast at such meeting by the holders of shares of capital stock present in person or represented by proxy and entitled to vote at the meeting.

**Section 2.12    Order of Business.** The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting, but the order of business to be followed at any meeting at which a quorum is present may be changed by a majority of the votes cast at such meeting by the holders of shares of capital stock present in person or represented by proxy and entitled to vote at the meeting.

**Section 2.13    Action by Consent.** Unless otherwise required by applicable law or provided in the Certificate of Incorporation, any action required by applicable law to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of shares of the outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

3

## ARTICLE III
## BOARD OF DIRECTORS

**Section 3.1**    **Number.** The authorized number of directors of the Corporation shall be fixed by the board of directors from time to time. Each director shall be entitled to cast one (1) vote on any matter presented to the board of directors for its consideration. A majority of the directors on the board of directors at any given time shall have the right to elect, remove and replace the chairman of the board of directors.

**Section 3.2**    **Term.** Each director shall hold office until such director's successor is duly elected and qualified or until such director's earlier death, resignation, disqualification or removal.

**Section 3.3**    **Board Meetings.** All meetings of the board of directors will be held either within or without the State of Delaware, and/or by means of remote communication.

**Section 3.4**    **Regular Meetings.** Regular meetings of the board of directors shall be held at such time and place as shall from time to time be determined by resolution of the board of directors.

**Section 3.5**    **Special Meetings.** Special meetings of the board of directors may be called by any director of the board of directors at least 24 hours before the time at which the meeting is to commence, and such notice shall be delivered personally or sent electronic mail, fax, telegraphic or other electronic transmission, in each case with confirmation of receipt, unless such director has waived notice in accordance with Section 3.7. Telephone notice shall be deemed to be given when a director or a director's agent is personally given such notice in a telephone call to which a director or a director's agent is a party, and such director confirms receipt in writing to the Corporation. Electronic mail or transmittal notice shall be deemed to be given upon transmission of the message to the electronic mail address (or other electronic address) given to the Corporation by the director and receipt of a completed reply from the recipient indicating receipt. The business to be transacted at, and the purpose of, any special meeting of the board of directors must be stated in the notice of a special meeting.

**Section 3.6**    **Actions Without a Meeting.** Any action required or permitted to be taken at any meeting of the board of directors may be taken without a meeting if all members of the board of directors consent in writing, by electronic mail or by other electronic transmission, and such writing or writings or transmission or transmissions are filed with the minutes of proceedings of the board of directors.

**Section 3.7**    **Waivers of Notice.** Whenever the giving of any notice to the board is required by applicable law or these Bylaws, a waiver thereof, in writing and delivered to the Corporation signed by the director entitled to such notice, whether before or after the event as to which notice is required, shall be deemed equivalent to notice. Attendance of a director at a meeting or execution of a written consent to any action shall constitute a waiver of notice of such meeting or action.

**Section 3.8**    **Quorum; Telephone Meeting; Vote Required for Action.** At all meetings of the board of directors (whether in person or by telephone, video conference or other communications equipment by means of which all persons participating in the meeting can hear

4

each other), the presence of a majority of the directors (whether in person or by telephone or other communications equipment by means of which all persons participating in the meeting can hear each other) immediately before the meeting begins (including vacancies) shall be necessary to constitute a quorum for the transaction of business. If a quorum shall not be present at any meeting, the directors present may, by majority vote, adjourn the meeting until a quorum shall be present. Each director shall have the right to participate and vote in an annual or special meeting by means of conference telephone, video conference or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in a meeting by these means shall constitute presence in person at the meeting. The vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors unless applicable law, the Certificate of Incorporation or these Bylaws shall require a vote of a greater number.

**Section 3.9   Powers.** The business and operations of the Corporation shall be managed by or under the direction of its board of directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or by the Certificate of Incorporation or by these Bylaws directed or required to be exercised or done by the stockholders or any stockholder. The board of directors may adopt such rules and regulations, not inconsistent with applicable  law, the Certificate of Incorporation or these Bylaws, or as it may deem proper for the conduct of its meetings and the management of the Corporation. Unless otherwise prohibited by law, the Certificate of Incorporation or these Bylaws, the board of directors may delegate any of its powers, authority or duties (including any discretionary authority granted to the board of directors under these Bylaws) to a committee of the board of directors or to any officer or agent of the Corporation and upon such terms as it deems appropriate.

**Section 3.10   Committees.** The board of directors may, by resolution passed by a majority of the whole board, designate one or more committees, with each committee to consist of one or more of the directors of the Corporation. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent permitted by law and provided in a resolution of the board of directors, shall have and may exercise the powers and authority of the board of directors in the management of the business and operations of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the Certificate of Incorporation (except that a committee may, to the extent authorized in any resolution or resolutions providing for the issuance of shares of stock adopted by the board of directors as provided in Section 151(a) of the General Corporation Law of the State of Delaware, or any successor provision thereto and only to the extent consistent with the Certificate of Incorporation and these Bylaws, fix the designation and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the Corporation or the conversion into, or the exchange of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the Corporation or fix the number of shares of any series of stock or authorize the increase or decrease of the shares of any series), adopting an agreement of merger or consolidation,

recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, or amending the Bylaws of the Corporation; and, unless the resolution or the Certificate of Incorporation expressly so provides and then only to the extent consistent with the Certificate of Incorporation and these Bylaws, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock, or to adopt a certificate of ownership and merger pursuant to Section 253 of the General Corporation Law of the State of Delaware, or any successor provision thereto.

Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.

Section 3.11   **Minutes of Committees.** Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

Section 3.12   **Compensation.** The majority of the board of directors shall have the authority to fix the compensation of directors and such compensation shall be consistent with market rates for board service as reasonably determined by the board of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors together with reimbursement for the reasonable out-of-pocket expenses, if any, incurred by such director in connection with the performance of his or her duties. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending.

Section 3.13   **Conflict of Interest**.

(a)     No contract or other transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other Corporation, partnership, association or other organization in which one or more of the Corporation's directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for such reason, or solely because such director or directors or officer or officers are present at or participate in the meeting of the board of directors or a committee thereof which authorizes or approves the contract or transaction, or solely because such director's or directors' votes are counted for such purpose, if (1) the material facts as to such director's or directors' relationships or interests as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum, or (2) the material facts as to such director's or directors' relationships or interests as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders, or (3) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee thereof, or the stockholders.

(b)     Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction.

6

**ARTICLE IV**
**NOTICES**

**Section 4.1    Notice to Stockholders.** Whenever, under the provisions of applicable law or of the Certificate of Incorporation or of these Bylaws, notice is required to be given to any stockholder, it shall not be construed to mean personal notice only, and such notice shall be delivered personally or sent by registered mail (such notice shall be deemed to be delivered when deposited in the United States mail, with postage thereon prepaid, directed to the stockholder or such other security holder at its, his or her address as it appears on the records of the Corporation) or by electronic mail, fax, telegraphic or other electronic transmission, in each case with confirmation of receipt.

**Section 4.2    Notice to Directors.** Whenever, under the provisions of applicable law or of the Certificate of Incorporation or of these Bylaws, notice is required to be given to any director, it shall be delivered by the chairman, the president or the secretary to such director within the time provided in Section 3.5 of these Bylaws. Such notice either: (i) may be in writing (A) delivered personally, (B) delivered by electronic mail or by telecopier or other means of electronic transmittal to an address specified by such director, with confirmation of receipt or (D) delivered by telegram to an address specified by such director, with confirmation of receipt; or (ii) may be orally given either in person or by telephone, provided that the company receive a concurrent confirmation of receipt from the director via electronic mail or other electronic transmittal. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, so addressed, with postage thereon prepaid. If by electronic mail or by telecopier or other electronic means of transmittal, such notice shall be deemed delivered upon completion of transmittal from the sender thereof and confirmation of receipt from the director thereof, provided that it shall have been directed to such a place as is reasonably calculated to cause actual receipt of such notice by such director. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the board of directors need be specified in any notice of such meeting.

**Section 4.3    Waiver of Notice.** Whenever any notice is required to be given under the provisions of applicable law or of the Certificate of Incorporation or of these Bylaws to a stockholder or director, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance by a person at a meeting shall constitute a waiver of notice of such meeting except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors, or members of a committee of directors need to be specified in any written waiver of notice unless so required by the Certificate of Incorporation.

**ARTICLE V**
**OFFICERS**

**Section 5.1    Officers.** The officers of the Corporation shall be chosen by a majority of the board of directors. Any number of offices may be held by the same person unless the Certificate of Incorporation otherwise provides. The board of directors may appoint such other officers and

7

agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the board.

**Section 5.2    Compensation.** The salaries and other compensation of all officers and agents of the Corporation shall be fixed by a majority of the board of directors.

**Section 5.3    Term of Office; Removal; Vacancies.** The officers of the Corporation shall serve at the pleasure of the board of directors and shall hold office until their successors are duly elected and qualified or until their earlier death, resignation or removal, unless otherwise provided in the resolution of the board of directors electing any such officer. Any officer elected or appointed by the board of directors may be removed at any time with or without cause by the affirmative vote of a majority of the board of directors. Any vacancy occurring in any office of the Corporation shall be filled by the board of directors.

**Section 5.4    Duties of Officers.** The following officers of the Corporation, if and when elected by the board of directors of the Corporation, shall have the following duties (except to the extent otherwise determined by the board):

(a)    Chief Executive Officer. The Chief Executive Officer ("CEO") shall, subject to the direction of the board of directors, have general and active management, supervision and control of the business and all operations of the Corporation and, in the absence of the chairman, shall preside at all meetings of the stockholders and the board of directors. The CEO shall carry into effect, or shall cause to be carried into effect, all orders and resolutions of the board of directors. The CEO may execute certificates for shares of the Corporation and bonds, mortgages, deeds, contracts or other instruments on behalf of the Corporation except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the board of directors to some other officer or agent of the Corporation.

(b)    Vice Presidents. The vice presidents shall perform such other duties and have such other powers as the board of directors or CEO may from time to time prescribe.

(c)    Secretary. The secretary shall attend all meetings of the board of directors and all meetings of the stockholders and record all the proceedings of the meetings of the stockholders and of the board of directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required. The secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the board of directors, and shall perform such other duties as may be prescribed by the board of directors or president, under whose supervision the secretary shall be. The secretary shall have custody of the corporate seal of the Corporation and the secretary, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the secretary's signature or by the signature of such assistant secretary. The board of directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by such officer's signature.

(d)    Assistant Secretaries. The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors or the CEO (or if there

8

be no such determination, then in the order of their election), shall, in the absence of the secretary or in the event of the secretary's inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

(e)     <u>Treasurer</u>. The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the board of directors. The treasurer shall disburse the funds of the Corporation as may be ordered by the board of directors, taking proper vouchers for such disbursements, and shall render to the president and the board of directors, at its regular meetings or when the board of directors so requires, an account of all such treasurer's transactions as treasurer and of the financial condition of the Corporation. If required by the board of directors, the treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the treasurer's office and for the restoration to the Corporation, in case of the treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the treasurer's possession or under the treasurer's control belonging to the Corporation.

(f)     <u>Assistant Treasurers</u>. The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors or the CEO (or if there be no such determination, then in the order of their election), shall, in the absence of the treasurer or in the event of the treasurer's inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe. Each assistant treasurer, if required by the board of directors, shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the assistant treasurer's office and for the restoration to the Corporation, in case of the assistant treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the assistant treasurer's possession or under the assistant treasurer's control belonging to the Corporation.

## ARTICLE VI
## CERTIFICATES OF STOCK

**Section 6.1     Certificates.** Every holder of stock in the Corporation shall be entitled to have a certificate, signed by, or in the name of the Corporation by, the president or a vice president, and by the treasurer or an assistant treasurer or the secretary or an assistant secretary of the Corporation, certifying the number of shares owned by such holder of stock in the Corporation. Certificates may be issued for partly paid shares and in such case upon the face or back of the certificates issued to represent any such partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which

the Corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of the State of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the Corporation shall issue to represent such class or series of stock, a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

**Section 6.2    Signatures.** Any of or all the signatures on the certificate may be electronically transmitted. In case any officer, transfer agent or registrar who has signed or whose electronic of pdf signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

**Section 6.3    Lost, Stolen or Destroyed Certificates.** The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or such owner's legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

**Section 6.4    Transfer of Stock.** Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

**Section 6.5    Record Date.**

(a)    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the board of directors may fix a new record date for the adjourned meeting.

10

(b)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the board of directors. If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in the manner provided by Section 2.13(a) hereof. If no record date has been fixed by the board of directors and prior action by the board of directors is required, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

(c)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

**Section 6.6    Registered Stockholders.** The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.1    Indemnification.** To the extent not prohibited by law, the Corporation shall indemnify any person who is or was made, or threatened to be made, a party to any threatened, pending or completed action, suit or proceeding (a "Proceeding"), whether civil, criminal, administrative or investigative, including, without limitation, an action by or in the right of the Corporation to procure a judgment in its favor, by reason of the fact that such person, or a person of whom such person is the legal representative, is or was a director or officer of the Corporation, or, at the request of the Corporation, is or was serving as a director or officer of any other Corporation or in a capacity with comparable authority or responsibilities for any limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise (an "Other Entity"), against judgments, fines, penalties, excise taxes, amounts paid in settlement and costs, charges and expenses (including attorneys' fees, disbursements and other charges). Persons who are not directors or officers of the Corporation (or otherwise entitled to indemnification pursuant to the preceding sentence) may be similarly indemnified in respect of service to the Corporation or to an Other Entity at the request of the Corporation to the extent the board of directors at any

11

time specifies that such persons are entitled to the benefits of this Article 7. The indemnification and advancement of expenses pursuant to this Article 7 shall be in addition to, and not exclusive of, any other right that the person seeking indemnification may have under these Bylaws, the Certificate of Incorporation, any separate contract or agreement or applicable law.

**Section 7.2      Advancement of Expenses.** The Corporation shall, from time to time, reimburse or advance to any director or officer or other person entitled to indemnification hereunder the funds necessary for payment of expenses, including attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; provided, however, that, if required by law or by the board of directors, such expenses incurred by or on behalf of any director or officer or other person may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer (or other person indemnified hereunder), to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director, officer or other person is not entitled to be indemnified for such expenses.

**Section 7.3      Insurance.** The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or any person who is or was serving at the request of the Corporation as a director, officer, employee, or agent of another Corporation, partnership, joint venture, trust, or other enterprise, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under applicable law.

**Section 7.4      Binding Effect.** The provisions of this Article 7 shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Article 7 is in effect and any other person entitled to indemnification hereunder, on the other hand, pursuant to which the Corporation and each such director, officer or other person intend to be, and shall be legally bound. No repeal or modification of this Article 7 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or thereafter arising or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

**Section 7.5      Procedural Rights.** The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Article 7 shall be enforceable by any person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction. The burden of proving that such indemnification or reimbursement or advancement of expenses is not appropriate shall be on the Corporation. Neither the failure of the Corporation (including its board of directors, its independent legal counsel and its stockholders) to have made, a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its board of directors, its independent legal counsel and its stockholders) that such person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such person is not so entitled. Such a person shall also be indemnified for any expenses incurred in connection with successfully establishing his or her right to such

indemnification or reimbursement or advancement of expenses, in whole or in part, in any such proceeding.

Section 7.6   **Survival of Right.** Any right to indemnification or advancement of expenses provided by or granted pursuant to this Article 7 shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors, administrators and personal representatives of such a person.

# ARTICLE VIII
# GENERAL PROVISIONS

Section 8.1   **Dividends.** Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the board of directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of capital stock, subject to the provisions of the Certificate of Incorporation.

Section 8.2   **Reserves.** Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the directors shall think conducive to the interest of the Corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 8.3   **Checks.** All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the board of directors may from time to time designate.

Section 8.4   **Fiscal Year.** The fiscal year of the Corporation shall be fixed by resolution of the board of directors.

Section 8.5   **Seal.** The board of directors may adopt a corporate seal; alter such seal at pleasure, and authorize it to be used by causing it or a reproduction of such seal to be affixed or impressed or reproduced in any other manner.

Section 8.6   **Contracts.** The board of directors may authorize any officer, agent or employee to enter into any contract, instrument or agreement on behalf of the Corporation, and the authority granted may be general or confined to specific instances. Except as provided in this section or as authorized by the board of directors, no officer, agent, or employee, other than the president, any vice president, the secretary or the treasurer, shall have any power or authority to bind the Corporation by any contract, instrument or agreement, to pledge its credit, or to render it liable, for any purpose or any amount.

Section 8.7   **Voting of Corporation's Securities.** Unless otherwise ordered by the board of directors, any officer shall have full power and authority on behalf of the Corporation to attend and to act and to vote, and to execute a proxy or proxies empowering others to attend and to act and to vote, at any meetings of security holders of any corporation or other entity in which the Corporation may hold securities, and at such meetings the president, or such other officer of the Corporation, or such proxy shall possess and may exercise any and all rights and powers

13

incident to the ownership of such securities, and which as the owner thereof the Corporation might have possessed and exercised, if present. The secretary or any assistant secretary may affix the corporate seal to any such proxy or proxies so executed by the president, or such other officer, and attest the same. The board of directors by resolution from time to time may confer like powers upon any other person or persons.

Section 8.8    **Electronic Signatures.** Unless otherwise required by law, whenever the Certificate of Incorporation or these Bylaws require or permit a signature, such signature may be a manual, facsimile, conformed or electronic signature.

**ARTICLE IX**
**AMENDMENT OF BYLAWS**

Section 9.1    **Procedure.** Subject to applicable law and the Certificate of Incorporation, these Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the affirmative vote of the stockholders owning a majority of the voting power of all the then outstanding capital stock of the Corporation or by resolution of the board of directors.

14

## HISTORY OF BYLAWS

1.      **Initial Adoption: April 31, 2011.**

2.      **Subsequent Adoption: As of June 15, 2015.**

3.      **Subsequent Adoption: As of November 12, 2015.**

4.      **Subsequent Amendment: As of February 27, 2017.**

5.      **Subsequent Amendment: As of September 26, 2018.**

6.      **Subsequent Amendment: As of September 24, 2019.**

7.      **Subsequent Amendment and Restatement: As of December 20, 2021.**

8.      **Subsequent Amendment and Restatement: As of July 5, 2022.**

9.      **Subsequent Amendment and Restatement: As of January 25, 2023.**

10.     **Subsequent Amendment and Restatement: As of August 3, 2023.**

### Exhibit A-1

**Redline to New Organizational
Documents Filed on June 30, 2023**

## <u>Exhibit A-1(i)</u>

**Redline to Bylaws of
Reorganized SiO2 Filed on June 30, 2023**

*[Different first page setting changed from off in original to on in modified.].*

**AMENDED AND RESTATED BYLAWS ~~OF~~**

**<u>OF</u>**

**SiO2 MEDICAL PRODUCTS, INC.**

**EFFECTIVE ~~JULY [ ]~~<u>AUGUST 3</u>, 2023**

# TABLE OF CONTENTS

**Page**

**ARTICLE I OFFICES** .................................................................................................. **1**

**ARTICLE I OFFICES** .................................................................................................. **1**

    Section 1.1    Registered Office ......................................................................1

    Section 1.2    Additional Offices ....................................................................1

**ARTICLE II MEETINGS OF STOCKHOLDERS.** ................................................... **1**

**ARTICLE II MEETINGS OF STOCKHOLDERS** ................................................... **1**

    Section 2.1    Place of Meeting .......................................................................1

    Section 2.2    Annual Meetings ......................................................................1

    Section 2.3    Notice of Annual Meetings ......................................................1

    Section 2.4    List of Stockholders .................................................................1

    Section 2.5    Special Meetings ....................................................................21

    Section 2.6    Notice of Special Meetings .....................................................2

    Section 2.7    Business at Special Meetings ...................................................2

    Section 2.8    Quorum .....................................................................................2

    Section 2.9    Voting .......................................................................................2

    Section 2.10   Proxies. .....................................................................................3

    Section 2.11   Conduct of Meetings; Organization ........................................3

    Section 2.12   Order of Business .....................................................................3

    Section 2.13   Action by Consent ...................................................................3

**ARTICLE III BOARD OF DIRECTORS** .............................................................. **4**

    Section 2.13   Action by Consent. ..................................................................3

**ARTICLE III BOARD OF DIRECTORS** .............................................................. **4**

    Section 3.1    Number .....................................................................................4

    Section 3.2    Term .........................................................................................4

    Section 3.3    Board Meetings ........................................................................4

    Section 3.4    Regular Meetings .....................................................................4

    Section 3.5    Special Meetings ......................................................................4

    Section 3.6    Actions Without a Meeting ......................................................4

    Section 3.7    Waivers of Notice ..................................................................54

    Section 3.8    Quorum; Telephone Meeting ...................................................5

    Section 3.9    Powers ......................................................................................5

    Section 3.10   Committees ...............................................................................5

    Section 3.11   Minutes of Committees ............................................................6

    Section 3.12   Compensation ...........................................................................6

    Section 3.13   Conflict of Interest ..................................................................6

**ARTICLE IV NOTICES** ......................................................................................... **7**

    Section 3.13   Conflict of Interest ..................................................................6

**ARTICLE IV NOTICES** ......................................................................................... **7**

4890-5257-0989 v.3

*[Different first page setting changed from off in original to on in modified.].*

Section 4.1   Notice to Stockholders .......... 7
Section 4.2   Notice to Directors .......... 7
Section 4.3   Waiver of Notice .......... 7

**ARTICLE V OFFICERS** .......... **8**

**ARTICLE V OFFICERS** .......... **8**
Section 5.1   Officers .......... 8
Section 5.2   Additional Officers .......... **Error! Bookmark not defined.**
Section 5.32   Compensation .......... 8
Section 5.43   Term of Office; Removal; Vacancies .......... 8
Section 5.54   Duties of Officers .......... 8

**ARTICLE VI CERTIFICATES OF STOCK** .......... **9**

**ARTICLE VI CERTIFICATES OF STOCK** .......... **9**
Section 6.1   Certificates .......... 9
Section 6.2   Signatures .......... 10
Section 6.3   Lost, Stolen or Destroyed Certificates .......... 10
Section 6.4   Transfer of Stock .......... 10
Section 6.5   Record Date .......... 10
Section 6.5   Record Date .......... 10
Section 6.6   Registered Stockholders .......... 11

**ARTICLE VII INDEMNIFICATION** .......... **11**

**ARTICLE VII INDEMNIFICATION** .......... **11**
Section 7.1   Indemnification .......... 11
Section 7.2   Advancement of Expenses .......... 12
Section 7.3   Insurance .......... 12
Section 7.4   Binding Effect .......... 12
Section 7.5   Procedural Rights .......... 1223
Section 7.6   Survival of Right .......... 13

**ARTICLE VIII GENERAL PROVISIONS** .......... **13**

**ARTICLE VIII GENERAL PROVISIONS** .......... **13**
Section 8.1   Dividends .......... 13
Section 8.2   Reserves .......... 13
Section 8.3   Checks .......... 13
Section 8.4   Fiscal Year .......... 13
Section 8.5   Seal .......... 13
Section 8.6   Contracts .......... 1334
Section 8.7   Voting of Corporation's Securities .......... 14

**ARTICLE IX AMENDMENT OF BYLAWS** .......... **14**

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*
ii
4890-5257-0989 v.3

*[Different first page setting changed from off in original to on in modified.].*

Section 8.8     Electronic Signatures..                                                    14

**ARTICLE IX AMENDMENT OF BYLAWS**                                                      **14**
      Section 9.1     Procedure                                                          14

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*
iii
4890-5257-0989 v.3

## ARTICLE I ~~ARTICLE I~~
## OFFICES

**Section 1.1** ~~Section 1.1~~ **Registered Office.** The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware, or such other place as the board of directors may designate.

**Section 1.2** ~~Section 1.2~~ **Additional Offices.** The Corporation may also have offices at such other places both within and without the State of Delaware as the board of directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II ~~ARTICLE II~~
## MEETINGS OF STOCKHOLDERS

**Section 2.1** ~~Section 2.1~~ **Place of Meeting.** All meetings of the stockholders for the election of directors shall be held at such place as may be fixed from time to time by the board of directors, or at such other place either within or without the State of Delaware as shall be designated from time to time by the board of directors and stated in the notice of the meeting. Meetings of stockholders for any other purpose may be held at such time and place, within or without the State of Delaware, as shall be stated in the notice of the meeting.

**Section 2.2** ~~Section 2.2~~ **Annual Meetings.** Annual meetings of stockholders shall be held each year at such time and place as determined by the board of directors of the Corporation and stated in the notice of the meeting, at which meeting the stockholders shall elect a board of directors in accordance with the requirements of Section 2.9 hereof and transact such other business as may properly be brought before the meeting.

**Section 2.3** ~~Section 2.3~~ **Notice of Annual Meetings.** Unless otherwise required by law, written notice of the annual meeting stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

**Section 2.4** ~~Section 2.4~~ **List of Stockholders.** The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least ten (10) days ~~prior to~~ending on the day before the meeting _date_, either on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or during ordinary business hours, at the principal executive offices of the Corporation. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders. ~~If the meeting is to be held at a place, then a list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present. If the meeting is to be held by means of remote communication, then such list shall also be open to the examination of~~

~~any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.~~

**Section 2.5** ~~Section 2.5~~ **Special Meetings.** Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by law or by the Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), may be called by the chairman, or, in the absence of the chairman, by the president or the secretary at the request in writing of a majority of the board of directors or at the request in writing of stockholders ~~owning~~who own a majority of the shares of the issued and outstanding capital stock of the Corporation (on an as-converted to common stock basis) then entitled to vote at a meeting of the stockholders ("Special Meeting Requisite Percentage") and who have continuously held the Special Meeting Requisite Percentage for a one-year period ending on the date of the Secretary's receipt of the Special Meeting Request. Such request shall state the purpose or purposes of the proposed meeting.

**Section 2.6** ~~Section 2.6~~ **Notice of Special Meetings.** Unless otherwise required by applicable law, written notice of a special meeting stating the place, date and ~~hour~~time of the meeting and the purpose or purposes for which the meeting is called, shall be given, subject to Section 4.3 hereof, not less than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting.

**Section 2.7** ~~Section 2.7~~ **Business at Special Meetings.** Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice or in the waiver of such notice pursuant to ~~Section 4.3~~Section 4.3 hereof.

**Section 2.8** ~~Section 2.8~~ **Quorum.** The holders of one vote more than fifty percent (i.e., 50% plus one share) of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws. When a quorum is once present to organize a meeting, it shall not be broken by the subsequent withdrawal of any stockholders or their proxies. At any meeting of stockholders, whether annual or special, or any adjournment thereof, including any such meeting at which a quorum shall not be present or represented, the stockholders entitled to vote thereat, whether present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record as of the new record date entitled to vote at the meeting.

**Section 2.9** ~~Section 2.9~~ **Voting.** When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy at such meeting shall decide any question, [including elections of directors by the stockholders of the Corporation], brought before such meeting, except to the extent a different vote is required by ~~express provision of the statutes, of~~applicable law, the Certificate of Incorporation or ~~of~~ these Bylaws. Each stockholder shall have the right to participate and vote in an annual or special meeting by means of conference telephone, video conference or other communications equipment

*[Different first page setting changed from off in original to on in modified.]*.

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 33 of 468

by means of which all persons participating in the meeting can hear each other. [For purposes of these Bylaws, a majority of votes cast shall mean that the number of votes cast "for" a director's

4890-5257-0989 v.3

election exceeds the number of votes cast "against" that director's election (with "abstentions" not counted as a vote cast either "for" or "against" that director's election).]

Section 2.10 ~~Section 2.10~~ **Proxies.** Unless otherwise provided in the Certificate of Incorporation each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy in the manner authorized by Section 212 of the General Corporation Law of the State of Delaware for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.

**Section 2.11** **Conduct of Meetings; Organization.**

(a)     The board of directors may adopt by resolution such rules and regulations for the conduct of each meeting of stockholders as it shall deem appropriate. If the board of directors determines that any requirement in these Bylaws, the Certificate of Incorporation or any other applicable legal requirement has not been satisfied as to any nomination or other business proposed to be brought before a meeting of stockholders, then the board of directors may elect to (i) waive such deficiency with respect to such proposed nomination or other business, (ii) notify the stockholder of, and provide the stockholder with an opportunity to cure, such deficiency, or (iii) decline to allow the proposed nomination or other business to be transacted at the meeting, even if the Corporation has received proxies or votes in respect of those matters (which proxies and votes shall also be disregarded).

(b)     ~~Section 2.11 Organization.~~ At each meeting of stockholders, the chairman, or in the absence of the chairman, the president, or if there is no president or if there be one and the president is absent, a vice president, and in case more than one vice president shall be present, that vice president designated by the board of directors (or in the absence of any such designation, the most senior vice president, based on age, present), shall act as chairman of the meeting. The secretary, or in his or her absence, one of the assistant secretaries, shall act as secretary of the meeting. In case none of the officers above designated to act as chairman or secretary of the meeting, respectively, shall be present, a chairman or a secretary of the meeting, as the case may be, shall be chosen by a majority of the votes cast at such meeting by the holders of shares of capital stock present in person or represented by proxy and entitled to vote at the meeting.

Section 2.12 ~~Section 2.12~~ **Order of Business.** The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting, but the order of business to be followed at any meeting at which a quorum is present may be changed by a majority of the votes cast at such meeting by the holders of shares of capital stock present in person or represented by proxy and entitled to vote at the meeting.

Section 2.13 ~~Section 2.13~~ **Action by Consent.**: Unless otherwise required by applicable law or provided in the Certificate of Incorporation, any action required by applicable law to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of shares of the outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the

4890-5257-0989 v.3

Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

(b) Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered to the Corporation in the manner required by paragraph (a) of this Section 2.13, written consents signed

5

~~by a sufficient number of holders to take action are delivered to the Corporation in the manner provided in said paragraph (a).~~

~~(c)Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders (i) who have not consented in writing and (ii) who if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders or members to take the action were delivered to the Corporation in the manner required by Section 2.13(a). Failure to provide such notice will not impair or invalidate any corporate action taken by written consent, in accordance with this Section 2.13.~~

## ARTICLE III ~~ARTICLE III~~
## BOARD OF DIRECTORS

**Section 3.1** ~~Section 3.1~~ **Number.** The authorized number of directors of the Corporation shall be fixed by the board of directors from time to time. Each director shall be entitled to cast one (1) vote on any matter presented to the board of directors for its consideration. A majority of the directors on the board of directors at any given time shall have the right to elect, remove and replace the chairman of the board of directors.

**Section 3.2** ~~Section 3.2~~ **Term.** Each director shall hold office until such director's successor is duly elected and qualified or until such director's earlier death, resignation, disqualification or removal.

**Section 3.3** ~~Section 3.3~~ **Board Meetings.** All meetings of the board of directors will be held either within or without the State of Delaware, and/or by means of remote communication.

**Section 3.4** ~~Section 3.4~~ **Regular Meetings.** Regular meetings of the board of directors shall be held at such time and place as shall from time to time be determined by resolution of the board of directors.

**Section 3.5** ~~Section 3.5~~ **Special Meetings.** Special meetings of the board of directors may be called by any director of the board of directors at least 24 hours before the time at which the meeting is to commence, and such notice shall be delivered personally or sent electronic mail, fax, telegraphic or other electronic transmission, in each case with confirmation of receipt, unless such director has waived notice in accordance with Section 3.7. Telephone notice shall be deemed to be given when a director or a director's agent is personally given such notice in a telephone call to which a director or a director's agent is a party, and such director confirms receipt in writing to the Corporation. Electronic mail or transmittal notice shall be deemed to be given upon transmission of the message to the electronic mail address (or other electronic address) given to the Corporation by the director and receipt of a completed reply from the recipient indicating receipt. The business to be transacted at, and the purpose of, any special meeting of the board of directors must be stated in the notice of a special meeting.

**Section 3.6** ~~Section 3.6~~ **Actions Without a Meeting.** Any action required or permitted to be taken at any meeting of the board of directors may be taken without a meeting if all members of the board of directors consent in writing, by electronic mail or by other electronic transmission, and such writing or writings or transmission or transmissions are filed with the minutes of proceedings of the board of directors.

4890-5257-0989 v.3

Section 3.7    ~~Section 3.7~~ **Waivers of Notice**. Whenever the giving of any notice to the board is required by <u>applicable</u> law or these Bylaws, a waiver thereof, in writing and delivered to the Corporation signed by the director entitled to such notice, whether before or after the event as to which notice is required, shall be deemed equivalent to notice. Attendance of a director at a meeting or execution of a written consent to any action shall constitute a waiver of notice of such meeting or action.

Section 3.8    ~~Section 3.8~~ **Quorum; Telephone Meeting<u>; Vote Required for Action</u>**. At all meetings of the board of directors (whether in person or by telephone, video conference or other communications equipment by means of which all persons participating in the meeting can hear each other), the presence of a majority of the directors (whether in person or by telephone or other communications equipment by means of which all persons participating in the meeting can hear each other) immediately before the meeting begins (including vacancies) shall be necessary to constitute a quorum for the transaction of business. If a quorum shall not be present at any meeting, the directors present may<u>, by majority vote,</u> adjourn the meeting until a quorum shall be present. Each director shall have the right to participate and vote in an annual or special meeting by means of conference telephone, video conference or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in a meeting by these means shall constitute presence in person at the meeting. <u>The vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors unless applicable law, the Certificate of Incorporation or these Bylaws shall require a vote of a greater number.</u>

Section 3.9    ~~Section 3.9~~ **Powers**. The business and operations of the Corporation shall be managed by or under the direction of its board of directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or by the Certificate of Incorporation or by these Bylaws directed or required to be exercised or done by the stockholders or any stockholder. The board of directors may adopt such rules and regulations, not inconsistent with applicable law, the Certificate of Incorporation or these Bylaws, or as it may deem proper for the conduct of its meetings and the management of the Corporation. <u>Unless otherwise prohibited by law, the Certificate of Incorporation or these Bylaws, the board of directors may delegate any of its powers, authority or duties (including any discretionary authority granted to the board of directors under these Bylaws) to a committee of the board of directors or to any officer or agent of the Corporation and upon such terms as it deems appropriate.</u>

Section 3.10    ~~Section 3.10~~ **Committees**. The board of directors may, by resolution passed by a majority of the whole board, designate one or more committees, <u>with</u> each committee to consist of one or more of the directors of the Corporation. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent <u>permitted by law and</u> provided in a resolution of the board of directors, shall have and may exercise the powers and authority of the board of directors in the management of the business and operations of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the Certificate of

4890-5257-0989 v.3

Incorporation (except that a committee may, to the extent authorized in any resolution or resolutions providing for the issuance of shares of stock adopted by the board of directors as provided in Section 151(a) of the General Corporation Law of the State of Delaware, or any successor provision thereto and only to the extent consistent with the Certificate of Incorporation and these Bylaws, fix the designation and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the Corporation or the conversion into, or the exchange

4890-5257-0989 v.3

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 39 of 468

of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the Corporation or fix the number of shares of any series of stock or authorize the increase or decrease of the shares of any series), adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, or amending the Bylaws of the Corporation; and, unless the resolution or the Certificate of Incorporation expressly so provides and then only to the extent consistent with the Certificate of Incorporation and these Bylaws, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock, or to adopt a certificate of ownership and merger pursuant to Section 253 of the General Corporation Law of the State of Delaware, or any successor provision thereto.

Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.

**Section 3.11** ~~Section 3.11~~ **Minutes of Committees.** Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

**Section 3.12** ~~Section 3.12~~ **Compensation.** The majority of the board of directors shall have the authority to fix the compensation of directors and such compensation shall be consistent with market rates for board service as reasonably determined by the board of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors together with reimbursement for the reasonable out-of-pocket expenses, if any, incurred by such director in connection with the performance of his or her duties. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending.

**Section 3.13** ~~Section 3.13~~ **Conflict of Interest**.

(a)      No contract or other transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other Corporation, partnership, association or other organization in which one or more of the Corporation's directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for such reason, or solely because such director or directors or officer or officers are present at or participate in the meeting of the board of directors or a committee thereof which authorizes or approves the contract or transaction, or solely because such director's or directors' votes are counted for such purpose, if (1) the material facts as to such director's or directors' relationships or interests as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum, or (2) the material facts as to such director's or directors' relationships or interests as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders, or (3) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee thereof, or the stockholders.

4890-5257-0989 v.3

*[Different first page setting changed from off in original to on in modified.]*.

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 40 of 468

(b)     Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction.

## ARTICLE IV ~~ARTICLE IV~~
## NOTICES

**Section 4.1**   ~~Section 4.1~~ **Notice to Stockholders.** Whenever, under the provisions of applicable law or of the Certificate of Incorporation or of these Bylaws, notice is required to be given to any stockholder, it shall not be construed to mean personal notice only, and such notice shall be delivered personally or sent by registered mail (such notice shall be deemed to be delivered when deposited in the United States mail, with postage thereon prepaid, directed to the stockholder or such other security holder at its, his or her address as it appears on the records of the Corporation) or by electronic mail, fax, telegraphic or other electronic transmission, in each case with confirmation of receipt.

**Section 4.2**   ~~Section 4.2~~ **Notice to Directors.** Whenever, under the provisions of applicable law or of the Certificate of Incorporation or of these Bylaws, notice is required to be given to any director, it shall be delivered by the chairman, the president or the secretary to such director within the time provided in <u>Section 3.5</u> of these Bylaws. Such notice either: (i) may be in writing (A) delivered personally, (B) delivered by electronic mail or by telecopier or other means of electronic transmittal to an address specified by such director, with confirmation of receipt or (D) delivered by telegram to an address specified by such director, with confirmation of receipt; or

~~(ii)~~ (ii) may be orally given either in person or by telephone, provided that the company receive a concurrent confirmation of receipt from the director via electronic mail or other electronic transmittal. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, so addressed, with postage thereon prepaid. If by electronic mail or by telecopier or other electronic means of transmittal, such notice shall be deemed delivered upon completion of transmittal from the sender thereof and confirmation of receipt from the director thereof, provided that it shall have been directed to such a place as is reasonably calculated to cause actual receipt of such notice by such director. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the board of directors need be specified in any notice of such meeting.

**Section 4.3**   ~~Section 4.3~~ **Waiver of Notice.** Whenever any notice is required to be given under the provisions of applicable law or of the Certificate of Incorporation or of these Bylaws to a stockholder or director, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance by a person at a meeting shall constitute a waiver of notice of such meeting except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors, or members of a committee of directors need to be specified in any written waiver of notice unless so required by the Certificate of Incorporation.

4890-5257-0989 v.3

# ARTICLE V ~~ARTICLE V~~
## OFFICERS

**Section 5.1** ~~Section 5.1~~ **Officers.** The officers of the Corporation shall be chosen by a majority of the board of directors. Any number of offices may be held by the same person unless the Certificate of Incorporation otherwise provides. The board of directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the board.

**Section 5.2** ~~Section 5.2~~ **Compensation.** The salaries and other compensation of all officers and agents of the Corporation shall be fixed by a majority of the board of directors.

**Section 5.3** ~~Section 5.3~~ **Term of Office; Removal; Vacancies.** The officers of the Corporation shall serve at the pleasure of the board of directors and shall hold office until their successors are duly elected and qualified or until their earlier death, resignation or removal, unless otherwise provided in the resolution of the board of directors electing any such officer. Any officer elected or appointed by the board of directors may be removed at any time with or without cause by the affirmative vote of a majority of the board of directors. Any vacancy occurring in any office of the Corporation shall be filled by the board of directors.

**Section 5.4** ~~Section 5.4~~ **Duties of Officers.** The following officers of the Corporation, if and when elected by the board of directors of the Corporation, shall have the following duties (except to the extent otherwise determined by the board):

    (a)   <u>Chief Executive Officer</u>. The Chief Executive Officer ("CEO") shall, subject to the direction of the board of directors, have general and active management, supervision and control of the business and all operations of the Corporation and, in the absence of the chairman, shall preside at all meetings of the stockholders and the board of directors. The CEO shall carry into effect, or shall cause to be carried into effect, all orders and resolutions of the board of directors. The CEO may execute certificates for shares of the Corporation and bonds, mortgages, deeds, contracts or other instruments on behalf of the Corporation except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the board of directors to some other officer or agent of the Corporation.

    (b)   <u>Vice Presidents</u>. The vice presidents shall perform such other duties and have such other powers as the board of directors or CEO may from time to time prescribe.

    (c)   <u>Secretary</u>. The secretary shall attend all meetings of the board of directors and all meetings of the stockholders and record all the proceedings of the meetings of the stockholders and of the board of directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required. The secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the board of directors, and shall perform such other duties as may be prescribed by the board of directors or president, under whose supervision the secretary shall be. The secretary shall have custody of the corporate seal of the Corporation and the secretary, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the secretary's

signature or by the signature of such assistant secretary. The board of directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by such officer's signature.

(d)     Assistant Secretaries. The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors or the CEO (or if there be no such determination, then in the order of their election), shall, in the absence of the secretary or in the event of the secretary's inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

(e)     Treasurer. The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the board of directors. The treasurer shall disburse the funds of the Corporation as may be ordered by the board of directors, taking proper vouchers for such disbursements, and shall render to the president and the board of directors, at its regular meetings or when the board of directors so requires, an account of all such treasurer's transactions as treasurer and of the financial condition of the Corporation. If required by the board of directors, the treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the treasurer's office and for the restoration to the Corporation, in case of the treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the treasurer's possession or under the treasurer's control belonging to the Corporation.

(f)     Assistant Treasurers. The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors or the CEO (or if there be no such determination, then in the order of their election), shall, in the absence of the treasurer or in the event of the treasurer's inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe. Each assistant treasurer, if required by the board of directors, shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the assistant treasurer's office and for the restoration to the Corporation, in case of the assistant treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the assistant treasurer's possession or under the assistant treasurer's control belonging to the Corporation.

## ARTICLE VI ~~ARTICLE VI~~
## CERTIFICATES OF STOCK

**Section 6.1** ~~Section 6.1~~ **Certificates.** Every holder of stock in the Corporation shall be entitled to have a certificate, signed by, or in the name of the Corporation by, the president or a vice president, and by the treasurer or an assistant treasurer or the secretary or an assistant secretary of the Corporation, certifying the number of shares owned by such holder of stock in the Corporation. Certificates may be issued for partly paid shares and in such case upon the face or

4890-5257-0989 v.3

back of the certificates issued to represent any such partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the Corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of the State of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the Corporation shall issue to represent such class or series of stock, a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

**Section 6.2**   ~~Section 6.2~~ **Signatures.** Any of or all the signatures on the certificate may be electronically transmitted. In case any officer, transfer agent or registrar who has signed or whose electronic of pdf signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

**Section 6.3**   ~~Section 6.3~~ **Lost, Stolen or Destroyed Certificates.** The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or such owner's legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

**Section 6.4**   ~~Section 6.4~~ **Transfer of Stock.** Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

**Section 6.5**   ~~Section 6.5~~   **Record Date**.

(a)    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the board of directors, the record date for determining stockholders

entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the board of directors may fix a new record date for the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the board of directors. If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in the manner provided by ~~Section 2.13(a)~~Section 2.13(a) hereof. If no record date has been fixed by the board of directors and prior action by the board of directors is required, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

(c)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

**Section 6.6**    ~~Section 6.6~~ **Registered Stockholders.** The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

**ARTICLE VII** ~~ARTICLE VII~~
**INDEMNIFICATION**

**Section 7.1**    ~~Section 7.1~~ **Indemnification.** To the extent not prohibited by law, the Corporation shall indemnify any person who is or was made, or threatened to be made, a party to any threatened, pending or completed action, suit or proceeding (a "Proceeding"), whether civil, criminal, administrative or investigative, including, without limitation, an action by or in the

right of the Corporation to procure a judgment in its favor, by reason of the fact that such person, or a person of whom such person is the legal representative, is or was a director or officer of the Corporation, or, at the request of the Corporation, is or was serving as a director or officer of any other Corporation or in a capacity with comparable authority or responsibilities for any limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise (an "Other Entity"), against judgments, fines, penalties, excise taxes, amounts paid in settlement and costs, charges and expenses (including attorneys' fees, disbursements and other charges). Persons who are not directors or officers of the Corporation (or otherwise entitled to indemnification pursuant to the preceding sentence) may be similarly indemnified in respect of service to the Corporation or to an Other Entity at the request of the Corporation to the extent the board of directors at any time specifies that such persons are entitled to the benefits of this Article 7. The indemnification and advancement of expenses pursuant to this Article 7 shall be in addition to, and not exclusive of, any other right that the person seeking indemnification may have under these Bylaws, the Certificate of Incorporation, any separate contract or agreement or applicable law.

**Section 7.2** ~~Section 7.2~~ **Advancement of Expenses.** The Corporation shall, from time to time, reimburse or advance to any director or officer or other person entitled to indemnification hereunder the funds necessary for payment of expenses, including attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; provided, however, that, if required by law or by the board of directors, such expenses incurred by or on behalf of any director or officer or other person may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer (or other person indemnified hereunder), to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director, officer or other person is not entitled to be indemnified for such expenses.

**Section 7.3** ~~Section 7.3~~ **Insurance.** The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or any person who is or was serving at the request of the Corporation as a director, officer, employee, or agent of another Corporation, partnership, joint venture, trust, or other enterprise, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under applicable law.

**Section 7.4** ~~Section 7.4~~ **Binding Effect.** The provisions of this Article 7 shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Article 7 is in effect and any other person entitled to indemnification hereunder, on the other hand, pursuant to which the Corporation and each such director, officer or other person intend to be, and shall be legally bound. No repeal or modification of this Article 7 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or thereafter arising or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

**Section 7.5** ~~Section 7.5~~ **Procedural Rights.** The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Article 7 shall be enforceable

4890-5257-0989 v.3

by any person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction. The burden of proving that such indemnification or reimbursement or advancement of expenses is not appropriate shall be on the Corporation. Neither the failure of the Corporation (including its board of directors, its independent legal counsel and its stockholders) to have made, a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its board of directors, its independent legal counsel and its stockholders) that such person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such person is not so entitled. Such a person shall also be indemnified for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such proceeding.

**Section 7.6** ~~Section 7.6~~ **Survival of Right.** Any right to indemnification or advancement of expenses provided by or granted pursuant to this Article 7 shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors, administrators and personal representatives of such a person.

## ARTICLE VIII ~~ARTICLE VIII~~
### GENERAL PROVISIONS

**Section 8.1** ~~Section 8.1~~ **Dividends.** Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the board of directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of capital stock, subject to the provisions of the Certificate of Incorporation.

**Section 8.2** ~~Section 8.2~~ **Reserves.** Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the directors shall think conducive to the interest of the Corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

**Section 8.3** ~~Section 8.3~~ **Checks.** All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the board of directors may from time to time designate.

**Section 8.4** ~~Section 8.4~~ **Fiscal Year.** The fiscal year of the Corporation shall be fixed by resolution of the board of directors.

**Section 8.5** ~~Section 8.5~~ **Seal.** The board of directors may adopt a corporate seal; alter such seal at pleasure, and authorize it to be used by causing it or a reproduction of such seal to be affixed or impressed or reproduced in any other manner.

**Section 8.6** ~~Section  8.6~~ **Contracts.** The board of directors may authorize any officer, agent or employee to enter into any contract, instrument or agreement on behalf of the Corporation, and

the authority granted may be general or confined to specific instances. Except as provided in this section or as authorized by the board of directors, no officer, agent, or employee, other than the president, any vice president, the secretary or the treasurer, shall have any power or authority to bind the Corporation by any contract, instrument or agreement, to pledge its credit, or to render it liable, for any purpose or any amount.

**Section 8.7** ~~Section 8.7~~ **Voting of Corporation's Securities.** Unless otherwise ordered by the board of directors, any officer shall have full power and authority on behalf of the Corporation to attend and to act and to vote, and to execute a proxy or proxies empowering others to attend and to act and to vote, at any meetings of security holders of any corporation or other entity in which the Corporation may hold securities, and at such meetings the president, or such other officer of the Corporation, or such proxy shall possess and may exercise any and all rights and powers incident to the ownership of such securities, and which as the owner thereof the Corporation might have possessed and exercised, if present. The secretary or any assistant secretary may affix the corporate seal to any such proxy or proxies so executed by the president, or such other officer, and attest the same. The board of directors by resolution from time to time may confer like powers upon any other person or persons.

**Section 8.8    Electronic Signatures.** Unless otherwise required by law, whenever the Certificate of Incorporation or these Bylaws require or permit a signature, such signature may be a manual, facsimile, conformed or electronic signature.

**ARTICLE IX** ~~ARTICLE IX~~
**AMENDMENT OF BYLAWS**

**Section 9.1** ~~Section 9.1~~ **Procedure.** Subject to applicable law and the Certificate of Incorporation, these Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the affirmative vote of the stockholders owning a majority of the voting power of all the then outstanding capital stock of the Corporation or by resolution of the board of directors.

*[Different first page setting changed from off in original to on in modified.].*

## HISTORY OF BYLAWS

1.     **Initial Adoption: April 31, 2011.**

2.     **Subsequent Adoption: As of June 15, 2015.**

3.     **Subsequent Adoption: As of November 12, 2015.**

4.     **Subsequent Amendment: As of February 27, 2017.**

5.     **Subsequent Amendment: As of September 26, 2018.**

6.     **Subsequent Amendment: As of September 24, 2019.**

7.     **Subsequent Amendment and Restatement: As of December 20, 2021.**

8.     **Subsequent Amendment and Restatement: As of July 5, 2022.**

9.     **Subsequent Amendment and Restatement: As of January 25, 2023.**

10.     **Subsequent Amendment and Restatement: As of ~~July [   ]~~ <u>August 3</u>, 2023.**

## **Exhibit B**

## **Exit Financing Documents**

This <u>Exhibit B</u> includes the following Exit Financing Documents of Reorganized SiO2:

- Exhibit B(i): Exit Facility Credit Agreement

- Exhibit B(ii): Exit Facility Security Agreement

Certain documents, or portions thereof, contained in this <u>Exhibit B</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Restructuring Support Agreement.

## **Exhibit B(i)**

**Exit Facility Credit Agreement**

*Execution Version*

**CREDIT AGREEMENT AND GUARANTY**

**dated as of August 3, 2023**

**by and among**

**SiO2 MEDICAL PRODUCTS, INC.,**
**as the Borrower,**

**THE SUBSIDIARY GUARANTORS FROM TIME TO TIME PARTY
HERETO,**
**as** the **Subsidiary Guarantors,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO**
**as the Lenders, and**

**OAKTREE FUND ADMINISTRATION, LLC,**
**as the Administrative Agent**

**U.S. $60,000,000**

# TABLE OF CONTENTS

## SECTION 1.
## DEFINITIONS

1.01    Certain Defined Terms ..................................................................................1

1.02    Accounting Terms and Principles ..............................................................30

1.03    Interpretation .............................................................................................31

1.04    Effectuation of Exit Transaction ...............................................................32

1.05    Division .....................................................................................................32

## SECTION 2.
## THE COMMITMENT AND THE LOANS

2.01    Loans .........................................................................................................32

2.02    Borrowing Procedures ...............................................................................33

2.03    [Reserved] .................................................................................................33

2.04    Notes ..........................................................................................................33

2.05    Use of Proceeds .........................................................................................33

2.06    Incremental Loans .....................................................................................33

## SECTION 3.
## PAYMENTS OF PRINCIPAL AND INTEREST, ETC.

3.01    Scheduled Repayments and Prepayments Generally; Application .......................34

3.02    Interest .......................................................................................................34

3.03    Prepayments ...............................................................................................35

## SECTION 4.
## PAYMENTS, ETC.

4.01    Payments ....................................................................................................37

4.02    Computations .............................................................................................38

4.03    Set-Off .......................................................................................................38

## SECTION 5.
## YIELD PROTECTION, TAXES, ETC.

5.01    Additional Costs .........................................................................................39

5.02    Illegality .....................................................................................................40

5.03    Taxes ..........................................................................................................40

5.04    Mitigation Obligations ...............................................................................44

## SECTION 6.
## CONDITIONS

# TABLE OF CONTENTS
(continued)

6.01    Conditions to the Borrowing of the Term Loan.......................................................45

## SECTION 7.
## REPRESENTATIONS AND WARRANTIES

7.01    Power and Authority ........................................................................................48

7.02    Authorization; Enforceability ........................................................................49

7.03    Governmental and Other Approvals; No Conflicts ............................................49

7.04    Financial Statements; Material Adverse Change ...............................................49

7.05    Properties ........................................................................................................50

7.06    No Actions or Proceedings ..............................................................................52

7.07    Compliance with Laws and Agreements ...........................................................52

7.08    Taxes ...............................................................................................................52

7.09    Full Disclosure ................................................................................................53

7.10    Investment Company Act and Margin Stock Regulation ..................................53

7.11    Solvency..........................................................................................................53

7.12    Subsidiaries .....................................................................................................53

7.13    Indebtedness and Liens ...................................................................................53

7.14    Material Agreements........................................................................................53

7.15    Restrictive Agreements ...................................................................................53

7.16    Real Property ..................................................................................................54

7.17    Pension Matters...............................................................................................54

7.18    Regulatory Approvals ......................................................................................54

7.19    Transactions with Affiliates ............................................................................55

7.20    OFAC; Anti-Terrorism Laws...........................................................................56

7.21    Anti-Corruption...............................................................................................56

7.22    Necessary Permits, Etc....................................................................................56

7.23    Priority of Obligations .....................................................................................56

7.24    Royalty and Other Payments ...........................................................................56

7.25    Non-Competes .................................................................................................56

7.26    Security Interest ..............................................................................................57

7.27    Capitalization Table ........................................................................................57

## SECTION 8.
## AFFIRMATIVE COVENANTS

8.01    Financial Statements and Other Information ....................................................57

-ii-

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 8.02 | Notices of Material Events | 59 |
| 8.03 | Existence | 61 |
| 8.04 | Payment of Obligations | 61 |
| 8.05 | Insurance | 61 |
| 8.06 | Books and Records; Inspection Rights | 62 |
| 8.07 | Compliance with Laws and Other Obligations | 62 |
| 8.08 | Maintenance of Properties, Etc. | 63 |
| 8.09 | Licenses | 63 |
| 8.10 | Conversion of Convertible Debt | 63 |
| 8.11 | Use of Proceeds | 63 |
| 8.12 | Certain Obligations Respecting Subsidiaries; Further Assurances | 63 |
| 8.13 | Termination of Non-Permitted Liens | 65 |
| 8.14 | [Reserved]. | 65 |
| 8.15 | Maintenance of Permits, Etc. | 65 |
| 8.16 | Maintenance of Regulatory Approvals, Contracts, Intellectual Property, Etc. | 65 |
| 8.17 | ERISA Compliance | 66 |
| 8.18 | Cash Management | 66 |
| 8.19 | [Reserved] | 67 |
| 8.20 | [Reserved] | 67 |
| 8.21 | [Reserved] | 67 |
| 8.22 | Post-Closing Obligations | 67 |

## SECTION 9.
## NEGATIVE COVENANTS

| | | |
|---|---|---|
| 9.01 | Indebtedness | 67 |
| 9.02 | Liens | 69 |
| 9.03 | Fundamental Changes and Acquisitions | 71 |
| 9.04 | Lines of Business | 71 |
| 9.05 | Investments | 72 |
| 9.06 | Restricted Payments | 73 |
| 9.07 | Payments of Indebtedness | 74 |
| 9.08 | Change in Fiscal Year | 74 |
| 9.09 | Sales of Assets, Etc. | 74 |

-iii-

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| 9.10 | Transactions with Affiliates | 75 |
| 9.11 | Restrictive Agreements | 76 |
| 9.12 | Modifications and Terminations of Material Agreements and Organic Documents | 76 |
| 9.13 | Outbound Licenses | 77 |
| 9.14 | Sales and Leasebacks | 77 |
| 9.15 | Hazardous Material | 77 |
| 9.16 | Accounting Changes | 77 |
| 9.17 | Compliance with ERISA | 78 |
| 9.18 | Sanctions; Anti-Corruption Use of Proceeds | 78 |

## SECTION 10.
## FINANCIAL COVENANTS

| | | |
|---|---|---|
| 10.01 | Minimum Liquidity | 78 |

## SECTION 11.
## EVENTS OF DEFAULT

| | | |
|---|---|---|
| 11.01 | Events of Default | 78 |
| 11.02 | Remedies | 82 |
| 11.03 | Additional Remedies | 82 |
| 11.04 | [Reserved] | 82 |
| 11.05 | Payment of Prepayment Fee | 82 |

## SECTION 12.
## THE ADMINISTRATIVE AGENT

| | | |
|---|---|---|
| 12.01 | Appointment and Duties | 83 |
| 12.02 | Binding Effect | 85 |
| 12.03 | Use of Discretion | 85 |
| 12.04 | Delegation of Rights and Duties | 85 |
| 12.05 | Reliance and Liability | 86 |
| 12.06 | Administrative Agent Individually | 87 |
| 12.07 | Lender Credit Decision | 87 |
| 12.08 | Expenses; Indemnities | 88 |
| 12.09 | Resignation of the Administrative Agent | 88 |
| 12.10 | Release of Collateral or Guarantors | 89 |
| 12.11 | Additional Secured Parties | 90 |

-iv-

**TABLE OF CONTENTS**
(continued)

12.12  Agent May File Proofs of Claim ........................................................90

12.13  Acknowledgements of Lenders ........................................................91

SECTION 13.
GUARANTY

13.01  The Guaranty ........................................................93

13.02  Obligations Unconditional ........................................................94

13.03  Discharge Only Upon Payment in Full ........................................................95

13.04  Additional Waivers; General Waivers ........................................................96

13.05  Reinstatement ........................................................97

13.06  Subrogation ........................................................97

13.07  Remedies ........................................................98

13.08  Instrument for the Payment of Money ........................................................98

13.09  Continuing Guarantee ........................................................98

13.10  Contribution with Respect to Guaranteed Obligations ........................................................98

13.11  General Limitation on Guarantee Obligations ........................................................99

SECTION 14.
MISCELLANEOUS

14.01  No Waiver ........................................................99

14.02  Notices ........................................................100

14.03  Expenses, Indemnification, Etc. ........................................................100

14.04  Amendments, Etc. ........................................................101

14.05  Successors and Assigns ........................................................101

14.06  Survival ........................................................104

14.07  Captions ........................................................104

14.08  Counterparts, Effectiveness ........................................................105

14.09  Governing Law ........................................................105

14.10  Jurisdiction, Service of Process and Venue ........................................................105

14.11  Waiver of Jury Trial ........................................................105

14.12  Waiver of Immunity ........................................................105

14.13  Entire Agreement ........................................................106

14.14  Severability ........................................................106

14.15  No Fiduciary Relationship ........................................................106

14.16  Confidentiality ........................................................106

# TABLE OF CONTENTS
(continued)

14.17  Interest Rate Limitation ............................................................................107

14.18  Judgment Currency ...................................................................................107

14.19  USA PATRIOT Act ..................................................................................108

14.20  Acknowledgement and Consent to Bail-In of Affected Financial Institutions.........................................................................................108

-vi-

## TABLE OF CONTENTS
(continued)

**SCHEDULES AND EXHIBITS**

Schedule 1           -    Loans Schedule
Schedule 2           -    Products
Schedule 7.05(b)     -    Certain Intellectual Property
Schedule 7.06(b)     -    Environmental Matters
Schedule 7.08        -    Taxes
Schedule 7.12        -    Information Regarding Subsidiaries
Schedule 7.13(a)     -    Existing Indebtedness
Schedule 7.13(b)     -    Existing Liens
Schedule 7.14        -    Material Agreements
Schedule 7.15        -    Restrictive Agreements
Schedule 7.16        -    Real Property Owned or Leased by Obligors
Schedule 7.17        -    Pension Matters
Schedule 7.18(c)     -    Adverse Findings
Schedule 7.19        -    Transactions with Affiliates
Schedule 7.24             Royalty and Other Payments
Schedule 7.27             Capitalization Table
Schedule 9.05        -    Existing Investments
Schedule 9.09        -    Sale of Assets
Schedule 9.14        -    Existing Sales and Leasebacks


Exhibit A            -    Form of Note
Exhibit B            -    Form of Borrowing Notice
Exhibit C            -    Form of Guarantee Assumption Agreement
Exhibit D-1          -    Form of U.S. Tax Compliance Certificate (For Foreign Lenders|
                          That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-2          -    Form of U.S. Tax Compliance Certificate (For Foreign Participants
                          That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-3          -    Form of U.S. Tax Compliance Certificate (For Foreign Participants
                          That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-4          -    Form of U.S. Tax Compliance Certificate (For Foreign Lenders
                          That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit E            -    Form of Compliance Certificate
Exhibit F            -    Form of Assignment and Assumption
Exhibit G            -    Form of Landlord Consent
Exhibit H            -    [Reserved]
Exhibit I            -    Form of Intercompany Subordination Agreement
Exhibit J            -    [Reserved]
Exhibit K            -    Form of Solvency Certificate
Exhibit L            -    Funding Date Certificate
Exhibit M            -    Initial Budget

## CREDIT AGREEMENT AND GUARANTY

CREDIT AGREEMENT AND GUARANTY, dated as of August 3, 2023 (this "***Agreement***"), among **SiO2 MEDICAL PRODUCTS, INC.**, a Delaware corporation (the "***Borrower***"), certain Subsidiaries of the Borrower that may be required to provide Guarantees from time to time hereunder (each a "***Subsidiary Guarantor***" and collectively, the "***Subsidiary Guarantors***"), the lenders from time to time party hereto (each a "***Lender***" and collectively, the "***Lenders***"), and **OAKTREE FUND ADMINISTRATION, LLC**, as administrative agent for the Lenders (in such capacity, the "***Administrative Agent***").

WITNESSETH:

WHEREAS, on March 29, 2023, the Borrower and certain of its direct and indirect Subsidiaries, including each of the Guarantors (collectively the "***Debtors***"), filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), commencing the Debtors' respective jointly administered cases that are pending under Chapter 11 of the Bankruptcy Code (the "***Bankruptcy Cases***") as Case No. 23-10366 (JTD);

WHEREAS, on June 9, 2023, the Debtors filed that certain Joint Chapter 11 Plan of Reorganization of Sio2 Medical Products, Inc. and its Debtor Affiliates with the Bankruptcy Court (Docket No. 372) (together with all schedules, documents and exhibits contained therein, as amended, supplemented, modified or waived from time to time as permitted under the Confirmation Order, the "***Plan***");

WHEREAS, on July 19, 2023, the Bankruptcy Court entered that certain Order Confirming the Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc. and its Debtor Affiliates (Docket No. 478) (the "***Confirmation Order***") confirming the Plan (such confirmed plan, the "***Approved Plan***"), including the terms of and entry into the Loan Documents];

WHEREAS, in connection with the confirmation and implementation of the Approved Plan, the Borrower and the Guarantors have requested that the Lenders make available to the Borrower the financing facilities consisting of term loans in an aggregate principal amount equal to $60,000,000 issued in connection with the Confirmation Order (the "***Credit Facility***") and

WHEREAS, the Lenders are willing, on the terms and subject to the conditions set forth herein, to extend such credit to the Borrower;

NOW, THEREFORE, the parties hereto agree as follows:

## SECTION 1.
## DEFINITIONS

**1.01**        **Certain Defined Terms**. As used herein, the following terms have the following respective meanings:

"***Account Control Agreement Completion Date***" means October 1, 2023 (or such longer period of time as agreed by the Administrative Agent in its sole discretion).

"***Acquisition***" means any transaction, or any series of related transactions, by which any Person (for purposes of this definition, an "***acquirer***") directly or indirectly, by means of amalgamation, merger, purchase of assets, purchase of Equity Interests, or otherwise, (i) acquires all or substantially all of the assets of any other Person, (ii) acquires an entire business line or unit or division of any other Person, (iii) with respect to any other Person that is managed or governed by a Board, acquires control of Equity Interests of such other Person representing more than fifty percent (50%) of the ordinary voting power (determined on a fully-diluted basis) for the election of directors of such Person's Board, (iv) acquires control of more than fifty percent (50%) of the Equity Interests in any other Person (determined on a fully-diluted basis) that is not managed by a Board or (v) the acquisition of, or the right to use, develop or sell (in each case, including through exclusive licensing), any product, product line or Intellectual Property of or from any other Person, excluding, for the avoidance of doubt, non-exclusive licenses of Intellectual Property in the ordinary course of business.

"***Additional Lender***" means any Person that agrees to provide any portion of any Incremental Term Loan pursuant to an Incremental Facility Amendment in accordance with **Section 2.06**; provided that each Additional Lender shall be subject to the approval of the Administrative Agent and the Oaktree Lender.

"***Administrative Agent***" has the meaning set forth in the preamble hereto.

"***Affected Financial Institution***" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"***Affiliate***" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"***Agreement***" has the meaning set forth in the preamble hereto.

"***Allocable Amount***" has the meaning set forth in **Section 13.10(b)**.

"***Anti-Terrorism Laws***" means any laws relating to terrorism or money laundering, including, without limitation, (i) the Money Laundering Control Act of 1986 (e.g., 18 U.S.C. §§ 1956 and 1957), (ii) the Bank Secrecy Act of 1970 (e.g., 31 U.S.C. §§ 5311 – 5330), as amended by the Patriot Act, (iii) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("***OFAC***"), (iv) the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and implementing regulations by the United States Department of the Treasury, (v) any law prohibiting or directed against terrorist activities or the financing of terrorist activities (e.g., 18 U.S.C. §§ 2339A and 2339B), or (vi) any similar laws enacted in the United States, European Union or any other jurisdictions in which the parties to this agreement operate, and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war.

"***Approval Order***" has the meaning set forth in **Section 6.01(j)**.

"***Approved Plan***" has the meaning set forth in the recitals hereto.

"***Asset Sale***" has the meaning set forth in **Section 9.09**.

"***Assignment and Assumption***" means an assignment and assumption entered into by a Lender and an assignee of such Lender substantially in the form of **Exhibit F**, or such other form as agreed by the Administrative Agent.

"***Arm's Length Transaction***" means, with respect to any transaction, the terms of such transaction shall not be less favorable to the Borrower or any of its Subsidiaries than commercially reasonable terms that would be obtained in a transaction with a Person that is an unrelated third party.

"***Bail-In Action***" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"***Bail-In Legislation***" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"***Bailee Letter***" means a bailee letter substantially in the form of **Exhibit F** to the Security Agreement.

"***Bankruptcy Cases***" has the meaning set forth in the recitals hereto.

"***Bankruptcy Code***" means Title 11 of the United States Code entitled "Bankruptcy."

"***Bankruptcy Court***" has the meaning set forth in the recitals hereto.

"***Beneficial Ownership Certification***" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" means 31 C.F.R. § 1010.230.

"***Benefit Plan***" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Obligor or Subsidiary thereof incurs or otherwise has any obligation or liability, contingent or otherwise.

"***Board***" means, with respect to any Person, the board of directors or equivalent management or oversight body of such Person or any committee thereof authorized to act on behalf of such board (or equivalent body).

-3-

"***Borrower***" has the meaning set forth in the preamble hereto.

"***Borrower Party***" has the meaning set forth in **Section 14.03(b)**.

"***Borrowing***" means the borrowing of the Loans on the Closing Date.

"***Borrowing Notice***" means a written notice substantially in the form of **Exhibit B**.

"***Business Day***" means a day (other than a Saturday or Sunday) on which commercial banks are not authorized or required to close in New York City.

"***Capital Lease Obligations***" means, as to any Person, the obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real and/or personal property, the amount of the liability in respect thereof that would at that time be required to be capitalized on a balance sheet in accordance with GAAP.

"***Casualty Event***" means the damage, destruction or condemnation, as the case may be, of property of the Borrower or any of its Subsidiaries in excess of $2,000,000.

"***Change of Control***" means an event or series of events:

        (i)     as a result of which (x) at any time prior to the consummation of a Qualified IPO/SPAC Transaction, the Permitted Holders cease to beneficially own, in the aggregate, directly or indirectly, at least a majority of the Equity Interests of the Borrower entitled to vote for members of the Board of the Borrower on a fully-diluted basis and Equity Interests representing at least a majority of the economic interests in the Borrower or (y) at any time following the consummation of a Qualified IPO/SPAC Transaction, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Act, but excluding any of such person or its Subsidiaries, and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such Plan) other than the Permitted Holders, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all Equity Interests that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "***option right***")), directly or indirectly, of forty percent (40%) or more of the Equity Interests of the Borrower entitled to vote for members of the Board of the Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such person or group has the right to acquire pursuant to any option right); or

        (ii)     as a result of which, during any period of twelve (12) consecutive months, a majority of the members of the Board of the Borrower cease to be composed of individuals (x) who were members of such Board on the first day of such period, (y) whose election or nomination to such Board was approved by individuals referred to in **clause (x)** above constituting at the time of such election or nomination at least a majority of such Board or equivalent governing body or (z) whose election or nomination to such Board was approved by individuals referred to in **clauses (x)** and **(y)** above constituting at the time of such election or nomination at least a majority of such Board; or

(iii)    that results in the sale, including without limitation any exclusive licensing, of all or substantially all of the assets or businesses of the Borrower and its Subsidiaries, taken as a whole; or

(iv)    that results in the Borrower's failure to own, directly or indirectly, beneficially and of record, one-hundred percent (100%) of all issued and outstanding Equity Interests of each Subsidiary Guarantor.

"*charges*" has the meaning set forth in **Section 14.17**.

"*Claims*" means (and includes) any claim, demand, complaint, grievance, action, application, suit, cause of action, order, charge, indictment, prosecution, judgement or other similar process, whether in respect of assessments or reassessments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including fees and disbursements of legal counsel, and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

"*Class*" when used in reference to any Loan, refers to whether such Loan is a Term Loan or an Incremental Term Loan.

"*Closing Date*" means the date on which the conditions precedent specified in **Section 6.01** are satisfied (or waived in accordance with **Section 14.04**) and on which the Term Loan is to be made to the Borrower.

"*Closing Date Property*" means each of the Property and the properties located at 2250 Riley St., Auburn, AL and any other real property owned by the Obligors as of the Closing Date.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"*Collateral*" means any real, personal and mixed property (including Equity Interests), whether tangible or intangible, in which Liens are granted or purported to be granted to the Administrative Agent as security for the Obligations under any Loan Document on or after the Closing Date, including future acquired or created assets or property (or collectively, all such real, personal and mixed property, as the context may require).

"*Company Competitor*" means (i) any competitor of the Borrower or any of its Subsidiaries primarily operating in the same line of business as the Borrower or any of its Subsidiaries and (ii) any of such competitor's Affiliates (other than any Person that is a bona fide debt fund primarily engaged in the making, purchasing, holding or other investing in commercial loans, notes, bonds or similar extensions of credit or securities in the Ordinary Course) that, in the case of each of clauses (i) and (ii), are identified by name in writing by the Borrower to the Administrative Agent from time to time.

"*Compliance Certificate*" has the meaning set forth in **Section 8.01(b)**.

"*Connection Income Taxes*" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Contracts*" means any contract, license, lease, agreement, obligation, promise, undertaking, understanding, arrangement, document, commitment, entitlement or engagement under which a Person has, or will have, any liability or contingent liability (in each case, whether written or oral, express or implied, and whether in respect of monetary or payment obligations, performance obligations or otherwise).

"*Commitment*" means a commitment to acquire an interest in a Loan.

"*Control*" means, in respect of a particular Person, the possession by one or more other Persons, directly or indirectly, of the power to direct or cause the direction of the management or policies of such particular Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"*Controlled Account*" has the meaning set forth in **Section 8.18(a)**.

"*Copyright*" means published and unpublished works of authorship whether or not copyrightable, including software, website and mobile content, data, databases, and other compilations of information, in each case, whether or not registered, and any and all copyrights in and to the foregoing, together with all common law rights and moral rights therein, and all copyrights, copyright registrations and applications for copyright registrations, including all renewals, extensions, restorations, derivative works and reversions thereof and all common law rights, moral rights and other rights whatsoever accruing thereunder or pertaining thereto throughout the world.

"*County*" means Lee County, Alabama, and any political subdivision succeeding to the powers thereof.

"*Default*" means any Event of Default and any event that, upon the giving of notice, the lapse of time or both, would constitute an Event of Default.

"*Default Rate*" has the meaning set forth in **Section 3.02(b)**.

"*Deposit Account*" means any "Deposit Account," as such term is defined in Article 9 of the UCC (and all accounts and sub-accounts relating to any of the foregoing).

"*Designated Jurisdiction*" means any country or territory to the extent that such country or territory is the subject of country- or territory-wide Sanctions.

"*Disqualified Equity Interests*" means, with respect to any Person, any Equity Interest of such Person that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable or requires such Person to use efforts to redeem such Equity Interests (in each case, other than solely for Qualified Equity Interests), including pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder

-6-

thereof (other than solely for Qualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments of dividends or other distributions in cash or other securities that would constitute Disqualified Equity Interests, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date.

"***Disqualified Lender***" means any Person designated by the Borrower as a "Disqualified Lender" by written notice delivered to the Administrative Agent on or prior to the date of this Agreement.

"***Division***" has the meaning set forth in **Section 1.05**.

"***Dollars***" and "***$***" means lawful money of the United States of America.

"***Domestic Subsidiary***" means any Subsidiary that is a corporation, limited liability company, partnership or similar business entity incorporated, formed or organized under the laws of the United States, any state of the United States or the District of Columbia.

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in **clause (a)** of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in **clause (a)** or **(b)** of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Eligible Transferee***" means and includes (i) any commercial bank, (ii) any insurance company, (iii) any finance company, (iv) any financial institution, (v) any Person that is a bona fide debt fund primarily engaged in the making, purchasing, holding or other investing in commercial loans, notes, bonds or similar extensions of credit or securities in the Ordinary Course, (vi) with respect to any Lender, any of its Affiliates or such Lender's or Affiliate's managed funds or accounts, and (vii) any other "accredited investor" (as defined in Regulation D of the Securities Act) that is principally in the business of managing investments or holding assets for investment purposes; provided that, an Eligible Transferee shall not include (x) any Company Competitor or Disqualified Lender or (y) any Person that primarily invests in distressed debt or other distressed financial assets; provided; further that (A) neither **clause (x)** or **(y)** above shall apply retroactively to any Person that previously acquired an assignment or participation interest hereunder to the extent such Person was not a Company Competitor or a Person of the type described in clause (y) above at the time of the applicable assignment or participation, as the case may be, and (B) with respect to both **clauses (x)** and **(y)** above, the Administrative Agent shall not have any duty or obligation to carry out due diligence in order to

-7-

identify or determine whether a Person would be excluded as an Eligible Transferee as a result of the application of either such clause.

"***Environmental Claims***" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, information request, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of, or liability relating to, any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment, arising out of a violation of Environmental Law or any Hazardous Materials Activity.

"***Environmental Law***" means all laws (including common law and any federal, state, provincial or local governmental law), rule, regulation, order, writ, judgment, notice, requirement, binding agreement, injunction or decree, whether U.S. or non-U.S., relating in any way to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) to the extent related to Hazardous Materials Activity, occupational safety and health, industrial hygiene, land use, natural resources or the protection of human, plant or animal health or welfare, in any manner applicable to the Borrower or any of its Subsidiaries or any Facility.

"***Environmental Liability***" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Obligor or any of its Subsidiaries directly or indirectly resulting from or based upon (i) violation of any Environmental Law, (ii) the generation, use, presence, emission, discharge, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (iii) exposure to any Hazardous Materials, (iv) the release or threatened release of any Hazardous Materials into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Equity Interests***" means, with respect to any Person (for purposes of this defined term, an "***issuer***"), all shares of, interests or participations in, or other equivalents in respect of such issuer's capital stock, including all membership interests, partnership interests or equivalent, and all debt or other securities directly or indirectly exchangeable, exercisable or otherwise convertible into, such issuer's capital stock, whether now outstanding or issued after the Closing Date, and in each case, however designated and whether voting or non-voting.

"***Equivalent Amount***" means, with respect to an amount denominated in one currency, the amount in another currency that could be purchased by the amount in the first currency determined by reference to the Exchange Rate at the time of determination.

"***ERISA***" means the United States Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means, collectively, any Obligor, Subsidiary thereof, and any Person under common control, or treated as a single employer, with any Obligor or Subsidiary thereof, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"***ERISA Event***" means (i) a reportable event as defined in Section 4043 of ERISA with respect to a Title IV Plan, excluding, however, such events as to which the PBGC by regulation has waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event; (ii) the applicability of the requirements of Section 4043(b) of ERISA with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, to any Title IV Plan where an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such plan within the following thirty (30) days; (iii) a withdrawal by any Obligor or any ERISA Affiliate thereof from a Title IV Plan or the termination of any Title IV Plan resulting in liability under Sections 4063 or 4064 of ERISA; (iv) the withdrawal of any Obligor or any ERISA Affiliate thereof in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by any Obligor or any ERISA Affiliate thereof of notice from any Multiemployer Plan that it is insolvent pursuant to Section 4245 of ERISA; (v) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Title IV Plan or Multiemployer Plan; (vi) the imposition of liability on any Obligor or any ERISA Affiliate thereof pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the failure by any Obligor or any ERISA Affiliate thereof to make any required contribution to a Plan, or the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Title IV Plan (whether or not waived in accordance with Section 412(c) of the Code) or the failure to make by its due date a required installment under Section 430 of the Code with respect to any Title IV Plan or the failure to make any required contribution to a Multiemployer Plan; (viii) the determination that any Title IV Plan is considered an at-risk plan or a plan in endangered to critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; (ix) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan; (x) the imposition of any liability under Title I or Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or any ERISA Affiliate thereof; (xi) an application for a funding waiver under Section 303 of ERISA or an extension of any amortization period pursuant to Section 412 of the Code with respect to any Title IV Plan; (xii) the occurrence of a non-exempt prohibited transaction under Section 406 or 407 of ERISA for which any Obligor or any Subsidiary thereof may be directly or indirectly liable; (xiii) a violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary or disqualified person for which any Obligor or any ERISA Affiliate thereof may be directly or indirectly liable; (xiv) the occurrence of an act or omission which could give rise to the imposition on any Obligor or any ERISA Affiliate thereof of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Sections 409, 502(c), (i) or (1) or 4071 of ERISA; (xv) the assertion of a material claim (other than routine claims for benefits) against any Plan or the assets thereof, or against any Obligor or any Subsidiary thereof in connection with any such plan; (xvi) receipt from the IRS of notice of the failure of any Qualified Plan to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Qualified Plan to fail to qualify for exemption from taxation under Section 501(a) of the Code; (xvii) the imposition of any lien (or the fulfillment of the conditions for the imposition of any lien) on any of the rights, properties or assets of any

Obligor or any ERISA Affiliate thereof, in either case pursuant to Title I or IV, including Section 302(f) or 303(k) of ERISA or to Section 401(a)(29) or 430(k) of the Code; or (xviii) the establishment or amendment by any Obligor or any Subsidiary thereof of any "welfare plan", as such term is defined in Section 3(1) of ERISA, that provides post-employment welfare benefits in a manner that would increase the liability of any Obligor.

"***ERISA Funding Rules***" means the rules regarding minimum required contributions (including any installment payment thereof) to Title IV Plans, as set forth in Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"***Erroneous Payment***" has the meaning set forth in **Section 12.13(a)**.

"***Erroneous Payment Deficiency Assignment***" has the meaning set forth in **Section 12.13(d)**.

"***Erroneous Payment Impacted Loans***" has the meaning set forth in **Section 12.13(d)**.

"***Erroneous Payment Return Deficiency***" has the meaning set forth in **Section 12.13(d)**.

"***EU Bail-In Legislation Schedule***" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"***Event of Default***" has the meaning set forth in **Section 11.01**.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"***Exchange Rate***" means, as of any date, the rate at which any currency may be exchanged into another currency, as set forth on the relevant Reuters screen at or about 11:00 a.m. (Eastern time) on such date. In the event that such rate does not appear on the Reuters screen, the "Exchange Rate" shall be determined by reference to such other publicly available service for displaying exchange rates as may be reasonably designated by the Administrative Agent.

"***Excluded Accounts***" means (i) deposit accounts exclusively used for payroll, payroll Taxes and other employee wage and benefit payments to or for the benefit of any Obligor's employees which shall not exceed the amount necessary for the Borrower to fully-fund its next complete payroll cycle, (ii) zero balance accounts that are swept no less frequently than weekly to a Controlled Account, (iii) accounts used exclusively for bona fide insurance purposes in the Ordinary Course, (iv) cash collateral for Permitted Liens to the extent such cash collateral is permitted under **Section 9.02**, (v) [Reserved]; (vi) the Borrower's account ending in XXX9219 at Regions Bank for so long as (x) it is used by the Borrower to support credit card obligations of the Obligors in the Ordinary Course otherwise permitted by the terms hereof and (y) the aggregate amount on deposit in such account does not exceed $300,000 at any time and (vii) any other deposit accounts established after the Closing Date only for so long as the amounts of deposit therein do not exceed $50,000 in the aggregate.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (x) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivisions thereof) or (y) that are Other Connection Taxes, (ii) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (1) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment requested by the Borrower under Section 5.04) or (2) such Lender changes its lending office, except in each case to the extent that, pursuant to **Section 5.03**, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with **Section 5.03(f)**, and (iv) any U.S. federal withholding Taxes imposed under FATCA.

"*Exit Transaction*" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the loans to be incurred under this Agreement, the consummation of the other transactions contemplated by the Loan Documents, this Agreement, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing, and the payment of the fees and expenses incurred in connection with any of the foregoing.

"*Facility*" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased or operated by any Obligor or any of its Subsidiaries.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"*Federal Funds Effective Rate*" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"*Fee Letter*" means the Fee Letter, dated as of the Closing Date, among the Borrower, the Lenders and the Administrative Agent (as amended, modified or replaced from time to time).

"*Foreign Lender*" means a Lender that is not a U.S. Person.

"*Funding Date Certificate*" means a certificate substantially in the form of **Exhibit L**.

"*GAAP*" means generally accepted accounting principles in the United States of America, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board and in such other statements by such other entity as may be in general use by significant segments of the accounting profession that are applicable to the circumstances as of the date of determination. All references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements delivered pursuant to **Section 6.01(g)(i)**.

"*Governmental Approval*" means any consent, authorization, approval, order, license, franchise, permit, certification, accreditation, registration, clearance or exemption that is issued or granted by or from (or pursuant to any act of) any Governmental Authority, including any application or submission related to any of the foregoing.

"*Governmental Authority*" means any nation, government, branch of power (whether executive, legislative or judicial), state, province or municipality or other political subdivision thereof and any entity exercising executive, legislative, judicial, monetary, regulatory or administrative functions of or pertaining to government, including without limitation regulatory authorities, governmental departments, agencies, commissions, bureaus, officials, ministers, courts, bodies, boards, tribunals and dispute settlement panels, and other law-, rule- or regulation-making organizations or entities of any state, territory, county, city or other political subdivision of any country, in each case whether U.S. or non-U.S.

"*Guarantee*" of or by any Person (the "*guarantor*") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; <u>provided</u>, that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course.

"*Guarantee Assumption Agreement*" means a Guarantee Assumption Agreement substantially in the form of **Exhibit C** by an entity that, pursuant to **Section 8.12(a)**, is required to become a "Subsidiary Guarantor."

"*Guaranteed Obligations*" has the meaning set forth in **Section 13.01**.

"*Guarantor Payment*" has the meaning set forth in **Section 13.10(a)**.

-12-

"*Guaranty*" means the Guaranty made by the Subsidiary Guarantors under **Section 13** in favor of the Secured Parties (including any Guaranty assumed by an entity that is required to become a "Subsidiary Guarantor" pursuant to a Guarantee Assumption Agreement).

"*Hazardous Material*" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or would reasonably be expected to pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"*Hazardous Materials Activity*" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, release, threatened release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, recycling, disposition or handling of any Hazardous Materials, and any investigation, monitoring, corrective action or response action with respect to any of the foregoing.

"*Healthcare Laws*" means, collectively, all Laws and Product Authorizations applicable to the business of any Obligor or the Project, whether U.S. or non-U.S., regulating the distribution, dispensing, importation, exportation, quality, manufacturing, labeling, promotion and provision of and payment for drugs, medical or healthcare products, items and services, including, without limitation, 45 C.F.R. et seq.; Section 1128B(b) of the Social Security Act, as amended; 42 U.S.C. § 1320a-7b (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute"; § 1877 of the Social Security Act, as amended; 42 U.S.C. § 1395nn (Limitation on Certain Physician Referrals), commonly referred to as "Stark Statute"; all applicable Good Manufacturing Practice requirements addressed in the U.S. Food and Drug Administration's Quality System Regulation (21 C.F.R. Part 820); all rules, regulations and guidance with respect to the provision of Medicare and Medicaid programs or services (42 C.F.R. Chapter IV et seq.); 10 U.S.C. §§1071 – 1110(b); 5 U.S.C. §§ 8901 – 8914; and all rules, regulations and guidance promulgated under or pursuant to any of the foregoing, including any non-U.S. equivalents.

"*Hedging Agreement*" means any interest rate exchange agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"*Immaterial Subsidiary*" means any Subsidiary of the Borrower that (i) individually constitutes or holds less than five percent (5%) of the Borrower's consolidated total assets and generates less than five percent (5%) of the Borrower's consolidated total revenue, and (ii) when taken together with all then existing Immaterial Subsidiaries, such Subsidiary and such Immaterial Subsidiaries, in the aggregate, would constitute or hold less than five percent (5%) of the Borrower's consolidated total assets and generate less than five percent (5%) of the Borrower's consolidated total revenue, in each case as pursuant to the most recent fiscal period for which financial statements were required to have been delivered pursuant to **Section 8.01(a)** or **(b)**. If at any time the aggregate amount of the Borrower's consolidated total assets or consolidated total revenue attributable to Immaterial Subsidiaries exceeds five percent (5%) of the Borrower's consolidated total assets or consolidated total revenue, the Borrower shall

-13-

promptly (and in any event within thirty (30) days of becoming aware of such excess) designate sufficient Subsidiaries as ceasing to constitute "Immaterial Subsidiaries" to eliminate such excess, and such designated Subsidiaries shall be required to become Subsidiary Guarantors in accordance with **Section 8.12(a)**.  If at any time any Subsidiary designated as an Immaterial Subsidiary individually constitutes or holds five percent (5%) or more of the Borrower's consolidated total assets or generates five percent (5%) or more of the Borrower's consolidated total revenue, such Subsidiary shall cease to constitute an Immaterial Subsidiary and the Borrower shall promptly (and in any event within thirty (30) days of becoming aware thereof) cause such Subsidiary to become a Subsidiary Guarantor in accordance with **Section 8.12(a)**.

"*Incremental Facilities*" has the meaning assigned to such term in **Section 2.06**.

"*Incremental Facility Amendment*" has the meaning assigned to such term in **Section 2.06**.

"*Incremental Term Loans*" has the meaning assigned to such term in **Section 2.06**.

"*Indebtedness*" of any Person means, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments, (iii) all obligations of such Person upon which interest charges are customarily paid, (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (v) all obligations of such Person in respect of the deferred purchase price of property or services (excluding deferred compensation and accounts payable incurred in the ordinary course of business and not overdue by more than ninety (90) days), (vi) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (vii) all Guarantees by such Person of Indebtedness of others, (viii) all Capital Lease Obligations of such Person, (ix) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (x) obligations under any Hedging Agreement, currency swaps, forwards, futures or derivatives transactions, (xi) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (xii) all obligations under any earn-out and guaranteed minimum milestone and other payments of such Person under any license or other agreements (but excluding any payments based on sales under any such license or other agreement), (xiii) any Disqualified Equity Interests of such Person, (xiv) any Off-Balance Sheet Liability and (xv) all other obligations required to be classified as indebtedness of such Person under GAAP; provided that, notwithstanding the foregoing, Indebtedness shall not include accrued expenses, deferred rent, deferred taxes, deferred compensation or customary obligations under employment agreements, in each case, that are not overdue by more than forty-five (45) days. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"*Indemnified Party*" has the meaning set forth in **Section 14.03(b)**.

-14-

"*Indemnified Taxes*" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation and (ii) to the extent not otherwise described in **clause (i)**, Other Taxes.

"*Information Certificate*" means the Information Certificate delivered pursuant to **Section 6.01(d)**.

"*Insolvency Proceeding*" means (i) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (ii) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of any Person's creditors generally or any substantial portion of such Person's creditors, in each case undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"*Intellectual Property*" means all intellectual property or proprietary rights of any kind anywhere in the world, including any rights in or to Patents, Trademarks, Copyrights, Trade Secrets, whether U.S. or non-U.S.

"*Intercompany Subordination Agreement*" means a subordination agreement to be executed and delivered by each Obligor and each of its Subsidiaries, pursuant to which all obligations in respect of any Indebtedness owing to any such Person by an Obligor shall be subordinated to the prior payment in full in cash of all Obligations, such agreement to be in substantially the form attached hereto as **Exhibit I**.

"*Interest Rate*" means 12% per annum, as may be increased pursuant to **Section 3.02(b)**.

"*Invention*" means any novel, inventive or useful art, apparatus, method, process, machine (including any article or device), manufacture or composition of matter, or any novel, inventive and useful improvement in any art, method, process, machine (including article or device), manufacture or composition of matter.

"*Investment*" means, for any Person: (i) the acquisition (whether for cash, property, services or securities or otherwise) of any debt or Equity Interests, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (ii) the making of any deposit with, or advance, loan, assumption of debt or other extension of credit to, or capital contribution in any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person), but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days arising in connection with the sale of inventory or supplies by such Person in the Ordinary Course; (iii) investments between or among the Borrower, its Subsidiaries or any Affiliates, consisting of cost sharing, transfer pricing or similar transactions (including any related intercompany balances and any capitalization of such balances); (iv) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or

-15-

extended to such Person or (v) the consummation of, or entering into any agreement to consummate, any Acquisition.  The amount of an Investment shall be the amount actually invested (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on such Person's good faith estimate of the fair market value of such asset or property at the time such Investment is made), minus, solely to the extent such original Investment consisted of cash, the amount of cash received or returned for such Investment, without adjustment for subsequent increases or decreases in the value of such Investment or write-ups, write-downs or write-offs with respect thereto; provided that in no event shall such amount be less than zero or increase any basket or amount pursuant to **Section 9.05** above the fixed amount set forth therein.

"***IPO/SPAC Transaction***" means (a) the issuance by the Borrower of its common Equity Interests that are listed on a national exchange or publicly offered (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the Securities Exchange Commission in accordance with the Securities Act of 1933 (whether alone or in connection with a secondary public offering), which shall include any direct listing by the Borrower or one of its Subsidiaries of its capital stock or equity securities on a national securities exchange or (b) the merger, consolidation, share exchange or other business combination of the Borrower, or any direct or indirect parent of Borrower, with any domestic special purpose acquisition company, or any of its subsidiaries following which, the Equity Interests of the surviving company or acquirer (the "***Surviving Company***") is listed on a national securities exchange in the United States.

"***IRS***" means the U.S. Internal Revenue Service or any successor agency, and to the extent relevant, the U.S. Department of the Treasury.

"***Landlord Consent***" means a Landlord Consent substantially in the form of **Exhibit G.**

"***Law***" means, collectively, all U.S. or non-U.S. federal, state, provincial, territorial, municipal or local statute, treaty, rule, guideline, regulation, ordinance, code or administrative or judicial precedent or authority, including any interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"***Lenders***" has the meaning set forth in the preamble hereto.

"***Lien***" means (a) any mortgage, lien, license, pledge, hypothecation, charge, security interest, or other encumbrance of any kind or character whatsoever, whether or not filed, recorded or otherwise perfected under applicable Law, or any lease, title retention agreement, mortgage, restriction, easement, right-of-way, option or adverse claim (of ownership or possession) (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any other encumbrance on title to real property, any option or other agreement to sell, or give a security interest in, such asset and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes of any jurisdiction)) or any preferential arrangement that has the practical effect of creating a security

-16-

interest and (b) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"***Loan***" means a loan deemed to have been made by a Lender pursuant to **Section 2.01** or any Incremental Term Loans made to the Borrower pursuant to **Section 2.06**.

"***Loan Documents***" means, collectively, this Agreement, the Notes, the Security Documents, the Warrants, the Fee Letter, any Guarantee Assumption Agreement, the Intercompany Subordination Agreement and any subordination agreement, intercreditor agreement or other present or future document, instrument, agreement or certificate delivered to the Administrative Agent (for itself or for the benefit of any other Secured Party) in connection with this Agreement or any of the other Loan Documents, in each case, as amended or otherwise modified.

"***Loss***" means judgments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any Claim or any proceeding relating to any Claim.

"***Majority Lenders***" means, at any time, Lenders having at such time in excess of fifty percent (50%) of the aggregate Commitments (or, if such Commitments are terminated, the outstanding principal amount of the Loans) then in effect; provided that for so long as any Oaktree Lender holds any Loans or Commitments hereunder, the Majority Lenders shall include such Oaktree Lender.

"***Margin Stock***" means "margin stock" within the meaning of Regulations U and X.

"***Material Adverse Change***" and "***Material Adverse Effect***" mean a material adverse change in or effect on (i) the business, financial performance, operations, condition of the assets or liabilities of the Borrower and its Subsidiaries taken as a whole, (ii) the ability of any Obligor to perform its obligations under the Loan Documents, as and when due, (iii) the legality, validity, binding effect or enforceability of the Loan Documents or (iv) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent or the Secured Parties under any of the Loan Documents.

"***Material Agreement***" means any Contract required to be disclosed (including amendments thereto) under regulations promulgated under the Securities Act of 1933 or Securities Exchange Act of 1934, as may be amended. For the avoidance of doubt, employment and management contracts shall not be Material Agreements.

"***Material Indebtedness***" means, at any time, any Indebtedness of any Obligor or Subsidiary thereof, the outstanding principal amount of which, individually or in the aggregate, exceeds $5,000,000 (or the Equivalent Amount in other currencies).

"***Material Intellectual Property***" means all Intellectual Property, whether currently owned by (or purported to be owned by) or licensed to (or purported to be licensed to) the Borrower or any of its Subsidiaries, or acquired, developed or obtained by or otherwise licensed

-17-

to the Borrower or any of its Subsidiaries after the Closing Date that is, in each case, material to any current, planned or anticipated business of the Borrower and its Subsidiaries.

"*Material Subsidiary*" means any Subsidiary of the Borrower that is not an Immaterial Subsidiary.

"*Maturity Date*" means August 3, 2028.

"*Maximum Rate*" has the meaning set forth in **Section 14.17**.

"*Minimum Liquidity Amount*" means $2,500,000.

"*Mortgage Deliverables*" has the meaning set forth in **Section 8.12(b)**.

"*Multiemployer Plan*" means any multiemployer plan, as defined in Section 400l(a)(3) of ERISA, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"*Net Cash Proceeds*" means, (i) with respect to any Casualty Event experienced or suffered by any Obligor or any of its Subsidiaries, the amount of cash proceeds received (directly or indirectly) from time to time by or on behalf of such Person after deducting therefrom only (w) reasonable costs and expenses related thereto incurred by such Obligor or such Subsidiary in connection therewith, (x) Taxes (including transfer Taxes or net income Taxes) paid or payable in connection therewith, (y) reasonable reserves established for liabilities estimated to be payable in respect of such Casualty Event and deposited into escrow with a third party escrow agent on terms reasonably acceptable to the Administrative Agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of the Administrative Agent and (z) any amounts required to be used to prepay Permitted Indebtedness pursuant to **Sections 9.01(j)** and **9.01(l)** secured by the assets subject to such Casualty Event (other than (A) Indebtedness owing to the Administrative Agent or any Lender under this Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset); and (ii) with respect to any Asset Sale by any Obligor or any of its Subsidiaries, the amount of cash proceeds received (directly or indirectly) from time to time by or on behalf of such Person after deducting therefrom only (w) reasonable costs and expenses related thereto incurred by such Obligor or such Subsidiary in connection therewith, (x) Taxes (including transfer Taxes or net income Taxes) paid or payable in connection therewith, (y) reasonable reserves established for liabilities estimated to be payable in respect of such Asset Sale and deposited into escrow with a third party escrow agent on terms reasonably acceptable to the Administrative Agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of the Administrative Agent and (z) any amounts required to be used to prepay Permitted Indebtedness pursuant to **Sections 9.01(j)** and **9.01(l)** secured by the assets subject to such Asset Sale (other than (A) Indebtedness owing to the Administrative Agent or any Lender under this Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset); provided that, in each case of **clauses (i)** and **(ii)**, costs and expenses shall only be deducted to the extent, that the amounts so deducted are (x) actually paid to a Person that is not an Affiliate of any Obligor or any of its Subsidiaries and (y) properly attributable to such Casualty Event or Asset Sale, as the case may be.

-18-

"***Note***" means a promissory note, in substantially the form of **Exhibit A** hereto, executed and delivered by the Borrower to any Lender in accordance with **Section 2.04**.

"***NY UCC***" means the UCC as in effect from time to time in New York.

"***Oaktree Lender***" means any Lender that is an Affiliate or managed fund or account of Oaktree Capital Management, L.P.

"***Obligations***" means, with respect to any Obligor, all amounts, obligations, liabilities, covenants and duties of every type and description owing by such Obligor to any Secured Party (including all Guaranteed Obligations and Warrant Obligations) any other indemnitee hereunder or any participant, arising out of, under, or in connection with, any Loan Document, whether direct or indirect (regardless of whether acquired by assignment), absolute or contingent, due or to become due, whether liquidated or not, now existing or hereafter arising and however acquired, and whether or not evidenced by any instrument or for the payment of money, including, without duplication, (i) if such Obligor is the Borrower, all Loans (including any PIK Interest accrued and capitalized), (ii) all interest, whether or not accruing after the filing of any petition in bankruptcy or after the commencement of any insolvency, reorganization or similar proceeding, and whether or not a claim for post-filing or post-petition interest is allowed in any such proceeding, and (iii) all other fees, expenses (including fees, charges and disbursement of counsel), interest, Prepayment Fee, commissions, charges, costs, disbursements, indemnities and reimbursement of amounts paid and other sums chargeable to such Obligor under any Loan Document.

"***Obligors***" means, collectively, the Borrower and the Subsidiary Guarantors and their respective successors and permitted assigns.

"***OFAC***" has the meaning assigned to such term in the definition of "Anti-Terrorism Laws."

"***Off-Balance Sheet Liability***" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"***Ordinary Course***" means ordinary course of business or ordinary trade activities that are customary for similar businesses in the normal course of their ordinary operations and not while in financial distress and are consistent with past practice.

"***Organic Document***" means, for any Person, such Person's formation documents, including, as applicable, its certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts, investor rights agreements, voting rights agreements, co-sale agreements and similar arrangements applicable to such Person's Equity Interests, or any equivalent document of any of the foregoing.

-19-

"***Other Connection Taxes***" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"***Other Taxes***" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 5.04**).

"***Participant***" has the meaning set forth in **Section 14.05(e)**.

"***Participant Register***" has the meaning set forth in **Section 14.05(e)**.

"***Patents***" means all patents and patent applications, including (i) the Inventions and improvements described and claimed therein, (ii) the reissues, divisions, continuations, renewals, extensions, and continuations in part thereof, and (iii) all rights whatsoever accruing thereunder or pertaining thereto throughout the world.

"***Patriot Act***" has the meaning set forth in **Section 14.19**.

"***Payment Date***" means (i) March 31, June 30, September 30 and December 31 of each year, commencing on the first such date to occur after the Closing Date (provided, that if such date is not a Business Day, then on the immediately preceding Business Day); and (ii) the Maturity Date.

"***Payment Recipient***" has the meaning set forth in **Section 12.13(a)**.

"***PBGC***" means the United States Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"***Permits***" means all licenses, permits and certificates of the Borrower and any of its Affiliates used or useful in connection with the ownership, operation, use or occupancy of the Property or the Project.

"***Permitted Acquisition***" means any Acquisition by the Borrower or any of its Subsidiaries, whether by purchase, merger or otherwise; underline(provided) that:

(a)    immediately prior to, and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or could reasonably be expected to result therefrom;

(b)    such Acquisition shall comply in all material respects with all applicable Laws and all applicable Governmental Approvals;

-20-

(c)      in the case of any Acquisition of Equity Interests of another Person, after giving effect to such Acquisition, all Equity Interests of such other Person acquired by the Borrower or any of its Subsidiaries shall be owned, directly or indirectly, beneficially and of record, by the Borrower or any of its Subsidiaries, and, the Borrower shall cause such acquired Person to satisfy each of the actions set forth in **Section 8.12** as required by such Section;

(d)      on a *pro forma* basis after giving effect to such Acquisition, the Borrower and its Subsidiaries shall be in compliance with the financial covenant set forth in **Section 10**;

(e)      to the extent that the purchase price for any such Acquisition is paid in cash, the amount thereof does not exceed $10,000,000 (or the Equivalent Amount in other currencies) in the aggregate;

(f)      to the extent that the purchase price for any such Acquisition is paid in Equity Interests, all such Equity Interests shall be Qualified Equity Interests;

(g)      in the case of any such Acquisition that has a purchase price in excess of $35,000,000, (A) the Borrower shall provide to the Administrative Agent (i) at least ten (10) Business Day's prior written notice of any such Acquisition, together with summaries, prepared in reasonable detail, of all due diligence conducted by or on behalf of the Borrower or the applicable Subsidiary, as applicable, prior to such Acquisition, in each case subject to customary confidentiality restrictions, (ii) subject to customary confidentiality restrictions, a copy of the draft purchase agreement related to the proposed Acquisition (and any related documents requested by the Administrative Agent), (iii) pro forma financial statements of the Borrower and its Subsidiaries (as of the last day of the most recently ended fiscal quarter prior to the date of consummation of such Acquisition for which financial statements are required to be delivered pursuant to **Section 8.01(a)** or (**b**)) after giving effect to such Acquisition, and (iv) subject to customary confidentiality restrictions, any other information reasonably requested (to the extent available), by the Administrative Agent and available to the Obligors and (B) to the extent the cash purchase price exceeds $35,000,000, the Administrative Agent shall have consented to in writing to such Acquisition; and

(h)      no Obligor or any of its Subsidiaries (including any acquired Person) shall, in connection with any such Acquisition, assume or remain liable with respect to (x) any Indebtedness of the related seller or the business, Person or assets acquired unless such Indebtedness is permitted under Section 9.01, (y) any Lien on any business, Person or assets acquired unless such Lien is a Permitted Lien, (z) any other liabilities (including Tax, ERISA and environmental liabilities), except to the extent the assumption of such liability could not reasonably be expected to result in a Material Adverse Effect. Any other such Indebtedness, liabilities or Liens not permitted to be assumed, continued or otherwise supported by any Obligor or Subsidiary thereof hereunder shall be paid in full or released within sixty (60) days of the acquisition date as to the business, Persons or properties being so acquired on or before the consummation of such Acquisition.

"***Permitted Cash Equivalent Investments***" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States or any member states of the European Union or any agency or any state thereof having maturities of not more than one (1) year from the date

-21-

of acquisition, (ii) commercial paper maturing no more than two hundred seventy (270) days after the date of acquisition thereof and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc., (iii) certificates of deposit maturing no more than one (1) year after issue that are issued by any bank organized under the Laws of the United States, or any state thereof, or the District of Columbia, or any U.S. branch of a foreign bank having, at the date of acquisition thereof, combined capital and surplus of not less than $500,000,000 and (iv) any money market or similar funds that exclusively hold any of the foregoing.

"*Permitted Exclusive License*" means that certain (i) Agreement for a License and Supply Agreement from SiO2 to Santo, dated as of August 5, 2015, by and between the Borrower and Santo, (ii) Letter Agreement Regarding Exclusive Licenses to SiO2 Technology, dated as of July 11, 2017, by and between Santo and the Borrower and (iii) License Agreement Confirmation and Right to Manufacture Agreement, entered into as of August 20, 2020, by and among the Borrower, Santo and Klinge Biopharma GmbH.

"*Permitted Hedging Agreement*" means a Hedging Agreement entered into by any Obligor in such Obligor's Ordinary Course for the purpose of hedging interest rate risks (and not for speculative purposes) and in an aggregate notional amount for all such Hedging Agreements in excess of 50%, but not more than 100%, of the aggregate principal amount of Loans outstanding at such time.

"*Permitted Holders*" means any Person that is an Affiliate or managed fund or account of Oaktree Capital Management, L.P.

"*Permitted Indebtedness*" means any Indebtedness permitted under **Section 9.01**.

"*Permitted Investment*" means any Investment permitted under **Section 9.05.**

"*Permitted Licenses*" are outbound non-exclusive licenses for the use of the Intellectual Property of any Borrower or any of their Subsidiaries entered into in the Ordinary Course.

"*Permitted Liens*" means any Liens permitted under **Section 9.02**.

"*Permitted Refinancing*" means, with respect to any Indebtedness permitted to be refinanced, extended, renewed or replaced hereunder, any refinancings, extensions, renewals and replacements of such Indebtedness; underlined provided that such refinancing, extension, renewal or replacement shall not (i) increase the outstanding principal amount of the Indebtedness being refinanced, extended, renewed or replaced, except by an amount equal to accrued interest and any required prepayment premium, (ii) contain terms relating to outstanding principal amount, amortization, maturity, collateral security (if any) or subordination (if any), or other material terms that, taken as a whole, are less favorable in any material respect to the Obligors and their respective Subsidiaries or the Secured Parties than the terms of any agreement or instrument governing such existing Indebtedness, (iii) have an applicable interest rate which does not exceed the greater of (A) the rate of interest of the Indebtedness being replaced and (B) the then applicable market interest rate, (iv) contain any new requirement to grant any Lien or to give any Guarantee that was not an existing requirement of such Indebtedness and (v) after giving effect

-22-

to such refinancing, extension, renewal or replacement, no Default shall have occurred (or could reasonably be expected to occur) as a result thereof.

"***Person***" means any individual, corporation, company, voluntary association, partnership, limited liability company, joint venture, trust, unincorporated organization or Governmental Authority or other entity of whatever nature.

"***Plan***" has the meaning set forth in the recitals hereto.

"***PIK Interest***" has the meaning set forth in **Section 3.02(c)**.

"***Plan***" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"***Prepayment Fee***" means with respect to any repayment or prepayment of all or any portion of the Loans or any requirement to repay or prepay any Loans, whether by optional or mandatory prepayment, acceleration or otherwise, occurring (i) on or prior to the date that is 36 months after the Closing Date, an amount equal to the amount of interest that would have been paid on the principal amount of the Loans being so repaid or prepaid for the period from and including the date of such repayment or prepayment to but excluding the date that is 36 months after the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans that is in effect on the date of such repayment or prepayment and on the basis of actual days elapsed over a year of three hundred sixty (360) days), *plus* three percent (3%) of the principal amount of the Loans being so repaid or prepaid and the Commitments being so terminated, (ii) at any time after the date that is 36 months after the Closing Date but on or prior to the date that is 48 months after the Closing Date, an amount equal to three percent (3%) and (iii) if the repayment or prepayment is made after the date that is 48 months after the Closing Date, 0%.

"***Prepayment Price***" has the meaning set forth in **Section 3.03(a)(i)**.

"***Pro Forma Basis***" or "***pro forma basis***" shall mean, with respect to the calculation of any financial ratio, as of any date, that *pro forma* effect will be given to the Transactions, any Permitted Acquisition, any issuance, incurrence, assumption or permanent repayment of Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transaction and for which any such financial ratio is being calculated), all sales, transfers and other dispositions or discontinuance of any subsidiary, line of business or division, or any conversion of a Subsidiary Guarantor to Subsidiary or of a Subsidiary to a Subsidiary Guarantor, in each case that have occurred during the four consecutive fiscal quarter period of the Borrower being used to calculate such financial ratio (the "***Reference Period***"), or subsequent to the end of the Reference Period but prior to such date or prior to or simultaneously with the event for which a determination under this definition is made (including any such event occurring at a person who became a Subsidiary after the commencement of the Reference Period), as if each such event occurred on the first day of the Reference Period.

-23-

"***Product***" means (i) those products (and described in reasonable detail) on **Schedule 2** attached hereto, and (ii) any current or future product developed, distributed, dispensed, imported, exported, labeled, promoted, manufactured, licensed, marketed, sold or otherwise commercialized by any Obligor or any of its Subsidiaries, including any such product in development or which may be developed.

"***Product Authorizations***" means any and all Governmental Approvals, whether U.S. or non-U.S. (including all applicable Product Standards, supplements, amendments, pre- and post-approvals, governmental price and reimbursement approvals and approvals of applications for regulatory exclusivity) of any Regulatory Authority, in each case, necessary to be held or maintained by, or for the benefit of, any Obligor or any of its Subsidiaries for the ownership, use or commercialization of any Product or for any Product Commercialization and Development Activities with respect thereto in any country or jurisdiction.

"***Product Commercialization and Development Activities***" means, with respect to any Product, any combination of research, development, manufacture, import, use, sale, licensing, importation, exportation, shipping, storage, handling, design, labeling, marketing, promotion, supply, distribution, testing, packaging, purchasing or other commercialization activities, receipt of payment in respect of any of the foregoing (including, without limitation, in respect of licensing, royalty or similar payments), or any similar or other activities the purpose of which is to commercially exploit such Product.

"***Product Standards***" means all safety, quality and other specifications and standards applicable to any Product, including all pharmaceutical, biological and other standards promulgated by Standards Bodies.

"***Prohibited Payment***" means any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment) to any officer, employee or ceremonial office holder of any government or instrumentality thereof, political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing that is prohibited under any Law for the purpose of influencing any act or decision of such payee in his official capacity, inducing such payee to do or omit to do any act in violation of his lawful duty, securing any improper advantage or inducing such payee to use his influence with a government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality.

"***Project***" means the prefilled syringe production facility located on the Property, infrastructure for such facility and amenities related thereto, as they may at any time exist.

"***Property***" means the real property situated in the County upon which the Project is located.

"***Proportionate Share***" means, with respect to any Lender, the percentage obtained by dividing (i) the sum of the outstanding principal amount of the Loans of such Lender then in effect by (ii) the sum of the outstanding principal amount of the Loans of all Lenders then in effect.

-24-

"***Qualified Equity Interest***" means, with respect to any Person, any Equity Interest of such Person that is not a Disqualified Equity Interest.

"***Qualified IPO/SPAC Transaction***" means an IPO/SPAC Transaction pursuant to which the following requirements are met: (a) both before and after giving effect to the IPO/SPAC Transaction, no Default or Event of Default shall have occurred and be continuing, (b) such IPO/SPAC Transaction shall be consummated based on an implied enterprise value of Borrower of not less than $1,500,000,000, with total cash proceeds (including cash investments pursuant to any "PIPE" transaction, backstop investment, conversion of sponsor notes and cash available in the trust account (after redemptions and payment of any deferred underwriting expenses and transaction expenses not related to the IPO/SPAC Transaction)) of not less than $400,000,000, net of any underwriting discount and commissions, and (i) the Borrower's and its Subsidiaries' balance sheet cash plus (ii) cash on the Surviving Company's working capital balance sheet on the date of the consummation of the IPO/SPAC Transaction is not less than $200,000,000, (c) all Indebtedness of the Borrower and its Subsidiaries that is convertible into Equity Interests of the Borrower outstanding on or prior to such Qualified IPO/SPAC Transaction shall have been converted into Equity Interests in full in accordance with its respective terms, (d) to the extent the Surviving Company is not the Borrower (or its direct or indirect parent), such Surviving Company shall have assumed each of the Warrants pursuant to documentation in form and substance reasonably acceptable to the Administrative Agent and (e) the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer of the Borrower certifying as to the consummation of such transaction and the satisfaction of each of the foregoing criteria along with copies of all definitive documentation relating thereto.

"***Qualified Plan***" means an employee benefit plan (as defined in Section 3(3) of ERISA) other than a Multiemployer Plan (i) that is or was at any time maintained or sponsored by any Obligor or any ERISA Affiliate thereof or to which any Obligor or any ERISA Affiliate thereof has ever made, or was ever obligated to make, contributions, and (ii) that is intended to be tax qualified under Section 401(a) of the Code.

"***R+D Promissory Note***" means the Promissory Note, executed by the Borrower in favor of R+D Custom Automation, Inc., in the original principal amount of $3,500,000.

"***Real Property Security Documents***" means any Mortgage Deliverables, Landlord Consents or Bailee Letters.

"***Recipient***" means any Lender or any other recipient of any payment to be made by or on account of any Obligation.

"***Register***" has the meaning set forth in **Section 14.05(d)**.

"***Regulation T***" means Regulation T of the Board of Governors of the Federal Reserve System, as amended.

"***Regulation U***" means Regulation U of the Board of Governors of the Federal Reserve System, as amended.

"***Regulation X***" means Regulation X of the Board of Governors of the Federal Reserve System, as amended.

"***Regulatory Approvals***" mean, with respect to a Product, the approval of the applicable Regulatory Authority necessary for the testing, manufacturing, use, storage, supply, promotion, marketing or sale of such Product for a particular indication in a particular jurisdiction.

"***Regulatory Authority***" means any Governmental Authority, whether U.S. or non-U.S., that is concerned with or has regulatory or supervisory oversight with respect to any Product or any Product Commercialization and Development Activities relating to any Product.

"***Reinvestment***" has the meaning set forth in **Section 3.03(b)(i)**.

"***Reinvestment Period***" has the meaning set forth in **Section 3.03(b)(i)**.

"***Related Parties***" or "***Related Persons***" has the meaning set forth in **Section 14.16**.

"***Renasant Indebtedness***" means the Indebtedness outstanding under that certain Amended and Restated Credit Agreement dated as of February 26, 2021 by and among the Borrower, as the borrower, and Renasant Bank, as lender, as in effect as of the Closing Date and without giving effect to any amendments, modifications, waivers, supplements or restatements thereafter.

"***Resignation Effective Date***" has the meaning set forth in **Section 12.09**.

"***Resolution Authority***" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"***Responsible Officer***" of any Person means each of the president, chief executive officer, chief financial officer and similar officer of such Person.

"***Restricted Payment***" means any dividend or other distribution (whether in cash, Equity Interests or other property) with respect to any Equity Interests of any Obligor or any of its Subsidiaries, or any payment (whether in cash, Equity Interests or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests of any Obligor or any of its Subsidiaries, or any option, warrant or other right to acquire any such Equity Interests of any Obligor or any of its Subsidiaries.

"***Restrictive Agreement***" means any Contract or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of any Obligor or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its properties or assets (other than (x) customary provisions in Contracts (including without limitation leases and in bound licenses of Intellectual Property) restricting the assignment thereof and (y) restrictions or conditions imposed by any Contract governing secured Permitted Indebtedness permitted under **Section 9.01(j)**, to the extent that such restrictions or conditions apply only to the property or assets securing such Indebtedness), or (ii) the ability of any Obligor or any of its Subsidiaries to make Restricted Payments with respect to any of their respective Equity Interests or to make or

-26-

repay loans or advances to any other Obligor or any of its Subsidiaries or such other Obligor or to Guarantee Indebtedness of any other Obligor or any of its Subsidiaries thereof or such other Obligor.

"***Revenue***" means, for any relevant fiscal period, the consolidated revenues of the Borrower and its Subsidiaries for such fiscal period solely to the extent consisting of product net sales, as recognized on the income statement of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; <u>provided</u> that in no event shall any payments received in connection with any arrangement with the Biomedical Advanced Research and Development Authority (or any successor) be included in Revenue.

"***Sanction***" means any international economic or financial sanction or trade embargo imposed, administered or enforced from time to time by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union or its Member States, His Majesty's Treasury or other relevant sanctions authority where the Borrower is located or conducts business.

"***Sanctioned Person***" means, at any time, (i) any Person listed in any Sanctions-related list of designated Persons maintained by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union or its Member States, Her Majesty's Treasury, or other relevant sanctions authority, (ii) any Person organized or resident in a Designated Jurisdiction or (iii) any Person fifty percent (50%) or more owned or is controlled by any such Person or Persons described in the foregoing **clause (i) or (ii)**.

"***Santo***" means Santo Holding (Deutschland) GmbH, a company incorporated under the laws of Germany.

"***Secured Parties***" means the Lenders, the Administrative Agent and any of their respective permitted transferees or assigns.

"***Securities Act***" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"***Security Agreement***" means the Security Agreement, delivered pursuant to **Section 6.01(i)**, among the Obligors and the Administrative Agent, granting a security interest in the Obligors' personal property in favor of the Administrative Agent, for the benefit of the Secured Parties (and as amended, modified or replaced from time to time with the consent of the Administrative Agent).

"***Security Documents***" means, collectively, the Security Agreement, each Short-Form IP Security Agreement, each Real Property Security Document, and each other security document, control agreement or financing statement required or recommended to perfect Liens in favor of the Secured Parties for purposes of securing the Obligations.

"***Short-Form IP Security Agreements***" means short-form Copyright, Patent or Trademark (as the case may be) security agreements, dated as of the Closing Date and substantially in the form of Exhibits C, D and E to the Security Agreement, entered into by one

or more Obligors in favor of the Secured Parties, each in form and substance satisfactory to the Administrative Agent (and as amended, modified or replaced from time to time).

"*Solvent*" means, as to any Person as of any date of determination, that on such date (i) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (ii) the present fair saleable value of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (iii) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (iv) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital. The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"*Specified Assets*" means all production facilities of the Obligors currently owned or in which any Obligor has a lessee interest pursuant to a ground lease or that may in the future be acquired or created, including the facilities located at 2250 Riley Street, Auburn, AL, all property, plant and equipment associated with such facilities, and all infrastructure for such facilities and amenities related thereto.

"*Standards Bodies*" means any of the organizations that create, sponsor or maintain safety, quality or other standards, including ISO, ANSI, CEN and SCC and the like.

"*Subsidiary*" means, with respect to any Person (the "*parent*") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (i) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests are, as of such date, owned, controlled or held, directly or indirectly, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more direct or indirect subsidiaries of the parent or by the parent and one or more direct or indirect subsidiaries of the parent. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"*Subsidiary Guarantors*" means each Subsidiary of the Borrower identified under the caption "SUBSIDIARY GUARANTORS" on the signature pages hereto and each Subsidiary of the Borrower that becomes, or is required to become, a "Subsidiary Guarantor" after the Closing Date pursuant to **Section 8.12(a)** or **8.12(b)**.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

-28-

"***Term Loan***" has the meaning assigned to such term in **Section 2.01**.

"***Termination Conditions***" has the meaning set forth in **Section 13.03**.

"***Title IV Plan***" means an employee benefit plan (as defined in Section 3(3) of ERISA) other than a Multiemployer Plan (i) that is or was at any time maintained or sponsored by any Obligor or any ERISA Affiliate thereof or to which any Obligor or any ERISA Affiliate thereof has ever made, or was obligated to make, contributions, and (ii) that is or was subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA.

"***Trade Secrets***" means all know-how, trade secrets and other proprietary or confidential information, any information of a scientific, technical, or business nature in any form or medium, Inventions and Invention disclosures, all documented research, developmental, demonstration or engineering work (including all novel manufacturing methods), and all other technical data and information related thereto.

"***Trademarks***" means all trade names, trademarks and service marks, trade dress, corporate names, logos, Internet domain names, IP addresses, social media handles, uniform resource locators and other indicia of origin, trademark and service mark registrations, and applications for trademark and service mark registrations, whether or not registered, and any and all common law rights thereto, including (i) all renewals of trademark and service mark registrations and (ii) all rights whatsoever accruing thereunder or pertaining thereto throughout the world, together, in each case, with the goodwill of the business connected with the use thereof and symbolized thereby.

"***Transactions***" means (a) the Exit Transaction, (b) the funding (or deemed funding) of the Term Loan and (c) the payment of fees, commissions, costs and expenses in connection with the foregoing.

"***UCC***" means, with respect to any applicable jurisdictions, the Uniform Commercial Code as in effect in such jurisdiction, as may be modified from time to time.

"***UK Financial Institutions***" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"***UK Resolution Authority***" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"***United States***" or "***U.S.***" means the United States of America, its fifty states and the District of Columbia.

"***U.S. Person***" means a "United States Person" within the meaning of Section 7701(a)(30) of the Code.

-29-

"***U.S. Tax Compliance Certificate***" has the meaning set forth in **Section 5.03(f)(ii)(B)(3)**.

"***Warrant Obligations***" means all Obligations of Borrower arising out of, under or in connection with the Warrants.

"***Warrants***" means the Warrants, dated as of the Closing Date and delivered to the Lenders pursuant to the Approved Plan.

"***Withdrawal Liability***" means, at any time, any liability incurred (whether or not assessed) by any ERISA Affiliate and not yet satisfied or paid in full at such time with respect to any Multiemployer Plan pursuant to Section 4201 of ERISA.

"***Withholding Agent***" means the Borrower and the Administrative Agent.

"***Write-Down and Conversion Powers***" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.02**          **Accounting Terms and Principles**. Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under **Section 10** and any definitions used in such calculations) shall be made, in accordance with GAAP. Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Borrower and its Subsidiaries, in each case without duplication. If the Borrower requests an amendment to any provision hereof to eliminate the effect of (a) any change in GAAP or the application thereof or (b) the issuance of any new accounting rule or guidance or in the application thereof, in each case, occurring after the date of this Agreement, then the Lenders and Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change or issuance with the intent of having the respective positions of the Lenders and Borrower after such change or issuance conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, (i) the provisions in this Agreement shall be calculated as if no such change or issuance has occurred and (ii) the Borrower shall provide to the Lenders a written reconciliation in form and substance reasonably satisfactory to the Lenders, between calculations of any baskets and other requirements hereunder before and after giving effect to such change or issuance. For purposes of the definition of Indebtedness and related covenants, GAAP will be deemed to treat any operating lease as an operating lease and not a capital lease, regardless of any change in GAAP as a result of ASU 2016-02, Leases (Topic 842) by the

-30-

Financial Accounting Standards Board to the extent such operating lease was so treated under GAAP as in effect for any fiscal year of Borrower beginning before December 15, 2018.

**1.03        Interpretation**. For all purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires,

(a)     the terms defined in this Agreement include the plural as well as the singular and vice versa;

(b)     words importing gender include all genders;

(c)     any reference to a Section, Annex, Schedule or Exhibit refers to a Section of, or Annex, Schedule or Exhibit to, this Agreement;

(d)     any reference to "this Agreement" refers to this Agreement, including all Annexes, Schedules and Exhibits hereto, and the words herein, hereof, hereto and hereunder and words of similar import refer to this Agreement and its Annexes, Schedules and Exhibits as a whole and not to any particular Section, Annex, Schedule, Exhibit or any other subdivision;

(e)     references to days, months and years refer to calendar days, months and years, respectively;

(f)     all references herein to "include" or "including" shall be deemed to be followed by the words "without limitation";

(g)     the word "from" when used in connection with a period of time means "from and including" and the word "until" means "to but not including";

(h)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer broadly to any and all assets and properties, whether tangible or intangible, real or personal, including cash, securities, rights under contractual obligations and permits and any right or interest in any such assets or property;

(i)     accounting terms not specifically defined herein (other than "property" and "asset") shall be construed in accordance with GAAP, subject to **Section 1.02**;

(j)     the word "will" shall have the same meaning as the word "shall";

(k)     where any provision in this Agreement or any other Loan Document refers to an action to be taken by any Person, or an action which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or, to the knowledge of such Person, indirectly; and

(l)     references to any Lien granted or created hereunder or pursuant to any other Loan Document securing any Obligations shall deemed to be a Lien for the benefit of the Secured Parties.

-31-

Unless otherwise expressly provided herein, references to organizational documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto permitted by the Loan Documents. Any definition or reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

If any payment required to be made pursuant to the terms and conditions of any Loan Document falls due on a day which is not a Business Day, then such required payment date shall be extended to the immediately following Business Day. For purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Obligors and their Subsidiaries will be deemed to be equal to 100% of the outstanding principal amount thereof or payment obligations with respect thereto at the time of determination thereof, or with respect to any Hedging Agreements, the amount that would be payable if the agreement governing such Hedging Agreements were terminated on the date of termination.

**1.04    Effectuation of Exit Transaction**. All references herein to the Borrower and its Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the Borrower and the other parties to this Agreement contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Exit Transactions to occur on the Closing Date, unless the context otherwise requires.

**1.05    Division**. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws) (a "***Division***"), if (a) any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## SECTION 2.
## THE COMMITMENT AND THE LOANS

**2.01    Loans**.

(a)    Subject to the satisfaction of the conditions set forth in Section 6.01 and this Section 2.01(a), on the Closing Date, and subject to the terms in this Agreement and in reliance on the representations and warranties in the Loan Documents and the Confirmation Order, each Lender severally but not jointly agrees to make and shall be deemed to have made to the Borrower, a single term loan, on a cashless basis, in a principal amount equal to the principal amount set forth opposite such Lender's name in Appendix A ("***Term Loan***").

(b)    No amounts paid or prepaid with respect to any Loan may be reborrowed.

(c)    Any term or provision hereof (or of any other Loan Document) to the contrary notwithstanding, Loans deemed to have been made to the Borrower will be denominated solely in Dollars and will be repayable solely in Dollars and no other currency.

**2.02**        **Borrowing Procedures**. At least one(1) Business Day prior to the Closing Date, the Borrower shall deliver to the Administrative Agent an irrevocable Borrowing Notice in the form of **Exhibit B** signed by a duly authorized representative of the Borrower (which notice, if received by the Administrative Agent on a day that is not a Business Day or after 10:00 A.M. (Eastern time) on a Business Day, shall be deemed to have been delivered on the next Business Day). The Borrowing Notice shall be for the full amount of the Term Loans and no Borrowing Notice for less than such full amount shall be permitted.

**2.03**        **[Reserved]**.

**2.04**        **Notes**. If requested by any Lender, the Loan of such Lender shall be evidenced by one or more Notes. The Borrower shall prepare, execute and deliver to the Lender such promissory note(s) substantially in the form attached hereto as **Exhibit A**.

**2.05**        **Use of Proceeds**. The Borrower shall use the proceeds of the Term Loan to refinance certain existing Indebtedness owed to the Lenders pursuant to the Approved Plan.

**2.06**        **Incremental Loans**.

        (a)        The Borrower may at any time and from time to time after the Closing Date, subject to the terms and conditions set forth herein, with the approval of the Majority Lenders, by notice to the Administrative Agent, request one or more additional Classes of term loans or additional term loans of the same Class of any existing Class of term loans (the "Incremental Term Loans" or the "Incremental Facilities"); provided that, after giving effect to the effectiveness of any Incremental Facility Amendment referred to below and at the time that any such Incremental Term Loan is made or effected, no Event of Default shall have occurred and be continuing or would result therefrom. Notwithstanding anything to contrary herein, the sum of the aggregate principal amount of the Incremental Facilities shall not at the time of incurrence of any such Incremental Facilities (and after giving effect to such incurrence) exceed $60,000,000.

        (b)        Each Incremental Term Loan shall be on the same terms as, and shall be treated for all purposes as, the initial Term Loans made on the Closing Date. Incremental Term Loan may be provided by existing Lenders or Additional Lenders acceptable to the Administrative Agent and Majority Lenders, in their sole discretion. Each Incremental Term Loan shall be in a minimum principal amount of $1,000,000 and integral multiples of $500,000 in excess thereof (unless the Borrower and the Administrative Agent otherwise agree); provided that such amount may be less than $1,000,000, if such amount represents all the remaining availability under the aggregate principal amount of Incremental Term Loans set forth above.

        (c)        Each notice from the Borrower pursuant to this **Section 2.06** shall set forth the requested amount of the relevant Incremental Term Loans.

        (d)        Commitments in respect of Incremental Term Loans shall become commitments under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such commitment (provided that no Lender shall be obligated to provide any loans or commitments under any Incremental Facility unless it so

-33-

agrees), if any, each Additional Lender and the Administrative Agent.  Incremental Term Loans shall be a "Loan" for all purposes of this Agreement and the other Loan Documents.  The Incremental Facility Amendment may without the consent of any other Lenders (except to the extent Lender consent is otherwise provided for herein), effect such amendments to this Agreement and the other Loan Documents as may be necessary, appropriate or advisable, in the opinion of the Administrative Agent and the Borrower, to effect the provisions of this **Section 2.06**.  The effectiveness of any Incremental Facility Amendment and the occurrence of any credit event (including the making of a Loan) pursuant to such Incremental Facility Amendment may be subject to the satisfaction of such additional conditions as the parties thereto shall agree.  The Borrower and any Subsidiary Guarantor may use the proceeds of the Incremental Term Loans for any purpose not prohibited by this Agreement.

(e)    Notwithstanding anything to the contrary, this  **Section 2.06** shall supersede any provisions in **Section 14.04** to the contrary.

## SECTION 3.
## PAYMENTS OF PRINCIPAL AND INTEREST, ETC.

**3.01    Scheduled Repayments and Prepayments Generally; Application**. The Borrower hereby promises to pay to the Administrative Agent for the account of each Lender (as such amounts may in each case be reduced from time to time in accordance with **Section 3.03**) on the Maturity Date, all outstanding Obligations in full (together with accrued and unpaid interest and any other accrued and unpaid charges thereon and all other obligations due and payable by the Borrower under this Agreement). Except as otherwise provided in this Agreement, each payment (including each repayment and prepayment) by the Borrower (other than fees payable pursuant to the Fee Letter) will be deemed to be made ratably in accordance with the Lenders' Proportionate Shares. On any date occurring prior to the Maturity Date that payment or prepayment in full of the Loans hereunder occurs, the Borrower shall pay in full all outstanding Obligations, which shall include the Prepayment Fee, if applicable.

**3.02    Interest**.

(a)    **Interest Generally**. The outstanding principal amount of the Loans shall accrue interest from the date made to repayment (whether by acceleration or otherwise and whether voluntary or mandatory) at the Interest Rate.

(b)    **Default Interest**. Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, the Interest Rate shall increase automatically by two percent (2.0%) *per annum* (the Interest Rate, as increased pursuant to this **Section 3.02(b)**, being the "*Default Rate*"). If any Obligation (other than Warrant Obligations but including, without limitation, fees, costs, and expenses hereunder) is not paid when due (giving effect to any applicable grace period) under any applicable Loan Document, the amount thereof shall accrue interest at the Default Rate.

(c)    **Interest Payment Dates**. Accrued interest on the Loans shall be payable in arrears on each Payment Date in cash, and upon the payment or prepayment of the Loans (on the principal amount being so paid or prepaid); provided that interest payable at the Default Rate

-34-

shall also be payable in cash from time to time on demand by the Administrative Agent; provided, further, that (i) with respect to any Payment Date occurring within twenty-four (24) months after the Closing Date, 12.0% per annum and (ii) with respect to any Payment Date thereafter, 6.0% per annum, of the interest for the applicable period shall be payable in kind by capitalizing and adding such interest to the outstanding principal amount of the Loans on such Payment Date ("*PIK Interest*") unless the Borrower elects, by written notice to the Administrative Agent at least three (3) Business Days prior to any Payment Date, to pay all of such interest in cash instead of as PIK Interest. The PIK Interest shall be automatically capitalized on the applicable Payment Date by adding the amount thereof to the outstanding principal amount of the Loans.  For purposes of this Agreement and the other Loan Documents, the amounts so capitalized pursuant to this **Section 3.02** shall constitute a portion of the principal amount outstanding of the Loans hereunder and shall bear interest in accordance with this **Section 3** and all references herein or in any other Loan Document to the principal amount of the Loans shall include all interest accrued and capitalized as a result of any payment of PIK Interest.

**3.03        Prepayments**.

>          (a)        **Optional Prepayments.**

>                (i)        Subject to prior written notice pursuant to **clause (ii)** below, the Borrower shall have the right upon written notice to the Administrative Agent pursuant to **Section 3.03(a)(ii)** below to optionally prepay in whole or in part the outstanding principal amount of the Loans on any Business Day for an amount equal to the sum of (A) the aggregate principal amount of the Loans being prepaid, (B) any accrued but unpaid interest on the principal amount of the Loans being prepaid, (C) any applicable Prepayment Fee and (D) other unpaid amounts then due and owing pursuant to this Agreement and the other Loan Documents (such aggregate amount, the "*Prepayment Price*"); provided that each partial prepayment of principal of Loans shall be in an aggregate amount at least equal to $5,000,000 and integral multiples of $1,000,000 in excess thereof (or, if less, the remaining principal amount of the outstanding Loans hereunder).

>                (ii)        A notice of optional prepayment shall be effective only if received by the Administrative Agent not later than 2:00 p.m. (Eastern time) on a date not less than three (3) (nor more than five (5)) Business Days prior to the proposed prepayment date; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Each notice of optional prepayment shall specify the proposed prepayment date, the Prepayment Price, the principal amount to be prepaid and any conditions to prepayment (if applicable).

>          (b)        **Mandatory Prepayments.**

>                (i)        **Mandatory Prepayments for Casualty Events or Asset Sales**. Upon the occurrence of any Casualty Event or Asset Sale (that is not otherwise permitted by

-35-

**Section 9.09** (other than pursuant to clause (l) thereof), the Borrower shall make a mandatory prepayment of the Loans in an amount equal to the sum of (i) one hundred percent (100%) of the Net Cash Proceeds received by the Borrower or any of its Subsidiaries with respect to such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, as the case may be, (ii) any accrued but unpaid interest on any principal amount of the Loans being prepaid and (iii) any applicable Prepayment Fee; provided that, so long as no Default has occurred and is continuing or shall result therefrom, if, following the occurrence of any such Casualty Event or Asset Sale as a result of which the Borrower or any of its Subsidiaries receives Net Cash Proceeds in an aggregate amount less than $15,000,000 and $50,000,000 in the aggregate for all such Casualty Events or Asset Sales over the term of this Agreement), a Responsible Officer of the Borrower delivers to the Administrative Agent a notice to the effect that the Borrower or the applicable Subsidiary intends to apply the Net Cash Proceeds from such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, to reinvest in the business of the Borrower or any of its Subsidiaries (a "***Reinvestment***"), then such Net Cash Proceeds of such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event may be applied for such purpose in lieu of such mandatory prepayment to the extent such Net Cash Proceeds of such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event are actually applied for such purpose; provided, further, that, if such Casualty Event or Asset Sale occurs with respect to any Obligor, such Reinvestment shall be made in the business of an Obligor; provided, further, that, in the event that Net Cash Proceeds have not been so applied within three hundred sixty-five (365) days (the "***Reinvestment Period***") following the occurrence of such Casualty Event or Asset Sale (or, if the Borrower or any of its Subsidiaries has entered into a binding commitment prior to the last day of such Reinvestment Period to reinvest such proceeds no later than one hundred eighty (180) days following the last day of the Reinvestment Period, one hundred eighty (180) days after the expiry of the Reinvestment Period), the Borrower shall no later than the end of such period make a mandatory prepayment of the Loans in an aggregate amount equal to the sum of (i) one hundred percent (100%) of the unused balance of such Net Cash Proceeds received by any Obligor or any of its Subsidiaries with respect to such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, (ii) any accrued but unpaid interest on any principal amount of the Loans being prepaid and (iii) any applicable Prepayment Fee.

(ii)     **Mandatory Prepayments for Debt Issuances**. Immediately upon receipt by any Obligor or any of its Subsidiaries of proceeds from any issuance, incurrence or assumption of Indebtedness other than Permitted Indebtedness, on or after the Closing Date, the Borrower shall prepay the Loans and other Obligations, *plus* the Prepayment Fee, if applicable, in an amount equal to 100% of the cash proceeds received.

(iii)    **[Reserved]**

(iv)    **Notice**. The Borrower shall provide the Administrative Agent with notice of any mandatory prepayment not later than 2:00 p.m. (New York City time) on a date not less than one (1) Business Day (or such shorter period agreed by the Administrative Agent).

(c)     **Application**. All prepayments of the Loans shall be applied to principal installments on the Loans in the inverse order of maturity. Each such prepayment shall be

-36-

accompanied by all accrued and unpaid interest on the Loans so prepaid, through the date of such prepayment and any applicable Prepayment Fee.

(d)    **Prepayment Fee**. Without limiting the foregoing, whenever the Prepayment Fee is in effect and payable pursuant to the terms hereof or any other Loan Document, such Prepayment Fee shall be payable on each prepayment of all or any portion of the Loans, whether by optional or mandatory prepayment, acceleration or otherwise (other than any prepayment pursuant to **Section 5.02**).

(e)    **Partial Prepayments**. Prepayments shall be accompanied by accrued interest to the extent required by **Section 3.02**.

## SECTION 4.
## PAYMENTS, ETC.

**4.01    Payments**.

(a)    **Payments Generally**. Each payment of principal, interest and other amounts to be made in cash by the Obligors under this Agreement or any other Loan Document shall be made (i) in Dollars, in immediately available funds, without deduction, set off or counterclaim, to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, to the deposit account of the Administrative Agent designated by the Administrative Agent by notice to the Borrower, and (ii) not later than 2:00 p.m. (Eastern time) on the date on which such payment is due (each such payment made after such time on such due date may, in the Administrative Agent's discretion, be deemed to have been made on the next succeeding Business Day).

(b)    **Application of Payments**. Notwithstanding anything herein to the contrary, following the occurrence and continuance of an Event of Default, all payments shall be applied as follows:

(A)    first, to the payment of that portion of the Obligations constituting unpaid fees, indemnities, expenses or other amounts (including fees and disbursements and other charges of counsel payable under **Section 14.03**) payable to the Administrative Agent in its capacity as such;

(B)    second, to the payment of that portion of the Obligations constituting unpaid fees, indemnities, costs, expenses and other amounts (other than principal and interest, but including fees and disbursements and other charges of counsel payable under **Section 14.03**, any Prepayment Fees) payable to the Lenders arising under the Loan Documents (other than the Warrants), ratably among them in proportion to the respective amounts described in this **clause (B)** payable to them;

(C)    third, to the payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this **clause (C)** payable to them;

-37-

(D)    fourth, to the payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this **clause (D)** payable to them;

(E)    fifth, in reduction of any other Obligation then due and owing, ratably among the Administrative Agent and the Lenders based upon the respective aggregate amount of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

(F)    sixth, the balance, if any, after all Obligations have been indefeasibly paid in full, to the Borrower or such other Person as may be lawfully entitled to or directed by the Borrower to receive the remainder.

(c)    **Non-Business Days**. If the due date of any payment under this Agreement (whether in respect of principal, interest, fees, costs or otherwise) would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall continue to accrue and be payable for the period of such extension; provided that if such next succeeding Business Day would fall after the Maturity Date, payment shall be made on the immediately preceding Business Day.

**4.02**    **Computations**. All computations of interest and fees hereunder shall be computed on the basis of a year of three hundred and sixty (360) days and actual days elapsed during the period for which payable.

**4.03**    **Set-Off**.

(a)    **Set-Off Generally**.  Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent, each of the Lenders and each of their Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than trust and tax accounts) at any time held and other indebtedness at any time owing by the Administrative Agent, any Lender and any of their Affiliates to or for the credit or the account of any Obligor against any and all of the Obligations, whether or not such Person shall have made any demand and although such obligations may be unmatured. Any Person exercising rights of set off hereunder agrees promptly to notify the Borrower after any such set-off and application; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Administrative Agent, the Lenders and each of their Affiliates under this **Section 4.03** are in addition to other rights and remedies (including other rights of set-off) that such Persons may have.

(b)    **Exercise of Rights Not Required**. Nothing contained in **Section 4.03(a)** shall require the Administrative Agent, any Lender or any of their Affiliates to exercise any such right or shall affect the right of such Persons to exercise, and retain the benefits of exercising, any such right with respect to any other indebtedness or obligation of any Obligor.

(c)    **Payments Set Aside.** To the extent that any payment by or on behalf of any Obligor is made to the Administrative Agent or any Lender, or the Administrative Agent,

-38-

any Lender or any Affiliate of the foregoing exercises its right of setoff pursuant to this **Section 4.03**, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, such Lender or such Affiliate in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any Insolvency Proceeding or otherwise, then (i) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (ii) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

## SECTION 5.
## YIELD PROTECTION, TAXES, ETC.

**5.01**          **Additional Costs**.

(a)          **Change in Law Generally**. If, on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), the adoption of any Law, or any change in any Law, or any change in the interpretation or administration thereof by any court or other Governmental Authority charged with the interpretation or administration thereof, or compliance by the Administrative Agent or any of the Lenders (or its lending office) with any request or directive (whether or not having the force of law) of any such Governmental Authority, shall impose, modify or deem applicable any reserve (including any such requirement imposed by the Board of Governors of the Federal Reserve System), special deposit, contribution, insurance assessment or similar requirement, in each case that becomes effective after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), against assets of, deposits with or for the account of, or credit extended by, a Lender (or its lending office) or shall impose on a Lender (or its lending office) any other condition affecting the Loans or the Commitment, and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining the Loans, or to reduce the amount of any sum received or receivable by such Lender under this Agreement or any other Loan Document, or subject any Lender to any Taxes on its Loan, Commitment or other obligations, or its deposits, reserves, other liabilities or capital (if any) attributable thereto by an amount reasonably deemed by such Lender in good faith to be material (other than (i) Indemnified Taxes, (ii) Taxes described in **clauses (ii)** through **(iv)** of the definition of Excluded Taxes and (iii) Connection Income Taxes), then the Borrower shall pay to such Lender on demand such additional amount or amounts as will compensate such Lender for such increased cost or reduction.

(b)          **Change in Capital Requirements**. If a Lender shall have determined that, on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), the adoption of any Law regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of law) of any such

-39-

Governmental Authority, in each case that becomes effective after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), has or would have the effect of reducing the rate of return on capital of a Lender (or its parent) as a consequence of a Lender's obligations hereunder or the Loans to a level below that which a Lender (or its parent) could have achieved but for such adoption, change, request or directive by an amount reasonably deemed by it to be material, then the Borrower shall pay to such Lender on demand such additional amount or amounts as will compensate such Lender (or its parent) for such reduction.

(c)      **Notification by Lender**. Each Lender promptly will notify the Borrower of any event of which it has knowledge, occurring after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), which will entitle such Lender to compensation pursuant to this **Section 5.01**. Before giving any such notice pursuant to this **Section 5.01(c)** such Lender shall designate a different lending office if such designation (x) will, in the reasonable judgment of such Lender, avoid the need for, or reduce the amount of, such compensation and (y) will not, in the reasonable judgment of such Lender, be materially disadvantageous to such Lender. A certificate of such Lender claiming compensation under this **Section 5.01**, setting forth the additional amount or amounts to be paid to it hereunder, shall be conclusive and binding on the Borrower in the absence of manifest error.

(d)      Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to constitute a change in Law for all purposes of this **Section 5.01**, regardless of the date enacted, adopted or issued.

**5.02**      **Illegality**. Notwithstanding any other provision of this Agreement, in the event that on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement) the adoption of or any change in any Law or in the interpretation or application thereof by any competent Governmental Authority shall make it unlawful for a Lender or its lending office to make or maintain the Loans (and, in the opinion of such Lender, the designation of a different lending office would either not avoid such unlawfulness or would be disadvantageous to such Lender), then such Lender shall promptly notify the Borrower thereof, following which if such Law shall so mandate, the Loans shall be prepaid by the Borrower on or before such date as shall be mandated by such Law in an amount equal to the Prepayment Price (notwithstanding anything herein to the contrary, without any Prepayment Fee) applicable on such prepayment date in accordance with **Section 3.03(a)**.

**5.03**      **Taxes**.

(a)      **Payments Free of Taxes**. Any and all payments by or on account of any Obligation shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such

-40-

deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws and, if such Tax is an Indemnified Tax, then the sum payable by such Obligor shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this **SECTION 5**) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    **Payment of Other Taxes by the Borrower**. The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Laws, or at the option of the Administrative Agent or each Lender, timely reimburse it for the payment of any Other Taxes.

(c)    **Evidence of Payments**. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this **SECTION 5**, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment.

(d)    **Indemnification by the Borrower**. The Borrower shall reimburse and indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this **SECTION 5**) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(e)    **Indemnification by the Lender**. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.05(e) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this **Section 5.03(e)**.

(f)    **Status of Lenders**.

-41-

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Law as reasonably requested by the Borrower as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two (2) sentences, the completion, execution and submission of such documentation (other than such documentation set forth in **Sections 5.03(f)(ii)(A), (ii)(B),** and **(ii)(D)**) shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 (or successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E as applicable (or successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E as applicable (or successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI (or successor form);

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit D-1** to the effect that such Foreign Lender is not a "bank"

-42-

within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "***U.S. Tax Compliance Certificate***") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E as applicable (or successor forms); or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY (or successor form), accompanied by IRS Form W-8ECI (or successor form), IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), a U.S. Tax Compliance Certificate, substantially in the form of **Exhibit D-2** or **D-3**, IRS Form W-9 (or successor form), and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Exhibit D-4** on behalf of each such direct and indirect partner.

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)     if a payment made to a Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this **clause (D)**, "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(g)     if the Administrative Agent is a U.S. Person, it shall deliver to the Borrower on or prior to the date on which it becomes the Administrative Agent under this Agreement with two duly completed copies of Form W-9. If the Administrative Agent is not a U.S. Person, it shall provide to the Borrower on or prior to the date on which it becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower): (A) two executed copies of the applicable Form W-8 with

-43-

respect to any amounts payable to the Administrative Agent for its own account, and (B) two executed copies of Form W-8IMY with respect to any amounts payable to the Administrative Agent for the account of others, together with all required attachments and backup documentation.

Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    **Treatment of Certain Tax Benefits**. If any party to this Agreement determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this **SECTION 5** (including by the payment of additional amounts pursuant to this **SECTION 5**), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this **SECTION 5** with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this **Section 5.03(h)** (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this **Section 5.03(h)**, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this **Section 5.03(h)** the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This **Section 5.03(h)** shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    **Survival**.  Each party's obligations under this **Section 5.03** shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**5.04**    **Mitigation Obligations**. If the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to **Section 5.01** or **Section 5.03**, then such Lender shall (at the request of the Borrower) use commercially reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the sole reasonable judgment of such Lender, such designation or assignment and delegation would (i) eliminate or reduce amounts payable pursuant to **Section 5.01** or **Section 5.03**, as the case may be, in the future, (ii) not subject such Lender to any unreimbursed cost or expense and (iii) not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and

-44-

expenses incurred by any Lender in connection with any such designation or assignment and delegation.

# SECTION 6.
# CONDITIONS

**6.01**     **Conditions to the Borrowing of the Term Loan**. The obligation of each Lender to make its Term Loan shall be subject to the delivery of a Borrowing Notice as required pursuant to **Section 2.02**, and the prior or concurrent satisfaction or waiver of each of the conditions precedent set forth below in this **Section 6.01**.

    (a)     **Loan Documents**. The Administrative Agent shall have received each Loan Document required to be executed by the appropriate Obligor on the Closing Date and delivered by each applicable Obligor in such number as reasonably requested by the Administrative Agent (which may be delivered by facsimile or other electronic means for the purposes of satisfying this **clause (a)** on the Closing Date) and such Loan Documents shall be in form and substance satisfactory to the Administrative Agent and the Lenders and their respective counsels.

    (b)     **[Reserved]**.

    (c)     **Secretary's Certificate, Etc.** The Administrative Agent shall have received from each Obligor (x) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (y) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Responsible Officer, as to:

    (i)     resolutions of each such Person's Board then in full force and effect authorizing the execution, delivery and performance of each Loan Document to be executed by such Person and the Transactions;

    (ii)     the incumbency and signatures of Responsible Officers authorized to execute and deliver each Loan Document to be executed by such Person; and

    (iii)     the full force and validity of the certificate of incorporation and by-laws (or equivalent documents) of such Person and copies thereof;

upon which certificates shall be in form and substance reasonably satisfactory to the Administrative Agent and upon which the Administrative Agent and the Lenders may conclusively rely until they shall have received a further certificate of the Responsible Officer of any such Person cancelling or amending the prior certificate of such Person.

    (d)     **Information Certificate**. The Administrative Agent shall have received a fully completed Information Certificate in form and substance reasonably satisfactory to the Administrative Agent, dated as of the Closing Date, duly executed and delivered by a Responsible Officer of the Borrower. All documents and agreements required to be appended to the Information Certificate, shall be in form and substance reasonably satisfactory to the Administrative Agent, shall have been executed and delivered by the requisite parties and shall be in full force and effect.

-45-

(e)　**Funding Date Certificate**. The Administrative Agent shall have received a Funding Date Certificate, dated as of the Closing Date and in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by a Responsible Officer of the Borrower.

(f)　**Delivery of Notes**. The Administrative Agent shall have received a Note to the extent requested by any Lender pursuant to **Section 2.04** for the Term Loan duly executed and delivered by a Responsible Officer of the Borrower.

(g)　**Financial Information, Etc.** The Administrative Agent shall have received unaudited consolidated balance sheets of the Borrower and its Subsidiaries for the fiscal quarter ended March 31, 2023 together with the related consolidated statement of operations, shareholder's equity and cash flows for such fiscal quarter.

(h)　**Solvency**. The Administrative Agent shall have received a solvency certificate, substantially in the form of **Exhibit K**, duly executed and delivered by the chief financial officer of the Borrower, dated as of the Closing Date, in form and substance reasonably satisfactory to the Administrative Agent.

(i)　**Security Documents**. The Administrative Agent shall have received executed counterparts of a Security Agreement, in form and substance reasonably acceptable to the Administrative Agent, dated as of the Closing Date, duly executed and delivered by each Obligor, together with all documents (including share certificates, transfers and stock transfer forms, notices or any other instruments) required to be delivered or filed under the Security Documents and evidence satisfactory to it that arrangements have been made with respect to all registrations, notices or actions required under the Security Documents to be effected, given or made in order to establish a valid and perfected first priority security interest in the Collateral in accordance with the terms of the Security Documents, including:

(i)　delivery of all certificates (in the case of Equity Interests that are certificated securities (as defined in the UCC)) evidencing the issued and outstanding capital securities owned by each Obligor that are required to be pledged and so delivered under the Security Agreement, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, or, in the case of Equity Interests that are uncertificated securities (as defined in the UCC), confirmation and evidence reasonably satisfactory to the Administrative Agent and the Lenders that the security interest required to be pledged therein under the Security Agreement has been transferred to and perfected by the Administrative Agent and the Lenders in accordance with Articles 8 and 9 of the NY UCC and all laws otherwise applicable to the perfection of the pledge of such Equity Interests;

(ii)　financing statements naming each Obligor as a debtor and the Administrative Agent as the secured party, or other similar instruments or documents, in each case suitable for filing, filed under the UCC (or equivalent law) of all jurisdictions as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the Liens of the Secured Parties pursuant to the Security Agreement;

(iii)　[reserved];

(iv)     UCC-3 termination statements, if any, necessary to release all Liens and other rights of any Person in any collateral described in the Security Agreement previously granted by any Person that are not permitted under the Loan Documents; and

(v)     all applicable Short-Form IP Agreements required to be provided under the Security Agreement, each dated as of the Closing Date, duly executed and delivered by each applicable Obligor.

(j)     **Bankruptcy Court Order**. The Bankruptcy Court shall have entered an order in form and substance satisfactory to the Administrative Agent and the Lenders, which, for the avoidance of doubt, may be the Confirmation Order (as defined herein), authorizing the entry of the parties to this Agreement into and performance under this Agreement and the other Loan Documents (the "*Approval Order*").

(k)     **Confirmation Order**. The Confirmation Order shall have been entered by the Bankruptcy Court. Each of the Approval Order and the Confirmation Order shall be in full force and effect and not have been stayed, reversed, or vacated, amended, supplemented, or modified and shall not be subject to any pending appeals, except for any of the following, which shall be permissible appeals the pendency of which shall not prevent the occurrence of the Closing Date: (i) any appeal relating to the distributions (or the allocation of such distributions) between and among creditors under the Approved Plan, or (ii) any other appeal, the result of which would not have a materially adverse effect on the rights and interests of any of Agent or the Lenders. The Confirmation Order shall authorize the parties to this Agreement to execute, deliver and perform all of their obligations under all documents contemplated hereunder and thereunder and shall contain no term or provision that contradicts such authorization or the Approval Order. The Approved Plan shall have become effective in accordance with its terms and all conditions to the effectiveness of the Approved Plan shall have been satisfied or waived in accordance with the terms thereof and all transactions contemplated in the Approved Plan, the Approval Order or the Confirmation Order to occur on the effective date of the Approved Plan shall have been (or concurrently with the Closing Date, shall be) substantially consummated in accordance with the terms thereof.

(l)     **Lien Searches**. The Administrative Agent shall be satisfied with Lien searches regarding the Borrower and the Subsidiary Guarantors made as of a date reasonably close to the Closing Date.

(m)     **Opinions of Counsel**. The Administrative Agent shall have received a duly executed legal opinion of counsel to the Obligors dated as of the Closing Date, in form and substance reasonably acceptable to the Administrative Agent.

(n)     **Fee Letter**. The Administrative Agent shall have received an executed counterpart of the Fee Letter, duly executed and delivered by the Borrower.

(o)     **Closing Fees, Expenses, Etc**. Each of the Administrative Agent and each Lender shall have received for its own account, (i) the upfront fee as set forth in the Fee Letter, which shall be paid by way of the Administrative Agent retaining such amount from the proceeds of the Loan and (ii) all fees, costs and expenses due and payable to it pursuant to the

-47-

Fee Letter and **Section 14.03**, including all reasonable closing costs and fees and all unpaid reasonable expenses of the Administrative Agent and the Lenders incurred in connection with the Transactions (including the Administrative Agent's and the Lenders' legal fees and expenses), in each case, to the extent invoiced (or as to which a good faith estimate has been provided to the Borrower) at least two (2) Business Days prior to the Closing Date.

(p)     **Material Adverse Change**. Since August 3, 2023, no Material Adverse Change shall have occurred, both before and after giving effect to the Loans to be made on the Closing Date (it being understood that the Bankruptcy Cases, in and of themselves, shall not constitute a Material Adverse Change).

(q)     **Know Your Customer**. The Administrative Agent shall have received, as applicable, all documentation and other information required by bank regulatory authorities under applicable "know your customer" and Anti-Terrorism Laws.

(r)     **No Default**. No event shall have occurred or be continuing or would result from the making of the Term Loan that would constitute a Default or Event of Default.

(s)     **Representations and Warranties**.  The representations and warranties contained in this Agreement and in the other Loan Documents delivered pursuant to this **Section 6.01** shall be true and correct in all material respects (unless such representations are already qualified by reference to materiality, Material Adverse Effect or similar language, in which case such representations and warranties shall be true and correct in all respects) on and as of the Closing Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all respects on and as of such earlier date.

(t)     **Beneficial Ownership Certificate**.  To the extent requested by any Lender or the Administrative Agent, the Borrower shall have provided to such Lender and the Administrative Agent all documentation and other information so requested, including a duly executed W-9 of the Borrower (or such other applicable tax form), in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification, in each case prior to the Closing Date.

(u)     **Warrants**. The Administrative Agent shall have received the executed Warrants, in form and substance acceptable to the Administrative Agent.

**SECTION 7.**
**REPRESENTATIONS AND WARRANTIES**

The Borrower and each other Obligor hereby jointly and severally represents and warrants to the Administrative Agent and each Lender on the Closing Date and any other date such representation and warranty is required to be made under the Loan Documents, as set forth below:

**7.01**          **Power and Authority**. Each Obligor and each of its Subsidiaries (i) is duly organized and validly existing under the laws of its jurisdiction of organization, (ii) has all

-48-

requisite corporate or other power, and has all Governmental Approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except to the extent that failure to have the same could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (iii) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary except where failure so to qualify could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (iv) has full power, authority and legal right to enter into and perform its obligations under each of the Loan Documents to which it is a party and, in the case of the Borrower, to borrow the Loans hereunder.

7.02        **Authorization; Enforceability**. Each Transaction to which an Obligor is a party (or to which it or any of its assets or properties is subject) are within such Obligor's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational action including, if required, approval by all necessary holders of Equity Interests. This Agreement has been duly executed and delivered by each Obligor and constitutes, and each of the other Loan Documents to which it is a party when executed and delivered by such Obligor will constitute, a legal, valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights and (ii) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.03        **Governmental and Other Approvals; No Conflicts**. None of the execution, delivery and performance by each Obligor of the Loan Documents to which it is a party or the consummation by each Obligor of the Transactions (i) requires any Governmental Approval of, registration or filing with, or any other action by, any Governmental Authority or any other Person, except for (x) such as have been obtained or made and are in full force and effect and (y) filings and recordings in respect of perfecting or recording the Liens created pursuant to the Security Documents, (ii) will violate (1) any Law, (2) any Organic Document of any Obligor or any of its Subsidiaries or (3) any order of any Governmental Authority, that in the case of **clause (ii)(1)** or **clause (ii)(3)**, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, (iii) will violate or result in a default under any Material Agreement binding upon any Obligor or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (iv) will result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of any Obligor or any of its Subsidiaries.

7.04        **Financial Statements; Material Adverse Change**.

(a)        **Financial Statements**. The Borrower has heretofore furnished to the Administrative Agent (who shall forward to the Lenders) consolidated financial statements required to be delivered pursuant to this Agreement. Such financial statements present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of the Borrower and its Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements of the type described in **Section 8.01(a)**.

-49-

(b)       **No Material Adverse Change**. Since August 3, 2023, there has been no Material Adverse Change (it being understood that the Bankruptcy Cases, in and of themselves, shall not constitute a Material Adverse Change).

**7.05         Properties**.

(a)       **Property Generally**. Each Obligor and each of its Subsidiaries has good and marketable fee simple title to, or valid leasehold interests in, all its real and personal property material to its business, including all Material Intellectual Property, subject only to Permitted Liens and except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.  There are no condemnation proceedings pending or, to the best of the Obligors' knowledge, threatened, to acquire by power of condemnation or eminent domain any portion of any Obligor's assets or properties, or any interest therein, or to enjoin or similarly prevent the construction and/or use of any of such assets and properties.

(b)       **Intellectual Property**.

(i)       The Obligors are the sole and exclusive legal and beneficial owners of all right, title and interest in and to all Material Intellectual Property and all other Intellectual Property that is, in each case, owned or purported to be owned by the Obligors, free and clear of any Liens or Claims other than Permitted Liens.  The Obligors own or have sufficient and valid, written rights to use all Material Intellectual Property.  Without limiting the foregoing, and except as set forth in **Schedule 7.05(b)(i)**:

(A)       other than (1) customary restrictions in in-bound licenses of Intellectual Property and non-disclosure Contracts, or (2) as would have been or is permitted by **Section 9.09**, there are no judgments, covenants not to sue, grants, Liens (other than Permitted Liens), or other Claims, agreements or arrangements relating to any Material Intellectual Property, which materially restrict any Obligor or any of its Subsidiaries with respect to its use, enforcement, or other exploitation of any Material Intellectual Property;

(B)       the operation and conduct of the business of by the Borrower or any of its Subsidiaries, including their use of their respective Material Intellectual Property, does not, in any material respect, violate, infringe or constitute a misappropriation of Intellectual Property rights of any other Person;

(C)       (1) there are no pending Claims, or Claims threatened in writing, against any Obligor or any of their Subsidiaries asserted by any other Person relating to Intellectual Property, including any material Claims alleging ownership, invalidity or unenforceability of any Material Intellectual Property, or infringement, misappropriation, or violation of such Person's Intellectual Property rights in any material respect; and (2) neither any Obligor nor any of their Subsidiaries has received any notice from, or Claim by, any Person that the operation and conduct of the businesses of the Borrower or any of its Subsidiaries (including their use of Material Intellectual Property), infringes upon, violates or constitutes a misappropriation of, any Intellectual Property of any other Person in each case of **clause (1)** and

-50-

**(2)**, that would reasonably be expected to result in material liability to any Obligor or any of their Subsidiaries;

(D)      to the knowledge of any Borrower and their Subsidiaries, no Material Intellectual Property is being infringed, violated, or misappropriated by any other Person in any material respect; and neither such Obligor nor any of its Subsidiaries has put any other Person on notice of such actual or potential infringement, violation or misappropriation of any such Material Intellectual Property, and neither any Obligor nor any of their Subsidiaries has not initiated any Claim with respect to any such Material Intellectual Property;

(E)      all current and former employees and contractors that have developed Material Intellectual Property for or on behalf of any Obligor or any of their Subsidiaries has executed written confidentiality and invention assignment Contracts with such Obligor or Subsidiary, as applicable, that irrevocably and presently assign to such Obligor or Subsidiary, as applicable, all rights of such employees and contractors to any such Material Intellectual Property; and

(F)      each Obligor and each of its Subsidiaries has taken reasonable precautions to protect the secrecy, confidentiality and value of its Material Intellectual Property consisting of Trade Secrets.

(ii)      With respect to Material Intellectual Property consisting of Patents, except as set forth in **Schedule 7.05(b)(ii)**, and without limiting the representations and warranties in **Section 7.05(b)(i)**:

(A)      each of the issued claims in such Patents are valid and enforceable;

(B)      subsequent to the issuance of such Patents, no Obligor nor any of its Subsidiaries or predecessors-in-interest, has filed any disclaimer or made or permitted any other voluntary reduction in the scope of the Inventions claimed in such Patents;

(C)      to the knowledge of the Obligor, no allowable or allowed subject matter of such Patents is subject to any competing conception claims of allowable or allowed subject matter of any patent applications or patents of any third party and have not been the subject of any interference, and are not and have not been the subject of any re-examination, opposition or any other post-grant proceedings, nor is any Obligor or its Subsidiaries aware of any basis for any such interference, re-examination, opposition, *inter partes* review, post grant review, or any other post-grant proceedings;

(D)      no such Patents have ever been finally adjudicated to be invalid, unpatentable or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, and, with the exception of publicly available documents in the applicable patent office with respect to any such Patents, no Obligor nor any of its Subsidiaries has received any written notice asserting that such Patents are invalid, unpatentable or unenforceable; and

(E)      all maintenance fees, annuities, and the like due or payable on or with respect to any such Patents have been timely paid or the failure to so pay could not reasonably be expected to result in a Material Adverse Change.

-51-

**7.06**         **No Actions or Proceedings**.

(a)         **Litigation**. Except for the Bankruptcy Cases, there is no litigation, investigation or proceeding pending or, to the knowledge of any Obligor or any of its Subsidiaries threatened in writing, with respect to such Obligor or any such Subsidiaries by or before any Governmental Authority or arbitrator that, (i) if adversely determined, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (ii) involves this Agreement or any other Loan Document.

(b)         **Environmental Matters**. No Obligor nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, except for any such failure to comply with such Environmental Law or failure to obtain, maintain or comply with a permit that could not reasonably be expected to have a Material Adverse Effect, (ii) has become subject to any Environmental Liability that could reasonably be expected to have a Material Adverse Effect, (iii) except as disclosed on **Schedule 7.06(b)**, has received any Environmental Claim, or has knowledge that any is threatened, (iv) has entered into any agreement in which such Obligor or any Subsidiary has assumed or undertaken material responsibility or obligations of any other person with respect to any Environmental Liability or (v) has knowledge of any basis for any other material Environmental Liability.

(c)         **Labor Matters**. No Obligor or any of its Subsidiaries has engaged in unfair labor practices as defined in 29 U.S.C. §§ 152(8) and 158 of the National Labor Relations Act and there are no pending or threatened in writing labor actions, disputes, grievances, arbitration proceedings, or similar Claims or actions involving the employees of any Obligor or any of its Subsidiaries, in each case that could reasonably be expected to have a Material Adverse Effect. There are no strike or work stoppages in existence or threatened in writing against any Obligor and to the knowledge of such Obligor, no union organizing activity is taking place. There are no collective bargaining agreements covering employees of any Obligor or any of its Subsidiaries.

**7.07**         **Compliance with Laws and Agreements**. Each Obligor is in compliance with all Laws and all Contracts binding upon it or its property, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing. The Obligors and their Subsidiaries are in material compliance with all applicable Healthcare Laws.

**7.08**         **Taxes**. Except as set forth on **Schedule 7.08**, each Obligor and its Subsidiaries has timely filed or caused to be filed all federal, state and other tax returns and reports required to have been filed and has paid or caused to be paid all federal, state and other taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which such Obligor or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP or (b) to the extent that the failure to do so would not reasonably be expected to have an Material Adverse Effect.

**7.09** **Full Disclosure**. None of the reports, financial statements, certificates or other written information furnished by or on behalf of the Obligors or any of their Subsidiaries to the Administrative Agent (on behalf of itself and the Lenders) in connection with the negotiation of this Agreement and the other Loan Documents or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of material fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, and it being understood that such projected financial information and all other forward looking information are not to be viewed as facts and that actual results during the period or periods covered thereby may differ from such projected results and that the differences may be material.

**7.10** **Investment Company Act and Margin Stock Regulation**.

(a) **Investment Company Act**. No Obligor is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(b) **Margin Stock**. No Obligor is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying Margin Stock, and no part of the proceeds of the Loans will be used to buy or carry any Margin Stock in violation of Regulation T, U or X.

**7.11** **Solvency**. The Obligors, on a consolidated basis, are and, immediately after giving effect to the making of the Loans, the use of proceeds thereof, and the consummation of the Transactions, will be, Solvent.

**7.12** **Subsidiaries**. Set forth on **Schedule 7.12** is a complete and correct list of all direct and indirect Subsidiaries of the Borrower. Each such Subsidiary is duly organized and validly existing under the jurisdiction of its organization shown in said **Schedule 7.12**, and the percentage ownership by each Obligor of each such Subsidiary thereof is as shown in said **Schedule 7.12**.

**7.13** **Indebtedness and Liens**. Set forth on **Schedule 7.13(a)** is a complete and correct list of all Indebtedness of each Obligor and each of its Subsidiaries outstanding as of the Closing Date. Set forth on **Schedule 7.13(b)** is a complete and correct list of all Liens granted by the Obligors and each of their respective Subsidiaries with respect to their respective property and outstanding as of the Closing Date.

**7.14** **Material Agreements**. Except as set forth on **Schedule 7.14**, no Obligor or any of its Subsidiaries is in material default under any Material Agreement, nor does any Obligor have knowledge of (i) any Claim against it or any of its Subsidiaries for any material breach of any such Material Agreement or (ii) any material default by any party to any such Material Agreement.

**7.15** **Restrictive Agreements**. Except as set forth in **Schedule 7.15**, as of the Closing Date, no Obligor or any of its Subsidiaries is subject to any Restrictive Agreement, except (i) those permitted under **Section 9.11**, (ii) restrictions and conditions imposed by Law or by this

-53-

Agreement, (iii) any stockholder agreement, charter, by-laws, or other organizational documents of an Obligor or any of its Subsidiaries as in effect on the Closing Date and (iv) limitations associated with Permitted Liens.

**7.16** **Real Property**. **Schedule 7.16** correctly sets forth all real property that is owned or leased by the Obligors, indicating in each case whether the respective property is owned or leased, the identity of the owner and lessee (if applicable) and the location of the respective property. Except as set forth in **Schedule 7.16**, no Obligor owns or leases (as tenant thereof) any real property as of the Closing Date.

**7.17** **Pension Matters**. **Schedule 7.17** sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, (i) all Title IV Plans, (ii) all Multiemployer Plans and (iii) all material Benefit Plans. Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Laws so qualifies. Except for those that could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Laws, (y) there are no existing or pending (or to the knowledge of any Obligor or any of its Subsidiaries, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Obligor or Subsidiary thereof incurs or otherwise has or could have an obligation or any liability or Claim and (z) no ERISA Event is reasonably expected to occur. The Borrower and each of its ERISA Affiliates has met all applicable requirements under the ERISA Funding Rules with respect to each Title IV Plan, and no waiver of the minimum funding standards under the ERISA Funding Rules has been applied for or obtained. As of the most recent valuation date for any Title IV Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least sixty percent (60%), and neither any Obligor nor any of its ERISA Affiliates knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage to fall below sixty percent (60%) as of the most recent valuation date. As of the Closing Date, no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding. No ERISA Affiliate would have any Withdrawal Liability as a result of a complete withdrawal from any Multiemployer Plan on the date this representation is made.

**7.18** **Regulatory Approvals**.

(a) Each Obligor and each of its Subsidiaries holds, and will continue to hold, either directly or through licensees and agents, all Product Authorizations necessary or required for the Borrower and each of its Subsidiaries to conduct, in all material respects, their respective operations and businesses in the manner currently conducted and to conduct its Product Commercialization and Development Activities.

(b) No Obligor or its Subsidiaries has received any written notice from any Governmental Authority that (i) it is considering suspending, revoking or materially limiting any Product Authorization or (ii) it is not likely to approve any applications made to such Governmental Authority with respect to any of the Products or any Material Agreement. The Obligors and their Subsidiaries have made all material required and notices, registrations and reports (including field alerts or other reports of adverse experiences) and other filings with

-54-

respect to each such Person's Products and Product Commercialization and Development Activities.

(c) Except as set forth on **Schedule 7.18(c)**, and without limiting the generality of any other representation or warranty made by any Obligor hereunder or under any other Loan Document: (i) no Obligor, nor any of its Subsidiaries nor, to the knowledge of any Obligor, any of their respective agents, suppliers, licensors or licensees have received any inspection reports, warning letters or notices or similar documents with respect to any Product or any Product Commercialization and Development Activities from any Regulatory Authority within the last two (2) years that asserts material lack of compliance with any applicable Healthcare Laws or Product Authorizations; (ii) no Obligor, nor any of its Subsidiaries nor, to the knowledge of any Obligor, any of their respective agents, suppliers or licensors or licensees have received any material notification from any Regulatory Authority within the last two (2) years, asserting that any Product or any Product Commercialization and Development Activities lacks a required Product Authorization; (iii) there is no pending regulatory action, investigation or inquiry (other than non-material routine or periodic inspections or reviews) against any Obligor, any of its Subsidiaries or, to the knowledge of any Obligor, any of their respective suppliers, licensors or licensees with respect to any Product or any Product Commercialization and Development Activities, and, to the knowledge of any Obligor, there is no basis in fact for any material adverse regulatory action against such Obligor or any of its Subsidiaries or, to the knowledge of any Obligor, any of their respective suppliers agents, licensors or licensees with respect to any Product or any Product Commercialization and Development Activities; and (iv) without limiting the foregoing, (A) (1) there have been no material product recalls, safety alerts, corrections, withdrawals, marketing suspensions, removals or the like conducted, undertaken or issued by any Obligor or any of its Subsidiaries, whether voluntary, at the request, demand or order of any Regulatory Authority or otherwise, with respect to any Product, any Product Commercialization and Development Activities or any Product Authorization within the last two (2) years, (2) no such product recall, safety alert, correction, withdrawal, marketing suspension, removal or the like has been requested, demanded or ordered by any Regulatory Authority within the last two (2) years, and, to the knowledge of any Obligor, there is no basis in fact for the issuance of any such product recall, safety alert, correction, withdrawal, marketing suspension, removal or the like with respect to any Product or any Product Commercialization and Development Activities, and (B) no criminal, injunctive, seizure, detention or civil penalty action has been commenced or threatened in writing by any Regulatory Authority within the last two (2) years with respect to or in connection with any Product or any Product Commercialization and Development Activities, and there are no consent decrees (including plea agreements) that relate to any Product or any Product Commercialization and Development Activities, and, to the knowledge of each Obligor, there is no basis in fact for the commencement of any criminal injunctive, seizure, detention or civil penalty action by any Regulatory Authority relating to any Product or any Product Commercialization and Development Activities or for the issuance of any consent decree. No Obligor nor any of its Subsidiaries, nor, to the knowledge of any Obligor, any of their respective agents, suppliers, licensees or licensors, is employing or utilizing the services of any individual, in connection with Product Commercialization and Development Activities, who has been debarred from any federal healthcare program.

**7.19        Transactions with Affiliates**. Except as set forth on **Schedule 7.19**, no Obligor nor any of its Subsidiaries has entered into, renewed, extended or been a part to, any transaction

(including the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate.

**7.20     OFAC; Anti-Terrorism Laws**.

(a)     Neither the Borrower nor any of its Subsidiaries is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the Anti-Terrorism Laws.

(b)     Neither the Borrower nor any of its Subsidiaries, nor, to the knowledge of the Borrower, any of their respective directors, officers, or employees (i) is currently the target of any Sanctions, (ii) is located, organized or residing in any Designated Jurisdiction in violation of Sanctions, or (iii) is or has been (within the previous five (5) years) engaged in any transaction with, or for the benefit of, any Person who is now or was then the target of Sanctions or who is located, organized or residing in any Designated Jurisdiction, in violation of Sanctions. No Loan, nor the proceeds from any Loan, has been or will be used, directly or, to the knowledge of the Borrower, indirectly, to lend, contribute or provide to, or has been or will be otherwise made available for the purpose of funding, any activity or business in any Designated Jurisdiction in violation of Sanctions or for the purpose of funding any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions, in violation of Sanctions, or in any other manner that will result in any violation by any party to this Agreement of Sanctions.

**7.21     Anti-Corruption**. Neither the Borrower nor any of its Subsidiaries, nor, to the knowledge of the Borrower, any of their respective directors, officers or employees, directly or, to the knowledge of the Borrower, indirectly, has (i) materially violated or is in material violation of any applicable anti-corruption Law, or (ii) made, offered to make, promised to make or authorized the payment or giving of, directly or, to the knowledge of the Borrower, indirectly, any Prohibited Payment.

**7.22     Necessary Permits, Etc.** The Borrower possesses (or will file for) all franchises, trademarks, Permits, licenses, consents, agreements and governmental approvals that are necessary or required by any Governmental Authority in order to carry on its business and to construct and operate the Project.  The Borrower has not received any notice of default or termination of any such Permit, license, consent, approval or agreement, or any notice of noncompliance therewith.

**7.23     Priority of Obligations**. The Obligations constitute unsubordinated obligations of the Obligors, and except for any obligations which have priority under applicable Law, rank at least pari passu in right of payment with all other unsubordinated Indebtedness of the Obligors.

**7.24     Royalty and Other Payments**. Except as set forth on **Schedule 7.24**, no Obligor, nor any of its Subsidiaries, is obligated to pay any royalty, milestone payment, deferred payment or any other contingent payment in respect of any Product.

**7.25     Non-Competes**. Neither the Borrower, any other Obligor, nor any of their respective Subsidiaries, nor any of their respective directors, officers or employees, is subject to

-56-

a non-compete agreement that prohibits or will interfere with any of the Product Commercialization and Development Activities, including the development, commercialization or marketing of any Product.

**7.26** **Security Interest**. The Security Documents provide the Secured Parties with effective, valid, legally binding and enforceable first priority Liens on all of the Collateral, subject to Permitted Liens. As of the Closing Date, (a) there are no security interests in, or Liens on, any of the Collateral other than Liens in favor of the Secured Parties as security for the Obligations and (b) subject to **Section 8.22**, all necessary action (including as described in **Section 7.03**) has been taken under applicable Law to (i) establish and perfect the first priority rights of the Secured Parties in and to the Collateral, if applicable, and (ii) terminate and/or release all existing security interests in, and Liens on, the Collateral, in each case, under their respective applicable Law, in each case of **clauses (a)** and **(b)**, subject to Permitted Liens.  The Mortgage Deliverables with respect to the Property, when duly executed, delivered, and recorded, shall constitute a first-priority Lien against the Collateral therein described, prior to all other Liens and encumbrances, including those which may hereafter accrue, except for such matters as shall have been approved by the Administrative Agent and set forth in the Mortgage Deliverables or herein as a "Permitted Lien."

**7.27** **Capitalization Table**. Schedule 7.27 sets forth a true, complete and correct capitalization table of the Borrower, including a description of all outstanding equity interests (including any warrants or options to acquire, or instruments convertible into, equity interests) and indebtedness of the Borrower and the holders thereof.

**SECTION 8.**
**AFFIRMATIVE COVENANTS**

Each Obligor covenants and agrees with the Administrative Agent and the Lenders that, until all Obligations (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made) have been indefeasibly paid in full in cash:

**8.01** **Financial Statements and Other Information**. The Borrower will furnish to the Administrative Agent:

(a) as soon as available and in any event within forty-five (45) days after the end of each fiscal quarter (i) the consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such fiscal quarter and (ii) the related consolidated statements of income, shareholders' equity and cash flows of the Borrower and its Subsidiaries for such quarter and the portion of the fiscal year through the end of such fiscal quarter, in each case prepared in accordance with GAAP consistently applied, all in reasonable detail and setting forth in comparative form the figures for the corresponding period in the preceding fiscal year, together with (iii) a certificate of a Responsible Officer of the Borrower stating that (x) such financial statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as at such date and (y) the results of operations of the Borrower and its Subsidiaries for the period ended on such date have been prepared in accordance with GAAP consistently

-57-

applied, subject to changes resulting from normal, year-end audit adjustments and except for the absence of notes; provided that documents required to be furnished pursuant to this **Section 8.01(a)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR" (with the related certificate separately delivered);

(b)     as soon as available and in any event, with respect to the fiscal year ending December 31, 2022, on or before November 30, 2023, and, with respect to each fiscal year ending thereafter, within one hundred fifty (150) days after the end of each such fiscal year (i) the consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such fiscal year and (ii) the related consolidated statements of income, shareholders' equity and cash flows of the Borrower and its Subsidiaries for such fiscal year, in each case prepared in accordance with GAAP consistently applied, all in reasonable detail and setting forth in comparative form the figures for the previous fiscal year, accompanied by a report and opinion thereon of Ernst & Young or another firm of independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards, and, such report and opinion (other than for the fiscal years ended December 31, 2021 and December 31, 2022) shall not be subject to any "going concern" or like qualification or exception or emphasis of matter of going concern footnote or any qualification or exception as to the scope of such audit, and in the case of such consolidated financial statements, certified by a Responsible Officer of the Borrower;

(c)     together with the financial statements required pursuant to **Sections 8.01(a)** and **(b)**, a compliance certificate signed by the chief financial or accounting Responsible Officer of the Borrower as of the end of the applicable accounting period (which delivery may be by electronic communication including fax or email and shall be deemed to be an original, authentic counterpart thereof for all purposes) substantially in the form of **Exhibit E** (a "***Compliance Certificate***") including (i) details of any issues that are material that are raised by auditors and any occurrence or existence of any event, circumstance, act or omission that would cause any representation or warranty contained in **Section 7.07**, **Section 7.18** or **Section 7.23** to be incorrect in any material respect (or in any respect if such representation or warranty is qualified by materiality or by reference to Material Adverse Effect or Material Adverse Change) if such representation or warranty were to be made at the time of delivery of a Compliance Certificate.

(d)     promptly after the same are released, copies of all press releases; provided that documents required to be furnished pursuant to this **Section 8.01(d)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(e)     promptly, and in any event within five (5) Business Days after receipt thereof by an Obligor thereof, copies of each notice or other correspondence received from any securities regulator or exchange to the authority of which the Borrower may become subject from time to time concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of such Obligor; provided that documents required to be furnished pursuant to this **Section 8.01(e)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(f)      promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of each Obligor and its Subsidiaries, and copies of all annual, regular, periodic and special reports and registration statements which any Obligor or its Subsidiaries may file or be required to file with any securities regulator or exchange to the authority of which such Obligor or such Subsidiary, as applicable, may become subject from time to time; provided that documents required to be furnished pursuant to this **Section 8.01(f)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(g)      the information regarding insurance maintained by the Borrower and its Subsidiaries as required under **Section 8.05**;

(h)      as soon as possible and in any event within five (5) Business Days after the Borrower obtains knowledge of any Claim against the Borrower or any of its Subsidiaries relating to any of its products or inventory involving more than $2,500,000 (or the Equivalent Amount in other currencies), written notice thereof from a Responsible Officer of the Borrower which notice shall include a statement setting forth details of such return, recovery, dispute or claim;

(i)      [Reserved]; and

(j)      such other information respecting the businesses, financial performance, operations or condition of the assets or liabilities of the Obligors (including with respect to the Collateral), taken as a whole, as the Administrative Agent may from time to time reasonably request.

**8.02      Notices of Material Events**. The Borrower will furnish to the Administrative Agent written notice of the following (x) with respect to **clause (a)** below within three (3) Business Days and (y) with respect to **clause (b)** through **(n)** below, within five (5) Business Days, in each case, after a Responsible Officer of the Borrower first learns of or acquires knowledge with respect to:

(a)      the occurrence of any Default or Event of Default;

(b)      the occurrence of any event with respect to the property or assets of the Borrower or any of its Subsidiaries resulting in a Loss aggregating $2,500,000 (or the Equivalent Amount in other currencies) or more;

(c)      (i) any proposed acquisition of stock, assets or property by the Borrower or any of its Subsidiaries that could reasonably be expected to result in material Environmental Liability, and (ii) any spillage, leakage, discharge, disposal, leaching, migration or release of any Hazardous Material by the Borrower or any of its Subsidiaries required to be reported to any Governmental Authority or that would reasonably be expected to result in material Environmental Liability;

(d)      the assertion of any Environmental Claim by any Person against, or with respect to the activities of, the Borrower or any of its Subsidiaries and any alleged liability or non-compliance with any Environmental Laws or any permits, licenses or authorizations issued

-59-

pursuant to Environmental Laws which could reasonably be expected to have a Material Adverse Effect;

(e)     the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any of its Affiliates that would reasonably be expected to result in a Material Adverse Effect;

(f)     (i) the intention of any ERISA Affiliate to file any notice of intent to terminate any Title IV Plan, a copy of such notice and (ii) the filing by any ERISA Affiliate of a request for a minimum funding waiver under Section 412 of the Code with respect to any Title IV Plan or Multiemployer Plan, in each case in writing and in reasonable detail (including a description of any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto);

(g)     (i) the termination of any Material Agreement other than in accordance with its terms and not as a result of a breach or default, (ii) the receipt by the Borrower or any of its Subsidiaries of any notice of a material breach or default under any Material Agreement (and a copy thereof) asserting a default by such Obligor or any of its Subsidiaries where such alleged default would permit such counterparty to terminate such Material Agreement, (iii) the entering into of any new Material Agreement by any Obligor (and a copy thereof) or (iv) any material amendment to a Material Agreement that would be adverse in any material respect to the Lenders (and a copy thereof); provided, that the Borrower shall not be required to provide such notice if such documents become publicly available on "EDGAR" within the time period notice would otherwise be required pursuant to this **Section 8.02**;

(h)     any material change in accounting policies or financial reporting practices by the Borrower or any of its Subsidiaries;

(i)     any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other material labor disruption against or involving an Obligor;

(j)     any Contract entered into by the Borrower or any of its Subsidiaries in connection with any Claim of actual or alleged infringement, misappropriation or violation of any Intellectual Property by or against the Borrower or any of its Subsidiaries;

(k)     the creation, development or other acquisition (including any in-bound exclusive licenses) of any Material Intellectual Property by the Borrower or any Subsidiary after the Closing Date; provided that, with respect to any such Material Intellectual Property created, developed or acquired (including through any in-bound exclusive license) in any fiscal year, notice thereof pursuant to this **Section 8.02(k)** shall be made in accordance with the timing of the financial statements for such fiscal year required pursuant to **Section 8.01(b)**;

(l)     any change to any Obligor's or any of its Subsidiaries' ownership of any Controlled Account, by delivering the Administrative Agent a notice setting forth a complete and correct list of all such accounts as of the date of such change;

(m)     [Reserved];

(n)      to the extent not otherwise required to be delivered to the Administrative Agent and the Lenders, copies of (i) all notices, reports, certificates or other information provided by the Borrower or its Subsidiaries to the lenders or agents under any agreement with respect to Material Indebtedness and (ii) all material notices, reports, certificates or other information provided by the Borrower or its Subsidiaries under any other Material Agreement, except to the extent delivery would violate any confidentiality agreements or restrictions; and

(o)      any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this **Section 8.02** shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto. Nothing in this **Section 8.02** is intended to waive, consent to or otherwise permit any action or omission that is otherwise prohibited by this Agreement or any other Loan Document.

**8.03      Existence**. Such Obligor shall, and shall cause each of its Subsidiaries to, preserve, renew and maintain in full force and effect its legal existence; provided that the foregoing shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under **Section 9.03**.

**8.04      Payment of Obligations**. Such Obligor will, and will cause each of its Subsidiaries to, pay and discharge its obligations, including (i) all material Taxes, fees, assessments and governmental charges or levies imposed upon it or upon its properties or assets prior to the date on which penalties attach thereto, and all lawful claims for labor, materials and supplies which, if unpaid, might become a Lien upon any properties or assets of the Borrower or any of its Subsidiaries, except to the extent such Taxes, fees, assessments or governmental charges or levies or such claims are being contested in good faith by appropriate proceedings diligently conducted and are adequately reserved against in accordance with GAAP, and (ii) all lawful claims which, if unpaid, would by law become a Lien upon its property not constituting a Permitted Lien.

**8.05      Insurance**. Such Obligor will, and will cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses, including, without limitation, commercial property, liability and business interruption coverage in amounts and with scope no less protective to the Obligors than such coverage as in effect on the Closing Date.  Upon the request of the Administrative Agent, the Borrower shall furnish the Administrative Agent from time to time with (i) material information as to the insurance carried by it and, if so requested, copies of all such insurance policies and (ii) a certificate from the Borrower's insurance broker or other insurance specialist stating that all premiums then due on the policies relating to insurance on the Collateral have been paid and that such policies are in full force and effect. Receipt of notice of termination or cancellation of any such insurance policies or reduction of coverages or amounts thereunder shall entitle the Secured Parties to renew any such policies, cause the coverages and amounts thereof to be maintained at levels required pursuant to the first sentence of this **Section 8.05** or otherwise to obtain similar insurance in place of such policies, in each case, the Borrower will be responsible for the

4877-6890-5580 v.8

reasonable and documented cost of such insurance (to be payable on demand). The amount of any such reasonable and documented expenses shall accrue interest at the Default Rate if not paid on demand and shall constitute "Obligations." Such Obligor shall cause each such policy of insurance (with respect to each such policy outstanding as of the Closing Date, within the time period set forth in **Section 8.22(b)**) to (i) name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear, and (ii) in the case of each casualty insurance policy (including business interruption, if any) contain a lender loss payable clause or endorsement naming the Administrative Agent, on behalf of the Secured Parties, as loss payee thereunder and providing for at least thirty (30) days' prior written notice to the Agent of any material modification or cancellation of such policy, and otherwise reasonably satisfactory in form and substance to the Administrative Agent.

**8.06** **Books and Records; Inspection Rights**. Such Obligor will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct (in all material respects) entries are made of all dealings and transactions in relation to its business and activities. Such Obligor will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or the Lenders, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition (financial or otherwise) with its officers and independent accountants, during normal business hours (but not more often than once per quarter unless an Event of Default has occurred and is continuing) as the Administrative Agent or the Lenders may request; <u>provided</u> that such representative shall use its commercially reasonable efforts to minimize disruption to the business and affairs of the Borrower as a result of any such visit, inspection, examination or discussion. Notwithstanding anything to the contrary contained herein, no Obligor nor any of its Subsidiaries will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to any Lender (or their respective representatives or contractors) is prohibited by any applicable Law or any binding agreement with a third party (so long as such agreement is not entered into in contemplation of this Agreement) or (iii) that is subject to attorney-client or similar privilege, which could reasonably be expected to be lost or forfeited if disclosed to the Administrative Agent or any Lender. The Borrower shall pay all reasonable and documented costs of all such inspections.

**8.07** **Compliance with Laws and Other Obligations**. Such Obligor will, and will cause each of its Subsidiaries to, (i) comply with all Laws (including Anti-Terrorism Laws, Sanctions and Environmental Laws) applicable to it and its business activities, (ii) comply in all material respects with all Healthcare Laws and Governmental Approvals applicable to it and its business activities and (iii) maintain in full force and effect, remain in compliance with, and perform all obligations under all Material Agreement to which it is a party, except, in the case of **clause (i)** and **(iii)** above, where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Within 60 days after the Closing Date, each Obligor shall institute (if not already in effect) and thereafter maintain in effect and enforce policies and procedures reasonably designed to promote compliance by such Obligor, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Terrorism Laws and Sanctions.

-62-

**8.08**       **Maintenance of Properties, Etc.** Such Obligor shall, and shall cause each of its Subsidiaries to, maintain and preserve all of its assets and properties, including all assets and properties, whether tangible or intangible, necessary or useful in the conduct of its business in good working order and condition in accordance with the general practice of other Persons of similar character and size, ordinary wear and tear and damage from casualty or condemnation excepted and except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**8.09**       **Licenses**. Such Obligor shall, and shall cause each of its Subsidiaries to, obtain and maintain all Governmental Approvals necessary in connection with the execution, delivery and performance of the Loan Documents, the consummation of the Transactions or the operation and conduct of its business and ownership of its properties, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**8.10**       **Conversion of Convertible Debt**. Concurrently with or prior to the consummation of any Qualified IPO/SPAC Transaction, all Indebtedness of the Borrower and its Subsidiaries that is convertible into Equity Interests of the Borrower outstanding on or prior to such Qualified IPO/SPAC Transaction shall have been converted into common Equity Interests in full in accordance with its respective terms.

**8.11**       **Use of Proceeds**. The proceeds of the Loans will be used only as provided in **Section 2.05**. No part of the proceeds of the Loans will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board of Governors of the Federal Reserve System, including Regulations T, U and X.

**8.12**       **Certain Obligations Respecting Subsidiaries; Further Assurances**.

(a)       **Subsidiary Guarantors, etc**. In the event that the Borrower or any of its Subsidiaries shall form or acquire any Material Subsidiary (or any Immaterial Subsidiary ceases to be an Immaterial Subsidiary in accordance with the definition thereof), the Borrower shall promptly (and in any event within thirty (30) calendar days (or such later date agreed to by the Administrative Agent in its sole discretion)):

(i)       cause such Subsidiary to become a "Subsidiary Guarantor" hereunder pursuant to a Guarantee Assumption Agreement and a "Grantor" under the Security Agreement;

(ii)       take such action or cause such Subsidiary to take such action (including joining the Security Agreement and delivering shares of stock together with undated transfer powers executed in blank, applicable control agreements and other instruments and, in the case of any non-U.S. Subsidiary, executing and delivering such applicable local law security documents) as shall be reasonably necessary or desirable or reasonably requested by the Administrative Agent in order to create and perfect, in favor of the Administrative Agent, for the benefit of the Secured Parties, valid and enforceable first priority Liens on substantially all of the personal property of such Subsidiary as collateral security for the Obligations hereunder; provided that any such security interest or Lien shall be subject to the relevant requirements of the Security Documents and the Intercompany Subordination Agreement;

-63-

(iii)　　to the extent that the parent of such Subsidiary is not a party to the Security Agreement or has not otherwise pledged Equity Interests in its Subsidiaries in accordance with the terms of the Security Agreement and this Agreement, cause the parent (if possible) of such Subsidiary to execute and deliver a pledge agreement in favor of the Administrative Agent, for the benefit of the Secured Parties, in respect of all outstanding issued shares of such Subsidiary;

(iv)　　deliver such proof of corporate action, incumbency of officers, and other applicable documents as is consistent with those delivered by each Obligor pursuant to **Section 6.01** or as the Administrative Agent shall reasonably request; and

(v)　　cause each Subsidiary to become a party to the Intercompany Subordination Agreement.

(b)　　**Further Assurances.**

(i)　　such Obligor will take such action from time to time as shall reasonably be requested by the Administrative Agent to effectuate the purposes and objectives of this Agreement and the Security Agreement;

(ii)　　in the event that such Obligor creates, develops or otherwise acquires Intellectual Property during the term of this Agreement, then the provisions of this Agreement and the Security Agreement shall and hereby does automatically apply thereto and any such Intellectual Property shall automatically constitute and hereby does constitute part of the Collateral under the Security Documents, without further action by any party, in each case from and after the date of such creation, development or acquisition;

(iii)　　without limiting the generality of the foregoing, each Obligor will, and will cause each Person that is required to be a Subsidiary Guarantor to, take such action from time to time (including joining the Security Agreement and delivering shares of stock together with undated transfer powers executed in blank, applicable control agreements and other instruments) as shall be reasonably requested by the Administrative Agent to create, in favor of the Secured Parties, perfected security interests and Liens in substantially all of the personal property (other than Excluded Assets (as defined in the Security Agreement)) of such Obligor as collateral security for the Obligations; underlined provided that any such security interest or Lien shall be subject to the relevant requirements of the Security Documents; underlined provided, further that, without limiting the right of the Administrative Agent to require a Lien or security interest in any newly acquired or created Subsidiary or asset, upon the prior written request of the Borrower, the Borrower and the Administrative Agent shall consult, in good faith, as to whether the cost of obtaining a Lien or security interest thereon would be unreasonably excessive relative to the benefit thereof;

(iv)　　promptly (and in any event within five (5) Business Days (or such later date agreed to by the Administrative Agent in its sole discretion)) following the acquisition by any Obligor or any of its Subsidiaries following the Closing Date of any fee interest in real property or lessee interest under a ground lease having a value in excess of $1,000,000, such Borrower Party shall notify Administrative Agent of such fact and shall, if so requested by

-64-

Administrative Agent, within thirty (30) days following such request by Administrative Agent (or such longer period as agreed by Administrative Agent in its reasonable discretion), with respect to any such owned or leased real estate, use commercially reasonable efforts to deliver or cause to be delivered to Administrative Agent the following (collectively, "***Mortgage Deliverables***"): (A) a mortgage or deed of trust, as applicable, in form and substance reasonably satisfactory to Administrative Agent, executed by the title holder thereof and recorded in the applicable jurisdiction, granting Administrative Agent, on behalf of the Lenders, a first priority Lien on the fee or lessee interest in such real estate, (B) a lender's title insurance policy issued by a title insurer reasonably satisfactory to Administrative Agent in form and substance and in amounts reasonably satisfactory to Administrative Agent insuring Administrative Agent's, for itself and on behalf of the Lenders', first priority Lien in the fee or lessee interest in such real estate, free and clear of all defects and encumbrances except Permitted Liens, (C) a current ALTA survey, certified to Administrative Agent, for itself and on behalf of the Lenders, by a licensed surveyor, in form and substance reasonably satisfactory to Administrative Agent, or survey affidavits sufficient to allow the issuer of the lender's title insurance policy to issue such policy without a survey exception, (D) a certificate, in form and substance reasonably acceptable to Administrative Agent, to Administrative Agent from a national certification agency acceptable to Administrative Agent, indicating whether such real estate is located in a special flood hazard area and (E) legal opinions in form and substance reasonably acceptable to Administrative Agent from one or more law firms reasonably acceptable to Administrative Agent opining as to due execution, authority, noncircumvention, recordability, perfection and enforceability of the such mortgage or deed of trust; and

(v)     in the event that such Obligor is party to (i) any lease agreement with respect to real property or (ii) any warehousing or bailment arrangement pursuant to which inventory, equipment or other assets of the Obligors are stored at a third-party warehouse or other facility, such Obligor shall use its commercially reasonable efforts to obtain a Landlord Consent or Bailee Letter, as applicable, within 30 days after entry into such agreement or arrangement.

**8.13     Termination of Non-Permitted Liens**. In the event that any Obligor shall become aware of, or be notified by the Administrative Agent or any Lender of the existence of, any outstanding Lien against any assets or property of such Obligor or any of its Subsidiaries, which Lien is not a Permitted Lien, such Obligor shall use its commercially reasonable efforts to promptly terminate or cause the termination of such Lien.  This provision shall not limit any rights or remedies the Administrative Agent and Lenders have upon the occurrence and during the continuance of an Event of Default.

**8.14     [Reserved].**

**8.15     Maintenance of Permits, Etc.** The Borrower shall obtain, maintain and do all things necessary to preserve in full force and effect all permits, licenses, authorizations, approvals, franchises, certificates and accreditations which are necessary for the proper conduct of its businesses.

**8.16     Maintenance of Regulatory Approvals, Contracts, Intellectual Property, Etc.** Each Obligor shall, and shall cause each of its Subsidiaries (to the extent applicable) to,

-65-

(i) maintain in full force and effect all Regulatory Approvals, Material Agreements, Material Intellectual Property and other rights, interests or assets (whether tangible or intangible) reasonably necessary for the businesses of Obligor and its Subsidiaries, except as would not reasonably be expected to have a Material Adverse Effect, (ii) maintain in full force and effect, and pay all costs and expenses relating to, such Regulatory Approvals, Material Agreements and Material Intellectual Property owned, used or controlled by such Obligor or any such Subsidiary, except as would not be reasonably expected to have a Material Adverse Effect, (iii) promptly after obtaining knowledge thereof, notify the Administrative Agent of any infringement, misappropriation or other violation by any Person of any Material Intellectual Property, and use commercially reasonable efforts to stop, curtail or abate such infringement, misappropriation or other violation if determined appropriate by the Borrower in the exercise of its business judgment and (iv) promptly after obtaining knowledge thereof, notify the Administrative Agent of any Claim by any Person that the conduct of the business of any Obligor or any of its Subsidiaries has infringed, misappropriated or otherwise violated any Intellectual Property of such Person, where such Claim could reasonably be expected to have a Material Adverse Effect.

**8.17**     **ERISA Compliance**. Such Obligor shall comply, and shall cause each of its Subsidiaries to comply, with the provisions of ERISA with respect to any Plans to which such Obligor or such Subsidiary is a party as an employer in all material respects.

**8.18**     **Cash Management**. Such Obligor shall, and shall cause each of its Subsidiaries to:

(a)     maintain at all times after the Account Control Agreement Completion Date both (i) an aggregate amount of cash of the Borrower and the other Obligors at least equal to the Minimum Liquidity Amount and (ii) no less than 70% of the aggregate amount of cash of the Borrower and its Subsidiaries, in each case, in deposit accounts, disbursement accounts, investment accounts (and other similar accounts) and lockboxes with a bank or financial institution within the U.S. which has executed and delivered to the Administrative Agent an account control agreement, in form and substance reasonably acceptable to the Administrative Agent (each such deposit account, disbursement account, investment account (or similar account) and lockbox, a "***Controlled Account***"); each such Controlled Account shall be a cash collateral account, with all cash, checks and other similar items of payment in such account securing payment of the Obligations, and each Obligor shall have granted a Lien to the Administrative Agent, for the benefit of the Secured Parties, over such Controlled Accounts;

(b)     deposit promptly, and in any event no later than five (5) Business Days after the date of receipt thereof (or such later date agreed to by the Administrative Agent in its sole discretion), all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all accounts and other rights and interests into Controlled Accounts; and

(c)     at any time after the occurrence and during the continuance of an Event of Default, at the request of the Administrative Agent, each Obligor shall cause all payments constituting proceeds of accounts to be directed into lockbox accounts under agreements in form and substance satisfactory to the Administrative Agent.

**8.19**        **[Reserved]**.

**8.20**        **[Reserved]**.

**8.21**        **[Reserved]**.

**8.22**        **Post-Closing Obligations**.

(a)        **Mortgage Deliverables.**  Within sixty (60) days after the Closing Date (or such longer time as agreed to by Administrative Agent in its sole discretion), deliver to Administrative Agent Mortgage Deliverables with respect to each Closing Date Property, in form and substance reasonably satisfactory to Administrative Agent.

(b)        **Insurance**.  Within sixty (60) days following the Closing Date (or such longer period of time as agreed by the Administrative Agent in its sole discretion), all such insurance policies required pursuant to each Loan Document shall name the Administrative Agent (for its benefit and the benefit of the Lenders) as loss payee or additional insured, as applicable, and the Borrower shall cause the applicable insurance certificates to provide that no cancellation of the policies will be made without at least ten (10) days' prior written notice to the Administrative Agent and the Administrative Agent shall have received certified copies of such insurance policies (or binders in respect thereof).

(c)        **Controlled Accounts.** On or prior to the Account Control Agreement Completion Date, the Administrative Agent shall have received evidence that (i) all deposit accounts, lockboxes, disbursement accounts, investment accounts or other similar accounts (other than Excluded Accounts) of each Obligor located within the U.S. are Controlled Accounts and (ii) such Controlled Accounts are subject to one or more account control agreements, in favor of, and satisfactory in form and substance to, the Administrative Agent that (A) ensures, to the extent necessary under applicable Law, the perfection of a first priority security interest in favor of the Administrative Agent on such Controlled Account, (B) provides that, upon written notice from the Administrative Agent, such bank or financial institution shall comply with instructions originated by the Administrative Agent directing disposition of the funds in such Controlled Account without further consent by the applicable Obligor, and (C) may not be terminated without prior written consent of the Administrative Agent.

**SECTION 9.**
**NEGATIVE COVENANTS**

Each Obligor covenants and agrees with the Administrative Agent and the Lenders that, until all Obligations (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made), have been indefeasibly paid in full in cash:

**9.01**        **Indebtedness**. Such Obligor will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, whether directly or indirectly, except:

(a)        the Obligations;

-67-

(b)    Indebtedness existing on the date hereof and set forth on **Schedule 7.13(a)** and Permitted Refinancings thereof; provided that, if such Indebtedness is intercompany Indebtedness, (x) any Permitted Refinancing of such Indebtedness shall also be intercompany Indebtedness among the same parties and (y) such Indebtedness and any Permitted Refinancing thereof shall be subject to the Intercompany Subordination Agreement;

(c)    accounts payable to trade creditors for goods and services and current operating liabilities (not the result of the borrowing of money) incurred in the Ordinary Course of such Obligor's or such Subsidiary's business in accordance with customary terms and paid within the specified time, unless contested in good faith by appropriate proceedings and reserved for in accordance with GAAP;

(d)    Indebtedness consisting of guarantees resulting from the endorsement of negotiable instruments for collection in the Ordinary Course;

(e)    Indebtedness of an Obligor owing to any other Obligor, subject to the Intercompany Subordination Agreement;

(f)    The R+D Promissory Note;

(g)    [Reserved];

(h)    the Renasant Indebtedness in an aggregate outstanding principal amount not to exceed $25,000,000 at any time;

(i)    Guarantees by any Obligor of Permitted Indebtedness of any other Obligor;

(j)    Ordinary Course Capital Lease Obligations and equipment financing and leasing and Permitted Refinancings in respect thereof; provided that (i) if secured, the collateral therefor consists solely of the assets being financed, the products and proceeds thereof and books and records related thereto and (ii) the outstanding principal amount of such Indebtedness does not exceed $10,000,000 in the aggregate at any time;

(k)    [Reserved];

(l)    [Reserved];

(m)    unsecured Indebtedness in respect of working capital facilities of the Borrower or any of its Subsidiaries in an aggregate outstanding principal amount not to exceed $10,000,000 (or the Equivalent Amount in other currencies); provided that the documentation governing such Indebtedness shall be in form and substance reasonable satisfactory to the Administrative Agent in its sole discretion;

(n)    [Reserved];

(o)    other Indebtedness in an aggregate outstanding principal amount not to exceed $100,000 (or the Equivalent Amount in other currencies);

-68-

(p)    [Reserved];

(q)    Indebtedness in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created, or related to obligations or liabilities incurred, in the Ordinary Course, including in respect of workers compensation claims, health, disability or other employee benefits or property, leases, commercial contracts, Indebtedness permitted pursuant to **Section 9.01(s)**, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims, collectively in an aggregate outstanding principal amount not to exceed $5,000,000;

(r)    Indebtedness arising in connection with the financing of insurance premiums in the Ordinary Course;

(s)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations arising in the Ordinary Course;

(t)    Indebtedness in respect of netting services, overdraft protections, business credit cards, purchasing cards, payment processing, automatic clearinghouse arrangements, arrangements in respect of pooled deposit or sweep accounts, check endorsement guarantees, and otherwise in connection with deposit accounts or cash management services, in each case, in the Ordinary Course.

**9.02**    **Liens**. Such Obligor will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist, whether directly or indirectly, any Lien on any property now owned by it or such Subsidiary, except:

(a)    Liens securing the Obligations;

(b)    any Lien on any property or asset of such Obligor or any of its Subsidiaries existing on the date hereof and set forth on **Schedule 7.13(b)** and renewals and extensions thereof in connection with Permitted Refinancings of the Indebtedness being secured by such Lien; provided that (i) no such Lien (including any renewal or extension thereof) shall extend to any other property or asset of such Obligor or any of its Subsidiaries and (ii) any such Lien shall secure only those obligations which it secures on the date hereof and renewals, extensions and replacements thereof in connection with Permitted Refinancings of the Indebtedness being secured by such Lien that do not increase the outstanding principal amount thereof;

(c)    Liens securing Indebtedness permitted under **Section 9.01(j)**; provided that such Liens are restricted solely to the collateral described in **Section 9.01(j)**;

(d)    Liens imposed by any Law arising in the Ordinary Course, including (but not limited to) carriers', warehousemen's, landlords', and mechanics' liens, liens relating to leasehold improvements and other similar Liens arising in the Ordinary Course and which (x) secure obligations that are not overdue by more than thirty (30) days or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property subject to such Liens and for which adequate reserves have been made if required in accordance with GAAP;

-69-

(e)      pledges or deposits made in the Ordinary Course in connection with bids, contract leases, appeal bonds, workers' compensation, unemployment insurance or other similar social security legislation;

(f)      Liens securing Taxes, assessments and other governmental charges, the payment of which is not yet due or is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted and for which such reserve or other appropriate provisions, if any, as shall be required by GAAP shall have been made;

(g)      servitudes, easements, rights of way, restrictions and other similar encumbrances on real property imposed by any Law and Liens consisting of zoning or building restrictions, easements, licenses, restrictions on the use of real property or minor imperfections in title thereto which, in the aggregate, are not material, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any of the Obligors or any of their Subsidiaries;

(h)      with respect to any real property, (i) such defects or encroachments as might be revealed by an up-to-date survey of such real property; (ii) the reservations, limitations, provisos and conditions expressed in the original grant, deed or patent of such property by the original owner of such real property pursuant to all applicable Laws; and (iii) rights of expropriation, access or user or any similar right conferred or reserved by or in any Law, which, in the aggregate for **clauses (i)**, **(ii)** and **(iii)**, are not material, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any of the Obligors or its Subsidiaries;

(i)      Bankers liens, rights of setoff and similar Liens incurred on deposits made in the Ordinary Course;

(j)      [Reserved];

(k)      Liens securing Indebtedness permitted under **Sections 9.01(q), (r), (s)** and **(t)**;

(l)      Any judgment lien or lien arising from decrees or attachments not constituting an Event of Default;

(m)      Liens arising from precautionary UCC financing statement filings regarding operating leases of personal property and consignment arrangements entered into in the Ordinary Course;

(n)      other Liens not securing borrowed money which secure obligations in an aggregate amount not to exceed $5,000,000 (or the Equivalent Amount in other currencies) at any time outstanding;

(o)      [Reserved];

(p)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and incurred in the Ordinary Course;

(q)     Permitted Licenses and Permitted Exclusive Licenses;

(r)     Liens on cash and Permitted Cash Equivalent Investments securing obligations under Permitted Hedging Agreements;

(s)     (i) Liens to secure payment of workers' compensation, employment insurance, old age pensions, social security and other like obligations incurred in the Ordinary Course (other than Liens imposed by ERISA) and (ii) deposits in respect of letters of credit, bank guarantees or similar instruments issued for the account of any Obligor or any Subsidiary in the Ordinary Course supporting obligations of the type set forth in **clause (i)** above; and

(t)     Liens securing Indebtedness permitted under **Section 9.01(h)**;

provided that (i) no Lien otherwise permitted under any of the foregoing **clauses (b), (c), (d), (e), (g)** through **(q)** and **(t)** of this **Section 9.02** shall apply to any Material Intellectual Property and (ii) no Lien shall secure any Renasant Indebtedness except pursuant to **Section 9.02(t)**.

**9.03     Fundamental Changes and Acquisitions**. Such Obligor will not, and will not permit any of its Subsidiaries to, (i) enter into any transaction of merger, amalgamation or consolidation (or otherwise merge, amalgamate or consolidate), (ii) liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), (iii) sell or issue any of its Disqualified Equity Interests or (iv) other than Permitted Acquisitions, make any Acquisition or otherwise acquire any business or substantially all the property from, or Equity Interests of, or be a party to any Acquisition of, any Person, except:

(a)     the merger, amalgamation or consolidation or liquidation of any (i) Subsidiary with or into any Obligor; provided that with respect to any such transaction involving (x) the Borrower, the Borrower must be the surviving or successor entity of such transaction and (y) any other Obligor, such Obligor must be the surviving or successor entity of such transaction (unless such transaction involves more than one Obligor, then an Obligor must be the surviving or successor entity of such transaction) or (ii) any Subsidiary that is not an Obligor with or into any other Subsidiary that is not an Obligor;

(b)     the sale, lease, transfer or other disposition by (i) any Subsidiary of any or all of its property (upon voluntary liquidation or otherwise) to any Obligor or (ii) any Subsidiary that is not an Obligor of any or all of its property (upon voluntary liquidation or otherwise) to any other Subsidiary that is not an Obligor; and

(c)     the sale, transfer or other disposition of the Equity Interests of (i) any Subsidiary to any Obligor or (ii) any Subsidiary that is not an Obligor to any other Subsidiary that is not an Obligor.

**9.04     Lines of Business**. Such Obligor will not, and will not permit any of its Subsidiaries to, engage in any business other than the business engaged in on the date hereof by

-71-

such Persons or a business reasonably related, incidental or complementary thereto or reasonable extensions thereof.

**9.05**       **Investments**. Such Obligor will not, and will not permit, whether directly or indirectly, any of its Subsidiaries to, make, directly or indirectly, or permit to remain outstanding any Investments except:

(a)       Investments (but without giving effect to the cash return provision contained in the definition thereof) outstanding on the Closing Date and identified in **Schedule 9.05** and any renewals, amendments and replacements thereof that do not increase the amount thereof of any such Investment, net of cash returns thereon, or require that any additional Investment be made (unless otherwise permitted hereunder);

(b)       operating deposit accounts with banks (or similar deposit-taking institutions) that, in the case maintained by Obligors, are Controlled Accounts;

(c)       extensions of credit in the nature of accounts receivable or notes receivable arising from the sales of goods or services in the Ordinary Course;

(d)       Permitted Cash Equivalent Investments;

(e)       Investments by an Obligor (i) in another Obligor or (ii) in a Subsidiary that is not an Obligor; provided that Investments made pursuant to this **clause (ii)** (x) shall not at any time exceed $5,000,000 in the aggregate outstanding at any time;

(f)       Investments by a Subsidiary that is not an Obligor in any other Subsidiary that is not an Obligor;

(g)       Permitted Hedging Agreements;

(h)       Investments consisting of prepaid expenses, negotiable instruments held for collection or deposit, security deposits with utilities, landlords and other like Persons and deposits in connection with workers' compensation and similar deposits, in each case, made in the Ordinary Course;

(i)       employee loans, travel advances and guarantees in accordance with the Borrower's usual and customary practices with respect thereto (if permitted by applicable Laws) which in the aggregate shall not exceed $2,500,000 outstanding at any time (or the Equivalent Amount in other currencies);

(j)       Investments received in connection with any Insolvency Proceedings in respect of any customers, suppliers or clients and in settlement of delinquent obligations of, and other disputes with, customers, suppliers or clients;

(k)       the increase in value of any Investment otherwise permitted pursuant to this **Section 9.05**;

-72-

(l)      other Investments in an aggregate amount not to exceed $5,000,000 (or the Equivalent Amount in other currencies) outstanding at any time;

(m)      Investments of any Person in existence at the time such Person becomes a Subsidiary; provided such Investment was not made in connection with or anticipation of such Person becoming a Subsidiary and any modification, replacement, renewal or extension thereof; and

(n)      Investments permitted under **Section 9.03**.

Notwithstanding anything in this Agreement to the contrary, (i) the Borrower shall not, and shall not permit any of its Subsidiaries to (x) directly or indirectly transfer, by means of contribution, sale, assignment, lease or sublease, license or sublicense, or other disposition of any kind, or by designation of any Subsidiary as an Immaterial Subsidiary, any Material Intellectual Property or any Specified Asset held by the Borrower or any other Obligor to any Person other than the Borrower or a Subsidiary Guarantor, or (y) permit any Person other than the Borrower or a Subsidiary Guarantor to hold any interest in any Material Intellectual Property or any Specified Asset (other than pursuant to non-exclusive intercompany licenses), and (ii) no Material Intellectual Property or Specified Asset held by the Borrower or a Subsidiary Guarantor shall be contributed as an Investment to any Subsidiary other than a Subsidiary Guarantor.

**9.06      Restricted Payments**. Such Obligor will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment; <u>provided</u> that the following Restricted Payments shall be permitted:

(a)      dividends with respect to the Borrower's Equity Interests payable solely in shares of its Qualified Equity Interests (or the equivalent thereof);

(b)      so long as no Default or Event of Default has occurred and is continuing, the Borrower's purchase, redemption, retirement, or other acquisition of shares of its Equity Interests with the proceeds received from a substantially concurrent issue of new shares of its Qualified Equity Interests;

(c)      dividends paid by any Subsidiary to any Obligor;

(d)      so long as no Default or Event of Default has occurred and is continuing, any purchase, redemption, retirement or other acquisition of Equity Interests of the Borrower held by officers, directors and employees or former officers, directors or employees (or their transferees, estates, or beneficiaries under their estates) of Borrower and its Subsidiaries not to exceed $2,500,000 (or the Equivalent Amount in other currencies) in any fiscal year;

(e)      cashless exercises of options and warrants;

(f)      cash payments made by the Borrower to redeem, purchase, repurchase or retire its obligations under warrants issued by it in the nature of cash payments in lieu of fractional shares in accordance with the terms thereof and in the Ordinary Course; and

-73-

(g)      Borrower may acquire (or withhold) its Equity Interests pursuant to any employee stock option or similar plan to pay withholding taxes for which Borrower is liable in respect of a current or former officer, director, employee, member of management or consultant upon such grant or award (or upon vesting or exercise thereof).

**9.07      Payments of Indebtedness**. Such Obligor will not, and will not permit any of its Subsidiaries to, whether directly or indirectly, make any payments in respect of any Indebtedness other than (i) payments of the Obligations, (ii) scheduled payments of other Indebtedness to the extent permitted pursuant to the terms, if any, of any applicable subordination or intercreditor agreement in respect of the Obligations, (iii) intercompany indebtedness permitted under **Section 9.01(e)**, (iv) Indebtedness permitted to be incurred under **Sections 9.01(b), (j), (m) (o), (q),** and **(t)**, (v) [Reserved]; (vi) [Reserved] (vii) [Reserved] and (viii) Permitted Refinancings permitted hereunder.

**9.08      Change in Fiscal Year**. Such Obligor will not, and will not permit any of its Subsidiaries to, change the last day of its fiscal year from that in effect on the Closing Date, except to change the fiscal year of a Subsidiary acquired in connection with an Acquisition to conform its fiscal year to that of the Borrower.

**9.09      Sales of Assets, Etc.** Such Obligor will not, and will not permit any of its Subsidiaries to, sell, lease or sublease (as lessor or sub-lessor), sale and leaseback, assign, convey, exclusively license (in terms of geography or field of use), transfer, or otherwise dispose of any of its businesses, assets or property of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired (including accounts receivable and Equity Interests of Subsidiaries), or forgive, release or compromise any amount owed to such Obligor or Subsidiary, in each case, in one transaction or series of transactions (any thereof, an "*Asset Sale*"), except:

(a)      sales, transfers and other dispositions of receivables in connection with the compromise, settlement or collection thereof in the Ordinary Course;

(b)      sales of inventory in the Ordinary Course in an Arm's Length Transaction;

(c)      the forgiveness, release or compromise of any amount owed to any Obligor or Subsidiary in the Ordinary Course;

(d)      Permitted Licenses and Permitted Exclusive Licenses;

(e)      transfers of assets, rights or property by any Subsidiary Guarantor to any other Obligor;

(f)      dispositions (including by way of abandonment or cancellation) of any equipment and other tangible property that is obsolete or worn out or no longer used or useful in the business disposed of in the Ordinary Course;

(g)      dispositions resulting from Casualty Events;

-74-

(h)    the unwinding of any Hedging Agreements permitted by **Section 9.05** pursuant to its terms;

(i)    in connection with any transaction permitted under **Section 9.03** or **9.05**;

(j)    dispositions identified in **Schedule 9.09**;

(k)    so long as no Event of Default has occurred and is continuing, other Asset Sales consummated after the Closing Date with a fair market value not in excess of $1,000,000 (or the Equivalent Amount in other currencies) in the aggregate;

(l)    other Asset Sales consummated after the Closing Date not in excess of $5,000,000 (or the Equivalent Amount in other currencies) in the aggregate in which any Obligor or any Subsidiary will receive cash proceeds in an amount equal to no less than seventy-five percent (75%) of the total consideration (fixed or contingent) paid or payable to such Obligor or Subsidiary, but only so long as, unless otherwise waived by Administrative Agent in its sole discretion, the net cash proceeds of such Asset Sale are applied to repay or prepay, in whole or in part, Indebtedness in accordance with **Section 3.03(b)(i)**;

(m)    the disposition of the property located at 1117 W. Veterans Blvd., Auburn, Al 36830; and

(n)    dispositions in the Ordinary Course consisting of the abandonment of intellectual property rights (other than Material Intellectual Property) which, in the reasonable good faith determination of Borrower, are not material to the conduct of the business of the Obligors and the Subsidiaries.

**9.10**    **Transactions with Affiliates**. Such Obligor will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction to sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, unless such arrangement or transaction (i) is an Arm's Length Transaction and is of the kind which would be entered into by a prudent Person in the position of the Borrower with another Person that is not an Affiliate; provided that (x) in connection with any such transaction involving aggregate consideration or payments of at least $1,000,000, such transaction shall have been approved by a majority of the directors serving on the Borrower's board of directors that do not have any material direct or indirect financial interest in or with respect to such transaction and (y) in connection with any such transaction involving aggregate consideration or payments of at least $10,000,000, the Borrower shall have received a fairness opinion from a nationally recognized appraisal or investment banking firm with respect to such transaction, (ii) is between or among (x) one or more Obligors, on the one hand, and, on the other hand, one or more Obligors, (y) one or more Subsidiaries of the Obligors that are not Obligors, on the one hand, and, on the other hand, one or more Subsidiaries of the Obligors that are not Obligors and (z) one or more Obligors or their Subsidiaries that are not Obligors, on the one hand, and, on the other hand, one or more Obligors or their Subsidiaries that are Obligors (*provided* that, with respect to **clause (z)** only, the terms thereof are no less favorable to the Obligors than those that would be obtained in a comparable Arm's Length Transaction with a non-affiliated Person), (iii) constitutes customary

-75-

compensation and indemnification of, and other employment arrangements with, directors, officers, and employees of any Obligor or its Subsidiaries in the Ordinary Course, (iv) constitutes payment of customary fees, reimbursement of expenses, and payment of indemnification to officers and directors and customary payment of insurance premiums on behalf of officers and directors by the Obligors or their Subsidiaries, in each case, in the ordinary course of business, (v) [Reserved] or (vi) are the transactions set forth on **Schedule 7.19**.

**9.11** **Restrictive Agreements**. Such Obligor will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any Restrictive Agreement other than (i) restrictions and conditions imposed by applicable Laws or by the Loan Documents, (ii) Restrictive Agreements listed on **Schedule 7.15,** (iii) limitations associated with Permitted Liens or any document or instrument governing any Permitted Lien, (iv) [Reserved], (v) customary provisions in leases, Permitted Licenses, Permitted Exclusive Licenses and other Contracts restricting the assignment thereof or restricting the assignment or sublease or sublicense of the property leased, licensed or otherwise the subject thereof; (vi) any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary; (vii) restrictions or conditions in any Permitted Indebtedness that is incurred or assumed by Subsidiaries that are not Obligors to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Loan Documents; (viii) restrictions or conditions imposed by any agreement relating to purchase money Indebtedness and other secured Indebtedness or to leases and licenses permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness or the property leased or licensed; (ix) customary provisions in contracts for the disposition of any assets; <u>provided</u> that the restrictions in any such contract shall apply only to the assets or Subsidiary that is to be disposed of and such disposition is permitted hereunder; and (x) customary provisions regarding confidentiality or restricting assignment, pledges or transfer of any Permitted License or any Permitted Exclusive License or any other agreement entered into in the Ordinary Course.

**9.12** **Modifications and Terminations of Material Agreements and Organic Documents**. Such Obligor will not, and will not permit any of its Subsidiaries to:

(a)    waive, amend, terminate, replace or otherwise modify any term or provision of any Organic Document in any way or manner adverse to the interests of the Administrative Agent and the Lenders, provided that for purposes of this **clause (a)**, any amendment, modification or waiver to Section 6 of the certificate of incorporation of the Borrower shall be deemed adverse to the Administrative Agent and the Lenders;

(b)    waive, amend, replace or otherwise modify any term or provision of any Material Agreement in a manner materially adverse to the rights and remedies the Administrative Agent and the Lenders hereunder;

(c)    (x) take or omit to take any action that results in the termination of, or permits any other Person to terminate, any Material Agreement or such Obligor's rights under Material Intellectual Property or (y) take any action that permits any Material Agreement or such

-76-

Obligor's rights under Material Intellectual Property to be terminated by any counterparty thereto prior to its stated date of expiration, in each such case if such action or omission could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

(d)     enter into, waive, terminate, replace or otherwise modify any joint venture agreement, distribution agreement, collaboration agreement or any agreement similar to any of the foregoing, in each case, that involves the disposition of Collateral or the assignment or exclusive licensing of any Material Intellectual Property, unless such agreement is acceptable in form and substance to the Majority Lenders.

**9.13     Outbound Licenses**.  No Obligor shall, nor shall it permit any of its Subsidiaries to, enter into or become or remain bound by any outbound exclusive license of Intellectual Property, except for Permitted Exclusive Licenses.

**9.14     Sales and Leasebacks**. Except as disclosed on **Schedule 9.14**, except as otherwise consented to in writing by the Administrative Agent in its sole discretion, such Obligor will not, and will not permit any of its Subsidiaries to, become liable, directly or indirectly, with respect to any lease, whether an operating lease or a Capital Lease Obligation, of any property (whether real, personal, or mixed), whether now owned or hereafter acquired, (i) which such Person has sold or transferred or is to sell or transfer to any other Person and (ii) which such Obligor or Subsidiary intends to use for substantially the same purposes as property which has been or is to be sold or transferred.

**9.15     Hazardous Material**. (a) Such Obligor will not, and will not permit any of its Subsidiaries to, use, generate, manufacture, install, treat, release, store or dispose of any Hazardous Material, except in compliance with all applicable Environmental Laws and as would not result in Environmental Liability except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. If the Administrative Agent at any time has a reasonable basis to believe that there is any material violation by an Obligor of any Environmental Law or the presence or release of any Hazardous Material which could result in an Environmental Liability that could be reasonably expected to result in a Material Adverse Effect, each Obligor shall, and shall cause each Subsidiary to, (i) prepare an environmental assessment of such condition, including where appropriate environmental testing, and the preparation of such environmental report, at the Borrower's sole cost and expense, as the Administrative Agent may reasonably request with respect to any affected parcel of real property subject to a Security Document that is a mortgage, deed of trust or similar instrument, which shall be conducted by Persons reasonably acceptable to the Administrative Agent and shall be in form and substance reasonably acceptable to the Administrative Agent, and (ii) if such report is not delivered within thirty (30) days, permit the Administrative Agent or its representatives to have access to all such real property for the purpose of conducting, at the Borrower's sole cost and expense, such environmental audits and testing as the Administrative Agent shall reasonably deem appropriate.

**9.16     Accounting Changes**. Such Obligor will not, and will not permit any of its Subsidiaries to, make any significant change in accounting treatment or reporting practices, except as required or permitted by GAAP.

**9.17     Compliance with ERISA**.  No ERISA Affiliate shall cause or suffer to exist (i) any event that could result in the imposition of a Lien with respect to any Title IV Plan or Multiemployer Plan or (ii) any other ERISA Event that could, in the aggregate, reasonably be expected to result in a Material Adverse Effect. No Obligor or any of its Subsidiaries shall cause or suffer to exist any event that could result in the imposition of a Lien with respect to any Benefit Plan.

**9.18     Sanctions; Anti-Corruption Use of Proceeds**.

(a)     Neither the Borrower or any of its Subsidiaries or their respective agents shall (i) conduct any business or engage in any transaction or dealing with any Sanctioned Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to any Sanctions; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Sanctions, the Patriot Act or any other Anti-Terrorism Law.

(b)     The Borrower will not, directly or, to the knowledge of the Borrower, indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable anti-corruption Law, or (ii) (A) for the purpose of funding any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of country- or territory-wide Sanctions, in violation of Sanctions or (B) in any other manner that would result in a violation of Sanctions by any party to this Agreement.

## SECTION 10.
## FINANCIAL COVENANTS

**10.01     Minimum Liquidity**. The Borrower shall at all times maintain the Minimum Liquidity Amount in cash or Permitted Cash Equivalent Investments in one or more Controlled Accounts that is free and clear of all Liens, other than Liens granted in favor of the Administrative Agent.

## SECTION 11.
## EVENTS OF DEFAULT

**11.01     Events of Default**. Each of the following events shall constitute an "***Event of Default***":

(a)     **Principal Payment Default**. The Borrower shall fail to pay any principal of the Loan, when and as the same shall become due and payable, whether at the due date thereof, at a date fixed for prepayment thereof or otherwise.

(b)     **Other Payment Defaults**. Any Obligor shall fail to pay interest or any other Obligation (other than an amount referred to in **Section 11.01(a)**) when and as the same

shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days.

(c)     **Representations and Warranties**. Any representation or warranty made or deemed made by or on behalf of any Obligor or any of its Subsidiaries in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof, shall: (i) prove to have been incorrect or misleading in any respect when made or deemed made to the extent that such representation or warranty contains any materiality or Material Adverse Effect qualifier; or (ii) prove to have been incorrect or misleading in any material respect when made or deemed made to the extent that such representation or warranty does not otherwise contain any materiality or Material Adverse Effect qualifier.

(d)     **Certain Covenants**. Any Obligor shall fail to observe or perform any covenant, condition or agreement contained in **Sections 8.02**, **8.03** (with respect to the Borrower's existence), **8.11**, **8.12**, **8.16**, **8.18**, **8.22, SECTION 9** or **SECTION 10**.

(e)     **Other Covenants**. Any Obligor shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in **Section 11.01(a)**, **(b)** or **(d)**) or any other Loan Document, and, in the case of any failure that is capable of cure, such failure shall continue unremedied for a period of fifteen (15) or more days.

(f)     **Payment Default on Other Indebtedness**. Any Obligor or any of its Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable after giving effect to any applicable grace or cure period as originally provided by the terms of such Indebtedness or Second Lien Indebtedness, as applicable.

(g)     **Other Defaults on Other Indebtedness**. (i) Any material breach of, or "event of default" or similar event under, any Contract governing any Material Indebtedness shall occur and such breach or "event of default" or similar event shall continue unremedied, uncured or unwaived after the expiration of any grace or cure period thereunder, or (ii) any event or condition occurs (x) that results in any Indebtedness becoming due prior to its scheduled maturity or (y) that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf to cause such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this **Section 11.01(g)** shall not apply to (x) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any conversion of any convertible Indebtedness or satisfaction of any condition giving rise to or permitting a conversion of any convertible Indebtedness; provided that the Borrower has the right to settle any such Indebtedness into Equity Interests of the Borrower (and nominal cash payments in respect of fractional shares and cash payments in respect of accrued and unpaid interest) in accordance with the express terms or conditions thereof) and (z) with respect to any Indebtedness consisting of Hedging Agreements, termination events or equivalent events pursuant to the terms of such

-79-

Hedging Agreements and not as a result of any default thereunder by any Obligor or any Subsidiary.

(h)     **Insolvency, Bankruptcy, Etc**.

(i)     Any Obligor or any of its Material Subsidiaries becomes insolvent, or generally does not or becomes unable to pay its debts or meet its liabilities as the same become due, or admits in writing its inability to pay its debts generally, or declares any general moratorium on its indebtedness, or proposes a compromise or arrangement or deed of company arrangement between it and any class of its creditors.

(ii)     Any Obligor or any of its Material Subsidiaries commits an act of bankruptcy or makes an assignment of its property for the general benefit of its creditors or makes a proposal (or files a notice of its intention to do so).

(iii)     Any Obligor or any of its Material Subsidiaries institutes any proceeding seeking to adjudicate it an insolvent, or seeking liquidation, dissolution, winding-up, reorganization, compromise, arrangement, adjustment, protection, moratorium, relief, stay of proceedings of creditors generally (or any class of creditors), or composition of it or its debts or any other relief, under any Law, whether U.S. or non-U.S., now or hereafter in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors or at common law or in equity, or files an answer admitting the material allegations of a petition filed against it in any such proceeding.

(iv)     Any Obligor or any of its Material Subsidiaries applies for the appointment of, or the taking of possession by, a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, voluntary administrator, receiver and manager or other similar official for it or any substantial part of its property.

(v)     Any Obligor or any of its Material Subsidiaries takes any action, corporate or otherwise, to approve, effect, consent to or authorize any of the actions described in this **Section 11.01(h)**, or otherwise acts in furtherance thereof or fails to act in a timely and appropriate manner in defense thereof.

(vi)     Any petition is filed, application made or other proceeding instituted against or in respect of any Obligor or any of its Material Subsidiaries:

(A)     seeking to adjudicate it as insolvent;

(B)     seeking a receiving order against it;

(C)     seeking liquidation, dissolution, winding-up, reorganization, compromise, arrangement, adjustment, protection, moratorium, relief, stay of proceedings of creditors generally (or any class of creditors), deed of company arrangement or composition of it or its debts or any other relief under any Law, whether U.S. or non-U.S., now or hereafter in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors or at common law or in equity; or

-80-

(D)      seeking the entry of an order for relief or the appointment of, or the taking of possession by, a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, voluntary administrator, receiver and manager or other similar official for it or any substantial part of its property, and such petition, application or proceeding continues undismissed, or unstayed and in effect, for a period of forty-five (45) days after the institution thereof; provided that if an order, decree or judgment is granted or entered (whether or not entered or subject to appeal) against such Obligor or such Subsidiary thereunder in the interim, such grace period will cease to apply; provided, further, that if such Obligor or Material Subsidiary files an answer admitting the material allegations of a petition filed against it in any such proceeding, such grace period will cease to apply.

(vii)      Any other event occurs which, under the Laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in this **Section 11.01(h)**.

(i)      **Judgments**. One or more judgments for the payment of money in an aggregate amount in excess of $5,000,000 (or the Equivalent Amount in other currencies) (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage) shall be rendered against any Obligor or any of its Subsidiaries or any combination thereof and the same shall remain undischarged for a period of forty-five (45) calendar days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Obligor to enforce any such judgment.

(j)      **ERISA**. An ERISA Event shall have occurred that when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount in excess of $5,000,000 (or the Equivalent Amount in other currencies).

(k)      **Change of Control**. A Change of Control shall have occurred.

(l)      [Reserved].

(m)      [Reserved].

(n)      [Reserved].

(o)      **Impairment of Security, Etc.** Subject in all respects to any applicable post-closing periods and certain other time periods under the Loan Documents for any Obligor or Subsidiary to take perfection actions, if any of the following events occurs: (i) any Lien created by any of the Security Documents shall at any time not constitute a valid and perfected Lien on the applicable Collateral in favor of the Secured Parties, free and clear of all other Liens (other than Permitted Liens) except due to the action or inaction of the Administrative Agent, (ii) except for expiration in accordance with its terms, any of the Security Documents or any Guarantee of any of the Obligations (including that contained in **Section 13**) shall for whatever reason cease to be in full force and effect, (iii) any Obligor shall, directly or indirectly, contest in any manner such effectiveness, validity, binding nature or enforceability of any such Lien or any Loan Document, or (iv) any injunction, whether temporary or permanent, shall be rendered against any Obligor that prevents the Obligors from selling or manufacturing any of their other

-81-

material and commercially available products in the United States for more than forty-five (45) calendar days.

**11.02**          **Remedies**.

          (a)          **Defaults Other Than Bankruptcy Defaults**. Upon the occurrence of any Event of Default, then, and in every such event (other than an Event of Default described in **Section 11.01(h)**), and at any time thereafter during the continuance of such event, the Administrative Agent may, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations, including any applicable Prepayment Fee, shall become due and payable immediately (in the case of the Loans, at the Prepayment Price therefor), without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Obligor.

          (b)          **Bankruptcy Defaults**. In case of an Event of Default described in **Section 11.01(h)**, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other Obligations, including any applicable Prepayment Fee, shall automatically become due and payable immediately (in the case of the Loans, at the Prepayment Price therefor), without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Obligor.

**11.03**          **Additional Remedies**. If an Event of Default has occurred and is continuing, if any Obligor shall be in default under a Material Agreement, the Administrative Agent shall have the right (but not the obligation) to cause the default or defaults under such Material Agreement to be remedied (including without limitation by paying any unpaid amount thereunder) and otherwise exercise any and all rights of such Obligor, as the case may be, thereunder, as may be necessary to prevent or cure any default. Without limiting the foregoing, upon any such default, each Obligor shall promptly execute, acknowledge and deliver to the Administrative Agent such instruments as may reasonably be required of such Obligor to permit the Administrative Agent to cure any default under the applicable Material Agreement or permit the Administrative Agent to take such other action required to enable the Administrative Agent to cure or remedy the matter in default and preserve the interests of the Administrative Agent. Any amounts paid by the Administrative Agent pursuant to this **Section 11.03** shall be payable in accordance with **Section 14.03(a)**, shall accrue interest at the Default Rate if not paid when due, and shall constitute "Obligations."

**11.04**          **[Reserved]**.

**11.05**          **Payment of Prepayment Fee**. Notwithstanding anything in this Agreement to the contrary, the Prepayment Fee shall automatically be due and payable at any time the Obligations become due and payable prior to the Maturity Date in accordance with the terms hereof as though such Indebtedness was voluntarily prepaid and shall constitute part of the Obligations, whether due to acceleration pursuant to the terms of this Agreement (in which case it shall be due immediately, upon the giving of notice to Borrower in accordance with **Section 11.02(a)**, or automatically, in accordance with **Section 11.02(b)**), by operation of law or otherwise (including

-82-

on account of any bankruptcy filing), in view of the impracticability and extreme difficulty of ascertaining the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such acceleration, and by mutual agreement of the parties as to a reasonable estimation and calculation of the lost profits or damages of the Lenders as a result thereof. Any Prepayment Fee payable pursuant to this Agreement shall be presumed to be the liquidated damages sustained by each Lender as the result of the early termination, acceleration or prepayment and each Obligor agrees that such Prepayment Fee is reasonable under the circumstances currently existing. The Prepayment Fee shall also become due and payable under this Agreement in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means or the Obligations are reinstated pursuant to Section 1124 of the Bankruptcy Code. If the Prepayment Fee becomes due and payable pursuant to this Agreement, the Prepayment Fee shall be deemed to be principal of the Loans and Obligations under this Agreement and interest shall accrue on the full principal amount of the Loans (including the Prepayment Fee) from and after the applicable triggering event. In the event the Prepayment Fee is determined not to be due and payable by order of any court of competent jurisdiction, including, without limitation, by operation of the Bankruptcy Code, despite such a triggering event having occurred, the Prepayment Fee shall nonetheless constitute Obligations under this Agreement for all purposes hereunder. EACH OBLIGOR HEREBY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE PREPAYMENT FEE AND ANY DEFENSE TO PAYMENT, WHETHER SUCH DEFENSE MAY BE BASED IN PUBLIC POLICY, AMBIGUITY, OR OTHERWISE. The Obligors, the Administrative Agent and the Lenders acknowledge and agree that any Prepayment Fee due and payable in accordance with this Agreement shall not constitute unmatured interest, whether under Section 5.02(b)(3) of the Bankruptcy Code or otherwise. Each Obligor further acknowledges and agrees, and waives any argument to the contrary, that payment of such amount does not constitute a penalty or an otherwise unenforceable or invalid obligation. Each Obligor expressly agrees that (i) the Prepayment Fee is reasonable and is the product of an Arm's Length Transaction between sophisticated business people, ably represented by counsel, (ii) the Prepayment Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the Lenders and the Obligors giving specific consideration in this transaction for such agreement to pay the Prepayment Fee, (iv) the Obligors shall be estopped hereafter from claiming differently than as agreed to in this **Section 11.05**, (v) their agreement to pay the Prepayment Fee is a material inducement to the Lenders to make the Loans, and (vi) the Prepayment Fee represents a good faith, reasonable estimate and calculation of the lost profits, losses or other damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such event.

## SECTION 12.
## THE ADMINISTRATIVE AGENT

**12.01**      **Appointment and Duties**. Subject in all cases to clause (c) below:

(a)      **Appointment of the Administrative Agent**. Each of the Lenders hereby irrevocably appoints Oaktree Fund Administration, LLC (together with any successor Administrative Agent pursuant to **Section 12.09**) as the Administrative Agent hereunder and

authorizes the Administrative Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Obligor or any of its Subsidiaries, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Administrative Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto. Except as expressly set forth herein, the provisions of this **Section 12** are solely for the benefit of the Administrative Agent and the Lenders, and no Obligor or any Affiliate thereof shall have rights as a third-party beneficiary of any such provisions.

(b)  **Duties as Collateral and Disbursing Agent**. Without limiting the generality of **Section 12.01(a)**, the Administrative Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents (including in any proceeding described in **Section 11.01(h)** or any other bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to the Administrative Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in **Section 11.01(h)** or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Secured Party), (iii) act as collateral agent for each Secured Party for purposes of acquiring, holding, enforcing and perfecting all Liens created by the Loan Documents and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to the Administrative Agent and the other Secured Parties with respect to the Collateral, whether under the Loan Documents, applicable Laws or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided that the Administrative Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for the Administrative Agent and the Lenders for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Obligor with, and cash and Permitted Cash Equivalent Investments held by, such Lender, and may further authorize and direct the Lenders to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to the Administrative Agent, and each Lender hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)  **Limited Duties**. The Lenders and the Obligors hereby each acknowledge and agree that the Administrative Agent (i) has undertaken its role hereunder purely as an accommodation to the parties hereto and the Transactions, (ii) is receiving no compensation for undertaking such role and (iii) subject only to the notice provisions set forth in **Section 12.09**, may resign from such role at any time for any reason or no reason whatsoever. Without limiting the foregoing, the parties hereto further acknowledge and agree that under the Loan Documents, the Administrative Agent (i) is acting solely on behalf of the Lenders (except to the limited extent provided in **Section 12.11**), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "the Administrative Agent", the terms "agent",

-84-

"administrative agent" and "collateral agent" and similar terms in any Loan Document to refer to the Administrative Agent, which terms are used for title purposes only, (ii) is not assuming any duty or obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Secured Party and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document (fiduciary or otherwise), in each case, regardless of whether a Default has occurred and is continuing, and each Lender hereby waives and agrees not to assert any claim against the Administrative Agent based on the roles, duties and legal relationships expressly disclaimed in this **clause (c)**. Without in any way limiting the foregoing, the Administrative Agent shall not, except as expressly set forth in this Agreement and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Obligor or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

**12.02** **Binding Effect**. Each Lender agrees that (i) any action taken by the Administrative Agent or the Majority Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by the Administrative Agent in reliance upon the instructions of the Majority Lenders (or, where so required, such greater proportion) and (iii) the exercise by the Administrative Agent or the Majority Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

**12.03** **Use of Discretion**.

(a) **No Action without Instructions**. The Administrative Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except (subject to **clause (b)** below) any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to written instructions from the Majority Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

(b) **Right Not to Follow Certain Instructions**. Notwithstanding **Section 12.03(a)** or any other term or provision of this **Section 12**, the Administrative Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Administrative Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Administrative Agent, any other Secured Party) against all liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Administrative Agent or any Related Person thereof or (ii) that is, in the opinion of the Administrative Agent, in its sole and absolute discretion, contrary to any Loan Document, Law or the best interests of the Administrative Agent or any of its Affiliates or Related Persons, including, for the avoidance of doubt, any action that may be in violation of the automatic stay in connection with any Insolvency Proceeding.

**12.04** **Delegation of Rights and Duties**. The Administrative Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by

-85-

or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party). The Administrative Agent and any such Person may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. Any such Person and its Related Parties shall benefit from this **Section 12** to the extent provided by the Administrative Agent; provided, however, that the exculpatory provisions of this **Section 12** shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and of any such sub-agent, and shall apply to their respective activities in connection with their activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**12.05        Reliance and Liability**.

(a)        The Administrative Agent may, without incurring any liability hereunder, (i) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Obligor) and (ii) rely and act upon any notice, request, certificate, consent, statement, instrument, document or other writing (including and electronic message, Internet or intranet website posting or other distribution), telephone message or conversation or oral conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.

(b)        Neither the Administrative Agent nor any of its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Lender and the Borrower hereby waive and shall not assert (and the Borrower shall cause each other Obligor to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the fraudulent conduct or behavior of the Administrative Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment or order by a court of competent jurisdiction) in connection with the duties expressly set forth herein. Without limiting the foregoing, the Administrative Agent:

(i)        shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of, or with the consent of, the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in **Section 14.04**) or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent);

(ii)        shall not be responsible to any Secured Party for the (a) validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any

-86-

other agreement, instrument or document, or (b) due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)     makes no warranty or representation, and shall not be responsible, to any Secured Party for, and shall not have any duty to ascertain or inquire into, any statement, document, information, certificate, report, representation or warranty made or furnished by or on behalf of any Related Person, in or in connection with any Loan Document or any transaction contemplated therein, whether or not transmitted by the Administrative Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Administrative Agent in connection with the Loan Documents, including, for the avoidance of doubt, the satisfaction of any condition set forth in **Section 6** of this Agreement or elsewhere herein (other than to confirm receipt of items expressly required to be delivered to the Administrative Agent); and

(iv)     shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document or whether any condition set forth in any Loan Document is satisfied or waived, including, without limiting the generality of the foregoing, as to the financial condition of any Obligor or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower, any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case the Administrative Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in **clauses (i)** through **(iv)** above, each Lender and the Borrower hereby waives and agrees not to assert (and the Borrower shall cause each other Obligor to waive and agree not to assert) any right, claim or cause of action it might have against the Administrative Agent based thereon.

**12.06     Administrative Agent Individually**. The Administrative Agent and its Affiliates may make loans and other extensions of credit to, acquire stock and stock equivalents of, accept deposits from, act as the financial advisor for or in any other advisory capacity for, or engage in any kind of business with, any Obligor or Affiliate thereof as though it were not acting as the Administrative Agent and may receive separate fees and other payments therefor. To the extent the Administrative Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Majority Lender", and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, the Administrative Agent or such Affiliate, as the case may be, in its individual capacity as Lender or as one of the Majority Lenders, respectively.

**12.07     Lender Credit Decision**. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any Lender or any of their Related Persons or upon any document solely or in part because such document was transmitted by the Administrative Agent or any of its Related Persons, conducted its own independent investigation

of the financial condition and affairs of each Obligor and has made and continues to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.

**12.08        Expenses; Indemnities**.

(a)        Each Lender agrees to reimburse the Administrative Agent and each of its Related Persons (to the extent not reimbursed by any Obligor) promptly upon demand for such Lender's Proportionate Share of any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Obligor) that may be incurred by the Administrative Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding or otherwise) of, or legal advice in respect of its rights or responsibilities under, any Loan Document.

(b)        Each Lender further agrees to indemnify the Administrative Agent (or any sub-agent thereof) and any Related Persons of the Administrative Agent (or any such sub-agent) (to the extent not indefeasibly paid by any Obligor), from and against such Lender's aggregate Proportionate Share of the liabilities (including taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to on or for the account of any Lender) that may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub-agent) in any matter relating to or arising out of, in connection with or as a result of any Loan Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub-agent) under or with respect to any of the foregoing; <u>provided</u> that no Lender shall be liable to the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub-agent) to the extent such liability has resulted primarily from the gross negligence or willful misconduct of the Administrative Agent (or any sub-agent thereof) or, as the case may be, such Related Person of the Administrative Agent (or any sub-agent thereof), as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

**12.09        Resignation of the Administrative Agent**.

(a)        At any time upon not less than 30 days' prior written notice, the Administrative Agent may resign as the "the Administrative Agent" hereunder, in whole or in part (in the sole and absolute discretion of the Administrative Agent). If the Administrative Agent delivers any such notice, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be (i) a Lender holding at least thirty percent (30%) of the outstanding principal amount of the Loans or any Affiliate thereof or (ii) any other financial institution consented to by the Borrower (provided that the consent of the Borrower shall not be required to the extent an Event of Default has occurred and is continuing). If a successor Administrative Agent has not been appointed on or before the effectiveness of the

-88-

resignation of the resigning Administrative Agent (or such earlier date as shall be agreed by the Majority Lenders) (the "***Resignation Effective Date***"), then the resigning Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint any Person reasonably chosen by it as the successor Administrative Agent, notwithstanding whether the Majority Lenders have appointed a successor or the Borrower has consented to such successor. Whether or not a successor has been appointed, such resignation shall become effective on the Resignation Effective Date.

(b)      Effective from the Resignation Effective Date, (i) the resigning Administrative Agent shall be discharged from its duties and obligations under the Loan Documents to the extent set forth in the applicable resignation notice, (ii) the Lenders shall assume and perform all of the duties of the Administrative Agent until a successor Administrative Agent shall have accepted a valid appointment hereunder, (iii) the resigning Administrative Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to (x) any actions taken or omitted to be taken while such resigning Administrative Agent was, or because the Administrative Agent had been, validly acting as the Administrative Agent under the Loan Documents or (y) any continuing duties such resigning Administrative Agent will continue to perform, and (iv) subject to its rights under **Section 12.04**, the resigning Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as the Administrative Agent under the Loan Documents. Effective immediately upon its acceptance of a valid appointment as the Administrative Agent, a successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the resigning Administrative Agent under the Loan Documents.

**12.10**      **Release of Collateral or Guarantors**. Each Lender hereby consents to the release and hereby directs the Administrative Agent to release, and the Administrative Agent hereby agrees, (or, in the case of **Section 12.10(b)**, release or subordinate) the following:

(a)      any Subsidiary of the Borrower from its guaranty of any Obligation of any Obligor (i) if all of the Equity Interests in such Subsidiary owned by any Obligor or any of its Subsidiaries are disposed of in an Asset Sale permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such Asset Sale, such Subsidiary would not be required to guaranty any Obligations pursuant to **Section 8.12(a)** and (ii) upon (x) termination of the Commitments and (y) payment and satisfaction in full of all Loans and all other Obligations that the Administrative Agent has been notified in writing are then due and payable (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made); and

(b)      any Lien held by the Administrative Agent for the benefit of the Secured Parties against (i) any Collateral that is disposed of by an Obligor in an Asset Sale permitted by the Loan Documents (including pursuant to a valid waiver or consent), (ii) any property subject to a Lien described in **Section 9.02(c)** and (iii) all of the Collateral and all Obligors, upon (x) termination of the Commitments and (y) payment and satisfaction in full of all Loans and all other Obligations that the Administrative Agent has been notified in writing are then due and payable (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made).

Each Lender hereby directs the Administrative Agent, and the Administrative Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guarantees and Liens when and as directed in this **Section 12.10** and deliver to the Borrower, at the expense of the Borrower, any portion of such Collateral so released pursuant to this **Section 12.10** that is in possession of the Administrative Agent.

**12.11    Additional Secured Parties**. The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender as long as, by accepting such benefits, such Secured Party agrees, as among the Administrative Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Administrative Agent, shall confirm such agreement in a writing in form and substance acceptable to the Administrative Agent) this **SECTION 12** and the decisions and actions of the Administrative Agent and the Majority Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) to the same extent a Lender is bound; provided that, notwithstanding the foregoing, (i) such Secured Party shall be bound by **Section 12.08** only to the extent of liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (ii) each of the Administrative Agent and each Lender shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (iii) such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

**12.12    Agent May File Proofs of Claim**.  In case of the pendency of any Insolvency Proceeding or any other judicial proceeding relating to any Obligor, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower or any other Obligor) shall be entitled and empowered (but not obligated) by intervention or such proceeding or otherwise:

        (a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under **Section 14.03**) allowed in such judicial proceeding; and

        (b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

-90-

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent under **Section 14.03**.

**12.13        Acknowledgements of Lenders**.

(a)        If the Administrative Agent notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "***Payment Recipient***"), that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding **clause (b)**) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "***Erroneous Payment***") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this **clause (a)** shall be conclusive, absent manifest error.

(b)        Without limiting immediately preceding **clause (a)**, each Lender, or any Person who has received funds on behalf of a Lender, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or other such recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case: (i) (A) in the case of immediately preceding **clauses (x) or (y)**, an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding **clause (z)**), in each case, with respect to such payment, prepayment or repayment; and (ii) such Lender shall (and shall cause any other

-91-

recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this **Section 12.13(b)(ii)**.

(c)    Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender from any source, against any amount due to the Administrative Agent under immediately preceding **clause (a)** or under the indemnification provisions of this Agreement.

(d)    In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding **clause (a)**, from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "***Erroneous Payment Return Deficiency***"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "***Erroneous Payment Impacted Loans***") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Loans, the "***Erroneous Payment Deficiency Assignment***") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights

and interests of the applicable Lender under the Loan Documents with respect to each Erroneous Payment Return Deficiency.

(e)    The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Obligor, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Obligor for the purpose of making such Erroneous Payment.

(f)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)    Each party's obligations, agreements and waivers under this **Section 12.13** shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## SECTION 13.
## GUARANTY

**13.01**    **The Guaranty**. The Subsidiary Guarantors hereby unconditionally jointly and severally guarantee to the Administrative Agent and the Lenders, and their successors and assigns, the full and punctual payment in full or performance (whether at stated maturity, by acceleration or otherwise) of the Obligations, including (i) principal of and interest on the Loans, (ii) all fees and other amounts and Obligations from time to time owing to the Administrative Agent and the Lenders by the Borrower and each other Obligor under this Agreement or under any other Loan Document, in each case strictly in accordance with the terms hereof and thereof and (iii) the punctual and faithful performance, keeping, observance and fulfillment by the Borrower and Subsidiary Guarantors of all the agreements, conditions, covenants and obligations of the Borrower and Subsidiary Guarantors contained in the Loan Documents (such obligations being herein collectively called the "***Guaranteed Obligations***"). The Subsidiary Guarantors hereby further jointly and severally agree that if the Borrower or any other Obligor shall fail to pay any amount in full when due or perform any such obligation (whether at stated maturity, by acceleration or otherwise), the Subsidiary Guarantors will promptly pay the same or perform such obligation at the place and in the manner specified herein or in the relevant Loan Document, as the case may be, without any demand or notice whatsoever, and that in the case of any extension of time of payment or performance or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full or performed when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**13.02** **Obligations Unconditional**.  The obligations of the Subsidiary Guarantors under **Section 13.01** shall constitute a guaranty of payment and performance and not of collection and are absolute and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations under this Agreement or any other agreement or instrument referred to herein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by all applicable Laws, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this **Section 13.02** that the obligations of the Subsidiary Guarantors hereunder shall be absolute and unconditional, joint and several, under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Subsidiary Guarantors hereunder, which shall remain absolute and unconditional as described above:

(a)    at any time or from time to time, without notice to the Subsidiary Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein shall be done or omitted;

(c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be extended, modified, supplemented or amended in any respect, or any right under this Agreement or any other agreement or instrument referred to herein shall be waived or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)    any lien or security interest granted to, or in favor of, the Secured Parties as security for any of the Guaranteed Obligations shall fail to be perfected or preserved;

(e)    any modification or amendment of or supplement to this Agreement or any other Loan Document, including any such amendment which may increase the amount of, or the interest rates applicable to, any of the Guaranteed Obligations guaranteed hereby;

(f)    any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, or any Insolvency Proceeding or other similar proceeding affecting the Borrower, any Subsidiary Guarantor or any other guarantor of the Guaranteed Obligations, or any of their respective assets, or any resulting release or discharge of any obligation of the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations;

(g)    the existence of any claim, setoff or other rights which any Subsidiary Guarantor may have at any time against the Borrower, any other Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, the Administrative Agent, any Secured Party or any other Person, whether in connection herewith or in connection with any unrelated transactions; *provided* that, notwithstanding any other provisions in this Guaranty, nothing in this

-94-

Guaranty shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(h)      the unenforceability or invalidity of the Guaranteed Obligations or any part thereof or the lack of genuineness, enforceability or validity of any agreement relating thereto or with respect to the collateral, if any, securing the Guaranteed Obligations or any part thereof, or any other invalidity or unenforceability relating to or against the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, for any reason, related to this Agreement or any other Loan Document, or any provision of applicable Law, decree, order or regulation of any jurisdiction purporting to prohibit the payment of any of the Guaranteed Obligations by the Borrower, any Subsidiary Guarantor or any other guarantor of the Guaranteed Obligations;

(i)      the disallowance, under any state or federal bankruptcy, insolvency or similar law, of all or any portion of the claims of the Secured Parties or the Administrative Agent for repayment of all or any part of the Guaranteed Obligations;

(j)      the failure of any other guarantor to sign or become party to this Agreement or any amendment, change, or reaffirmation hereof;

(k)      any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the Guaranteed Obligations or any part thereof, any other guaranties with respect to the Guaranteed Obligations or any part thereof, or any other obligation of any person or entity with respect to the Guaranteed Obligations or any part thereof, or any nonperfection or invalidity of any direct or indirect security for the Guaranteed Obligations; or

(l)      any other act or omission to act or delay of any kind by the Borrower, such Subsidiary Guarantor, any other guarantor of the Guaranteed Obligations, the Administrative Agent, any Secured Party or any other Person or any other circumstance whatsoever which might, but for the provisions of this **Section 13.02**, constitute a legal or equitable discharge of any Subsidiary Guarantor's obligations hereunder.

The Subsidiary Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Administrative Agent or any Lender exhaust any right, power or remedy or proceed against the Borrower or any other Subsidiary Guarantor under this Agreement or any other agreement or instrument referred to herein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.

**13.03      Discharge Only Upon Payment in Full**. Subject to any prior release herefrom of any Subsidiary Guarantor by the Administrative Agent in accordance with (and pursuant to authority granted to the Administrative Agent under) the terms of this Agreement, each Subsidiary Guarantor's obligations hereunder shall remain in full force and effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full in cash (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made) and all other financing arrangements among the Borrower or any

-95-

Subsidiary Guarantor and the Secured Parties under or in connection with this Agreement and each other Loan Document shall have terminated (herein, the "***Termination Conditions***"), and until the prior and complete satisfaction of the Termination Conditions all of the rights and remedies under this Guaranty and the other Loan Documents shall survive. Notwithstanding the foregoing, the Administrative Agent hereby agrees to release any Subsidiary of the Borrower from its guaranty of any Obligation of any Obligor if all of the Equity Interests in such Subsidiary owned by any Obligor or any of its Subsidiaries are disposed of in an Asset Sale permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such Asset Sale, such Subsidiary would not be required to guarantee any Obligations pursuant to **Section 8.12(a)**.

**13.04        Additional Waivers; General Waivers**.

(a)        *Additional Waivers.*  Notwithstanding anything herein to the contrary, each of the Subsidiary Guarantors hereby absolutely, unconditionally, knowingly, and expressly waives:

(i)        any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof;

(ii)        (A) notice of acceptance hereof; (B) notice of any other financial accommodations made or maintained under the Loan Documents or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to each Subsidiary Guarantor's right to make inquiry of the Administrative Agent and the Secured Parties to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any adverse change in the financial condition of the Borrower or of any other fact that might increase such Subsidiary Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Subsidiary Guarantor under this Guaranty or under the other Loan Documents) and demands to which each Subsidiary Guarantor might otherwise be entitled;

(iii)        its right, if any, to require the Administrative Agent and the Secured Parties to institute suit against, or to exhaust any rights and remedies which the Administrative Agent and the Secured Parties now have or may hereafter have against, any other guarantor of the Guaranteed Obligations or any third party, or against any collateral provided by such other guarantors or any third party; and each Subsidiary Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid) of any other guarantor of the Guaranteed Obligations or by reason of the cessation from any cause whatsoever of the liability of any other guarantor of the Guaranteed Obligations in respect thereof;

(iv)        (A) any rights to assert against the Administrative Agent and the Secured Parties any defense (legal or equitable), set-off, counterclaim, or claim which such Subsidiary Guarantor may now or at any time hereafter have against any other guarantor of the

Guaranteed Obligations or any third party liable to the Administrative Agent and the Secured Parties; (B) any defense, set-off, counterclaim or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity or enforceability of the Guaranteed Obligations or any security therefor; (C) any defense such Subsidiary Guarantor has to performance hereunder, and any right such Subsidiary Guarantor has to be exonerated, arising by reason of: (1) the impairment or suspension of the Administrative Agent's and the Secured Parties' rights or remedies against any other guarantor of the Guaranteed Obligations; (2) the alteration by the Administrative Agent and the Secured Parties of the Guaranteed Obligations; (3) any discharge of the obligations of any other guarantor of the Guaranteed Obligations to the Administrative Agent and the Secured Parties by operation of law as a result of the Administrative Agent's and the Secured Parties' intervention or omission; or (4) the acceptance by the Administrative Agent and the Secured Parties of anything in partial satisfaction of the Guaranteed Obligations; and (D) the benefit of any statute of limitations affecting such Subsidiary Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Subsidiary Guarantor's liability hereunder; and

(v)     any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by the Administrative Agent and the other Secured Parties; or (B) any election by the Administrative Agent and the other Secured Parties under any provision of any state or federal bankruptcy, insolvency or similar law to limit the amount of, or any collateral securing, its claim against the Subsidiary Guarantors.

(b)     *General Waivers*.  Each Subsidiary Guarantor irrevocably waives, to the fullest extent permitted by law, any notice not provided for herein.

**13.05     Reinstatement**. The obligations of the Subsidiary Guarantors under this **Section 13** shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Guaranteed Obligations is at any time rescinded, annulled, avoided, set aside, invalidated, declared to be fraudulent or must be otherwise restored or repaid by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization, equitable cause or otherwise, and the Subsidiary Guarantors jointly and severally agree that they will indemnify the Secured Parties on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Persons in connection with such rescission, repayment or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any state or federal bankruptcy, insolvency or similar law. The provisions of this **Section 13.05** shall survive termination of this Guaranty.

**13.06     Subrogation**. The Subsidiary Guarantors hereby jointly and severally agree that, until the prior and complete satisfaction of all Termination Conditions, they (i) shall have no right of subrogation with respect to the Guaranteed Obligations and (ii) waive any right to enforce any remedy which the Secured Parties or the Administrative Agent now have or may hereafter have against the Borrower, any endorser or any other guarantor of all or any part of the Guaranteed Obligations or any other Person, and each Subsidiary Guarantor waives any benefit of, and any right to participate in, any security or collateral that may from time to time be given

to the Secured Parties and the Administrative Agent to secure the payment or performance of all or any part of the Guaranteed Obligations or any other liability of the Borrower to the Secured Parties.  Should any Subsidiary Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights prior to complete satisfaction of the Termination Conditions, each Subsidiary Guarantor hereby expressly and irrevocably (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set-off that such Subsidiary Guarantor may have prior to the complete satisfaction of the Termination Conditions, and (B) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until all Termination Conditions are satisfied in full. Each Subsidiary Guarantor acknowledges and agrees that this subordination is intended to benefit the Administrative Agent and the Secured Parties and shall not limit or otherwise affect such Subsidiary Guarantor's liability hereunder or the enforceability of this Guaranty, and that the Administrative Agent, the Secured Parties and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this **Section 13.06**.

13.07       **Remedies**. The Subsidiary Guarantors jointly and severally agree that, as between the Subsidiary Guarantors, on one hand, and the Administrative Agent and the Lenders, on the other hand, the obligations of the Borrower under this Agreement and under the other Loan Documents may be declared to be forthwith due and payable as provided in **Section 11** (and shall be deemed to have become automatically due and payable in the circumstances provided in **Section 11**) for purposes of **Section 13.01** notwithstanding any stay, injunction or other prohibition, including any such stay upon an Insolvency Proceeding, preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Subsidiary Guarantors for purposes of **Section 13.01**.

13.08       **Instrument for the Payment of Money**. Each Subsidiary Guarantor hereby acknowledges that the guarantee in this **Section 13** constitutes an instrument for the payment of money, and consents and agrees that the Administrative Agent and the Lenders, at their sole option, in the event of a dispute by such Subsidiary Guarantor in the payment of any moneys due hereunder, shall have the right to proceed by motion for summary judgment in lieu of complaint pursuant to N.Y. Civ. Prac. L&R § 3213.

13.09       **Continuing Guarantee**. The guarantee in this **Section 13** is a continuing guarantee, and shall apply to all Guaranteed Obligations whenever arising.

13.10       **Contribution with Respect to Guaranteed Obligations**.

(a)       To the extent that any Subsidiary Guarantor shall make a payment under this Guaranty (a "***Guarantor Payment***") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Subsidiary Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Subsidiary Guarantor if each Subsidiary Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Subsidiary Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the

-98-

aggregate Allocable Amounts of each of the Subsidiary Guarantors as determined immediately prior to the making of such Guarantor Payment, *then*, following the prior and complete satisfaction of the Termination Conditions, such Subsidiary Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Subsidiary Guarantor for the amount of such excess, *pro rata* based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)     As of any date of determination, the "***Allocable Amount***" of any Subsidiary Guarantor shall be equal to the maximum amount of the claim which could then be recovered from such Subsidiary Guarantor under this Agreement without rendering such claim voidable or avoidable under any state or federal bankruptcy, insolvency or similar law or other applicable Law.

(c)     This **Section 13.10** is intended only to define the relative rights of the Subsidiary Guarantors, and nothing set forth in this **Section 13.10** is intended to or shall impair the obligations of the Subsidiary Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement.

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Subsidiary Guarantor or Subsidiary Guarantors to which such contribution and indemnification is owing.

(e)     The rights of the indemnifying Subsidiary Guarantors against other Subsidiary Guarantors under this **Section 13.10** shall be exercisable only upon the prior and complete satisfaction of the Termination Conditions.

**13.11     General Limitation on Guarantee Obligations**. In any action or proceeding involving any provincial, territorial or state corporate law, or any state or federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Subsidiary Guarantor under **Section 13.01** would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under **Section 13.01**, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Subsidiary Guarantor, the Administrative Agent, any Lender or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**SECTION 14.**
**MISCELLANEOUS**

**14.01     No Waiver**. No failure on the part of the Administrative Agent or the Lenders to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

-99-

**14.02**    **Notices**. All notices, requests, instructions, directions and other communications provided for herein (including any modifications of, or waivers, requests or consents under, this Agreement) or in the other Loan Documents shall be given or made in writing (including by telecopy or email) delivered, if to the Borrower, another Obligor, the Administrative Agent or any Lender, to its address specified on the signature pages hereto or its Guarantee Assumption Agreement, as the case may be, or at such other address as shall be designated by such party in a written notice to the other parties. Except as otherwise provided in this Agreement or therein, all such communications shall be deemed to have been duly given upon receipt of a legible copy thereof, in each case given or addressed as aforesaid. All such communications provided for herein by telecopy shall be confirmed in writing promptly after the delivery of such communication (it being understood that non-receipt of written confirmation of such communication shall not invalidate such communication).

**14.03**    **Expenses, Indemnification, Etc.**

(a)    **Expenses**. Each Obligor, jointly and severally, agrees to pay or reimburse (i) the Administrative Agent and the Lenders and their respective Affiliates for all of their reasonable and documented out of pocket costs and expenses (including the reasonable and documented out of pocket fees, expenses, charges and disbursements of Sullivan & Cromwell LLP, counsel to the Lenders, the fees (if necessary) of local and regulatory counsel for both of the Administrative Agent and the Lenders in each relevant material jurisdiction, and any sales, goods and services or other similar taxes applicable thereto, and reasonable and documented printing, reproduction, document delivery, communication and travel costs) in connection with (x) the negotiation, preparation, execution and delivery of this Agreement and the other Loan Documents and the making of the Loans (exclusive of post-closing costs), (y) post-closing costs (including, without limitation, costs of the administration of this Agreement and the other Loan Documents) and (z) the negotiation or preparation of any modification, supplement or waiver of any of the terms of this Agreement or any of the other Loan Documents (whether or not consummated); and (ii) each of the Administrative Agent and the Lenders for all of their documented out of pocket costs and expenses (including the fees and expenses of any legal counsel) in connection with the enforcement, exercise or protection of their rights in connection with this Agreement and the other Loan Documents, including their rights under this **Section 14.03**, or in connection with the Loans made hereunder, including such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    **Indemnification**. Each Obligor, jointly and severally, hereby indemnifies the Administrative Agent (and any sub-agent thereof), the Lenders and their respective Affiliates, directors, officers, employees, attorneys, agents, advisors and controlling parties (each, an "*Indemnified Party*") from and against, and agrees to hold them harmless against, any and all Claims and Losses of any kind including reasonable and documented out of pocket fees and disbursements of any counsel for each Indemnified Party (limited to one legal counsel in each relevant jurisdiction), that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to (i) Agreement or any of the other Loan Documents or the Transactions, (ii) any use made or proposed to be made with the proceeds of the Loans, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Obligor or any of its Subsidiaries, or (iv) any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing,

-100-

whether based on contract, tort, or any other theory, whether or not such investigation, litigation or proceeding is brought by any Obligor, any of its Subsidiaries, shareholders or creditors, an Indemnified Party or any other Person, or an Indemnified Party is otherwise a party thereto, and whether or not any of the conditions precedent set forth in **SECTION 6** are satisfied or the other transactions contemplated by this Agreement are consummated, except to the extent such Claim or Loss is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. No Obligor shall assert any claim against any Indemnified Party, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to this Agreement or any of the other Loan Documents or any of the Transactions or the actual or proposed use of the proceeds of the Loans. The Borrower, its Subsidiaries and Affiliates and their respective directors, officers, employees, attorneys, agents, advisors and controlling parties are each sometimes referred to in this Agreement as a "***Borrower Party***". No Lender shall assert any claim against any Borrower Party, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to this Agreement or any of the other Loan Documents or any of the Transactions or the actual or proposed use of the proceeds of the Loans. This Section shall not apply to Taxes other than Taxes relating to a non-Tax Claim or Loss governed by this **Section 14.03(b)**.

**14.04**    **Amendments, Etc.** Except as otherwise expressly provided in this Agreement, any provision of this Agreement and any other Loan Document (except for the Warrant, which may be amended, waived or supplemented in accordance with the terms thereof) may be modified or supplemented only by an instrument in writing signed by the Borrower, the Administrative Agent and the Majority Lenders; provided that:

(a)    any such modification or supplement that is disproportionately adverse to any Lender as compared to other Lenders or subjects any Lender to any additional obligation shall not be effective without the consent of such affected Lender;

(b)    the consent of all of the Lenders shall be required to:

(i)    amend, modify, discharge, terminate or waive any of the terms of this Agreement or any other Loan Agreement if such amendment, modification, discharge, termination or waiver would increase the amount of the Loans or Commitment, reduce the fees payable hereunder, reduce interest rates or other amounts payable with respect to the Loans, extend any date fixed for payment of principal (it being understood that the waiver of any prepayment of Loans shall not constitute an extension of any date fixed for payment of principal), interest or other amounts payable relating to the Loans or extend the repayment dates of the Loans;

(ii)    amend, modify, discharge, terminate or waive any Security Document if the effect is to release all or substantially all of the Collateral subject thereto other than pursuant to the terms hereof or thereof; or

(iii)    amend this **Section 14.04** or the definition of "Majority Lenders".

**14.05**    **Successors and Assigns**.

-101-

(a) **General**. The provisions of this Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the parties hereto or thereto and their respective successors and assigns permitted hereby or thereby, except that no Obligor may assign or otherwise transfer any of its rights or obligations hereunder (except in connection with an event permitted under **Section 9.03**) without the prior written consent of the Administrative Agent. Any Lender may assign or otherwise transfer any of its rights or obligations hereunder or under any of the other Loan Documents (i) to an assignee in accordance with the provisions of **Section 14.05(b)**, (ii) by way of participation in accordance with the provisions of **Section 14.05(e)**, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of **Section 14.05(f)**. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in **Section 14.05(e)** and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) **Assignments by Lender**. Any Lender may at any time assign to one or more Eligible Transferees (or, if an Event of Default has occurred and is continuing, to any Person) all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) and the other Loan Documents; <u>provided</u> that (i) no such assignment shall be made to any Obligor, any Affiliate of any Obligor, any employees or directors of any Obligor at any time and (ii) no such assignment shall be made without the prior written consent of the Administrative Agent. The consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (x) a Default or Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to an Eligible Transferee described in **clause (vi)** of the definition thereof; <u>provided</u> that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received written notice thereof; <u>provided</u> further that the consent of the Borrower shall not be required for any assignment to (x) Oaktree Capital Management, L.P. or any of its managed funds or accounts or  (y) any Affiliate of the foregoing.  Subject to the recording thereof by the Administrative Agent pursuant to **Section 14.05(d)**, and to receipt by the Administrative Agent of a processing and recordation fee in the amount of $3,500 (provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment) from and after the date such Assignment and Assumption is recorded in the Register, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of the Lender under this Agreement and the other Loan Documents, and correspondingly the assigning Lender shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) and the other Loan Documents but shall continue to be entitled to the benefits of **SECTION 5** and **Section 14.03**. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this **Section 14.05(b)** shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with **Section 14.05(e)**.

-102-

(c)    **Amendments to Loan Documents**. Each of the Administrative Agent, the Lenders and the Obligors agrees to enter into such amendments to the Loan Documents, and such additional Security Documents and other instruments and agreements, in each case in form and substance reasonably acceptable to the Administrative Agent, the Lenders and the Obligors, as shall reasonably be necessary to implement and give effect to any assignment made under this **Section 14.05**.

(d)    **Register**. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***"). The entries in the Register shall be conclusive and binding absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior written notice. Notwithstanding anything to the contrary, any assignment of any Loan shall be effective only upon appropriate entries with respect thereto being made in the Register. The parties hereto intend that the Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related United States Treasury Regulations (or any other relevant or successor provisions of the Code or of such United States Treasury Regulations).

(e)    **Participations**. Any Lender may at any time, without the consent of, or notice to, the Borrower, sell participations to any Eligible Transferee (other than a natural person or any Obligor or any of its Affiliates or Subsidiaries) (each, a "***Participant***") in all or a portion of the Lender's rights and/or obligations under this Agreement (including all or a portion of the Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with such Lender in connection therewith. Any agreement or instrument pursuant to which any Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that would (i) increase or extend the term of such Lender's Commitment, (ii) extend the date fixed for the payment of principal of or interest on the Loans or any portion of any fee hereunder payable to the Participant, (iii) reduce the amount of any such payment of principal, or (iv) reduce the rate at which interest is payable thereon to a level below the rate at which the Participant is entitled to receive such interest. Subject to **Section 14.05(f)**, the Borrower agrees that each Participant shall be entitled to the benefits of **Section 5.01** or **5.03** (subject to the requirements and limitations therein, including the requirements under **Section 5.03(f)** (it being understood that the documentation required under **Section 5.03(f)** shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Section 14.05(b)**; provided that such Participant (i) agrees to be subject to the provisions of **Section 5.04** as if it

-103-

were an assignee under **Section 14.05(b)** and (ii) shall not be entitled to receive any greater payment under **Section 5.01** or **5.03**, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after the Participant acquired the applicable participation. To the extent permitted by Law, each Participant also shall be entitled to the benefits of **Section 4.03(a)** as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "*Participant Register*"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)      **Limitations on Rights of Participants**. A Participant shall not be entitled to receive any greater payment under **Section 5.01** or **5.03** than such Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(g)      **Certain Pledges**. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**14.06**      **Survival**. The obligations of the Borrower under Sections 5.01, 5.02, 5.03, 14.03, 14.05, 14.06, 14.09, 14.10, 14.11, 14.12, 14.13, and 14.14 and the obligations of the Subsidiary Guarantors under **Section** 13 (solely to the extent guaranteeing any of the obligations under the foregoing Sections) shall survive the repayment of the Obligations and the termination of the Commitments and, in the case of the Lenders' assignment of any interest in the Commitments or the Loans hereunder, shall survive, in the case of any event or circumstance that occurred prior to the effective date of such assignment, the making of such assignment, notwithstanding that the Lenders may cease to be "Lenders" hereunder. In addition, each representation and warranty made, or deemed to be made by a Borrowing Notice, herein or pursuant hereto shall survive the making of such representation and warranty.

**14.07**      **Captions**. The table of contents and captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

-104-

**14.08**      **Counterparts, Effectiveness**. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or electronic transmission (in PDF format) shall be effective as delivery of a manually executed counterpart hereof. This Agreement shall become effective when counterparts hereof executed on behalf of the Obligors, the Administrative Agent and the Lender shall have been received by the Administrative Agent.

**14.09**      **Governing Law**. This Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed in accordance with, the law of the State of New York, without regard to the conflict of law provisions thereof.

**14.10**      **Jurisdiction, Service of Process and Venue**.

(a)      **Submission to Jurisdiction**. Each party hereby irremovably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or tort or otherwise, against such other party in any way relating to this Agreement or any Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable Law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)      **[Reserved]**.

(c)      **Waiver of Venue, Etc**. Each party hereto irrevocably waives to the fullest extent permitted by law any objection that it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document and hereby further irrevocably waives to the fullest extent permitted by law any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. A final judgment (in respect of which time for all appeals has elapsed) in any such suit, action or proceeding shall be conclusive and may be enforced in any court to the jurisdiction of which such party is or may be subject, by suit upon judgment.

**14.11**      **Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**14.12**      **Waiver of Immunity**. To the extent that any Obligor may be or become entitled to claim for itself or its property or revenues any immunity on the ground of sovereignty or the

-105-

like from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment or execution of a judgment, and to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), such Obligor hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity with respect to its obligations under this Agreement and the other Loan Documents.

**14.13    Entire Agreement**. This Agreement and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof, including any confidentiality (or similar) agreements. EACH OBLIGOR ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT IN DECIDING TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS OR IN TAKING OR NOT TAKING ANY ACTION HEREUNDER OR THEREUNDER, IT HAS NOT RELIED, AND WILL NOT RELY, ON ANY STATEMENT, REPRESENTATION, WARRANTY, COVENANT, AGREEMENT OR UNDERSTANDING, WHETHER WRITTEN OR ORAL, OF OR WITH ADMINISTRATIVE AGENT OR THE LENDERS OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

**14.14    Severability**. If any provision hereof is found by a court to be invalid or unenforceable, to the fullest extent permitted by any Law the parties agree that such invalidity or unenforceability shall not impair the validity or enforceability of any other provision hereof.

**14.15    No Fiduciary Relationship**. The Borrower acknowledges that the Administrative Agent and the Lenders have no fiduciary relationship with, or fiduciary duty to, the Borrower arising out of or in connection with this Agreement or the other Loan Documents, and the relationship between the Lenders and the Borrower is solely that of creditor and debtor. This Agreement and the other Loan Documents do not create a joint venture among the parties.

**14.16    Confidentiality**. The Administrative Agent and each Lender agree to keep confidential all non-public information provided to them by any Obligor pursuant to this Agreement that is designated by such Obligor as confidential in accordance with its customary procedures for handling its own confidential information; <u>provided</u> that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (i) to the Administrative Agent, any other Lender, any Affiliate of a Lender or any Eligible Transferee or other assignee permitted under **Section 14.05(b)**, (ii) subject to an agreement to comply with the provisions of this Section, to any actual or prospective direct or indirect counterparty to any Hedging Agreement (or any professional advisor to such counterparty), (iii) to its employees, officers, directors, agents, attorneys, accountants, trustees and other professional advisors or those of any of its affiliates (collectively, its "***Related Parties***" or "***Related Persons***"), (iv) upon the request or demand of any Governmental Authority or any Regulatory Authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (v) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Law, (vi) if requested or required to do so in connection with any litigation or similar proceeding, (vii) that has been publicly disclosed (other than as a result of a disclosure in violation of this **Section 14.16**), (viii) to the National Association of Insurance Commissioners or any similar

-106-

organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (ix) in connection with the exercise of any remedy hereunder or under any other Loan Document, (x) on a confidential basis to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers of other market identifiers with respect to the Loans or (xi) to any other party hereto; provided that, in the case of disclosure pursuant to **clauses (iv), (v)** and **(vi)** above, the Administrative Agent or applicable Lender, as applicable, shall promptly provide notice to the Borrower to the extent reasonable and not prohibited by Law or any applicable Governmental Authority.

**14.17**      **Interest Rate Limitation**. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable Law (collectively, "*charges*"), shall exceed the maximum lawful rate (the "***Maximum Rate***") that may be contracted for, charged, taken, received or reserved by the Administrative Agent and the Lender holding such Loan in accordance with applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all charges payable in respect thereof, shall be limited to the Maximum Rate. To the extent lawful, the interest and charges that would have been paid in respect of such Loan but were not paid as a result of the operation of this **Section 14.17** shall be cumulated and the interest and charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the amount collectible at the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate for each day to the date of repayment, shall have been received by such Lender. Any amount collected by such Lender that exceeds the maximum amount collectible at the Maximum Rate shall be applied to the reduction of the principal balance of such Loan so that at no time shall the interest and charges paid or payable in respect of such Loan exceed the maximum amount collectible at the Maximum Rate.

**14.18**      **Judgment Currency**.

(a)      If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency, the parties hereto agree, to the fullest extent permitted by Law, that the rate of exchange used shall be that at which, in accordance with normal banking procedures, the Administrative Agent could purchase Dollars with such other currency at the buying spot rate of exchange in the New York foreign exchange market on the Business Day immediately preceding that on which any such judgment, or any relevant part thereof, is given.

(b)      The obligations of the Obligors in respect of any sum due to the Administrative Agent hereunder and under the other Loan Documents shall, notwithstanding any judgment in a currency other than Dollars, be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in such other currency the Administrative Agent may, in accordance with normal banking procedures, purchase Dollars with such other currency. If the amount of Dollars so purchased is less than the sum originally due to the Administrative Agent in Dollars, the Borrower agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such

-107-

judgment, to indemnify the Administrative Agent against such loss. If the amount of Dollars so purchased exceeds the sum originally due to the Administrative Agent in Dollars, the Administrative Agent shall remit such excess to the Borrower.

**14.19      USA PATRIOT Act**. The Administrative Agent and the Lenders hereby notify the Obligors that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*Patriot Act*"), they are required to obtain, verify and record information that identifies the Obligors, which information includes the name and address of each Obligor and other information that will allow such Person to identify such Obligor in accordance with the Patriot Act.

**14.20      Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

[Signature Pages Follow]

-108-

**<u>Exhibit B(ii)</u>**

**Exit Facility Security Agreement**

**SECURITY AGREEMENT**

by and among

**SIO₂ MEDICAL PRODUCTS, INC.,**

a Delaware corporation
(the "Borrower")

**the Borrower's Subsidiaries named in the signature pages hereto or having acceded hereto pursuant to Section 24**

(each a "Subsidiary Guarantor"
and, together with the Borrower, each a "Grantor"
and, collectively, the "Grantors")

**OAKTREE FUND ADMINISTRATION, LLC,**

as Administrative Agent for the Lenders referred to below
(in such capacity, together with its successors and assigns,
the "Administrative Agent").

**Dated as of August 3, 2023**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

SECTION 1    Definitions; Interpretation...................................................................... 3

SECTION 2    Security Interest ................................................................................ 8

SECTION 3    Perfection and Priority ...................................................................... 8

SECTION 4    Representations and Warranties......................................................... 12

SECTION 5    Covenants......................................................................................... 16

SECTION 6    Rights to Payment and Pledged Collateral.......................................... 21

SECTION 7    Authorization; Agent Appointed Attorney-in-Fact................................ 22

SECTION 8    Agent Performance of Grantor Obligations .......................................... 24

SECTION 9    Agent's Duties .................................................................................. 24

SECTION 10   Remedies........................................................................................... 25

SECTION 11   Certain Waivers ................................................................................ 28

SECTION 12   Notices ............................................................................................. 29

SECTION 13   No Waiver; Cumulative Remedies ...................................................... 29

SECTION 14   Costs and Expenses; Indemnification .................................................. 29

SECTION 15   Binding Effect................................................................................... 30

SECTION 16   Governing Law ................................................................................. 30

SECTION 17   Submission to Jurisdiction ................................................................. 30

SECTION 18   Waiver of Jury Trial .......................................................................... 31

SECTION 19   Entire Agreement; Amendment ........................................................... 31

SECTION 20   Severability ...................................................................................... 31

SECTION 21   Counterparts ..................................................................................... 31

SECTION 22   Incorporation of Provisions of the Credit Agreement........................... 31

SECTION 23   No Inconsistent Requirements ............................................................ 31

SECTION 24   Accession ......................................................................................... 32

SECTION 25   Termination....................................................................................... 32

SECTION 26   Right of Set-Off ................................................................................ 32

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "***Agreement***"), dated as of August 3, 2023, is made by and among SiO2 Medical Products, Inc., a Delaware corporation (the "***Borrower***"), the Borrower's Subsidiaries named in the signature pages hereto or having acceded hereto pursuant to **Section 24** (each a "***Subsidiary Guarantor***" and, together with the Borrower, each a "***Grantor***" and, collectively, the "***Grantors***"), and Oaktree Fund Administration, LLC, as administrative agent for the Lenders referred to below (in such capacity, together with its successors and assigns, the "***Administrative Agent***").

WHEREAS, the Borrower, the Subsidiary Guarantors from time to time party thereto, the lenders from time to time party thereto (the "***Lenders***") and the Administrative Agent are parties to that certain Credit Agreement and Guaranty, dated as of August 3, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***");

WHEREAS, in order to guarantee the indebtedness and other obligations of the Borrower under the Credit Agreement, each Subsidiary Guarantor has executed the Credit Agreement, or will execute and deliver on the date such Subsidiary Guarantor accedes hereto, a Guarantee Assumption Agreement (as defined in the Credit Agreement); and

WHEREAS, it is a condition precedent to the Borrowing under the Credit Agreement that the Grantors enter into this Agreement and grant to the Administrative Agent, for itself and on behalf of and for the ratable benefit of the other Secured Parties, the security interests hereinafter provided to secure the Secured Obligations of the Borrower and the Subsidiary Guarantors described below.

NOW, THEREFORE, the parties hereto agree as follows:

**SECTION 1   Definitions; Interpretation**.

(a)      **Terms Defined in Credit Agreement**. All capitalized terms used in this Agreement (including in the recitals hereof) and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

(b)      **Certain Defined Terms**. As used in this Agreement, the following terms shall have the following meanings:

"***Acceding Grantor***" has the meaning set forth in **Section 24**.

"***Accession Agreement***" has the meaning set forth in **Section 24**.

"***Books***" means all books, records and other written, electronic or other documentation in whatever form maintained now or hereafter by or for any Grantor in connection with the ownership of its assets or the conduct of its business or evidencing or containing information relating to the Collateral, including: (i) ledgers; (ii) records indicating, summarizing, or evidencing any Grantor's assets (including Inventory and Rights to Payment), business operations or financial condition; (iii) computer programs and software; (iv) computer discs, tapes, files, manuals, spreadsheets; (v) computer printouts and output of whatever kind; (vi) any other

computer prepared or electronically stored, collected or reported information and equipment of any kind; and (vii) any and all other rights now or hereafter arising out of any Contract or agreement between any Grantor and any service bureau, computer or data processing company or other Person charged with preparing or maintaining any of any Grantor's books or records or with credit reporting, including with regard to any such Grantor's Accounts.

"*Collateral*" has the meaning set forth in **Section 2**.

"*Excluded Asset*" means:

(i)     [Reserved].

(ii)     any leases, licenses, contracts, rights, instrument, document or other agreements contained within the Collateral to which any Grantor is a party or any of its rights or interests are subject thereto (including pursuant to a purchase money security interest or similar arrangement) to the extent and solely to the extent that the grant of such security interest shall (1) constitute or result in the abandonment, invalidation or unenforceability of any right, title, interest or purchase money arrangement of such Grantor therein or (2) create a situation under which such Grantor shall be deemed to have breached or terminated pursuant to the terms of, or defaulted under, or a termination right shall arise under any such Collateral (in each case, so long as such term was not incurred or entered into in contemplation of this Agreement); and in each cause under **clauses (1)** and **(2)** above such abandonment, invalidation, unenforceability, breach, termination or default (x) would not be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the NY UCC (or any successor provision or provisions) or equivalent statutes of any relevant jurisdiction or any applicable Law or principles or equity or (y) has not been waived and is not waivable by any Grantor or Subsidiary thereof; provided, however, that the Excluded Assets shall not include, and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation, unenforceability, breach, termination, default, termination right or violation shall be remedied and to the extent severable, shall attach immediately to, any portion of such lease, license, contract, right, agreement or purchase money arrangement that does not result in any of the consequences specified in **(1)**, **(2)** or **(3)** above;

(iii)     any property subject to a Permitted Lien pursuant to Section 9.02(c) of the Credit Agreement;

(iv)     assets to the extent (and only to the extent) and for so long as the grant of a security interest by any Grantor in such assets hereunder would violate any provision of Law applicable to such Grantor or such assets, after giving effect to any applicable anti-assignment provision of the NY UCC or other applicable Law and other than proceeds thereof to the extent that the assignment of the same is effective under the NY UCC or other applicable Law notwithstanding such restriction;

(v)     any United States "intent-to-use" trademark or service mark application filed pursuant to Section 1(b) of the Lanham Act prior to the filing of an "Amendment to Allege Use" or a "Statement of Use" pursuant to Sections 1(c) or 1(d) of the Lanham Act, solely to the extent that and solely during the period in which the grant of such security interest would impair

4

the validity or enforceability, or result in the cancellation or voiding of such "intent-to-use" trademark or service mark application under federal law;

(vi)    any particular assets if the burden, cost or consequences of creating or perfecting such pledges or security interests in such assets is excessive in relation to the benefits to be obtained by the Secured Parties under the Loan Documents as mutually agreed by the Borrower and the Administrative Agent;

(vii)    [Reserved].

(viii)    Excluded Accounts; and

(ix)    motor vehicles and other assets subject to certificates of title, except to the extent a security interest therein can be perfected by the filing of a UCC financing statement;

*provided* that the Proceeds of any Excluded Assets shall not constitute Excluded Assets and shall be subject to the Security Interest.

"***Grantors***" has the meaning set forth in the preamble to this Agreement.

"***Intellectual Property Collateral***" means the following properties and assets anywhere in the world owned or otherwise controlled by any Grantor or in which any Grantor otherwise has any right, title or interest, now existing or hereafter acquired or arising:

(i)    all Patents, domestic or foreign, all Licenses relating to any of the foregoing and all income and royalties with respect to any Licenses (including the Patents and Patent Licenses as are described in **Schedule 2**), all rights to sue for past, present or future infringement thereof, all rights arising therefrom and pertaining thereto and all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof;

(ii)    all Copyrights, domestic or foreign, together with the underlying works of authorship (including titles), whether or not the underlying works of authorship have been published and whether said Copyrights are statutory or arise under the common law, and all other rights and works of authorship (including the Copyrights and Copyright Licenses described in **Schedule 2**), all computer programs, computer databases, computer program flow diagrams, source codes, object codes and all tangible property embodying or incorporating any Copyrights, all Licenses relating to any of the foregoing and all income and royalties with respect to any Licenses, and all other rights, Claims and demands in any way relating to any such Copyrights or works, including royalties and rights to sue for past, present or future infringement, and all rights of renewal and extension of such Copyrights;

(iii)    all state (including common law), federal and foreign Trademarks, all Licenses relating to any of the foregoing and all income and royalties with respect to any Licenses (including such Trademarks and Trademark licenses as described in **Schedule 2**), whether registered or unregistered and wherever registered, all rights to sue for past, present or future infringement or unconsented use thereof, all rights arising therefrom and pertaining thereto and all reissues, extensions and renewals thereof;

5

(iv)    all Trade Secrets, software, data (including business data and technical data), databases, quality control procedures, product, service and technical specifications, operating, production and quality control manuals, sales literature, internet websites, and internet domain names and associated URL addresses;

(v)    the entire goodwill of or associated with the businesses now or hereafter conducted by such Grantor connected with and symbolized by any of the aforementioned properties and assets (including all Trademarks); and

(vi)    all other proprietary rights, all other Intellectual Property or other similar property and all other intangibles associated with or arising out of any of the aforementioned properties and assets and not otherwise described above.

"*Intellectual Property Security Agreement*" means each Copyright Security Agreement in substantially the form of **Exhibit C**, each Trademark Security Agreement in substantially the form of **Exhibit D**, each Patent Security Agreement in substantially the form of **Exhibit E** or any amendment thereto and prepared for purposes of recordation with the U.S. Copyright Office or the U.S. Patent and Trademark Office, as applicable.

"*License*" shall mean any written Contract pursuant to which any Grantor grants or receives any license or sublicense, release or covenant not to assert or any other similar right or immunity with respect to any Intellectual Property owned or controlled by any Grantor, including those listed on **Schedule 2**.

"*NY UCC*" means the Uniform Commercial Code as from time to time in effect in the State of New York; *provided* that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the Security Interest in any portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction in the United states other than New York, "NY UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdictions for purposes of the provisions hereto relating to such perfection, effect of perfection or non-perfection or priority with respect to such Collateral.

"*Partnership and LLC Collateral*" means any and all limited, limited liability and general partnership interests and limited liability company interests of any type or nature (including any such interests in the Borrower's direct or indirect Subsidiaries now or hereafter owned by any Grantor), including all economic and/or control rights with respect thereto, whether now existing or hereafter acquired or arising, including any such interests specified in **Schedule 3**.

"*Perfection Certificate*" means the Perfection Certificate dated the Closing Date delivered to the Administrative Agent, as amended, restated, supplemented or otherwise modified from time to time.

"*Pledge Supplement*" has the meaning specified in **Section 3(i)**.

"*Pledged Collateral*" means any and all (i) Pledged Shares; (ii) additional capital stock or other Equity Interests of the direct Subsidiaries of any Grantor, whether certificated or

6

uncertificated; (iii) other Investment Property of any Grantor; (iv) warrants, options or other rights entitling any Grantor to acquire any interest in Equity Interests or other securities of such Subsidiaries or any other Person; (v) Partnership and LLC Collateral; (vi) Instruments and Pledged Debt Securities; (vii) securities, property, interest, dividends and other payments and distributions from time to time received, receivable or otherwise distributed in respect of, or issued as an addition to, in redemption of, in renewal or exchange for, in substitution or upon conversion of, or otherwise on account of, any of the foregoing; (viii) certificates and instruments now or hereafter representing or evidencing any of the foregoing; (ix) rights, interests and Claims with respect to the foregoing, including under any and all related agreements, instruments and other documents, and (x) cash and non-cash proceeds of any of the foregoing, in each case whether presently existing or owned or hereafter arising or acquired and wherever located, and as from time to time received or receivable by, or otherwise paid or distributed to or acquired by, any Grantor.

"***Pledged Collateral Agreements***" has the meaning specified in **Section 5(p)(i)**.

"***Pledged Debt Securities***" means any and all the debt securities and promissory notes and other instruments evidencing Indebtedness for borrowed money held by such Grantor on the date hereof (including all such debt securities listed opposite the name of such Grantor on **Schedule 1**) and not an Excluded Asset and (ii) any debt securities or promissory notes or other instruments evidencing Indebtedness for borrowed money in the future issued to such Grantor and not an Excluded Asset.

"***Pledged Shares***" means all of the issued and outstanding shares of Equity Interests, whether certificated or uncertificated, of the Borrower's direct or indirect Subsidiaries, now or hereafter owned by any Grantor, including each Subsidiary identified on **Schedule 3** (as amended or supplemented from time to time).

"***Proceeds Account***" has the meaning set forth in **Section 10(c)**.

"***Rights to Payment***" means any and all of any Grantor's Accounts and any and all of any Grantor's rights and Claims to the payment or receipt of money or other forms of consideration of any kind in, to and under or with respect to its Chattel Paper, Documents, General Intangibles, Instruments, Investment Property, Letter-of-Credit Rights, Proceeds and Supporting Obligations.

"***Secured Obligations***" means all Obligations (as defined in the Credit Agreement).

(c)     **Terms Defined in the NY UCC**. Where applicable and except as otherwise defined herein or in the Credit Agreement, terms used in this Agreement shall have the meanings assigned to them in the NY UCC; provided that to the extent that the NY UCC is used to define any term herein and such term is defined differently in different Articles of the NY UCC, the definition of such term contained in (and ascribed thereto in) Article 9 shall govern.

(d)     **Interpretation**. The rules of interpretation set forth in Section 1.03 of the Credit Agreement shall be applicable to this Agreement and are incorporated herein by this reference.

7

**SECTION 2   Security Interest**.

(a)      **Grant of Security Interest**. As security for the payment or performance, in full of the Secured Obligations, each Grantor hereby collaterally assigns and pledges to the Administrative Agent, for itself and on behalf of and for the ratable benefit of the other Secured Parties, and hereby grants to the Administrative Agent, for itself and on behalf of and for the ratable benefit of the other Secured Parties, a security interest (the "***Security Interest***") in and lien on all of such Grantor's right, title and interest in, to and under all of such Grantor's personal property and all other assets, wherever located and whether now existing or owned or hereafter acquired by such Grantor, or in which such Grantor now has or at any time in the future may acquire, including the following property (collectively, the "***Collateral***"): (i) all Accounts; (ii) all Chattel Paper; (iii) all Commercial Tort Claims specified in **Schedule 1** or notified to the Administrative Agent pursuant to **Section 5(o)**; (iv) all Deposit Accounts, Securities Accounts and Commodity Accounts; (v) all Documents; (vi) all Equipment; (vii) all General Intangibles; (viii) all Instruments; (ix) all Inventory; (x) all Investment Property; (xi) all Letter-of-Credit Rights; (xii) all other Goods; (xiii) all Intellectual Property Collateral; (xiv) all money; (xv) all Pledged Collateral; (xvi) all Books pertaining to the foregoing; and (xvii) all products, Proceeds and Supporting Obligations of any and all of the foregoing.

Notwithstanding the foregoing or anything herein to the contrary, in no event shall the "***Collateral***" include or the Security Interest attach to any Excluded Asset.

(b)      **Grantors Remain Liable**. The Security Interest is granted as security only and shall not subject the Administrative Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral. Anything herein to the contrary notwithstanding, (i) each Grantor shall remain liable under any Contracts included in the Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Administrative Agent of any of the rights granted to the Administrative Agent hereunder shall not release any Grantor from any of its duties or obligations under any such Contracts included in the Collateral, and (iii) neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any such Contracts included in the Collateral by reason of this Agreement, nor shall the Administrative Agent or any other Secured Party be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any such Contract included in the Collateral.

(c)      **Continuing Security Interest; Ratable Benefit.** Each Grantor agrees that this Agreement shall create a continuing security interest in the Collateral which shall remain in effect until terminated in accordance with **Section 25**, and such security has been granted to the Administrative Agent for itself and on behalf of and for the ratable benefit of the Secured Parties.

**SECTION 3   Perfection and Priority**.

(a)      **Financing Statements, Etc**. Each Grantor hereby irrevocably authorizes the Administrative Agent to file at any time and from time to time in any relevant jurisdiction in the United States (including any jurisdiction within or of the United States) any financing

8

statements (including fixture filings or similar filings) with respect to the Collateral or any part thereof and amendments thereto that (i) indicate the Collateral as "all assets" of such Grantor or words of similar effect, and (ii) contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment, including (A) whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Collateral relates. Each Grantor agrees to provide such information to the Administrative Agent promptly (and in any case within five (5) Business Days) upon its reasonable request. The Agent is further authorized to file (x) with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) or other applicable Government Authority, organization or office in any jurisdiction such documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by each Grantor, without the signature of any Grantor, and naming any Grantor or the Grantors as debtors and the Administrative Agent as secured party and (y) if any of the Collateral is pledged or shall be pledged under a non-U.S. law Security Document, such documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by each Grantor in accordance with the terms and procedures contained therein or as required pursuant to applicable Law. Each Grantor shall execute and deliver to the Administrative Agent, and each Grantor hereby authorizes the Administrative Agent to file, at any time and from time to time, all amendments to financing statements, continuation financing statements, termination statements, Intellectual Property Security Agreements, assignments, fixture filings, affidavits, reports, notices and all other documents and instruments, in form reasonably satisfactory to the Administrative Agent, as the Administrative Agent or the Majority Lenders may reasonably request, to perfect and continue perfected, to maintain the priority of or provide notice of the Administrative Agent's Security Interest in the Collateral, to confirm, continue, enforce or protect the Security Interest granted by such Grantor, and to otherwise accomplish the purposes of this Agreement. Without limiting the generality of the foregoing, each Grantor shall from time to time take the actions specified in **subsections (b)** through **(j)** below.

(b)     **Delivery of Pledged Collateral**. Each Grantor hereby agrees to deliver promptly (and in any case within five (5) Business Days following its acquisition thereof) to the Administrative Agent, the certificates, instruments and other writings representing any Pledged Collateral (other than Instruments subject to **subsection (c)** below), which shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, in form reasonably satisfactory to the Administrative Agent. If any Grantor shall become entitled to receive or shall receive any Pledged Collateral (other than Instruments subject to **subsection (c)** below) after the date hereof, such Grantor shall accept the foregoing as the agent for the Administrative Agent, shall hold it in trust for the Administrative Agent, shall segregate it from other property or funds of such Grantor, and shall promptly deliver the same and all certificates, instruments and other writings representing such Pledged Collateral forthwith to or for the account of the Administrative Agent, at the address in New York and to the Person to be designated by the Administrative Agent, which shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank in form satisfactory to the Administrative Agent.

9

Notwithstanding the foregoing, if any Pledged Collateral is pledged or shall be pledged under a non-U.S. law Security Document, each Grantor shall deliver such Pledged Collateral in accordance with the terms and procedures contained therein.

(c)     **Instrument Collateral**. Anything herein to the contrary notwithstanding, so long as no Event of Default shall have occurred and be continuing, each Grantor may retain for collection in the Ordinary Course any Instruments representing amounts not exceeding $1,000,000 individually and any notes evidencing intercompany balances, in each case received by such Grantor in the Ordinary Course, and the Administrative Agent shall, promptly upon request of such Grantor, make appropriate arrangements for making any other Instruments pledged by such Grantor available to the payor of any such Instrument for purposes of presentation, collection or renewal (any such arrangement to be effected, to the extent required under applicable Law to continue to have perfected the Administrative Agent's security interest in such Instruments, against trust receipt or like document).

(d)     **Transfer of Security Interest Other Than by Delivery**. If for any reason Pledged Collateral cannot be delivered to or for the account of the Administrative Agent as provided in **Section 3(b)**, each applicable Grantor shall promptly take such other steps as may be necessary or as shall be reasonably requested from time to time by the Administrative Agent to effect a transfer of a perfected first priority security interest in and pledge of the Pledged Collateral to the Administrative Agent for itself and on behalf of and for the ratable benefit of the other Secured Parties pursuant to the NY UCC. To the extent practicable, each such Grantor shall thereafter deliver the Pledged Collateral to or for the account of the Administrative Agent as provided in **Section 3(b)**.

(e)     **Intellectual Property Collateral**. (i) Each Grantor shall execute and deliver to the Administrative Agent, concurrently with the execution of this Agreement, such Intellectual Property Security Agreements as the Administrative Agent may reasonably request, and record such Intellectual Property Security Agreements with the U.S. Copyright Office or the U.S. Patent and Trademark Office, as applicable, and take such other action as may be necessary, or as the Administrative Agent may reasonably request, to perfect the Administrative Agent's security interest in such U.S. Intellectual Property Collateral. Notwithstanding anything herein to the contrary, for the avoidance of doubt, no Grantor shall be required to take any action to perfect Administrative Agent's security interest in Intellectual Property Collateral in any jurisdiction except the U.S.

(ii)     Following the creation or other acquisition of any Intellectual Property Collateral by any Grantor after the date hereof which is registered or becomes registered or the subject of an application for registration with the U.S. Copyright Office or the U.S. Patent and Trademark Office, as applicable, such Grantor shall include details of such newly created or acquired Intellectual Property Collateral on the next Compliance Certificate provided or required to be provided under Section 8.01 of the Credit Agreement, and modify this Agreement by amending **Schedule 2** to include any Intellectual Property Collateral which becomes part of the Collateral and which was not included on **Schedule 2** as of the date hereof and record such Intellectual Property Security Agreement with the U.S. Copyright Office or the U.S. Patent and Trademark Office, as applicable, and take such other action as may be necessary, or as the

10

Administrative Agent or the Majority Lenders may reasonably request, to perfect the Administrative Agent's security interest in such U.S. Intellectual Property Collateral.

(iii)      Without limiting the generality of the foregoing, each Grantor hereby authorizes the Administrative Agent, with prompt notice thereof to the Grantors, to supplement this Agreement by supplementing **Schedule 2** or adding additional schedules hereto to identify specifically any asset or item of a Grantor that may, in the Administrative Agent's judgment, constitute Intellectual Property Collateral; provided that any Grantor shall have the right, exercisable within ten (10) days after it has been notified by the Administrative Agent of the specific identification of such Collateral, to advise the Administrative Agent in writing of any inaccuracy of the representations and warranties made by such Grantor hereunder with respect to such Collateral.  Each Grantor agrees that it will use its commercially reasonable efforts to take such action as shall be necessary in order that all representations and warranties hereunder shall be true and correct with respect to such Collateral within 30 days after the date it has been notified by the Administrative Agent of the specific identification of such Collateral.

(f)      **Documents, Etc.** Each Grantor shall deliver to the Administrative Agent, or an agent designated by it, appropriately endorsed or accompanied by appropriate instruments of transfer or assignment, all Documents and Chattel Paper, and all other Rights to Payment, in each case, representing amounts in excess of $1,000,000 at any time evidenced by promissory notes, trade acceptances or other instruments, not already delivered hereunder pursuant to this **Section 3**.

(g)      **Bailees**. Any Person (other than the Administrative Agent) at any time and from time to time holding all or any portion of the Collateral shall be deemed to, and shall, hold the Collateral as the agent of, and as pledge holder for, the Administrative Agent. At any time and from time to time, upon the consent of the applicable Grantor (not to be unreasonably withheld, delayed or conditioned), the Administrative Agent may give notice to any such Person holding all or any portion of the Collateral that such Person is holding the Collateral as the agent and bailee of, and as the pledge holder for, the Administrative Agent and obtain such Person's written acknowledgement thereof. In connection with the immediately preceding sentence, each Grantor will, upon the reasonable request of the Administrative Agent, join with the Administrative Agent in notifying any Person who has possession of any Collateral of the Administrative Agent's security interest therein and obtaining an acknowledgement from such Person that it is holding the Collateral for the benefit of the Administrative Agent.

(h)      **Control**. Each Grantor will cooperate with the Administrative Agent in obtaining control (as defined in the NY UCC) of Collateral consisting of any Deposit Accounts, Securities Accounts, Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights, including delivery of Control Agreements with respect to Controlled Accounts (as defined in the Credit Agreement), as the Administrative Agent may reasonably request, to perfect and continue perfected, maintain the priority of or provide notice of the Administrative Agent's security interest in such Collateral.

(i)      **Additional Subsidiaries**. In the event that any Grantor acquires rights in any Subsidiary after the date hereof and such Subsidiary is required to become a Subsidiary Guarantor under Section 8.12 of the Credit Agreement, such applicable Grantor shall deliver to

11

the Administrative Agent a completed pledge supplement, substantially in the form of **Exhibit B** (the "*Pledge Supplement*"), together with all schedules thereto, reflecting such new Subsidiary. Notwithstanding the foregoing, it is understood and agreed that the security interest of the Administrative Agent shall attach to the Pledged Collateral (other than Excluded Assets) related to such Subsidiary immediately upon any Grantor's acquisition of rights therein and shall not be affected by the failure of any Grantor to deliver a Pledge Supplement.

(j)     **Further Assurances**. Each Grantor agrees that, at its own expense, it will promptly execute, acknowledge, deliver and cause to be filed all further instruments and documents and take all other commercially reasonable actions as the Administrative Agent may from time to time reasonably request in order to assure, obtain, perfect, preserve and protect any security interest granted or purported to be granted under this Agreement or enable the Administrative Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral, including the payment of any fees and Other Taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing or continuation statements (including fixture filings) or other documents in connection herewith or therewith.

(k)     **Taxes**. At its option, the Administrative Agent may discharge past due Taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Collateral and not expressly permitted pursuant to the Credit Agreement, and may pay for the maintenance and preservation of the Collateral to the extent any Grantor fails to do so to the extent required by the Credit Agreement or this Agreement, and each Grantor jointly and severally agrees to reimburse the Administrative Agent on demand for any reasonable payment made or any reasonable expense incurred by the Administrative Agent pursuant to the foregoing authorization; provided, however, that nothing in this paragraph shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor with respect to Taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

**SECTION 4   Representations and Warranties**. Each Grantor represents and warrants to each Secured Party as of the date of this Agreement that:

(a)     **Location of Chief Executive Office and Collateral**. Such Grantor's chief executive office and principal place of business (as of the date of this Agreement) is located at the address set forth in **Schedule 1**, and all other locations (as of the date of this Agreement) where such Grantor conducts business or Collateral is kept are set forth in **Schedule 1**.

(b)     **Locations of Books**. All Books pertaining to the Rights to Payment of such Grantor are kept at such Grantor's chief executive office, principal place of business or place where such Grantor conducts business.

(c)     **Jurisdiction of Organization and Names**. Such Grantor's jurisdiction of organization is set forth in **Schedule 1**; and such Grantor's exact legal name is as set forth in the signature pages of this Agreement. All trade names and trade styles under which such Grantor

12

presently conducts its business operations are set forth in **Schedule 1**, and, except as set forth in **Schedule 1**, such Grantor has not, at any time in the past: (i) been known as or used any other corporate, trade or fictitious name or (ii) changed its name; (iii) been the surviving or resulting corporation in a merger or consolidation; or (iv) acquired through asset purchase or otherwise any business of any Person.

(d)     **Collateral**. Such Grantor has rights in or the power to transfer the Collateral, and such Grantor has legal title to the Collateral (or, in the case of after-acquired Collateral, at the time such Grantor acquires rights in such Collateral, will have good and valid title therein), free from any Lien other than Permitted Liens.

(e)     **Intellectual Property Collateral**. As of the date of this Agreement, **Schedule 2** includes (i) all Copyrights registered with the U.S. Copyright Office or subject of pending applications with the U.S. Copyright Office, and all Copyright Licenses, (ii) all Patents and Trademarks issued by the U.S. Patent and Trademark Office or the subject of pending applications with the U.S. Patent and Trademark Office, and all Patent Licenses and Trademark Licenses, in each case, that are not Excluded Assets and are owned or otherwise controlled by any Grantor or in which any Grantor otherwise has any interest.

(f)     **Enforceability; Priority of Security Interest**. (i) This Agreement creates a valid security interest in the Collateral which is enforceable against the Collateral in which such Grantor now has rights and will create a valid security interest which is enforceable against the Collateral in which such Grantor hereafter acquires rights at the time such Grantor acquires any such rights; and (ii) upon the completion of the filings described in **Section 4(g)(f)** and delivery of certificates, instruments and other writing representing Pledged Collateral (if any) and performance of other actions described in Section 3, the Administrative Agent will have a perfected security interest in the Collateral in which such Grantor now has rights, and will have a perfected security interest in the Collateral in which such Grantor hereafter acquires rights at the time such Grantor acquires any such rights, in each case, for the Administrative Agent's own benefit and for the ratable benefit of the other Secured Parties, subject to Permitted Liens and securing the payment and performance of the Secured Obligations.

(g)     **Perfection Certificate**. The Perfection Certificate has been duly prepared, completed and executed and the information set forth therein is correct and complete in all material respects as of the Closing Date. The Uniform Commercial Code financing statements attached as **Schedule 4** have been prepared by the Administrative Agent based upon the information provided to the Administrative Agent and the Secured Parties in the Perfection Certificate for filing in each United States governmental, municipal or other office specified in the Perfection Certificate, which are all the filings, recordings and registrations (other than filings required to be made in the United States Patent and Trademark Office and the United States Copyright Office in order to perfect the Security Interest in the Collateral consisting of United States Patents, Trademarks and Copyrights and exclusive Licenses in or to Copyrights) that are necessary as of the Closing Date to perfect the Security Interest in favor of the Administrative Agent (for the ratable benefit of the Secured Parties) in respect of all Collateral in which the Security Interest may be perfected by filing a Uniform Commercial Code Financing Statement. Each Grantor represents and warrants that upon filing and recording of the Intellectual Property Security Agreements executed in favor of and

13

delivered to the Administrative Agent pursuant to **Section 3(e)**, together with the consummation of the other actions set forth above in this **clause (g)**, to the extent that a security interest with respect to Patents, Trademarks Copyrights and exclusive licenses in or to Copyrights may be perfected by the filing and recording of financing statements and short-form security agreements of the type described in this **clause (g)**, the Administrative Agent will have a perfected security interest in all Collateral consisting of Patents, Trademarks and Copyrights that are issued by, registered with or the subject of a pending application before the United States Patent and Trademark Office or the United States Copyright Office and exclusive Licenses in or to Copyrights.

(h)     **Other Financing Statements**. Other than (i) financing statements disclosed to the Administrative Agent, (ii) financing statements in favor of the Administrative Agent for itself and on behalf of and for the ratable benefit of the Secured Parties or (iii) financing statements in respect of Permitted Liens, no effective financing statement naming such Grantor as debtor, assignor, grantor, mortgagor, pledgor or the like and covering all or any part of the Collateral is on file in any filing or recording office in any jurisdiction.

(i)     **Rights to Payment.**

(i)     To the best of such Grantor's knowledge, the Rights to Payment of such Grantor represent valid, binding and enforceable obligations of the account debtors or other Persons obligated thereon, representing undisputed, bona fide transactions completed in accordance with the terms and provisions contained in any documents related thereto, and are and will be genuine and what they purport to be, in each case, in all material respects;

(ii)     such Grantor has not assigned any of its rights under any of its Rights to Payment except as provided in this Agreement or as set forth in the other Loan Documents;

(iii)     all Rights to Payment of such Grantor comply in all material respects with all applicable Law concerning form, content and manner of preparation and execution;

(iv)     to the best of such Grantor's knowledge, all account debtors and other obligors on the Rights to Payment of such Grantor are solvent and generally paying their debts as they come due; and

(v)     such Grantor has no knowledge of any fact or circumstance which would materially impair the validity or collectability of any of the Rights to Payment of such Grantor.

(j)     **Inventory**. No Inventory of such Grantor is stored with any bailee, warehouseman or similar Person or on any premises leased to such Grantor, no such Inventory has been consigned to such Grantor or consigned by such Grantor to any Person, nor is any such Inventory held by such Grantor for any Person under any "bill and hold" or other arrangement, except as set forth in **Schedule 1**.

14

(k)    [Reserved].

(l)    **Instrument Collateral**. (i) Such Grantor has not previously assigned any interest in any Instruments held by such Grantor (other than such interests as will be released on or before the date hereof), (ii) no Person other than such Grantor owns an interest in such Instruments (whether as joint holders, participants or otherwise), and (iii) no material default exists under or in respect of such Instruments.

(m)    **Pledged Shares, Partnership and LLC Collateral and other Pledged Collateral**. As of the Closing Date, **Schedule 3** correctly sets forth (A) the percentage of the issued and outstanding shares of each class of Equity Interests of the issuer thereof and (B) includes all Equity Interests required to be pledged hereunder.  (i) All of the Pledged Shares and Partnership and LLC Collateral of such Grantor have been, and upon issuance any additional Pledged Collateral consisting of Pledged Shares, Partnership and LLC Collateral or any other securities of such Grantor, will be, duly and validly issued, and are and will be fully paid and non-assessable, subject in the case of Partnership and LLC Collateral to future assessments required under applicable Law and any applicable partnership or operating agreement, (ii) such Grantor is or, in the case of any such additional Pledged Collateral will be, the legal record and beneficial owner thereof, (iii) there are no restrictions on the transferability of such Pledged Collateral or such additional Pledged Collateral to the Administrative Agent or with respect to the foreclosure, transfer or disposition thereof by the Administrative Agent, except as provided under applicable securities or "Blue Sky" laws, (iv) the Pledged Shares and Partnership and LLC Collateral of such Grantor constitute 100% of the issued and outstanding Equity Interests of directly owned Subsidiaries of such Grantor, and no securities convertible into or exchangeable for any Equity Interests of any such Subsidiary, or any options, warrants or other commitments entitling any Person to purchase or otherwise acquire any Equity Interests of any such Subsidiary, are issued and outstanding, (v) any and all Pledged Collateral Agreements which affect or relate to the voting or giving of written consents with respect to any of the Pledged Shares pledged by such Grantor, and any and all other Pledged Collateral Agreements relating to the Partnership and LLC Collateral of such Grantor, have been disclosed in writing to the Administrative Agent and the Lenders, and (vi) as to each such Pledged Collateral Agreement relating to the Partnership and LLC Collateral of such Grantor, (A) such agreement contains the entire agreement between the parties thereto with respect to the subject matter thereof, has not been amended or modified, and is in full force and effect in accordance with its terms, (B) there exists no material violation or material default under any such agreement by such Grantor or, to the best knowledge of such Grantor party thereto, the other parties thereto, and (C) such Grantor has not knowingly waived or released any of its material rights under or otherwise consented to a material departure from the terms and provisions of any such agreement. No consent or approval of any Governmental Authority, any securities exchange or any other person was or is necessary to the validity of the pledge of any Equity Interests (other than such as have been obtained and are in full force and effect).

(n)    **Control Agreements**. No Control Agreements exist with respect to any Collateral held by such Grantor other than any Control Agreements in favor of the Administrative Agent.

15

(o)    **Letter-of-Credit Rights**. Such Grantor does not have any Letter-of- Credit Rights except as set forth in **Schedule**.

(p)    **Commercial Tort Claims**. Such Grantor does not have any Commercial Tort Claims the recovery from which would reasonably be expected to exceed $1,000,000 except as set forth in **Schedule 1**.

(q)    **Leases**. Such Grantor is not and will not become a lessee under any real property lease or other agreement governing the location of Collateral at the premises of another Person pursuant to which the lessor or such other Person may obtain any rights in any of the Collateral, and no such lease or other such agreement now prohibits, restrains, impairs or will prohibit, restrain or impair such Grantor's right to remove any Collateral from the premises at which such Collateral is situated, except for the usual and customary restrictions contained in such leases of real property.

(r)    **Pledged Debt Securities**. As of the Closing Date, **Schedule 1** correctly sets forth a list of all Collateral constituting Pledged Debt Securities, the aggregate principal amount and maturity date of all Indebtedness represented by any Pledged Debt Securities and (ii) includes all debt securities, promissory notes and other Collateral constituting Pledged Debt Securities required to be pledged hereunder. The Collateral constituting Pledged Debt Securities are valid and binding obligations of the issuers thereof, subject as to the enforcement of remedies to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(s)    **No Transfer Restrictions**. Except for (i) restrictions and limitations imposed by the Loan Documents or securities laws generally or (ii) otherwise expressly permitted hereunder, the Pledged Collateral is and will continue to be freely transferable and assignable, and none of such Pledged Collateral is or will be subject to any option, right of first refusal, shareholders agreement, charter or by-law provisions or contractual restriction of any nature that might prohibit, impair, delay or otherwise affect the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Administrative Agent of rights and remedies hereunder.

**SECTION 5  Covenants**.    So long as any of the Secured Obligations (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made) remain unsatisfied or any Lender shall have any Commitment, each Grantor agrees that:

(a)    **Defense of Collateral**. Such Grantor will appear in and defend any action, suit or proceeding which may to a material extent affect its title to, or right or interest in, or the Administrative Agent's right or interest in, the Collateral, including any action, suit or proceeding with respect to any Liens on the Collateral (other than any Lien not prohibited by the Loan Documents).

16

(b)     **Preservation of Collateral**. Such Grantor will do and perform all commercially reasonable acts that may be necessary and appropriate to maintain, preserve and protect the Collateral.

(c)     **Compliance with Laws, Etc.** Such Grantor will comply, in all material respects, with all applicable Laws, and all policies of insurance, relating to the possession, operation, maintenance and control of the Collateral.

(d)     **Location of Books and Chief Executive Office**. Such Grantor will: (i) keep all Books pertaining to the Rights to Payment of such Grantor at such Grantor's chief executive office, principal place of business or place where such Grantor conducts business and (ii) promptly notify the Administrative Agent of any changes in the location of such Grantor's chief executive office or principal place of business.

(e)     **Location of Collateral**. Such Grantor will: (i) keep the Collateral (to the extent such Collateral is tangible or a tangible embodiment of Collateral) held by such Grantor at the locations set forth in **Schedule 1** or at such other locations as may be disclosed in writing to the Administrative Agent pursuant to **clause (ii)** and will not remove any such Collateral from such locations (other than in connection with sales of Inventory in the ordinary course of such Grantor's business, other dispositions permitted by **Section 5** and movements of Collateral from one disclosed location to another disclosed location); and (ii) give the Administrative Agent prompt notice of any change in the locations set forth in **Schedule 1**.

(f)     **Change in Name, Identity or Structure**. Such Grantor will give five (5) Business Days prior written notice to the Administrative Agent of (i) any change in name, (ii) any change in its jurisdiction of organization, (iii) any change in its registration as an organization (or any new registration); and (iv) any changes in its identity or structure in any manner which might make any financing statement filed hereunder incorrect or misleading; <u>provided</u> that such changes are otherwise permitted by the Loan Documents and that no Grantor shall change its jurisdiction of organization to a jurisdiction outside of the United States.

(g)     **Maintenance of Records**. Such Grantor will keep, at its own cost and expense, separate, accurate and complete Books as is consistent with its practices as of the date hereof in all material respects with respect to the Collateral held by such Grantor.

(h)     **Disposition of Collateral**. Such Grantor will not surrender or lose possession of (other than to the Administrative Agent), sell, lease, rent, or otherwise dispose of or transfer any of the Collateral held by such Grantor or any right or interest therein, except to the extent permitted by the Loan Documents.

(i)     **Leased Premises; Collateral Held by Warehouseman, Bailee, Etc.** At the Administrative Agent's reasonable request, such Grantor will use commercially reasonable efforts to obtain from each Person so reasonably requested by the Administrative Agent from whom such Grantor leases any premises, and from each other Person so reasonably requested by the Administrative Agent at whose premises any Collateral held by such Grantor is present (including any bailee, warehouseman or similar Person), any such collateral access, subordination,

17

landlord waiver, bailment, consent and estoppel agreements as the Administrative Agent may reasonably request, in form and substance reasonably satisfactory to the Administrative Agent; provided that such landlord waiver shall be in substantially the form of Exhibit G to the Credit Agreement and such bailee letter shall be in substantially the form of **Exhibit F** hereto. For the avoidance of doubt, the failure to obtain such collateral access, subordination, landlord waiver, bailment or consent and estoppel agreements after the use of commercially reasonable efforts shall not be a Default or an Event of Default.

(j)    **Rights to Payment**. Such Grantor will:

(i)    with such frequency as the Administrative Agent may reasonably require or as may be required under the Credit Agreement, furnish to the Administrative Agent full and complete reports, in form and substance reasonably satisfactory to the Administrative Agent, with respect to the Accounts;

(ii)    if any Accounts of such Grantor in an aggregate amount in excess of $1,000,000 per fiscal year arise from Contracts with the United States or any department, agency or instrumentality thereof, promptly notify the Administrative Agent thereof and execute any documents and instruments and take any other steps reasonably requested by the Administrative Agent in order that all monies due and to become due thereunder shall be assigned to the Administrative Agent upon the occurrence and continuance of an Event of Default;

(iii)    upon the occurrence and during the continuation of an Event of Default and upon the request of the Administrative Agent (A) notify all or any designated portion of the account debtors and other obligors on the Rights to Payment of such Grantor of the security interest hereunder, and (B) notify the account debtors and other obligors on the Rights to Payment or any designated portion thereof that payment shall be made directly to the Administrative Agent or to such other Person or location as the Administrative Agent shall specify; and

(iv)    upon the occurrence and during the continuation of a Default, establish such lockbox or similar arrangements for the payment of the Accounts and other Rights to Payment of such Grantor as the Administrative Agent shall require.

(k)    **Instruments, Investment Property, Etc.** Upon the request of the Administrative Agent, such Grantor will (i) promptly deliver to the Administrative Agent, or an agent designated by it in New York, appropriately endorsed or accompanied by appropriate instruments of transfer or assignment, all Instruments, Documents, Chattel Paper and certificated securities with respect to any Investment Property held by such Grantor, all letters of credit of such Grantor, and all other Rights to Payment held by such Grantor at any time evidenced by promissory notes, trade acceptances or other instruments, (ii) cause any securities intermediaries to show on their books that the Administrative Agent is the entitlement holder with respect to any Investment Property held by such securities intermediary on behalf of such Grantor, and/or obtain Control Agreements in favor of the Administrative Agent from such securities intermediaries, in form and substance satisfactory to the Administrative Agent, with respect to any such Investment Property, as reasonably requested by the Administrative Agent, and (iii) provide such notice, obtain such acknowledgments and take all such other action, with respect to any Chattel Paper, Documents

18

and Letter-of-Credit Rights held by such Grantor, as the Administrative Agent shall reasonably specify.

(l)    **Deposit Accounts and Securities Accounts.** Such Grantor will (i) give the Administrative Agent prompt notice of the establishment of any new Deposit Account, new Securities Account and new Commodity Account, in each case other than any Excluded Account, established in the U.S. by such Grantor with respect to any Investment Property held by such Grantor and (ii) obtain Control Agreements in favor of the Administrative Agent with respect to such Deposit Account, Securities Account and Commodity Account within 30 days (or such longer time as agreed by the Administrative Agent in its sole discretion) of the establishing of such account, in form and substance reasonably satisfactory to the Administrative Agent.

(m)    **Inventory**. Such Grantor will not store any Inventory with a bailee, warehouseman or similar Person or on premises leased to such Grantor, nor dispose of any Inventory on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or similar basis, nor acquire any Inventory from any Person on any such basis, without in each case giving the Administrative Agent prior written notice thereof.

(n)    **Intellectual Property Collateral.** Such Grantor will:

(i)    not allow or suffer any Intellectual Property Collateral held by such Grantor to become abandoned, nor any registration thereof to be abandoned, terminated, forfeited, expired, cancelled, or dedicated to the public, except for Intellectual Property Collateral that is not Material Intellectual Property, and for such Intellectual Property Collateral, only as shall be reasonable and appropriate in accordance with prudent business practice;

(ii)    notify the Administrative Agent promptly if it knows or has reason to know (A) that any Material Intellectual Property owned or controlled by any Obligor constituting Intellectual Property Collateral may become abandoned, terminated, forfeited, expired or dedicated to the public, except to the extent expressly permitted by the Credit Agreement or (B) of any materially adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, United States Copyright Office or any court or similar office of any other jurisdiction) regarding such Grantor's ownership or control of any such Material Intellectual Property, its right to register the same, or its right to keep and maintain the same.

(iii)    diligently prosecute all applications for Patents, Copyrights and Trademarks, and file and prosecute any and all continuations, continuations-in-part, applications for reissue, applications for certificate of correction and like matters as shall be reasonable and appropriate in accordance with prudent business practice, and promptly and timely pay any and all maintenance, license, registration and other fees, taxes and expenses incurred in connection with any Intellectual Property Collateral held by such Grantor; and

(iv)    in the event that any Grantor knows or has reason to believe that any Material Intellectual Property owned or controlled by any Obligor constituting Intellectual Property Collateral has been or will imminently be infringed, misappropriated or otherwise

19

violated by a third person in any manner that would reasonably be expected to result in a Material Adverse Change, such Grantor shall promptly notify the Administrative Agent in writing and shall, if consistent with prudent business judgment, promptly take such commercially reasonable measures to cause a cessation of such infringement, misappropriation or other violation and to recover damages therefor.

(o)     **Notices, Reports and Information**. Such Grantor will (i) within 45 days after the end of each fiscal quarter, notify the Administrative Agent of any other modifications of or additions to the information contained in **Schedule 1** (including any acquisition or holding of an interest in any Chattel Paper, Commercial Tort Claims and Letter-of- Credit Rights); (ii) notify the Administrative Agent of any material Claim made or asserted against the Collateral by any Person and of any change in the composition of the Collateral or other event which could materially adversely affect the value of the Collateral or the Administrative Agent's Lien thereon; and (iii) upon the reasonable request of the Administrative Agent make such demands and requests for information and reports as such Grantor is entitled to make in respect of the Collateral.

(p)     **Shareholder Agreements; Other Agreements.**

(i)     Such Grantor shall comply in all material respects with all of its obligations under any shareholders agreement, operating agreement, partnership agreement, voting trust, proxy agreement or other agreement or understanding (collectively, the "***Pledged Collateral Agreements***") to which it is a party and shall enforce all of its rights thereunder.

(ii)     Such Grantor will take all actions necessary to cause each such Pledged Collateral Agreement relating to Partnership and LLC Collateral to provide specifically at all times that: (A) no such Partnership and LLC Collateral shall be a security governed by Article 8 of the NY UCC or any other applicable state's Uniform Commercial Code; and (B) no consent of any member, manager, partner or other Person shall be a condition to the admission as a member or partner of any transferee (including the Administrative Agent) that acquires ownership of such Partnership and LLC Collateral as a result of the exercise by the Administrative Agent of any remedy hereunder or under applicable Law. Additionally, such Grantor agrees that no such Partnership and LLC Collateral (A) shall be dealt in or traded on any securities exchange or in any securities market, (B) shall constitute an investment company security, or (C) shall be held by such Grantor in a Securities Account.

(iii)     Such Grantor shall not vote to enable or take any other action to: amend or terminate, or waive compliance with any of the terms of, any such Pledged Collateral Agreement, certificate or articles of incorporation, bylaws or other organizational documents in any way that materially changes the rights of such Grantor with respect to any such Pledged Collateral in a manner adverse to the Administrative Agent or the other Secured Parties or that adversely affects the validity, perfection or priority of the Administrative Agent's security interest therein.

4876-0957-0929 v.3

## SECTION 6    Rights to Payment and Pledged Collateral.

(a)    **Collection of Rights to Payment**. Until the Administrative Agent exercises its rights hereunder to collect any Rights to Payment of any Grantor, each such Grantor shall endeavor in the first instance diligently to collect all amounts due or to become due on or with respect to the Rights to Payment held by such Grantor. At the request of the Administrative Agent, upon the occurrence and during the continuation of an Event of Default, all remittances received by such Grantor shall be held in trust for the Administrative Agent and, in accordance with the Administrative Agent's instructions, remitted to the Administrative Agent or deposited to an account with the Administrative Agent in the form received (with any necessary endorsements or instruments of assignment or transfer).

(b)    **Pledged Collateral**. Unless and until an Event of Default shall have occurred and is continuing, each Grantor shall be entitled to receive and retain for its own account any cash dividend on or other cash distribution or payment, if any, in respect of the Pledged Collateral, to the extent not prohibited under the Credit Agreement. Upon the occurrence and during the continuation of an Event of Default, following notice from the Administrative Agent to the Borrower of its exercise of rights under this Agreement (provided that no such notice shall be required upon an Event of Default pursuant to Section 11.01(h) of the Credit Agreement), the Administrative Agent shall have the sole and exclusive right and authority to receive all distributions and payments of any nature with respect to any Pledged Collateral, and all such distributions or payments received by such Grantor shall be held in trust for the Administrative Agent and, in accordance with the Administrative Agent's instructions, remitted to the Administrative Agent or deposited to an account with the Administrative Agent in the form received (with any necessary endorsements or instruments of assignment or transfer). All dividends, interest, principal or other distributions received by any Grantor contrary to the provisions of this **Section 6(b)** shall be held in trust for the benefit of the Administrative Agent, shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Administrative Agent upon demand in the same form as so received (with any necessary endorsement or instrument of assignment). Following the occurrence and during the continuation of an Event of Default, any such distributions and payments with respect to any such Pledged Collateral held in any Securities Account shall be held and retained in such Securities Account, in each case as part of the Collateral hereunder. Additionally, the Administrative Agent shall have the right, upon the occurrence and during the continuation of an Event of Default, following prior written notice to any applicable Grantor (provided that no such notice shall be required upon an Event of Default pursuant to Section 11.01(h) of the Credit Agreement), to vote and to give consents, ratifications and waivers with respect to any Pledged Collateral held by such Grantor, and to exercise all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining thereto, as if the Administrative Agent were the absolute owner thereof; provided that the Administrative Agent shall have no duty to exercise any of the foregoing rights afforded to it and shall not be responsible to such Grantor or any other Person for any failure to do so or delay in doing so.

(c)    **Voting Prior to an Event of Default**. Unless and until an Event of Default shall have occurred and is continuing, each Grantor shall have the right to vote the Pledged Collateral held by such Grantor and to give consents, ratifications and waivers in respect thereof,

21

and shall retain the power to control the direction, management and policies of any Person comprising such Pledged Collateral to the same extent as such Grantor would if such Pledged Collateral were not pledged to the Administrative Agent pursuant to this Agreement; provided that no vote shall be cast or consent, waiver or ratification given or action taken which would have the effect of materially impairing the position or interest of the Administrative Agent and the other Secured Parties in respect of such Pledged Collateral or which would alter the voting rights with respect to the stock or other ownership interest in or of any such Person or be inconsistent with or violate any provision of this Agreement, the Credit Agreement, or any other Loan Documents. If applicable, such Grantor shall be deemed the beneficial owner of all such Pledged Collateral for purposes of Sections 13 and 16 of the Exchange Act and agrees to file all reports required to be filed by beneficial owners of securities thereunder. The Administrative Agent shall execute and deliver (or cause to be executed and delivered) to each Grantor all such proxies and other instruments as such Grantor may reasonably request for the purpose of enabling such Grantor to exercise the voting and other rights which it is entitled to exercise pursuant to this **subsection (c)** and to receive the distributions which it is authorized to receive and retain pursuant to this **subsection (c)**.

(d)    **Certain Other Administrative Matters**. Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may cause any of the Pledged Collateral to be transferred into its name or into the name of its nominee or nominees (subject to the revocable rights specified in this **Section 6**). Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall have the right to exchange uncertificated Pledged Collateral for certificated Pledged Collateral, and to exchange certificated Pledged Collateral for certificates of larger or smaller denominations, for any purpose consistent with this Agreement.

**SECTION 7   Authorization; Agent Appointed Attorney-in-Fact**. In addition to (and not in limitation of) any other right or remedy provided to the Administrative Agent hereunder, the Administrative Agent shall have the right to, in the name of any Grantor, or in the name of the Administrative Agent or otherwise, without notice to or assent by any such Grantor, and each Grantor hereby constitutes and appoints the Administrative Agent (and any of the Administrative Agent's officers or employees or agents designated by the Administrative Agent) as such Grantor's true and lawful attorney-in-fact, with full power and authority to:

(a)    file any of the financing statements which must be filed to perfect or continue perfected, maintain the priority of, or provide notice of, the Administrative Agent's Lien in the Collateral;

(b)    take possession of and endorse any notes, acceptances, checks, drafts, money orders or other forms of payment or security and collect any Proceeds of any Collateral;

(c)    sign and endorse any invoice or bill of lading relating to any of the Collateral, warehouse or storage receipts, drafts against customers or other obligors, assignments, notices of assignment, verifications and notices to customers or other obligors;

22

(d)      notify the U.S. Postal Service and other postal authorities to change the address for delivery of mail addressed to such Grantor to such address as the Administrative Agent may designate; and, without limiting the generality of the foregoing, establish with any Person lockbox or similar arrangements for the payment of the Rights to Payment of such Grantor;

(e)      receive, open and dispose of all mail addressed to such Grantor;

(f)      send requests for verification of Rights to Payment to the customers or other obligors of such Grantor;

(g)      contact, or direct such Grantor to contact, all account debtors and other obligors on the Rights to Payment of such Grantor and instruct such account debtors and other obligors to make all payments directly to the Administrative Agent;

(h)      assert, adjust, sue for, compromise or release any claims under any policies of insurance;

(i)      exercise dominion and control over, and refuse to permit further withdrawals from, any Deposit Accounts of such Grantor maintained with the Administrative Agent, any Lender or any other bank, financial institution or other Person, in each case other than any Excluded Accounts;

(j)      notify each Person maintaining lockbox or similar arrangements for the payment of the Rights to Payment of such Grantor to remit all amounts representing collections on such Rights to Payment directly to the Administrative Agent;

(k)      ask, demand, collect, receive and give acquittances and receipts for any and all Rights to Payment of such Grantor, enforce payment or any other rights in respect of the Rights to Payment and other Collateral, grant consents, agree to any amendments, modifications or waivers of the agreements and documents governing such Rights to Payment and other Collateral, and otherwise file any Claims, take any action or institute, defend, settle or adjust any actions, suits or proceedings with respect to the Collateral, as the Administrative Agent may deem necessary or desirable to maintain, preserve and protect the Collateral, to collect the Collateral or to enforce the rights of the Administrative Agent with respect to the Collateral;

(l)      execute any and all applications, documents, papers and instruments necessary for the Administrative Agent to use, transfer or otherwise exploit the Intellectual Property Collateral and grant or issue any exclusive or non-exclusive License with respect to any Intellectual Property Collateral;

(m)      execute any and all endorsements, assignments or other documents and instruments necessary to sell, lease, assign, convey or otherwise transfer title in or dispose of the Collateral;

(n)      execute and deliver to any securities intermediary or other Person any entitlement order or other notice, document or instrument which the Administrative Agent may deem necessary or advisable to maintain, protect, realize upon and preserve the Deposit Accounts

4876-0957-0929 v.3

and Investment Property of such Grantor constituting Collateral and the Administrative Agent's security interest therein;

(o)  commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral;

(p)  settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; and

(q)  use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and execute any and all such other documents and instruments, and do any and all acts and things for and on behalf of such Grantor, which the Administrative Agent may deem necessary or advisable to maintain, protect, realize upon and preserve the Collateral and the Administrative Agent's security interest therein and to accomplish the purposes of this Agreement.

The Administrative Agent agrees that, except upon the occurrence and during the continuation of an Event of Default, it shall not exercise the power of attorney, or any rights granted to the Administrative Agent, pursuant to **clauses (b)** through **(q)**. The foregoing power of attorney is coupled with an interest and irrevocable so long as the Lenders have any Commitments or the Secured Obligations have not been paid and performed in full. Each Grantor hereby ratifies, to the extent permitted by Law, all that the Administrative Agent shall lawfully and in good faith do or cause to be done by virtue of and in compliance with this **Section 7**.

SECTION 8   **Agent Performance of Grantor Obligations**. Upon the occurrence and continuation of an Event of Default, the Administrative Agent shall have the right (but not any obligation) to perform or pay any obligation which any Grantor has agreed to perform or pay under or in connection with this Agreement, and such Grantor shall reimburse the Administrative Agent on demand for all reasonable and documented out of pocket costs and expenses by the Administrative Agent pursuant to this **Section 8**.

SECTION 9   **Agent's Duties**. Notwithstanding any provision contained in this Agreement, the Administrative Agent shall have no duty to exercise any of the rights, privileges or powers afforded to it and shall not be responsible to any Grantor or any other Person for any failure to do so or delay in doing so. Without limiting the generality of the foregoing, nothing herein contained shall be construed as requiring or obligating the Administrative Agent to make any commitment or to make any inquiry as to the nature of sufficiency of any payment received by the Administrative Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. With the exception of the exercise of reasonable care to assure the safe custody of Collateral in the Administrative Agent's possession and the accounting for moneys actually received by the Administrative Agent hereunder, the Administrative Agent and its officers, directors, employees, agents or sub-agents shall have no duty or liability to exercise or preserve any rights, privileges or powers pertaining to the Collateral.

24

**SECTION 10 Remedies**.

(a)    **Remedies**. Solely upon the occurrence and during the continuation of an Event of Default, each Grantor agrees to deliver each item of Collateral to the Administrative Agent on demand, and the Administrative Agent shall have, in addition to all other rights and remedies granted to it in this Agreement, the Credit Agreement, or any other Loan Document, all rights and remedies of a secured party under the NY UCC and other applicable Law. Without limiting the generality of the foregoing, each Grantor agrees that:

(i)    The Administrative Agent may peaceably, with or without legal process and with or without notice, without liability for trespass enter any premises of such Grantor, take possession of any Collateral, remove or dispose of all or part of the Collateral on any premises of such Grantor or elsewhere, or, in the case of Equipment, render it nonfunctional, and otherwise collect, receive, appropriate and realize upon all or any part of the Collateral, and demand, give receipt for, settle, renew, extend, exchange, compromise, adjust, or sue for all or any part of the Collateral, as the Administrative Agent may determine, and, generally, exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law.

(ii)    The Administrative Agent may require such Grantor to assemble all or any part of the Collateral and make it available to the Administrative Agent, at any place and time designated by the Administrative Agent.

(iii)    The Administrative Agent may use, transfer or otherwise exploit any of such Grantor's rights and interests in any Intellectual Property Collateral, by assignment, by license, by sublicense (solely to the extent permitted by such applicable license) or otherwise, on such conditions and in such manner as the Administrative Agent may determine.

(iv)    The Administrative Agent may secure the appointment of a receiver of the Collateral or any part thereof (to the extent and in the manner provided by applicable Law).

(v)    The Administrative Agent may withdraw (or cause to be withdrawn) any and all funds from any Deposit Accounts, Securities Accounts or Commodity Accounts, in each case other than Excluded Accounts.

(vi)    The Administrative Agent may sell, resell, lease, use, assign, transfer or otherwise dispose of any or all of the Collateral in its then condition or following any commercially reasonable preparation or processing (utilizing in connection therewith any of such Grantor's assets, without charge or liability to the Administrative Agent therefor) at public or private sale or at any broker's board or any securities exchange, by one or more Contracts, in one or more parcels, at the same or different times, for cash or credit or for future delivery without assumption of any credit risk, all as the Administrative Agent deems advisable; provided that such Grantor shall be credited with the net proceeds of a sale only when such proceeds are finally collected by the Administrative Agent. The Administrative Agent and each of the other Secured Parties shall have the right upon any such public sale, and, to the extent permitted by Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold, free of any right

25

or equity of redemption, which right or equity of redemption such Grantor hereby releases, to the extent permitted by Law. The Administrative Agent shall give such Grantor such notice of any public or private sale as may be required by the NY UCC or other applicable Law. Such Grantor recognizes that the Administrative Agent may be unable to make a public sale of any or all of the Pledged Collateral, by reason of prohibitions contained in applicable securities laws or otherwise, and expressly agrees that a private sale to a restricted group of purchasers for investment and not with a view to any distribution thereof shall be considered a commercially reasonable sale. Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor, and each Grantor hereby waives and releases (to the extent permitted by law) all rights of redemption, stay, valuation and appraisal that such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Administrative Agent shall give each applicable Grantor not less than 10 days' written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the NY UCC or its equivalent in other jurisdictions) of the Administrative Agent's intention to make any sale of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Administrative Agent may fix and state in the notice (if any) of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, and by the Administrative Agent in its own right or by one or more agents or contractors, upon any premises owned, leased or occupied by any Grantor, the Administrative Agent or any such agent or contractor, and any such sale may include any other property, in each case, as the Administrative Agent may (in its sole and absolute discretion) determine. The Administrative Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Administrative Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Administrative Agent until the sale price is paid by the purchaser or purchasers thereof, but the Administrative Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by applicable law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by applicable law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Administrative Agent shall be free to carry out such sale pursuant to such agreement and no

26

Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Administrative Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations shall have been indefeasibly paid in full in cash. As an alternative to exercising the power of sale herein conferred upon it, the Administrative Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this **Section 10(a)** shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the NY UCC or its equivalent in other jurisdictions. Neither the Administrative Agent nor the Secured Parties shall be required to marshal any present or future Collateral or to resort to such Collateral in any particular order.

(vii)    Neither the Administrative Agent nor any other Secured Party shall have any obligation to clean up or otherwise prepare the Collateral for sale. The Administrative Agent has no obligation to attempt to satisfy the Secured Obligations by collecting them from any other Person liable for them and the Administrative Agent and the other Secured Parties may release, modify or waive any Collateral provided by any other Person to secure any of the Secured Obligations, all without affecting the Administrative Agent's or any other Secured Party's rights against such Grantor. Such Grantor waives any right it may have to require the Administrative Agent or any other Secured Party to pursue any third Person for any of the Secured Obligations. The Administrative Agent and the other Secured Parties may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. The Administrative Agent may sell the Collateral without giving any warranties as to the Collateral. The Administrative Agent may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. If the Administrative Agent sells any of the Collateral upon credit, such Grantor will be credited only with payments actually made by the purchaser, received by the Administrative Agent and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, the Administrative Agent may resell the Collateral and the Grantors shall be credited with the proceeds of the sale.

(b)    **License**. For the purpose of enabling the Administrative Agent to exercise its rights and remedies under this **Section 10** or otherwise in connection with this Agreement or the Credit Agreement, and solely during the continuance of an Event of Default, each Grantor hereby grants to the Administrative Agent an irrevocable, worldwide non-exclusive sublicensable (through multiple tiers), fully paid-up, royalty-free license or sublicense (exercisable without payment or royalty or other compensation to such Grantor) under the Intellectual Property Collateral for any purpose in connection with the Administrative Agent's exercise of such rights and remedies hereunder, including to use, license, or sublicense or grant a covenant not to assert release, or other similar right or immunity under any Intellectual Property Collateral and, including in such license, sublicense or grant, all access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used in connection therewith; provided, however, that nothing in this **Section 10(b)** shall require a Grantor to grant any license that (i) violates the express terms of any License between a Grantor and a third party governing

27

such Grantor's use of such Intellectual Property Collateral, or gives such third party any right of acceleration, modification or cancellation therein, or (ii) is prohibited by any applicable Law; provided, further, that such licenses to be granted hereunder with respect to Trademarks shall be subject to maintenance of quality standards with respect to the goods and services on which such Trademarks are used necessary to preserve the validity of such Trademarks. Notwithstanding anything to the contrary, any license or sublicense entered into by the Administrative Agent in accordance with this Section 10(b) shall be binding upon each Grantor notwithstanding any subsequent cure of an Event of Default.

(c)  **Proceeds Account**. To the extent that any of the Secured Obligations may be contingent, unmatured or unliquidated at such time as an Event of Default has occurred and is continuing, the Administrative Agent may, at its election, (i) retain the proceeds of any sale, collection, disposition or other realization upon the Collateral (or any portion thereof) in a special purpose non-interest-bearing restricted deposit account (the "*Proceeds Account*") created and maintained by the Administrative Agent for such purpose (which shall constitute a Deposit Account included within the Collateral hereunder) until such time as the Administrative Agent may elect to apply such proceeds to the Secured Obligations, and each Grantor agrees that such retention of such proceeds by the Administrative Agent shall not be deemed strict foreclosure with respect thereto; (ii) in any manner elected by the Administrative Agent, estimate the liquidated amount of any such contingent, unmatured or unliquidated Claims and apply the proceeds of the Collateral against such amount; or (iii) otherwise proceed in any manner permitted by applicable Law. Each Grantor agrees that the Proceeds Account shall be a blocked account and that upon the irrevocable deposit of funds into the Proceeds Account, such Grantor shall not have any right of withdrawal with respect to such funds. Accordingly, each Grantor irrevocably waives until the termination of this Agreement in accordance with **Section 25** the right to make any withdrawal from the Proceeds Account and the right to instruct the Administrative Agent to honor drafts against the Proceeds Account.

(d)  **Application of Proceeds**. The cash proceeds actually received from the sale or other disposition or collection of any Grantor's Collateral, and any other amounts received in respect of such Collateral the application of which is not otherwise provided for herein, shall be applied as provided in Section 4.01(b) of the Credit Agreement. Any surplus thereof which exists after payment and performance in full of the Secured Obligations shall be promptly paid over to such Grantor or otherwise disposed of in accordance with the NY UCC or other applicable Law. Each Grantor shall remain liable to the Administrative Agent and the other Secured Parties for any deficiency which exists after any sale or other disposition or collection of Collateral.

**SECTION 11 Certain Waivers**. Each Grantor waives, to the fullest extent permitted by Law, (i) any right of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling of the Collateral or other collateral or security for the Secured Obligations; (ii) any right to require the Administrative Agent or the other Secured Parties (w) to proceed against any Person, (x) to exhaust any other collateral or security for any of the Secured Obligations, (y) to pursue any remedy in the Administrative Agent's or any of the other Secured Parties' power, or (z) to make or give any presentments, demands for performance, notices of nonperformance, protests, notices of protests or notices of dishonor in connection with any of the Collateral; and (iii) all Claims, damages, and demands against the

28

Administrative Agent or the other Secured Parties arising out of the repossession, retention, sale or application of the proceeds of any sale of the Collateral.

**SECTION 12 Notices**. All notices, requests, instructions, directions and other communications provided for herein (including any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including by telecopy or email) delivered, if to any of the parties hereto, as specified in the Credit Agreement. Except as otherwise provided in this Agreement or therein, all such communications shall be deemed to have been duly given upon receipt of a legible copy thereof, in each case given or addressed as aforesaid. All such communications provided for herein by telecopy shall be confirmed in writing promptly after the delivery of such communication (it being understood that non-receipt of written confirmation of such communication shall not invalidate such communication).

**SECTION 13 No Waiver; Cumulative Remedies**. No failure on the part of the Administrative Agent or any other Secured Party to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Any waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on any Grantor in any case shall entitle any Grantor to any other or further notice or demand in similar or other circumstances. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

**SECTION 14 Costs and Expenses; Indemnification**.

(a)     **Costs and Expenses**. In addition to the payment and reimbursement obligations set forth in Section 14.03(a) of the Credit Agreement, each Grantor jointly and severally agrees to pay (i) all out-of-pocket expenses incurred by the Administrative Agent and any other Secured Party (including the fees and expenses of legal counsel) in connection with the enforcement or collection proceedings resulting from the occurrence of a Default or an Event of Default (A) in connection with this Agreement, including its rights under this **Section 14**, (B) in connection with the Secured Obligations, including all such reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, preparation, execution and delivery of this Agreement or in respect of the Secured Obligations, and including in or in connection with any Insolvency Proceeding, and (C) in connection with the protection, sale or collection of, or other realization upon, any of the Collateral, including all reasonable and documented out of pocket expenses of taking, collecting, holding, sorting, handling, preparing for sale, selling, or the like, and other such expenses of sales and collections of Collateral, and (ii) all out-of-pocket title, appraisal, survey, audit, environmental inspection, consulting, search, recording, filing and similar costs, fees and expenses incurred or sustained by the Administrative Agent or any of its Affiliates in connection with this Agreement or the Collateral.

29

(b) **Indemnification**. Each Grantor, jointly and severally, hereby indemnifies each Indemnified Party pursuant to Section 14.03(b) of the Credit Agreement.

(c) **Payment**. All amounts due under this **Section 14** shall be due payable upon demand therefor.

(d) **Interest**. Any amounts payable to the Administrative Agent or any Secured Party under this **Section 14** or otherwise under this Agreement if not paid upon the due date shall bear interest from the date of such demand until paid in full, at the rate of interest set forth in Section 3.02(b) of the Credit Agreement.

(e) **Survival**. The agreements in this **Section 14** shall survive the termination of the Commitments and the repayment of all Secured Obligations.

**SECTION 15 Binding Effect**. This Agreement shall be binding upon, inure to the benefit of and be enforceable by each Grantor, the Administrative Agent, each Secured Party, each Indemnified Party referred to in **Section 14**, and their respective successors and assigns and shall bind any Person who becomes bound as a debtor to this Agreement. This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or release with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereto. No Grantor shall assign or delegate this Agreement, any of its rights or obligations hereunder or any interest herein or in the Collateral (in each case, except as expressly contemplated by this Agreement or the Credit Agreement) without the prior written consent of the Administrative Agent, and any attempted assignment without such consent shall be null and void.

**SECTION 16 Governing Law**. This Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed in accordance with, the law of the State of New York, without regard to principles of conflicts of laws that would result in the application of the laws of any other jurisdiction; <u>provided</u> that Section 5-1401 of the New York General Obligations Law shall apply.

**SECTION 17 Submission to Jurisdiction**.

(a) **Submission to Jurisdiction**. Each party hereto agrees that any suit, action or proceeding with respect to this Agreement or any other Loan Document to which it is a party or any judgment entered by any court in respect thereof may be brought initially in the federal or state courts in New York, New York or in the courts of its own corporate domicile and irrevocably submits to the non-exclusive jurisdiction of each such court for the purpose of any such suit, action, proceeding or judgment.

(b) **Waiver of Venue**. Each party hereto irrevocably waives to the fullest extent permitted by Law any objection that it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document and hereby further irrevocably waives to the fullest extent permitted by Law any Claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. A final judgment (in respect of which time for all appeals has elapsed) in any such suit,

30

action or proceeding shall be conclusive and may be enforced in any court to the jurisdiction of which such Grantor is or may be subject, by suit upon judgment.

(c)     **Alternative Process**. Nothing herein shall in any way be deemed to limit the ability of the parties hereto to serve any process or summons in any manner permitted by any Law.

**SECTION 18 Waiver of Jury Trial**. **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

**SECTION 19 Entire Agreement; Amendment**. This Agreement and the other Loan Documents contain the entire agreement of the parties with respect to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof, including any confidentiality (or similar) agreements. EACH GRANTOR ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT IN DECIDING TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS OR IN TAKING OR NOT TAKING ANY ACTION HEREUNDER OR THEREUNDER, IT HAS NOT RELIED, AND WILL NOT RELY, ON ANY STATEMENT, REPRESENTATION, WARRANTY, COVENANT, AGREEMENT OR UNDERSTANDING, WHETHER WRITTEN OR ORAL, OF OR WITH THE LENDERS OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. This Agreement shall not be amended except by the written agreement of the parties as provided in the Credit Agreement.

**SECTION 20 Severability**. If any provision hereof is found by a court to be invalid or unenforceable, to the fullest extent permitted by any Law the parties agree that such invalidity or unenforceability shall not impair the validity or enforceability of any other provision hereof.

**SECTION 21 Counterparts**. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or electronic transmission (in PDF format) shall be effective as delivery of a manually executed counterpart hereof.

**SECTION 22 Incorporation of Provisions of the Credit Agreement**. To the extent the Credit Agreement contains provisions of general applicability to the Loan Documents, including any such provisions contained in Section 14 thereof, such provisions are incorporated herein by this reference.

**SECTION 23 No Inconsistent Requirements**. Each Grantor acknowledges that this Agreement and the other Loan Documents may contain covenants and other terms and provisions variously stated regarding the same or similar matters, and agrees that all such

31

covenants, terms and provisions are cumulative and all shall be performed and satisfied in accordance with their respective terms.

        **SECTION 24 Accession**. At such time following the date hereof as any Person (an "***Acceding Grantor***") is required to accede hereto pursuant to the terms of Section 8.12 of the Credit Agreement, such Acceding Grantor shall execute and deliver to the Administrative Agent an accession agreement substantially in the form of **Exhibit A** (an "***Accession Agreement***"), signifying its agreement to be bound by the provisions of this Agreement as a Grantor to the same extent as if such Acceding Grantor had originally executed this Agreement as of the date hereof.

        **SECTION 25 Termination**. Upon the termination of the Commitments of the Lenders and payment and performance in full in cash of all Secured Obligations (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made), the security interests created by this Agreement shall automatically terminate and the Administrative Agent shall promptly execute and deliver to each Grantor such documents and instruments reasonably requested by such Grantor as shall be necessary to evidence the termination of all security interests given by such Grantor to the Administrative Agent hereunder.  Any execution and delivery of such documents pursuant to this **Section 25** shall be without recourse to or representation or warranty by the Administrative Agent or any Secured Party. The Borrower shall reimburse the Administrative Agent upon demand for all reasonable and documented costs and out of pocket expenses, including the reasonable fees, charges and expenses of counsel, incurred by it in connection with any action contemplated by this **Section 25**.

        Upon the consummation of any transaction permitted under the Credit Agreement as a result of which such Grantor ceases to be a Subsidiary Guarantor, such Grantor shall be automatically released from its obligations hereunder arising after the date on which such Grantor ceases to be a Subsidiary Guarantor and the security interests created hereunder in the Collateral of such Grantor shall be automatically released.

        Upon any sale, lease, transfer or other disposition by any Grantor of any Collateral that is permitted under the Credit Agreement to any Person that is not another Grantor, the security interest in such Collateral shall be automatically released.

        **SECTION 26 Right of Set-Off.** If an Event of Default shall have occurred and is continuing, each Secured Party is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all Collateral (including any deposits (general or special, time or demand, provisional or final)) at any time held and other obligations at any time owing by such Secured Party to or for the credit or the account of any Grantor against any and all of the obligations of such Grantor now or hereafter existing under this Agreement and the other Loan Documents held by such Secured Party, irrespective of whether or not such Secured Party shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured. The rights of each Secured Party under this **Section 26** are in additional to others rights and remedies (including other rights of setoff) which such Secured Party may have.

32

**SCHEDULES**
**TO THE SECURITY AGREEMENT**

# SCHEDULE 4

## UCC FINANCING STATEMENTS

*[attached]*

**EXHIBIT A**

**TO THE SECURITY AGREEMENT**

**FORM OF ACCESSION AGREEMENT**

To:    OAKTREE FUND ADMINISTRATION, LLC, as the Administrative Agent

Re:    SIO$_2$ MEDICAL PRODUCTS, INC., as the Borrower

Ladies and Gentlemen:

      This Accession Agreement is made and delivered as of _____, 20__ pursuant to **Section 24** of that certain Security Agreement, dated as of August 3, 2023 (as amended, modified, renewed or extended from time to time, the "***Security Agreement***"), between each Grantor party thereto (each a "***Grantor***" and collectively, the "***Grantors***"), and Oaktree Fund Administration, LLC (in such capacity, together with its successors and assigns, the "***Administrative Agent***"). All capitalized terms used in this Accession Agreement and not otherwise defined herein shall have the meanings assigned to them in either the Security Agreement or the Credit Agreement (as defined in the Security Agreement), as the context may require.

      The undersigned, _____ *[insert name of Acceding Grantor]*, a _____ *[corporation, partnership, limited liability company, etc.]*, hereby acknowledges for the benefit of the Secured Parties that it shall be a "Grantor" for all purposes of the Security Agreement effective from the date hereof. The undersigned confirms that the representations and warranties set forth in **Section 4** of the Security Agreement are true and correct as to the undersigned as of the date hereof. The undersigned further represents and warrants to the Administrative Agent and the other Secured Parties that this Accession Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding obligation, enforceable against it in accordance with its terms, subject, as to the enforcement of remedies, to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

      Without limiting the foregoing, the undersigned hereby agrees to perform all of the obligations of a Grantor under, and to be bound in all respects by the terms of, the Security Agreement, including **Section 5** thereof, to the same extent and with the same force and effect as if the undersigned were an original signatory thereto. The undersigned hereby grants to the Administrative Agent, for itself and on behalf of and for the ratable benefit of the other Secured Parties, a security interest in all of the undersigned's right, title and interest in, to and under all of its personal property other than Excluded Assets, wherever located and whether now existing or owned or hereafter acquired or arising, including all Collateral, as security for the payment and performance of the Secured Obligations.

      The undersigned agrees to reimburse the Administrative Agent for its reasonable and documented out-of-pocket expenses in connection with this Accession Agreement, including the

1

reasonable fees, other charges and disbursements of counsel for the Administrative Agent, in accordance with the terms of the Security Agreement.

**Schedules 1** through **3** to the Security Agreement are hereby amended by adding **Schedules 1** through **3** attached hereto to the Security Agreement. *[Attach hereto completed **Schedules 1** through **3** in the form of **Schedules 1** through **3** attached to the Security Agreement.]*

This Accession Agreement shall constitute a Loan Document under the Credit Agreement. Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

If any provision hereof is found by a court to be invalid or unenforceable, to the fullest extent permitted by any Law the parties agree that such invalidity or unenforceability shall not impair the validity or enforceability of any other provision hereof.

THIS ACCESSION AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

*[Remainder of page intentionally left blank; signature pages follow]*

2

**EXHIBIT B**

**TO THE SECURITY AGREEMENT**

**FORM OF PLEDGE SUPPLEMENT**

To:    OAKTREE FUND ADMINISTRATION, LLC, as the Administrative Agent

Re:    SIO$_2$ MEDICAL PRODUCTS, INC., as the Borrower

Ladies and Gentlemen:

This Pledge Supplement (this "***Pledge Supplement***") is made and delivered as of _____, 20__ pursuant to **Section 3(i)** of that certain Security Agreement, dated as of August 3, 2023 (as amended, modified, renewed or extended from time to time, the "***Security Agreement***"), among each Grantor party thereto (each a "***Grantor***" and collectively, the "***Grantors***"), and Oaktree Fund Administration, LLC, (in such capacity, together with its successors and assigns, the "***Administrative Agent***"). All capitalized terms used in this Pledge Supplement and not otherwise defined herein shall have the meanings assigned to them in either the Security Agreement or the Credit Agreement (as defined in the Security Agreement), as the context may require.

The _____ undersigned, _____ *[insert _____ name _____ of _____ Grantor]*, a _____ *[corporation, partnership, limited liability company, etc.]*, confirms and agrees that all Pledged Collateral of the undersigned other than Excluded Assets, including the property described on the supplemental schedule attached hereto (such property, the "**New Collateral**"), shall be and become part of the Pledged Collateral and shall secure all Secured Obligations. The undersigned confirms that the representations and warranties set forth in **Section 4(m)** of the Security Agreement are true and correct as to the New Collateral as of the date hereof. The undersigned further represents and warrants to the Administrative Agent and the other Secured Parties that this Pledge Supplement has been duly authorized, executed and delivered by it and constitutes its valid and binding obligation, enforceable against it in accordance with its terms, subject, as to the enforcement of remedies, to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

The undersigned agrees to reimburse the Administrative Agent for its reasonable and documented out-of-pocket expenses in connection with this Pledge Supplement, including the reasonable fees, other charges and disbursements of counsel for the Administrative Agent, in accordance with the terms of the Security Agreement.

**Schedule 3** to the Security Agreement is hereby amended by adding to such **Schedule 3** the information set forth in the supplement attached hereto.

4

This Pledge Supplement shall constitute a Loan Document under the Credit Agreement. THIS PLEDGE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

If any provision hereof is found by a court to be invalid or unenforceable, to the fullest extent permitted by any Law the parties agree that such invalidity or unenforceability shall not impair the validity or enforceability of any other provision hereof.

*[Remainder of page intentionally left blank; signature pages follow]*

5

**SUPPLEMENT TO SCHEDULE 3**
**TO THE SECURITY AGREEMENT**

**PARTNERSHIP AND LLC COLLATERAL**

<u>Limited Liability Company Interests Constituting Collateral</u>

| Grantor | Name of Issuer of Interests | Number of Units Held by Grantor | Date Units Issued to Grantor | Percentage Ownership Interest |
|---------|------------------------------|----------------------------------|-------------------------------|--------------------------------|
|         |                              |                                  |                               |                                |

<u>Partnership Interests Constituting Collateral</u>

| Grantor | Name of Issuer of Interests | Type of Partnership Interest | Number of Units Held by Grantor | Date Units Issued to Grantor | Percentage Ownership Interest |
|---------|------------------------------|-------------------------------|----------------------------------|-------------------------------|--------------------------------|
|         |                              |                               |                                  |                               |                                |

**PLEDGED SHARES**

<u>Pledged Shares Held by each Grantor</u>

| Grantor | Name of Issuer of Pledged Shares | Number and Class of Pledged Shares | Certificate Numbers | Certificate Dates | Percentage Ownership Interest |
|---------|------------------------------------|-------------------------------------|----------------------|--------------------|--------------------------------|
|         |                                    |                                     |                      |                    |                                |

7

**EXHIBIT C**

**TO THE SECURITY AGREEMENT**

**FORM OF COPYRIGHT SECURITY AGREEMENT**

This COPYRIGHT SECURITY AGREEMENT, dated as of [_____], 20[__] ("***Copyright Security Agreement***"), made by each of the signatories hereto (the "***Copyright Grantors***"), is in favor of Oaktree Fund Administration, LLC, as administrative agent for the Secured Parties (in such capacity, together with its successors and assigns, the "***Administrative Agent***").

W I T N E S S E T H:

WHEREAS, the Copyright Grantors are party to a Security Agreement dated as of August 3, 2023 (the "***Security Agreement***") in favor of the Administrative Agent, pursuant to which the Copyright Grantors are required to execute and deliver this Copyright Security Agreement (capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Security Agreement);

WHEREAS, pursuant to the terms of the Security Agreement, each Copyright Grantor has created in favor of the Administrative Agent a security interest in, and the Administrative Agent has become a secured creditor with respect to, the Copyright Collateral (as defined below);

NOW, THEREFORE, in consideration of the premises and to induce the Administrative Agent and the Lender to enter into the Credit Agreement and to induce the Lender to make their respective extensions of credit to the Borrower thereunder, each Copyright Grantor hereby grants to the Administrative Agent, for itself and on behalf of and for the ratable benefit of the other Secured Parties, a security interest in and to all of the following property now owned or at any time hereafter acquired by such Copyright Grantor or in which such Copyright Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "***Copyright Collateral***"), as collateral security for the complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all Secured Obligations:

(a)    all Copyrights of such Copyright Grantor, including, without limitation, the registered and applied-for Copyrights of such Copyright Grantor listed on **Schedule 1** attached hereto;

(b)    to the extent not covered by **clause (a)**, all Proceeds of any of the foregoing;

(c)    to the extent not covered by **clause (a)**, all causes of action arising prior to or after the date hereof for infringement of any of the Copyrights; and

(d)    all exclusive Licenses pursuant to which such Copyright Grantor receives rights in, to or under any Copyrights, including, without limitation, the Licenses listed on **Schedule 1** attached hereto.

8

The security interest granted pursuant to this Copyright Security Agreement is granted in conjunction with the security interest granted to the Administrative Agent pursuant to the Security Agreement, and the Copyright Grantors hereby acknowledge and affirm that the rights and remedies of the Administrative Agent with respect to the security interest in the Copyrights made and granted hereby are more fully set forth in the Security Agreement. In the event that any provision of this Copyright Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

Each Copyright Grantor hereby authorizes and requests that the Register of Copyrights record this Copyright Security Agreement.

THIS COPYRIGHT SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS COPYRIGHT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

This Copyright Security Agreement may be executed by one or more of the parties to this Copyright Security Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Copyright Security Agreement by facsimile transmission or electronic transmission (in PDF format) shall be effective as delivery of a manually executed counterpart hereof.

[*Remainder of This Page Intentionally Left Blank.*]

9

**COPYRIGHTS**

Copyright Registrations

| Title of Work | Reg. No. | Reg. Date | Owner |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Exclusive Copyright Licenses

11

**EXHIBIT D**

**TO THE SECURITY AGREEMENT**

**FORM OF TRADEMARK SECURITY AGREEMENT**

This TRADEMARK SECURITY AGREEMENT, dated as of [_____], 20[\_\_] ("***Trademark Security Agreement***"), made by each of the signatories hereto (the "***Trademark Grantors***"), is in favor of Oaktree Fund Administration, LLC, as administrative agent for the Secured Parties (in such capacity, together with its successors and assigns, the "***Administrative Agent***").

W I T N E S S E T H:

WHEREAS, the Trademark Grantors are party to a Security Agreement, dated as August 3, 2023 (the "***Security Agreement***") in favor of the Administrative Agent, pursuant to which the Trademark Grantors are required to execute and deliver this Trademark Security Agreement (capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Security Agreement);

WHEREAS, pursuant to the terms of the Security Agreement, each Trademark Grantor has created in favor of the Administrative Agent a security interest in, and the Administrative Agent has become a secured creditor with respect to, the Trademark Collateral (as defined below);

NOW, THEREFORE, in consideration of the premises and to induce the Administrative Agent and the Lender to enter into the Credit Agreement and to induce the Lender to make their respective extensions of credit to the Borrower thereunder, each Trademark Grantor hereby grants to the Administrative Agent, for itself and on behalf of and for the ratable benefit of the other Secured Parties, a security interest in and to all of the following property now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "***Trademark Collateral***"), as collateral security for the complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all Secured Obligations:

(a)    all Trademarks of such Trademark Grantor, including, without limitation, the registered and applied-for Trademarks of such Grantor listed on **Schedule 1** attached hereto; provided, that no Lien or security interest is granted hereunder with respect to any United States "intent-to-use" trademark or service mark application filed pursuant to Section 1(b) of the Lanham Act, solely to the extent that, and only for so long as, the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of, any Grantor's right, title or interest therein;

(b)    to the extent not covered by **clause (a)**, all Proceeds of any of the foregoing;

(c)    to the extent not covered by **clause (a)**, the goodwill of the businesses with which the Trademarks are associated; and

12

(d)      to the extent not covered by **clause (a)**, all causes of action arising prior to or after the date hereof for infringement of any of the Trademarks or unfair competition regarding the same.

The security interest granted pursuant to this Trademark Security Agreement is granted in conjunction with the security interest granted to the Administrative Agent pursuant to the Security Agreement, and the Trademark Grantors hereby acknowledge and affirm that the rights and remedies of the Administrative Agent with respect to the security interest in the Trademarks made and granted hereby are more fully set forth in the Security Agreement. In the event that any provision of this Trademark Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

Each Trademark Grantor hereby authorizes and requests that the Commissioner of Trademarks record this Trademark Security Agreement.

**THIS TRADEMARK SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS TRADEMARK SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

This Trademark Security Agreement may be executed by one or more of the parties to this Trademark Security Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Trademark Security Agreement by facsimile transmission or electronic transmission (in PDF format) shall be effective as delivery of a manually executed counterpart hereof.

[*Remainder of This Page Intentionally Left Blank.*]

4876-0957-0929 v.3

<u>Schedule 1</u>

**TRADEMARKS**

<u>Trademark Registrations and Applications</u>

| Trademark | Reg. No. (App. No.) | Reg. Date (App. Date) | Owner |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

15

**EXHIBIT E**

**TO THE SECURITY AGREEMENT**

**FORM OF PATENT SECURITY AGREEMENT**

This PATENT SECURITY AGREEMENT, dated as of [_____], 20[_] ("***Patent Security Agreement***"), made by each of the signatories hereto (the "***Patent Grantors***"), is in favor of Oaktree Fund Administration, LLC, as administrative agent for the Secured Parties (in such capacity, together with its successors and assigns, the "***Administrative Agent***").

W I T N E S S E T H:

WHEREAS, the Patent Grantors are party to a Security Agreement dated as of August 3, 2023 (the "***Security Agreement***") in favor of the Administrative Agent, pursuant to which the Patent Grantors are required to execute and deliver this Patent Security Agreement (capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Security Agreement);

WHEREAS, pursuant to the terms of the Security Agreement, each Patent Grantor has created in favor of the Administrative Agent a security interest in, and the Administrative Agent has become a secured creditor with respect to, the Patent Collateral (as defined below);

NOW, THEREFORE, in consideration of the premises and to induce the Administrative Agent and the Lender to enter into the Credit Agreement and to induce the Lender to make their respective extensions of credit to the Borrower thereunder, each Patent Grantor hereby grants to the Administrative Agent, for itself and on behalf of and for the ratable benefit of the other Secured Parties, a security interest in and to all of the following property now owned or at any time hereafter acquired by such Patent Grantor or in which such Patent Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "***Patent Collateral***"), as collateral security for the complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all Secured Obligations:

(a)     all Patents of such Patent Grantor, including, without limitation, the registered and applied-for Patents of such Grantor listed on **Schedule 1** attached hereto;

(b)     to the extent not covered by **clause (a)**, all Proceeds of any of the foregoing; and

(c)     to the extent not covered by **clause (a)**, all causes of action arising prior to or after the date hereof for infringement of any of the Patents.

The security interest granted pursuant to this Patent Security Agreement is granted in conjunction with the security interest granted to the Administrative Agent pursuant to the Security Agreement, and the Patent Grantors hereby acknowledge and affirm that the rights and remedies of the Administrative Agent with respect to the security interest in the Patents made and granted hereby are more fully set forth in the Security Agreement. In the event that any provision

16

of this Patent Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

Each Patent Grantor hereby authorizes and requests that the Commissioner of Patents record this Patent Security Agreement.

THIS PATENT SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS PATENT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

This Patent Security Agreement may be executed by one or more of the parties to this Patent Security Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Patent Security Agreement by facsimile transmission or electronic transmission (in PDF format) shall be effective as delivery of a manually executed counterpart hereof.

[Remainder of This Page Intentionally Left Blank.]

4876-0957-0929 v.3

<u>Schedule 1</u>

**PATENTS**

<u>**Patents and Patent Applications**</u>

| Patent | Reg. No. (App. No.) | Reg. Date (App. Date) | Owner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

19

**EXHIBIT F**

**TO THE SECURITY AGREEMENT**

**FORM OF BAILEE LETTER**

[INSERT DATE]

To:      [INSERT NAME AND ADDRESS OF BAILEE]

_____

_____

        Re:      [INSERT NAME OF RELEVANT OBLIGOR]

Ladies and Gentlemen:

        We are the agent for certain lending institutions that are making or have made certain credit extensions to [SiO$_2$ Medical Products, Inc.(the "***Company***")][1] [SiO$_2$ Medical Products, Inc., the [direct] [indirect] parent of [OBLIGOR] (the "***Company***"), and the Company has provided a guaranty thereof].[2] The Company has entered into (i) that certain Credit Agreement and Guaranty, dated as of August 3, 2023, among [SiO$_2$ Medical Products, Inc.] [the Company], as borrower, the Subsidiary Guarantors from time to time party thereto [including the Company], the Lender and ourselves, as Administrative Agent (as amended or otherwise modified from time to time, the "***Credit Agreement***") and (ii) that certain Security Agreement, dated as of August 3, 2023 among [SiO$_2$ Medical Products, Inc.] [the Company], the other Grantors from time to time party thereto [including the Company], and ourselves, as Administrative Agent (as amended or otherwise modified from time to time, the "***Security Agreement***").

        Pursuant to the Security Agreement, we have obtained a continuing security interest in all of the Company's personal property other than Excluded Assets (the "***Collateral***"), until all Obligations have been paid in full indefeasibly in cash and the Commitment under the Credit Agreement has been terminated (the capitalized terms used above but not defined shall have the definition provided in the Credit Agreement).

        We understand that the Company has made arrangements with you to locate from time to time certain Collateral at the location(s) described in **Annex A** hereto (the "***Premises***"). (The agreement between you and the Company governing the location of the Collateral at the Premises shall be hereinafter referred to as the "***Agreement***.")

        Because Collateral will be located at the Premises, we will require certain agreements and acknowledgments from you. Accordingly, we would appreciate your execution of this letter.

_____

[1] Insert if obligor is SiO$_2$ Medical Products, Inc.**.**
[2] Insert if obligor is a guarantor

By your signature below you acknowledge notice of our security interest in the Collateral.

This letter will also confirm your agreement to the following:

The Collateral located at the Premises will be and remain personal property of the Company, and such Collateral will not be deemed a fixture or part of the Premises even if the Collateral may be affixed to or placed in, or about the Premises.

Until such time as the security interests in the Collateral granted to us by the Company have been terminated, you hereby waive and release in favor of us: (a) any liens on, claims to, or interest in the Collateral and the proceeds thereof and agree not to assert any claim against the Collateral or proceeds thereof and (b) any and all other interests or claims of every nature whatsoever which you may now or hereafter have in or against the Collateral for any rent, storage charges, or other sums due or to become due to you.

You will allow us, or our auditors or other agents or representatives, reasonable access to the Premises from time to time to inspect the Collateral in accordance with the Credit Agreement.

In the event that the Company defaults in its obligations under the Agreement or abandons or surrenders the Premises, or you desire or elect to terminate or exercise remedies under the Agreement for any reason, you will provide notice to us in writing of this fact, at the address provided beneath our signature block, prior to your terminating or exercising remedies under the Agreement and retaking possession of the Premises. In such event, you will allow us, at our option, 30 days from our receipt of such notice in which to cure or request the Company to cure such default. If any order or injunction is issued or stay granted that prohibits us from exercising any of our rights hereunder, then the period to exercise our rights shall be stayed during the period of such prohibition and shall continue thereafter for the greater of (a) the number of days remaining in the initial period or (b) thirty (30) days.

Upon our request, you will grant us, or our agents or representatives on our behalf, access to the Premises at reasonable times and upon reasonable prior notice so that we may preserve, protect and enforce our security interests. In such event you will allow us, or our agents or representatives on our behalf, access to the Premises to assemble, appraise, repair, service and maintain the Collateral, to show the Collateral to potential purchasers or lessees, to prepare the Collateral for removal for return to us or for other sale or disposition and to remove the Collateral from the Premises. At your option, you may elect to have an agent accompany us or our agents or representatives while on the Premises; provided that your failure to have your agent accompany us or our agents or representatives will not in any way limit our right to enter upon the Premises. While on the Premises, we will use reasonable efforts so as not to disturb any other tenant, occupant or you. We will reimburse you for, or repair, at our cost, any damage to the Premises caused by the removal of the Collateral or otherwise caused by us or our agents or representatives during our possession of the Premises.

You will permit us to remain on the Premises for a period of up to 30 days following receipt by us of written notice from you that you are in possession and control of the Premises, have terminated the Agreement and are directing removal of the Collateral. Any extensions of the foregoing period shall be with your written consent.

*[Signature Page to Security Agreement]*

Nothing herein contained will be deemed to make us a tenant at the Premises, or be deemed to delegate any duties or obligations to us under the Agreement or constitute any assumption thereof by us of any unperformed or unpaid obligations of the Company under the Agreement. This letter and any right, remedy, obligation, claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this letter will be governed and controlled by, and interpreted under, the laws of the State of New York.

You will notify any purchaser or successor owner or landlord of the Premises of the existence of this letter, which will be binding upon your executors, administrators, successors, transferees or assignees.

This letter may be executed in one or more counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this letter by facsimile shall be equally as effective as delivery of a manually executed counterpart of this letter.

[*Remainder of page intentionally left blank*]

[*Signature Page to Security Agreement*]

**Exhibit B-1**

**Redline to Exit Financing
Documents Filed on June 30, 2023**

**<u>Exhibit B-1(i)</u>**

**Redline to Exit Facility**
**Credit Agreement Filed on June 30, 2023**

*[Different first page setting changed from off in original to on in modified.].*

*Execution Version*

**CREDIT AGREEMENT AND GUARANTY**

**dated as of August 3, 2023**

**by and among**

**SiO2 MEDICAL PRODUCTS, INC.,**
**as the Borrower,**

**THE SUBSIDIARY GUARANTORS FROM TIME TO TIME PARTY HERETO,**
**as the Subsidiary Guarantors,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO**
**as the Lenders, and**

**OAKTREE FUND ADMINISTRATION, LLC,**
**as the Administrative Agent**

**U.S. $60,000,000**

**FIRST LIEN CREDIT AGREEMENT AND GUARANTY**

*[Different first page setting changed from off in original to on in modified.].*

4877-6890-5580 v.8

*[Different first page setting changed from off in original to on in modified.].*

~~dated as of [•], 2023~~

~~by and among~~
~~SiO2 MEDICAL PRODUCTS, INC.,~~
~~as the Borrower,~~
~~THE SUBSIDIARY GUARANTORS FROM TIME TO TIME~~
~~PARTY HERETO,~~
~~as the Subsidiary Guarantors,~~
~~THE LENDERS FROM TIME TO TIME PARTY HERETO~~
~~as the Lenders, and~~
~~OAKTREE FUND ADMINISTRATION, LLC,~~
~~as the Administrative Agent~~
~~U.S. $[•]~~

*[Different first page setting changed from off in original to on in modified.].*

# TABLE OF CONTENTS

## SECTION 1.
## DEFINITIONS

1.01 1.01 ................................................ Certain Defined Terms ................ 1

1.02 1.02 ................................ Accounting Terms and Principles ........ 36 0

1.03 1.03 ................................................ Interpretation ........ 37 1

1.04    Effectuation of Exit Transaction ................................ 32

1.04 1.05 ................................................ Division ........ 38 2

## SECTION 2.
## THE COMMITMENT AND THE LOANS

2.01    Loans ................................................ 33

## SECTION 2.
## THE COMMITMENT AND THE LOANS

2.01 Loans ................................................ 38

2.02 2.02 ................................ Borrowing Procedures ........ 39 3

2.03 Funding of Borrowings ................................ 39

2.03    [Reserved] ................................ 33

2.04 2.04 ................................................ Notes ........ 39 3

2.05 2.05 ................................ Use of Proceeds ........ 39 3

2.06    Incremental Loans ................................ 33

## SECTION 3.
## PAYMENTS OF PRINCIPAL AND INTEREST, ETC.

## SECTION 3.
## PAYMENTS OF PRINCIPAL AND INTEREST, ETC.

3.01 3.01 ................ Scheduled Repayments and Prepayments Generally; Application ........ 39 4

3.02    Interest ................................ 34

3.03    Prepayments ................................ 35

## SECTION 4.
## PAYMENTS, ETC.

4.01    Payments ................................ 37

3.02 Interest. ................................ 39

3.03 Prepayments ................................ 40

## SECTION 4.
## PAYMENTS, ETC.

4.01 Payments ................................ 42

4.02 4.02 ................................................ Computations ........ 43 8

4.03    Set-Off ................................ 38

## SECTION 5.
## YIELD PROTECTION, TAXES, ETC.

5.01   Additional Costs ............................................................................. 39

4.03 Set-Off. ....................................................................................... 43

## SECTION 5.
## YIELD PROTECTION, TAXES, ETC.

5.01 Additional Costs. ......................................................................... 44

5.02 5.02                                                          Illegality      4550

5.03 Taxes .......................................................................................... 46

5.03   Taxes ........................................................................................ 41

5.04 5.04                                              Mitigation Obligations      4955

## SECTION 6.
## CONDITIONS

5.05 Survival ...................................................................................... 49

## SECTION 6.
## CONDITIONS

6.01    Conditions to the Borrowing of the Term Loan ....................... 450

-i-

## ~~TABLE OF CONTENTS~~
(continued)

SECTION 7.
REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| ~~7.01~~ 7.01 | Power and Authority | ~~53~~49 |
| ~~7.02~~ 7.02 | Authorization; Enforceability | ~~5~~49 |
| ~~7.03~~ 7.03 | Governmental and Other Approvals; No Conflicts | ~~5~~49 |
| ~~7.04~~ 7.04 | Financial Statements; Material Adverse Change | ~~5~~40 |
| ~~7.05~~ 7.05 | Properties | ~~5~~50 |
| ~~7.06~~ 7.06 | No Actions or Proceedings | ~~5~~72 |
| ~~7.07~~ 7.07 | Compliance with Laws and Agreements | ~~5~~73 |
| ~~7.08~~ 7.08 | Taxes | ~~58~~3 |
| ~~7.09~~ 7.09 | Full Disclosure | ~~58~~3 |
| ~~7.10~~ 7.10 | Investment Company Act and Margin Stock Regulation | ~~58~~3 |
| ~~7.11~~ 7.11 | Solvency | ~~58~~3 |
| ~~7.12~~ 7.12 | Subsidiaries | ~~58~~3 |
| ~~7.13~~ 7.13 | Indebtedness and Liens | ~~58~~4 |
| ~~7.14~~ 7.14 | Material Agreements | ~~59~~4 |
| ~~7.15~~ 7.15 | Restrictive Agreements | ~~59~~4 |
| ~~7.16~~ 7.16 | Real Property | ~~59~~4 |
| ~~7.17~~ 7.17 | Pension Matters | ~~59~~4 |
| ~~7.18~~ 7.18 | Regulatory Approvals | ~~59~~5 |
| ~~7.19~~ 7.19 | Transactions with Affiliates | ~~56~~1 |
| ~~7.20~~ 7.20 | OFAC; Anti-Terrorism Laws | ~~56~~1 |
| ~~7.21~~ 7.21 | Anti-Corruption~~.~~ | ~~56~~1 |
| ~~7.22~~ 7.22 | Necessary Permits, Etc. | ~~56~~1 |
| ~~7.23~~ 7.23 | Priority of Obligations | ~~62~~57 |
| ~~7.24~~ 7.24 | Royalty and Other Payments | ~~62~~57 |
| ~~7.25~~ 7.25 | Non-Competes | ~~62~~57 |
| ~~7.26~~ 7.26 | Security Interest | ~~62~~57 |
| ~~7.27~~ 7.27 | Capitalization Table | ~~62~~57 |

SECTION 8.
AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| ~~8.01~~ 8.01 | Financial Statements and Other Information | ~~62~~58 |
| ~~8.02~~ 8.02 | Notices of Material Events~~.~~ | ~~64~~59 |

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 227 of 468

# TABLE OF CONTENTS
## (continued)

| | | | | |
|---|---|---|---|---|
| 8.03 8.03 | | Existence | 66 1 |
| 8.04 8.04 | | Payment of Obligations | 66 1 |
| 8.05 8.05 | | Insurance | 67 2 |
| 8.06 8.06 | | Books and Records; Inspection Rights | 67 2 |
| 8.07 8.07 | | Compliance with Laws and Other Obligations | 68 3 |
| 8.08 8.08 | | Maintenance of Properties, Etc. | 68 3 |
| 8.09 8.09 | | Licenses. | 68 3 |
| 8.10 8.10 | | Conversion of Convertible Debt | 68 3 |
| 8.11 8.11 | | Use of Proceeds | 68 3 |
| 8.12 8.12 | | Certain Obligations Respecting Subsidiaries; Further Assurances | 68 3 |
| 8.13 8.13 | | Termination of Non-Permitted Liens | 71 66 |
| 8.14 Board Materials; Oaktree Lender Board Rights; Independent Capital Raise Committee | | 71 | |
| 8.14 | [Reserved]. | 66 | |
| 8.15 8.15 | | Maintenance of Permits, Etc. | 71 66 |
| 8.16 8.16 | Maintenance of Regulatory Approvals, Contracts, Intellectual Property, Etc. | 71 66 | |
| 8.17 8.17 | | ERISA Compliance | 72 66 |
| 8.18 8.18 | | Cash Management | 72 66 |
| 8.19 | [Reserved] | 67 | |
| 8.20 | [Reserved] | 67 | |
| 8.21 | [Reserved] | 67 | |
| 8.19 Lender Calls | | 72 | |
| 8.20 Repayment of Subordinated Loans | | 73 | |
| 8.21 Warrants | | 73 | |
| 8.22 8.22 | | Post-Closing Obligations | 67 3 |
| 8.23 Liquidity Reserve Account | | Error! Bookmark not defined. | |
| 8.24 Milestones | | Error! Bookmark not defined. | |
| 8.25 Post-Closing Warrant Obligations | | Error! Bookmark not defined. | |

SECTION 9.
NEGATIVE COVENANTS

| | | | | |
|---|---|---|---|---|
| 9.01 9.01 | | Indebtedness | 74 68 |
| 9.02 9.02 | | Liens | 76 9 |
| 9.03 9.03 | | Fundamental Changes and Acquisitions | 78 1 |
| 9.04 9.04 | | Lines of Business | 79 2 |
| 9.05 9.05 | | Investments | 79 2 |
| 9.06 9.06 | | Restricted Payments | 80 73 |

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 228 of 468

-iii-

**TABLE OF CONTENTS**
(continued)

9.07 9.07 .................................................. Payments of Indebtedness 81 74

9.08 9.08 ........................................................ Change in Fiscal Year 81 74

9.09 9.09 ............................................................ Sales of Assets, Etc. 81 74

9.10 9.10 ...................................................... Transactions with Affiliates 83 76

9.11 9.11 ............................................................ Restrictive Agreements 83 76

9.12 9.12       Modifications and Terminations of Material Agreements and Organic
Documents ................................................................................... 84 77

9.13 9.13 ............................................................ Outbound Licenses 84 77

9.14 9.14 ...................................................... Sales and Leasebacks 84 77

9.15 9.15 ........................................................ Hazardous Material 85 77

9.16 9.16 ........................................................ Accounting Changes 78 5

9.17 9.17 ...................................................... Compliance with ERISA 78 5

9.18 9.18 ................................ Sanctions; Anti-Corruption Use of Proceeds 78 5

9.19 Foreign Subsidiaries ................................................................ 86

9.20 No Participating Preferred Stock ........................................... 86

9.21 Transfers to Non-Obligors ...................................................... 86

9.22 No Swiss Subsidiary Debt ........................................................ 86

9.23 Payments to Insiders ................................................................ 86

**9.24** Budget Variance Covenant ................................ **Error! Bookmark not defined.**

SECTION 10.
FINANCIAL COVENANTS

10.01 10.01    Minimum Liquidity ................................................ 87 79

10.02 Minimum Revenue ........................................................... 87

10.03 Minimum EBITDA ........................................................... 87

SECTION 11.
EVENTS OF DEFAULT

11.01 11.01    Events of Default ................................................... 87 79

11.02 11.02    Remedies ............................................................... 91 82

11.03 11.03    Additional Remedies ........................................... 91 82

11.04 Minimum Revenue Covenant Cure ........................... 91

11.04    [Reserved] ............................................................... 83

11.05 11.05    Payment of Prepayment Fee ............................ 92 83

SECTION 12.
THE ADMINISTRATIVE AGENT

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 230 of 468

# TABLE OF CONTENTS
## (continued)

| | | | |
|---|---|---|---|
| 12.01 12.01 | Appointment and Duties | | 9384 |
| 12.02 12.02 | Binding Effect | | 985 |
| 12.03 12.03 | Use of Discretion | | 985 |
| 12.04 12.04 | Delegation of Rights and Duties | | 9586 |
| 12.05 12.05 | Reliance and Liability | | 9586 |
| 12.06 12.06 | Administrative Agent Individually | | 9788 |
| 12.07 12.07 | Lender Credit Decision | | 9788 |
| 12.08 12.08 | Expenses; Indemnities | | 9788 |
| 12.09 12.09 | Resignation of the Administrative Agent | | 989 |
| 12.10 12.10 | Release of Collateral or Guarantors | | 990 |
| 12.11 12.11 | Additional Secured Parties | | 990 |
| 12.12 12.12 | Agent May File Proofs of Claim | | 9100 |
| 12.13 12.13 | Acknowledgements of Lenders | | 9100 |

SECTION 13.
GUARANTY

| | | | |
|---|---|---|---|
| 13.01 13.01 | The Guaranty | | 10394 |
| 13.02 13.02 | Obligations Unconditional | | 10394 |
| 13.03 13.03 | Discharge Only Upon Payment in Full | | 10596 |
| 13.04 13.04 | Additional Waivers; General Waivers | | 1096 |
| 13.05 13.05 | Reinstatement | | 10798 |
| 13.06 13.06 | Subrogation | | 10798 |
| 13.07 13.07 | Remedies | | 1098 |
| 13.08 13.08 | Instrument for the Payment of Money | | 10899 |
| 13.09 13.09 | Continuing Guarantee | | 10899 |
| 13.10 13.10 | Contribution with Respect to Guaranteed Obligations | | 10899 |
| 13.11 13.11 | General Limitation on Guarantee Obligations | | 1099 |

SECTION 14.
MISCELLANEOUS

| | | | |
|---|---|---|---|
| 14.01 14.01 | No Waiver | | 1090 |
| 14.02 14.02 | Notices | | 1090 |
| 14.03 14.03 | Expenses, Indemnification, Etc. | | 1100 |
| 14.04 14.04 | Amendments, Etc. | | 1011 |
| 14.05 14.05 | Successors and Assigns | | 11102 |

-v-

**TABLE OF CONTENTS**
(continued)

14.06 14.06    Survival ........................................................................................ 11405

14.07 14.07    Captions ....................................................................................... 11405

14.08 14.08    Counterparts, Effectiveness ........................................................ 11405

14.09 14.09    Governing Law ............................................................................ 11405

14.10 14.10    Jurisdiction, Service of Process and Venue ............................... 1105

14.11 14.11    Waiver of Jury Trial .................................................................... 11506

14.12 14.12    Waiver of Immunity .................................................................... 11506

14.13 14.13    Entire Agreement ........................................................................ 11506

14.14 14.14    Severability ................................................................................. 1106

14.15 14.15    No Fiduciary Relationship .......................................................... 1106

14.16 14.16    Confidentiality ............................................................................ 11607

14.17 14.17    Interest Rate Limitation .............................................................. 1107

14.18 14.18    Judgment Currency ..................................................................... 11708

14.19 14.19    USA PATRIOT Act ..................................................................... 11708

14.20 14.20       Acknowledgement and Consent to Bail-In of Affected Financial
Institutions. ................................................................................. 1108

[Different first page setting changed from off in original to on in modified.].

-vi-

*[Different first page setting changed from off in original to on in modified.].*

## TABLE OF CONTENTS
### (continued)

### SCHEDULES AND EXHIBITS

Schedule 1          -    Loans Schedule
Schedule 2          -    Products
Schedule 7.05(b)    -    Certain Intellectual Property
Schedule 7.06(b)    -    Environmental Matters
Schedule 7.08       -    Taxes
Schedule 7.12       -    Information Regarding Subsidiaries
Schedule 7.13(a)    -    Existing Indebtedness
Schedule 7.13(b)    -    Existing Liens
Schedule 7.14       -    Material Agreements
Schedule 7.15       -    Restrictive Agreements
Schedule 7.16       -    Real Property Owned or Leased by Obligors
Schedule 7.17       -    Pension Matters
Schedule 7.18(c)    -    Adverse Findings
Schedule 7.19       -    Transactions with Affiliates ~~Schedule 8.22(c)~~    ~~-~~
~~Post-Closing Obligations~~
Schedule 7.24       -    Royalty and Other Payments
Schedule 7.27       -    Capitalization Table
Schedule 9.05       -    Existing Investments
Schedule 9.09       -    Sale of Assets
Schedule 9.14       -    Existing Sales and Leasebacks ~~Schedule 10.02~~    ~~-~~
~~Minimum Revenue~~


Exhibit A           -    Form of Note
Exhibit B           -    Form of Borrowing Notice
Exhibit C           -    Form of Guarantee Assumption Agreement
Exhibit D-1         -    Form of U.S. Tax Compliance Certificate (For Foreign Lenders|
                         That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-2         -    Form of U.S. Tax Compliance Certificate (For Foreign Participants
                         That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-3         -    Form of U.S. Tax Compliance Certificate (For Foreign Participants
                         That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-4         -    Form of U.S. Tax Compliance Certificate (For Foreign Lenders
                         That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit E           -    Form of Compliance Certificate
Exhibit F           -    Form of Assignment and Assumption
Exhibit G           -    Form of Landlord Consent
Exhibit H           -    [Reserved]
Exhibit I           -    Form of Intercompany Subordination Agreement
Exhibit J           -    [Reserved]
Exhibit K           -    Form of Solvency Certificate
Exhibit L           -    Funding Date Certificate

*[Different first page setting changed from off in original to on in modified.].*

4877-6890-5580 v.8

*[Different first page setting changed from off in original to on in modified.].*

## TABLE OF CONTENTS
### (continued)

Exhibit M        -        Initial Budget

-vii-

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

-ii-

4877-6890-5580 v.1.1
4877-6890-5580 v.8

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 235 of 468
(continued)

## ~~FIRST LIEN~~ CREDIT AGREEMENT AND GUARANTY

~~FIRST LIEN~~ CREDIT AGREEMENT AND GUARANTY, dated as of [•]August 3, 2023 (this "**_Agreement_**"), among **SiO2 MEDICAL PRODUCTS, INC.**, a Delaware corporation (the "**_Borrower_**"), certain Subsidiaries of the Borrower that may be required to provide Guarantees from time to time hereunder (each a "**_Subsidiary Guarantor_**" and collectively, the "**_Subsidiary Guarantors_**"), the lenders from time to time party hereto (each a "**_Lender_**" and collectively, the "**_Lenders_**"), and **OAKTREE FUND ADMINISTRATION, LLC**, as administrative agent for the Lenders (in such capacity, the "**_Administrative Agent_**").

WITNESSETH:

WHEREAS, on March 29, 2023 ~~(the "_Petition Date_")~~, the Borrower and certain of its direct and indirect Subsidiaries, including each of the Guarantors (collectively the "**_Debtors_**"), filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**_Bankruptcy Court_**"), commencing the Debtors' respective jointly administered cases that are pending under Chapter 11 of the Bankruptcy Code (the "**_Bankruptcy Cases_**") as Case No. 23-10366 (JTD);

WHEREAS, on June 9, 2023, the Debtors filed that certain Joint Chapter 11 Plan of Reorganization of Sio2 Medical Products, Inc. and its Debtor Affiliates with the Bankruptcy Court (Docket No. 372) (together with all schedules, documents and exhibits contained therein, as amended, supplemented, modified or waived from time to time as permitted under the Confirmation Order, the "**_Plan_**");

[WHEREAS, on [•]July 19, 2023, the Bankruptcy Court entered that certain [~~confirmation order~~]Order Confirming the Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc. and its Debtor Affiliates (Docket No. [•]478) (the "**_Confirmation Order_**") confirming the Plan (such confirmed plan, the "**_Approved Plan_**"), including the terms of and entry into the Loan Documents];

WHEREAS, in connection with the confirmation and implementation of the Approved Plan, the Borrower and the Guarantors have requested that the Lenders make available to the Borrower the financing facilities consisting of term loans in an aggregate principal amount equal to $[•]60,000,000 issued in connection with the Confirmation Order (the "**_Credit Facility_**") and

WHEREAS, the Lenders are willing, on the terms and subject to the conditions set forth herein, to extend such credit to the Borrower;

NOW, THEREFORE, the parties hereto agree as follows:

## SECTION 1. ~~SECTION 1.~~
## DEFINITIONS

1.01    **Certain Defined Terms**. As used herein, the following terms have the following respective meanings:

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500   Filed 08/03/23    Page 236 of 468
TABLE OF CONTENTS
(continued)

"*Account Control Agreement Completion Date*" means [•]October 1, 2023 (or such longer period of time as agreed by the Administrative Agent in its sole discretion).

"***Acquisition***" means any transaction, or any series of related transactions, by which any Person (for purposes of this definition, an "***acquirer***") directly or indirectly, by means of amalgamation, merger, purchase of assets, purchase of Equity Interests, or otherwise, (i) acquires all or substantially all of the assets of any other Person, (ii) acquires an entire business line or unit or division of any other Person, (iii) with respect to any other Person that is managed or governed by a Board, acquires control of Equity Interests of such other Person representing more than fifty percent (50%) of the ordinary voting power (determined on a fully-diluted basis) for the election of directors of such Person's Board, (iv) acquires control of more than fifty percent (50%) of the Equity Interests in any other Person (determined on a fully-diluted basis) that is not managed by a Board or (v) the acquisition of, or the right to use, develop or sell (in each case, including through exclusive licensing), any product, product line or Intellectual Property of or from any other Person, excluding, for the avoidance of doubt, non-exclusive licenses of Intellectual Property in the ordinary course of business.

"***Additional Lender***" means any Person that agrees to provide any portion of any Incremental Term Loan pursuant to an Incremental Facility Amendment in accordance with **Section 2.06**; provided that each Additional Lender shall be subject to the approval of the Administrative Agent and the Oaktree Lender.

"***Administrative Agent***" has the meaning set forth in the preamble hereto.

"***Affected Financial Institution***" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"***Affiliate***" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"***Agreement***" has the meaning set forth in the preamble hereto.

"***Allocable Amount***" has the meaning set forth in **Section 13.10(b)**.

"***Anti-Terrorism Laws***" means any laws relating to terrorism or money laundering, including, without limitation, (i) the Money Laundering Control Act of 1986 (e.g., 18 U.S.C. §§ 1956 and 1957), (ii) the Bank Secrecy Act of 1970 (e.g., 31 U.S.C. §§ 5311 – 5330), as amended by the Patriot Act, (iii) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("***OFAC***"), (iv) the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and implementing regulations by the United States Department of the Treasury, (v) any law prohibiting or directed against terrorist activities or the financing of terrorist activities (e.g., 18 U.S.C. §§ 2339A and 2339B), or (vi) any similar laws enacted in the United States, European Union or any other jurisdictions in which the parties to this agreement operate, and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war.

"***Approval Order***" has the meaning set forth in **Section 6.01(j)6.01(j)**.

"***Approved Budget***" has the meaning set forth in **Section** Error! Reference source not found..

*[Different first page setting changed from off in original to on in modified.].*

"***Approved Plan***" has the meaning set forth in the recitals hereto.

"***Asset Sale***" has the meaning set forth in **Section** ~~**9.09**~~**9.09**.

[Different first page setting changed from off in original to on in modified.].

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee of such Lender substantially in the form of **Exhibit F**, or such other form as agreed by the Administrative Agent.

"**Arm's Length Transaction**" means, with respect to any transaction, the terms of such transaction shall not be less favorable to the Borrower or any of its Subsidiaries than commercially reasonable terms that would be obtained in a transaction with a Person that is an unrelated third party.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bailee Letter**" means a bailee letter substantially in the form of **Exhibit F** to the Security Agreement.

"**Bankruptcy Cases**" has the meaning set forth in the recitals hereto.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy."

"**Bankruptcy Court**" has the meaning set forth in the recitals hereto.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Obligor or Subsidiary thereof incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Board**" means, with respect to any Person, the board of directors or equivalent management or oversight body of such Person or any committee thereof authorized to act on behalf of such board (or equivalent body).

"**Board Observer**" has the meaning set forth in **Section** Error! Reference source not found.

"**Borrower**" has the meaning set forth in the preamble hereto.

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 240 of 468
(continued)

"**Borrower Party**" has the meaning set forth in **Section** ~~14.03(b).~~ **14.03(b)**.

"**Borrowing**" means the borrowing of the Loans on the Closing Date.

"*Borrowing Notice*" means a written notice substantially in the form of **Exhibit B**.

"**Business Day**" means a day (other than a Saturday or Sunday) on which commercial banks are not authorized or required to close in New York City.

"**Capital Lease Obligations**" means, as to any Person, the obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real and/or personal property, the amount of the liability in respect thereof that would at that time be required to be capitalized on a balance sheet in accordance with GAAP.

"**Casualty Event**" means the damage, destruction or condemnation, as the case may be, of property of the Borrower or any of its Subsidiaries in excess of $2,000,000.

"**Change of Control**" means an event or series of events:

(i)        as a result of which (x) at any time prior to the consummation of a Qualified IPO/SPAC Transaction, the Permitted Holders cease to beneficially own, in the aggregate, directly or indirectly, at least a majority of the Equity Interests of the Borrower entitled to vote for members of the Board of the Borrower on a fully-diluted basis and Equity Interests representing at least a majority of the economic interests in the Borrower or (y) at any time following the consummation of a Qualified IPO/SPAC Transaction, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Act, but excluding any of such person or its Subsidiaries, and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such Plan) other than the Permitted Holders, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all Equity Interests that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "*option right*")), directly or indirectly, of forty percent (40%) or more of the Equity Interests of the Borrower entitled to vote for members of the Board of the Borrower on a ~~fully- diluted~~fully-diluted basis (and taking into account all such Equity Interests that such person or group has the right to acquire pursuant to any option right); or

(ii)        as a result of which, during any period of twelve (12) consecutive months, a majority of the members of the Board of the Borrower cease to be composed of individuals (x) who were members of such Board on the first day of such period, (y) whose election or nomination to such Board was approved by individuals referred to in **clause (x)** above constituting at the time of such election or nomination at least a majority of such Board or equivalent governing body or (z) whose election or nomination to such Board was approved by individuals referred to in **clauses (x)** and **(y)** above constituting at the time of such election or nomination at least a majority of such Board; or

4877-6890-5580 v.1.1

*[Different first page setting changed from off in original to on in modified.].*

(continued)

        (iii)     that results in the sale, including without limitation any exclusive licensing, of all or substantially all of the assets or businesses of the Borrower and its Subsidiaries, taken as a whole; or

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 242 of 468
(continued)

(iv)    that results in the Borrower's failure to own, directly or indirectly, beneficially and of record, one-hundred percent (100%) of all issued and outstanding Equity Interests of each Subsidiary Guarantor.

"***charges***" has the meaning set forth in **Section 14.17**.

"***Claims***" means (and includes) any claim, demand, complaint, grievance, action, application, suit, cause of action, order, charge, indictment, prosecution, judgement or other similar process, whether in respect of assessments or reassessments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including fees and disbursements of legal counsel, and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

"***Class***" when used in reference to any Loan, refers to whether such Loan is a Term Loan or an Incremental Term Loan.

"***Closing Date***" means the date on which the conditions precedent specified in **Section 6.01**6.01 are satisfied (or waived in accordance with **Section 14.04**14.04) and on which the Term Loan is to be made to the Borrower.

"***Closing Date Property***" means each of the Property and the properties located at 2250 Riley St., Auburn, AL and any other real property owned by the Obligors as of the Closing Date.

"***Coating Building***" means the coating facility to be constructed upon that certain real property owned by the City of Auburn, AL and located on Paul Parks Blvd, Auburn, AL, in the County for use by the Borrower and its Subsidiaries.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"***Collateral***" means any real, personal and mixed property (including Equity Interests), whether tangible or intangible, in which Liens are granted or purported to be granted to the Administrative Agent as security for the Obligations under any Loan Document on or after the Closing Date, including future acquired or created assets or property (or collectively, all such real, personal and mixed property, as the context may require).

"***Company Competitor***" means (i) any competitor of the Borrower or any of its Subsidiaries primarily operating in the same line of business as the Borrower or any of its Subsidiaries and (ii) any of such competitor's Affiliates (other than any Person that is a bona fide debt fund primarily engaged in the making, purchasing, holding or other investing in commercial loans, notes, bonds or similar extensions of credit or securities in the Ordinary Course) that, in the case of each of clauses (i) and (ii), are identified by name in writing by the Borrower to the Administrative Agent from time to time.

"***Compliance Certificate***" has the meaning set forth in **Section 8.01(b).** **8.01(b).**

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 243 of 468

TABLE OF CONTENTS
(continued)

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

4877-6890-5580 v.1.1

"*Consolidated Debt*" shall mean, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date and determined on a consolidated basis in accordance with GAAP; provided that Consolidated Debt shall not include (A) Indebtedness that is not for borrowed money incurred pursuant to paragraphs (c), (d), (k)(i) and (ii) (in the case of clause (k)(i), so long as such instruments are classified as equity), (q), (r), (s) and (t) of **Section 9.01**, (B) intercompany indebtedness permitted under **Section 9.01** and (C) Indebtedness under Permitted Convertible Debt.

"*Consolidated Interest Expense*" shall mean, with respect to any person for any period, the sum, without duplication, of (a) the aggregate interest expense of such person and its subsidiaries for such period, calculated on a consolidated basis in accordance with GAAP (including pay-in-kind interest payments, amortization of original issue discount, the interest component of Capital Lease Obligations and net payments and receipts (if any) pursuant to interest rate Hedging Agreements (other than in connection with the early termination thereof), plus (b) consolidated capitalized interest of the referent person and its subsidiaries for such period, whether paid or accrued, any amounts paid or payable in respect of interest on Indebtedness the proceeds of which have been contributed to the referent person and that has been guaranteed by the referent person.

"*Consolidated Net Income*" means, with respect to the Borrower and its Subsidiaries on a consolidated basis for any period, the net income (loss) of Borrower and its Subsidiaries for such period, determined on a consolidated basis and in accordance with GAAP, but excluding from the determination of Consolidated Net Income (without duplication) any non-cash gains or losses from Asset Sales for such period.

"*Contracts*" means any contract, license, lease, agreement, obligation, promise, undertaking, understanding, arrangement, document, commitment, entitlement or engagement under which a Person has, or will have, any liability or contingent liability (in each case, whether written or oral, express or implied, and whether in respect of monetary or payment obligations, performance obligations or otherwise).

"*Commitment*" means a commitment to acquire an interest in a Loan.

"*Control*" means, in respect of a particular Person, the possession by one or more other Persons, directly or indirectly, of the power to direct or cause the direction of the management or policies of such particular Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"*Controlled Account*" has the meaning set forth in **Section 8.18(a)8.18(a)**.

"*Copyright*" means published and unpublished works of authorship whether or not copyrightable, including software, website and mobile content, data, databases, and other compilations of information, in each case, whether or not registered, and any and all copyrights in and to the foregoing, together with all common law rights and moral rights therein, and all copyrights, copyright registrations and applications for copyright registrations, including all renewals, extensions, restorations, derivative works and reversions thereof and all common law rights, moral rights and other rights whatsoever accruing thereunder or pertaining thereto throughout the world.

4877-6890-5580 v.1.1

"**County**" means Lee County, Alabama, and any political subdivision succeeding to the powers thereof.

"**Default**" means any Event of Default and any event that, upon the giving of notice, the lapse of time or both, would constitute an Event of Default.

"**Default Rate**" has the meaning set forth in **Section** ~~**3.02(b)**~~**3.02(b)**.

"**Deposit Account**" means any "Deposit Account," as such term is defined in Article 9 of the UCC (and all accounts and sub-accounts relating to any of the foregoing).

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory is the subject of country- or territory-wide Sanctions.

"**Disqualified Equity Interests**" means, with respect to any Person, any Equity Interest of such Person that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition ~~(x)~~ (i) matures or is mandatorily redeemable or requires such Person to use efforts to redeem such Equity Interests (in each case, other than solely for Qualified Equity Interests), including pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments of dividends or other distributions in cash or other securities that would constitute Disqualified Equity Interests, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date.

"**Disqualified Lender**" means any Person designated by the Borrower as a "Disqualified Lender" by written notice delivered to the Administrative Agent on or prior to the date of this Agreement.

"**Division**" has the meaning set forth in **Section** ~~**1.05**~~**1.05**.

"**Dollars**" and "**$**" means lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary that is a corporation, limited liability company, partnership or similar business entity incorporated, formed or organized under the laws of the United States, any state of the United States or the District of Columbia.

~~"**EBITDA**" means, for any period, the Consolidated Net Income for such period:~~

~~(a) increased, in each case to the extent deducted, and without duplication, by:~~

~~(i) provision for Taxes based on income paid or accrued during such period; plus~~

~~(ii) Consolidated Interest Expense for such period; plus~~

4877-6890-5580 v.1.1

*[Different first page setting changed from off in original to on in modified.]*.

Case 23-10366-JTD    Doc 500   Filed 08/03/23    Page 246 of 468

(continued)

period; plus                                                                                          depreciation and amortization expense of such person
                                                                                                      for such

(iii)

                                                                                (iv) to the extent actually paid during such period,
                                                                                third-party fees and
expenses related to the consummation of the transactions contemplated to be closed on the
Closing Date; plus

                                                (v) transaction costs related to Permitted Acquisitions, Permitted Investments,
Permitted Convertible Debt or any offering by the Borrower of its Equity Interests during such period; plus

                                                (vi) non-cash charges recorded in respect of purchase accounting and non-cash
exchange, translation or performance losses relating to any foreign currency fluctuations, and non-cash expenses,
charges or losses reducing Consolidated Net Income (and not otherwise excluded thereunder) during such period
in connection with royalty payments or expected future royalty payments; plus

                                                (vii) any other non-cash items (except to the extent representing an accrual for future
cash outlays), including non-cash compensation expenses recorded pursuant to FASB 123R or FASB 158 (codified
under Accounting Standards Codification 715); plus

                                                (viii) to the extent actually reimbursed, expenses incurred to the extent covered by
indemnification provisions in any agreement in connection with any Permitted Acquisition; plus

                                                (ix) all reserves taken during such period on account of contingent cash payments that
may be required in future periods; plus

                                                (x) restructuring charges or reserves during such period, including write-downs and
write-offs, including any one-time costs incurred in connection with Permitted Acquisitions and other Investments
and costs related to the closure, consolidation and integration of facilities, information technology infrastructure and
legal entities, and severance and retention bonuses; provided that, when taken together with the amounts in item (xi)
for the same period, such charges or reserves do not exceed, in the aggregate, 15% of the amount of EBITDA for
such period after giving effect to this addback; plus

                                                (xi) non-recurring litigation costs during such period; provided that, when taken
together with the amounts in item (x) for the same period, such costs do not exceed, in the aggregate, 15% of the
amount of EBITDA for such period after giving effect to this addback; and

                                (b) decreased by (without duplication):

                                                (i) net unrealized gains on Hedging Agreements; plus

                                                (ii) non-cash gains relating to cash receipts or netting arrangement in a prior period to
the extent such cash receipts or netting arrangement were included in the calculation of EBITDA in such prior
period; plus

-11-

~~(iii) cash payments during such period on account of accruals or reserves added to EBITDA pursuant to clause (a)(ix) above; plus~~

~~(iv) non-cash gains increasing Consolidated Net Income for such period, excluding any non-cash gains that represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that were deducted (and not added back) in the calculation of EBITDA for any prior period.~~

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in **clause (a)** of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in **clause (a)** or **(b)** of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Eligible Transferee***" means and includes (i) any commercial bank, (ii) any insurance company, (iii) any finance company, (iv) any financial institution, (v) any Person that is a bona fide debt fund primarily engaged in the making, purchasing, holding or other investing in commercial loans, notes, bonds or similar extensions of credit or securities in the Ordinary Course, (vi) with respect to any Lender, any of its Affiliates or such Lender's or Affiliate's managed funds or accounts, and (vii) any other "accredited investor" (as defined in Regulation D of the Securities Act) that is principally in the business of managing investments or holding assets for investment purposes; <u>provided</u> that, an Eligible Transferee shall not include (x) any Company Competitor or Disqualified Lender or (y) any Person that primarily invests in distressed debt or other distressed financial assets; <u>provided</u>; <u>further</u> that (A) neither **clause (x)** or

~~(y)~~ **(y)** above shall apply retroactively to any Person that previously acquired an assignment or participation interest hereunder to the extent such Person was not a Company Competitor or a Person of the type described in clause (y) above at the time of the applicable assignment or participation, as the case may be, and (B) with respect to both **clauses (x)** and **(y)** above, the Administrative Agent shall not have any duty or obligation to carry out due diligence in order to identify or determine whether a Person would be excluded as an Eligible Transferee as a result of the application of either such clause.

"***Environmental Claims***" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, information request, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising ~~(i)~~ **(i)** pursuant to or in connection with any actual or alleged violation of, or liability relating to, any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury,

-12-

threat or harm to health, safety, natural resources or the environment, arising out of a violation of Environmental Law or any Hazardous Materials Activity.

"*Environmental Law*" means all laws (including common law and any federal, state, provincial or local governmental law), rule, regulation, order, writ, judgment, notice, requirement, binding agreement, injunction or decree, whether U.S. or non-U.S., relating in any way to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) to the extent related to Hazardous Materials Activity, occupational safety and health, industrial hygiene, land use, natural resources or the protection of human, plant or animal health or welfare, in any manner applicable to the Borrower or any of its Subsidiaries or any Facility.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Obligor or any of its Subsidiaries directly or indirectly resulting from or based upon (i) violation of any Environmental Law, (ii) the generation, use, presence, emission, discharge, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (iii) exposure to any Hazardous Materials, (iv) the release or threatened release of any Hazardous Materials into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equity Interests*" means, with respect to any Person (for purposes of this defined term, an "*issuer*"), all shares of, interests or participations in, or other equivalents in respect of such issuer's capital stock, including all membership interests, partnership interests or equivalent, and all debt or other securities directly or indirectly exchangeable, exercisable or otherwise convertible into, such issuer's capital stock, whether now outstanding or issued after the Closing Date, and in each case, however designated and whether voting or non-voting.

"*Equivalent Amount*" means, with respect to an amount denominated in one currency, the amount in another currency that could be purchased by the amount in the first currency determined by reference to the Exchange Rate at the time of determination.

"*ERISA*" means the United States Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means, collectively, any Obligor, Subsidiary thereof, and any Person under common control, or treated as a single employer, with any Obligor or Subsidiary thereof, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"*ERISA Event*" means (i) a reportable event as defined in Section 4043 of ERISA with respect to a Title IV Plan, excluding, however, such events as to which the PBGC by regulation has waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event; (ii) the applicability of the requirements of Section 4043(b) of ERISA with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, to any Title IV Plan where an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such plan within the following thirty (30) days; (iii) a withdrawal by any Obligor or any ERISA Affiliate thereof from a Title IV

-13-

Plan or the termination of any Title IV Plan resulting in liability under Sections 4063 or 4064 of ERISA; (iv) the withdrawal of any Obligor or any ERISA Affiliate thereof in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by any Obligor or any ERISA Affiliate thereof of notice from any Multiemployer Plan that it is insolvent pursuant to Section 4245 of ERISA; (v) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Title IV Plan or Multiemployer Plan; (vi) the imposition of liability on any Obligor or any ERISA Affiliate thereof pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the failure by any Obligor or any ERISA Affiliate thereof to make any required contribution to a Plan, or the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Title IV Plan (whether or not waived in accordance with Section 412(c) of the Code) or the failure to make by its due date a required installment under Section 430 of the Code with respect to any Title IV Plan or the failure to make any required contribution to a Multiemployer Plan; (viii) the determination that any Title IV Plan is considered an at-risk plan or a plan in endangered to critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; (ix) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan; (x) the imposition of any liability under Title I or Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or any ERISA Affiliate thereof; (xi) an application for a funding waiver under Section 303 of ERISA or an extension of any amortization period pursuant to Section 412 of the Code with respect to any Title IV Plan; (xii) the occurrence of a non-exempt prohibited transaction under Section 406 or 407 of ERISA for which any Obligor or any Subsidiary thereof may be directly or indirectly liable; (xiii) a violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary or disqualified person for which any Obligor or any ERISA Affiliate thereof may be directly or indirectly liable; (xiv) the occurrence of an act or omission which could give rise to the imposition on any Obligor or any ERISA Affiliate thereof of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Sections 409, 502(c), (i) or (1) or 4071 of ERISA; (xv) the assertion of a material claim (other than routine claims for benefits) against any Plan or the assets thereof, or against any Obligor or any Subsidiary thereof in connection with any such plan; (xvi) receipt from the IRS of notice of the failure of any Qualified Plan to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Qualified Plan to fail to qualify for exemption from taxation under Section 501(a) of the Code; (xvii) the imposition of any lien (or the fulfillment of the conditions for the imposition of any lien) on any of the rights, properties or assets of any Obligor or any ERISA Affiliate thereof, in either case pursuant to Title I or IV, including Section 302(f) or 303(k) of ERISA or to Section 401(a)(29) or 430(k) of the Code; or (xviii) the establishment or amendment by any Obligor or any Subsidiary thereof of any "welfare plan", as such term is defined in Section 3(1) of ERISA, that provides post-employment welfare benefits in a manner that would increase the liability of any Obligor.

"***ERISA Funding Rules***" means the rules regarding minimum required contributions (including any installment payment thereof) to Title IV Plans, as set forth in Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500F Filed 08/03/23   Page 250 of 468
(continued)

"*Erroneous Payment*" has the meaning set forth in **Section 12.13(a)**.

"*Erroneous Payment Deficiency Assignment*" has the meaning set forth in **Section 12.13(d)**.

"*Erroneous Payment Impacted Loans*" has the meaning set forth in **Section 12.13(d)**.

"*Erroneous Payment Return Deficiency*" has the meaning set forth in **Section 12.13(d)**.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Event of Default*" has the meaning set forth in **Section ~~11.01~~11.01**.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Exchange Rate*" means, as of any date, the rate at which any currency may be exchanged into another currency, as set forth on the relevant Reuters screen at or about 11:00 a.m~~11:00 a.m~~. (Eastern time) on such date. In the event that such rate does not appear on the Reuters screen, the "Exchange Rate" shall be determined by reference to such other publicly available service for displaying exchange rates as may be reasonably designated by the Administrative Agent.

"*Excluded Accounts*" means (i) deposit accounts exclusively used for payroll, payroll Taxes and other employee wage and benefit payments to or for the benefit of any Obligor's employees which shall not exceed the amount necessary for the Borrower to fully-fund its next complete payroll cycle, (ii) zero balance accounts that are swept no less frequently than weekly to a Controlled Account, (iii) accounts used exclusively for bona fide insurance purposes in the Ordinary Course, (iv) cash collateral for Permitted Liens ~~(other than Liens securing any Permitted Financing)~~ to the extent such cash collateral is permitted under **Section 9.02**, ~~(v)~~ (v) ~~customary collateral accounts securing the Permitted Financing and required under the terms thereof (so long as such agreement is not entered into in contemplation of this Agreement) the balances of which shall not in the aggregate exceed $[5,000,000]~~[Reserved]; (vi) the Borrower's account ending in ~~[~~XXX9219 at Regions Bank~~]~~ for so long as (x) it is used by the Borrower to support credit card obligations of the Obligors in the Ordinary Course otherwise permitted by the terms hereof and (y) the aggregate amount on deposit in such account does not exceed $~~[~~300,000~~]~~ at any time and (vii) any other deposit accounts established after the Closing Date only for so long as the amounts of deposit therein do not exceed $~~[~~50,000~~]~~ in the aggregate.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (x) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivisions thereof) or (y) that are Other Connection Taxes, (ii) in the case of a Lender, U.S. federal withholding Taxes imposed

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 251 of 468
(continued)

on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (1) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment requested by the Borrower under Section 5.04) or (2) such Lender changes its lending office, except in each case to the extent that, pursuant to **Section ~~5.03~~5.03**, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with **Section ~~5.03(f)~~5.03(f)**, and (iv) any U.S. federal withholding Taxes imposed under FATCA.

"***Exit Transaction***" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the loans to be incurred under this Agreement, the consummation of the other transactions contemplated by the Loan Documents, this Agreement, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing, and the payment of the fees and expenses incurred in connection with any of the foregoing.

"***Facility***" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased or operated by any Obligor or any of its Subsidiaries.

"***FATCA***" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"***Federal Funds Effective Rate***" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; <u>provided</u> that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"***Fee Letter***" means the Fee Letter, dated as of ~~[•], 2023~~the Closing Date, among the Borrower, the Lenders and the Administrative Agent (as amended, modified or replaced from time to time).

"***Foreign Lender***" means a Lender that is not a U.S. Person.

"***~~Foreign Subsidiary~~***" ~~means any Subsidiary that is not a Domestic Subsidiary.~~ "***Funding Date Certificate***" means a certificate substantially in the form of **Exhibit L**.

"***~~Funding Notice~~***" ~~means a written notice substantially in the form of~~ **Exhibit B**.

"***GAAP***" means generally accepted accounting principles in the United States of America, as in effect from time to time, set forth in the opinions and pronouncements of the

Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board and in such other statements by such other entity as may be in general use by significant segments of the accounting profession that are applicable to the circumstances as of the date of determination. All references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements delivered pursuant to **Section 6.01(g)(i)**.

"*Governmental Approval*" means any consent, authorization, approval, order, license, franchise, permit, certification, accreditation, registration, clearance or exemption that is issued or granted by or from (or pursuant to any act of) any Governmental Authority, including any application or submission related to any of the foregoing.

"*Governmental Authority*" means any nation, government, branch of power (whether executive, legislative or judicial), state, province or municipality or other political subdivision thereof and any entity exercising executive, legislative, judicial, monetary, regulatory or administrative functions of or pertaining to government, including without limitation regulatory authorities, governmental departments, agencies, commissions, bureaus, officials, ministers, courts, bodies, boards, tribunals and dispute settlement panels, and other law-, rule- or regulation-making organizations or entities of any state, territory, county, city or other political subdivision of any country, in each case whether U.S. or non-U.S.

"*Guarantee*" of or by any Person (the "*guarantor*") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course.

"*Guarantee Assumption Agreement*" means a Guarantee Assumption Agreement substantially in the form of **Exhibit C** by an entity that, pursuant to **Section 8.12(a)8.12(a)**, is required to become a "Subsidiary Guarantor."

"*Guaranteed Obligations*" has the meaning set forth in **Section 13.01**.

"*Guarantor Payment*" has the meaning set forth in **Section 13.10(a)**.

"*Guaranty*" means the Guaranty made by the Subsidiary Guarantors under **Section 13** in favor of the Secured Parties (including any Guaranty assumed by an entity that is required to become a "Subsidiary Guarantor" pursuant to a Guarantee Assumption Agreement).

"*Hazardous Material*" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or would reasonably be expected to pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"*Hazardous Materials Activity*" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, release, threatened release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, recycling, disposition or handling of any Hazardous Materials, and any investigation, monitoring, corrective action or response action with respect to any of the foregoing.

"*Healthcare Laws*" means, collectively, all Laws and Product Authorizations applicable to the business of any Obligor or the Project, whether U.S. or non-U.S., regulating the distribution, dispensing, importation, exportation, quality, manufacturing, labeling, promotion and provision of and payment for drugs, medical or healthcare products, items and services, including, without limitation, 45 C.F.R. ("*HIPAA*"); Section 1128B(b) of the Social Security Act, as amended; 42 U.S.C. § 1320a-7b (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute"; § 1877 of the Social Security Act, as amended; 42 U.S.C. § 1395nn (Limitation on Certain Physician Referrals), commonly referred to as "Stark Statute"; all applicable Good Manufacturing Practice requirements addressed in the U.S. Food and Drug Administration's Quality System Regulation (21 C.F.R. Part 820); all rules, regulations and guidance with respect to the provision of Medicare and Medicaid programs or services (42 C.F.R. Chapter IV et seq.); 10 U.S.C. §§1071 – 1110(b) (the "*TRICARE Program*"); 5 U.S.C. §§ 8901 – 8914 ("*FEHB Plans*"); and all rules, regulations and guidance promulgated under or pursuant to any of the foregoing, including any non-U.S. equivalents.

"*Hedging Agreement*" means any interest rate exchange agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"*Immaterial Subsidiary*" means any Subsidiary of the Borrower that (i) individually constitutes or holds less than five percent (5%) of the Borrower's consolidated total assets and generates less than five percent (5%) of the Borrower's consolidated total revenue, and (ii) when taken together with all then existing Immaterial Subsidiaries, such Subsidiary and such Immaterial Subsidiaries, in the aggregate, would constitute or hold less than five percent (5%) of the Borrower's consolidated total assets and generate less than five percent (5%) of the Borrower's consolidated total revenue, in each case as pursuant to the most recent fiscal period for which financial statements were required to have been delivered pursuant to **Section 8.01(a)8.01(a)** or **(b)**.  If at any time the aggregate amount of the Borrower's consolidated total assets or consolidated total revenue attributable to Immaterial Subsidiaries exceeds five percent (5%) of the Borrower's consolidated total assets or consolidated total revenue, the Borrower shall promptly (and in any event within thirty (30) days of becoming aware of such excess) designate sufficient Subsidiaries as ceasing to constitute "Immaterial Subsidiaries" to eliminate such excess, and such designated Subsidiaries shall be required to become Subsidiary Guarantors in

accordance with **Section 8.12(a)**. If at any time any Subsidiary designated as an Immaterial Subsidiary individually constitutes or holds five percent (5%) or more of the Borrower's consolidated total assets or generates five percent (5%) or more of the Borrower's consolidated total revenue, such Subsidiary shall cease to constitute an Immaterial Subsidiary and the Borrower shall promptly (and in any event within thirty (30) days of becoming aware thereof) cause such Subsidiary to become a Subsidiary Guarantor in accordance with **Section 8.12(a)**.

"***Incremental Facilities***" has the meaning assigned to such term in **Section 2.06**.

"***Incremental Facility Amendment***" has the meaning assigned to such term in **Section 2.06**.

"***Incremental Term Loans***" has the meaning assigned to such term in **Section 2.06**.

"***Indebtedness***" of any Person means, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments, (iii) all obligations of such Person upon which interest charges are customarily paid, (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (v) all obligations of such Person in respect of the deferred purchase price of property or services (excluding deferred compensation and accounts payable incurred in the ordinary course of business and not overdue by more than ninety (90) days), (vi) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (vii) all Guarantees by such Person of Indebtedness of others, (viii) all Capital Lease Obligations of such Person, (ix) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (x) obligations under any Hedging Agreement, currency swaps, forwards, futures or derivatives transactions, (xi) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (xii) all obligations under any earn-out and guaranteed minimum milestone and other payments of such Person under any license or other agreements (but excluding any payments based on sales under any such license or other agreement), (xiii) any Disqualified Equity Interests of such Person, (xiv) any Off-Balance Sheet Liability and (xv) all other obligations required to be classified as indebtedness of such Person under GAAP; provided that, notwithstanding the foregoing, Indebtedness shall not include accrued expenses, deferred rent, deferred taxes, deferred compensation or customary obligations under employment agreements, in each case, that are not overdue by more than forty-five (45) days. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"***Indemnified Party***" has the meaning set forth in **Section ~~14.03(b)~~14.03(b)**.

"***Indemnified Taxes***" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation and (ii) to the extent not otherwise described in **clause (i)**, Other Taxes.

"*Information Certificate*" means the Information Certificate delivered pursuant to **Section** ~~6.01(d)~~6.01(d).

"*Insolvency Proceeding*" means (i) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (ii) any general assignment for the

4877-6890-5580 v.1.1

benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of any Person's creditors generally or any substantial portion of such Person's creditors, in each case undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"*Intellectual Property*" means all intellectual property or proprietary rights of any kind anywhere in the world, including any rights in or to Patents, Trademarks, Copyrights, Trade Secrets, whether U.S. or non-U.S.

"*Intercompany Subordination Agreement*" means a subordination agreement to be executed and delivered by each Obligor and each of its Subsidiaries, pursuant to which all obligations in respect of any Indebtedness owing to any such Person by an Obligor shall be subordinated to the prior payment in full in cash of all Obligations, such agreement to be in substantially the form attached hereto as **Exhibit I**.

"*Interest Rate*" means 12% per annum, as may be increased pursuant to **Section 3.02(b)**.

"*Interest Period*" means (a) the period commencing on and including the Closing Date and ending on but excluding the immediately subsequent Payment Date and (b) subsequently, each period commencing on and excluding the last day of the previous Interest Period for such Loan and ending on but excluding the immediately subsequent Payment Date.

"*Interest Rate*" means (i) initially, from the Closing Datee until the consummation of the Qualifying Transaction, the Interest Rate shall be [•]% per annum and (ii) from and upon the consummation of the Qualifying Transaction, the Interest Rate shall be [•]% per annum; provided that notwithstanding the foregoing, with respect to any time during a Step-Down Period, the Interest Rate shall be [•]% per annum, in each case, as may be increased pursuant to **Section 3.02(b)**.

"*Invention*" means any novel, inventive or useful art, apparatus, method, process, machine (including any article or device), manufacture or composition of matter, or any novel, inventive and useful improvement in any art, method, process, machine (including article or device), manufacture or composition of matter.

"*Investment*" means, for any Person: (i) the acquisition (whether for cash, property, services or securities or otherwise) of any debt or Equity Interests, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (ii) the making of any deposit with, or advance, loan, assumption of debt or other extension of credit to, or capital contribution in any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person), but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days arising in connection with the sale of inventory or supplies by such Person in the Ordinary Course; (iii) investments between or among the Borrower, its Subsidiaries or any Affiliates, consisting of cost sharing, transfer pricing or similar transactions (including any related intercompany balances and any capitalization of such balances); (iv) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or

extended to such Person or (v) the consummation of, or entering into any agreement to consummate, any Acquisition.  The amount of an Investment shall be the amount actually invested (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on such Person's good faith estimate of the fair market value of such asset or property at the time such Investment is made), minus, solely to the extent such original Investment consisted of cash, the amount of cash received or returned for such Investment, without adjustment for subsequent increases or decreases in the value of such Investment or write-ups, write-downs or write-offs with respect thereto; provided that in no event shall such amount be less than zero or increase any basket or amount pursuant to **Section 9.05** above the fixed amount set forth therein.

"***IPO/SPAC Transaction***" means (a) the issuance by the Borrower of its common Equity Interests that are listed on a national exchange or publicly offered (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the Securities Exchange Commission in accordance with the Securities Act of 1933 (whether alone or in connection with a secondary public offering), which shall include any direct listing by the Borrower or one of its Subsidiaries of its capital stock or equity securities on a national securities exchange or (b) the merger, consolidation, share exchange or other business combination of the Borrower, or any direct or indirect parent of Borrower, with any domestic special purpose acquisition company, or any of its subsidiaries following which, the Equity Interests of the surviving company or acquirer (the "***Surviving Company***") is listed on a national securities exchange in the United States.

"***IRS***" means the U.S. Internal Revenue Service or any successor agency, and to the extent relevant, the U.S. Department of the Treasury.

"***Key Person***" means each of [•].
"***Landlord Consent***" means a Landlord Consent substantially in the form of **Exhibit G.**

"***Law***" means, collectively, all U.S. or non-U.S. federal, state, provincial, territorial, municipal or local statute, treaty, rule, guideline, regulation, ordinance, code or administrative or judicial precedent or authority, including any interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"***Lenders***" has the meaning set forth in the preamble hereto.

"***Lien***" means (a) any mortgage, lien, license, pledge, hypothecation, charge, security interest, or other encumbrance of any kind or character whatsoever, whether or not filed, recorded or otherwise perfected under applicable Law, or any lease, title retention agreement, mortgage, restriction, easement, right-of-way, option or adverse claim (of ownership or possession) (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any other encumbrance on title to real property, any option or other agreement to sell, or give a security interest in, such asset and any filing of or agreement to give

4877-6890-5580 v.1.1

any financing statement under the Uniform Commercial Code (or equivalent statutes of any jurisdiction)) or any preferential arrangement that has the practical effect of creating a security interest and (b) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"***Loan***" means a loan deemed to have been made by a Lender pursuant to **Section 2.01 2.01 or any Incremental Term Loans made to the Borrower pursuant to Section 2.06**.

"***Loan Documents***" means, collectively, this Agreement, the Notes, the Security Documents, the Warrants, the Fee Letter, any Guarantee Assumption Agreement, the Intercompany Subordination Agreement, the Second Lien Subordination Agreement and any subordination agreement, intercreditor agreement or other present or future document, instrument, agreement or certificate delivered to the Administrative Agent (for itself or for the benefit of any other Secured Party) in connection with this Agreement or any of the other Loan Documents, in each case, as amended or otherwise modified.

"***Loss***" means judgments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any Claim or any proceeding relating to any Claim.

"***Majority Lenders***" means, at any time, Lenders having at such time in excess of fifty percent (50%) of the aggregate Commitments (or, if such Commitments are terminated, the outstanding principal amount of the Loans) then in effect; provided that for so long as any Oaktree Lender holds any Loans or Commitments hereunder, the Majority Lenders shall include such Oaktree Lender.

"***Margin Stock***" means "margin stock" within the meaning of Regulations U and X.

"***Material Adverse Change***" and "***Material Adverse Effect***" mean a material adverse change in or effect on (i) the business, financial performance, operations, condition of the assets or liabilities of the Borrower and its Subsidiaries taken as a whole, (ii) the ability of any Obligor to perform its obligations under the Loan Documents, as and when due, (iii) the legality, validity, binding effect or enforceability of the Loan Documents or (iv) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent or the Secured Parties under any of the Loan Documents.

"***Material Agreement***" means any Contract required to be disclosed (including amendments thereto) under regulations promulgated under the Securities Act of 1933 or Securities Exchange Act of 1934, as may be amended. For the avoidance of doubt, employment and management contracts shall not be Material Agreements.

"***Material Indebtedness***" means, at any time, any Indebtedness of any Obligor or Subsidiary thereof, the outstanding principal amount of which, individually or in the aggregate, exceeds $[5,000,000] (or the Equivalent Amount in other currencies).

"***Material Intellectual Property***" means all Intellectual Property, whether currently

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 259 of 468
(continued)

owned by (or purported to be owned by) or licensed to (or purported to be licensed to) the Borrower or any of its Subsidiaries, or acquired, developed or obtained by or otherwise licensed

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 260 of 468
(continued)

to the Borrower or any of its Subsidiaries after the Closing Date that is, in each case, material to any current, planned or anticipated business of the Borrower and its Subsidiaries.

"*Material Subsidiary*" means any Subsidiary of the Borrower that is not an Immaterial Subsidiary.

"*Maturity Date*" means [•]August 3, 2028.

"*Maximum Rate*" has the meaning set forth in **Section 14.17**.

"*Minimum EBITDA Covenant*" has the meaning set forth in **Section 10.03**. "*Minimum Liquidity Amount*" means $[+]2,5,000,000[].

"*Minimum Revenue*" means, with respect to any fiscal quarter, the amount set forth opposite such fiscal quarter on **Schedule 10.02**.
"*Minimum Revenue Covenant*" has the meaning set forth in **Section 10.02**. "*Minimum Revenue Cure Right*" has the meaning set forth in **Section 11.04(a)**. "*Mortgage Deliverables*" has the meaning set forth in **Section 8.12(b)**.

"*Multiemployer Plan*" means any multiemployer plan, as defined in Section 400l(a)(3) of ERISA, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"*Net Cash Proceeds*" means, (i) with respect to any Casualty Event experienced or suffered by any Obligor or any of its Subsidiaries, the amount of cash proceeds received (directly or indirectly) from time to time by or on behalf of such Person after deducting therefrom only (w) (w) reasonable costs and expenses related thereto incurred by such Obligor or such Subsidiary in connection therewith, (x) Taxes (including transfer Taxes or net income Taxes) paid or payable in connection therewith, (y) reasonable reserves established for liabilities estimated to be payable in respect of such Casualty Event and deposited into escrow with a third party escrow agent on terms reasonably acceptable to the Administrative Agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of the Administrative Agent and (z) any amounts required to be used to prepay Permitted Indebtedness pursuant to **Sections 9.01(j)9.01(j)** and **9.01(l)** secured by the assets subject to such Casualty Event (other than (A) Indebtedness owing to the Administrative Agent or any Lender under this Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset); and (ii) with respect to any Asset Sale by any Obligor or any of its Subsidiaries, the amount of cash proceeds received (directly or indirectly) from time to time by or on behalf of such Person after deducting therefrom only (w) reasonable costs and expenses related thereto incurred by such Obligor or such Subsidiary in connection therewith, (x) Taxes (including transfer Taxes or net income Taxes) paid or payable in connection therewith, (y) reasonable reserves established for liabilities estimated to be payable in respect of such Asset Sale and deposited into escrow with a third party escrow agent on terms reasonably acceptable to the Administrative Agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of the Administrative Agent and (z) any amounts

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 261 of 468
(continued)

required to be used to prepay Permitted Indebtedness pursuant to Sections ~~9.01(j)~~9.01(j) and **9.01(l)** secured by the assets subject to such Asset Sale (other than (A) Indebtedness owing to the Administrative Agent or any Lender under this Agreement or the other Loan Documents and

~~(B)~~ (B) Indebtedness assumed by the purchaser of such asset); provided that, in each case of **clauses (i)** and **(ii)**, costs and expenses shall only be deducted to the extent, that the amounts so deducted are (x) actually paid to a Person that is not an Affiliate of any Obligor or any of its Subsidiaries and (y) properly attributable to such Casualty Event or Asset Sale, as the case may be.

"**_Note_**" means a promissory note, in substantially the form of **Exhibit A** hereto, executed and delivered by the Borrower to any Lender in accordance with **Section ~~2.04~~2.04**.

"**_NY UCC_**" means the UCC as in effect from time to time in New York.

"**_Oaktree Lender_**" means any Lender that is an Affiliate or managed fund or account of Oaktree Capital Management, L.P.

"**_Obligations_**" means, with respect to any Obligor, all amounts, obligations, liabilities, covenants and duties of every type and description owing by such Obligor to any Secured Party (including all Guaranteed Obligations and Warrant Obligations) any other indemnitee hereunder or any participant, arising out of, under, or in connection with, any Loan Document, whether direct or indirect (regardless of whether acquired by assignment), absolute or contingent, due or to become due, whether liquidated or not, now existing or hereafter arising and however acquired, and whether or not evidenced by any instrument or for the payment of money, including, without duplication, (i) if such Obligor is the Borrower, all Loans (including any PIK Interest accrued and capitalized), (ii) all interest, whether or not accruing after the filing of any petition in bankruptcy or after the commencement of any insolvency, reorganization or similar proceeding, and whether or not a claim for post-filing or post-petition interest is allowed in any such proceeding, and (iii) all other fees, expenses (including fees, charges and disbursement of counsel), interest, Prepayment Fee, commissions, charges, costs, disbursements, indemnities and reimbursement of amounts paid and other sums chargeable to such Obligor under any Loan Document.

"**_Obligors_**" means, collectively, the Borrower and the Subsidiary Guarantors and their respective successors and permitted assigns.

"**_OFAC_**" has the meaning assigned to such term in the definition of "Anti-Terrorism Laws."

"**_Off-Balance Sheet Liability_**" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"**Ordinary Course**" means ordinary course of business or ordinary trade activities that are customary for similar businesses in the normal course of their ordinary operations and not while in financial distress and are consistent with past practice.

"**Organic Document**" means, for any Person, such Person's formation documents, including, as applicable, its certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts, investor rights agreements, voting rights agreements, co-sale agreements and similar arrangements applicable to such Person's Equity Interests, or any equivalent document of any of the foregoing.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 5.03(g)5.04**).

"**Participant**" has the meaning set forth in **Section 14.05(e).14.05(e).**

"**Participant Register**" has the meaning set forth in **Section 14.05(e)14.05(e).**

"**Patents**" means all patents and patent applications, including (i) the Inventions and improvements described and claimed therein, (ii) the reissues, divisions, continuations, renewals, extensions, and continuations in part thereof, and (iii) all rights whatsoever accruing thereunder or pertaining thereto throughout the world.

"**Patriot Act**" has the meaning set forth in **Section 14.1914.19**.

"**Payment Date**" means (i) March 31, June 30, September 30 and December 31 of each year, commencing on the first such date to occur after the Closing Date (provided, that if such date is not a Business Day, then on the immediately preceding Business Day); and (ii) the Maturity Date.

"**Payment Recipient**" has the meaning set forth in **Section 12.13(a)**.

"**PBGC**" means the United States Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"***Permits***" means all licenses, permits and certificates of the Borrower and any of its Affiliates used or useful in connection with the ownership, operation, use or occupancy of the Property or the Project.

"***Permitted Acquisition***" means any Acquisition by the Borrower or any of its Subsidiaries, whether by purchase, merger or otherwise; provided that:

(a)       immediately prior to, and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or could reasonably be expected to result therefrom;

(b)       such Acquisition shall comply in all material respects with all applicable Laws and all applicable Governmental Approvals;

(c)       in the case of any Acquisition of Equity Interests of another Person, after giving effect to such Acquisition, all Equity Interests of such other Person acquired by the Borrower or any of its Subsidiaries shall be owned, directly or indirectly, beneficially and of record, by the Borrower or any of its Subsidiaries, and, the Borrower shall cause such acquired Person to satisfy each of the actions set forth in **Section 8.128.12** as required by such Section;

(d)       on a *pro forma* basis after giving effect to such Acquisition, the Borrower and its Subsidiaries shall be in compliance with the financial covenant set forth in **Section 10**;

(e)       to the extent that the purchase price for any such Acquisition is paid in cash, the amount thereof does not exceed $[10,000,000] (or the Equivalent Amount in other currencies) in the aggregate;

(f)       to the extent that the purchase price for any such Acquisition is paid in Equity Interests, all such Equity Interests shall be Qualified Equity Interests;

(g)       in the case of any such Acquisition that has a purchase price in excess of $[35,000,000], (A) the Borrower shall provide to the Administrative Agent (i) at least ten (10) Business Day's prior written notice of any such Acquisition, together with summaries, prepared in reasonable detail, of all due diligence conducted by or on behalf of the Borrower or the applicable Subsidiary, as applicable, prior to such Acquisition, in each case subject to customary confidentiality restrictions, (ii) subject to customary confidentiality restrictions, a copy of the draft purchase agreement related to the proposed Acquisition (and any related documents requested by the Administrative Agent), (iii) pro forma financial statements of the Borrower and its Subsidiaries (as of the last day of the most recently ended fiscal quarter prior to the date of consummation of such Acquisition for which financial statements are required to be delivered pursuant to **Section 8.01(a)8.01(a)** or (**b**)) after giving effect to such Acquisition, and (iv) subject to customary confidentiality restrictions, any other information reasonably requested (to the extent available), by the Administrative Agent and available to the Obligors and (B) to the extent the cash purchase price exceeds $[35,000,000], the Administrative Agent shall have consented to in writing to such Acquisition; and

(h)       no Obligor or any of its Subsidiaries (including any acquired Person) shall, in connection with any such Acquisition, assume or remain liable with respect to (x) any

-28-

Indebtedness of the related seller or the business, Person or assets acquired unless such Indebtedness is permitted under Section 9.01, (y) any Lien on any business, Person or assets acquired unless such Lien is a Permitted Lien, (z) any other liabilities (including Tax, ERISA and environmental liabilities), except to the extent the assumption of such liability could not reasonably be expected to result in a Material Adverse Effect. Any other such Indebtedness, liabilities or Liens not permitted to be assumed, continued or otherwise supported by any Obligor or Subsidiary thereof hereunder shall be paid in full or released within sixty (60) days of the acquisition date as to the business, Persons or properties being so acquired on or before the consummation of such Acquisition.

"***Permitted Cash Equivalent Investments***" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States or any member states of the European Union or any agency or any state thereof having maturities of not more than one (1) year from the date of acquisition, (ii) commercial paper maturing no more than two hundred seventy (270) days after the date of acquisition thereof and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc., (iii) certificates of deposit maturing no more than one (1) year after issue that are issued by any bank organized under the Laws of the United States, or any state thereof, or the District of Columbia, or any U.S. branch of a foreign bank having, at the date of acquisition thereof, combined capital and surplus of not less than $500,000,000 and (iv) any money market or similar funds that exclusively hold any of the foregoing.

"***Permitted Convertible Debt***" means unsecured Indebtedness of the Borrower that (i) contains customary conversion rights for broadly distributed 144A convertible bond transactions as of the date of issuance and (ii) is convertible into shares of common stock of the Borrower, cash or a combination thereof (such amount of cash determined by reference to the price of the Borrower's common stock or such other securities or property), or cash in lieu of fractional shares of common stock of the Borrower; provided that any such indebtedness shall (A) mature, and not be subject to mandatory repurchase or redemption (other than in connection with a customary change of control or "fundamental change" provision), at least 180 days after the Maturity Date, (B) have recourse only to the Borrower and (C) not have an all-in-yield greater than [550] basis points as determined in good faith by the Administrative Agent (with any original issue discount equated to interest based on the convertible debt maturity date and excluding any additional or special interest that may become payable from time to time).

"***Permitted Exclusive License***" means [that certain (i) Agreement for a License and Supply Agreement from SiO2 to Santo, dated as of August 5, 2015, by and between the Borrower and Santo, (ii) Letter Agreement Regarding Exclusive Licenses to SiO2 Technology, dated as of July 11, 2017, by and between Santo and the Borrower and (iii) License Agreement Confirmation and Right to Manufacture Agreement, entered into as of August 20, 2020, by and among the Borrower, Santo and Klinge Biopharma GmbH].

"***Permitted Hedging Agreement***" means a Hedging Agreement entered into by any Obligor in such Obligor's Ordinary Course for the purpose of hedging interest rate risks (and not for speculative purposes) and in an aggregate notional amount for all such Hedging Agreements in excess of 50%, but not more than 100%, of the aggregate principal amount of Loans outstanding at such time.

4877-6890-5580 v.1.1

"**_Permitted Holders_**" means any Person that is an Affiliate or managed fund or account of Oaktree Capital Management, L.P.

"**_Permitted Indebtedness_**" means any Indebtedness permitted under **Section 9.01**.

"**_Permitted Investment_**" means any Investment permitted under **Section 9.05.**

"**_Permitted Financing_**" means Indebtedness in respect of future real estate financing of the Coating Building, including, but not limited to, related purchase money Indebtedness and Capital Lease Obligations and/or equipment purchases financed with purchase money Indebtedness or Capital Lease Obligations; provided that:

4877-6890-5580 v.1.1

(a) the aggregate principal amount of Permitted Financing outstanding at any time shall not exceed $[12,500,000];

(b) the aggregate amount of interest, amortization payments and fees payable in respect of the Permitted Financing in any year shall not exceed $[4,000,000];

(c) the Permitted Financing shall only be secured by Liens on assets permitted pursuant to **Section 9.02(o)**;

(d) the Permitted Financing shall not have a final maturity date or a weighted-average life to maturity that is prior to the date that is ninety-one (91) days after the Maturity Date;

(e) the Borrower shall have delivered copies of the definitive documentation for the Permitted Financing (including any amendment thereto) to the Administrative Agent at least 10 Business Days prior to the execution thereof and such documentation shall be reasonably acceptable to the Majority Lenders;

(f) the Borrower and its Subsidiaries shall use their commercially reasonable efforts to grant a second-priority lien in the assets securing the Permitted Financing to the Administrative Agent for the benefit of the Secured Parties to secure the Obligations and to obtain the consent of the lenders or holders of the Permitted Financing to such security interest;

(g) at any time, the Lenders shall have the right, upon 10 Business Days' notice to the Borrower, to effect a refinancing of the Permitted Financing by either, at the Administrative Agent's discretion: (x) funding a new tranche of loans to the Borrower pursuant to an amendment to this Credit Agreement with the same economic terms as the Permitted Financing in the principal amount required to repay the Permitted Financing in full (and the Borrower shall apply any such new loans to payment in full of the Permitted Financing upon the funding of such loans) or (y) purchasing from the holder or lender of the Permitted Financing the outstanding claims thereunder for a purchase price equal to the outstanding principal amount thereof plus any interest and fees payable thereon; and

(h) all proceeds from Permitted Financing shall be applied solely to fund improvements to the Coating Building.

"***Permitted Hedging Agreement***" means a Hedging Agreement entered into by any Obligor in such Obligor's Ordinary Course for the purpose of hedging interest rate risks (and not for speculative purposes) and in an aggregate notional amount for all such Hedging Agreements in excess of 50%, but not more than 100%, of the aggregate principal amount of Loans outstanding at such time.

"***Permitted Indebtedness***" means any Indebtedness permitted under **Section 9.01**.

"***Permitted Investors***" means [•].

"***Permitted Licenses***" are outbound non-exclusive licenses for the use of the Intellectual Property of any Borrower or any of their Subsidiaries entered into in the Ordinary Course.

"*Permitted Liens*" means any Liens permitted under **Section ~~9.02~~9.02**.

"*Permitted Refinancing*" means, with respect to any Indebtedness permitted to be refinanced, extended, renewed or replaced hereunder, any refinancings, extensions, renewals and replacements of such Indebtedness; <u>provided</u> that such refinancing, extension, renewal or replacement shall not (i) increase the outstanding principal amount of the Indebtedness being refinanced, extended, renewed or replaced, except by an amount equal to accrued interest and any required prepayment premium, (ii) contain terms relating to outstanding principal amount, amortization, maturity, collateral security (if any) or subordination (if any), or other material terms that, taken as a whole, are less favorable in any material respect to the Obligors and their respective Subsidiaries or the Secured Parties than the terms of any agreement or instrument governing such existing Indebtedness, (iii) have an applicable interest rate which does not exceed the greater of (A) the rate of interest of the Indebtedness being replaced and (B) the then applicable market interest rate, (iv) contain any new requirement to grant any Lien or to give any Guarantee that was not an existing requirement of such Indebtedness and (v) after giving effect to such refinancing, extension, renewal or replacement, no Default shall have occurred (or could reasonably be expected to occur) as a result thereof.

~~"*Permitted Second Lien Refinancing*" means a Permitted Refinancing of the Indebtedness under the Second Lien Loan Documents that is consummated on or prior to [•] provided that the Indebtedness in respect of such Permitted Second Lien Refinancing (x) shall be subject to the Second Lien Subordination Agreement as "Subordinated Indebtedness" thereunder (or replacement subordination agreement on terms no less favorable in any respect to the~~ Administrative Agent and the Lenders (as determined by the Administrative Agent and the ~~Lenders) than the Second Lien Subordination Agreement and otherwise acceptable to the Administrative Agent) and (y) shall have covenants, representations and warranties, events of default and other provisions of such Indebtedness no more restrictive on the Obligors and their Subsidiaries in any respect than the Loan Documents (other than any provision placing a cap on the incurrence of Indebtedness hereunder).~~

~~[**"*Permitted Swiss Subsidiary*" means a single wholly-owned Subsidiary of the Obligors organized under the laws of Switzerland that at all times individually constitutes or holds less than one percent (1%) of the Borrower's consolidated total assets and generates less than one percent (1%) of the Borrower's consolidated total revenue measured over the most recent fiscal period for which financial statements were required to have been delivered pursuant to Section 8.01(a) or (b). If at any time the Permitted Swiss Subsidiary constitutes or holds one percent (1%) or more of the Borrower's consolidated total assets or generates one percent (1%) or more of the Borrower's consolidated total revenue, it shall constitute an immediate breach of Section 9.19 and an Event of Default.]~~

~~[**"*Permitted Swiss Subsidiary Operating Expenses*" means (x) cash payroll expenses for employees of the Permitted Swiss Subsidiary for the next ninety (90) day payroll period and (y) cash rent and utility expenses in connection with offices of the Permitted Swiss Subsidiary, in each case incurred in the Ordinary Course due or payable within ninety (90) days of such payment.]~~

~~-32-~~

*[Different first page setting changed from off in original to on in modified.].*

"**Person**" means any individual, corporation, company, voluntary association, partnership, limited liability company, joint venture, trust, unincorporated organization or Governmental Authority or other entity of whatever nature.

"~~**Petition Date**" has the meaning set forth in the recitals hereto.~~ "**Plan**" has the meaning set forth in the recitals hereto.

"**PIK Interest**" has the meaning set forth in **Section 3.02(c)**.

"**Plan**" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Prepayment Fee**" means with respect to any repayment or prepayment of all or any portion of the Loans or any requirement to repay or prepay any Loans, whether by optional or mandatory prepayment, acceleration or otherwise, occurring (i) on or prior to the date that is ~~[18~~36 months~~]~~ after the Closing Date, an amount equal to the amount of interest ~~(calculated on a net present value basis using a discount rate equal to the Treasury Rate as of the applicable date of such repayment or prepayment plus 0.50%)~~ that would have been paid on the principal amount of the Loans being so repaid or prepaid for the period from and including the date of such repayment or prepayment to but excluding the date that is ~~[18~~36 months~~]~~ after the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans that is in effect on the date of such repayment or prepayment and on the basis of actual days elapsed over a year of three hundred sixty (360) days), *plus ~~[~~*three percent (3%)~~)]~~ of the principal amount of the Loans being so repaid or prepaid and the Commitments being so terminated, (ii) at any time after the date that is ~~[18~~36 months~~]~~ after the Closing Date but on or prior to the date that is ~~[30~~48 months~~]~~ after the Closing Date, an amount equal to [three percent (3%)~~] of the aggregate outstanding principal amount of the Loans being so repaid or prepaid,~~ and (iii) if the repayment or prepayment is made after the date that is ~~[30~~48 months~~]~~ after the Closing Date, [0]%~~; provided, that if the Obligations are prepaid in full, but not in part, on or prior to [•] and prior to any acceleration (whether pursuant to the terms of this Agreement, by operation of law or otherwise (including, without limitation, on account of any bankruptcy filing)), with the proceeds from the issuance of new Equity Interests or the incurrence of new Indebtedness of the Borrower, the Prepayment Fee shall be an amount equal to the greater of (x) $[7,500,000] less the amount of interest accrued on the Loans after the Closing Date and through the date of such prepayment and (y)~~ zero.%.

~~Notwithstanding anything herein to the contrary, no Prepayment Fee shall be payable (i) in connection with mandatory prepayment made pursuant to **Section 3.03(b)(iii)** or (ii) in connection with the payment of any Revenue Cure Payment.~~

"**Prepayment Price**" has the meaning set forth in **Section ~~3.03(a)(i)~~3.03(a)(i)**.

"~~**Primary Equity Financing**" means a primary equity financing by the Borrower to a bona fide third party or third parties for the sale of Equity Interests of the Borrower that are not~~

-33-

Disqualified Equity Interests, on terms reasonably acceptable to the Administrative Agent and the Majority Lenders.

"***Pro Forma Basis***" or "***pro forma basis***" shall mean, with respect to the calculation of any financial ratio, as of any date, that *pro forma* effect will be given to the Transactions, any Permitted Acquisition, any issuance, incurrence, assumption or permanent repayment of Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transaction and for which any such financial ratio is being calculated), all sales, transfers and other dispositions or discontinuance of any subsidiary, line of business or division, or any conversion of a Subsidiary Guarantor to Subsidiary or of a Subsidiary to a Subsidiary Guarantor, in each case that have occurred during the four consecutive fiscal quarter period of the Borrower being used to calculate such financial ratio (the "***Reference Period***"), or subsequent to the end of the Reference Period but prior to such date or prior to or simultaneously with the event for which a determination under this definition is made (including any such event occurring at a person who became a Restricted Subsidiary after the commencement of the Reference Period), as if each such event occurred on the first day of the Reference Period.

Whenever *pro forma* effect is given to any of the foregoing, pro forma calculations shall be made in good faith by a Responsible Officer of the Borrower giving effect to any synergies that the Borrower in good faith reasonably anticipates to be realized within 12 months of the date of any relevant transaction that could then be reflected in pro forma financial statements in accordance with Regulation S-X and not exceeding 15% of EBITDA, in the aggregate, for such period after giving effect thereof and (b) any cost savings that could then be reflected in pro forma financial statements in accordance with Regulation S-X promulgated under the Securities Act or any other regulation or policy of the SEC, in each case, as though such cost savings and synergies had been realized on the first day of the applicable Reference Period and net of the amount of actual benefits realized during such period from such action.

"***Product***" means (i) those products (and described in reasonable detail) on **Schedule 2** attached hereto, and (ii) any current or future product developed, distributed, dispensed, imported, exported, labeled, promoted, manufactured, licensed, marketed, sold or otherwise commercialized by any Obligor or any of its Subsidiaries, including any such product in development or which may be developed.

"***Product Authorizations***" means any and all Governmental Approvals, whether U.S. or non-U.S. (including all applicable Product Standards, supplements, amendments, pre- and post-approvals, governmental price and reimbursement approvals and approvals of applications for regulatory exclusivity) of any Regulatory Authority, in each case, necessary to be held or maintained by, or for the benefit of, any Obligor or any of its Subsidiaries for the ownership, use or commercialization of any Product or for any Product Commercialization and Development Activities with respect thereto in any country or jurisdiction.

"***Product Commercialization and Development Activities***" means, with respect to any Product, any combination of research, development, manufacture, import, use, sale, licensing, importation, exportation, shipping, storage, handling, design, labeling, marketing, promotion, supply, distribution, testing, packaging, purchasing or other commercialization activities, receipt of payment in respect of any of the foregoing (including, without limitation, in respect of

licensing, royalty or similar payments), or any similar or other activities the purpose of which is to commercially exploit such Product.

"***Product Standards***" means all safety, quality and other specifications and standards applicable to any Product, including all pharmaceutical, biological and other standards promulgated by Standards Bodies.

"***Prohibited Payment***" means any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment) to any officer, employee or ceremonial office holder of any government or instrumentality thereof, political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing that is prohibited under any Law for the purpose of influencing any act or decision of such payee in his official capacity, inducing such payee to do or omit to do any act in violation of his lawful duty, securing any improper advantage or inducing such payee to use his influence with a government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality.

"***Project***" means the prefilled syringe production facility located on the Property, infrastructure for such facility and amenities related thereto, as they may at any time exist.

"***Property***" means the real property situated in the County upon which the Project is located.

"***Proportionate Share***" means, with respect to any Lender, the percentage obtained by dividing (i) the sum of the outstanding principal amount of the Loans of such Lender then in effect by (ii) the sum of the outstanding principal amount of the Loans of all Lenders then in effect.

"***Qualified Equity Interest***" means, with respect to any Person, any Equity Interest of such Person that is not a Disqualified Equity Interest.

"***Qualified IPO/SPAC Transaction***" means an IPO/SPAC Transaction pursuant to which the following requirements are met: (a) both before and after giving effect to the IPO/SPAC Transaction, no Default or Event of Default shall have occurred and be continuing, (b) such IPO/SPAC Transaction shall be consummated based on an implied enterprise value of Borrower of not less than $[1,500,000,000], with total cash proceeds (including cash investments pursuant to any "PIPE" transaction, backstop investment, conversion of sponsor notes and cash available in the trust account (after redemptions and payment of any deferred underwriting expenses and transaction expenses not related to the IPO/SPAC Transaction)) of not less than $[400,000,000], net of any underwriting discount and commissions, and (i) the Borrower's and its Subsidiaries' balance sheet cash plus (ii) cash on the Surviving Company's working capital balance sheet on the date of the consummation of the IPO/SPAC Transaction is not less than $[200,000,000], (c) all Indebtedness of the Borrower and its Subsidiaries that is convertible into Equity Interests of the Borrower outstanding on or prior to such Qualified IPO/SPAC Transaction shall have been converted into Equity Interests in full in accordance with its respective terms, (d) to the extent the Surviving Company is not the Borrower (or its direct or indirect parent), such Surviving

Company shall have assumed each of the Warrants pursuant to documentation in form and substance reasonably acceptable to the Administrative Agent and (e) the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer of the Borrower certifying as to the consummation of such transaction and the satisfaction of each of the foregoing criteria along with copies of all definitive documentation relating thereto.

"**Qualified Plan**" means an employee benefit plan (as defined in Section 3(3) of ERISA) other than a Multiemployer Plan (i) that is or was at any time maintained or sponsored by any Obligor or any ERISA Affiliate thereof or to which any Obligor or any ERISA Affiliate thereof has ever made, or was ever obligated to make, contributions, and (ii) that is intended to be tax qualified under Section 401(a) of the Code.

"**R+D Promissory Note**" means the Promissory Note, executed by the Borrower in favor of R+D Custom Automation, Inc., in the original principal amount of $3,500,000.

"**Qualified Private Financing Transaction**" means a private financing transaction that is economically equivalent to a Qualified IPO/SPAC Transaction, as determined by the Administrative Agent in its sole discretion, with an investor that is acceptable to the Administrative Agent in its sole discretion.

"**Qualifying Transaction**" means the first IPO/SPAC Transaction or one or more Primary Equity Financings consummated after the Effective Date, in each case, with unencumbered net cash proceeds received by the Borrower, or the relevant Surviving Company, as applicable, of not less than $[150,000,000] in the aggregate.

"**Real Property Security Documents**" means any Mortgage Deliverables, Landlord Consents or Bailee Letters.

"**Recipient**" means any Lender or any other recipient of any payment to be made by or on account of any Obligation.

"**Register**" has the meaning set forth in Section 14.05(d)**14.05(d)**.

"**Regulation T**" means Regulation T of the Board of Governors of the Federal Reserve System, as amended.

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System, as amended.

"**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System, as amended.

"**Regulatory Approvals**" mean, with respect to a Product, the approval of the applicable Regulatory Authority necessary for the testing, manufacturing, use, storage, supply, promotion, marketing or sale of such Product for a particular indication in a particular jurisdiction.

"**Regulatory Authority**" means any Governmental Authority, whether U.S. or non-U.S., that is concerned with or has regulatory or supervisory oversight with respect to any Product or any Product Commercialization and Development Activities relating to any Product.

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 272 of 468
(continued)

"*Reinvestment*" has the meaning set forth in **Section 3.03(b)(i)**.

4877-6890-5580 v.1.1

"***Reinvestment Period***" has the meaning set forth in **Section ~~3.03(b)~~3.03(b)(i)**.

"***Related Parties***" or "***Related Persons***" has the meaning set forth in **Section ~~14.16~~14.16**. ~~{~~

"***Renasant Indebtedness***" means the Indebtedness outstanding under that certain Amended and Restated Credit Agreement dated as of February 26, 2021 by and among the Borrower, as the borrower, and Renasant Bank, as lender, as in effect as of the Closing Date and without giving effect to any amendments, modifications, waivers, supplements or restatements thereafter.~~}~~

"***Resignation Effective Date***" has the meaning set forth in **Section 12.09**.

"***Resolution Authority***" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"***Responsible Officer***" of any Person means each of the president, chief executive officer, chief financial officer and similar officer of such Person.

"***Restricted Payment***" means any dividend or other distribution (whether in cash, Equity Interests or other property) with respect to any Equity Interests of any Obligor or any of its Subsidiaries, or any payment (whether in cash, Equity Interests or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests of any Obligor or any of its Subsidiaries, or any option, warrant or other right to acquire any such Equity Interests of any Obligor or any of its Subsidiaries~~; provided that any payments on Permitted Convertible Debt (prior to conversion thereof) shall not be Restricted Payments~~.

"***Restrictive Agreement***" means any Contract or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of any Obligor or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its properties or assets (other than (x) customary provisions in Contracts (including without limitation leases and in bound licenses of Intellectual Property) restricting the assignment thereof and (y) restrictions or conditions imposed by any Contract governing secured Permitted Indebtedness permitted under **Section ~~9.01(j)~~9.01(j)**, to the extent that such restrictions or conditions apply only to the property or assets securing such Indebtedness), or (ii) the ability of any Obligor or any of its Subsidiaries to make Restricted Payments with respect to any of their respective Equity Interests or to make or repay loans or advances to any other Obligor or any of its Subsidiaries or such other Obligor or to Guarantee Indebtedness of any other Obligor or any of its Subsidiaries thereof or such other Obligor.

"***Revenue***" means, for any relevant fiscal period, the consolidated revenues of the Borrower and its Subsidiaries for such fiscal period solely to the extent consisting of product net sales, as recognized on the income statement of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that in no event shall any payments received in connection with any arrangement with the Biomedical Advanced Research and Development Authority (or any successor) be included in Revenue.

"***Sanction***" means any international economic or financial sanction or trade embargo imposed, administered or enforced from time to time by the United States Government (including,

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD TABLE OF CONTENTS Doc 500 Filed 08/03/23 Page 274 of 468
(continued)

without limitation, OFAC), the United Nations Security Council, the European Union or its Member States, His Majesty's Treasury or other relevant sanctions authority where the Borrower is located or conducts business.

4877-6890-5580 v.1.1

"***Revenue Cure Payment***" means, with respect to any period, the greater of (x) $[10,000,000] and (y) the amount by which Revenue with respect to such period is less than the Minimum Revenue for such period.

["***RSA Indebtedness***" means the Indebtedness outstanding under that certain Master Loan Agreement dated as of March 15, 2012 (as amended, modified, supplemented or extended from time to time in accordance with the terms hereof) by and among the Borrower, as the borrower, certain of the Borrower's Subsidiaries, The Employees' Retirement System of Alabama, The Teachers' Retirement System of Alabama, as lenders, and The Teachers' Retirement System of Alabama as the administrative agent for the lenders.]

"***Sanction***" means any international economic or financial sanction or trade embargo imposed, administered or enforced from time to time by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union or its Member States, His Majesty's Treasury or other relevant sanctions authority where the Borrower is located or conducts business.

"***Sanctioned Person***" means, at any time, (i) any Person listed in any Sanctions-related list of designated Persons maintained by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union or its Member States, Her Majesty's Treasury, or other relevant sanctions authority, (ii) any Person organized or resident in a Designated Jurisdiction or (iii) any Person fifty percent (50%) or more owned or is controlled by any such Person or Persons described in the foregoing **clause (i) or (ii)**.

["***Santo***" means Santo Holding (Deutschland) GmbH, a company incorporated under the laws of Germany.]

["***Second Lien Administrative Agent***" means [•], together with its successors and permitted assigns.]

["***Second Lien Credit Agreement***" means that certain Second Lien Credit Agreement and Guaranty, dated as of [•] by and between the Borrower, the Guarantors, as guarantors, the lenders from time to time party thereto and [•], as administrative agent, as amended, modified or replaced from time to time to the extent permitted hereunder and under the Second Lien Subordination Agreement.]

["***Second Lien Indebtedness***" means the Indebtedness incurred pursuant to the Second Lien Credit Agreement.]

["***Second Lien Loan Documents***" means each "Loan Document" (as defined in the Second Lien Credit Agreement as in effect on the date hereof).]

["***Second Lien Subordination Agreement***" means that certain Subordination and Intercreditor Agreement, dated as of [•], by and among the Administrative Agent, as senior agent, [•], as subordinated agent, each of the lenders under the Second Lien Credit Agreement, as subordinated creditors, and the Borrower, as amended, modified or replaced from time to time.]

-40-

"***Secured Parties***" means the Lenders, the Administrative Agent and any of their respective permitted transferees or assigns.

"***Securities Act***" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"***Security Agreement***" means the Security Agreement, delivered pursuant to Section ~~6.01(i)~~**6.01(i)**, among the Obligors and the Administrative Agent, granting a security interest in the Obligors' personal property in favor of the Administrative Agent, for the benefit of the Secured Parties (and as amended, modified or replaced from time to time with the consent of the Administrative Agent).

"***Security Documents***" means, collectively, the Security Agreement, each Short-Form IP Security Agreement, each Real Property Security Document, and each other security document, control agreement or financing statement required or recommended to perfect Liens in favor of the Secured Parties for purposes of securing the Obligations.

~~["***Shareholders Agreement***" means the Shareholders Agreement by and among the Borrower and the stockholders party thereto, dated as of [•], 2023.]~~

"***Short-Form IP Security Agreements***" means short-form Copyright, Patent or Trademark (as the case may be) security agreements, dated as of the Closing Date and substantially in the form of Exhibits C, D and E to the Security Agreement, entered into by one or more Obligors in favor of the Secured Parties, each in form and substance satisfactory to the Administrative Agent (and as amended, modified or replaced from time to time).

"***Solvent***" means, as to any Person as of any date of determination, that on such date

(i) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (ii) the present fair saleable value of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (iii) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (iv) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital. The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"***Specified Assets***" means all production facilities of the Obligors currently owned or in which any Obligor has a lessee interest pursuant to a ground lease or that may in the future be acquired or created, including the facilities located at 2250 Riley Street, Auburn, AL, all property, plant and equipment associated with such facilities, and all infrastructure for such facilities and amenities related thereto.

~~"***Specified Key Person***" means each of [•].~~

"***Standards Bodies***" means any of the organizations that create, sponsor or maintain safety, quality or other standards, including ISO, ANSI, CEN and SCC and the like.

"***Step-Down Period***" means any period (i) commencing on the date on which the Borrower has delivered audited financial statements to the Administrative Agent pursuant to **Section 8.01(b)** and related compliance certificate pursuant to **Section 8.01(c)** demonstrating that the EBITDA of the Borrower and its Subsidiaries with respect to such fiscal year is greater than or equal to $[55,000,000] and (ii) ending on the date subsequent to the date referred to in clause (i) on which either (x) the Borrower has delivered financial statements pursuant to **Section 8.01(a) or (b)** and related compliance certificate pursuant to **Section 8.01(c)** demonstrating that the EBITDA of the Borrower and its Subsidiaries with respect to the period of four consecutive fiscal quarters covered by such financial statements is less than $[55,000,000] or (y) Borrower has failed to deliver any such financial statements or compliance certificates in accordance with **Section 8.01** hereof.

"***Subsidiary***" means, with respect to any Person (the "***parent***") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (i) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests are, as of such date, owned, controlled or held, directly or indirectly, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more direct or indirect subsidiaries of the parent or by the parent and one or more direct or indirect subsidiaries of the parent. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"***Subsidiary Guarantors***" means each Subsidiary of the Borrower identified under the caption "SUBSIDIARY GUARANTORS" on the signature pages hereto and each Subsidiary of the Borrower that becomes, or is required to become, a "Subsidiary Guarantor" after the Closing Date pursuant to **Section 8.12(a)8.12(a)** or **8.12(b)8.12(b)**.

["***Swiss Law Share Pledge***" means a pledge agreement in favor of the Administrative Agent, for the benefit of the Secured Parties, in respect of all outstanding issued Equity Interests of the Permitted Swiss Subsidiary, which shall be delivered in accordance with, and enforceable pursuant to, the laws of Switzerland.]

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"***Term Loan***" has the meaning assigned to such term in **Section 2.01**.

"***Termination Conditions***" has the meaning set forth in **Section 13.03**.

"**Title IV Plan**" means an employee benefit plan (as defined in Section 3(3) of ERISA) other than a Multiemployer Plan (i) that is or was at any time maintained or sponsored by any Obligor or any ERISA Affiliate thereof or to which any Obligor or any ERISA Affiliate thereof has ever made, or was obligated to make, contributions, and (ii) that is or was subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA.

"**Trade Secrets**" means all know-how, trade secrets and other proprietary or confidential information, any information of a scientific, technical, or business nature in any form or medium, Inventions and Invention disclosures, all documented research, developmental, demonstration or engineering work (including all novel manufacturing methods), and all other technical data and information related thereto.

"**Trademarks**" means all trade names, trademarks and service marks, trade dress, corporate names, logos, Internet domain names, IP addresses, social media handles, uniform resource locators and other indicia of origin, trademark and service mark registrations, and applications for trademark and service mark registrations, whether or not registered, and any and all common law rights thereto, including (i) all renewals of trademark and service mark registrations and (ii) all rights whatsoever accruing thereunder or pertaining thereto throughout the world, together, in each case, with the goodwill of the business connected with the use thereof and symbolized thereby.

"**Transactions**" means (a) the Exit Transaction, (b) the funding (or deemed funding) of the Term Loan and (c) the payment of fees, commissions, costs and expenses in connection with the foregoing.

"~~**Treasury Rate**~~" ~~means, as of any date of determination, the yield to maturity as of such date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the date of determination to the date that is 18 months after the Closing Date; provided, however, that if the period from such date to the date that is 18 months after the Closing Date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.~~

"**UCC**" means, with respect to any applicable jurisdictions, the Uniform Commercial Code as in effect in such jurisdiction, as may be modified from time to time.

"**UK Financial Institutions**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 279 of 468
(continued)

"***United States***" or "***U.S.***" means the United States of America, its fifty states and the District of Columbia.

~~"***USPTO***" has the meaning set forth in **Section 8.22(c)**.~~

"***U.S. Person***" means a "United States Person" within the meaning of Section 7701(a)(30) of the Code.

"***U.S. Tax Compliance Certificate***" has the meaning set forth in Section ~~5.03~~5.03(f)(ii)~~(f)(ii)~~(B)(3). "

"***Warrant Obligations***" means all Obligations of Borrower arising out of, under or in connection with the Warrants.

"***Warrants***" means the Warrants, dated as of the Closing Date and delivered to the Lenders pursuant to the Approved Plan.

"***Withdrawal Liability***" means, at any time, any liability incurred (whether or not assessed) by any ERISA Affiliate and not yet satisfied or paid in full at such time with respect to any Multiemployer Plan pursuant to Section 4201 of ERISA.

"***Withholding Agent***" means the Borrower and the Administrative Agent.

"***Write-Down and Conversion Powers***" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which ~~write-down~~write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.02        Accounting Terms and Principles**. Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under **Section 10** and any definitions used in such calculations) shall be made, in accordance with GAAP. Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Borrower and its Subsidiaries, in each case without duplication. If the Borrower requests an amendment to any provision hereof to eliminate the effect of (a) any change in GAAP or the application thereof or (b) the issuance of any new accounting rule or guidance or in the application thereof, in each case, occurring after the date of this Agreement, then the Lenders and Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change or issuance with the intent of having the respective positions of the Lenders and Borrower after such change or issuance conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, (i) the provisions in this Agreement shall be calculated as if no such change or issuance has occurred and (ii) the Borrower shall provide to the Lenders a written reconciliation in form and substance reasonably satisfactory to the Lenders, between calculations of any baskets and other requirements hereunder before and after giving effect to such change or issuance. For purposes of the

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 280 of 468
(continued)

definition of Indebtedness and related covenants, GAAP will be deemed to treat any operating lease as an operating lease and not a capital lease,

4877-6890-5580 v.1.1

regardless of any change in GAAP as a result of ASU 2016-02, Leases (Topic 842) by the Financial Accounting Standards Board to the extent such operating lease was so treated under GAAP as in effect for any fiscal year of Borrower beginning before December 15, 2018.

**1.03** **Interpretation**. For all purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires,

(a)    the terms defined in this Agreement include the plural as well as the singular and vice versa;

(b)    words importing gender include all genders;

(c)    any reference to a Section, Annex, Schedule or Exhibit refers to a Section of, or Annex, Schedule or Exhibit to, this Agreement;

(d)    any reference to "this Agreement" refers to this Agreement, including all Annexes, Schedules and Exhibits hereto, and the words herein, hereof, hereto and hereunder and words of similar import refer to this Agreement and its Annexes, Schedules and Exhibits as a whole and not to any particular Section, Annex, Schedule, Exhibit or any other subdivision;

(e)    references to days, months and years refer to calendar days, months and years, respectively;

(f)    all references herein to "include" or "including" shall be deemed to be followed by the words "without limitation";

(g)    the word "from" when used in connection with a period of time means "from and including" and the word "until" means "to but not including";

(h)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer broadly to any and all assets and properties, whether tangible or intangible, real or personal, including cash, securities, rights under contractual obligations and permits and any right or interest in any such assets or property;

(i)    accounting terms not specifically defined herein (other than "property" and "asset") shall be construed in accordance with GAAP, subject to **Section 1.02**;

(j)    the word "will" shall have the same meaning as the word "shall";

(k)    where any provision in this Agreement or any other Loan Document refers to an action to be taken by any Person, or an action which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or, to the knowledge of such Person, indirectly; and

(l)    references to any Lien granted or created hereunder or pursuant to any other Loan Document securing any Obligations shall deemed to be a Lien for the benefit of the Secured Parties.

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500-1   Filed 08/03/23   Page 282 of 468
(continued)

Unless otherwise expressly provided herein, references to organizational documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto permitted by the Loan Documents. Any definition or reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

If any payment required to be made pursuant to the terms and conditions of any Loan Document falls due on a day which is not a Business Day, then such required payment date shall be extended to the immediately following Business Day. For purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Obligors and their Subsidiaries will be deemed to be equal to 100% of the outstanding principal amount thereof or payment obligations with respect thereto at the time of determination thereof, or with respect to any Hedging Agreements, the amount that would be payable if the agreement governing such Hedging Agreements were terminated on the date of termination.

1.04        **Effectuation of Exit Transaction**. All references herein to the Borrower and its Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the Borrower and the other parties to this Agreement contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Exit Transactions to occur on the Closing Date, unless the context otherwise requires.

1.05        **Division**. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws) (a "*Division*"), if (a) any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

**SECTION 2. SECTION 2.**
**THE COMMITMENT AND THE LOANS**

2.01        **Loans**.

(a)        Subject to the satisfaction of the conditions set forth in Section 6.01 and this Section 2.01(a), on the Closing Date, and subject to the terms in this Agreement and in reliance on the representations and warranties in the Loan Documents an and the Confirmation Order, each Lender severally but not jointly agrees to make and shall be deemed to have made to the Borrower, a single term loan, on a cashless basis, in a principal amount equal to the principal amount set forth opposite such Lender's name in Appendix A ("*Term Loan*").

(b)        No amounts paid or prepaid with respect to any Loan may be reborrowed.

(c)        Any term or provision hereof (or of any other Loan Document) to the contrary notwithstanding, Loans deemed to have been made to the Borrower will be denominated solely in Dollars and will be repayable solely in Dollars and no other currency.

-47-

**2.02**     **Borrowing Procedures**. At least ~~five~~ one(~~5~~1) Business Day~~s~~ prior to the Closing Date, the Borrower shall deliver to the Administrative Agent an irrevocable ~~Funding~~Borrowing Notice in the form of **Exhibit B** signed by a duly authorized representative of the Borrower (which notice, if received by the Administrative Agent on a day that is not a Business Day or after 10:00 A.M. (Eastern time) on a Business Day, shall be deemed to have been delivered on the next Business Day).  The Borrowing Notice shall be for the full amount of the Term Loans and no Borrowing Notice for less than such full amount shall be permitted.

**2.03**     **[Reserved]**~~.~~.

**2.04**     **Notes**. If requested by any Lender, the Loan of such Lender shall be evidenced by one or more Notes. The Borrower shall prepare, execute and deliver to the Lender such promissory note(s) substantially in the form attached hereto as **Exhibit A**.

**2.05**     **Use of Proceeds**~~Use of Proceeds~~. The Borrower shall use the proceeds of the Term Loan ~~for working capital and general corporate purposes, including the payment of fees and expenses associated with this Agreement~~to refinance certain existing Indebtedness owed to the Lenders pursuant to the Approved Plan.

**2.06**     **Incremental Loans**.

        (a)     The Borrower may at any time and from time to time after the Closing Date, subject to the terms and conditions set forth herein, with the approval of the Majority Lenders, by notice to the Administrative Agent, request one or more additional Classes of term loans or additional term loans of the same Class of any existing Class of term loans (the "Incremental Term Loans" or the "Incremental Facilities"); provided that, after giving effect to the effectiveness of any Incremental Facility Amendment referred to below and at the time that any such Incremental Term Loan is made or effected, no Event of Default shall have occurred and be continuing or would result therefrom. Notwithstanding anything to contrary herein, the sum of the aggregate principal amount of the Incremental Facilities shall not at the time of incurrence of any such Incremental Facilities (and after giving effect to such incurrence) exceed $60,000,000.

        (b)     Each Incremental Term Loan shall be on the same terms as, and shall be treated for all purposes as, the initial Term Loans made on the Closing Date.  Incremental Term Loan may be provided by existing Lenders or Additional Lenders acceptable to the Administrative Agent and Majority Lenders, in their sole discretion.  Each Incremental Term Loan shall be in a minimum principal amount of $1,000,000 and integral multiples of $500,000 in excess thereof (unless the Borrower and the Administrative Agent otherwise agree); provided that such amount may be less than $1,000,000, if such amount represents all the remaining availability under the aggregate principal amount of Incremental Term Loans set forth above.

        (c)     Each notice from the Borrower pursuant to this **Section 2.06** shall set forth the requested amount of the relevant Incremental Term Loans.

        (d)     Commitments in respect of Incremental Term Loans shall become commitments under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such commitment (provided that no Lender shall be

-48-

obligated to provide any loans or commitments under any Incremental Facility unless it so agrees), if any, each Additional Lender and the Administrative Agent. Incremental Term Loans shall be a "Loan" for all purposes of this Agreement and the other Loan Documents. The Incremental Facility Amendment may without the consent of any other Lenders (except to the extent Lender consent is otherwise provided for herein), effect such amendments to this Agreement and the other Loan Documents as may be necessary, appropriate or advisable, in the opinion of the Administrative Agent and the Borrower, to effect the provisions of this **Section 2.06**. The effectiveness of any Incremental Facility Amendment and the occurrence of any credit event (including the making of a Loan) pursuant to such Incremental Facility Amendment may be subject to the satisfaction of such additional conditions as the parties thereto shall agree. The Borrower and any Subsidiary Guarantor may use the proceeds of the Incremental Term Loans for any purpose not prohibited by this Agreement.

(e)    Notwithstanding anything to the contrary, this **Section 2.06** shall supersede any provisions in **Section 14.04** to the contrary.

## SECTION 3. ~~SECTION 3.~~
### PAYMENTS OF PRINCIPAL AND INTEREST, ETC.

**3.01    Scheduled Repayments and Prepayments Generally; Application**. The Borrower hereby promises to pay to the Administrative Agent for the account of each Lender (as such amounts may in each case be reduced from time to time in accordance with **Section ~~3.03~~3.03**) on the Maturity Date, all outstanding Obligations in full (together with accrued and unpaid interest and any other accrued and unpaid charges thereon and all other obligations due and payable by the Borrower under this Agreement). Except as otherwise provided in this Agreement, each payment (including each repayment and prepayment) by the Borrower (other than fees payable pursuant to the Fee Letter) will be deemed to be made ratably in accordance with the Lenders' Proportionate Shares. On any date occurring prior to the Maturity Date that payment or prepayment in full of the Loans hereunder occurs, the Borrower shall pay in full all outstanding Obligations, which shall include the Prepayment Fee, if applicable.

**3.02    Interest~~:~~.**

(a)    **Interest Generally**. The outstanding principal amount of the Loans shall accrue interest from the date made to repayment (whether by acceleration or otherwise and whether voluntary or mandatory) at the Interest Rate.

(b)    **Default Interest**. Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, the Interest Rate shall increase automatically by two percent (2.0%) *per annum* (the Interest Rate, as increased pursuant to this **Section ~~3.02(b)~~3.02(b)**, being the "***Default Rate***"). If any Obligation (other than Warrant Obligations but including, without limitation, fees, costs, and expenses ~~payable~~ hereunder) is not paid when due (giving effect to any applicable grace period) under any applicable Loan Document, the amount thereof shall accrue interest at the Default Rate.

(c)      **Interest Payment Dates**. Accrued interest on the Loans shall be payable in arrears on each Payment Date in cash, and upon the payment or prepayment of the Loans (on the principal amount being so paid or prepaid); provided that interest payable at the Default Rate shall also be payable in cash from time to time on demand by the Administrative Agent; provided, further, that (i) with respect to any Payment Date occurring within [twelvetwenty-four (1~~24~~) months] after the Closing Date[, so long as such Payment Date is not occurring during a Step-Down Period,] the Borrower may, at its option, elect by written notice to the Administrative Agent by 10:00 a.m. (Eastern time) three (3) Business Days prior12.0% per annum and (ii) with respect to any Payment Date that up [•]thereafter, 6.0% per annum, of the interest for the applicable period shall be payable in kind by capitalizing and adding such interest to the outstanding principal amount of the Loans on such Payment Date ("***PIK Interest***")[, provided, further that unless the Borrower may not elects any, by written notice to the Administrative Agent at least three (3) Business Days prior to any Payment Date, to pay all of such interest to bein cash instead of as PIK Interest if, as of such election date, any Permitted Convertible Debt has been incurred pursuant to **Section 9.01(p)**]. At any time on or after [twelve (12) months] following the Closing Date, all interest shall be paid in cash. The PIK Interest shall be automatically capitalized on the applicable Payment Date by adding the amount thereof to the outstanding principal amount of the Loans.  For purposes of this Agreement and the other Loan Documents, the amounts so capitalized pursuant to this **Section 3.02** shall constitute a portion of the principal amount outstanding of the Loans hereunder and shall bear interest in accordance with this **Section 3** and all references herein or in any other Loan Document to the principal amount of the Loans shall include all interest accrued and capitalized as a result of any payment of PIK Interest.

**3.03**      **Prepayments~~.~~:**

(a)      **Optional Prepayments.**

(i)      Subject to prior written notice pursuant to **clause (ii)** below, the Borrower shall have the right upon written notice to the Administrative Agent pursuant to **Section 3.03(a)(ii)3.03(a)(ii)** below to optionally prepay in whole or in part the outstanding principal amount of the Loans on any Business Day for an amount equal to the sum of (A) the aggregate principal amount of the Loans being prepaid, (B) any accrued but unpaid interest on the principal amount of the Loans being prepaid, (C) any applicable Prepayment Fee and (D) other unpaid amounts then due and owing pursuant to this Agreement and the other Loan Documents (such aggregate amount, the "***Prepayment Price***"); provided that each partial prepayment of principal of Loans shall be in an aggregate amount at least equal to $5,000,000 and integral multiples of
$1,000,000 in excess thereof (or, if less, the remaining principal amount of the outstanding Loans hereunder).

(ii)      A notice of optional prepayment shall be effective only if received by the Administrative Agent not later than 2:00 p.m. (Eastern time) on a date not less than three (3) (nor more than five (5)) Business Days prior to the proposed prepayment date; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or

-50-

prior to the specified date of prepayment) if such condition is not satisfied. Each notice of optional prepayment shall specify the proposed prepayment date, the Prepayment Price, the principal amount to be prepaid and any conditions to prepayment (if applicable).

4877-6890-5580 v.1.1

(b)     **Mandatory Prepayments.**

(i)     **Mandatory Prepayments for Casualty Events or Asset Sales**. Upon the occurrence of any Casualty Event or Asset Sale (that is not otherwise permitted by **Section 9.09~~9.09~~** (other than pursuant to clause (l) thereof), the Borrower shall make a mandatory prepayment of the Loans in an amount equal to the sum of (i) one hundred percent (100%) of the Net Cash Proceeds received by the Borrower or any of its Subsidiaries with respect to such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, as the case may be, (ii) any accrued but unpaid interest on any principal amount of the Loans being prepaid and (iii) any applicable Prepayment Fee; provided that, so long as no Default has occurred and is continuing or shall result therefrom, if, ~~within fifteen (15) Business Days~~ following the occurrence of any such Casualty Event or Asset Sale as a result of which the Borrower or any of its Subsidiaries receives Net Cash Proceeds in an aggregate amount less than $[1~~0~~5,000,000~~]~~ and $[3~~5~~0,000,000~~]~~ in the aggregate for all such Casualty Events or Asset Sales over the term of this Agreement), a Responsible Officer of the Borrower delivers to the Administrative Agent a notice to the effect that the Borrower or the applicable Subsidiary intends to apply the Net Cash Proceeds from such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, to reinvest in the business of the Borrower or any of its Subsidiaries (a "***Reinvestment***"), then such Net Cash Proceeds of such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event may be applied for such purpose in lieu of such mandatory prepayment to the extent such Net Cash Proceeds of such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event are actually applied for such purpose; provided, further, that, if such Casualty Event or Asset Sale occurs with respect to any Obligor, such Reinvestment shall be made in the business of an Obligor; provided, further, that, in the event that Net Cash Proceeds have not been so applied within three hundred sixty-five (365) days (the "***Reinvestment Period***") following the occurrence of such Casualty Event or Asset Sale (or, if the Borrower or any of its Subsidiaries has entered into a binding commitment prior to the last day of such Reinvestment Period to reinvest such proceeds no later than one hundred eighty (180) days following the last day of the Reinvestment Period, one hundred eighty (180) days after the expiry of the Reinvestment Period), the Borrower shall no later than the end of such period make a mandatory prepayment of the Loans in an aggregate amount equal to the sum of (i) one hundred percent (100%) of the unused balance of such Net Cash Proceeds received by any Obligor or any of its Subsidiaries with respect to such Asset Sale or insurance proceeds or condemnation awards in respect of such Casualty Event, (ii) any accrued but unpaid interest on any principal amount of the Loans being prepaid and (iii) any applicable Prepayment Fee.

(ii)     **Mandatory Prepayments for Debt Issuances**. Immediately upon receipt by any Obligor or any of its Subsidiaries of proceeds from any issuance, incurrence or assumption of Indebtedness other than Permitted Indebtedness, on or after the Closing Date, the Borrower shall prepay the Loans and other Obligations, *plus* the Prepayment Fee, if applicable, in an amount equal to 100% of the cash proceeds received, ~~*plus* the Prepayment Fee, if applicable~~.

(iii)     **[Reserved]**

~~(iii) Mandatory Prepayments for Qualifying Transaction. Immediately upon receipt by any Obligor or any of its Subsidiaries of net cash proceeds from a Qualifying Transaction, the Borrower shall, at the option of each Lender, prepay the Loans and other Obligations in an aggregate principal~~

~~-~~-52-~~-~~

amount equal to [50]% of the net cash proceeds

4877-6890-5580 v.1.1

~~received in excess of $[150,000,000] in an aggregate principal amount not to exceed $[17,500,000] (provided that, to the extent any Lender declines to receive such repayment, such Lender's ratable portion of such amount shall be offered to prepay the loans of the other Lenders on a ratable basis).~~

        (iv)    **Notice**. The Borrower shall provide the Administrative Agent with notice of any mandatory prepayment not later than 2:00 p.m. (New York City time) on a date not less than one (1) Business Day (or such shorter period agreed by the Administrative Agent) ~~or, in the case of a mandatory prepayment pursuant to~~ **~~Section 3.03(b)(iii)~~**~~, five (5) Business Days prior to the proposed prepayment date. Each notice of mandatory prepayment shall specify the proposed prepayment date, the Prepayment Price, the principal amount to be prepaid and the subsection under which the prepayment is required.~~.

        (c)    **Application**. All prepayments of the Loans shall be applied to principal installments on the Loans in the inverse order of maturity. Each such prepayment shall be accompanied by all accrued and unpaid interest on the Loans so prepaid, through the date of such prepayment and any applicable Prepayment Fee.

        (d)    **Prepayment Fee**. Without limiting the foregoing, whenever the Prepayment Fee is in effect and payable pursuant to the terms hereof or any other Loan Document, such Prepayment Fee shall be payable on each prepayment of all or any portion of the Loans, whether by optional or mandatory prepayment, acceleration or otherwise (other than any prepayment pursuant to **Section ~~3.03(b)(iii) above or~~ ~~Section 5.02~~5.02**).

        (e)    **Partial Prepayments**. Prepayments shall be accompanied by accrued interest to the extent required by **Section ~~3.02~~3.02**.

**SECTION 4.** ~~SECTION 4.~~
**PAYMENTS, ETC.**

**4.01**      **Payments**~~.~~.

        (a)    **Payments Generally**. Each payment of principal, interest and other amounts to be made in cash by the Obligors under this Agreement or any other Loan Document shall be made (i) in Dollars, in immediately available funds, without deduction, set off or counterclaim, to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, to the deposit account of the Administrative Agent designated by the Administrative Agent by notice to the Borrower, and (ii) not later than 2:00 p.m. (Eastern time) on the date on which such payment is due (each such payment made after such time on such due date may, in the Administrative Agent's discretion, be deemed to have been made on the next succeeding Business Day).

        (b)    **Application of Payments**. Notwithstanding anything herein to the contrary, following the occurrence and continuance of an Event of Default, all payments shall be applied as follows:

          (A)    first, to the payment of that portion of the Obligations constituting unpaid fees, indemnities, expenses or other amounts (including fees and disbursements and other

charges of counsel payable under **Section 14.0314.03**) payable to the Administrative Agent in its capacity as such;

(B)    second, to the payment of that portion of the Obligations constituting unpaid fees, indemnities, costs, expenses and other amounts (other than principal and interest, but including fees and disbursements and other charges of counsel payable under **Section 14.0314.03**, any Prepayment Fees) payable to the Lenders arising under the Loan Documents (other than the Warrants), ratably among them in proportion to the respective amounts described in this **clause (B)** payable to them;

(C)    third, to the payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this **clause (C)** payable to them;

(D)    fourth, to the payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this **clause (D)** payable to them;

(E)    fifth, in reduction of any other Obligation then due and owing, ratably among the Administrative Agent and the Lenders based upon the respective aggregate amount of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

(F)    sixth, the balance, if any, after all Obligations have been indefeasibly paid in full, to the Borrower or such other Person as may be lawfully entitled to or directed by the Borrower to receive the remainder.

(c)    **Non-Business Days**. If the due date of any payment under this Agreement (whether in respect of principal, interest, fees, costs or otherwise) would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall continue to accrue and be payable for the period of such extension; provided that if such next succeeding Business Day would fall after the Maturity Date, payment shall be made on the immediately preceding Business Day.

**4.02    Computations**. All computations of interest and fees hereunder shall be computed on the basis of a year of three hundred and sixty (360) days and actual days elapsed during the period for which payable.

**4.03    Set-Off.**

(a)    **Set-Off Generally**.  Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent, each of the Lenders and each of their Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than trust and tax accounts) at any time held and other indebtedness at any time owing by the Administrative Agent, any Lender and any of their Affiliates to or for the credit or the account of any Obligor against any and all of the Obligations, whether or not such Person shall have made any demand and although such

-55-

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 291 of 468
(continued)

obligations may be unmatured. Any Person exercising rights of set off hereunder agrees promptly to notify the Borrower after any such set-off and application; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Administrative Agent, the Lenders and each of their Affiliates under this **Section 4.03~~4.03~~** are in addition to other rights and remedies (including other rights of set-off) that such Persons may have.

(b) **Exercise of Rights Not Required**. Nothing contained in **Section ~~4.03(a)~~4.03(a)** shall require the Administrative Agent, any Lender or any of their Affiliates to exercise any such right or shall affect the right of such Persons to exercise, and retain the benefits of exercising, any such right with respect to any other indebtedness or obligation of any Obligor.

(c) **Payments Set Aside.** To the extent that any payment by or on behalf of any Obligor is made to the Administrative Agent or any Lender, or the Administrative Agent, any Lender or any Affiliate of the foregoing exercises its right of setoff pursuant to this **Section ~~4.03~~4.03**, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, such Lender or such Affiliate in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any Insolvency Proceeding or otherwise, then (i) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (ii) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

## SECTION 5. ~~SECTION 5.~~
## YIELD PROTECTION, TAXES, ETC.

**5.01** **Additional Costs~~.~~**.

(a) **Change in Law Generally**. If, on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), the adoption of any Law, or any change in any Law, or any change in the interpretation or administration thereof by any court or other Governmental Authority charged with the interpretation or administration thereof, or compliance by the Administrative Agent or any of the Lenders (or its lending office) with any request or directive (whether or not having the force of law) of any such Governmental Authority, shall impose, modify or deem applicable any reserve (including any such requirement imposed by the Board of Governors of the Federal Reserve System), special deposit, contribution, insurance assessment or similar requirement, in each case that becomes effective after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), against assets of, deposits with or for the account of, or credit extended by, a Lender (or its lending office) or shall impose on a Lender (or its lending office) any other condition affecting the Loans or the Commitment, and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining the

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 292 of 468
(continued)

Loans, or to reduce the amount of any sum received or receivable by such Lender under this Agreement

4877-6890-5580 v.1.1

or any other Loan Document, or subject any Lender to any Taxes on its Loan, Commitment or other obligations, or its deposits, reserves, other liabilities or capital (if any) attributable thereto by an amount reasonably deemed by such Lender in good faith to be material (other than (i) Indemnified Taxes, (ii) Taxes described in **clauses (ii)** through **(iv)** of the definition of Excluded Taxes and (iii) Connection Income Taxes), then the Borrower shall pay to such Lender on demand such additional amount or amounts as will compensate such Lender for such increased cost or reduction.

(b)    **Change in Capital Requirements**. If a Lender shall have determined that, on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), the adoption of any Law regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, in each case that becomes effective after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), has or would have the effect of reducing the rate of return on capital of a Lender (or its parent) as a consequence of a Lender's obligations hereunder or the Loans to a level below that which a Lender (or its parent) could have achieved but for such adoption, change, request or directive by an amount reasonably deemed by it to be material, then the Borrower shall pay to such Lender on demand such additional amount or amounts as will compensate such Lender (or its parent) for such reduction.

(c)    **Notification by Lender**. Each Lender promptly will notify the Borrower of any event of which it has knowledge, occurring after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), which will entitle such Lender to compensation pursuant to this **Section 5.015.01**. Before giving any such notice pursuant to this **Section 5.01(c)5.01(c)** such Lender shall designate a different lending office if such designation (x) will, in the reasonable judgment of such Lender, avoid the need for, or reduce the amount of, such compensation and (y) will not, in the reasonable judgment of such Lender, be materially disadvantageous to such Lender. A certificate of such Lender claiming compensation under this **Section 5.015.01**, setting forth the additional amount or amounts to be paid to it hereunder, shall be conclusive and binding on the Borrower in the absence of manifest error.

(d)    Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to constitute a change in Law for all purposes of this **Section 5.015.01**, regardless of the date enacted, adopted or issued.

**5.02**        **Illegality**. Notwithstanding any other provision of this Agreement, in the event that on or after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement) the adoption of or any change in any Law or in the interpretation or application thereof by any competent Governmental Authority shall make it unlawful for a Lender or its lending office to make or maintain the Loans (and, in the opinion of

-58-

such Lender, the designation of a different lending office would either not avoid such unlawfulness or would be disadvantageous to such Lender), then such Lender shall promptly notify the Borrower thereof, following which if such Law shall so mandate, the Loans shall be prepaid by the Borrower on or before such date as shall be mandated by such Law in an amount equal to the Prepayment Price (notwithstanding anything herein to the contrary, without any Prepayment Fee) applicable on such prepayment date in accordance with Section ~~3.03(a)~~ **3.03(a)**.

**5.03        Taxes~~:~~.**

(a)        **Payments Free of Taxes**. Any and all payments by or on account of any Obligation shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws and, if such Tax is an Indemnified Tax, then the sum payable by such Obligor shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this ~~SECTION 5~~ **SECTION 5**) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)        **Payment of Other Taxes by the Borrower**. The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Laws, or at the option of the Administrative Agent or each Lender, timely reimburse it for the payment of any Other Taxes.

(c)        **Evidence of Payments**. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this ~~SECTION 5~~ **SECTION 5**, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment.

(d)        **Indemnification by the Borrower**. The Borrower shall reimburse and indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this ~~SECTION 5~~ **SECTION 5**) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(e)        **Indemnification by the Lender**. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the

obligation of the Borrower to do so), and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.05(e) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this **Section 5.03(e)5.03(e)**.

(f)       **Status of Lenders**.

(i)       Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Law as reasonably requested by the Borrower as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two (2) sentences, the completion, execution and submission of such documentation (other than such documentation set forth in **Sections 5.035.03(f)(ii)(f)(ii)(A), (ii)(B),** and **(ii)(D)**) shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)       Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person:

(A)       any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 (or successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)       any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)       in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-

8BEN-E as applicable (or successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E as applicable (or successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)   e~~form);~~xecuted copies of IRS Form W-8ECI (or successor ~~form);~~ form);

(3)   in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit D-1** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "***U.S. Tax Compliance Certificate***") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E as applicable (or successor forms); or

(4)   to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY (or successor form), accompanied by IRS Form W-8ECI (or successor form), IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), a U.S. Tax Compliance Certificate, substantially in the form of **Exhibit D-2** or **D-3**, IRS Form W-9 (or successor form), and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Exhibit D-4** on behalf of each such direct and indirect partner.

(C)   any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; ~~and~~

(D)   if a payment made to a ~~Lender~~Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such ~~Lender~~Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such ~~Lender~~Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the

*[Different first page setting changed from off in original to on in modified.].*

**TABLE OF CONTENTS**

(continued)

Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative

Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such ~~Lender~~Recipient has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this **clause (D)**, "FATCA" shall include any amendments made to FATCA after the date of this Agreement~~.~~; and

(g)     if the Administrative Agent is a U.S. Person, it shall deliver to the Borrower on or prior to the date on which it becomes the Administrative Agent under this Agreement with two duly completed copies of Form W-9. If the Administrative Agent is not a U.S. Person, it shall provide to the Borrower on or prior to the date on which it becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower): (A) two executed copies of the applicable Form W-8 with respect to any amounts payable to the Administrative Agent for its own account, and (B) two executed copies of Form W-8IMY with respect to any amounts payable to the Administrative Agent for the account of others, together with all required attachments and backup documentation.

Each ~~Lender~~Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     ~~(g)~~**Treatment of Certain Tax Benefits**. If any party to this Agreement determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this ~~SECTION 5~~SECTION 5 (including by the payment of additional amounts pursuant to this ~~SECTION 5~~SECTION 5), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this ~~SECTION 5~~SECTION 5 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section ~~5.03(g)~~5.03(h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this **Section ~~5.03(g)~~5.03(h)**, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this **Section ~~5.03(g)~~5.03(h)** the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This **Section ~~5.03(g)~~5.03(h)** shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     **Survival**. Each party's obligations under this **Section 5.03** shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all obligations under any Loan Document.

4877-6890-5580 v.1.1

*[Different first page setting changed from off in original to on in modified.].*

**5.04**        **Mitigation Obligations**~~Mitigation Obligations~~. If the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to **Section ~~5.01~~5.01** or **Section ~~5.03~~5.03**, then such Lender shall (at the request of the Borrower) use commercially reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the sole reasonable judgment of such Lender, such designation or assignment and delegation would (i) eliminate or reduce amounts payable pursuant to **Section ~~5.01~~5.01** or **Section ~~5.03~~5.03**, as the case may be, in the future, (ii) not subject such Lender to any unreimbursed cost or expense and (iii) not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and delegation.

~~**5.05**~~ ~~**Survival**~~. ~~Each party's obligations under this~~ ~~**SECTION 5**~~ ~~shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the~~

4877-6890-5580 v.1.1

~~replacement of, a Lender, the termination of the Commitments~~ and the repayment, satisfaction or discharge of all Obligations under any Loan Document.

**SECTION 6.** ~~SECTION 6.~~
**CONDITIONS**

**6.01**        **Conditions to the Borrowing of the Term Loan.** ~~Subject to Section 8.19, the~~The obligation of each Lender to make its Term Loan shall be subject to the delivery of a Borrowing Notice as required pursuant to **Section ~~2.02~~2.02**, and the prior or concurrent satisfaction or waiver of each of the conditions precedent set forth below in this **Section ~~6.01~~6.01**.

(a)        **Loan Documents.** The Administrative Agent shall have received each Loan Document required to be executed by the appropriate Obligor on the Closing Date and delivered by each applicable Obligor in such number as reasonably requested by the Administrative Agent (which may be delivered by facsimile or other electronic means for the purposes of satisfying this **clause (a)** on the Closing Date) and such Loan Documents shall be in form and substance satisfactory to the Administrative Agent and the Lenders and their respective counsels.

(b)        **[Reserved].**

(c)        **Secretary's Certificate, Etc.** The Administrative Agent shall have received from each Obligor (x) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (y) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Responsible Officer, as to:

(i)        resolutions of each such Person's Board then in full force and effect authorizing the execution, delivery and performance of each Loan Document to be executed by such Person and the Transactions;

(ii)        the incumbency and signatures of Responsible Officers authorized to execute and deliver each Loan Document to be executed by such Person; and

(iii)        the full force and validity of the certificate of incorporation and ~~by-laws~~by-laws (or equivalent documents) of such Person and copies thereof;

upon which certificates shall be in form and substance reasonably satisfactory to the Administrative Agent and upon which the Administrative Agent and the Lenders may conclusively rely until they shall have received a further certificate of the Responsible Officer of any such Person cancelling or amending the prior certificate of such Person.

(d)        **Information Certificate.** The Administrative Agent shall have received a fully completed Information Certificate in form and substance reasonably satisfactory to the Administrative Agent, dated as of the Closing Date, duly executed and delivered by a Responsible Officer of the Borrower. All documents and agreements required to be appended to the Information Certificate, shall be in form and substance reasonably satisfactory to the Administrative Agent, shall have been executed and delivered by the requisite parties and shall be in full force and effect.

(e)      **Funding Date Certificate**. The Administrative Agent shall have received a Funding Date Certificate, dated as of the Closing Date and in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by a Responsible Officer of the Borrower.

(f)      **Delivery of Notes**. The Administrative Agent shall have received a Note to the extent requested by any Lender pursuant to **Section 2.04~~2.04~~** for the Term Loan duly executed and delivered by a Responsible Officer of the Borrower.

~~(g) Financial Information, Etc. The Administrative Agent shall have received:~~

~~(i) audited consolidated financial statements of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2022; and~~

(g)      ~~(ii)~~ **Financial Information, Etc.** The Administrative Agent shall have received unaudited consolidated balance sheets of the Borrower and its Subsidiaries for the fiscal quarter ended ~~[•]~~March 31, 2023 together with the related consolidated statement of operations, shareholder's equity and cash flows for such fiscal quarter.

(h)      **Solvency**. The Administrative Agent shall have received a solvency certificate, substantially in the form of **Exhibit K**, duly executed and delivered by the chief financial officer of the Borrower, dated as of the Closing Date, in form and substance reasonably satisfactory to the Administrative Agent.

(i)      **Security Documents**. The Administrative Agent shall have received executed counterparts of a Security Agreement, in form and substance reasonably acceptable to the Administrative Agent, dated as of the Closing Date, duly executed and delivered by each Obligor, together with all documents (including share certificates, transfers and stock transfer forms, notices or any other instruments) required to be delivered or filed under the Security Documents and evidence satisfactory to it that arrangements have been made with respect to all registrations, notices or actions required under the Security Documents to be effected, given or made in order to establish a valid and perfected first priority security interest in the Collateral in accordance with the terms of the Security Documents, including:

(i)      delivery of all certificates (in the case of Equity Interests that are certificated securities (as defined in the UCC)) evidencing the issued and outstanding capital securities owned by each Obligor that are required to be pledged and so delivered under the Security Agreement, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, or, in the case of Equity Interests that are uncertificated securities (as defined in the UCC), confirmation and evidence reasonably satisfactory to the Administrative Agent and the Lenders that the security interest required to be pledged therein under the Security Agreement has been transferred to and perfected by the Administrative Agent and the Lenders in accordance with Articles 8 and 9 of the NY UCC and all laws otherwise applicable to the perfection of the pledge of such Equity Interests;

(ii)      financing statements naming each Obligor as a debtor and the Administrative Agent as the secured party, or other similar instruments or documents, in each case suitable for filing, filed under the UCC (or equivalent law) of all jurisdictions as may be

4877-6890-5580 v.1.1

necessary or, in the opinion of the Administrative Agent, desirable to perfect the Liens of the Secured Parties pursuant to the Security Agreement;

(iii)    [reserved];

(iv)    UCC-3 termination statements, if any, necessary to release all Liens and other rights of any Person in any collateral described in the Security Agreement previously granted by any Person that are not permitted under the Loan Documents; and

(v)    all applicable Short-Form IP Agreements required to be provided under the Security Agreement, each dated as of the Closing Date, duly executed and delivered by each applicable Obligor.

(j)    **Bankruptcy Court Order**. The Bankruptcy Court shall have entered an order in form and substance satisfactory to the Administrative Agent and the Requisite Lenders, which, for the avoidance of doubt, may be the Confirmation Order (as defined herein), authorizing the Loan Parties' entry of the parties to this Agreement into and performance under this Agreement and the other Loan Documents (the "**Approval Order**").

(k)    **Confirmation Order**. The Confirmation Order shall have been entered by the Bankruptcy Court. Each of the Approval Order and the Confirmation Order shall be in full force and effect and not have been stayed, reversed, or vacated, amended, supplemented, or modified and shall not be subject to any pending appeals, except for any of the following, which shall be permissible appeals the pendency of which shall not prevent the occurrence of the Closing Date: (i) any appeal relating to the distributions (or the allocation of such distributions) between and among creditors under the Approved Plan, or (ii) any other appeal, the result of which would not have a materially adverse effect on the rights and interests of any of Agent or the Lenders. The Confirmation Order shall authorize the parties to this Agreement to execute, deliver and perform all of their obligations under all documents contemplated hereunder and thereunder and shall contain no term or provision that contradicts such authorization or the Approval Order. The Approved Plan shall have become effective in accordance with its terms and all conditions to the effectiveness of the Approved Plan shall have been satisfied or waived in accordance with the terms thereof and all transactions contemplated in the Approved Plan, the Approval Order or the Confirmation Order to occur on the effective date of the Approved Plan shall have been (or concurrently with the Closing Date, shall be) substantially consummated in accordance with the terms thereof.

(l)    **Lien Searches**. The Administrative Agent shall be satisfied with Lien searches regarding the Borrower and the Subsidiary Guarantors made as of a date reasonably close to the Closing Date.

(m)    **Opinions of Counsel**. The Administrative Agent shall have received a duly executed legal opinion of counsel to the Obligors dated as of the Closing Date, in form and substance reasonably acceptable to the Administrative Agent.

(n)    **Fee Letter**. The Administrative Agent shall have received an executed counterpart of the Fee Letter, duly executed and delivered by the Borrower.

4877-6890-5580 v.1.1

(o)     **Closing Fees, Expenses, Etc**. Each of the Administrative Agent and each Lender shall have received for its own account, (i) the upfront fee as set forth in the Fee Letter, which shall be paid by way of the Administrative Agent retaining such amount from the proceeds of the Loan and (ii) all fees, costs and expenses due and payable to it pursuant to the Fee Letter and **Section** ~~14.03~~**14.03**, including all reasonable closing costs and fees and all unpaid reasonable expenses of the Administrative Agent and the Lenders incurred in connection with the Transactions (including the Administrative Agent's and the Lenders' legal fees and expenses), in each case, to the extent invoiced (or as to which a good faith estimate has been provided to the Borrower) at least two (2) Business Days prior to the Closing Date.

(p)     **Material Adverse Change**. Since ~~[•]~~August 3, 2023, no Material Adverse Change shall have occurred, both before and after giving effect to the Loans to be made on the Closing Date (it being understood that the Bankruptcy Cases, in and of themselves, shall not constitute a Material Adverse Change).

(q)     **Know Your Customer**. The Administrative Agent shall have received, as applicable, all documentation and other information required by bank regulatory authorities under applicable "know your customer" and Anti-Terrorism Laws.

(r)     **No Default**. No event shall have occurred or be continuing or would result from the making of the Term Loan that would constitute a Default or Event of Default.

(s)     **Representations and Warranties**.  The representations and warranties contained in this Agreement and in the other Loan Documents delivered pursuant to this **Section** ~~6.01(a)~~**6.01** shall be true and correct in all material respects (unless such representations are already qualified by reference to materiality, Material Adverse Effect or similar language, in

which case such representations and warranties shall be true and correct in all respects) on and as of the Closing Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all respects on and as of such earlier date.

(t)     **Beneficial Ownership Certificate**.  To the extent requested by any Lender or the Administrative Agent, the Borrower shall have provided to such Lender and the Administrative Agent all documentation and other information so requested, including a duly executed W-9 of the Borrower (or such other applicable tax form), in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification, in each case prior to the Closing Date.

(u)     **Warrants**. The Administrative Agent shall have received the executed Warrants, in form and substance acceptable to the Administrative Agent.

**SECTION 7.** ~~SECTION 7.~~
**REPRESENTATIONS AND WARRANTIES**

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

The Borrower and each other Obligor hereby jointly and severally represents and warrants to the Administrative Agent and each Lender on the Closing Date and any other date such representation and warranty is required to be made under the Loan Documents, as set forth below:

**7.01**          **Power and Authority**. Each Obligor and each of its Subsidiaries (i) is duly organized and validly existing under the laws of its jurisdiction of organization, (ii) has all

requisite corporate or other power, and has all Governmental Approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except to the extent that failure to have the same could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (iii) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary except where failure so to qualify could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (iv) has full power, authority and legal right to enter into and perform its obligations under each of the Loan Documents to which it is a party and, in the case of the Borrower, to borrow the Loans hereunder.

**7.02    Authorization; Enforceability**. Each Transaction to which an Obligor is a party (or to which it or any of its assets or properties is subject) are within such Obligor's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational action including, if required, approval by all necessary holders of Equity Interests. This Agreement has been duly executed and delivered by each Obligor and constitutes, and each of the other Loan Documents to which it is a party when executed and delivered by such Obligor will constitute, a legal, valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights and (ii) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**7.03    Governmental and Other Approvals; No Conflicts**. None of the execution, delivery and performance by each Obligor of the Loan Documents to which it is a party or the consummation by each Obligor of the Transactions (i) requires any Governmental Approval of, registration or filing with, or any other action by, any Governmental Authority or any other Person, except for (x) such as have been obtained or made and are in full force and effect and (y) filings and recordings in respect of perfecting or recording the Liens created pursuant to the Security Documents, (ii) will violate (1) any Law, (2) any Organic Document of any Obligor or any of its Subsidiaries or (3) any order of any Governmental Authority, that in the case of **clause (ii)(1)** or **clause (ii)(3)**, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, (iii) will violate or result in a default under any Material Agreement binding upon any Obligor or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (iv) will result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of any Obligor or any of its Subsidiaries.

**7.04    Financial Statements; Material Adverse Change**.

(a)    **Financial Statements**. The Borrower has heretofore furnished to the Administrative Agent (who shall forward to the Lenders) consolidated financial statements required to be delivered pursuant to this Agreement. ~~The pro forma unaudited~~ Such financial statements present fairly, in all material respects, the consolidated ~~balance sheet~~ financial position and results of operations and cash flows of the Borrower and its Subsidiaries, ~~dated [•], 2023, delivered on or prior to the Closing Date was prepared by the Borrower giving pro forma effect to the funding of the Loans and the Transactions and was based on the unaudited consolidated and consolidating balance sheets of the Borrower and its Subsidiaries, dated [•], 2023. Other than the Bankruptcy Cases and~~ as of such dates and for such periods in accordance with GAAP, subject to year-end audit

-70-

adjustments and the absence of footnotes in the case of the statements of the type described in Section 8.01(a).

~~the continuation and prosecution thereof since the Petition Date, there has been no Material Adverse Effect or circumstance which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. All financial performance projections delivered to any Secured Party, including the financial performance projections delivered on or prior to the Closing Date, represent the Borrower's and its Subsidiaries' good faith estimate of future financial performance and are based on assumptions believed by each Loan Party and each of its Subsidiaries to be fair and reasonable in light of current market conditions, it being acknowledged and agreed by the Agent and the Lenders that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by such projections may differ from the projected results and such differences may be material.~~

(b)    **No Material Adverse Change**. Since ~~[•]~~August 3, 2023, there has been no Material Adverse Change (it being understood that the Bankruptcy Cases, in and of themselves, shall not constitute a Material Adverse Change).

**7.05     Properties**~~.~~.

(a)    **Property Generally**. Each Obligor and each of its Subsidiaries has good and marketable fee simple title to, or valid leasehold interests in, all its real and personal property material to its business, including all Material Intellectual Property, subject only to Permitted Liens and except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.  There are no condemnation proceedings pending or, to the best of the Obligors' knowledge, threatened, to acquire by power of condemnation or eminent domain any portion of any Obligor's assets or properties, or any interest therein, or to enjoin or similarly prevent the construction and/or use of any of such assets and properties.

(b)    **Intellectual Property**.

(i)    The Obligors are the sole and exclusive legal and beneficial owners of all right, title and interest in and to all Material Intellectual Property and all other Intellectual Property that is, in each case, owned or purported to be owned by the Obligors, free and clear of any Liens or Claims other than Permitted Liens.  The Obligors own or have sufficient and valid, written rights to use all Material Intellectual Property.  Without limiting the foregoing, and except as set forth in **Schedule 7.05(b)(i)**:

(A)    other than (1) customary restrictions in in-bound licenses of Intellectual Property and non-disclosure Contracts, or (2) as would have been or is permitted by **Section ~~9.09~~9.09**, there are no judgments, covenants not to sue, grants, Liens (other than Permitted Liens), or Claims, agreements or arrangements relating to any Material Intellectual Property, which materially restrict any Obligor or any of its Subsidiaries with respect to its use, enforcement, or other exploitation of any Material Intellectual Property;

(B)    the operation and conduct of the business of by the Borrower or any of its Subsidiaries, including their use of their respective Material Intellectual Property, does not, in any material respect, violate, infringe or constitute a misappropriation of Intellectual Property rights of any other Person;

4877-6890-5580 v.1.1

(C)    (1) (1) there are no pending Claims, or Claims threatened in writing, against any Obligor or any of their Subsidiaries asserted by any other Person relating to Intellectual Property, including any material Claims alleging ownership, invalidity or unenforceability of any Material Intellectual Property, or infringement, misappropriation, or violation of such Person's Intellectual Property rights in any material respect; and (2) neither any Obligor nor any of their Subsidiaries has received any notice from, or Claim by, any Person that the operation and conduct of the businesses of the Borrower or any of its Subsidiaries (including their use of Material Intellectual Property), infringes upon, violates or constitutes a misappropriation of, any Intellectual Property of any other Person in each case of **clause (1)** and **(2)**, that would reasonably be expected to result in material liability to any Obligor or any of their Subsidiaries;

(D)    to the knowledge of any Borrower and their Subsidiaries, no Material Intellectual Property is being infringed, violated, or misappropriated by any other Person in any material respect; and neither such Obligor nor any of its Subsidiaries has put any other Person on notice of such actual or potential infringement, violation or misappropriation of any such Material Intellectual Property, and neither any Obligor nor any of their Subsidiaries has not initiated any Claim with respect to any such Material Intellectual Property;

(E)    all current and former employees and contractors that have developed Material Intellectual Property for or on behalf of any Obligor or any of their Subsidiaries has executed written confidentiality and invention assignment Contracts with such Obligor or Subsidiary, as applicable, that irrevocably and presently assign to such Obligor or Subsidiary, as applicable, all rights of such employees and contractors to any such Material Intellectual Property; and

(F)    each Obligor and each of its Subsidiaries has taken reasonable precautions to protect the secrecy, confidentiality and value of its Material Intellectual Property consisting of Trade Secrets.

(ii)    (ii) With respect to Material Intellectual Property consisting of Patents, except as set forth in **Schedule 7.05(b)(ii)**, and without limiting the representations and warranties in **Section 7.05(b)(i) 7.05(b)(i)**:

(A)    each of the issued claims in such Patents are valid and enforceable;

(B)    subsequent to the issuance of such Patents, no Obligor nor any of its Subsidiaries or predecessors-in-interest, has filed any disclaimer or made or permitted any other voluntary reduction in the scope of the Inventions claimed in such Patents;

(C)    to the knowledge of the Obligor, no allowable or allowed subject matter of such Patents is subject to any competing conception claims of allowable or allowed subject matter of any patent applications or patents of any third party and have not been the subject of any interference, and are not and have not been the subject of any re-examination, opposition or any other post-grant proceedings, nor is any Obligor or its Subsidiaries aware of any basis for any such interference, re-examination, opposition, *inter partes* review, post grant review, or any other post-grant proceedings;

4877-6890-5580 v.1.1

(D)      no such Patents have ever been finally adjudicated to be invalid, unpatentable or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, and, with the exception of publicly available documents in the applicable patent office with respect to any such Patents, no Obligor nor any of its Subsidiaries has received any written notice asserting that such Patents are invalid, unpatentable or unenforceable; and

(E)      all maintenance fees, annuities, and the like due or payable on or with respect to any such Patents have been timely paid or the failure to so pay could not reasonably be expected to result in a Material Adverse Change.

**7.06        No Actions or Proceedings.**

(a)      **Litigation**. Except for the Bankruptcy Cases, there is no litigation, investigation or proceeding pending or, to the knowledge of any Obligor or any of its Subsidiaries threatened in writing, with respect to such Obligor or any such Subsidiaries by or before any Governmental Authority or arbitrator that, (i) if adversely determined, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (ii) involves this Agreement or any other Loan Document.

(b)      **Environmental Matters**. No Obligor nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, except for any such failure to comply with such Environmental Law or failure to obtain, maintain or comply with a permit that could not reasonably be expected to have a Material Adverse Effect, (ii) has become subject to any Environmental Liability that could reasonably be expected to have a Material Adverse Effect, (iii) except as disclosed on **Schedule 7.06(b)**, has received any Environmental Claim, or has knowledge that any is threatened, (iv) has entered into any agreement in which such Obligor or any Subsidiary has assumed or undertaken material responsibility or obligations of any other person with respect to any Environmental Liability or (v) has knowledge of any basis for any other material Environmental Liability.

(c)      **Labor Matters**. No Obligor or any of its Subsidiaries has engaged in unfair labor practices as defined in 29 U.S.C. §§ 152(8) and 158 of the National Labor Relations Act and there are no pending or threatened in writing labor actions, disputes, grievances, arbitration proceedings, or similar Claims or actions involving the employees of any Obligor or any of its Subsidiaries, in each case that could reasonably be expected to have a Material Adverse Effect. There are no strike or work stoppages in existence or threatened in writing against any Obligor and to the knowledge of such Obligor, no union organizing activity is taking place. There are no collective bargaining agreements covering employees of any Obligor or any of its Subsidiaries.

**7.07        Compliance with Laws and Agreements**. Each Obligor is in compliance with all Laws and all Contracts binding upon it or its property, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing. The Obligors and their Subsidiaries are in material compliance with all applicable Healthcare Laws.

4877-6890-5580 v.1.1

7.08        **Taxes**. Except as set forth on Schedule ~~7.08~~7.08, each Obligor and its Subsidiaries has timely filed or caused to be filed all federal, state and other tax returns and reports required to have been filed and has paid or caused to be paid all federal, state and other taxes required to have been paid by it, except (a) ~~t~~Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which such Obligor or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP or (b) to the extent that the failure to do so would not reasonably be expected to have an Material Adverse Effect.

7.09        **Full Disclosure**. None of the reports, financial statements, certificates or other written information furnished by or on behalf of the Obligors or any of their Subsidiaries to the Administrative Agent (on behalf of itself and the Lenders) in connection with the negotiation of this Agreement and the other Loan Documents or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of material fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, and it being understood that such projected financial information and all other forward looking information are not to be viewed as facts and that actual results during the period or periods covered thereby may differ from such projected results and that the differences may be material.

7.10        **Investment Company Act and Margin Stock Regulation**.

(a)        **Investment Company Act**. No Obligor is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(b)        **Margin Stock**. No Obligor is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying Margin Stock, and no part of the proceeds of the Loans will be used to buy or carry any Margin Stock in violation of Regulation T, U or X.

7.11        **Solvency**. The Obligors, on a consolidated basis, are and, immediately after giving effect to the making of the Loans, the use of proceeds thereof, and the consummation of the Transactions, will be, Solvent.

7.12        **Subsidiaries**~~Subsidiaries~~. Set forth on Schedule ~~7.12~~7.12 is a complete and correct list of all direct and indirect Subsidiaries of the Borrower. Each such Subsidiary is duly organized and validly existing under the jurisdiction of its organization shown in said Schedule ~~7.12~~7.12, and the percentage ownership by each Obligor of each such Subsidiary thereof is as shown in said Schedule ~~7.12~~7.12.

7.13        **Indebtedness and Liens**. Set forth on Schedule 7.13(a) is a complete and correct list of all Indebtedness of each Obligor and each of its Subsidiaries outstanding as of the Closing Date. Set forth on Schedule 7.13(b) is a complete and correct list of all Liens granted by the Obligors and each of their respective Subsidiaries with respect to their respective property and outstanding as of the Closing Date.

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 311 of 468

(continued)

**7.14**          **Material Agreements**. Except as set forth on **Schedule 7.14**, no Obligor or any of its Subsidiaries is in material default under any Material Agreement, nor does any Obligor have knowledge of (i) any Claim against it or any of its Subsidiaries for any material breach of any such Material Agreement or (ii) any material default by any party to any such Material Agreement.

**7.15**          **Restrictive Agreements**. Except as set forth in **Schedule 7.15**, as of the Closing Date, no Obligor or any of its Subsidiaries is subject to any Restrictive Agreement, except (i) those permitted under **Section 9.119.11**, (ii) restrictions and conditions imposed by Law or by this Agreement, (iii) any stockholder agreement, charter, by-laws, or other organizational documents of an Obligor or any of its Subsidiaries as in effect on the Closing Date and (iv) limitations associated with Permitted Liens.

**7.16**          **Real Property**. Schedule **7.167.16** correctly sets forth all real property that is owned or leased by the Obligors, indicating in each case whether the respective property is owned or leased, the identity of the owner and lessee (if applicable) and the location of the respective property. Except as set forth in **Schedule 7.167.16**, no Obligor owns or leases (as tenant thereof) any real property as of the Closing Date.

**7.17**          **Pension Matters**. **Schedule 7.17** sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, (i) all Title IV Plans, (ii) all Multiemployer Plans and (iii) all material Benefit Plans. Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Laws so qualifies. Except for those that could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Laws, (y) there are no existing or pending (or to the knowledge of any Obligor or any of its Subsidiaries, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Obligor or Subsidiary thereof incurs or otherwise has or could have an obligation or any liability or Claim and (z) no ERISA Event is reasonably expected to occur. The Borrower and each of its ERISA Affiliates has met all applicable requirements under the ERISA Funding Rules with respect to each Title IV Plan, and no waiver of the minimum funding standards under the ERISA Funding Rules has been applied for or obtained. As of the most recent valuation date for any Title IV Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least sixty percent (60%), and neither any Obligor nor any of its ERISA Affiliates knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage to fall below sixty percent (60%) as of the most recent valuation date. As of the Closing Date, no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding. No ERISA Affiliate would have any Withdrawal Liability as a result of a complete withdrawal from any Multiemployer Plan on the date this representation is made.

**7.18**          **Regulatory Approvals**.

          (a)          Each Obligor and each of its Subsidiaries holds, and will continue to hold, either directly or through licensees and agents, all Product Authorizations necessary or required for the Borrower and each of its Subsidiaries to conduct, in all material respects, their respective

operations and businesses in the manner currently conducted and to conduct its Product Commercialization and Development Activities.

(b)    No Obligor or its Subsidiaries has received any written notice from any Governmental Authority that (i) it is considering suspending, revoking or materially limiting any Product Authorization or (ii) it is not likely to approve any applications made to such Governmental Authority with respect to any of the Products or any Material Agreement.  The Obligors and their Subsidiaries have made all material required and notices, registrations and reports (including field alerts or other reports of adverse experiences) and other filings with respect to each such Person's Products and Product Commercialization and Development Activities.

(c)    Except as set forth on **Schedule 7.18(c)**, and without limiting the generality of any other representation or warranty made by any Obligor hereunder or under any other Loan Document: (i) no Obligor, nor any of its Subsidiaries nor, to the knowledge of any Obligor, any of their respective agents, suppliers, licensors or licensees have received any inspection reports, warning letters or notices or similar documents with respect to any Product or any Product Commercialization and Development Activities from any Regulatory Authority within the last two (2) years that asserts material lack of compliance with any applicable Healthcare Laws or Product Authorizations; (ii) no Obligor, nor any of its Subsidiaries nor, to the knowledge of any Obligor, any of their respective agents, suppliers, licensors or licensees have received any material notification from any Regulatory Authority within the last two (2) years, asserting that any Product or any Product Commercialization and Development Activities lacks a required Product Authorization; (iii) there is no pending regulatory action, investigation or inquiry (other than non-material routine or periodic inspections or reviews) against any Obligor, any of its Subsidiaries or, to the knowledge of any Obligor, any of their respective suppliers, licensors or licensees with respect to any Product or any Product Commercialization and Development Activities, and, to the knowledge of any Obligor, there is no basis in fact for any material adverse regulatory action against such Obligor or any of its Subsidiaries or, to the knowledge of any Obligor, any of their respective suppliers agents, licensors or licensees with respect to any Product or any Product Commercialization and Development Activities; and (iv) without limiting the foregoing, (A) (1) there have been no material product recalls, safety alerts, corrections, withdrawals, marketing suspensions, removals or the like conducted, undertaken or issued by any Obligor or any of its Subsidiaries, whether voluntary, at the request, demand or order of any Regulatory Authority or otherwise, with respect to any Product, any Product Commercialization and Development Activities or any Product Authorization within the last two (2) years, (2) no such product recall, safety alert, correction, withdrawal, marketing suspension, removal or the like has been requested, demanded or ordered by any Regulatory Authority within the last two (2) years, and, to the knowledge of any Obligor, there is no basis in fact for the issuance of any such product recall, safety alert, correction, withdrawal, marketing suspension, removal or the like with respect to any Product or any Product Commercialization and Development Activities, and (B) no criminal, injunctive, seizure, detention or civil penalty action has been commenced or threatened in writing by any Regulatory Authority within the last two (2) years with respect to or in connection with any Product or any Product Commercialization and Development Activities, and there are no consent decrees (including plea agreements) that relate to any Product or any Product Commercialization and Development Activities, and, to the knowledge of each Obligor, there is no basis in fact for the commencement

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 313 of 468
(continued)

of any criminal injunctive, seizure, detention or civil penalty action by any Regulatory Authority relating to any Product or any Product Commercialization and Development Activities or for the issuance of any consent decree.  No Obligor nor any of its Subsidiaries, nor, to the knowledge of any Obligor, any of their respective agents, suppliers, licensees or licensors, is employing or utilizing the services of any individual, in connection with Product Commercialization and Development Activities, who has been debarred from any federal healthcare program.

**7.19** **Transactions with Affiliates**. Except as set forth on **Schedule 7.19**, no Obligor nor any of its Subsidiaries has entered into, renewed, extended or been a part to, any transaction (including the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate.

**7.20** **OFAC; Anti-Terrorism Laws**.

(a) Neither the Borrower nor any of its Subsidiaries is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the ~~Anti-~~ Anti-Terrorism Laws.

(b) Neither the Borrower nor any of its Subsidiaries, nor, to the knowledge of the Borrower, any of their respective directors, officers, or employees (i) is currently the target of any Sanctions, (ii) is located, organized or residing in any Designated Jurisdiction in violation of Sanctions, or (iii) is or has been (within the previous five (5) years) engaged in any transaction with, or for the benefit of, any Person who is now or was then the target of Sanctions or who is located, organized or residing in any Designated Jurisdiction, in violation of Sanctions. No Loan, nor the proceeds from any Loan, has been or will be used, directly or, to the knowledge of the Borrower, indirectly, to lend, contribute or provide to, or has been or will be otherwise made available for the purpose of funding, any activity or business in any Designated Jurisdiction in violation of Sanctions or for the purpose of funding any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions, in violation of Sanctions, or in any other manner that will result in any violation by any party to this Agreement of Sanctions.

**7.21** **Anti-Corruption**. Neither the Borrower nor any of its Subsidiaries, nor, to the knowledge of the Borrower, any of their respective directors, officers or employees, directly or, to the knowledge of the Borrower, indirectly, has (i) materially violated or is in material violation of any applicable anti-corruption Law, or (ii) made, offered to make, promised to make or authorized the payment or giving of, directly or, to the knowledge of the Borrower, indirectly, any Prohibited Payment.

**7.22** **Necessary Permits, Etc.** The Borrower possesses (or will file for) all franchises, trademarks, Permits, licenses, consents, agreements and governmental approvals that are necessary or required by any Governmental Authority in order to carry on its business and to construct and operate the Project.  The Borrower has not received any notice of default or termination of any such Permit, license, consent, approval or agreement, or any notice of noncompliance therewith.

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500   Filed 08/03/23    Page 314 of 468
(continued)

**7.23** **Priority of Obligations**. The Obligations constitute unsubordinated obligations of the Obligors, and except for any obligations which have priority under applicable Law, rank at least pari passu in right of payment with all other unsubordinated Indebtedness of the Obligors.

**7.24** **Royalty and Other Payments**. Except as set forth on Schedule ~~7.24~~7.24, no Obligor, nor any of its Subsidiaries, is obligated to pay any royalty, milestone payment, deferred payment or any other contingent payment in respect of any Product.

**7.25** **Non-Competes**. Neither the Borrower, any other Obligor, nor any of their respective Subsidiaries, nor any of their respective directors, officers or employees, is subject to a non-compete agreement that prohibits or will interfere with any of the Product Commercialization and Development Activities, including the development, commercialization or marketing of any Product.

**7.26** **Security Interest**. The Security Documents provide the Secured Parties with effective, valid, legally binding and enforceable first priority Liens on all of the Collateral, subject to Permitted Liens. As of the Closing Date, (a) there are no security interests in, or Liens on, any of the Collateral other than Liens in favor of the Secured Parties as security for the Obligations and (b) subject to **Section 8.22,** all necessary action (including as described in **Section 7.03**) has been taken under applicable Law to (i) establish and perfect the first priority rights of the Secured Parties in and to the Collateral, if applicable, and (ii) terminate and/or release all existing security interests in, and Liens on, the Collateral, in each case, under their respective applicable Law, in each case of **clauses (a)** and **(b)**, subject to Permitted Liens.  The Mortgage Deliverables with respect to the Property, when duly executed, delivered, and recorded ~~on the Closing Date~~, shall constitute a first-priority Lien against the Collateral therein described, prior to all other Liens and encumbrances, including those which may hereafter accrue, except for such matters as shall have been approved by the Administrative Agent and set forth in the Mortgage Deliverables or herein as a "Permitted Lien."

**7.27** **Capitalization Table**. **Schedule 7.27** sets forth a true, complete and correct capitalization table of the Borrower, including a description of all outstanding equity interests (including any warrants or options to acquire, or instruments convertible into, equity interests) and indebtedness of the Borrower and the holders thereof.

**SECTION 8.** ~~SECTION 8.~~
**AFFIRMATIVE COVENANTS**

Each Obligor covenants and agrees with the Administrative Agent and the Lenders that, until ~~the Commitments have expired or been terminated and~~ all Obligations (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made) have been indefeasibly paid in full in cash:

**8.01** **Financial Statements and Other Information**. The Borrower will furnish to the Administrative Agent:

(a)    as soon as available and in any event within forty-five (45) days after the end of each fiscal quarter (i) the consolidated balance sheets of the Borrower and its

-79-

Subsidiaries

as of the end of such fiscal quarter and (ii) the related consolidated statements of income, shareholders' equity and cash flows of the Borrower and its Subsidiaries for such quarter and the portion of the fiscal year through the end of such fiscal quarter, in each case prepared in accordance with GAAP consistently applied, all in reasonable detail and setting forth in comparative form the figures for the corresponding period in the preceding fiscal year, together with (iii) a certificate of a Responsible Officer of the Borrower stating that (x) such financial statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as at such date and (y) the results of operations of the Borrower and its Subsidiaries for the period ended on such date have been prepared in accordance with GAAP consistently applied, subject to changes resulting from normal, year-end audit adjustments and except for the absence of notes; provided that documents required to be furnished pursuant to this **Section 8.01(a)8.01(a)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR" (with the related certificate separately delivered);

(b)    as soon as available and in any event, with respect to the fiscal year ending December 31, 2022, ~~within one hundred thirty-four (134) days after the end of such fiscal year~~on or before November 30, 2023, and, with respect to each fiscal year ending thereafter, within one hundred ~~twenty~~fifty (1~~2~~50) days after the end of each such fiscal year (i) the consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such fiscal year and (ii) the related consolidated statements of income, shareholders' equity and cash flows of the Borrower and its Subsidiaries for such fiscal year, in each case prepared in accordance with GAAP consistently applied, all in reasonable detail and setting forth in comparative form the figures for the previous fiscal year, accompanied by a report and opinion thereon of Ernst & Young or another firm of independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards, and, such report and opinion (other than for the fiscal years ended December 31, 2021 and December 31, 2022) shall not be subject to any "going concern" or like qualification or exception or emphasis of matter of going concern footnote or any qualification or exception as to the scope of such audit, and in the case of such consolidated financial statements, certified by a Responsible Officer of the Borrower;

(c)    [together with the financial statements required pursuant to **Sections 8.01(a)8.01(a)** and **(b)**, a compliance certificate signed by the chief financial or accounting Responsible Officer of the Borrower as of the end of the applicable accounting period (which delivery may be by electronic communication including fax or email and shall be deemed to be an original, authentic counterpart thereof for all purposes) substantially in the form of **Exhibit E** (a "***Compliance Certificate***") including (i) details of any issues that are material that are raised by auditors and any occurrence or existence of any event, circumstance, act or omission that would cause any representation or warranty contained in **Section 7.07~~7.07~~**, **Section 7.18~~7.18~~** or **Section 7.23~~7.23~~** to be incorrect in any material respect (or in any respect if such representation or warranty is qualified by materiality or by reference to Material Adverse Effect or Material Adverse Change) if such representation or warranty were to be made at the time of delivery of a Compliance Certificate, ~~(ii) the calculation of EBITDA for the four consecutive fiscal period ending on the last day of the fiscal period to which the financial statements so delivered relate, (iii) a certification as to whether or not the Borrower is in compliance with the Minimum Revenue Covenant as of the last day of such period, and (iv) for any fiscal quarter ending on or after [•], a~~.

4877-6890-5580 v.1.1

certification as to whether or not the Borrower is in compliance with the Minimum EBITDA Covenant as of the last day of such period;]

(d)    promptly after the same are released, copies of all press releases; provided that documents required to be furnished pursuant to this **Section 8.01(d)8.01(d)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(e)    promptly, and in any event within five (5) Business Days after receipt thereof by an Obligor thereof, copies of each notice or other correspondence received from any securities regulator or exchange to the authority of which the Borrower may become subject from time to time concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of such Obligor; provided that documents required to be furnished pursuant to this **Section 8.01(e)8.01(e)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(f)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of each Obligor and its Subsidiaries, and copies of all annual, regular, periodic and special reports and registration statements which any Obligor or its Subsidiaries may file or be required to file with any securities regulator or exchange to the authority of which such Obligor or such Subsidiary, as applicable, may become subject from time to time; provided that documents required to be furnished pursuant to this **Section 8.01(f)8.01(f)** shall be deemed furnished on the date that such documents are publicly available on "EDGAR";

(g)    the information regarding insurance maintained by the Borrower and its Subsidiaries as required under **Section 8.058.05**;

(h)    as soon as possible and in any event within five (5) Business Days after the Borrower obtains knowledge of any Claim against the Borrower or any of its Subsidiaries relating to any of its products or inventory involving more than $[2,500,000] (or the Equivalent Amount in other currencies), written notice thereof from a Responsible Officer of the Borrower which notice shall include a statement setting forth details of such return, recovery, dispute or claim;

(i)    [Reserved]; and

(i) [as soon as possible and in any event within five (5) Business Days after the end of each fiscal month, evidence satisfactory to the Administrative Agent, based upon the Borrower's bank account statements that the Borrower has met its minimum liquidity requirement set out in **Section 10.01**;] and

(j)    such other information respecting the businesses, financial performance, operations or condition of the assets or liabilities of the Obligors (including with respect to the Collateral), taken as a whole, as the Administrative Agent may from time to time reasonably request.

**8.02    Notices of Material Events**. The Borrower will furnish to the Administrative Agent written notice of the following (x) with respect to **clause (a)** below within three (3) Business Days and (y) with respect to **clause (b)** through **(n)** below, within five (5) Business

Days, in each case, after a Responsible Officer of the Borrower first learns of or acquires knowledge with respect to:

(a)     the occurrence of any Default or Event of Default;

(b)     the occurrence of any event with respect to the property or assets of the Borrower or any of its Subsidiaries resulting in a Loss aggregating $[2,500,000] (or the Equivalent Amount in other currencies) or more;

(c)     (i) any proposed acquisition of stock, assets or property by the Borrower or any of its Subsidiaries that could reasonably be expected to result in material Environmental Liability, and (ii) any spillage, leakage, discharge, disposal, leaching, migration or release of any Hazardous Material by the Borrower or any of its Subsidiaries required to be reported to any Governmental Authority or that would reasonably be expected to result in material Environmental Liability;

(d)     the assertion of any Environmental Claim by any Person against, or with respect to the activities of, the Borrower or any of its Subsidiaries and any alleged liability or non-compliance with any Environmental Laws or any permits, licenses or authorizations issued pursuant to Environmental Laws which could reasonably be expected to have a Material Adverse Effect;

(e)     the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any of its Affiliates that would reasonably be expected to result in a Material Adverse Effect;

(f)     (i) the intention of any ERISA Affiliate to file any notice of intent to terminate any Title IV Plan, a copy of such notice and (ii) the filing by any ERISA Affiliate of a request for a minimum funding waiver under Section 412 of the Code with respect to any Title IV Plan or Multiemployer Plan, in each case in writing and in reasonable detail (including a description of any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto);

(g)     (i) the termination of any Material Agreement other than in accordance with its terms and not as a result of a breach or default, (ii) the receipt by the Borrower or any of its Subsidiaries of any notice of a material breach or default under any Material Agreement (and a copy thereof) asserting a default by such Obligor or any of its Subsidiaries where such alleged default would permit such counterparty to terminate such Material Agreement, (iii) the entering into of any new Material Agreement by any Obligor (and a copy thereof) or (iv) any material amendment to a Material Agreement that would be adverse in any material respect to the Lenders (and a copy thereof); provided, that the Borrower shall not be required to provide such notice if such documents become publicly available on "EDGAR" within the time period notice would otherwise be required pursuant to this **Section 8.02**;

(h)     any material change in accounting policies or financial reporting practices by the Borrower or any of its Subsidiaries;

(i)      any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other material labor disruption against or involving an Obligor;

(j)      any Contract entered into by the Borrower or any of its Subsidiaries in connection with any Claim of actual or alleged infringement, misappropriation or violation of any Intellectual Property by or against the Borrower or any of its Subsidiaries;

(k)      the creation, development or other acquisition (including any in-bound exclusive licenses) of any Material Intellectual Property by the Borrower or any Subsidiary after the Closing Date; provided that, with respect to any such Material Intellectual Property created, developed or acquired (including through any in-bound exclusive license) in any fiscal year, notice thereof pursuant to this **Section 8.02(k)8.02(k)** shall be made in accordance with the timing of the financial statements for such fiscal year required pursuant to **Section 8.01(b)8.01(b)**;

(l)      any change to any Obligor's or any of its Subsidiaries' ownership of any Controlled Account, by delivering the Administrative Agent a notice setting forth a complete and correct list of all such accounts as of the date of such change;

(m)      [Reserved];

(m) the occurrence of any Default or Event of Default under or with respect to the Permitted Financing;

(n)      to the extent not otherwise required to be delivered to the Administrative Agent and the Lenders, copies of (i) all notices, reports, certificates or other information provided by the Borrower or its AffiliatesSubsidiaries to the lenders or agents under the Second Lien Credit Agreement pursuant to the Second Lien Loan Documents; andany agreement with respect to Material Indebtedness and (ii) all material notices, reports, certificates or other information provided by the Borrower or its Subsidiaries under any other Material Agreement, except to the extent delivery would violate any confidentiality agreements or restrictions; and

(o)      any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this **Section 8.028.02** shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto. Nothing in this **Section 8.028.02** is intended to waive, consent to or otherwise permit any action or omission that is otherwise prohibited by this Agreement or any other Loan Document.

**8.04**      **Existence**. Such Obligor shall, and shall cause each of its Subsidiaries to, preserve, renew and maintain in full force and effect its legal existence; provided that the foregoing shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under **Section 9.039.03**.

**8.05**      **Payment of Obligations**. Such Obligor will, and will cause each of its Subsidiaries to, pay and discharge its obligations, including (i) all material Taxes, fees, assessments and governmental charges or levies imposed upon it or upon its properties or assets prior to the date on which penalties attach thereto, and all lawful claims for labor, materials and supplies which, if unpaid, might become a Lien upon any properties or assets of the Borrower or

[Different first page setting changed from off in original to on in modified.].

(continued)

any of its Subsidiaries, except to the extent such Taxes, fees, assessments or governmental charges or levies or such claims are being contested in good faith by appropriate proceedings diligently conducted and

4877-6890-5580 v.1.1

are adequately reserved against in accordance with GAAP, and (ii) all lawful claims which, if unpaid, would by law become a Lien upon its property not constituting a Permitted Lien.

**8.07**      **Insurance**. Such Obligor will, and will cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses, including, without limitation, commercial property, liability and business interruption coverage in amounts and with scope no less protective to the Obligors than such coverage as in effect on the Closing Date.  Upon the request of the Administrative Agent, the Borrower shall furnish the Administrative Agent from time to time with (i) material information as to the insurance carried by it and, if so requested, copies of all such insurance policies and (ii) a certificate from the Borrower's insurance broker or other insurance specialist stating that all premiums then due on the policies relating to insurance on the Collateral have been paid and that such policies are in full force and effect. Receipt of notice of termination or cancellation of any such insurance policies or reduction of coverages or amounts thereunder shall entitle the Secured Parties to renew any such policies, cause the coverages and amounts thereof to be maintained at levels required pursuant to the first sentence of this **Section 8.05~~8.05~~8.05** or otherwise to obtain similar insurance in place of such policies, in each case, the Borrower will be responsible for the reasonable and documented cost of such insurance (to be payable on demand). The amount of any such reasonable and documented expenses shall accrue interest at the Default Rate if not paid on demand and shall constitute "Obligations."  Such Obligor shall cause each such policy of insurance (with respect to each such policy outstanding as of the Closing Date, within the time period set forth in **Section 8.22(b)**) to (i) name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear, and (ii) in the case of each casualty insurance policy (including business interruption, if any) contain a lender loss payable clause or endorsement naming the Administrative Agent, on behalf of the Secured Parties, as loss payee thereunder and providing for at least thirty (30) days' prior written notice to the Agent of any material modification or cancellation of such policy, and otherwise reasonably satisfactory in form and substance to the Administrative Agent.

**8.08**      **Books and Records; Inspection Rights**. Such Obligor will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct (in all material respects) entries are made of all dealings and transactions in relation to its business and activities. Such Obligor will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or the Lenders, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition (financial or otherwise) with its officers and independent accountants, during normal business hours (but not more often than once per quarter unless an Event of Default has occurred and is continuing) as the Administrative Agent or the Lenders may request; <u>provided</u> that such representative shall use its commercially reasonable efforts to minimize disruption to the business and affairs of the Borrower as a result of any such visit, inspection, examination or discussion. Notwithstanding anything to the contrary contained herein, no Obligor nor any of its Subsidiaries will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to any Lender (or their respective representatives or contractors) is prohibited by any applicable Law or any binding agreement with a third party (so long as such agreement is not entered into in

contemplation of this Agreement) or (iii) that is subject to attorney-client or similar privilege, which could reasonably be expected to be lost or forfeited if disclosed to the Administrative Agent or any Lender. The Borrower shall pay all reasonable and documented costs of all such inspections.

**8.10**     **Compliance with Laws and Other Obligations**. Such Obligor will, and will cause each of its Subsidiaries to, (i) comply with all Laws (including Anti-Terrorism Laws, Sanctions and Environmental Laws) applicable to it and its business activities, (ii) comply in all material respects with all Healthcare Laws and Governmental Approvals applicable to it and its business activities and (iii) maintain in full force and effect, remain in compliance with, and perform all obligations under all Material Agreement to which it is a party, except, in the case of **clause (i)** and **(iii)** above, where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Within 60 days after the Closing Date, each Obligor shall institute (if not already in effect) and thereafter maintain in effect and enforce policies and procedures reasonably designed to promote compliance by such Obligor, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Terrorism Laws and Sanctions.

**8.11**     **Maintenance of Properties, Etc.** Such Obligor shall, and shall cause each of its Subsidiaries to, maintain and preserve all of its assets and properties, including all assets and properties, whether tangible or intangible, necessary or useful in the conduct of its business in good working order and condition in accordance with the general practice of other Persons of similar character and size, ordinary wear and tear and damage from casualty or condemnation excepted and except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**8.12**     **Licenses**. Such Obligor shall, and shall cause each of its Subsidiaries to, obtain and maintain all Governmental Approvals necessary in connection with the execution, delivery and performance of the Loan Documents, the consummation of the Transactions or the operation and conduct of its business and ownership of its properties, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**8.13**     **Conversion of Convertible Debt**.  Concurrently with or prior to the consummation of any Qualified IPO/SPAC Transaction, all Indebtedness of the Borrower and its Subsidiaries that is convertible into Equity Interests of the Borrower outstanding on or prior to such Qualified IPO/SPAC Transaction (other than the Second Lien Indebtedness) shall have been converted into common Equity Interests in full in accordance with its respective terms.

**8.14**     **Use of ProceedsUse of Proceeds**. The proceeds of the Loans will be used only as provided in **Section 2.052.05**. No part of the proceeds of the Loans will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board of Governors of the Federal Reserve System, including Regulations T, U and X.

**8.15**     **Certain Obligations Respecting Subsidiaries; Further Assurances**.

          (a)     **Subsidiary Guarantors, etc**. In the event that the Borrower or any of its Subsidiaries shall form or acquire any Material Subsidiary (or any Immaterial Subsidiary ceases

to be an Immaterial Subsidiary in accordance with the definition thereof), the Borrower shall promptly (and in any event within thirty (30) calendar days (or such later date agreed to by the Administrative Agent in its sole discretion)):

(i)     cause such Subsidiary to become a "Subsidiary Guarantor" hereunder pursuant to a Guarantee Assumption Agreement and a "Grantor" under the Security Agreement;

(ii)     take such action or cause such Subsidiary to take such action (including joining the Security Agreement and delivering shares of stock together with undated transfer powers executed in blank, applicable control agreements and other instruments and, in the case of any non-U.S. Subsidiary, executing and delivering such applicable local law security documents) as shall be reasonably necessary or desirable or reasonably requested by the Administrative Agent in order to create and perfect, in favor of the Administrative Agent, for the benefit of the Secured Parties, valid and enforceable first priority Liens on substantially all of the personal property of such Subsidiary as collateral security for the Obligations hereunder; provided that any such security interest or Lien shall be subject to the relevant requirements of the Security Documents and the Intercompany Subordination Agreement;

(iii)     to the extent that the parent of such Subsidiary is not a party to the Security Agreement or has not otherwise pledged Equity Interests in its Subsidiaries in accordance with the terms of the Security Agreement and this Agreement, cause the parent (if possible) of such Subsidiary to execute and deliver a pledge agreement in favor of the Administrative Agent, for the benefit of the Secured Parties, in respect of all outstanding issued shares of such Subsidiary;

(iv)     deliver such proof of corporate action, incumbency of officers, and other applicable documents as is consistent with those delivered by each Obligor pursuant to **Section 6.016.01** or as the Administrative Agent shall reasonably request; and

(v)     cause each Subsidiary to become a party to the Intercompany Subordination Agreement.

(b)     **Further Assurances.**

(i)     such Obligor will take such action from time to time as shall reasonably be requested by the Administrative Agent to effectuate the purposes and objectives of this Agreement and the Security Agreement;

(ii)     in the event that such Obligor creates, develops or otherwise acquires Intellectual Property during the term of this Agreement, then the provisions of this Agreement and the Security Agreement shall and hereby does automatically apply thereto and any such Intellectual Property shall automatically constitute and hereby does constitute part of the Collateral under the Security Documents, without further action by any party, in each case from and after the date of such creation, development or acquisition;

(iii)     without limiting the generality of the foregoing, each Obligor will, and will cause each Person that is required to be a Subsidiary Guarantor to, take such action from time to time (including joining the Security Agreement and delivering shares of stock together

with undated transfer powers executed in blank, applicable control agreements and other instruments) as shall be reasonably requested by the Administrative Agent to create, in favor of the Secured Parties, perfected security interests and Liens in substantially all of the personal property (other than Excluded Assets (as defined in the Security Agreement)) of such Obligor as collateral security for the Obligations; provided that any such security interest or Lien shall be subject to the relevant requirements of the Security Documents; provided, further that, without limiting the right of the Administrative Agent to require a Lien or security interest in any newly acquired or created Subsidiary or asset, upon the prior written request of the Borrower, the Borrower and the Administrative Agent shall consult, in good faith, as to whether the cost of obtaining a Lien or security interest thereon would be unreasonably excessive relative to the benefit thereof;

(iv)    promptly (and in any event within five (5) Business Days (or such later date agreed to by the Administrative Agent in its sole discretion))) following the acquisition by any Obligor or any of its Subsidiaries following the Closing Date of any fee interest in real property or lessee interest under a ground lease having a value in excess of $[1,000,000], such Borrower Party shall notify Administrative Agent of such fact and shall, if so requested by Administrative Agent, within thirty (30) days following such request by Administrative Agent (or such longer period as agreed by Administrative Agent in its reasonable discretion), with respect to any such owned or leased real estate, use commercially reasonable efforts to deliver or cause to be delivered to Administrative Agent the following (collectively, "**Mortgage Deliverables**"): (A) a mortgage or deed of trust, as applicable, in form and substance reasonably satisfactory to Administrative Agent, executed by the title holder thereof and recorded in the applicable jurisdiction, granting Administrative Agent, on behalf of the Lenders, a first priority Lien on the fee or lessee interest in such real estate, (B) a lender's title insurance policy issued by a title insurer reasonably satisfactory to Administrative Agent in form and substance and in amounts reasonably satisfactory to Administrative Agent insuring Administrative Agent's, for itself and on behalf of the Lenders', first priority Lien in the fee or lessee interest in such real estate, free and clear of all defects and encumbrances except Permitted Liens, (C) a current ALTA survey, certified to Administrative Agent, for itself and on behalf of the Lenders, by a licensed surveyor, in form and substance reasonably satisfactory to Administrative Agent, or survey affidavits sufficient to allow the issuer of the lender's title insurance policy to issue such policy without a survey exception, (D) a certificate, in form and substance reasonably acceptable to Administrative Agent, to Administrative Agent from a national certification agency acceptable to Administrative Agent, indicating whether such real estate is located in a special flood hazard area and (E) legal opinions in form and substance reasonably acceptable to Administrative Agent from one or more law firms reasonably acceptable to Administrative Agent opining as to due execution, authority, noncircumvention, recordability, perfection and enforceability of the such mortgage or deed of trust; and

(v)    in the event that such Obligor is party to (i) any lease agreement with respect to real property or (ii) any warehousing or bailment arrangement pursuant to which inventory, equipment or other assets of the Obligors are stored at a third-party warehouse or other facility, such Obligor shall use its commercially reasonable efforts to obtain a Landlord Consent or Bailee Letter, as applicable, within 30 days after entry into such agreement or arrangement.

4877-6890-5580 v.1.1

**8.16** **Termination of Non-Permitted Liens**. In the event that any Obligor shall become aware of, or be notified by the Administrative Agent or any Lender of the existence of, any outstanding Lien against any assets or property of such Obligor or any of its Subsidiaries, which Lien is not a Permitted Lien, such Obligor shall use its commercially reasonable efforts to promptly terminate or cause the termination of such Lien.  This provision shall not limit any rights or remedies the Administrative Agent and Lenders have upon the occurrence and during the continuance of an Event of Default.

~~**8.14 Board Materials; Oaktree Lender Board Rights; Independent Capital Raise Committee**.~~

~~(a) (i) The Borrower shall deliver to the Administrative Agent copies of any agenda and other written materials provided to the Board (or any committee thereof, including the Capital Raise Committee) of the Borrower prior to any meeting of the Board (or such committee thereof) of the Borrower, at or reasonably promptly after such materials are furnished to the members of the Board (or such committee thereof), (ii) copies of all minutes of meetings of the Board (or any committee thereof) of the Borrower at or promptly after such minutes are furnished to the members of the Board (or such committee thereof) of the Borrower, (iii) copies of all material written consents duly passed by the Board (or any committee thereof) of the Borrower and (iv) promptly upon presentation of any regular periodic materials to the Board (or any committee thereof) of the Borrower reporting on the current, past or future financial performance and business and operations of the Borrower or any of its Subsidiaries (which shall include, among other things, development updates with respect to material Products, and updates with respect to material events relating to other Material Agreements), copies of such materials shall be delivered to the Administrative Agent; provided that any such material may be redacted by the Borrower to (A) exclude information pertaining to the Borrower's strategy regarding the Loans or (B) preserve attorney-client privilege; provided, further that such redactions are restricted so as to be only as extensive as is reasonably necessary in order to exclude information described in **clauses (A) or (B)**.~~

~~(b) The Borrower shall cause its Board to meet at least once per calendar~~

**8.17** ~~quarter~~[Reserved].

~~(c) The rights set forth in this Section 8.14 shall terminate upon the consummation of a Qualified IPO/SPAC Transaction.~~

**8.18** **Maintenance of Permits, Etc.** The Borrower shall obtain, maintain and do all things necessary to preserve in full force and effect all permits, licenses, authorizations, approvals, franchises, certificates and accreditations which are necessary for the proper conduct of its businesses.

**8.19** **Maintenance of Regulatory Approvals, Contracts, Intellectual Property, Etc.** Each Obligor shall, and shall cause each of its Subsidiaries (to the extent applicable) to,

~~(i)~~ (i) maintain in full force and effect all Regulatory Approvals, Material Agreements, Material Intellectual Property and other rights, interests or assets (whether tangible or intangible) reasonably necessary for the businesses of Obligor and its Subsidiaries, except as would not reasonably be expected to have a Material Adverse Effect, (ii) maintain in full force and effect,

and pay all costs and expenses relating to, such Regulatory Approvals, Material Agreements and Material Intellectual Property owned, used or controlled by such Obligor or any such Subsidiary, except as would not be reasonably expected to have a Material Adverse Effect, (iii) promptly after obtaining knowledge thereof, notify the Administrative Agent of any infringement, misappropriation or other violation by any Person of any Material Intellectual Property, and use commercially reasonable efforts to stop, curtail or abate such infringement, misappropriation or other violation if determined appropriate by the Borrower in the exercise of its business judgment and (iv) promptly after obtaining knowledge thereof, notify the Administrative Agent of any Claim by any Person that the conduct of the business of any Obligor or any of its Subsidiaries has infringed, misappropriated or otherwise violated any Intellectual Property of such Person, where such Claim could reasonably be expected to have a Material Adverse Effect.

**8.20**    **ERISA Compliance**. Such Obligor shall comply, and shall cause each of its Subsidiaries to comply, with the provisions of ERISA with respect to any Plans to which such Obligor or such Subsidiary is a party as an employer in all material respects.

**8.21**    **Cash Management**. Such Obligor shall, and shall cause each of its Subsidiaries to:

(a)    maintain at all times after the Account Control Agreement Completion Date both (i) an aggregate amount of cash of the Borrower and the other Obligors at least equal to the Minimum Liquidity Amount and (ii) no less than 70% of the aggregate amount of cash of the Borrower and its Subsidiaries, in each case, in deposit accounts, disbursement accounts, investment accounts (and other similar accounts) and lockboxes with a bank or financial institution within the U.S. which has executed and delivered to the Administrative Agent an account control agreement, in form and substance reasonably acceptable to the Administrative Agent (each such deposit account, disbursement account, investment account (or similar account) and lockbox, a "***Controlled Account***"); each such Controlled Account shall be a cash collateral account, with all cash, checks and other similar items of payment in such account securing payment of the Obligations, and each Obligor shall have granted a Lien to the Administrative Agent, for the benefit of the Secured Parties, over such Controlled Accounts;

(b)    deposit promptly, and in any event no later than five (5) Business Days after the date of receipt thereof (or such later date agreed to by the Administrative Agent in its sole discretion), all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all accounts and other rights and interests into Controlled Accounts; and

(c)    at any time after the occurrence and during the continuance of an Event of Default, at the request of the Administrative Agent, each Obligor shall cause all payments constituting proceeds of accounts to be directed into lockbox accounts under agreements in form and substance satisfactory to the Administrative Agent.

**8.22**    **[Reserved]**.

~~8.19 **Lender Calls**. At the request of the Administrative Agent, the Borrower shall hold a conference call with the Administrative Agent and the Lenders at reasonable times to be mutually agreed to discuss the financial results of operations of the Borrower and its Subsidiaries.~~

**8.23**        **[Reserved].**

**8.24**        **[Reserved].**

**8.25**        **Post-Closing Obligations.**

(a)        **Mortgage Deliverables.**  Within sixty (60) days after the Closing Date (or such longer time as agreed to by Administrative Agent in its sole discretion), deliver to Administrative Agent Mortgage Deliverables with respect to each Closing Date Property, in form and substance reasonably satisfactory to Administrative Agent.

(b)        **Insurance**.  Within sixty (60) days following the Closing Date (or such longer period of time as agreed by the Administrative Agent in its sole discretion), all such insurance policies required pursuant to each Loan Document shall name the Administrative Agent (for its benefit and the benefit of the Lenders) as loss payee or additional insured, as applicable, and the Borrower shall cause the applicable insurance certificates to provide that no cancellation of the policies will be made without at least ten (10) days' prior written notice to the Administrative Agent and the Administrative Agent shall have received certified copies of such insurance policies (or binders in respect thereof).

(c) **Intellectual Property Assignment.** Within sixty (60) days following the Closing Date, the Borrower shall deliver to the Administrative Agent evidence in form and substance satisfactory to the Administrative Agent that the Borrower has (x) obtained from each inventor of each Patent set forth on **Schedule 8.22(e)** a customary invention assignment agreement presently assigning all of such inventor's right, title and interest in and to the relevant Patent to a Grantor and (y) made the necessary filings with the United States Patent and Trademark Office ("**USPTO**") to evidence in the records of the USPTO that the Borrower is the legal assignee and sole owner of each of the Patents set forth on **Schedule 8.22(e)**.

(c)        (d) **Controlled Accounts.** On or prior to the Account Control Agreement Completion Date, the Administrative Agent shall have received evidence that (i) all deposit accounts, lockboxes, disbursement accounts, investment accounts or other similar accounts (other than Excluded Accounts) of each Obligor located within the U.S. are Controlled Accounts and (ii) such Controlled Accounts are subject to one or more account control agreements, in favor of, and satisfactory in form and substance to, the Administrative Agent that (A) ensures, to the extent necessary under applicable Law, the perfection of a first priority security interest in favor of the Administrative Agent on such Controlled Account, (B) provides that, upon written notice from the Administrative Agent, such bank or financial institution shall comply with instructions originated by the Administrative Agent directing disposition of the funds in such Controlled Account without further consent by the applicable Obligor, and (C) may not be terminated without prior written consent of the Administrative Agent.

(e) **[Retention Package.** Within forty-five (45) days following the Closing Date, the Borrower shall use reasonable best efforts to establish a retention package for each of the Specified Key Persons that is reasonably satisfactory to the Majority Lenders, and the Administrative Agent shall have received true, correct and complete copies of the documentation relating to such retention package.]

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

~~(f) **[Swiss Law Share Pledge**. Within 45 days after the Closing Date (or such longer time as agreed to by Administrative Agent in its sole discretion), the Borrower shall deliver to the Administrative Agent the fully-executed Swiss Law Share Pledge, in form and substance acceptable to the Administrative Agent and the Lenders, in their sole discretion.]~~

## SECTION 9. ~~SECTION 9.~~
## NEGATIVE COVENANTS

Each Obligor covenants and agrees with the Administrative Agent and the Lenders that, until all Obligations (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made), have been indefeasibly paid in full in cash:

**9.01      Indebtedness**. Such Obligor will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, whether directly or indirectly, except:

(a)      the Obligations;

(b)      Indebtedness existing on the date hereof and set forth on **Schedule 7.13(a)** and Permitted Refinancings thereof; <u>provided</u> that, if such Indebtedness is intercompany Indebtedness, (x) any Permitted Refinancing of such Indebtedness shall also be intercompany Indebtedness among the same parties and (y) such Indebtedness and any Permitted Refinancing thereof shall be subject to the Intercompany Subordination Agreement;

(c)      accounts payable to trade creditors for goods and services and current operating liabilities (not the result of the borrowing of money) incurred in the Ordinary Course of such Obligor's or such Subsidiary's business in accordance with customary terms and paid within the specified time, unless contested in good faith by appropriate proceedings and reserved for in accordance with GAAP;

(d)      Indebtedness consisting of guarantees resulting from the endorsement of negotiable instruments for collection in the Ordinary Course;

(e)      Indebtedness of an Obligor owing to any other Obligor, subject to the Intercompany Subordination Agreement;

(f)      The R+D Promissory Note;

(g)      ~~(f)~~ [Reserved];

~~(g) [obligations of the Obligors incurred under the Second Lien Loan Documents (x) incurred on the Closing Date in an aggregate outstanding principal amount not to exceed $[•] plus the amount of interest paid-in-kind pursuant to the Second Lien Loan Documents at any time and (y) incurred after the Closing Date ("*Additional Second Lien Loans*") in an aggregate outstanding principal amount not to exceed $[•] plus the amount of interest paid-in-kind pursuant to the Second Lien Loan Documents, and any Permitted Second Lien Refinancing (including with respect to any interest paid-in-kind pursuant to the Second Lien Loan Documents) thereof; provided that (i) all obligations incurred under the Second Lien Loan Documents or any Permitted Second Lien Refinancing (and all Liens securing such obligations) shall at all times be subject to the Second Lien Subordination Agreement, (ii) no~~

-93-

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 329 of 468

(continued)

Additional Second Lien Loans or other amount shall be incurred after the Closing Date at any time unless, on and as of the date of funding thereof, (iii) no Default or Event of Default has occurred and is continuing or would result therefrom, (iv) the representations and warranties contained in this Agreement and in the other Loan Documents shall be true and correct in all material respects (unless such representations are already qualified by reference to materiality, Material Adverse Effect or similar language, in which case such representations and warranties shall be true and correct in all respects) on and as of the funding date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date, (v) the Borrower shall have no plan to file for relief under any debtor relief law or otherwise commence any proceeding of the type described in Section 11.01(h) hereof within 90 days of such incurrence, (vi) the Borrower shall have delivered to the Administrative Agent a certificate on the date any such Additional Second Lien Loans are funded setting forth the amount of such Additional Second Lien Loans, providing copies of the Second Lien Loan Documents entered into in connection therewith, and certifying as to compliance with the foregoing requirements and (vii) no loans or amounts payable under any Second Lien Loan Document shall be made by or assigned to any Person unless such Person (or such Person's Affiliates) is a holder of Equity Interests in, or Indebtedness of, the Borrower as of the Closing Date or is otherwise reasonably acceptable to the Administrative Agent and the Majority Lenders or any Affiliate or managed funds or accounts of any of the foregoing;

(h)     [the Renasant Indebtedness in an aggregate outstanding principal amount not to exceed $[25,000,000] at any time;]

(i)     Guarantees by any Obligor of Permitted Indebtedness of any other Obligor;

Obligor;

(j)     Ordinary Course Capital Lease Obligations and equipment financing and leasing and Permitted Refinancings in respect thereof; provided that (i) if secured, the collateral therefor consists solely of the assets being financed, the products and proceeds thereof and books and records related thereto and (ii) the outstanding principal amount of such Indebtedness does not exceed $[21]0,000,000] in the aggregate at any time;

(k)     [Reserved];

(l)     [Reserved];

(m)     unsecured Indebtedness in respect of working capital facilities of the Borrower or any of its Subsidiaries in an aggregate outstanding principal amount not to exceed $[150,000,000] (or the Equivalent Amount in other currencies); provided that the documentation governing such Indebtedness shall be in form and substance reasonable satisfactory to the Administrative Agent in its sole discretion;

(n)     the Permitted Financing[Reserved];

(o)     other Indebtedness in an aggregate outstanding principal amount not to exceed $[100,000] (or the Equivalent Amount in other currencies);

4877-6890-5580 v.1.1

(p)    [Reserved];

(q)    Indebtedness in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created, or related to obligations or liabilities incurred, in the Ordinary Course, including in respect of workers compensation claims, health, disability or other employee benefits or property, leases, commercial contracts, Indebtedness permitted pursuant to **Section 9.01(s)**, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims, collectively in an aggregate outstanding principal amount not to exceed $[5,000,000];

(r)    Indebtedness arising in connection with the financing of insurance premiums in the Ordinary Course;

(s)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations arising in the Ordinary Course;

(t)    Indebtedness in respect of netting services, overdraft protections, business credit cards, purchasing cards, payment processing, automatic clearinghouse arrangements, arrangements in respect of pooled deposit or sweep accounts, check endorsement guarantees, and otherwise in connection with deposit accounts or cash management services, in each case, in the Ordinary Course.

**9.02**    **Liens**. Such Obligor will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist, whether directly or indirectly, any Lien on any property now owned by it or such Subsidiary, except:

(a)    Liens securing the Obligations;

(b)    any Lien on any property or asset of such Obligor or any of its Subsidiaries existing on the date hereof and set forth on **Schedule 7.13(b)** and renewals and extensions thereof in connection with Permitted Refinancings of the Indebtedness being secured by such Lien; <u>provided</u> that (i) no such Lien (including any renewal or extension thereof) shall extend to any other property or asset of such Obligor or any of its Subsidiaries and (ii) any such Lien shall secure only those obligations which it secures on the date hereof and renewals, extensions and replacements thereof in connection with Permitted Refinancings of the Indebtedness being secured by such Lien that do not increase the outstanding principal amount thereof;

(c)    Liens securing Indebtedness permitted under **Section 9.01(j)9.01(j)**; <u>provided</u> that such Liens are restricted solely to the collateral described in **Section 9.01(j)9.01(j)**;

(d)    Liens imposed by any Law arising in the Ordinary Course, including (but not limited to) carriers', warehousemen's, landlords', and mechanics' liens, liens relating to leasehold improvements and other similar Liens arising in the Ordinary Course and which (x) secure obligations that are not overdue by more than thirty (30) days or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property subject to such Liens and for which adequate reserves have been made if required in accordance with GAAP;

(e)      pledges or deposits made in the Ordinary Course in connection with bids, contract leases, appeal bonds, workers' compensation, unemployment insurance or other similar social security legislation;

(f)      Liens securing Taxes, assessments and other governmental charges, the payment of which is not yet due or is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted and for which such reserve or other appropriate provisions, if any, as shall be required by GAAP shall have been made;

(g)      servitudes, easements, rights of way, restrictions and other similar encumbrances on real property imposed by any Law and Liens consisting of zoning or building restrictions, easements, licenses, restrictions on the use of real property or minor imperfections in title thereto which, in the aggregate, are not material, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any of the Obligors or any of their Subsidiaries;

(h)      with respect to any real property, (i) such defects or encroachments as might be revealed by an up-to-date survey of such real property; (ii) the reservations, limitations, provisos and conditions expressed in the original grant, deed or patent of such property by the original owner of such real property pursuant to all applicable Laws; and (iii) rights of expropriation, access or user or any similar right conferred or reserved by or in any Law, which, in the aggregate for **clauses (i)**, **(ii)** and **(iii)**, are not material, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any of the Obligors or its Subsidiaries;

(i)      Bankers liens, rights of setoff and similar Liens incurred on deposits made in the Ordinary Course;

(j)      ~~Liens securing Indebtedness permitted under~~ **~~Section 9.01(g)~~**~~; provided that (i) such Liens shall be at all times subject to the Second Lien Subordination Agreement and~~ (ii) such Liens shall attach only to assets constituting Collateral~~[Reserved];

(k)      Liens securing Indebtedness permitted under **Sections ~~9.01(q)~~9.01(q), ~~(r)~~(r), ~~(s)~~(s)** and **(t)**;

~~(t)~~ ;

(l)      Any judgment lien or lien arising from decrees or attachments not constituting an Event of Default;

(m)      Liens arising from precautionary UCC financing statement filings regarding operating leases of personal property and consignment arrangements entered into in the Ordinary Course;

(n)      other Liens not securing borrowed money which secure obligations in an aggregate amount not to exceed $~~[5,000,000]~~ (or the Equivalent Amount in other currencies) at any time outstanding;

(o)      [Reserved];

4877-6890-5580 v.1.1

(O) Liens securing the Permitted Financing so long as such Liens attach only to (i) the Coating Building, (ii) in the case of Permitted Financing consisting of equipment

4877-6890-5580 v.1.1

~~financing, the equipment being financed and (iii) cash and Permitted Cash Equivalent Investments held in deposit accounts constituting Excluded Accounts pursuant to **clause (v)** of the definition thereof;~~

(p)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and incurred in the Ordinary Course;

(q)     Permitted Licenses and Permitted Exclusive Licenses;

(r)     Liens on cash and Permitted Cash Equivalent Investments securing obligations under Permitted Hedging Agreements;

(s)     (i) Liens to secure payment of workers' compensation, employment insurance, old age pensions, social security and other like obligations incurred in the Ordinary Course (other than Liens imposed by ERISA) and (ii) deposits in respect of letters of credit, bank guarantees or similar instruments issued for the account of any Obligor or any Subsidiary in the Ordinary Course supporting obligations of the type set forth in **clause (i)** above; and

(t)     Liens securing Indebtedness permitted under **Section 9.01(h)**;

provided that (i) no Lien otherwise permitted under any of the foregoing **clauses (b), (c), (d), (e), (g)** through **(q)** and **(t)** of this **Section 9.02** shall apply to any Material Intellectual Property and (ii) no Lien shall secure any Renasant Indebtedness except pursuant to **Section 9.02(t)**.

**9.03**     **Fundamental Changes and Acquisitions**. Such Obligor will not, and will not permit any of its Subsidiaries to, (i) enter into any transaction of merger, amalgamation or consolidation (or otherwise merge, amalgamate or consolidate), (ii) liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), (iii) sell or issue any of its Disqualified Equity Interests or (iv) other than Permitted Acquisitions ~~and Investments permitted under **clause (o) of Section 9.05**~~, make any Acquisition or otherwise acquire any business or substantially all the property from, or Equity Interests of, or be a party to any Acquisition of, any Person, except:

(a)     the merger, amalgamation or consolidation or liquidation of any (i) Subsidiary with or into any Obligor; provided that with respect to any such transaction involving (x) the Borrower, the Borrower must be the surviving or successor entity of such transaction and ~~(y)~~ (y) any other Obligor, such Obligor must be the surviving or successor entity of such transaction (unless such transaction involves more than one Obligor, then an Obligor must be the surviving or successor entity of such transaction) or (ii) any Subsidiary that is not an Obligor with or into any other Subsidiary that is not an Obligor;

(b)     the sale, lease, transfer or other disposition by (i) any Subsidiary of any or all of its property (upon voluntary liquidation or otherwise) to any Obligor or (ii) any Subsidiary that is not an Obligor of any or all of its property (upon voluntary liquidation or otherwise) to any other Subsidiary that is not an Obligor; and

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 334 of 468
(continued)

(c)     the sale, transfer or other disposition of the Equity Interests of (i) any Subsidiary to any Obligor or (ii) any Subsidiary that is not an Obligor to any other Subsidiary that is not an Obligor.

**9.04**     **Lines of Business**. Such Obligor will not, and will not permit any of its Subsidiaries to, engage in any business other than the business engaged in on the date hereof by such Persons or a business reasonably related, incidental or complementary thereto or reasonable extensions thereof.

**9.05**     **Investments**. Such Obligor will not, and will not permit, whether directly or indirectly, any of its Subsidiaries to, make, directly or indirectly, or permit to remain outstanding any Investments except:

(a)     Investments (but without giving effect to the cash return provision contained in the definition thereof) outstanding on the Closing Date and identified in **Schedule** ~~9.05~~ 9.05 and any renewals, amendments and replacements thereof that do not increase the amount thereof of any such Investment, net of cash returns thereon, or require that any additional Investment be made (unless otherwise permitted hereunder);

(b)     operating deposit accounts with banks (or similar deposit-taking institutions) that, in the case maintained by Obligors, are Controlled Accounts;

(c)     extensions of credit in the nature of accounts receivable or notes receivable arising from the sales of goods or services in the Ordinary Course;

(d)     Permitted Cash Equivalent Investments;

(e)     ~~[~~Investments by an Obligor (i) in another Obligor or (ii) in a Subsidiary that is not an Obligor; provided that Investments made pursuant to this **clause (ii)** (x) shall not at any time exceed ~~the lesser of (1)~~ $[5,000,000]~~ in the aggregate outstanding at any time ~~and (2) the amount of Permitted Swiss Subsidiary Operating Expenses to be paid in cash for the next 90 day period (as reasonably projected by Borrower in the Ordinary Course) and (y) shall be used solely for the purpose of funding Permitted Swiss Subsidiary Operating Expenses;]~~;

(f)     Investments by a Subsidiary that is not an Obligor in any other Subsidiary that is not an Obligor;

(g)     Permitted Hedging Agreements;

(h)     Investments consisting of prepaid expenses, negotiable instruments held for collection or deposit, security deposits with utilities, landlords and other like Persons and deposits in connection with workers' compensation and similar deposits, in each case, made in the Ordinary Course;

(i)     employee loans, travel advances and guarantees in accordance with the Borrower's usual and customary practices with respect thereto (if permitted by applicable Laws)

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 335 of 468
(continued)

which in the aggregate shall not exceed $[2,500,000] outstanding at any time (or the Equivalent Amount in other currencies);

4877-6890-5580 v.1.1

(j)      Investments received in connection with any Insolvency Proceedings in respect of any customers, suppliers or clients and in settlement of delinquent obligations of, and other disputes with, customers, suppliers or clients;

(k)      the increase in value of any Investment otherwise permitted pursuant to this Section 9.059.05;

(l)      other Investments in an aggregate amount not to exceed $[5,000,000] (or the Equivalent Amount in other currencies) outstanding at any time;

(m)      Investments of any Person in existence at the time such Person becomes a Subsidiary; provided such Investment was not made in connection with or anticipation of such Person becoming a Subsidiary and any modification, replacement, renewal or extension thereof; and

(n)      Investments permitted under Section 9.03; and9.03.

(O) so long as no Default or Event of Default has occurred and is continuing or would result therefrom, cash Investments (i) to finance the construction, repair or improvement of the Coating Building in an amount not to exceed $[10,000,000] over the life of this Agreement, (ii) to pay cash interest, amortization or fees payable with respect to the Permitted Financing in an aggregate amount not to exceed $[4,000,000] per year and (iii) to finance the purchase, construction or repair of equipment for the Coating Building so long as the Administrative Agent has a first-priority security interest in such equipment senior to the interest of any lender or holder of Permitted Financing.

Notwithstanding anything in this Agreement to the contrary, (i) the Borrower shall not, and shall not permit any of its Subsidiaries to (x) directly or indirectly transfer, by means of contribution, sale, assignment, lease or sublease, license or sublicense, or other disposition of any kind, or by designation of any Subsidiary as an Immaterial Subsidiary, any Material Intellectual Property or any Specified Asset held by the Borrower or any other Obligor to any Person other than the Borrower or a Subsidiary Guarantor, or (y) permit any Person other than the Borrower or a Subsidiary Guarantor to hold any interest in any Material Intellectual Property or any Specified Asset (other than pursuant to non-exclusive intercompany licenses), and (ii) no Material Intellectual Property or Specified Asset held by the Borrower or a Subsidiary Guarantor shall be contributed as an Investment to any Subsidiary other than a Subsidiary Guarantor.

**9.06      Restricted Payments**. Such Obligor will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment; provided that the following Restricted Payments shall be permitted:

(a)      dividends with respect to the Borrower's Equity Interests payable solely in shares of its Qualified Equity Interests (or the equivalent thereof);

(b)      so long as no Default or Event of Default has occurred and is continuing, the Borrower's purchase, redemption, retirement, or other acquisition of shares of its Equity Interests with the proceeds received from a substantially concurrent issue of new shares of its Qualified Equity Interests;

(c)        dividends paid by any Subsidiary to any Obligor;

(d)        so long as no Default or Event of Default has occurred and is continuing, any purchase, redemption, retirement or other acquisition of Equity Interests of the Borrower held by officers, directors and employees or former officers, directors or employees (or their transferees, estates, or beneficiaries under their estates) of Borrower and its Subsidiaries not to exceed $[2,500,000] (or the Equivalent Amount in other currencies) in any fiscal year;

(e)        cashless exercises of options and warrants;

(f)        cash payments made by the Borrower to redeem, purchase, repurchase or retire its obligations under warrants issued by it in the nature of cash payments in lieu of fractional shares in accordance with the terms thereof and in the Ordinary Course; and

(g)        Borrower may acquire (or withhold) its Equity Interests pursuant to any employee stock option or similar plan to pay withholding taxes for which Borrower is liable in respect of a current or former officer, director, employee, member of management or consultant upon such grant or award (or upon vesting or exercise thereof).

~~Notwithstanding anything to the contrary in the foregoing, the issuance of, entry into (including any payments of premiums in connection therewith), performance of obligations under (including any payments of interest), and conversion, exercise, repurchase, redemption, settlement or early termination or cancellation of (whether in whole or in part and including by netting or set-off) (in each case, whether in cash, common stock of the Borrower or, following a merger event or other change of the common stock of Borrower, other securities or property) any Permitted Convertible Debt, or the satisfaction of any condition that would permit or require any of the foregoing, in each case, shall not constitute a Restricted Payment by the Borrower.~~

**9.07        Payments of Indebtedness**. Such Obligor will not, and will not permit any of its Subsidiaries to, whether directly or indirectly, make any payments in respect of any Indebtedness other than (i) payments of the Obligations, (ii) scheduled payments of other Indebtedness ~~(including the Permitted Financing)~~ to the extent permitted pursuant to the terms, if any, of any applicable subordination or intercreditor agreement in respect of the Obligations, (iii) intercompany indebtedness permitted under **Section** ~~9.01(e)~~**9.01(e)**, (iv) Indebtedness permitted to be incurred under **Sections 9.01(b), (j), (m) (o), (q),** and **(t)**, (v) [Reserved]; (vi) [~~Indebtedness permitted to be incurred under **Section 9.01(g)** solely to the extent such payment is a "Permitted Payment" under the Second Lien Subordination Agreement,~~Reserved] (vii) [Reserved] and (viii) Permitted Refinancings permitted hereunder ~~(provided that no Permitted Refinancing of the Indebtedness under the Second Lien Loan Documents shall be permitted other than a Permitted Second Lien Refinancing)~~.

**9.08        Change in Fiscal Year**. Such Obligor will not, and will not permit any of its Subsidiaries to, change the last day of its fiscal year from that in effect on the Closing Date, except to change the fiscal year of a Subsidiary acquired in connection with an Acquisition to conform its fiscal year to that of the Borrower.

**9.09        Sales of Assets, Etc.** Such Obligor will not, and will not permit any of its Subsidiaries to, sell, lease or sublease (as lessor or sub-lessor), sale and leaseback, assign,

convey, exclusively license (in terms of geography or field of use), transfer, or otherwise dispose of any of its businesses, assets or property of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired (including accounts receivable and Equity Interests of Subsidiaries), or forgive, release or compromise any amount owed to such Obligor or Subsidiary, in each case, in one transaction or series of transactions (any thereof, an "***Asset Sale***"), except:

(a)      sales, transfers and other dispositions of receivables in connection with the compromise, settlement or collection thereof in the Ordinary Course;

(b)      sales of inventory in the Ordinary Course in an ~~Arm's-Length~~Arm's Length Transaction;

(c)      the forgiveness, release or compromise of any amount owed to any Obligor or Subsidiary in the Ordinary Course;

(d)      Permitted Licenses and Permitted Exclusive Licenses;

(e)      transfers of assets, rights or property by any Subsidiary Guarantor to any other Obligor;

(f)      dispositions (including by way of abandonment or cancellation) of any equipment and other tangible property that is obsolete or worn out or no longer used or useful in the ~~B~~business disposed of in the Ordinary Course;

(g)      dispositions resulting from Casualty Events;

(h)      the unwinding of any Hedging Agreements permitted by **Section ~~9.05~~9.05** pursuant to its terms;

(i)      in connection with any transaction permitted under **Section ~~9.03~~9.03** or **~~9.05~~9.05**;

(j)      dispositions identified in **Schedule ~~9.09~~9.09**;

(k)      so long as no Event of Default has occurred and is continuing, other Asset Sales consummated after the Closing Date with a fair market value not in excess of $[1,000,000] (or the Equivalent Amount in other currencies) in the aggregate;

(l)      other Asset Sales consummated after the Closing Date not in excess of $[5,000,000] (or the Equivalent Amount in other currencies) in the aggregate in which any Obligor or any Subsidiary will receive cash proceeds in an amount equal to no less than ~~seventy- five~~seventy-five percent (75%) of the total consideration (fixed or contingent) paid or payable to such Obligor or Subsidiary[, but only so long as, unless otherwise waived by Administrative Agent in its sole discretion, the net cash proceeds of such Asset Sale are ~~utilized~~applied to repay or prepay, in whole or in part, Indebtedness ~~under and~~ in accordance with ~~this Agreement and the other Loan Documents]~~**Section 3.03(b)(i)**;~~ and~~

*[Different first page setting changed from off in original to on in modified.].*

(m)     the disposition of the property located at 1117 W. Veterans Blvd., Auburn, Al 36830; and

(n)     ~~(m)~~ dispositions in the Ordinary Course consisting of the abandonment of intellectual property rights (other than Material Intellectual Property) which, in the reasonable

4877-6890-5580 v.1.1

good faith determination of Borrower, are not material to the conduct of the business of the Obligors and the Subsidiaries.

**9.10**     **Transactions with Affiliates**. Such Obligor will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction to sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, unless such arrangement or transaction (i) is an ~~Arm's-Length~~Arm's Length Transaction and is of the kind which would be entered into by a prudent Person in the position of the Borrower with another Person that is not an Affiliate; <u>provided</u> that (x) in connection with any such transaction involving aggregate consideration or payments of at least $[1,000,000], such transaction shall have been approved by a majority of the directors serving on the Borrower's board of directors that do not have any material direct or indirect financial interest in or with respect to such transaction and (y) in connection with any such transaction involving aggregate consideration or payments of at least $[10,000,000], the Borrower shall have received a fairness opinion from a nationally recognized appraisal or investment banking firm with respect to such transaction, (ii) is between or among (x) one or more Obligors, on the one hand, and, on the other hand, one or more Obligors, (y) one or more Subsidiaries of the Obligors that are not Obligors, on the one hand, and, on the other hand, one or more Subsidiaries of the Obligors that are not Obligors and (z) one or more Obligors or their Subsidiaries that are not Obligors, on the one hand, and, on the other hand, one or more Obligors or their Subsidiaries that are Obligors (*provided* that, with respect to **clause (z)** only, the terms thereof are no less favorable to the Obligors than those that would be obtained in a comparable ~~arm's-length~~Arm's Length ~~t~~Transaction with a non-affiliated Person), (iii) constitutes customary compensation and indemnification of, and other employment arrangements with, directors, officers, and employees of any Obligor or its Subsidiaries in the Ordinary Course, (iv) constitutes payment of customary fees, reimbursement of expenses, and payment of indemnification to officers and directors and customary payment of insurance premiums on behalf of officers and directors by the Obligors or their Subsidiaries, in each case, in the ordinary course of business, (v) [~~the Second Lien Loan Documents~~Reserved] or (vi) are the transactions set forth on **Schedule 7.19**.

**9.11**     **Restrictive Agreements**. Such Obligor will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any Restrictive Agreement other than (i) restrictions and conditions imposed by applicable Laws or by the Loan Documents ~~or the Second Lien Loan Documents~~, (ii) Restrictive Agreements listed on **Schedule 7.15,** (iii) limitations associated with Permitted Liens or any document or instrument governing any Permitted Lien, (iv) ~~any documentation governing Indebtedness referenced in~~ **clauses (g), (l) or (p) of Section 9.01 (or any Permitted Refinancing thereof),**[Reserved], (v) customary provisions in leases, Permitted Licenses, Permitted Exclusive Licenses and other Contracts restricting the assignment thereof or restricting the assignment or sublease or sublicense of the property leased, licensed or otherwise the subject thereof; (vi) any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary; (vii) restrictions or conditions in any Permitted Indebtedness that is incurred or assumed by Subsidiaries that are not Obligors to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Loan Documents; (viii) restrictions or conditions imposed by any agreement relating to purchase money Indebtedness and other

secured Indebtedness or to leases and licenses permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness or the property leased or licensed; (ix) customary provisions in contracts for the disposition of any assets; provided that the restrictions in any such contract shall apply only to the assets or Subsidiary that is to be disposed of and such disposition is permitted hereunder; and (x) customary provisions regarding confidentiality or restricting assignment, pledges or transfer of any Permitted License or any Permitted Exclusive License or any other agreement entered into in the Ordinary Course.

**9.12    Modifications and Terminations of Material Agreements and Organic Documents**. Such Obligor will not, and will not permit any of its Subsidiaries to:

(a)    waive, amend, terminate, replace or otherwise modify any term or provision of any Organic Document in any way or manner adverse to the interests of the Administrative Agent and the Lenders, provided that for purposes of this **clause (a)**, any amendment, modification or waiver to Section 6 of the certificate of incorporation of the Borrower shall be deemed adverse to the Administrative Agent and the Lenders;

(b)    waive, amend, replace or otherwise modify any term or provision of any Material Agreement in a manner materially adverse to the rights and remedies the Administrative Agent and the Lenders hereunder;

(c)    (x) take or omit to take any action that results in the termination of, or permits any other Person to terminate, any Material Agreement or such Obligor's rights under Material Intellectual Property or (y) take any action that permits any Material Agreement or such Obligor's rights under Material Intellectual Property to be terminated by any counterparty thereto prior to its stated date of expiration, in each such case if such action or omission could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

(d)    enter into, waive, terminate, replace or otherwise modify any joint venture agreement, distribution agreement, collaboration agreement or any agreement similar to any of the foregoing, in each case, that involves the disposition of Collateral or the assignment or exclusive licensing of any Material Intellectual Property, unless such agreement is acceptable in form and substance to the Majority Lenders;.

(e)[Reserved]; or

(f)waive, amend, modify, replace, supplement or restate in any manner in contradiction of the Second Lien Subordination Agreement any Second Lien Loan Document without the prior written consent of the Administrative Agent and the Lenders.

**9.13    Outbound Licenses**.  No Obligor shall, nor shall it permit any of its Subsidiaries to, enter into or become or remain bound by any outbound exclusive license of Intellectual Property, except for Permitted Exclusive Licenses.

**9.14    Sales and Leasebacks**. Except as disclosed on **Schedule 9.14**, except as otherwise consented to in writing by the Administrative Agent in its sole discretion, such Obligor will not, and will not permit any of its Subsidiaries to, become liable, directly or indirectly, with respect to any lease, whether an operating lease or a Capital Lease Obligation, of any property

(whether real, personal, or mixed), whether now owned or hereafter acquired, (i) which such Person has sold or transferred or is to sell or transfer to any other Person and (ii) which such Obligor or Subsidiary intends to use for substantially the same purposes as property which has been or is to be sold or transferred.

**9.15** **Hazardous Material**. (a) Such Obligor will not, and will not permit any of its Subsidiaries to, use, generate, manufacture, install, treat, release, store or dispose of any Hazardous Material, except in compliance with all applicable Environmental Laws and as would not result in Environmental Liability except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. If the Administrative Agent at any time has a reasonable basis to believe that there is any material violation by an Obligor of any Environmental Law or the presence or release of any Hazardous Material which could result in an Environmental Liability that could be reasonably expected to result in a Material Adverse Effect, each Obligor shall, and shall cause each Subsidiary to, (i) prepare an environmental assessment of such condition, including where appropriate environmental testing, and the preparation of such environmental report, at the Borrower's sole cost and expense, as the Administrative Agent may reasonably request with respect to any affected parcel of real property subject to a Security Document that is a mortgage, deed of trust or similar instrument, which shall be conducted by Persons reasonably acceptable to the Administrative Agent and shall be in form and substance reasonably acceptable to the Administrative Agent, and (ii) if such report is not delivered within thirty (30) days, permit the Administrative Agent or its representatives to have access to all such real property for the purpose of conducting, at the Borrower's sole cost and expense, such environmental audits and testing as the Administrative Agent shall reasonably deem appropriate.

**9.16** **Accounting Changes**. Such Obligor will not, and will not permit any of its Subsidiaries to, make any significant change in accounting treatment or reporting practices, except as required or permitted by GAAP.

**9.17** **Compliance with ERISA**. No ERISA Affiliate shall cause or suffer to exist (i) any event that could result in the imposition of a Lien with respect to any Title IV Plan or Multiemployer Plan or (ii) any other ERISA Event that could, in the aggregate, reasonably be expected to result in a Material Adverse Effect. No Obligor or any of its Subsidiaries shall cause or suffer to exist any event that could result in the imposition of a Lien with respect to any Benefit Plan.

**9.18** **Sanctions; Anti-Corruption Use of Proceeds**.

(a) Neither the Borrower or any of its Subsidiaries or their respective agents shall (i) conduct any business or engage in any transaction or dealing with any Sanctioned Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to any Sanctions; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Sanctions, the Patriot Act or any other Anti-Terrorism Law.

4877-6890-5580 v.1.1

(b)    The Borrower will not, directly or, to the knowledge of the Borrower, indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable anti-corruption Law, or (ii) (A) for the purpose of funding any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of country- or territory-wide  wide Sanctions, in violation of Sanctions or (B) in any other manner that would result in a violation of Sanctions by any party to this Agreement.

9.19 Foreign Subsidiaries. Such Obligor will not, and will not permit any of its Subsidiaries to, form any Subsidiary, or acquire any Equity Interests in any Subsidiary, that is a

(i) Foreign Subsidiary or (ii) Domestic Subsidiary of a Foreign Subsidiary, unless, in each case, such Subsidiary is the Permitted Swiss Subsidiary or has become a Subsidiary Guarantor and granted a first priority security interest in all of its assets pursuant to security documentation in form and substance acceptable to the Administrative Agent.

9.20 [No Participating Preferred Stock. From and after the Closing Date, neither the Borrower or any of its Subsidiaries shall issue any class or series of participating preferred capital stock (or any other similar class of capital stock).]

9.21 [Transfers to Non-Obligors. Notwithstanding anything in this Agreement to the contrary, from and after the Closing Date, neither the Borrower nor any of its Subsidiaries shall sell, lease, license or otherwise transfer any assets to the Permitted Swiss Subsidiary or any other Subsidiary that is not an Obligor without the prior written consent of the Lenders, other than permitted Investments in the Permitted Swiss Subsidiary pursuant to, and subject to the conditions of, Section 9.05(e).]

9.22 [No Swiss Subsidiary Debt. Notwithstanding anything in this Agreement to the contrary, from and after the Closing Date, neither the Borrower nor any of its Subsidiaries will permit the Permitted Swiss Subsidiary to, create, incur, assume or permit to exist any Indebtedness or issue any Equity Interests to any party other than the Obligors, whether directly or indirectly, without the prior written consent of the Lenders.]

9.23 [Payments to Insiders. Notwithstanding anything to the contrary herein, neither the Borrower nor any of its Subsidiaries shall make any payments whether in cash, property or other consideration to any of its or their directors, officers, equityholders or any other Persons who are "insiders" pursuant to Section 101(31) of the Bankruptcy Code or Affiliates of any of the foregoing, in each case, other than (a) salaries and compensation to employees of any Obligor in the Ordinary Course, (b) reasonable, documented, out-of-pocket travel expenses of the members of the Board of Borrower.]

## SECTION 10. SECTION 10.
### FINANCIAL COVENANTS[1]

---

[1] Note to Draft: All financial covenants subject to ongoing review.

4877-6890-5580 v.1.1

**10.01**          [**Minimum Liquidity**. The Borrower shall at all times maintain the Minimum Liquidity Amount in cash or Permitted Cash Equivalent Investments in ~~the Liquidity Reserve~~one or more Controlled Accounts that is free and clear of all Liens, other than Liens granted ~~hereunder~~ in favor of the Administrative Agent ~~and Liens granted under the Second Lien Credit Agreement in favor of the Second Lien Administrative Agent~~.

~~**10.02** **Minimum Revenue.** Beginning with the fiscal quarter of the Borrower ending on [•] and with respect to each subsequent fiscal quarter prior to the consummation of a Qualified IPO/SPAC Transaction, as of the last day of each such fiscal quarter, the Revenue of the Borrower and its Subsidiaries for the twelve (12) consecutive month period ending on the last day of such fiscal quarter shall not be less than the Minimum Revenue with respect to such period (the "*Minimum Revenue Covenant*").~~
~~**10.03** **Minimum EBITDA.** Beginning with the fiscal quarter of the Borrower ending on [•] and with respect to each subsequent fiscal quarter prior to the Maturity Date, as of the last day of each such fiscal quarter, the EBITDA of the Borrower and its Subsidiaries for the twelve~~
~~(12) consecutive month period ending on the last day of such fiscal quarter shall not be less than $[75,000,000] (the "*Minimum EBITDA Covenant*").]~~

**SECTION 11.** ~~**SECTION 11.**~~
**EVENTS OF DEFAULT**

**11.01**          **Events of Default**. Each of the following events shall constitute an "*Event of Default*":

          (a)          **Principal Payment Default**. The Borrower shall fail to pay any principal of the Loan, when and as the same shall become due and payable, whether at the due date thereof, at a date fixed for prepayment thereof or otherwise.

          (b)          **Other Payment Defaults**. Any Obligor shall fail to pay interest or any other Obligation (other than an amount referred to in **Section ~~11.01(a)~~11.01(a)**) when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three
          (3) Business Days.

          (c)          **Representations and Warranties**. Any representation or warranty made or deemed made by or on behalf of any Obligor or any of its Subsidiaries in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof, shall: (i) prove to have been incorrect or misleading in any respect when made or deemed made to the extent that such representation or warranty contains any materiality or Material Adverse Effect qualifier; or (ii) prove to have been incorrect or misleading in any material respect when made or deemed made to the extent that such representation or warranty does not otherwise contain any materiality or Material Adverse Effect qualifier.

          (d)          **Certain Covenants**. Any Obligor shall fail to observe or perform any covenant, condition or agreement contained in **Sections ~~8.02~~8.02, ~~8.03~~8.03** (with respect to the Borrower's existence)**, 8.11, 8.12, 8.16, 8.18, 8.22, SECTION 9** or **SECTION 10**.

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD Doc 500 Filed 08/03/23 Page 345 of 468
(continued)

~~Borrower's existence), **8.11, 8.12, 8.14** (and, in the case of Section 8.14, such failure shall remain uncured for five days), **8.16, 8.18, 8.22, SECTION 9** or **SECTION 10**; provided that any Event of Default under **Section 10.02** is subject to cure as provided in **Section 11.04** and an Event of Default with respect to such **Section 10.02** shall not occur until the expiration of the tenth Business Day subsequent to the date on which the financial statements with respect to the applicable fiscal quarter (or the fiscal year ended on the last day of such fiscal quarter) are required to be delivered pursuant to **Sections 8.01(a) or 8.01(b)**, as applicable.~~

(e)       **Other Covenants**. Any Obligor shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in **Section ~~11.01(a)~~11.01(a)**, **(b)** or **d)**) or any other Loan Document, and, in the case of any failure that is capable of cure, such failure shall continue unremedied for a period of fifteen (15) or more days.

(f)       **Payment Default on Other Indebtedness**. Any Obligor or any of its Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material ~~Indebtedness or the Second Lien~~ Indebtedness, when and as the same shall become due and payable after giving effect to any applicable grace or cure period as originally provided by the terms of such Indebtedness or Second Lien Indebtedness, as applicable.

(g)       **Other Defaults on Other Indebtedness**. (i) Any material breach of, or "event of default" or similar event under, any Contract governing any Material Indebtedness ~~or the Second Lien Indebtedness~~ shall occur and such breach or "event of default" or similar event shall continue unremedied, uncured or unwaived after the expiration of any grace or cure period thereunder, or (ii) any event or condition occurs (x) that results in any Indebtedness becoming due prior to its scheduled maturity or (y) that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf to cause such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this **Section ~~11.01(g)~~11.01(g)** shall not apply to (x) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness,

~~(y)~~ (y) any conversion of any convertible Indebtedness or satisfaction of any condition giving rise to or permitting a conversion of any convertible Indebtedness; provided that the Borrower has the right to settle any such Indebtedness into Equity Interests of the Borrower (and nominal cash payments in respect of fractional shares and cash payments in respect of accrued and unpaid interest) in accordance with the express terms or conditions thereof and (z) with respect to any Indebtedness consisting of Hedging Agreements, termination events or equivalent events pursuant to the terms of such Hedging Agreements and not as a result of any default thereunder by any Obligor or any Subsidiary.

(h)       **Insolvency, Bankruptcy, Etc**.

(i)       Any Obligor or any of its Material Subsidiaries becomes insolvent, or generally does not or becomes unable to pay its debts or meet its liabilities as the same become due, or admits in writing its inability to pay its debts generally, or declares any general moratorium on

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 346 of 468

TABLE OF CONTENTS
(continued)

its indebtedness, or proposes a compromise or arrangement or deed of company arrangement between it and any class of its creditors.

4877-6890-5580 v.1.1

(ii)     Any Obligor or any of its Material Subsidiaries commits an act of bankruptcy or makes an assignment of its property for the general benefit of its creditors or makes a proposal (or files a notice of its intention to do so).

(iii)     Any Obligor or any of its Material Subsidiaries institutes any proceeding seeking to adjudicate it an insolvent, or seeking liquidation, dissolution, winding-up, reorganization, compromise, arrangement, adjustment, protection, moratorium, relief, stay of proceedings of creditors generally (or any class of creditors), or composition of it or its debts or any other relief, under any Law, whether U.S. or non-U.S., now or hereafter in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors or at common law or in equity, or files an answer admitting the material allegations of a petition filed against it in any such proceeding.

(iv)     Any Obligor or any of its Material Subsidiaries applies for the appointment of, or the taking of possession by, a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, voluntary administrator, receiver and manager or other similar official for it or any substantial part of its property.

(v)     Any Obligor or any of its Material Subsidiaries takes any action, corporate or otherwise, to approve, effect, consent to or authorize any of the actions described in this **Section ~~11.01(h)~~11.01(h),** or otherwise acts in furtherance thereof or fails to act in a timely and appropriate manner in defense thereof.

(vi)     Any petition is filed, application made or other proceeding instituted against or in respect of any Obligor or any of its Material Subsidiaries:

(A)     seeking to adjudicate it as insolvent;

(B)     seeking a receiving order against it;

(C)     seeking liquidation, dissolution, winding-up, reorganization, compromise, arrangement, adjustment, protection, moratorium, relief, stay of proceedings of creditors generally (or any class of creditors), deed of company arrangement or composition of it or its debts or any other relief under any Law, whether U.S. or non-U.S., now or hereafter in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors or at common law or in equity; or

(D)     seeking the entry of an order for relief or the appointment of, or the taking of possession by, a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, voluntary administrator, receiver and manager or other similar official for it or any substantial part of its property, and such petition, application or proceeding continues undismissed, or unstayed and in effect, for a period of ~~forty-five~~forty-five (45) days after the institution thereof; provided that if an order, decree or judgment is granted or entered (whether or not entered or subject to appeal) against such Obligor or such Subsidiary thereunder in the interim, such grace period will cease to apply; provided, further, that if such Obligor or Material Subsidiary files an answer admitting the material allegations of a petition filed against it in any such proceeding, such grace period will cease to apply.

(vii)    Any other event occurs which, under the Laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in this **Section 11.01(h)11.01(h)**.

(i)    **Judgments**. One or more judgments for the payment of money in an aggregate amount in excess of $[5,000,000] (or the Equivalent Amount in other currencies) (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage) shall be rendered against any Obligor or any of its Subsidiaries or any combination thereof and the same shall remain undischarged for a period of forty-five (45) calendar days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Obligor to enforce any such judgment.

(j)    **ERISA**. An ERISA Event shall have occurred that when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount in excess of $[5,000,000] (or the Equivalent Amount in other currencies).

(k)    **Change of Control**. A Change of Control shall have occurred.

(l)    [Reserved].

(m)    [Reserved].

(m) **[Key Person Events.** At any time, (i) three (3) or more Key Persons cease to be employed by the Borrower or (ii) two (2) or more Specified Key Persons cease to be employed by the Borrower and, in the case of this **clause (ii)**, the Borrower and its Subsidiaries are no longer able to perform to the same standards and in a timely manner, the activities being performed by the Borrower and its Subsidiaries as of the Closing Date. A Key Person or Specified Key Person shall be deemed not actively employed if they have resigned or provided notice of resignation or any period they are subject to any "gardening" or similar leave.]

(n)    [Reserved].

(n) **[Second Lien Subordination Agreement.** If any of the following events occurs: (i) the Obligations shall cease to constitute "Senior Indebtedness" under the Second Lien Subordination Agreement for any reason, (ii) the Second Lien Subordination Agreement or any provision thereof shall be invalidated or otherwise cease to be legal, valid and binding obligations of the parties thereto, enforceable in accordance with their terms, or (iii) any purported party to the Second Lien Subordination Agreement shall assert that any provision of the Second Lien Subordination Agreement is not legal, valid or binding or otherwise challenge or contest the legality, validity, binding nature or enforceability thereof.]

(o)    **Impairment of Security, Etc.** Subject in all respects to any applicable post-closing periods and certain other time periods under the Loan Documents for any Obligor or Subsidiary to take perfection actions, if any of the following events occurs: (i) any Lien created by any of the Security Documents shall at any time not constitute a valid and perfected Lien on the applicable Collateral in favor of the Secured Parties, free and clear of all other Liens (other than Permitted Liens) except due to the action or inaction of the Administrative Agent, (ii) except for expiration in accordance with its terms, any of the Security Documents or any Guarantee of any of the Obligations (including that contained in **Section 13**) shall for whatever reason cease to be in full force and effect, (iii) any Obligor shall, directly or indirectly, contest in

any manner such effectiveness, validity, binding nature or enforceability of any such Lien or any Loan Document, or (iv) any injunction, whether temporary or permanent, shall be rendered against any Obligor that prevents the Obligors from selling or manufacturing any of their other material and commercially available products in the United States for more than forty-five (45) calendar days.

**11.02     Remedies.**

(a)     **Defaults Other Than Bankruptcy Defaults**. Upon the occurrence of any Event of Default, then, and in every such event (other than an Event of Default described in **Section 11.01(h)11.01(h)**), and at any time thereafter during the continuance of such event, the Administrative Agent may, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations, including any applicable Prepayment Fee, shall become due and payable immediately (in the case of the Loans, at the Prepayment Price therefor), without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Obligor.

(b)     **Bankruptcy Defaults**. In case of an Event of Default described in **Section 11.01(h)11.01(h)**, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other Obligations, including any applicable Prepayment Fee, shall automatically become due and payable immediately (in the case of the Loans, at the Prepayment Price therefor), without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Obligor.

**11.03     Additional Remedies**. If an Event of Default has occurred and is continuing, if any Obligor shall be in default under a Material Agreement, the Administrative Agent shall have the right (but not the obligation) to cause the default or defaults under such Material Agreement to be remedied (including without limitation by paying any unpaid amount thereunder) and otherwise exercise any and all rights of such Obligor, as the case may be, thereunder, as may be necessary to prevent or cure any default. Without limiting the foregoing, upon any such default, each Obligor shall promptly execute, acknowledge and deliver to the Administrative Agent such instruments as may reasonably be required of such Obligor to permit the Administrative Agent to cure any default under the applicable Material Agreement or permit the Administrative Agent to take such other action required to enable the Administrative Agent to cure or remedy the matter in default and preserve the interests of the Administrative Agent. Any amounts paid by the Administrative Agent pursuant to this **Section 11.0311.03** shall be payable in accordance with **Section 14.03(a)14.03(a)**, shall accrue interest at the Default Rate if not paid when due, and shall constitute "Obligations."

**11.04     [~~Minimum Revenue Covenant Cure~~Reserved].**

(a) ~~Notwithstanding anything to the contrary contained in Section 11.02, in the event the Borrower fails to comply with the requirements of the Minimum Revenue Covenant, during the period from the end of the relevant fiscal quarter until the expiration of the tenth Business Day subsequent to the date the financial statements are required to be delivered~~

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 350 of 468
(continued)

pursuant to **Section 8.01(a) or 8.01(b)** with respect to such period, the Borrower shall have the right to make a Revenue Cure Payment so long as, immediately after giving effect to the Minimum Revenue Cure Right, the Borrower continues to hold at least the Minimum Liquidity Amount (the "***Minimum Revenue Cure Right***"). Upon the Administrative Agent's receipt of the applicable Revenue Cure Payment or application of such cash amounts, the Borrower shall then be in compliance with the requirements of the Minimum Revenue Covenant and the Borrower shall be deemed to have satisfied the requirements of the Minimum Revenue Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach of the Minimum Revenue Covenant and any related default that had occurred shall be deemed cured for the purposes of this Agreement. Any Revenue Cure Payment shall be applied to the prepayment of the Loans.

(b) If within such ten Business Day period, the Oaktree Lender declines the exercise by the Borrower of the Minimum Revenue Cure Right by written notice to the Administrative Agent and the Borrower to that effect, then the Borrower shall be deemed to have satisfied the requirements of the Minimum Revenue Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach of the Minimum Revenue Covenant and any related default that had occurred shall be deemed cured for the purposes of this Agreement.

(c) In each period of four consecutive fiscal quarters, there shall be no more than two (2) fiscal quarters in which the cure right set forth in this **Section 11.04** is exercised. There shall be no more than four (4) fiscal quarters in which the cure rights set forth in this **Section 11.04** are exercised during the term of the Loans.]

**11.05**     **Payment of Prepayment Fee**. Notwithstanding anything in this Agreement to the contrary, the Prepayment Fee shall automatically be due and payable at any time the Obligations become due and payable prior to the Maturity Date in accordance with the terms hereof as though such Indebtedness was voluntarily prepaid and shall constitute part of the Obligations, whether due to acceleration pursuant to the terms of this Agreement (in which case it shall be due immediately, upon the giving of notice to Borrower in accordance with **Section ~~11.02(a)~~11.02(a)**, or automatically, in accordance with **Section ~~11.02(b)~~11.02(b))**, by operation of law or otherwise (including on account of any bankruptcy filing), in view of the impracticability and extreme difficulty of ascertaining the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such acceleration, and by mutual agreement of the parties as to a reasonable estimation and calculation of the lost profits or damages of the Lenders as a result thereof. Any Prepayment Fee payable pursuant to this Agreement shall be presumed to be the liquidated damages sustained by each Lender as the result of the early termination, acceleration or prepayment and each Obligor agrees that such Prepayment Fee is reasonable under the circumstances currently existing.  The Prepayment Fee shall also become due and payable under this Agreement in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means or the Obligations are reinstated pursuant to Section 1124 of the Bankruptcy Code.  If the Prepayment Fee becomes due and payable pursuant to this Agreement, the Prepayment Fee shall be deemed to be principal of the Loans and Obligations under this Agreement and interest shall accrue on the full principal amount of the Loans (including the Prepayment Fee) from and after the applicable triggering event.  In the event the Prepayment Fee is determined not to be due and

4877-6890-5580 v.1.1

payable by order of any court of competent jurisdiction, including, without limitation, by operation of the Bankruptcy Code, despite such a triggering event having occurred, the Prepayment Fee shall nonetheless constitute Obligations under this Agreement for all purposes hereunder. ~~EACH OBLIGOR HEREBY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE PREPAYMENT FEE AND ANY DEFENSE TO PAYMENT, WHETHER SUCH DEFENSE MAY BE BASED IN PUBLIC POLICY, AMBIGUITY, OR~~ EACH OBLIGOR HEREBY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE PREPAYMENT FEE AND ANY DEFENSE TO PAYMENT, WHETHER SUCH DEFENSE MAY BE BASED IN PUBLIC POLICY, AMBIGUITY, OR OTHERWISE~~OTHERWISE~~.  The Obligors, the Administrative Agent and the Lenders acknowledge and agree that any Prepayment Fee due and payable in accordance with this Agreement shall not constitute unmatured interest, whether under Section 5.02(b)(3) of the Bankruptcy Code or otherwise. Each Obligor further acknowledges and agrees, and waives any argument to the contrary, that payment of such amount does not constitute a penalty or an otherwise unenforceable or invalid obligation. Each Obligor expressly agrees that (i) the Prepayment Fee is reasonable and is the product of an ~~arm's-length~~Arm's Length ~~t~~Transaction between sophisticated business people, ably represented by counsel, (ii) the Prepayment Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the Lenders and the Obligors giving specific consideration in this transaction for such agreement to pay the Prepayment Fee, (iv) the Obligors shall be estopped hereafter from claiming differently than as agreed to in this **Section 11.05**, (v) their agreement to pay the Prepayment Fee is a material inducement to the Lenders to make the Loans, and (vi) the Prepayment Fee represents a good faith, reasonable estimate and calculation of the lost profits, losses or other damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such event.

## SECTION 12. ~~SECTION 12.~~
### THE ADMINISTRATIVE AGENT

**12.01**      **Appointment and Duties**. Subject in all cases to clause (c) below:

(a)      **Appointment of the Administrative Agent**. Each of the Lenders hereby irrevocably appoints Oaktree Fund Administration, LLC (together with any successor Administrative Agent pursuant to **Section ~~12.09~~12.09**) as the Administrative Agent hereunder and authorizes the Administrative Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Obligor or any of its Subsidiaries, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Administrative Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto. Except as expressly set forth herein, the provisions of this **Section 12** are solely for the benefit of the Administrative Agent and the Lenders, and no Obligor or any Affiliate thereof shall have rights as a third-party beneficiary of any such provisions.

(b)      **Duties as Collateral and Disbursing Agent**. Without limiting the generality of **Section ~~12.01(a)~~12.01(a)**, the Administrative Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i)

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 352 of 468
(continued)

act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents (including in any proceeding described in **Section ~~11.01(h)~~11.01(h)** or any other bankruptcy, insolvency or similar proceeding), and each Person

4877-6890-5580 v.1.1

making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to the Administrative Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in **Section 11.01(h)11.01(h)** or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Secured Party), (iii) act as collateral agent for each Secured Party for purposes of acquiring, holding, enforcing and perfecting all Liens created by the Loan Documents and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to the Administrative Agent and the other Secured Parties with respect to the Collateral, whether under the Loan Documents, applicable Laws or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; <u>provided</u> that the Administrative Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for the Administrative Agent and the Lenders for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Obligor with, and cash and Permitted Cash Equivalent Investments held by, such Lender, and may further authorize and direct the Lenders to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to the Administrative Agent, and each Lender hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)     **Limited Duties**. The Lenders and the Obligors hereby each acknowledge and agree that the Administrative Agent (i) has undertaken its role hereunder purely as an accommodation to the parties hereto and the Transactions, (ii) is receiving no compensation for undertaking such role and (iii) subject only to the notice provisions set forth in **Section 12.0912.09**, may resign from such role at any time for any reason or no reason whatsoever. Without limiting the foregoing, the parties hereto further acknowledge and agree that under the Loan Documents, the Administrative Agent (i) is acting solely on behalf of the Lenders (except to the limited extent provided in **Section 12.1112.11**), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "the Administrative Agent", the terms "agent", "administrative agent" and "collateral agent" and similar terms in any Loan Document to refer to the Administrative Agent, which terms are used for title purposes only, (ii) is not assuming any duty or obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Secured Party and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document (fiduciary or otherwise), in each case, regardless of whether a Default has occurred and is continuing, and each Lender hereby waives and agrees not to assert any claim against the Administrative Agent based on the roles, duties and legal relationships expressly disclaimed in this **clause (c)**. Without in any way limiting the foregoing, the Administrative Agent shall not, except as expressly set forth in this Agreement and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Obligor or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

**12.02**     **Binding Effect**. Each Lender agrees that (i) any action taken by the Administrative Agent or the Majority Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by the Administrative Agent in reliance upon the instructions of the Majority Lenders (or, where so required, such greater proportion) and (iii) the exercise by the Administrative Agent or the Majority Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

**12.03**     **Use of Discretion**.

(a)     **No Action without Instructions**. The Administrative Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except (subject to **clause (b)** below) any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to written instructions from the Majority Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

(b)     **Right Not to Follow Certain Instructions**. Notwithstanding **Section 12.03(a)12.03(a)** or any other term or provision of this **Section 1212**, the Administrative Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Administrative Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Administrative Agent, any other Secured Party) against all liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Administrative Agent or any Related Person thereof or (ii) that is, in the opinion of the Administrative Agent, in its sole and absolute discretion, contrary to any Loan Document, Law or the best interests of the Administrative Agent or any of its Affiliates or Related Persons, including, for the avoidance of doubt, any action that may be in violation of the automatic stay in connection with any Insolvency Proceeding.

**12.04**     **Delegation of Rights and Duties**. The Administrative Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party). The Administrative Agent and any such Person may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. Any such Person and its Related Parties shall benefit from this **Section 1212** to the extent provided by the Administrative Agent; provided, however, that the exculpatory provisions of this **Section 12** shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and of any such sub-agent, and shall apply to their respective activities in connection with their activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**12.05**     **Reliance and Liability**.

-119-

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD    Doc 500    Filed 08/03/23    Page 355 of 468
(continued)

.

(a)    The Administrative Agent may, without incurring any liability hereunder, (i) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Obligor) and (ii) rely and act upon any notice, request, certificate, consent, statement, instrument, document or other writing (including and electronic message, Internet or intranet website posting or other distribution), telephone message or conversation or oral conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.

(b)    Neither the Administrative Agent nor any of its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Lender and the Borrower hereby waive and shall not assert (and the Borrower shall cause each other Obligor to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the fraudulent conduct or behavior of the Administrative Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment or order by a court of competent jurisdiction) in connection with the duties expressly set forth herein. Without limiting the foregoing, the Administrative Agent:

(i)    shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of, or with the consent of, the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in **Section 14.04**) or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent);

(ii)    shall not be responsible to any Secured Party for the (a) validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (b) due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)    makes no warranty or representation, and shall not be responsible, to any Secured Party for, and shall not have any duty to ascertain or inquire into, any statement, document, information, certificate, report, representation or warranty made or furnished by or on behalf of any Related Person, in or in connection with any Loan Document or any transaction contemplated therein, whether or not transmitted by the Administrative Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Administrative Agent in connection with the Loan Documents, including, for the avoidance of doubt, the satisfaction of any condition set forth in **Section 6** of this

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 356 of 468

TABLE OF CONTENTS
(continued)

Agreement or elsewhere herein (other than to confirm receipt of items expressly required to be delivered to the Administrative Agent); and

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 357 of 468

(continued)

(iv)    shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document or whether any condition set forth in any Loan Document is satisfied or waived, including, without limiting the generality of the foregoing, as to the financial condition of any Obligor or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower, any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case the Administrative Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in **clauses (i)** through **(iv)** above, each Lender and the Borrower hereby waives and agrees not to assert (and the Borrower shall cause each other Obligor to waive and agree not to assert) any right, claim or cause of action it might have against the Administrative Agent based thereon.

**12.06    Administrative Agent Individually**. The Administrative Agent and its Affiliates may make loans and other extensions of credit to, acquire stock and stock equivalents of, accept deposits from, act as the financial advisor for or in any other advisory capacity for, or engage in any kind of business with, any Obligor or Affiliate thereof as though it were not acting as the Administrative Agent and may receive separate fees and other payments therefor. To the extent the Administrative Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Majority Lender", and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, the Administrative Agent or such Affiliate, as the case may be, in its individual capacity as Lender or as one of the Majority Lenders, respectively.

**12.07    Lender Credit Decision**. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any Lender or any of their Related Persons or upon any document solely or in part because such document was transmitted by the Administrative Agent or any of its Related Persons, conducted its own independent investigation of the financial condition and affairs of each Obligor and has made and continues to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.

**12.08    Expenses; Indemnities**.

(a)    Each Lender agrees to reimburse the Administrative Agent and each of its Related Persons (to the extent not reimbursed by any Obligor) promptly upon demand for such Lender's Proportionate Share of any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Obligor) that may be incurred by the Administrative Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-work-out

out, bankruptcy, restructuring or other legal or other proceeding or otherwise) of, or legal advice in respect of its rights or responsibilities under, any Loan Document.

(b)    Each Lender further agrees to indemnify the Administrative Agent (or any sub-agent thereof) and any Related Persons of the Administrative Agent (or any such sub-agent) (to the extent not indefeasibly paid by any Obligor), from and against such Lender's aggregate Proportionate Share of the liabilities (including taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to on or for the account of any Lender) that may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub-agent sub-agent) in any matter relating to or arising out of, in connection with or as a result of any Loan Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub- agent sub-agent) under or with respect to any of the foregoing; provided that no Lender shall be liable to the Administrative Agent (or any sub-agent thereof) or any Related Persons of the Administrative Agent (or any such sub-agent) to the extent such liability has resulted primarily from the gross negligence or willful misconduct of the Administrative Agent (or any sub-agent thereof) or, as the case may be, such Related Person of the Administrative Agent (or any sub- agent sub-agent thereof), as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

**12.09**        **Resignation of the Administrative Agent.:.**

(a)    At any time upon not less than 30 days' prior written notice, the Administrative Agent may resign as the "the Administrative Agent" hereunder, in whole or in part (in the sole and absolute discretion of the Administrative Agent). If the Administrative Agent delivers any such notice, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be (i) a Lender holding at least thirty percent (30%) of the outstanding principal amount of the Loans or any Affiliate thereof or (ii) any other financial institution consented to by the Borrower (provided that the consent of the Borrower shall not be required to the extent an Event of Default has occurred and is continuing). If a successor Administrative Agent has not been appointed on or before the effectiveness of the resignation of the resigning Administrative Agent (or such earlier date as shall be agreed by the Majority Lenders) (the "***Resignation Effective Date***"), then the resigning Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint any Person reasonably chosen by it as the successor Administrative Agent, notwithstanding whether the Majority Lenders have appointed a successor or the Borrower has consented to such successor. Whether or not a successor has been appointed, such resignation shall become effective on the Resignation Effective Date.

(b)    Effective from the Resignation Effective Date, (i) the resigning Administrative Agent shall be discharged from its duties and obligations under the Loan Documents to the extent set forth in the applicable resignation notice, (ii) the Lenders shall assume and perform all of the duties of the Administrative Agent until a successor Administrative Agent shall have accepted a valid appointment hereunder, (iii) the resigning Administrative Agent and its Related Persons shall no longer have the benefit of any provision of

any Loan Document other than with respect to (x) any actions taken or omitted to be taken while such resigning Administrative Agent was, or because the Administrative Agent had been, validly acting as the Administrative Agent under the Loan Documents or (y) any continuing duties such resigning Administrative Agent will continue to perform, and (iv) subject to its rights under **Section ~~12.04~~12.04**, the resigning Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as the Administrative Agent under the Loan Documents. Effective immediately upon its acceptance of a valid appointment as the Administrative Agent, a successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the resigning Administrative Agent under the Loan Documents.

**12.10      Release of Collateral or Guarantors**. Each Lender hereby consents to the release and hereby directs the Administrative Agent to release, and the Administrative Agent hereby agrees, (or, in the case of **Section ~~12.10(b)~~12.10(b)**, release or subordinate) the following:

(a)      any Subsidiary of the Borrower from its guaranty of any Obligation of any Obligor (i) if all of the Equity Interests in such Subsidiary owned by any Obligor or any of its Subsidiaries are disposed of in an Asset Sale permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such Asset Sale, such Subsidiary would not be required to guaranty any Obligations pursuant to **Section ~~8.12(a)~~8.12(a)** and

(ii) upon (x) termination of the Commitments and (y) payment and satisfaction in full of all Loans and all other Obligations that the Administrative Agent has been notified in writing are then due and payable (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made); and

(b)      any Lien held by the Administrative Agent for the benefit of the Secured Parties against (i) any Collateral that is disposed of by an Obligor in an Asset Sale permitted by the Loan Documents (including pursuant to a valid waiver or consent), (ii) any property subject to a Lien described in **Section ~~9.02(c)~~9.02(c)** and (iii) all of the Collateral and all Obligors, upon (x) termination of the Commitments and (y) payment and satisfaction in full of all Loans and all other Obligations that the Administrative Agent has been notified in writing are then due and payable (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made).

Each Lender hereby directs the Administrative Agent, and the Administrative Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guarantees and Liens when and as directed in this **Section ~~12.10~~12.10** and deliver to the Borrower, at the expense of the Borrower, any portion of such Collateral so released pursuant to this **Section 12.10** that is in possession of the Administrative Agent.

**12.11      Additional Secured Parties**. The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender as long as, by accepting such benefits, such Secured Party agrees, as among the Administrative Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Administrative Agent, shall confirm such agreement in a writing in form and substance acceptable to the Administrative Agent) this

-124-

*[Different first page setting changed from off in original to on in modified.].*

TABLE OF CONTENTS
(continued)

**SECTION 12**

4877-6890-5580 v.1.1

~~SECTION 12~~ and the decisions and actions of the Administrative Agent and the Majority Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) to the same extent a Lender is bound; provided that, notwithstanding the foregoing, (i) such Secured Party shall be bound by **Section ~~12.08~~12.08** only to the extent of ~~L~~liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of ~~P~~pro ~~R~~rata ~~S~~share or similar concept, (ii) each of the Administrative Agent and each Lender shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (iii) such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

**12.12      Agent May File Proofs of Claim**.  In case of the pendency of any Insolvency Proceeding or any other judicial proceeding relating to any Obligor, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower or any other Obligor) shall be entitled and empowered (but not obligated) by intervention or such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under **Section 14.03**) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent under **Section 14.03**.

**12.13      Acknowledgements of Lenders~~:~~.**

(a)      If the Administrative Agent notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "***Payment Recipient***"), that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding **clause (b)**) that any funds received by

such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "***Erroneous Payment***") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this **clause (a)** shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding **clause (a)**, each Lender, or any Person who has received funds on behalf of a Lender, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or other such recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case: (i) (A) in the case of immediately preceding **clauses (x) or (y)**, an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding **clause (z)**), in each case, with respect to such payment, prepayment or repayment; and (ii) such Lender shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this **Section 12.13(b)(ii)**.

(c)     Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender from any source, against any amount due to the Administrative Agent under immediately preceding **clause (a)** or under the indemnification provisions of this Agreement.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding **clause (a)**, from any Lender

that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf)  (such unrecovered amount, an "***Erroneous Payment Return Deficiency***"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "***Erroneous Payment Impacted Loans***") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Loans, the "***Erroneous Payment Deficiency Assignment***") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender under the Loan Documents with respect to each Erroneous Payment Return Deficiency.

(e)     The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Obligor, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Obligor for the purpose of making such Erroneous Payment.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment

-128-

received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations, agreements and waivers under this **Section 12.13** shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## SECTION 13. SECTION 13.
## GUARANTY

**13.01**     **The Guaranty**. The Subsidiary Guarantors hereby unconditionally jointly and severally guarantee to the Administrative Agent and the Lenders, and their successors and assigns, the full and punctual payment in full or performance (whether at stated maturity, by acceleration or otherwise) of the Obligations, including (i) principal of and interest on the Loans, (ii) all fees and other amounts and Obligations from time to time owing to the Administrative Agent and the Lenders by the Borrower and each other Obligor under this Agreement or under any other Loan Document, in each case strictly in accordance with the terms hereof and thereof and (iii) the punctual and faithful performance, keeping, observance and fulfillment by the Borrower and Subsidiary Guarantors of all the agreements, conditions, covenants and obligations of the Borrower and Subsidiary Guarantors contained in the Loan Documents (such obligations being herein collectively called the "*Guaranteed Obligations*"). The Subsidiary Guarantors hereby further jointly and severally agree that if the Borrower or any other Obligor shall fail to pay any amount in full when due or perform any such obligation (whether at stated maturity, by acceleration or otherwise), the Subsidiary Guarantors will promptly pay the same or perform such obligation at the place and in the manner specified herein or in the relevant Loan Document, as the case may be, without any demand or notice whatsoever, and that in the case of any extension of time of payment or performance or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full or performed when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**13.02**     **Obligations Unconditional**.  The obligations of the Subsidiary Guarantors under **Section 13.01** shall constitute a guaranty of payment and performance and not of collection and are absolute and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations under this Agreement or any other agreement or instrument referred to herein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by all applicable Laws, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this **Section 13.02 13.02** that the obligations of the Subsidiary Guarantors hereunder shall be absolute and unconditional, joint and several, under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Subsidiary Guarantors hereunder, which shall remain absolute and unconditional as described above:

(a)       at any time or from time to time, without notice to the Subsidiary Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)       any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein shall be done or omitted;

(c)       the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be extended, modified, supplemented or amended in any respect, or any right under this Agreement or any other agreement or instrument referred to herein shall be waived or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)       any lien or security interest granted to, or in favor of, the Secured Parties as security for any of the Guaranteed Obligations shall fail to be perfected or preserved;

(e)       any modification or amendment of or supplement to this Agreement or any other Loan Document, including any such amendment which may increase the amount of, or the interest rates applicable to, any of the Guaranteed Obligations guaranteed hereby;

(f)       any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, or any Insolvency Proceeding or other similar proceeding affecting the Borrower, any Subsidiary Guarantor or any other guarantor of the Guaranteed Obligations, or any of their respective assets, or any resulting release or discharge of any obligation of the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations;

(g)       the existence of any claim, setoff or other rights which any Subsidiary Guarantor may have at any time against the Borrower, any other Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, the Administrative Agent, any Secured Party or any other Person, whether in connection herewith or in connection with any unrelated transactions; *provided* that, notwithstanding any other provisions in this Guaranty, nothing in this Guaranty shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(h)       the unenforceability or invalidity of the Guaranteed Obligations or any part thereof or the lack of genuineness, enforceability or validity of any agreement relating thereto or with respect to the collateral, if any, securing the Guaranteed Obligations or any part thereof, or any other invalidity or unenforceability relating to or against the Borrower, any Subsidiary Guarantor or any other guarantor of any of the Guaranteed Obligations, for any reason, related to this Agreement or any other Loan Document, or any provision of applicable Law, decree, order or regulation of any jurisdiction purporting to prohibit the payment of any of the Guaranteed Obligations by the Borrower, any Subsidiary Guarantor or any other guarantor of the Guaranteed Obligations;

-130-

(i)      the disallowance, under any state or federal bankruptcy, insolvency or similar law, of all or any portion of the claims of the Secured Parties or the Administrative Agent for repayment of all or any part of the Guaranteed Obligations;

(j)      the failure of any other guarantor to sign or become party to this Agreement or any amendment, change, or reaffirmation hereof;

(k)      any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the Guaranteed Obligations or any part thereof, any other guaranties with respect to the Guaranteed Obligations or any part thereof, or any other obligation of any person or entity with respect to the Guaranteed Obligations or any part thereof, or any nonperfection or invalidity of any direct or indirect security for the Guaranteed Obligations; or

(l)      any other act or omission to act or delay of any kind by the Borrower, such Subsidiary Guarantor, any other guarantor of the Guaranteed Obligations, the Administrative Agent, any Secured Party or any other Person or any other circumstance whatsoever which might, but for the provisions of this **Section 13.02**, constitute a legal or equitable discharge of any Subsidiary Guarantor's obligations hereunder.

The Subsidiary Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Administrative Agent or any Lender exhaust any right, power or remedy or proceed against the Borrower or any other Subsidiary Guarantor under this Agreement or any other agreement or instrument referred to herein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.

**13.03      Discharge Only Upon Payment in Full.** Subject to any prior release herefrom of any Subsidiary Guarantor by the Administrative Agent in accordance with (and pursuant to authority granted to the Administrative Agent under) the terms of this Agreement, each Subsidiary Guarantor's obligations hereunder shall remain in full force and effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full in cash (other than Warrant Obligations and inchoate indemnification and expense reimbursement obligations for which no claim has been made) and all other financing arrangements among the Borrower or any Subsidiary Guarantor and the Secured Parties under or in connection with this Agreement and each other Loan Document shall have terminated (herein, the "***Termination Conditions***"), and until the prior and complete satisfaction of the Termination Conditions all of the rights and remedies under this Guaranty and the other Loan Documents shall survive. Notwithstanding the foregoing, the Administrative Agent hereby agrees to release any Subsidiary of the Borrower from its guaranty of any Obligation of any Obligor if all of the Equity Interests in such Subsidiary owned by any Obligor or any of its Subsidiaries are disposed of in an Asset Sale permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such Asset Sale, such Subsidiary would not be required to guarantee any Obligations pursuant to **Section 8.12(a)**.

4877-6890-5580 v.1.1

**13.04**        **Additional Waivers; General Waivers**.

(a)        *Additional Waivers.*  Notwithstanding anything herein to the contrary, each of the Subsidiary Guarantors hereby absolutely, unconditionally, knowingly, and expressly waives:

(i)        any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof;

(ii)        (A) notice of acceptance hereof; (B) notice of any other financial accommodations made or maintained under the Loan Documents or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to each Subsidiary Guarantor's right to make inquiry of the Administrative Agent and the Secured Parties to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any adverse change in the financial condition of the Borrower or of any other fact that might increase such Subsidiary Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Subsidiary Guarantor under this Guaranty or under the other Loan Documents) and demands to which each Subsidiary Guarantor might otherwise be entitled;

(iii)        its right, if any, to require the Administrative Agent and the Secured Parties to institute suit against, or to exhaust any rights and remedies which the Administrative Agent and the Secured Parties now have or may hereafter have against, any other guarantor of the Guaranteed Obligations or any third party, or against any collateral provided by such other guarantors or any third party; and each Subsidiary Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid) of any other guarantor of the Guaranteed Obligations or by reason of the cessation from any cause whatsoever of the liability of any other guarantor of the Guaranteed Obligations in respect thereof;

(iv)        (A) (A) any rights to assert against the Administrative Agent and the Secured Parties any defense (legal or equitable), set-off, counterclaim, or claim which such Subsidiary Guarantor may now or at any time hereafter have against any other guarantor of the Guaranteed Obligations or any third party liable to the Administrative Agent and the Secured Parties; (B) (A) any defense, set-off, counterclaim or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity or enforceability of the Guaranteed Obligations or any security therefor; (C) (A) any defense such Subsidiary Guarantor has to performance hereunder, and any right such Subsidiary Guarantor has to be exonerated, arising by reason of: (1) (1) the impairment or suspension of the Administrative Agent's and the Secured Parties' rights or remedies against any other guarantor of the Guaranteed Obligations; (2) (2) the alteration by the Administrative Agent and the Secured Parties of the Guaranteed Obligations; (3) (3) any discharge of the obligations of any other guarantor of the Guaranteed Obligations to the Administrative Agent and the Secured Parties by operation of law as a result of the Administrative Agent's and the Secured Parties' intervention or omission; or (4) (4) the

4877-6890-5580 v.1.1

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 368 of 468
(continued)

acceptance by the Administrative Agent and the Secured Parties of anything in partial satisfaction of the Guaranteed Obligations; and (D) (B) the benefit of any statute of limitations affecting such Subsidiary Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Subsidiary Guarantor's liability hereunder; and

(v)     any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by the Administrative Agent and the other Secured Parties; or (B) any election by the Administrative Agent and the other Secured Parties under any provision of any state or federal bankruptcy, insolvency or similar law to limit the amount of, or any collateral securing, its claim against the Subsidiary Guarantors.

(b)     *General Waivers*.  Each Subsidiary Guarantor irrevocably waives, to the fullest extent permitted by law, any notice not provided for herein.

**13.05     Reinstatement**. The obligations of the Subsidiary Guarantors under this **Section 13** shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Guaranteed Obligations is at any time rescinded, annulled, avoided, set aside, invalidated, declared to be fraudulent or must be otherwise restored or repaid by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization, equitable cause or otherwise, and the Subsidiary Guarantors jointly and severally agree that they will indemnify the Secured Parties on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Persons in connection with such rescission, repayment or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any state or federal bankruptcy, insolvency or similar law. The provisions of this **Section 13.05** shall survive termination of this Guaranty.

**13.06     Subrogation**. The Subsidiary Guarantors hereby jointly and severally agree that, until the prior and complete satisfaction of all Termination Conditions, they (i) (i) shall have no right of subrogation with respect to the Guaranteed Obligations and (ii) (i) waive any right to enforce any remedy which the Secured Parties or the Administrative Agent now have or may hereafter have against the Borrower, any endorser or any other guarantor of all or any part of the Guaranteed Obligations or any other Person, and each Subsidiary Guarantor waives any benefit of, and any right to participate in, any security or collateral that may from time to time be given to the Secured Parties and the Administrative Agent to secure the payment or performance of all or any part of the Guaranteed Obligations or any other liability of the Borrower to the Secured Parties.  Should any Subsidiary Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights prior to complete satisfaction of the Termination Conditions, each Subsidiary Guarantor hereby expressly and irrevocably (A) (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set-off that such Subsidiary Guarantor may have prior to the complete satisfaction of the Termination Conditions, and (B) (A) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until all Termination Conditions are satisfied in full. Each Subsidiary Guarantor acknowledges and agrees that this subordination is intended to benefit the Administrative Agent and the Secured Parties and shall not limit or otherwise affect such

4877-6890-5580 v.1.1

Subsidiary Guarantor's liability hereunder or the enforceability of this Guaranty, and that the Administrative Agent, the Secured Parties and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this **Section 13.06**.

**13.07** **Remedies~~Remedies~~**. The Subsidiary Guarantors jointly and severally agree that, as between the Subsidiary Guarantors, on one hand, and the Administrative Agent and the Lenders, on the other hand, the obligations of the Borrower under this Agreement and under the other Loan Documents may be declared to be forthwith due and payable as provided in **Section ~~11~~11** (and shall be deemed to have become automatically due and payable in the circumstances provided in **Section ~~11~~11**) for purposes of **Section 13.01** notwithstanding any stay, injunction or other prohibition, including any such stay upon an Insolvency Proceeding, preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Subsidiary Guarantors for purposes of **Section 13.01**.

**13.08** **Instrument for the Payment of Money**. Each Subsidiary Guarantor hereby acknowledges that the guarantee in this **Section 13** constitutes an instrument for the payment of money, and consents and agrees that the Administrative Agent and the Lenders, at their sole option, in the event of a dispute by such Subsidiary Guarantor in the payment of any moneys due hereunder, shall have the right to proceed by motion for summary judgment in lieu of complaint pursuant to N.Y. Civ. Prac. L&R § 3213.

**13.09** **Continuing Guarantee**. The guarantee in this **Section 13** is a continuing guarantee, and shall apply to all Guaranteed Obligations whenever arising.

**13.10** **Contribution with Respect to Guaranteed Obligations**.

(a) To the extent that any Subsidiary Guarantor shall make a payment under this Guaranty (a "***Guarantor Payment***") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Subsidiary Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Subsidiary Guarantor if each Subsidiary Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Subsidiary Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Subsidiary Guarantors as determined immediately prior to the making of such Guarantor Payment, *then*, following the prior and complete satisfaction of the Termination Conditions, such Subsidiary Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Subsidiary Guarantor for the amount of such excess, *pro rata* based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b) As of any date of determination, the "***Allocable Amount***" of any Subsidiary Guarantor shall be equal to the maximum amount of the claim which could then be recovered from such Subsidiary Guarantor under this Agreement without rendering such claim

4877-6890-5580 v.1.1

voidable or avoidable under any state or federal bankruptcy, insolvency or similar law or other applicable Law.

(c) This **Section 13.10 13.10** is intended only to define the relative rights of the Subsidiary Guarantors, and nothing set forth in this **Section 13.10 13.10** is intended to or shall impair the obligations of the Subsidiary Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement.

(d) The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Subsidiary Guarantor or Subsidiary Guarantors to which such contribution and indemnification is owing.

(e) The rights of the indemnifying Subsidiary Guarantors against other Subsidiary Guarantors under this **Section 13.10 13.10** shall be exercisable only upon the prior and complete satisfaction of the Termination Conditions.

**13.11** **General Limitation on Guarantee Obligations**. In any action or proceeding involving any provincial, territorial or state corporate law, or any state or federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Subsidiary Guarantor under **Section 13.01** would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under **Section 13.01**, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Subsidiary Guarantor, the Administrative Agent, any Lender or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

## SECTION 14. SECTION 14.
## MISCELLANEOUS

**14.01** **No Waiver**. No failure on the part of the Administrative Agent or the Lenders to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

**14.02** **Notices**. All notices, requests, instructions, directions and other communications provided for herein (including any modifications of, or waivers, requests or consents under, this Agreement) or in the other Loan Documents shall be given or made in writing (including by telecopy or email) delivered, if to the Borrower, another Obligor, the Administrative Agent or any Lender, to its address specified on the signature pages hereto or its Guarantee Assumption Agreement, as the case may be, or at such other address as shall be designated by such party in a written notice to the other parties. Except as otherwise provided in this Agreement or therein, all such communications shall be deemed to have been duly given upon receipt of a legible copy thereof, in each case given or addressed as aforesaid. All such communications provided for herein by telecopy shall be confirmed in writing promptly after the delivery of such

4877-6890-5580 v.1.1

communication (it being understood that non-receipt of written confirmation of such communication shall not invalidate such communication).

**14.03        Expenses, Indemnification, Etc.**

(a)        **Expenses**. Each Obligor, jointly and severally, agrees to pay or reimburse (i) the Administrative Agent and the Lenders and their respective Affiliates for all of their reasonable and documented out of pocket costs and expenses (including the reasonable and documented out of pocket fees, expenses, charges and disbursements of Sullivan & Cromwell LLP, counsel to the Lenders, the fees (if necessary) of local and regulatory counsel for both of the Administrative Agent and the Lenders in each relevant material jurisdiction, and any sales, goods and services or other similar taxes applicable thereto, and reasonable and documented printing, reproduction, document delivery, communication and travel costs) in connection with (x) the negotiation, preparation, execution and delivery of this Agreement and the other Loan Documents and the making of the Loans (exclusive of post-closing costs), (y) post-closing costs (including, without limitation, costs of the administration of this Agreement and the other Loan Documents) and (z) the negotiation or preparation of any modification, supplement or waiver of any of the terms of this Agreement or any of the other Loan Documents (whether or not consummated); and (ii) each of the Administrative Agent and the Lenders for all of their documented out of pocket costs and expenses (including the fees and expenses of any legal counsel) in connection with the enforcement, exercise or protection of their rights in connection with this Agreement and the other Loan Documents, including their rights under this **Section 14.03**, or in connection with the Loans made hereunder, including such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)        **Indemnification**. Each Obligor, jointly and severally, hereby indemnifies the Administrative Agent (and any sub-agent thereof), the Lenders and their respective Affiliates, directors, officers, employees, attorneys, agents, advisors and controlling parties (each, an "***Indemnified Party***") from and against, and agrees to hold them harmless against, any and all Claims and Losses of any kind including reasonable and documented out of pocket fees and disbursements of any counsel for each Indemnified Party (limited to one legal counsel in each relevant jurisdiction), that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to (i) Agreement or any of the other Loan Documents or the Transactions, (ii) any use made or proposed to be made with the proceeds of the Loans, (ii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Obligor or any of its Subsidiaries, or (iv) any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory, whether or not such investigation, litigation or proceeding is brought by any Obligor, any of its Subsidiaries, shareholders or creditors, an Indemnified Party or any other Person, or an Indemnified Party is otherwise a party thereto, and whether or not any of the conditions precedent set forth in ~~SECTION 6~~SECTION 6 are satisfied or the other transactions contemplated by this Agreement are consummated, except to the extent such Claim or Loss is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. No Obligor shall assert any claim against any Indemnified Party, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to this Agreement or any of the other Loan Documents or any of the Transactions or the

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 372 of 468
(continued)

actual or proposed use of the

4877-6890-5580 v.1.1

proceeds of the Loans. The Borrower, its Subsidiaries and Affiliates and their respective directors, officers, employees, attorneys, agents, advisors and controlling parties are each sometimes referred to in this Agreement as a "***Borrower Party***".  No Lender shall assert any claim against any Borrower Party, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to this Agreement or any of the other Loan Documents or any of the Transactions or the actual or proposed use of the proceeds of the Loans. This Section shall not apply to Taxes other than Taxes relating to a non-Tax Claim or Loss governed by this **Section ~~14.03(b)~~14.03(b)**.

**14.04**        **Amendments, Etc.** Except as otherwise expressly provided in this Agreement, any provision of this Agreement and any other Loan Document (except for the Warrant, which may be amended, waived or supplemented in accordance with the terms thereof) may be modified or supplemented only by an instrument in writing signed by the Borrower, the Administrative Agent and the Majority Lenders; provided that:

(a)        any such modification or supplement that is disproportionately adverse to any Lender as compared to other Lenders or subjects any Lender to any additional obligation shall not be effective without the consent of such affected Lender;

(b)        the consent of all of the Lenders shall be required to:

(i)        amend, modify, discharge, terminate or waive any of the terms of this Agreement or any other Loan Agreement if such amendment, modification, discharge, termination or waiver would increase the amount of the Loans or Commitment, reduce the fees payable hereunder, reduce interest rates or other amounts payable with respect to the Loans, extend any date fixed for payment of principal (it being understood that the waiver of any prepayment of Loans shall not constitute an extension of any date fixed for payment of principal), interest or other amounts payable relating to the Loans or extend the repayment dates of the Loans;

(ii)        amend, modify, discharge, terminate or waive any Security Document if the effect is to release all or substantially all of the Collateral subject thereto other than pursuant to the terms hereof or thereof; or

(iii)        amend this **Section ~~14.04~~14.04** or the definition of "Majority Lenders".

**14.05**        **Successors and Assigns~~:~~.**

(a)        **General**. The provisions of this Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the parties hereto or thereto and their respective successors and assigns permitted hereby or thereby, except that no Obligor may assign or otherwise transfer any of its rights or obligations hereunder (except in connection with an event permitted under **Section ~~9.03~~9.03**) without the prior written consent of the Administrative Agent. Any Lender may assign or otherwise transfer any of its rights or obligations hereunder or under any of the other Loan Documents (i) to an assignee in accordance with the provisions of **Section 14.05(b)**, (ii) by way of participation in accordance with the provisions of ~~**Section 14.05(b)**, (ii) by way of participation in accordance with the provisions of~~ **Section 1~~4.05(c)~~4.05(e)**, or (iii) by way of pledge or assignment of a

~~-138-~~

security interest subject to the restrictions of **Section 1~~14.05(f)~~4.05(f)**. Nothing in this Agreement, expressed or implied, shall be

4877-6890-5580 v.1.1

construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in **Section 1~~14.05(e)~~4.05(e)** and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    **Assignments by Lender**. Any Lender may at any time assign to one or more Eligible Transferees (or, if an Event of Default has occurred and is continuing, to any Person) all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) and the other Loan Documents; provided that (i) no such assignment shall be made to any Obligor, any Affiliate of any Obligor, any employees or directors of any Obligor at any time and (ii) no such assignment shall be made without the prior written consent of the Administrative Agent. The consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (x) a Default or Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to an Eligible Transferee described in **clause (vi)** of the definition thereof~~)~~; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received written notice thereof; provided further that the consent of the Borrower shall not be required for any assignment to (x) Oaktree Capital Management, L.P. or any of its managed funds or accounts or  (y) any Affiliate of the foregoing.  Subject to the recording thereof by the Administrative Agent pursuant to **Section ~~14.05(d)~~14.05(d)**, and to receipt by the Administrative Agent of a processing and recordation fee in the amount of $3,500 (provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment) from and after the date such Assignment and Assumption is recorded in the Register, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of the Lender under this Agreement and the other Loan Documents, and correspondingly the assigning Lender shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) and the other Loan Documents but shall continue to be entitled to the benefits of **~~SECTION 5~~SECTION 5** and **Section ~~14.03~~14.03**. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this **Section ~~14.05(b)~~14.05(b)** shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with **Section ~~14.05(e)~~14.05(e)**.

(c)    **Amendments to Loan Documents**. Each of the Administrative Agent, the Lenders and the Obligors agrees to enter into such amendments to the Loan Documents, and such additional Security Documents and other instruments and agreements, in each case in form and substance reasonably acceptable to the Administrative Agent, the Lenders and the Obligors, as shall reasonably be necessary to implement and give effect to any assignment made under this **Section ~~14.05~~14.05**.

(d)    **Register**. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the

-140-

names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive and binding absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement; provided, that the failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's Obligations in respect of any Loan. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior written notice. Notwithstanding anything to the contrary, any assignment of any Loan shall be effective only upon appropriate entries with respect thereto being made in the Register. The parties hereto intend that the Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related United States Treasury Regulations (or any other relevant or successor provisions of the Code or of such United States Treasury Regulations).

(e)     **Participations**. Any Lender may at any time, without the consent of, or notice to, the Borrower, sell participations to any Eligible Transferee (other than a natural person or any Obligor or any of its Affiliates or Subsidiaries) (each, a "*Participant*") in all or a portion of the Lender's rights and/or obligations under this Agreement (including all or a portion of the Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with such Lender in connection therewith. Any agreement or instrument pursuant to which any Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that would (i) increase or extend the term of such Lender's Commitment, (ii) extend the date fixed for the payment of principal of or interest on the Loans or any portion of any fee hereunder payable to the Participant, (iii) reduce the amount of any such payment of principal, or (iv) reduce the rate at which interest is payable thereon to a level below the rate at which the Participant is entitled to receive such interest. Subject to Section ~~14.05(f)~~14.05(f), the Borrower agrees that each Participant shall be entitled to the benefits of Section ~~5.01~~5.01 or ~~5.03~~5.03 (subject to the requirements and limitations therein, including the requirements under Section ~~5.03(f)~~5.03(f) (it being understood that the documentation required under Section ~~5.03(f)~~5.03(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section ~~14.05(b)~~14.05(b); provided that such Participant (i) agrees to be subject to the provisions of Section ~~5.04~~5.04 as if it were an assignee under Section ~~14.05(b)~~14.05(b) and (ii) shall not be entitled to receive any greater payment under Section ~~5.01~~5.01 or ~~5.03~~5.03, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after the Participant acquired the applicable participation. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section ~~4.03(a)~~4.03(a) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in

-141-

[Different first page setting changed from off in original to on in modified.].

Case 23-10366-JTD   Doc 500   Filed 08/03/23   Page 377 of 468

(continued)

the Loans or other obligations under the Loan Documents (the "**_Participant Register_**"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other

4877-6890-5580 v.1.1

obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)    **Limitations on Rights of Participants**. A Participant shall not be entitled to receive any greater payment under **Section 5.015.01** or **5.035.03** than such Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(g)    **Certain Pledges**. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**14.06**    **SurvivalSurvival**. The obligations of the Borrower under Sections 5.01, 5.02, 5.03, 14.03, 14.05, 14.06, 14.09, 14.10, 14.11, 14.12, 14.13, and 14.14 5.01, 5.02, 5.03, 14.03, 14.05, 14.06, 14.09, 14.10, 14.11, 14.12, 14.13, and 14.14 and the obligations of the Subsidiary Guarantors under **Section** 13 (solely to the extent guaranteeing any of the obligations under the foregoing Sections) shall survive the repayment of the Obligations and the termination of the Commitments and, in the case of the Lenders' assignment of any interest in the Commitments or the Loans hereunder, shall survive, in the case of any event or circumstance that occurred prior to the effective date of such assignment, the making of such assignment, notwithstanding that the Lenders may cease to be "Lenders" hereunder. In addition, each representation and warranty made, or deemed to be made by a Borrowing Notice, herein or pursuant hereto shall survive the making of such representation and warranty.

**14.07**    **Captions**. The table of contents and captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

**14.08**    **Counterparts, Effectiveness**. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or electronic transmission (in PDF format) shall be effective as delivery of a manually executed counterpart hereof. This Agreement shall become effective when counterparts hereof executed on behalf of the Obligors, the Administrative Agent and the Lender shall have been received by the Administrative Agent.

**14.09**    **Governing Law**. This Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed in accordance with, the law of the State of New York, without regard to the conflict of law provisions thereof.

4877-6890-5580 v.1.1

**14.10** **Jurisdiction, Service of Process and Venue**.

(a) **Submission to Jurisdiction**. Each party hereby irremovably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or tort or otherwise, against such other party in any way relating to this Agreement or any Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable Law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) **[Reserved]**.

(c) **Waiver of Venue, Etc**. Each party hereto irrevocably waives to the fullest extent permitted by law any objection that it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document and hereby further irrevocably waives to the fullest extent permitted by law any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. A final judgment (in respect of which time for all appeals has elapsed) in any such suit, action or proceeding shall be conclusive and may be enforced in any court to the jurisdiction of which such party is or may be subject, by suit upon judgment.

**14.11** **Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**14.12** **Waiver of Immunity**. To the extent that any Obligor may be or become entitled to claim for itself or its property or revenues any immunity on the ground of sovereignty or the like from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment or execution of a judgment, and to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), such Obligor hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity with respect to its obligations under this Agreement and the other Loan Documents.

**14.13** **Entire Agreement**. This Agreement and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof, including any confidentiality (or similar) agreements. EACH OBLIGOR ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT IN DECIDING TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS OR IN TAKING OR

4877-6890-5580 v.1.1

NOT TAKING ANY ACTION HEREUNDER OR THEREUNDER, IT HAS NOT RELIED, AND WILL NOT RELY, ON ANY STATEMENT, REPRESENTATION, WARRANTY, COVENANT, AGREEMENT OR UNDERSTANDING, WHETHER WRITTEN OR ORAL, OF OR WITH ADMINISTRATIVE AGENT OR THE LENDERS OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

**14.14**       **Severability**. If any provision hereof is found by a court to be invalid or unenforceable, to the fullest extent permitted by any Law the parties agree that such invalidity or unenforceability shall not impair the validity or enforceability of any other provision hereof.

**14.15**       **No Fiduciary Relationship**. The Borrower acknowledges that the Administrative Agent and the Lenders have no fiduciary relationship with, or fiduciary duty to, the Borrower arising out of or in connection with this Agreement or the other Loan Documents, and the relationship between the Lenders and the Borrower is solely that of creditor and debtor. This Agreement and the other Loan Documents do not create a joint venture among the parties.

**14.16**       **Confidentiality**. The Administrative Agent and each Lender agree to keep confidential all non-public information provided to them by any Obligor pursuant to this Agreement that is designated by such Obligor as confidential in accordance with its customary procedures for handling its own confidential information; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (i) to the Administrative Agent, any other Lender, any Affiliate of a Lender or any Eligible Transferee or other assignee permitted under **Section 14.05(b)14.05(b)**, (ii) subject to an agreement to comply with the provisions of this Section, to any actual or prospective direct or indirect counterparty to any Hedging Agreement (or any professional advisor to such counterparty), (iii) to its employees, officers, directors, agents, attorneys, accountants, trustees and other professional advisors or those of any of its affiliates (collectively, its "***Related Parties***" or "***Related Persons***"), (iv) upon the request or demand of any Governmental Authority or any Regulatory Authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (v) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Law, (vi) if requested or required to do so in connection with any litigation or similar proceeding, (vii) that has been publicly disclosed (other than as a result of a disclosure in violation of this Section 14.1614.16), (viii) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender,

(ix) (ix) in connection with the exercise of any remedy hereunder or under any other Loan Document,
(x) (x) on a confidential basis to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers of other market identifiers with respect to the Loans or (xi) to any other party hereto; provided that, in the case of disclosure pursuant to **clauses (iv), (v)** and **(vi)** above, the Administrative Agent or applicable Lender, as applicable, shall promptly provide notice to the Borrower to the extent reasonable and not prohibited by Law or any applicable Governmental Authority.

**-145-**

**14.17    Interest Rate Limitation**. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable Law (collectively, "***charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") that may be contracted for, charged, taken, received or reserved by the Administrative Agent and the Lender holding such Loan in accordance with applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all charges payable in respect thereof, shall be limited to the Maximum Rate. To the extent lawful, the interest and charges that would have been paid in respect of such Loan but were not paid as a result of the operation of this **Section 14.17** shall be cumulated and the interest and charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the amount collectible at the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate for each day to the date of repayment, shall have been received by such Lender. Any amount collected by such Lender that exceeds the maximum amount collectible at the Maximum Rate shall be applied to the reduction of the principal balance of such Loan so that at no time shall the interest and charges paid or payable in respect of such Loan exceed the maximum amount collectible at the Maximum Rate.

**14.18    Judgment Currency**.

(a)    If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency, the parties hereto agree, to the fullest extent permitted by Law, that the rate of exchange used shall be that at which, in accordance with normal banking procedures, the Administrative Agent could purchase Dollars with such currency at the buying spot rate of exchange in the New York foreign exchange market on the Business Day immediately preceding that on which any such judgment, or any relevant part thereof, is given.

(b)    The obligations of the Obligors in respect of any sum due to the Administrative Agent hereunder and under the other Loan Documents shall, notwithstanding any judgment in a currency other than Dollars, be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in such other currency the Administrative Agent may, in accordance with normal banking procedures, purchase Dollars with such other currency. If the amount of Dollars so purchased is less than the sum originally due to the Administrative Agent in Dollars, the Borrower agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent against such loss. If the amount of Dollars so purchased exceeds the sum originally due to the Administrative Agent in Dollars, the Administrative Agent shall remit such excess to the Borrower.

**14.19    USA PATRIOT Act**. The Administrative Agent and the Lenders hereby notify the Obligors that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "***Patriot Act***"), they are required to obtain, verify and record information that identifies the Obligors, which information includes the name and address of each Obligor and other information that will allow such Person to identify such Obligor in accordance with the Patriot Act.

4877-6890-5580 v.1.1

*[Different first page setting changed from off in original to on in modified.].*

**14.20     Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

~~applicable:~~

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

[Signature Pages Follow]

-118-

*[Different first page setting changed from off in original to on in modified.].*

**<u>Exhibit C</u>**

**Assumed Executory Contracts and Unexpired Leases List**

This <u>Exhibit C</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Restructuring Support Agreement.

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| ADMA Biologics, Inc. | | | $         - |
| | Development and Supply Agreement dated 12/14/2020 | SiO2 Medical Products, Inc. | |
| | Development and Supply Agreement dated 1/4/2022 | SiO2 Medical Products, Inc. | |
| | Financing Agreement dated 9/1/2022 | SiO2 Medical Products, Inc. | |
| | Quality Agreement dated 12/2/2022 | SiO2 Medical Products, Inc. | |
| ADP, INC. | | | 86.20 |
| | Vendor Agreement dated 1/5/2021 | SiO2 Medical Products, Inc. | |
| Alabama Industrial Development Body, LLC | | | - |
| | First Amendment to Sublease Agreement dated 3/1/2021 | SiO2 Medical Products, Inc. | |
| Alabama Power Company Corporate Real Estate | | | - |
| | Underground Easement Agreement dated 12/9/2020 | SiO2 Medical Products, Inc. | |
| Araujo, Gonzalo Andres | | | - |
| | Offer Letter dated 10/16/2020 | SiO2 Medical Products, Inc. | |
| Baltazar-Lopez, Martin E | | | - |
| | Offer Letter dated 7/31/2013 | SiO2 Medical Products, Inc. | |
| Baltzell, Meesha | | | - |
| | Offer Letter dated 2/3/2020 | SiO2 Medical Products, Inc. | |
| Battle jr, Calvin | | | - |
| | Offer Letter dated 5/18/2020 | SiO2 Medical Products, Inc. | |
| Billins-Hundley, Roshonda | | | - |
| | Offer Letter dated 2/15/2023 | SiO2 Medical Products, Inc. | |
| Blue Cross/Blue Shield Ala. | | | - |
| | Amendment to Enrollment Agreement dated 1/1/2023 | SiO2 Medical Products, Inc. | |
| Bonner, Shekevia | | | - |
| | Offer Letter dated 8/12/2020 | SiO2 Medical Products, Inc. | |
| Braswell, Terry Bruce | | | - |
| | Offer Letter | SiO2 Medical Products, Inc. | |
| Breeland, Adam | | | - |
| | Offer Letter dated 5/29/2013 | SiO2 Medical Products, Inc. | |
| Brockstedt, David | | | - |
| | Offer Letter dated 2/12/2014 | SiO2 Medical Products, Inc. | |
| Brown, Tamanika | | | - |
| | Offer Letter dated 10/20/2021 | SiO2 Medical Products, Inc. | |
| Calloway, Jennifer | | | - |
| | Offer Letter dated 7/24/2020 | SiO2 Medical Products, Inc. | |
| Cartier, George Edward | | | - |
| | Offer Letter dated 12/9/2019 | SiO2 Medical Products, Inc. | |
| City of Auburn | | | - |
| | Tax Abatement Agreement dated 3/20/2012 | SiO2 Medical Products, Inc. | |
| | Resolution No. 12-232 dated 3/20/2012 | SiO2 Medical Products, Inc. | |
| | Resolution No. 18-232 dated 3/20/2012 | SiO2 Medical Products, Inc. | |
| | Resolution No. 14-270 dated 12/16/2014 | SiO2 Medical Products, Inc. | |
| | Resolution No. 16-013 dated 3/21/2016 | SiO2 Medical Products, Inc. | |
| | Resolution No. 16-294 dated 12/28/2016 | SiO2 Medical Products, Inc. | |
| | Resolution No. 20-137 dated 7/13/2020 | SiO2 Medical Products, Inc. | |
| | Resolution No. 21-242 dated 11/16/2021 | SiO2 Medical Products, Inc. | |
| | Resolution No. 21-243 dated 11/16/2021 | SiO2 Medical Products, Inc. | |

8/2/2023

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Clark, Cody Wayne | | | |
| | Offer Letter dated 3/30/2020 | SiO2 Medical Products, Inc. | - |
| Clark, David | | | |
| | Offer Letter dated 1/7/2020 | SiO2 Medical Products, Inc. | - |
| Cleaning Solutions, LLC | | | |
| | Vendor Maintenance Agreement dated 8/31/2020 | SiO2 Medical Products, Inc. | 7,690.00 |
| Coleman, Stacey G | | | |
| | Offer Letter dated 12/14/2020 | SiO2 Medical Products, Inc. | - |
| Computer Packages Inc. | | | |
| | Vendor Agreement dated 1/19/2021 | SiO2 Medical Products, Inc. | - |
| Daugherty, Keenan | | | |
| | Offer Letter dated 6/24/2021 | SiO2 Medical Products, Inc. | - |
| Davis, Michael Laterlla | | | |
| | Offer Letter dated 10/8/2020 | SiO2 Medical Products, Inc. | - |
| DeHart, Travis | | | |
| | Offer Letter dated 8/10/2020 | SiO2 Medical Products, Inc. | - |
| Dietrich, Philip H | | | |
| | Promotional Offer Letter dated 5/23/2022 | SiO2 Medical Products, Inc. | - |
| Dixie Electric Cooperative | | | 126,612.98 |
| | Vendor Agreement dated 7/21/2020 | SiO2 Medical Products, Inc. | |
| Dixon, Elijah O | | | |
| | Offer Letter dated 1/21/2021 | SiO2 Medical Products, Inc. | - |
| Doyle, Ryan | | | |
| | Offer Letter dated 6/3/2021 | SiO2 Medical Products, Inc. | - |
| Ernst & Young LLP | | | |
| | Engagement Letter dated 5/18/2021 | SiO2 Medical Products, Inc. | - |
| Exact Sciences Corporation | | | - |
| | Purchase Agreement dated 4/21/2021 | SiO2 Medical Products, Inc. | |
| | Services and Supply Agreement dated 4/23/2021 | SiO2 Medical Products, Inc. | |
| | Purchase Agreement dated 6/9/2021 | SiO2 Medical Products, Inc. | |
| | Amendment to Services and Supply Agreement dated 2/6/2023 | SiO2 Medical Products, Inc. | |
| Extra Space Storage | | | - |
| | Vendor Agreement dated 5/20/2021 | SiO2 Medical Products, Inc. | |
| Finley, Quentavious | | | |
| | Offer Letter dated 11/8/2021 | SiO2 Medical Products, Inc. | - |
| Fischer Sohne AG | | | |
| | Quality Agreement dated 12/17/2020 | SiO2 Medical Products, Inc. | - |
| Floyd, Michael Andrew | | | |
| | Offer Letter dated 8/24/2020 | SiO2 Medical Products, Inc. | - |
| Foreman, Justin Arthur | | | |
| | Offer Letter dated 4/29/2020 | SiO2 Medical Products, Inc. | - |
| Fresenius Kabi Deutschland GmbH | | | - |
| | License and Settlement Agreement dated 9/16/2020 | SiO2 Medical Products, Inc. | |
| Fujifilm Diosynth Biotechnologies Texas, LLC | | | - |
| | Supplier Quality Agreement dated 4/27/2021 | SiO2 Medical Products, Inc. | |
| Gandreti, Yashwant | | | - |
| | Offer Letter dated 12/3/2020 | SiO2 Medical Products, Inc. | |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Gentry, Stephen | | | - |
| | Promotional Offer Letter dated 2/6/2022 | SiO2 Medical Products, Inc. | |
| Gilead Sciences, Inc. | | | - |
| | Development and Supply Agreement dated 2/6/2020 | SiO2 Medical Products, Inc. | |
| | Scope of Work Agreement dated 2/6/2020 | SiO2 Medical Products, Inc. | |
| | Work Order dated 5/20/2020 | SiO2 Medical Products, Inc. | |
| | Work Order dated 8/13/2020 | SiO2 Medical Products, Inc. | |
| | Work Order dated 3/11/2021 | SiO2 Medical Products, Inc. | |
| | Quality Agreement dated 4/8/2021 | SiO2 Medical Products, Inc. | |
| Gilmore, Bradley Christopher | | | - |
| | Offer Letter dated 10/14/2013 | SiO2 Medical Products, Inc. | |
| Gopher, Alice Graham | | | - |
| | Offer Letter dated 8/13/2020 | SiO2 Medical Products, Inc. | |
| Gragg, Erica Lynn Hardy | | | - |
| | Offer Letter dated 7/7/2020 | SiO2 Medical Products, Inc. | |
| Grantham, Valerie K | | | - |
| | Offer Letter dated 10/30/2013 | SiO2 Medical Products, Inc. | |
| Gresham, James Troy | | | - |
| | Offer Letter dated 8/19/2022 | SiO2 Medical Products, Inc. | |
| Griffin, Nicholas | | | - |
| | Offer Letter dated 11/22/2013 | SiO2 Medical Products, Inc. | |
| Guifarro Funez, Omar Emilio | | | - |
| | Promotional Offer Letter dated 8/23/2021 | SiO2 Medical Products, Inc. | |
| Guilliams, Michael A | | | - |
| | Offer Letter dated 12/23/2020 | SiO2 Medical Products, Inc. | |
| Hamilton Jr, Clarence L | | | - |
| | Offer Letter dated 12/9/2019 | SiO2 Medical Products, Inc. | |
| Hamilton, Kandy Wynette | | | - |
| | Offer Letter dated 12/13/2021 | SiO2 Medical Products, Inc. | |
| Harrison, Dewayne B | | | - |
| | Offer Letter | SiO2 Medical Products, Inc. | |
| Hawaldar, Nishant | | | - |
| | Offer Letter dated 9/28/2021 | SiO2 Medical Products, Inc. | |
| Henton, David | | | - |
| | Contract Amendment 3 to Consultancy Agreement dated 3/20/2023 | SiO2 Medical Products, Inc. | |
| Hill, Aaron Leif | | | - |
| | Offer Letter dated 4/6/2020 | SiO2 Medical Products, Inc. | |
| Hood, Sylvia | | | - |
| | Promotional Offer Letter dated 5/5/2021 | SiO2 Medical Products, Inc. | |
| Industrial Development Board of the City of Auburn | | | - |
| | Lease Agreement for 1117 West Veterans Boulevard dated 6/1/2020 | SiO2 Medical Products, Inc. | |
| | Lease Agreement for 2425 Innovation Drive dated 6/1/2020 | SiO2 Medical Products, Inc. | |
| | Leasehold Mortgage and Assignment of Lease and Rents dated 12/29/2020 | SiO2 Medical Products, Inc. | |
| Johnson, Rhonda | | | - |
| | Offer Letter dated 8/14/2020 | SiO2 Medical Products, Inc. | |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Joint Project Management (JPM) - Chemical, Biological, Radiological and Nuclear (CBRN) Auto Injector Project - Phase I (Contract #W911QY-21-C-0069) | | | - |
| | Contract #W911QY-21-C-0069 - Government Award/Contract dated 5/3/2021 | SiO2 Medical Products, Inc. | |
| Joint Project Management (JPM) - Chemical, Biological, Radiological and Nuclear (CBRN) Auto Injector Project - Phase II (Contract # W911SR-22-C-0033) | | | |
| | Contract # W911SR-22-C-0033 - Government Award/Contract dated 6/15/2022 | SiO2 Medical Products, Inc. | |
| Jones, Jaelon Rashod | | | - |
| | Offer Letter dated 4/23/2020 | SiO2 Medical Products, Inc. | |
| Jones, Willis | | | - |
| | Offer Letter dated 6/28/2021 | SiO2 Medical Products, Inc. | |
| Jung, Yoonjae | | | - |
| | Offer Letter dated 2/21/2022 | SiO2 Medical Products, Inc. | |
| Kale, Himanshu | | | - |
| | Offer Letter dated 8/27/2021 | SiO2 Medical Products, Inc. | |
| Kelso, Leslie D | | | - |
| | Offer Letter dated 10/16/2020 | SiO2 Medical Products, Inc. | |
| Kibele, Ralf | | | - |
| | Assignment Agreement dated 8/8/2022 | SiO2 Medical Products, Inc. | |
| Lark, Shameria Dekella | | | - |
| | Offer Letter dated 6/30/2020 | SiO2 Medical Products, Inc. | |
| Leffler, Paul | | | - |
| | Offer Letter dated 8/3/2012 | SiO2 Medical Products, Inc. | |
| Leppin, Derick Harve | | | - |
| | Offer Letter dated 7/14/2020 | SiO2 Medical Products, Inc. | |
| Leppin, Tyler A | | | - |
| | Offer Letter dated 2/8/2021 | SiO2 Medical Products, Inc. | |
| Lessley, James J | | | - |
| | Offer Letter dated 6/19/2019 | SiO2 Medical Products, Inc. | |
| Lilly, Brian | | | - |
| | Offer Letter dated 9/17/2012 | SiO2 Medical Products, Inc. | |
| Longhorn Vaccines and Diagnostics, LLC | | | - |
| | Supply Agreement dated 2/16/23 | SiO2 Medical Products, Inc. | |
| Machen McChesney, LLP | | | - |
| | Vendor Agreement dated 5/21/2021 | SiO2 Medical Products, Inc. | |
| Mairtin, Stacy | | | - |
| | Promotional Offer Letter dated 3/23/2022 | SiO2 Medical Products, Inc. | |
| Matthews, Camill T. | | | - |
| | Promotional Offer Letter dated 11/23/2020 | SiO2 Medical Products, Inc. | |
| McDade Hanna, Jamelle Shantae | | | - |
| | Promotional Offer Letter dated 11/18/2021 | SiO2 Medical Products, Inc. | |
| McElrath, Corneishia | | | - |
| | Offer Letter dated 2/15/2023 | SiO2 Medical Products, Inc. | |
| Milstead, Mark S | | | - |
| | Offer Letter dated 11/25/2013 | SiO2 Medical Products, Inc. | |
| Mitchell, Wendy Lee | | | - |
| | Promotional Offer Letter dated 1/17/2022 | SiO2 Medical Products, Inc. | |
| Moon, Melanie | | | - |
| | Promotional Offer Letter dated 4/28/2020 | SiO2 Medical Products, Inc. | |
| Mulligan, David | | | - |

8/2/2023

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| | Offer Letter dated 1/4/2021 | SiO2 Medical Products, Inc. | |
| Myles, Gloria | | | - |
| | Offer Letter dated 8/2/2021 | SiO2 Medical Products, Inc. | |
| Nagy, Matthew R. | | | - |
| | Promotional Offer Letter dated 8/10/2020 | SiO2 Medical Products, Inc. | |
| Nano Scale Surface Systems, Inc | | | 12,938.05 |
| | License and Consultant Agreement, dated as of March 2008, by and between CVH and Nano Scale Surface Systems, Inc. | SiO2 Medical Products, Inc. | |
| | Services Agreement, dated as of May 10, 2013, by and between the Company and Nano Scale Surface Systems, Inc. | SiO2 Medical Products, Inc. | |
| | Second License and Consultant Agreement, dated as of June 16, 2011, by and between Nano Scale and CVH, as amended by the Contract Amendment, dated as of February 1, 2012 | SiO2 Medical Products, Inc. | |
| | Third License and Consultant Agreement dated 4/11/2012 | SiO2 Medical Products, Inc. | |
| | "Amendment #1 to Micro Plate License Agreement dated 3/11/2014" signed by SiO2 on August 20, 2018 | SiO2 Medical Products, Inc. | |
| | Fourth License and Consultant Agreement dated 3/11/2014 | SiO2 Medical Products, Inc. | |
| | Micro Plate License Agreement, dated March 11, 2014, by and between Nano Scale and the Company | SiO2 Medical Products, Inc. | |
| Nelson Laboratories, LLC | | | - |
| | Vendor Agreement dated 12/17/2020 | SiO2 Medical Products, Inc. | |
| Nelson, Timothy | | | - |
| | Offer Letter dated 7/9/2021 | SiO2 Medical Products, Inc. | |
| Novartis Pharma AG | | | - |
| | Supply Preparation Agreement dated 9/12/2017 | SiO2 Medical Products, Inc. | |
| | Amendment No. 4 to Development and Manufacturing Agreement dated 12/14/2018 | SiO2 Medical Products, Inc. | |
| | Letter Agreement for Commercial Exclusivity & Board Observation Rights dated 9/24/2019 | SiO2 Medical Products, Inc. | |
| | Work Order dated 12/1/2020 | SiO2 Medical Products, Inc. | |
| Oddo, Jacob N | | | - |
| | Offer Letter dated 8/14/2019 | SiO2 Medical Products, Inc. | |
| Outlook Therapeutics | | | - |
| | Amendment to Work Order 1 dated 3/23/2021 | SiO2 Medical Products, Inc. | |
| | Work Order 3 dated 11/29/2021 | SiO2 Medical Products, Inc. | |
| | Restated and Amended Supply Agreement dated 12/10/2021 | SiO2 Medical Products, Inc. | |
| | Quality Agreement | SiO2 Medical Products, Inc. | |
| Patel, Jaimini A. | | | - |
| | Promotional Offer Letter dated 6/4/2021 | SiO2 Medical Products, Inc. | |
| Penske Truck Leasing Co. LP | | | 3,967.18 |
| | Vehicle Lease Service Agreement dated 8/20/2020 | SiO2 Medical Products, Inc. | |
| | Vehicle Lease Service Agreement Schedule "S" Vehicle Specifications dated 8/28/2020 | SiO2 Medical Products, Inc. | |
| Peoples, Charlotte Elaine | | | - |
| | Promotional Offer Letter dated 12/11/2020 | SiO2 Medical Products, Inc. | |
| Phillips, Lolita Denise | | | - |
| | Offer Letter dated 7/30/2020 | SiO2 Medical Products, Inc. | |
| Phillips, Victor | | | - |
| | Offer Letter dated 12/30/2015 | SiO2 Medical Products, Inc. | |

8/2/2023

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Pitney Bowes | | | - |
| | Lease Agreement dated 8/28/2018 | SiO2 Medical Products, Inc. | |
| | Lease Agreement 00411306713 dated 7/21/2022 | SiO2 Medical Products, Inc. | |
| Ponds, Mary G | | | - |
| | Offer Letter dated 1/15/2018 | SiO2 Medical Products, Inc. | |
| Porch, Sandy Denise | | | - |
| | Offer Letter dated 6/24/2020 | SiO2 Medical Products, Inc. | |
| Pothuraju, Raja Praveen | | | - |
| | Offer Letter dated 4/9/2021 | SiO2 Medical Products, Inc. | |
| Quinton, Rodney Drew | | | - |
| | Offer Letter dated 3/5/2020 | SiO2 Medical Products, Inc. | |
| Raiford, Jon Derek | | | - |
| | Promotional Offer Letter dated 3/31/2022 | SiO2 Medical Products, Inc. | |
| Ramey, John E | | | - |
| | Offer Letter dated 9/21/2021 | SiO2 Medical Products, Inc. | |
| Richardson, Quindravious | | | - |
| | Offer Letter | SiO2 Medical Products, Inc. | |
| Riddle, Brenda | | | - |
| | Offer Letter dated 6/17/2020 | SiO2 Medical Products, Inc. | |
| Roberson, Yolanda | | | - |
| | Offer Letter dated 2/13/2019 | SiO2 Medical Products, Inc. | |
| Roby, Christopher | | | - |
| | Offer Letter dated 1/6/2021 | SiO2 Medical Products, Inc. | |
| Santana, Valdenise | | | - |
| | Promotional Offer Letter dated 1/19/2023 | SiO2 Medical Products, Inc. | |
| Santiago, Keecia B | | | - |
| | Offer Letter dated 2/18/2021 | SiO2 Medical Products, Inc. | |
| Sears, Tina J | | | - |
| | Offer Letter dated 1/15/2018 | SiO2 Medical Products, Inc. | |
| Shemwell, Daniel Adam | | | - |
| | Offer Letter dated 6/22/2020 | SiO2 Medical Products, Inc. | |
| SHL Medical AG | | | - |
| | Collaboration Agreement dated 2/23/2023 | SiO2 Medical Products, Inc. | |
| Singaram, Venkat | | | - |
| | Offer Letter dated 3/2/2020 | SiO2 Medical Products, Inc. | |
| Smith, Anthony | | | - |
| | Promotional Offer Letter dated 3/22/2022 | SiO2 Medical Products, Inc. | |
| Smith, Chad N | | | - |
| | Promotional Offer Letter dated 8/10/2020 | SiO2 Medical Products, Inc. | |

8/2/2023

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Smith, Staci Alicia | | | - |
| | Promotional Offer Letter dated 12/11/2020 | SiO2 Medical Products, Inc. | |
| Spratlin, Mary H | | | - |
| | Offer Letter dated 12/8/2020 | SiO2 Medical Products, Inc. | |
| State of Alabama | | | - |
| | Underground Easement Agreement dated 12/9/2020 | SiO2 Medical Products, Inc. | |
| | Project Agreement dated 5/14/2021 | SiO2 Medical Products, Inc. | |
| Staunton, Catherine | | | - |
| | Offer Letter dated 2/23/2022 | SiO2 Medical Products, Inc. | |
| Taha, Ahmad | | | - |
| | Assignment Agreement dated 8/8/2022 | SiO2 Medical Products, Inc. | |
| Thomas, Lashundra | | | - |
| | Offer Letter dated 6/24/2020 | SiO2 Medical Products, Inc. | |
| Thomas, Tamonica Lasha | | | - |
| | Offer Letter dated 9/3/2020 | SiO2 Medical Products, Inc. | |
| Tiimob, Boniface Jabik | | | - |
| | Offer Letter dated 6/1/2018 | SiO2 Medical Products, Inc. | |
| Tinsley, Carla D | | | - |
| | Offer Letter dated 6/24/2018 | SiO2 Medical Products, Inc. | |
| Tirrell, Matthew | | | - |
| | Consultancy Agreement Amendment dated 3/21/2023 | SiO2 Medical Products, Inc. | |
| Tolbert , Clem | | | - |
| | Offer Letter dated 4/19/2021 | SiO2 Medical Products, Inc. | |
| Tolbert, Amos L | | | - |
| | Offer Letter | SiO2 Medical Products, Inc. | |
| Trisoglio, Matteo | | | - |
| | Assignment Agreement dated 8/8/2022 | SiO2 Medical Products, Inc. | |
| Turman, Patrick O | | | - |
| | Offer Letter dated 11/11/2020 | SiO2 Medical Products, Inc. | |
| Twin City Security, LLC | | | - |
| | Vendor Agreement dated 12/11/2020 | SiO2 Medical Products, Inc. | |
| United States Department of Agriculture Rural Development | | | - |
| | USDA BORROWER'S CERTIFICATE dated 12/30/2020 | SiO2 Medical Products, Inc. | |
| Voladri, Satvik R | | | - |
| | Offer Letter dated 2/25/2021 | SiO2 Medical Products, Inc. | |
| Walker, Jada Faith | | | - |
| | Promotional Offer Letter dated 12/14/2020 | SiO2 Medical Products, Inc. | |
| Waste Away Group, Inc. | | | - |
| | Service Agreement dated 10/1/2020 - Riley Street | SiO2 Medical Products, Inc. | |
| | Service Agreement dated 11/9/2020 - Innovation Drive | SiO2 Medical Products, Inc. | |
| | Service Agreement dated 11/9/2020 - Veterans Compactor | SiO2 Medical Products, Inc. | |
| WaterStreet | | | - |
| | Equipment Lease Agreement dated 7/1/2015 | SiO2 Medical Products, Inc. | |

8/2/2023

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Watson III, Johnny | | | |
| | Offer Letter dated 5/1/2020 | SiO2 Medical Products, Inc. | - |
| Watson, Joanne Melissa | | | |
| | Offer Letter dated 6/21/2016 | SiO2 Medical Products, Inc. | - |
| Wills, Matthew S | | | |
| | Offer Letter dated 11/2/2012 | SiO2 Medical Products, Inc. | - |
| Wirthwein Medical GmbH & Co. KG | | | |
| | Collaboration Agreement dated 12/12/2022 | SiO2 Medical Products, Inc. | - |
| Woodson, Christopher M | | | |
| | Offer Letter dated 9/20/2011 | SiO2 Medical Products, Inc. | - |
| Wooten, Charlotte | | | |
| | Offer Letter dated 6/18/2020 | SiO2 Medical Products, Inc. | - |
| Xiong, Haiyuan | | | |
| | Offer Letter dated 6/10/2021 | SiO2 Medical Products, Inc. | - |
| Yancey, Traci | | | |
| | Offer Letter dated 10/27/2021 | SiO2 Medical Products, Inc. | - |
| Yarkareddy, GopiReddy | | | |
| | Offer Letter dated 10/14/2021 | SiO2 Medical Products, Inc. | - |
| **Total** | | | **$ 151,294.41** |

8/2/2023

**<u>Exhibit C-1</u>**

**Redline to Assumed Executory Contracts
and Unexpired Leases List Filed on July 12, 2023**

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| ADMA Biologics, Inc. | | | $ - |

**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ | See Notes |
|---|---|---|---|---|
| ADMA Biologics, Inc. | | | $ - | |
| | Development and Supply Agreement dated 12/14/2020 | SiO2 Medical Products, Inc. | | |
| | Development and Supply Agreement dated 1/4/2022 | SiO2 Medical Products, Inc. | | |
| | Financing Agreement dated 9/1/2022 | SiO2 Medical Products, Inc. | | |
| | Quality Agreement dated 12/2/2022 | SiO2 Medical Products, Inc. | | |
| ADP, INC. | | | | 86.20 |
| | Vendor Agreement dated 1/5/2021 | SiO2 Medical Products, Inc. | | |
| Alabama Industrial Development Body, LLC | | | - | |
| | First Amendment to Sublease Agreement dated 3/1/2021 | SiO2 Medical Products, Inc. | | |
| Alabama Power Company Corporate Real Estate | | | - | |
| | Underground Easement Agreement dated 12/9/2020 | SiO2 Medical Products, Inc. | | |
| Araujo, Gonzalo Andres | | | - | |
| | Offer Letter dated 10/16/2013 | SiO2 Medical Products, Inc. | | |
| Baltazar-Lopez, Martin E | | | - | |
| | Offer Letter dated 7/31/2013 | SiO2 Medical Products, Inc. | | |
| Baltzell, Meesha | | | - | |
| | Offer Letter dated 2/3/2020 | SiO2 Medical Products, Inc. | | |
| Battle jr, Calvin | | | - | |
| | Offer Letter dated 5/18/2020 | SiO2 Medical Products, Inc. | | |
| Billins-Hundley, Roshonda | | | - | |
| | Offer Letter dated 2/15/2021 | SiO2 Medical Products, Inc. | | |
| Blue Cross/Blue Shield Ala. | | | - | |
| | Amendment to Enrollment Agreement dated 1/1/2023 | SiO2 Medical Products, Inc. | | |
| Bonner, Shekevia | | | - | |
| | Offer Letter dated 8/12/2020 | SiO2 Medical Products, Inc. | | |
| Braswell, Terry Bruce | | | - | |
| | Offer Letter | SiO2 Medical Products, Inc. | | |
| Breeland, Adam | | | - | |
| | Offer Letter dated 5/29/2013 | SiO2 Medical Products, Inc. | | |
| Brockstedt, David | | | - | |
| | Offer Letter dated 2/12/2014 | SiO2 Medical Products, Inc. | | |
| Brown, Tamanika | | | - | |
| | Offer Letter dated 10/20/2021 | SiO2 Medical Products, Inc. | | |
| Calloway, Jennifer | | | - | |
| | Offer Letter dated 7/24/2020 | SiO2 Medical Products, Inc. | | |
| Cartier, George Edward | | | - | |
| | Offer Letter dated 12/9/2019 | SiO2 Medical Products, Inc. | | |
| City of Auburn | | | - | |
| | Tax Abatement Agreement dated 3/20/2012 | SiO2 Medical Products, Inc. | | |
| | Resolution No. 12-232 dated 3/20/2012 | SiO2 Medical Products, Inc. | | |
| | Resolution No. 18-232 dated 3/20/2012 | SiO2 Medical Products, Inc. | | |
| | Resolution No. 14-270 dated 12/16/2014 | SiO2 Medical Products, Inc. | | |
| | Resolution No. 16-013 dated 3/21/2016 | SiO2 Medical Products, Inc. | | |
| | Resolution No. 16-294 dated 12/28/2016 | SiO2 Medical Products, Inc. | | |
| | Resolution No. 20-137 dated 7/13/2020 | SiO2 Medical Products, Inc. | | |
| | Resolution No. 21-242 dated 11/16/2021 | SiO2 Medical Products, Inc. | | |
| | Resolution No. 21-243 dated 11/16/2021 | SiO2 Medical Products, Inc. | | |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Clark, Cody Wayne | | | - |
| Clark, David | Offer Letter dated 3/30/2020 | SiO2 Medical Products, Inc. | - |
| | Offer Letter dated 1/7/2020 | SiO2 Medical Products, Inc. | |
| Cleaning Solutions, LLC | | | 7,690.00 |
| | Vendor Maintenance Agreement dated 8/31/2020 | SiO2 Medical Products, Inc. | |
| Coleman, Stacey G | | | - |
| | Offer Letter dated 12/14/2020 | SiO2 Medical Products, Inc. | |
| Computer Packages Inc. | | | - |
| | Vendor Agreement dated 1/19/2021 | SiO2 Medical Products, Inc. | |
| ~~Crenshaw, Randy~~ Daugherty, Keenan | | | - |
| | ~~Employment Agreement~~ Offer Letter dated ~~8/1/2022~~ 6/24/2021 | SiO2 Medical Products, Inc. | |
| ~~Danilo Pavlovic Life Science Consulting~~ Davis, Michael Laterlla | | | - |
| | ~~Novation to Consulting Agreement~~ Offer Letter dated ~~7/2/2020~~ 10/8/2020 | SiO2 Medical Products, Inc. | |
| DeHart, Travis | | | - |
| | Offer Letter dated 8/10/2020 | SiO2 Medical Products, Inc. | |
| Dietrich, Philip H | | | - |
| | Promotional Offer Letter dated 5/23/2022 | SiO2 Medical Products, Inc. | |
| Dixie Electric Cooperative | | | 126,612.98 |
| | Vendor Agreement dated 7/21/2020 | SiO2 Medical Products, Inc. | (1) |
| Dixon, Elijah O | | | - |
| | Offer Letter dated 1/21/2021 | SiO2 Medical Products, Inc. | |
| Doyle, Ryan | | | - |
| | Offer Letter dated 6/3/2021 | SiO2 Medical Products, Inc. | |
| Ernst & Young LLP | | | - |
| | Engagement Letter 5/18/2021 | SiO2 Medical Products, Inc. | |
| Exact Sciences Corporation | | | - |
| | Purchase Agreement dated 4/21/2021 | SiO2 Medical Products, Inc. | |
| | Services and Supply Agreement dated 4/23/2021 | SiO2 Medical Products, Inc. | |
| | Purchase Agreement dated 6/9/2021 | SiO2 Medical Products, Inc. | |
| | Amendment to Services and Supply Agreement dated 2/6/2023 | SiO2 Medical Products, Inc. | |
| Extra Space Storage | | | - |
| | Vendor Agreement dated 5/20/2021 | SiO2 Medical Products, Inc. | |
| Finley, Quentavious | | | - |
| | Offer Letter dated 11/8/2021 | SiO2 Medical Products, Inc. | |
| Fischer Sohne AG | | | - |
| | Quality Agreement dated 12/17/2020 | SiO2 Medical Products, Inc. | |
| Floyd, Michael Andrew | | | - |
| | Offer Letter dated 8/24/2020 | SiO2 Medical Products, Inc. | |
| Foreman, Justin Arthur | | | - |
| | Offer Letter dated 4/29/2020 | SiO2 Medical Products, Inc. | |
| Fresenius Kabi Deutschland GmbH | | | - |
| | License and Settlement Agreement dated 9/16/2020 | SiO2 Medical Products, Inc. | |
| Fujifilm Diosynth Biotechnologies Texas, LLC | | | |
| | Supplier Quality Agreement dated 4/27/2021 | SiO2 Medical Products, Inc. | |
| Gandreti, Yashwant | | | - |
| | Offer Letter dated 12/3/2021 | SiO2 Medical Products, Inc. | |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ | See Notes |
|---|---|---|---|---|
| Gentry, Stephen | | | | - |
| | Promotional Offer Letter dated 2/6/2022 | SiO2 Medical Products, Inc. | | |
| Gilead Sciences, Inc. | | | - | |
| | Development and Supply Agreement dated 2/6/2020 | SiO2 Medical Products, Inc. | | |
| | Scope of Work Agreement dated 2/6/2020 | SiO2 Medical Products, Inc. | | |
| | Work Order dated 5/20/2020 | SiO2 Medical Products, Inc. | | |
| | Work Order dated 8/13/2020 | SiO2 Medical Products, Inc. | | |
| | Work Order dated 3/11/2021 | SiO2 Medical Products, Inc. | | |
| | Quality Agreement dated 4/8/2021 | SiO2 Medical Products, Inc. | | |
| Gilmore, Bradley Christopher | | | | - |
| | Offer Letter dated 10/14/2013 | SiO2 Medical Products, Inc. | | |
| Gopher, Alice Graham | | | | - |
| | Offer Letter dated 8/13/2020 | SiO2 Medical Products, Inc. | | |
| Gragg, Erica Lynn Hardy | | | | - |
| | Offer Letter dated 7/7/2020 | SiO2 Medical Products, Inc. | | |
| Grantham, Valerie K | | | | - |
| | Offer Letter dated 10/30/2013 | SiO2 Medical Products, Inc. | | |
| Gresham, James Troy | | | | - |
| | Offer Letter dated 8/19/2022 | SiO2 Medical Products, Inc. | | |
| Griffin, Nicholas | | | | - |
| | Offer Letter dated 11/22/2013 | SiO2 Medical Products, Inc. | | |
| Guifarro Funez, Omar Emilio | | | | - |
| | Promotional Offer Letter dated 8/23/2021 | SiO2 Medical Products, Inc. | | |
| Guilliams, Michael A | | | | - |
| | Offer Letter dated 12/23/2020 | SiO2 Medical Products, Inc. | | |
| Hamilton Jr, Clarence L | | | | - |
| | Offer Letter dated 12/9/2019 | SiO2 Medical Products, Inc. | | |
| Hamilton, Kandy Wynette | | | | - |
| | Offer Letter dated 12/13/2021 | SiO2 Medical Products, Inc. | | |
| Harrison, Dewayne B | | | | - |
| | Offer Letter | SiO2 Medical Products, Inc. | | |
| Hawaldar, Nishant | | | | - |
| | Offer Letter dated 9/28/2021 | SiO2 Medical Products, Inc. | | |
| Henton, David | | | - | |
| | Contract Amendment 3 to Consultancy Agreement dated 3/20/2023 | SiO2 Medical Products, Inc. | | |
| HK Packaging Consulting GmbH Hill, Aaron Leif | | | | - |
| | Consulting Agreement dated 1/1/2023 Medical Products, Inc. | Advanced Bioscience Consumables Offer Letter dated 4/6/2020 (1) | | SiO2 |
| | Consulting Agreement dated 1/1/2023 | Advanced Bioscience Labware, Inc. (1) | | |
| Hood, Sylvia | | | | - |
| | Consulting Agreement Promotional Offer Letter dated 1/1/2023 5/5/2021 | SiO2 Medical Products, Inc. | (1) | |
| Industrial Development Board of the City of Auburn | | | - | |
| | Lease Agreement for 1117 West Veterans Boulevard dated 6/1/2020 | SiO2 Medical Products, Inc. | | |
| | Lease Agreement for 2425 Innovation Drive dated 6/1/2020 | SiO2 Medical Products, Inc. | | |
| | Leasehold Mortgage and Assignment of Lease and Rents dated 12/29/2020 | SiO2 Medical Products, Inc. | | |
| Johnson, Rhonda | | | | - |
| | Offer Letter dated 8/14/2020 | SiO2 Medical Products, Inc. | | |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Joint Project Management (JPM) - Chemical, Biological, Radiological and Nuclear (CBRN) Auto Injector Project - Phase I (Contract #W911QY-21-C-0069) | | | - |
| | ~~Government~~ Contract ~~Agreement Amendment~~ #~~W911QY-21-C-0069 - Government Award/Contract~~ dated ~~8/31/2020~~5/3/2021    SiO2 Medical Products, Inc. | | |
| Joint Project Management (JPM) - Chemical, Biological, Radiological and Nuclear (CBRN) Auto Injector Project - Phase II (Contract # W911SR-22-C-0033) | | | - |
| | Contract # W911SR-22-C-0033 - Government Award/Contract dated ~~6/5/2020~~6/15/2022    SiO2 Medical Products, Inc. | | |
| ~~Kelly~~Jones, ~~Ken~~Jaelon Rashod | | | |
| | ~~Employment Agreement~~Offer Letter dated ~~8/1/2012~~4/23/2020    SiO2 Medical Products, Inc. | | - |
| Jones, Willis | | | |
| | Offer Letter dated 6/28/2021 | SiO2 Medical Products, Inc. | - |
| Jung, Yoonjae | | | |
| | Offer Letter dated 2/21/2022 | SiO2 Medical Products, Inc. | - |
| Kale, Himanshu | | | |
| | Offer Letter dated 8/27/2021 | SiO2 Medical Products, Inc. | - |
| Kelso, Leslie D | | | |
| | Offer Letter dated 10/16/2020 | SiO2 Medical Products, Inc. | - |
| Kibele, Ralf | | | |
| | Assignment Agreement dated 8/8/2022 | SiO2 Medical Products, Inc. | - |
| Lark, Shameria Dekella | | | |
| | Offer Letter dated 6/30/2020 | SiO2 Medical Products, Inc. | - |
| Leffler, Paul | | | |
| | Offer Letter dated 8/3/2012 | SiO2 Medical Products, Inc. | - |
| Leppin, Derick Harve | | | |
| | Offer Letter dated 7/14/2020 | SiO2 Medical Products, Inc. | - |
| Leppin, Tyler A | | | |
| | Offer Letter dated 2/8/2021 | SiO2 Medical Products, Inc. | - |
| Lessley, James J | | | |
| | Offer Letter dated 6/19/2019 | SiO2 Medical Products, Inc. | - |
| Lilly, Brian | | | |
| | Offer Letter dated 9/17/2012 | SiO2 Medical Products, Inc. | - |
| Longhorn Vaccines and Diagnostics, LLC | | | |
| | Supply Agreement dated 2/16/23 | SiO2 Medical Products, Inc. | - |
| Machen McChesney, LLP | | | |
| | Vendor Agreement dated 5/21/2021 | SiO2 Medical Products, Inc. | - |
| Mairtin, Stacy | | | |
| | Promotional Offer Letter dated 3/23/2022 | SiO2 Medical Products, Inc. | - |
| Matthews, Camill T. | | | |
| | Promotional Offer Letter dated 11/23/2020 | SiO2 Medical Products, Inc. | - |
| McDade Hanna, Jamelle Shantae | | | |
| | Promotional Offer Letter dated 11/18/2021 | SiO2 Medical Products, Inc. | - |
| McElrath, Corneishia | | | |
| | Offer Letter dated 2/15/2023 | SiO2 Medical Products, Inc. | - |
| Milstead, Mark S | | | |
| | Offer Letter dated 11/25/2013 | SiO2 Medical Products, Inc. | - |
| Mitchell, Wendy Lee | | | |
| | Promotional Offer Letter dated 1/17/2022 | SiO2 Medical Products, Inc. | - |
| Moon, Melanie | | | |
| | Promotional Offer Letter dated 4/28/2020 | SiO2 Medical Products, Inc. | - |
| Mulligan, David | | | |
| | | | - |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| | Offer Letter dated 1/4/2021 | SiO2 Medical Products, Inc. | - |
| Myles, Gloria | | | |
| | Offer Letter dated 8/2/2021 | SiO2 Medical Products, Inc. | - |
| Nagy, Matthew R. | | | |
| | Promotional Offer Letter dated 8/10/2020 | SiO2 Medical Products, Inc. | |
| Nano Scale Surface Systems, Inc | | | 12,938.05 |
| | License and Consultant Agreement, dated as of March 2008, by and between CVH and Nano Scale Surface Systems, Inc. | SiO2 Medical Products, Inc. | |
| | Services Agreement, dated as of May 10, 2013, by and between the Company and Nano Scale Surface Systems, Inc. | SiO2 Medical Products, Inc. | |
| | Second License and Consultant Agreement, dated as of June 16, 2011, by and between Nano Scale ~~Second License and Consultant Agreement dated 6/16/2011~~ and CVH, as amended by the Contract Amendment, dated as of February 1, 2012 | SiO2 Medical Products, Inc. | |
| | Third License and Consultant Agreement dated 4/11/2012 | SiO2 Medical Products, Inc. | |
| | "Amendment #1 to Micro Plate License Agreement dated ~~3/11/2013~~ on August 20, 2018 | 3/11/2014" signed by SiO2 | |
| | Fourth License and Consultant Agreement dated 3/11/2014 | SiO2 Medical Products, Inc. | |
| | Micro Plate License Agreement, dated March 11, 2014, by and between Nano Scale and the Company | SiO2 Medical Products, Inc. | |
| Nelson Laboratories, LLC | | | - |
| | Vendor Agreement dated 12/17/2020 | SiO2 Medical Products, Inc. | |
| Nelson, Timothy | | | - |
| | Offer Letter dated 7/9/2021 | SiO2 Medical Products, Inc. | |
| Novartis Pharma AG | | | - |
| | Supply Preparation Agreement dated 9/12/2017 | SiO2 Medical Products, Inc. | |
| | Amendment No. 4 to Development and Manufacturing Agreement dated 12/14/2018 | SiO2 Medical Products, Inc. | |
| | Letter Agreement for Commercial Exclusivity & Board Observation Rights dated 9/24/2019 | SiO2 Medical Products, Inc. | |
| | Work Order dated 12/1/2020 | SiO2 Medical Products, Inc. | |
| Oddo, Jacob N | | | - |
| | Offer Letter dated 8/14/2019 | SiO2 Medical Products, Inc. | |
| Outlook Therapeutics | | | - |
| | Amendment to Work Order 1 dated 3/23/2021 | SiO2 Medical Products, Inc. | |
| | Work Order 3 dated 11/29/2021 | SiO2 Medical Products, Inc. | |
| | Restated and Amended Supply Agreement dated 12/10/2021 | SiO2 Medical Products, Inc. | |
| | Quality Agreement | SiO2 Medical Products, Inc. | |
| ~~Pavlovic, Danilo~~Patel, Jaimini A. | ~~Novation to Consulting Agreement~~Promotional Offer Letter dated ~~7/2/2020~~6/4/2021 | SiO2 Medical Products, Inc. | - |
| Penske Truck Leasing Co. LP | | | 3,967.18 |
| | Vehicle Lease Service Agreement dated 8/20/2020 | SiO2 Medical Products, Inc. | |
| | Vehicle Lease Service Agreement Schedule "S" Vehicle Specifications dated 8/28/2020 | SiO2 Medical Products, Inc. | |
| Peoples, Charlotte Elaine | | | - |
| | Promotional Offer Letter dated 12/11/2020 | SiO2 Medical Products, Inc. | |
| Phillips, Lolita Denise | | | - |
| | Offer Letter dated 7/30/2020 | SiO2 Medical Products, Inc. | |
| ~~Pitney Bowes~~Phillips, Victor | | | - |
| | Offer Letter dated 12/30/2015 | SiO2 Medical Products, Inc. | |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Pitney Bowes | | | - |
| | Lease Agreement dated 8/28/2018 | SiO2 Medical Products, Inc. | |
| | Lease Agreement 00411306713 dated 7/21/2022 | SiO2 Medical Products, Inc. | |
| Ponds, Mary G | | | - |
| | Offer Letter dated 1/15/2018 | SiO2 Medical Products, Inc. | |
| Porch, Sandy Denise | | | - |
| | Offer Letter dated 6/24/2020 | SiO2 Medical Products, Inc. | |
| Pothuraju, Raja Praveen | | | - |
| | Offer Letter dated 4/9/2021 | SiO2 Medical Products, Inc. | |
| Quinton, Rodney Drew | | | - |
| | Offer Letter dated 3/5/2020 | SiO2 Medical Products, Inc. | |
| Raiford, Jon Derek | | | - |
| | Promotional Offer Letter dated 3/31/2022 | SiO2 Medical Products, Inc. | |
| Ramey, John E | | | - |
| | Offer Letter dated 9/21/2021 | SiO2 Medical Products, Inc. | |
| Richardson, Quindravious | | | - |
| | Offer Letter | SiO2 Medical Products, Inc. | |
| Riddle, Brenda | | | - |
| | Offer Letter dated 6/17/2020 | SiO2 Medical Products, Inc. | |
| Roberson, Yolanda | | | - |
| | Offer Letter dated 2/13/2019 | SiO2 Medical Products, Inc. | |
| Roby, Christopher | | | - |
| | Offer Letter dated 1/6/2021 | SiO2 Medical Products, Inc. | |
| Santana, Valdenise | | | - |
| | Promotional Offer Letter dated 1/19/2023 | SiO2 Medical Products, Inc. | |
| Santiago, Keecia B | | | - |
| | Offer Letter dated 2/18/2021 | SiO2 Medical Products, Inc. | |
| Sears, Tina J | | | - |
| | Offer Letter dated 1/15/2018 | SiO2 Medical Products, Inc. | |
| Shemwell, Daniel Adam | | | - |
| | Offer Letter dated 6/22/2020 | SiO2 Medical Products, Inc. | |
| SHL Medical AG | | | - |
| | Collaboration Agreement dated 2/23/2023 | SiO2 Medical Products, Inc. | |
| Singaram, Venkat | | | - |
| | Offer Letter dated 3/2/2020 | SiO2 Medical Products, Inc. | |
| Smith, Anthony | | | - |
| | Promotional Offer Letter dated 3/22/2022 | SiO2 Medical Products, Inc. | |
| Smith, Chad N | | | - |
| | Promotional Offer Letter dated 8/10/2020 | SiO2 Medical Products, Inc. | |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ | See Notes |
|---|---|---|---|---|
| Regions Bank | | | | |
| Smith, Staci Alicia | | SiO2 Medical Products, Inc. | | - |
| | Purchase Card Agreement Promotional Offer Letter dated 12/11/2020 | SiO2 Medical Products, Inc. | | - |
| SHL Medical AG Spratlin, Mary H | Collaboration Agreement Offer Letter dated 2/23/2023 12/8/2020 | SiO2 Medical Products, Inc. | | - |
| State of Alabama | Underground Easement Agreement dated 12/9/2020 | SiO2 Medical Products, Inc. | | |
| | Project Agreement dated 5/14/2021 | SiO2 Medical Products, Inc. | | |
| Staunton, Catherine | | SiO2 Medical Products, Inc. | | - |
| | Offer Letter dated 2/23/2022 | SiO2 Medical Products, Inc. | | - |
| Taha, Ahmad | Assignment Agreement dated 8/8/2022 | SiO2 Medical Products, Inc. | | - |
| Thomas, Lashundra | | SiO2 Medical Products, Inc. | | - |
| | Employment Agreement Offer Letter dated 1/1/2022 6/24/2020 | SiO2 Medical Products, Inc. | | |
| Thomas, Tamonica Lasha | | SiO2 Medical Products, Inc. | | - |
| | Offer Letter dated 9/3/2020 | SiO2 Medical Products, Inc. | | |
| Tiimob, Boniface Jabik | | SiO2 Medical Products, Inc. | | - |
| | Offer Letter dated 6/1/2018 | SiO2 Medical Products, Inc. | | |
| Tinsley, Carla D | | SiO2 Medical Products, Inc. | | - |
| | Offer Letter dated 6/24/2018 | SiO2 Medical Products, Inc. | | |
| Tirrell, Matthew | Consultancy Agreement Amendment dated 3/21/2023 | SiO2 Medical Products, Inc. | | - |
| Tolbert , Clem | | SiO2 Medical Products, Inc. | | - |
| | Offer Letter dated 4/19/2021 | SiO2 Medical Products, Inc. | | |
| Tolbert, Amos L | | SiO2 Medical Products, Inc. | | - |
| | Offer Letter | SiO2 Medical Products, Inc. | | |
| Trisoglio, Matteo | Assignment Agreement dated 8/8/2022 | SiO2 Medical Products, Inc. | | - |
| Turman, Patrick O | | SiO2 Medical Products, Inc. | | - |
| | Offer Letter dated 11/11/2020 | SiO2 Medical Products, Inc. | | |
| Twin City Security, LLC | Vendor Agreement dated 12/11/2020 | SiO2 Medical Products, Inc. | | - |
| United States Department of Agriculture Rural Development | USDA BORROWER'S CERTIFICATE dated 12/30/2020 | SiO2 Medical Products, Inc. | | |
| Voladri, Satvik R | | SiO2 Medical Products, Inc. | | - |
| | Offer Letter dated 2/25/2021 | SiO2 Medical Products, Inc. | | |
| Walker, Jada Faith | | SiO2 Medical Products, Inc. | | - |
| | Promotional Offer Letter dated 12/14/2020 | SiO2 Medical Products, Inc. | | |
| Waste Away Group, Inc. | Service Agreement dated 10/1/2020 - Riley Street | SiO2 Medical Products, Inc. | | - |
| | Service Agreement dated 11/9/2020 - Innovation Drive | SiO2 Medical Products, Inc. | | |
| | Service Agreement dated 11/9/2020 - Veterans Compactor | SiO2 Medical Products, Inc. | | |
| WaterStreet | Equipment Lease Agreement dated 7/1/2015 | SiO2 Medical Products, Inc. | | - |

DRAFT FOR DISCUSSION ONLY
SUBJECT TO MATERIAL REVISION

**SiO2 Medical Products, Inc.**
**Master Assumption Schedule**
(in $, Actuals)

| Contract Counterparty | Contract Description | Legal Entity | Cure $ |
|---|---|---|---|
| Weikart, Christopher Watson III, Johnny | Employment Agreement Offer Letter dated 9/20/2011 5/1/2020 | SiO2 Medical Products, Inc. | - |
| Watson, Joanne Melissa | Offer Letter dated 6/21/2016 | SiO2 Medical Products, Inc. | - |
| Wills, Matthew S | Offer Letter dated 11/2/2012 | SiO2 Medical Products, Inc. | - |
| Wirthwein Medical GmbH & Co. KG | Collaboration Agreement dated 12/12/2022 | SiO2 Medical Products, Inc. | - |
| Woodson, Christopher M | Offer Letter dated 9/20/2011 | SiO2 Medical Products, Inc. | - |
| Wooten, Charlotte | Offer Letter dated 6/18/2020 | SiO2 Medical Products, Inc. | - |
| Xiong, Haiyuan | Offer Letter dated 6/10/2021 | SiO2 Medical Products, Inc. | - |
| Yancey, Traci | Offer Letter dated 10/27/2021 | SiO2 Medical Products, Inc. | - |
| Yarkareddy, GopiReddy | Offer Letter dated 10/14/2021 | SiO2 Medical Products, Inc. | - |

## Exhibit E

**Liquidation Trust Agreement**

This Exhibit E and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Restructuring Support Agreement.

## LIQUIDATION TRUST AGREEMENT

This Liquidation Trust Agreement, dated as of [●], 2023, by and between SiO2 Medical Products, Inc. and its affiliated debtors and debtors in possession (the "Debtors")[1] in the Chapter 11 Cases (as defined below) and Peter Kravitz, of Province, Inc., not individually, but solely in its capacity as Liquidation Trustee, pertains to the administration of the Liquidation Trust pursuant to the terms of the Plan (as defined below), and is made effective as of the Effective Date thereof.

## R E C I T A L S :

(A)    On March 29, 2023, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Chapter 11 Cases"). The Chapter 11 Cases are jointly administered under Case Number 23-10366 (JTD).

(B)    On March 29, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtors Affiliates* [Docket No. 18].

(C)    On April 13, 2023, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee") [Docket No. 118].

(D)    On June 9, 2023, the Debtors filed the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtor Affiliates* [Docket No. 373].

(E)    On June 9, 2023, the Bankruptcy Court entered the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 378] (the "Disclosure Statement Order").

(F)    On June 9, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtor Affiliates*, [Docket No. 372] (as may be amended, modified, or supplemented in accordance with its terms, the "Plan").[2]

(G)    On July 19, 2023, the Bankruptcy Court entered the order confirming the Plan (the "Confirmation Order").

(H)    The Plan and Confirmation Order provide for the creation of a Liquidation Trust, to be formed on the Effective Date to hold, administer, and distribute the Liquidation Trust Assets

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510). The location of the Debtors' principal place of business and service address in these chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan.

to the Liquidation Trust Beneficiaries, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement.  This Agreement is executed to establish the Liquidation Trust and to facilitate the implementation of the Plan.

(I)     The Liquidation Trust is created on behalf, and for the benefit, of the Liquidation Trust Beneficiaries.

(J)     The respective powers, authority, responsibilities, and duties of the Liquidation Trustee shall be governed by this Agreement, the Plan, the Confirmation Order, and other applicable orders issued by the Bankruptcy Court.

(K)     This Agreement is intended to supplement, complement, and implement the Plan; *provided*, *however*, that if any of the terms and/or provisions of this Agreement conflict with the terms and/or provisions of the Plan, then the Plan shall govern.

(L)     The Liquidation Trust has no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its purpose described in the Plan and set forth in this Agreement.

(M)     The Liquidation Trust is intended to qualify as a "liquidating trust" pursuant to Treasury Regulation § 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124 and as a "grantor trust" for federal income tax purposes, pursuant to Sections 671 through 679 of the IRC. Transfer of the Liquidation Trust Assets to the Liquidation Trust shall be treated as a transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Liquidation Trust Assets by the Liquidation Trust Beneficiaries to the Liquidation Trust in exchange for their beneficial interests in the Liquidation Trust.  For federal income tax purposes, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of the Liquidation Trust and, therefore, shall be responsible for the payment of tax on their respective allocable share of the taxable income of the Liquidation Trust.

(N)     The Liquidation Trust is intended to qualify as a "liquidating trust" for all purposes of the Investment Company Act of 1940, as amended.

(O)     In accordance with the Plan, the Beneficial Interests are intended to be exempt, to the extent applicable, from the requirements of the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein and in the Plan, the parties to this Agreement agree as follows:

## ARTICLE I
## DEFINITIONS:

Any capitalized term used, but not otherwise defined, herein shall have the meaning set forth in the Plan.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

"**Agreement**" means this Liquidation Trust Agreement.

"**Beneficial Interests**" means, in the aggregate, the interests in the Liquidation Trust.

"**Cause**" means, for purposes of removing the Liquidation Trustee, (a) the Liquidation Trustee's conviction of a felony or any other crime involving moral turpitude, (b) any act or failure to act by the Liquidation Trustee involving actual dishonesty, fraud, misrepresentation, theft, or embezzlement, (c) the Liquidation Trustee's willful and repeated failure to substantially perform his or her duties under this Agreement after written notice and an opportunity to cure, or (d) the Liquidation Trustee's incapacity, such that he or she is unable to substantially perform his or her duties under this Agreement for more than ninety (90) consecutive days.

"**Confidential Parties**" means, collectively, the Liquidation Trustee and each of its respective employees, members, agents, professionals, and advisors, including the Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals.

"**Confidential Party**" means the Liquidation Trustee or each of its respective employees, members, agents, professionals, or advisors, including the Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals.

"**IRC**" means, as amended, the Internal Revenue Code of 1986.

"**Liquidation Trust Beneficiaries**" means, collectively, holders of Liquidation Trust Class A Interests and Liquidation Trust Class B Interests.

"**Liquidation Trust Class A Interests**" means the class A beneficial interests in the Liquidation Trust.

"**Liquidation Trust Class B Interests**" means the class B beneficial interests in the Liquidation Trust.

"**Liquidation Trust Expenses**" means the costs and expenses of the Liquidation Trust, including, without limitation (a) all claims, fees, expenses, charges, bonds (if any), liabilities, and obligations of the Liquidation Trust, other than with respect to the Liquidation Trust Beneficiaries, as contemplated by this Agreement and as required by law, (b) the reasonable and documented fees and expenses incurred (or to be incurred) by, all Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals retained by the Liquidation Trustee in connection with the performance of the Liquidation Trustee's duties in connection with this Agreement, (c) all claims, fees, expenses, charges, liabilities, and obligations of the Liquidation Trust on account of its indemnification obligations as set forth in this Agreement for the benefit of any Trustee Party, and (d) the fees and expenses as set forth in Section 4.1 hereof, which shall be paid from the Liquidation Trust Funding in accordance with the Plan and this Agreement.

"**Liquidation Trustee Non-Professionals**" means nonprofessionals retained by the Liquidation Trustee including, without limitation, employees, independent contractors,

alternative dispute resolution panelists, or other agents as the Liquidation Trustee deems appropriate.

"**Liquidation Trustee Professionals**" means professionals retained by the Liquidation Trustee including, without limitation, disbursing and transfer agents, legal counsel, accountants, experts, investment, auditing, and forecasting and other consultants, and other agents or advisors, as the Liquidation Trustee deems appropriate.

"**Permitted Investments**" means the investments that a Liquidation Trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code.

"**Treasury Regulation**" means any regulation promulgated by the United States Department of the Treasury, including any temporary regulations from time to time promulgated under the IRC.

"**Trustee Parties**" means, collectively, the Liquidation Trustee, the Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals, and any other representatives, agents, employees, successors, or assigns of the Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals.

"**Trustee Party**" means, individually, the Liquidation Trustee, the Liquidation Trustee Professionals, the Liquidation Trustee Non-Professionals, or any other representatives, agents, employees, successors, or assigns of the Liquidation Trustee, the Liquidation Trustee Professionals, or Liquidation Trustee Non-Professionals.

"**Trust Register**" means the trust register reflecting the Beneficial Interest and Allowed Claim held by each Liquidation Trust Beneficiary.

## ARTICLE II
## NAME OF TRUST AND LIQUIDATION TRUSTEE

The name of the Liquidation Trust is the "SiO2 Liquidation Trust." In connection with the exercise of the Liquidation Trustee's powers under this Agreement, the Liquidation Trustee may use this name or such variation thereof as the Liquidation Trustee, in the Liquidation Trustee's discretion, may determine.

On the Effective Date, pursuant to Article IV.M of the Plan, the Reorganized Debtors (as defined in the Plan) shall transfer the Liquidation Trust Assets to the Liquidation Trust, for the benefit of the Liquidation Trust Beneficiaries, which Assets shall vest in the Liquidation Trust free and clear of all Liens, Claims, charges, or other encumbrances or interests. On the Effective Date, the Liquidation Trust shall be authorized to make distributions to the Liquidation Trust Beneficiaries in accordance with the Plan and may commence the prosecution of the Liquidation Trust Claims.

The Liquidation Trustee shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Liquidation Trustee shall be entitled to liquidate any and all of the Liquidation Trust Assets, and the Available Net Liquidation Proceeds shall be distributed to the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and this Agreement.

Peter Kravitz, of Province, Inc. is hereby appointed to serve as the Liquidation Trustee, and hereby accepts this appointment and agrees to serve in such capacity effective upon the Effective Date of the Plan and pursuant to the terms of the Plan and this Agreement. A successor Liquidation Trustee shall be appointed as set forth in Section 11.1 hereof in the event the Liquidation Trustee is removed or resigns pursuant to this Agreement or if the Liquidation Trustee otherwise vacates the position.

## ARTICLE III
## DUTIES AND POWERS OF THE LIQUIDATION TRUSTEE

3.1    Generally

Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, the Liquidation Trustee shall control and exercise authority over the Liquidation Trust Assets and shall be responsible for administering and liquidating (or abandoning, as the case may be) the Liquidation Trust Assets and taking actions on behalf of, and representing, the Liquidation Trust, including prosecuting any and all Liquidation Trust Claims. The Liquidation Trustee shall have the authority to bind the Liquidation Trust within the limitations set forth herein, in the Plan, and in the Confirmation Order, but shall for all purposes hereunder be acting in the capacity of Liquidation Trustee and not individually.

Except as otherwise specified in this Agreement or in the Plan, the Liquidation Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder or in the Plan.

3.2    Scope of Authority of Liquidation Trustee

The Liquidation Trustee shall have all duties, obligations, rights, and benefits assumed by, assigned to, or vested in the Liquidation Trust under the Plan, the Confirmation Order, and, subject to the Plan and the Confirmation Order, this Agreement. Such duties, obligations, rights, and benefits include, without limitation, all duties, obligations, rights, and benefits relating to the collection, prosecution, settlement, administration, and liquidation of the Liquidation Trust Assets, making distributions to Liquidation Trust Beneficiaries, administration of the Liquidation Trust, and any other duties, obligations, rights, and benefits reasonably necessary to accomplish the purpose of the Liquidation Trust under the Plan, the Confirmation Order, and subject to the Plan and the Confirmation Order, this Agreement. The Liquidation Trustee shall be responsible for all decisions and duties with respect to the Liquidation Trust and its assets. In all circumstances, the Liquidation Trustee shall act in the best interests of the Liquidation Trust Beneficiaries and in furtherance of the purpose of the Liquidation Trust, and all transactions concerning Liquidation Trust Assets shall be conducted on an arm's-length basis.

3.3    <u>Fiduciary Duties of Liquidation Trustee</u>

Pursuant to the Plan and this Agreement, the Liquidation Trustee will act in a fiduciary capacity on behalf of the Liquidation Trust Beneficiaries.

3.4    <u>Additional Powers of Liquidation Trustee</u>

In connection with the administration of the Liquidation Trust, subject to and except as otherwise set forth in this Agreement or the Plan, the Liquidation Trustee is hereby authorized to perform those acts necessary to accomplish the purposes of the Plan and of the Liquidation Trust and to otherwise protect the interests of Liquidation Trust Beneficiaries as contemplated in the Plan. Without limiting, but subject to, the foregoing, the Liquidation Trustee shall be authorized, in its sole discretion, and subject to the limitations contained herein and in the Plan to:

(a)    hold legal title (on behalf of the Liquidation Trust as Liquidation Trustee, but not individually) to the Liquidation Trust Assets held by the Liquidation Trust and all assets transferred to the Liquidation Trust;

(b)    receive and take such action as may be necessary to take possession, custody, or control of all assets and property to be distributed to the Liquidation Trust pursuant to the Plan;

(c)    protect and enforce the rights to the Liquidation Trust Assets vested in the Liquidation Trust by the Plan through any method deemed appropriate in its sole discretion, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(d)    open and maintain bank accounts in the name of the Liquidation Trust, draw checks and drafts thereon on the sole signature of the Liquidation Trustee, and terminate such accounts as the Liquidation Trustee deems appropriate;

(e)    maintain the books and records of the Liquidation Trust

(f)    establish such funds, reserves, and accounts within the Liquidation Trust estate, as deemed necessary by the Liquidation Trustee in carrying out the purposes of the Liquidation Trust;

(g)    make distributions and pay any other obligations owed by the Liquidation Trust from the Available Net Litigation Proceeds as provided herein and in the Plan;

(h)    solely with respect to Class 5 General Unsecured Claims, (1) file, withdraw, or litigate to judgment objections to Claims; (2) file one or more motions to estimate any Disputed Claims; (3) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court; *provided* that the Reorganized Debtors and other parties in interest, including Athos and any of its affiliates, shall have the right to object to and prosecute such objections to such General Unsecured Claims;

(i)      invest moneys received by the Liquidation Trust or otherwise held by the Liquidation Trust in accordance with Section 3.6 hereof;

(j)      prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle, in accordance with the terms hereof, claims against the Liquidation Trust or the Liquidation Trust Assets;

(k)      prosecute, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle, in accordance with the terms hereof, any and all claims and causes of action held by the Liquidation Trust, including the Liquidation Trust Claims;

(l)      pay expenses and make disbursements necessary to preserve, liquidate, and enhance the Liquidation Trust Assets;

(m)      purchase liability insurance coverage as the Liquidation Trustee, in its sole discretion, deems necessary and appropriate with respect to the Liquidation Trustee's duties pertaining to the Liquidation Trust Assets (in the form of an errors and omissions policy, fiduciary policy, or otherwise);

(n)      purchase such insurance coverage as the Liquidation Trustee, in its sole discretion, deems necessary and appropriate with respect to real and personal property which may be or may become Liquidation Trust Assets;

(o)      purchase such insurance coverage as the Liquidation Trustee, in its sole discretion, deems necessary and appropriate with respect to the Liquidation Trust Claims (in the form of a directors and officers policy or otherwise);

(p)      retain and pay, as applicable, Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals as provided in, and subject to the terms of, this Agreement;

(q)      incur any reasonable and necessary expenses in liquidating and converting the Liquidation Trust Assets to Cash, or otherwise administering the Liquidation Trust, as set forth in the Plan or this Agreement;

(r)      administer the Liquidation Trust's tax obligations, including (A) filing tax returns and paying tax obligations, (B) making distributions to Liquidation Trust Beneficiaries net of such taxes and applicable withholdings, and (C) representing the interest and account of the Liquidation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, or audit;

(s)      in the event that the Liquidation Trustee determines that the Liquidation Trust Beneficiaries or the Liquidation Trust may, will, or have become subject to adverse tax consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences;

(t)      as soon as possible after the transfer of the Liquidation Trust Assets to the Liquidation Trust, value the Liquidation Trust Assets based on a good faith valuation of such Liquidation Trust Assets, and such valuation shall be used by all parties (including the Debtors,

the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all U.S. federal income tax purposes; and

(u)     assume such other powers as may be vested in or assumed by the Liquidation Trustee pursuant to the Plan or Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of the Plan or this Agreement.

3.5     Limitation of Liquidation Trustee's Authority; No Ongoing Business

Notwithstanding anything to the contrary under applicable law, this Agreement or the Plan, the authority of the Liquidation Trustee is limited as follows:

(a)     For federal tax purposes and otherwise, the Liquidation Trustee shall not be authorized to engage in any trade or business with respect to the Liquidation Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

(b)     The Liquidation Trustee shall take such actions consistent with the prompt and orderly liquidation of the Liquidation Trust Assets as required by applicable law and consistent with the treatment of the Liquidation Trust as a "Liquidation Trust" pursuant to Treasury Regulation § 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124 and as a "grantor trust" for federal income tax purposes, pursuant to Sections 671 through 679 of the IRC to the extent such actions are permitted by this Agreement.  The Liquidation Trust shall in no event be dissolved later than three (3) years after the date hereof unless the Bankruptcy Court, upon motion of the Liquidation Trustee within the six (6) months prior to the third (3rd) anniversary hereof (or within the six (6) month period prior to the end of an extension period), determines that a fixed-period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the trust as a Liquidation Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets.

(c)     The Liquidation Trustee shall not take, or fail to take, any action that would jeopardize treatment of the Liquidation Trust as a "Liquidation Trust" and as a "grantor trust" (with the Liquidation Trust Beneficiaries as the grantors) for federal income tax purposes.

(d)     The Liquidation Trustee shall not have the power to guarantee any debt of other Persons.

(e)     The Liquidation Trustee shall not, and shall not be authorized to, take any action inconsistent with the Plan, including, without limitation, asserting or seeking to pursue any Claims or Causes of Action released by the Plan.

3.6     Investment of Liquidation Trust Monies

The Liquidation Trustee shall not invest any Liquidation Trust Assets, proceeds thereof, or any income earned by the Liquidation Trust unless such investment is a Permitted Investment.  The Liquidation Trustee shall not be liable for interest or obligated to produce income

on any moneys received by the Liquidation Trust hereunder and held for distribution or payment, except as such interest or other income shall actually be received by the Liquidation Trustee. Notwithstanding anything to the contrary herein, any investment shall be made in the manner investments are permitted to be made by a Liquidation Trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities, including Revenue Procedure 94-45, 1994-2 C.B. 684.

3.7     Other Activities

The Liquidation Trustee shall be entitled to be employed by third parties while performing the duties required under the Plan and this Agreement, so long as such other employment does not involve holding or representing any interest adverse to the interests of the Liquidation Trust, or otherwise preclude or impair the Liquidation Trustee from performing its duties under the Plan and this Agreement.  The Liquidation Trustee represents that, as of the Effective Date, the Liquidation Trustee does not hold or represent any interest adverse to the interests of Liquidation Trust by virtue of its employment with or engagement by any Liquidation Trust Beneficiaries, third parties or otherwise.

**ARTICLE IV**
**TERM AND COMPENSATION FOR LIQUIDATION TRUSTEE**

4.1     Compensation

The Liquidation Trustee shall be entitled to receive fair and reasonable compensation as provided on **Schedule 1** hereto (the "Fee Schedule") for services rendered on behalf of the Liquidation Trust and reimbursement of all reasonable, out-of-pocket expenses.  Fees and expenses incurred by the Liquidation Trustee shall be paid from the Liquidation Trust Assets and any proceeds therefrom.  The Fee Schedule may be modified at any time by a vote of holders of Beneficial Interests that represent a majority in amount of Liquidation Trust Class A Interests; *provided* that if all Liquidation Trust Class A Interests have been paid in full, the Fee Schedule may be modified at any time by a vote of holders of Beneficial Interests that represent a majority in amount of Liquidation Trust Class B Interests.

4.2     Termination

The duties, responsibilities and powers of the Liquidation Trustee shall terminate in accordance with Section 14.1 hereof.

4.3     No Bond

Notwithstanding any state or other applicable law to the contrary, the Liquidation Trustee shall not be obligated to obtain a bond, but may do so, in its sole discretion, in which case the expense incurred by such bonding shall be paid by the Liquidation Trust.

4.4     Removal

If Cause for removal exists, the Liquidation Trustee may be removed at any time (a) by a vote of holders of Beneficial Interests that represent a majority in amount of Liquidation Trust Class A Interests; *provided* that if all Liquidation Trust Class A Interests have been paid in full, the Liquidation Trustee may be removed at any time by a vote of holders of Beneficial Interests that represent a majority in amount of Liquidation Trust Class B Interests, or (b) as determined by a court of competent jurisdiction, after notice and a hearing; *provided however*, that no such removal shall be effective until a successor Liquidation Trustee agrees to serve as Liquidation Trustee subject to all of the terms and conditions of this Agreement.

4.5     Resignation

The Liquidation Trustee may resign by giving not less than thirty (30) days' prior written notice thereof to the Liquidation Trust Beneficiaries, *provided*, *however*, that such resignation shall not become effective until a successor agrees to serve as Liquidation Trustee subject to all of the terms and conditions of this agreement.

## ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS

5.1     Distribution Agent

The Liquidation Trustee shall distribute Available Net Litigation Proceeds in accordance with the Plan and may employ or contract with other Persons to assist in making such distributions.

5.2     Application of Liquidation Trust Assets

The Liquidation Trustee shall apply the Available Net Litigation Proceeds as follows ("the Liquidation Trust Waterfall"):

*First*: Pro Rata to the holders of Liquidation Trust Class A Interests until such holders have each received an amount equal to 100.00% of the amount of their respective Allowed General Unsecured Claims, as provided in the Plan;

*Second*: Pro Rata to the holders of Liquidation Trust Class B Interests until such holders have each received an amount equal to 100.00% of the amount of their respective Allowed Athos Subordinated Claims, as provided in the Plan.

5.3     Timing of Distributions

The Liquidation Trustee shall make distributions to Liquidation Trust Beneficiaries not less frequently than once annually, starting on the Effective Date, unless the Liquidation Trustee determines, in the Liquidation Trustee's reasonable discretion, that making such a distribution is impracticable in light of the anticipated Cash needs of the Liquidation Trust going forward, or that, in light of the Cash available for distribution, making a distribution would not warrant the incurrence of costs in making the distribution.

5.4     Unclaimed Property

In the event that any distribution to a Liquidation Trust Beneficiary remains unclaimed or is returned as undeliverable, no distribution to such Liquidation Trust Beneficiary shall be made unless and until the Liquidation Trust has determined the then-current address of such Liquidation Trust Beneficiary, at which time such distribution shall be made to such Liquidation Trust Beneficiary without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the later of: (a) the expiration of one (1) year from the Final Effective Date or (b) ninety (90) days from the date of such distribution. After such date, all unclaimed Available Net Litigation Proceeds shall be redistributed in accordance with the Plan and this Agreement.

Nothing contained in the Plan or this Agreement shall require the Liquidation Trustee to attempt to locate any Liquidation Trust Beneficiary.

5.5    Plan Distribution to Holders of Claims Generally

(a)    No Plan Distribution in Excess of Allowed Claims. Notwithstanding anything to the contrary herein, Liquidation Trust Beneficiaries will not receive, in respect of their Claims, distributions under the Plan and this Agreement in excess of the amount of their respective Allowed Claims.

(b)    Disputed Payments. If any dispute arises as to the identity of a Liquidation Trust Beneficiary that is to receive any distribution, the Liquidation Trustee may, in lieu of making such distribution to such Liquidation Trust Beneficiary, make such distribution into an escrow account or otherwise hold such distribution until the disposition thereof is determined by a court of competent jurisdiction or by written agreement among the interested parties to such dispute, which written agreement is reasonably acceptable to the Liquidation Trustee.

(c)    Disputed Claims. If an objection to a Class 5 General Unsecured Claim or portion thereof is filed as set forth in Article VII of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim and the holder of such Allowed Claim receives Beneficial Interests on account of its Allowed Claim in accordance with Section 9.2 of this Agreement. As soon as reasonably practicable after that date, the Liquidation Trust shall provide to such Liquidation Trust Beneficiary the distribution (if any) to which it is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of its Claim, without any interest, dividends, or accruals to be paid on account of its Beneficial Interests unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan. The Debtors and the Reorganized Debtors shall work in good faith, expeditiously, and on a commercially reasonable basis with the Liquidation Trustee regarding the allowance or disallowance of Class 5 General Unsecured Claims.

(d)    Withholding Taxes. Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any distributions made pursuant to the Plan and this Agreement. All Liquidation Trust Beneficiaries shall be required to provide to the Liquidation Trustee any information necessary to effect the withholding of such taxes. Notwithstanding the foregoing, each Liquidation Trust Beneficiary that is to receive a distribution hereunder shall have the sole and exclusive

responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution.

(e) <u>Plan Distributions After the Effective Date</u>. In accordance with the Plan and this Agreement, no interest shall accrue or be payable with respect to distributions made after the Effective Date.

(f) <u>Manner of Payments</u>. Unless the Person receiving a distribution agrees otherwise, any distribution under the Plan and this Agreement shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank, in the sole discretion of the Liquidation Trustee.

(g) <u>Delivery of Plan Distribution</u>. Distributions to Liquidation Trust Beneficiaries shall be made as follows: (1) to the signatory set forth on any of the Proofs of Claim filed by such Liquidation Trust Beneficiary or other representative identified therein (or at the last known addresses of such Liquidation Trust Beneficiary if no Proof of Claim is filed or if the Liquidation Trustee has been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Debtors, as applicable, or the Liquidation Trustee, as applicable, after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Reorganized Debtors or the Liquidation Trustee, as applicable, have not received a written notice of a change of address; (4) at the address set forth on a completed form W-9, received by the Liquidation Trustee after the date of any related Proof of Claim; or (5) on any counsel that has appeared in the Chapter 11 Cases on the Liquidation Trust Beneficiary's behalf.

(h) <u>Record Date for Plan Distributions</u>. The Liquidation Trustee shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed General Unsecured Claim or Allowed Athos Subordinated Claim.

5.6     <u>De Minimis Distributions</u>

Notwithstanding anything in the Plan or herein to the contrary, the Liquidation Trustee shall not be required to make distributions or payments of less than $50.00 until the earlier of (a) as soon as reasonably practicable after the aggregate distributions owed to such Liquidation Trust Beneficiary on account of Allowed General Unsecured Claims and Allowed Athos Subordinated Claims held by such Liquidation Trust Beneficiary exceed $50.00 and (b) the final distribution to Liquidation Trust Beneficiaries.

Whenever any distribution of a fraction of a dollar would be required, the Liquidation Trustee shall round such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

5.7     <u>Final Plan Distribution</u>

Notwithstanding anything in the Plan to the contrary, in the event that: (a) in the discretion of the Liquidation Trustee, the Liquidation Trust (i) has insufficient funds to make any further distributions to the Liquidation Trust Beneficiaries and (ii) has no remaining potential sources of funds; (b) all Liquidation Trust Beneficiaries have been paid in full; or (c) it is

impractical or impossible for the Liquidation Trustee to make further distributions to the Liquidation Trust Beneficiaries, the Liquidation Trustee shall have the right to abandon or otherwise dispose of such assets, including by donation of such property to a charity qualifying under section 501(c)(3) of the IRC; *provided*, *however*, that the Liquidation Trustee shall be permitted to establish a reserve sufficient to pay all costs and expenses of the Liquidation Trust.

5.8     Requirement of Undertaking

The Liquidation Trustee may request any court of competent jurisdiction to require, and any such court may in its discretion require, in any suit for the enforcement of any right or remedy under the Plan, or in any suit against the Liquidation Trustee for any act taken or omitted by the Liquidation Trustee, that the filing party litigant in such suit undertake to pay the costs of such suit or post a bond, if required, and such court may in its discretion assess reasonable costs, including, without limitation, reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

**ARTICLE VI**
**LIQUIDATION TRUST FUNDING**

6.1     Liquidation Trust Funding

The Liquidation Trust Expenses shall be paid from the Liquidation Trust Funding in accordance with the Plan and this Agreement.  On the Effective Date, the Liquidation Trust Funding shall be $1,020,000 plus any amount of the Committee Fee Cap Amount (as defined in the *Stipulation Regarding Settlement Term Sheet* [Docket No. 343]) remaining after payment of all Allowed fees and expenses of the Committee for the period from execution of the Settlement Term Sheet through the Effective Date.

6.2     Liquidation Trust Assets

Notwithstanding any prohibition of assignability under applicable nonbankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors shall be deemed to have automatically distributed to the Liquidation Trust Beneficiaries, who will immediately thereafter be deemed to have automatically transferred to the Liquidation Trust, all of their right, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, encumbrances, and other liabilities, subject only to the Claims of the Liquidation Trust Beneficiaries as set forth in the Plan and the expenses of the Liquidation Trust and the Liquidation Trustee as set forth herein, with all proceeds of the Liquidation Trust to be distributed in accordance with the provisions of the Plan and this Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

6.3     Liquidation Trustee's Lien

The Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals shall have a first priority lien upon the Liquidation Trust Assets to secure the payment of any amounts payable to them pursuant to Sections 4.1, 6.1, or 13.2 hereof.

## ARTICLE VII
## LIABILITY AND EXCULPATION PROVISIONS

7.1     Liability, Indemnification of the Liquidation Trustee and the Liquidation Trustee Professionals

Except to the extent of any bond provided by the Liquidation Trustee, if any, or as otherwise provided in the Plan or this Agreement, no recourse shall ever be had, directly or indirectly, against the Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement whatsoever executed by the Liquidation Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidation Trustee under the Plan for any purpose authorized by the Plan.  All such liabilities, covenants, and agreements of the Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals or any other representatives, agents, employees, successors, or assigns of the Liquidation Trustee, whether in writing or otherwise, under the Plan shall be enforceable only against, and shall be satisfied only out of any such bond, if any, and the Liquidation Trust Assets or such part thereof as shall, under the terms of any such agreement, be liable therefor, or shall be evidence only of a right of payment out of the Liquidation Trust Assets. Every undertaking, contract, covenant, or agreement entered into in writing by the Liquidation Trustee shall provide expressly against the personal liability of the Liquidation Trustee.

No Trustee Party shall be liable for any act or omission of one another, nor shall the Trustee Parties be liable for any act or omission taken or not taken in such capacity, including, but not limited to, in the performance of any of the duties and powers of the Liquidation Trustee set forth in Article III of this Agreement, other than for specific acts or omissions as determined by a final judgment of a court of competent jurisdiction to be resulting solely from such Trustee Party's own willful misconduct or fraud.  The Liquidation Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with the Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such entities, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, the Liquidation Trustee shall not be under any obligation to consult with the Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals, and the determination not to do so shall not result in the imposition of liability on the Trustee Parties, unless such determination is based on such Trustee Party's willful misconduct or fraud as determined by a final judgment of a court of competent jurisdiction.  The Liquidation Trust shall indemnify and hold harmless the Trustee Parties from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements, and related expenses), which such Persons may incur or to which such Persons may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Persons arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Plan or the discharge of their duties hereunder, *provided*, *however*, that no such indemnification shall be made to such Persons for actions or omissions as a result of

-14-

their willful misconduct or fraud as determined by a final judgment of a court of competent jurisdiction.

All expenses, judgments, penalties, fines and amounts incurred by the Liquidation Trust in connection with this <u>Article VII</u> shall be born solely by the Liquidation Trust, payable from the Liquidation Trust Assets.  The costs of administering the Liquidation Trust and all fees and expenses incurred by and on behalf of the Liquidation Trust shall be charged against the Liquidation Trust Assets.  Notwithstanding anything herein or in the Plan to the contrary, the Reorganized Debtors shall have no obligation to provide any funds or financing to the Liquidation Trust, other than the obligation to contribute the Liquidation Trust Assets, and under no circumstances will the expenses of the Liquidation Trust be paid or reimbursed by the Debtors or the Reorganized Debtors, as applicable.  The Reorganized Debtors are intended third-party beneficiaries of this <u>Article VII</u>, and this <u>Article VII</u> shall not be amended without the prior written consent of each of the Reorganized Debtors.

7.2    <u>Reliance by Liquidation Trustee</u>

Except as otherwise provided herein:

(a)    the Liquidation Trustee may rely, and shall be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments, or reports believed by it to be genuine and to have been signed or presented by the proper Person or Persons;

(b)    the Liquidation Trustee shall not be liable for any action reasonably taken or not taken by it in reasonable reliance upon the advice of a Liquidation Trustee Professional or Liquidation Trustee Non-Professional;

(c)    Persons providing services to the Liquidation Trustee shall look only to the Liquidation Trust Assets to satisfy any liability incurred by the Liquidation Trustee to such Person in carrying out the terms of this Agreement, and neither the Liquidation Trustee nor Liquidation Trust Beneficiaries shall have any personal obligation to satisfy any such liability, except to the extent that actions taken or not taken after the Effective Date by the Liquidation Trustee are determined by a final judgment of a court of competent jurisdiction to be solely due to the Liquidation Trustee's own willful misconduct or fraud;

(d)    whenever, in the administration of this Agreement, the Liquidation Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering, or omitting any action hereunder, the Liquidation Trustee (unless other evidence be herein specifically prescribed) may rely upon an opinion of counsel or certificate furnished to the Liquidation Trustee by or on behalf of the Liquidation Trust Beneficiaries;

(e)    the Liquidation Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, or other paper or document, but the Liquidation Trustee, in the Liquidation Trustee's discretion, may make such further inquiry or investigation into such facts or matters as the Liquidation Trustee may see fit, and, if the Liquidation Trustee shall determine to make such further inquiry or investigation, the Liquidation Trustee shall be

entitled to examine the books, records, and premises of the relevant Person or entity, personally or by agent or attorney; and

    (f) the Liquidation Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Liquidation Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by the Liquidation Trustee hereunder.

## ARTICLE VIII
## ESTABLISHMENT OF THE LIQUIDATION TRUST

   8.1 Transfer of Assets to Liquidation Trust; Assumption of Liabilities

    (a) Pursuant to the Plan, the Debtors and the Liquidation Trustee hereby establish the Liquidation Trust on behalf of the Liquidation Trust Beneficiaries to be treated as the grantors and deemed owners of the Liquidation Trust Assets. On the Effective Date, pursuant to the Plan, the Debtors or Reorganized Debtors, as applicable, shall transfer, assign, and deliver to the Liquidation Trust, on behalf of the Liquidation Trust Beneficiaries, notwithstanding any prohibition of assignability under applicable nonbankruptcy law, all of their right, title, and interest in and to the Liquidation Trust Assets. The Liquidation Trust Assets shall include, among other claims and causes of action, any Avoidance Action held by the Debtors and their Estates to the extent not released under the Plan. For the avoidance of doubt, Avoidance Actions shall exclude any Claims or Causes of Action against Zahoransky Automation and Molds GmbH. All of the proceeds received by the Liquidation Trust from the prosecution, settlement, or other liquidation or monetization of the Liquidation Trust Assets after deducting (a) all fees and expenses of administering the Liquidation Trust (including reasonable and documented fees and expenses incurred by the Liquidation Trustee and its professionals), and (b) a reasonable reserve for anticipated future expenses (including the prosecution or settlement of any Cause of Action; collectively, the "Available Net Litigation Proceeds") shall be added to the Liquidation Trust Assets and held as a part thereof (and title thereto shall be vested in the Liquidation Trust) and shall be distributed in accordance with the Liquidation Trust Waterfall. Such transfer includes, but is not limited to, all rights to assert, waive, or otherwise exercise any attorney-client privilege, work product protection, or other privilege, immunity, or confidentiality provision vested in, or controlled by, the applicable Debtor. The Liquidation Trustee agrees to accept and hold the Liquidation Trust Assets for the benefit of the Liquidation Trust Beneficiaries, subject to the terms of the Plan and this Agreement.

   8.2 Title to Assets

    (a) Notwithstanding any prohibition of assignability under applicable nonbankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have automatically distributed to the Liquidation Trust Beneficiaries, who shall immediately thereafter be deemed to have automatically transferred to the Liquidation Trust, all of their right, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Liquidation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Liquidation Trust

-16-

Beneficiaries as set forth in the Plan and the Liquidation Trust Expenses as set forth in the Plan and in this Agreement.  Thereupon, the Debtors shall not have any interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

(b)    For all federal income tax purposes, all parties to this Agreement, the Liquidation Trust and the Liquidation Trust Beneficiaries shall treat the transfer of the Liquidation Trust Assets by the Debtors or Reorganized Debtors, as applicable, to the Liquidation Trust, as set forth in the Plan and this Agreement, as a transfer of such assets by the applicable Debtor to the Liquidation Trust Beneficiaries, followed by a transfer by such Liquidation Trust Beneficiaries to the Liquidation Trust.  Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

## ARTICLE IX
## BENEFICIAL INTERESTS

9.1    Allocation of Beneficial Interests to Holders of Claims

On the Effective Date or as soon thereafter as practicable, each Liquidation Trust Beneficiary shall be allocated its Beneficial Interest as set forth in the Plan.

9.2    Disputed Claims

As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the Liquidation Trust shall provide to the Holder of such Allowed General Unsecured Claim and Allowed Athos Subordinated Claim (which are deemed Allowed under the Plan) the Beneficial Interests to which such holder is entitled under the Plan.

9.3    Interests Beneficial Only

The ownership of a Beneficial Interest shall not entitle any Liquidation Trust Beneficiary to any title in or to the Liquidation Trust Assets as such (which title shall be vested in the Liquidation Trust) or to any right to call for a partition or division of the Liquidation Trust Assets or to require an accounting.

9.4    Transfer of Beneficial Interests

The Beneficial Interests shall not be transferrable.  No transfer, assignment, pledge, hypothecation, or other disposition of a Beneficial Interest shall be effective or binding upon the Liquidation Trust or the Liquidation Trustee for any purpose.  Notwithstanding the foregoing, (i) any Liquidation Trust Beneficiary may transfer its Beneficial Interests to a wholly-owned subsidiary treated as a corporation for U.S. federal income tax purposes, which shall thereafter be the relevant Liquidation Trust Beneficiary, and (ii) any Liquidation Trust Beneficiary may transfer its Beneficial Interests if the Liquidation Trust has become a public reporting company and/or files periodic reports under the Exchange Act following a determination set forth in the final sentence of Section 9.10 of this Agreement.

9.5     Effect of Death, Dissolution, Incapacity, or Bankruptcy of Liquidation Trust Beneficiary

The death, dissolution, incapacity, or bankruptcy of a Liquidation Trust Beneficiary during the term of the Liquidation Trust shall not operate to terminate the Liquidation Trust during the term of the Liquidation Trust, nor shall it entitle the representative or creditors of the deceased, incapacitated, or bankrupt Liquidation Trust Beneficiary to an accounting or to take any action in any court or elsewhere for the distribution of the Liquidation Trust Assets or for a partition thereof, nor shall it otherwise affect the rights and obligations of the Liquidation Trust Beneficiary under this Agreement or in the Liquidation Trust.

9.6     Tax Identification Number

The Liquidation Trustee may require any Liquidation Trust Beneficiary to furnish such Liquidation Trust Beneficiary's social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8 or Form W-9), and the Liquidation Trustee may condition any distribution to any Liquidation Trust Beneficiary upon the receipt of such information and the receipt of such other documents as the Liquidation Trustee reasonably requests. The Liquidation Trustee may require any such Liquidation Trust Beneficiary to furnish its social security number or employer or taxpayer identification number as assigned by the IRS and may condition any distribution to any Liquidation Trust Beneficiary upon receipt of such identification number. If a Liquidation Trust Beneficiary does not timely provide the Liquidation Trustee with its social security number or employer or taxpayer identification number in the manner and by the deadline established by the Liquidation Trustee, then the distribution to such Beneficiary shall be administered as an unclaimed distribution in accordance with Section 5.4 of this Agreement.

9.7     Register Entries Regarding Beneficial Interests

The Liquidation Trustee shall create and maintain a Trust Register.

9.8     Representation of Beneficial Interests

The Beneficial Interests shall be uncertificated. The Beneficial Interests shall be represented by appropriate book entries in the Trust Register.

9.9     Trust Register

(a)     Register of Beneficial Interests. The Liquidation Trustee shall cause the Trust Register to be kept at the office of the Liquidation Trustee or at such other place or places that shall be designated by the Liquidation Trustee from time to time. The Liquidation Trustee may rely on the Claims Register or creditor lists prepared by the Debtors or their representatives in preparing the Trust Register.

(b)     Access to Register by Liquidation Trust Beneficiaries. The Liquidation Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Liquidation Trustee, and in accordance with reasonable regulations prescribed by the Liquidation Trustee, to inspect, and at the expense of the Liquidation Trust

Beneficiary make copies of, the Trust Register, in each case only for a purpose reasonable and related to such Liquidation Trust Beneficiary's Beneficial Interest in the Liquidation Trust.

(c)    Absolute Owners.    The Liquidation Trustee may deem and treat each Liquidation Trust Beneficiary of record as determined pursuant to this Agreement as the absolute owner of such Liquidation Trust Beneficiary's Beneficial Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

9.10    Securities Law

The parties hereto intend that the Beneficial Interests shall not be "securities" under applicable laws, but none of the parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the parties hereto intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan. Subject to Section 9.4 hereof, the Liquidating Trustee may amend this Agreement in accordance with Section 15.1 hereof to make such changes as are deemed necessary or appropriate, with the advice of counsel, to ensure that the Liquidating Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA or the Investment Company Act.

# ARTICLE X
# ADMINISTRATION

10.1    Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the primary purpose of liquidating the Liquidation Trust Assets, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, compromise, settle, or litigate the Liquidation Trust Claims, liquidate and convert to Cash the Liquidation Trust Assets, make distributions to the Liquidation Trust Beneficiaries, and not unduly prolong the duration of the Liquidation Trust. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Plan.

10.2    Books and Records

The Liquidation Trustee shall maintain books and records relating to the administration of the Liquidation Trust Assets and the distribution by the Liquidation Trustee of the proceeds therefrom in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. The Liquidation Trustee shall also maintain books and records relating to the income and expenses of the Liquidation Trust, and the payment of expenses of and liabilities of, claims against or assumed by, the Liquidation Trust in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. Except as otherwise provided herein or in the Plan, nothing in this Agreement requires the Liquidation Trustee to file any accounting or seek approval of any court with respect to the

administration of the Liquidation Trust, or as a condition for making any payment or distribution out of the Liquidation Trust Assets.

Subject to all applicable privileges, the Liquidation Trust Beneficiaries shall have the right, in addition to any other rights they may have pursuant to this Agreement, under the Plan, or otherwise, upon thirty (30) days' prior written notice to the Liquidation Trustee, to request a reasonable inspection of the books and records held by the Liquidation Trustee, *provided*, *however*, that all costs associated with such inspection shall be paid in advance by such requesting Liquidation Trust Beneficiary, and further, if so requested, such Liquidation Trust Beneficiary shall have entered into a confidentiality agreement satisfactory in form and substance to the Liquidation Trustee, and make such other arrangements as may be reasonably requested by the Liquidation Trustee.

The books and records maintained by the Liquidation Trustee may be disposed of by the Liquidation Trustee at the later of (i) such time as the Liquidation Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Liquidation Trust or the Liquidation Trust Beneficiaries or (ii) upon the termination and completion of the winding down of the Liquidation Trust.

10.3    Compliance with Laws

Any and all distributions made pursuant to this Agreement shall comply with all applicable laws and regulations, including, but not limited to, applicable federal and state tax and securities laws.

**ARTICLE XI**
**SUCCESSOR LIQUIDATION TRUSTEE**

11.1    Successor Liquidation Trustee

In the event the Liquidation Trustee is removed or resigns pursuant to this Agreement or the Liquidation Trustee otherwise vacates its position, a successor Liquidation Trustee shall be appointed by a majority vote of holders of Liquidation Trust Class A Interests; *provided* that if all Liquidation Trust Class A Interests have been paid in full, a successor Liquidation Trustee shall be appointed by a majority vote of holders of Liquidation Trust Class B Interests. Thereupon, such successor Liquidation Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of its predecessor in the Liquidation Trust with like effect as if originally named herein; *provided*, *however*, that a removed or resigning Liquidation Trustee shall, nevertheless, when requested in writing by the successor Liquidation Trustee, execute and deliver any reasonable instrument or instruments conveying and transferring to such successor Liquidation Trustee all the estates, properties, rights, powers, and trusts of such removed or resigning Liquidation Trustee; *provided*, *further*, that no such appointment of a successor Liquidation Trustee shall be effective until such successor agrees in writing to accept such appointment and to serve as Liquidation Trustee upon all of the terms and conditions of this Agreement.

## ARTICLE XII
## REPORTING

12.1    Annual Reports

(a)    As soon as reasonably practicable after the end of each calendar year, and as soon as practicable upon termination of the Liquidation Trust, the Liquidation Trustee shall send to each Liquidation Trust Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct each such Beneficiary to report such items on their federal income tax returns.

12.2    Federal Income Tax

(a)    Grantor Trust Status.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee shall file returns for the Liquidation Trustee as a grantor trust pursuant to Treas. Reg. § 1.671-4(a).

(b)    Allocations of Liquidation Trust Taxable Income.  Subject to the provisions of Section 12.2(a) hereof, allocations of Liquidation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to Liquidation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust.  Similarly, taxable losses of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidation Trust Assets.  The tax book value of the Liquidation Trust Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidation Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)    Tax Compliance.  The Liquidation Trustee shall administer the Liquidation Trust's tax obligations, including (A) filing tax returns and paying tax obligations of the Liquidation Trust, *provided*, *that*, for the avoidance of doubt, any such tax obligations shall be paid from the Liquidation Trust Assets, (B) making distributions to Liquidation Trust Beneficiaries net of such taxes and applicable withholdings, (C) representing the interest and account of the Liquidation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, or audit.

(d)    Valuation for Tax Purposes.  As soon as possible after the transfer of the Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trustee shall perform a good faith valuation of such Liquidation Trust Assets, shall promptly notify the Debtors, the Reorganized Debtors, and the Liquidation Trust Beneficiaries of such valuation, and such

valuation shall be used by all parties (including the Debtors, the Reorganized Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all U.S. federal income tax purposes (and state and local tax purposes, to the extent applicable).

(e)     Determination of Taxes.  The Liquidation Trust may request an expedited determination of taxes of the Liquidation Trust under Section 505(a) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidation Trust for all taxable periods through the dissolution of the Liquidation Trust.

(f)     Tax Treatment of Reserves for Disputed General Unsecured Claims.  The Trustee may, in the Trustee's sole discretion, determine the best way to report for tax purposes with respect to any reserve for Disputed General Unsecured Claims, including (i) filing a tax election to treat any and all reserves for Disputed General Unsecured Claims as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Trust or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report any reserve for disputed claims as a DOF, the Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal tax return for the DOF and the payment of federal and/or state income tax due.

12.3    Other

The Liquidation Trustee shall file (or cause to be filed) any statement, returns, or disclosures relating to the Liquidation Trust or the Liquidation Trust Assets, that are required by any governmental unit.

## ARTICLE XIII
## LIQUIDATION TRUSTEE PROFESSIONALS AND NONPROFESSIONALS

13.1    Retention of Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals

The Liquidation Trustee shall have the right to retain Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals, each on such terms as the Liquidation Trustee deems appropriate.  It is contemplated that the law firm of White & Case LLP will be retained as general counsel to the Liquidation Trust.  The Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals shall be compensated in accordance with Section 13.2 hereof and need not be "disinterested" as that term is defined in the Bankruptcy Code.

13.2    Payment to Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals

After the Effective Date, the Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Liquidation Trustee, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of each such Person, plus an itemized statement of expenses.  The Liquidation Trustee shall pay those invoices within ten (10) days after receipt, without Bankruptcy Court approval, unless the Liquidation Trustee

objects in writing specifying the reasons for such objection and identifying the specific fees or expenses to which objection is made.  If there is a dispute as to a portion of an invoice, the Liquidation Trustee shall pay the undisputed portion.  All payments to Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals shall be paid out of the Liquidation Trust Assets.

## ARTICLE XIV
## TERMINATION OF LIQUIDATION TRUST

### 14.1    Duration and Extension

The Liquidation Trustee and the Liquidation Trust shall be discharged or dissolved, as the case may be, on the earlier of (a) such time as (i) all of the Liquidation Trust Assets have been liquidated and (ii) all distributions required to be made by the Liquidation Trustee under the Plan and this Agreement have been made, and (b) three (3) years after the date hereof, unless the Bankruptcy Court, upon motion of the Liquidation Trustee within the six (6) months prior to the third (3rd) anniversary hereof (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the trust as a Liquidation Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets.  After the final distribution of the balance of the Liquidation Trust Proceeds pursuant to the Plan and this Agreement, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

### 14.2    Diligent Administration

The Liquidation Trustee shall (a) not unduly prolong the duration of the Liquidation Trust; (b) at all times endeavor to resolve, settle, or otherwise dispose of all claims that constitute Liquidation Trust Assets; (c) consult and confer with the Liquidation Trust Beneficiaries and keep them fully advised of its activities; and (d) effect the liquidation of the Liquidation Trust Assets and distribution of the Available Net Litigation Proceeds to the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and this Agreement.

## ARTICLE XV
## AMENDMENT AND WAIVER

### 15.1    Amendment and Waiver

Any substantive provision of this Agreement may be materially amended or waived by order of the Bankruptcy Court if necessary to implement the Plan; *provided*, *however*, that no change may be made to this Agreement that would adversely affect the federal income tax status of the Liquidation Trust as a "grantor trust"; and *provided*, *further*, that no such amendment or waiver be inconsistent with the Plan.  Technical or nonmaterial amendments to or waivers of portions of this Agreement may be made as necessary to clarify this Agreement or to enable the Liquidation Trust to effectuate the terms of this Agreement, with the consent of the Liquidation Trustee; *provided*, *however*, that no such amendment or waiver be inconsistent with the Plan.

**ARTICLE XVI**
**MISCELLANEOUS PROVISIONS**

16.1    Intention of Parties to Establish Grantor Trust

This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

16.2    Debtors' Further Assurances

The Debtors, the Reorganized Debtors, and their respective officers, directors, professionals, and agents shall take such actions and execute such documents as are reasonably requested by the Liquidation Trustee to implement the provisions of this Agreement; *provided*, *however*, that nothing provided in this Section 16.2 shall limit the generality of Section 6.2.

16.3    Preservation of Privilege

In connection with the vesting and transfer of the Liquidation Trust Assets, any attorney-client privilege, work-product protection, or other privilege or immunity attaching or relating to any documents or communications (of any kind, whether written or oral, electronic, or otherwise) held by the Debtors shall be transferred to the Liquidation Trust and shall vest in the Liquidation Trust for the limited purpose set forth herein.  Accordingly, in connection with the prosecution and/or investigation of claims held by the Liquidation Trustee, no directors, officers, employees, counsel, agents, or attorneys-in-fact of the Debtors, may assert any attorney-client privilege, work product protection, or other privilege or immunity attaching or relating to any documents or communications (of any kind, whether written or oral, electronic, or otherwise) held by the Debtors or otherwise prevent, hinder, delay, or impede production or discussion of documents or communications requested by the Liquidation Trustee in discovery (whether formal or informal, and including without limitation, depositions, written discovery, and interviews).  The Debtors and the Liquidation Trustee shall take all necessary actions to protect the transfer of such privileges, protections, and immunities.

16.4    Prevailing Party

Except in connection with any action to enforce the Plan, the prevailing party in a dispute regarding the provisions of this Agreement or the enforcement thereof shall be entitled to collect any and all costs, expenses, and fees, including attorneys' fees, from the nonprevailing party incurred in connection with such dispute or enforcement action.

16.5    Confidentiality

The Confidential Parties shall hold strictly confidential and not use for personal gain any material, nonpublic information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Entity to which any of the Liquidation Trust Assets relates; *provided*, *however*, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties, or (b) such disclosure is required of the Confidential Parties pursuant to legal process,

-24-

including, but not limited to, subpoena or other court order or other applicable laws or regulations. In the event that any Confidential Party is requested to divulge confidential information pursuant to clause (b) above, such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Liquidation Trustee to allow it sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Liquidation Trustee in making any such objection, including, but not limited to, appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

16.6    Laws as to Construction; Enforcement of Agreement

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law.  Any action to enforce or interpret this Agreement shall be brought in the Bankruptcy Court unless and until a final decree has been entered in the Chapter 11 Cases, and thereafter in any court of competent jurisdiction.

16.7    Severability

Except with respect to provisions herein that are contained in the Plan, if any provision of this Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

16.8    Notices

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, on the third (3rd) Business Day after such notice is delivered by facsimile (at the number set forth below with proof of confirmation), overnight delivery, or electronic mail and mailed by certified mail, with return receipt requested at the address as set forth below, or such other addresses as may be filed with the Bankruptcy Court:

**As to the Liquidation Trustee:**

| | |
|---|---|
| Contact Name: | Province, Inc. |
| | c/o Peter Kravitz |
| Address: | 2360 Corporate Circle Ste 330 |
| | Henderson, NV 89074 |
| Phone: | 702-685-5555 |
| E-mail: | admin@provincefirm.com |

with copies to:

White & Case LLP

Attn.:  Gregory F. Pesce, Andrew F. O'Neill, Erin Rosenberg

| | |
|---|---|
| Address: | 111 South Wacker Drive, Suite 5100 |
| | Chicago, Illinois 60606 |
| Phone: | 312-881-5400 |
| E-mail: | gregory.pesce@whitecase.com |
| | aoneill@whitecase.com |
| | erin.rosenberg@whitecase.com |

**As to the Debtors:**

| | |
|---|---|
| Contact Name: | SiO2 Medical Products, Inc. |
| | Attn.:  Legal Department |
| Address: | 2250 Riley Street |
| | Auburn, Alabama 36832 |

with copies to:

| | |
|---|---|
| | Kirkland & Ellis LLP |
| | Kirkland & Ellis International LLP |
| | |
| | Attn.:  Brian Schartz, P.C. |
| Address: | 601 Lexington Avenue |
| | New York, New York 10022 |
| Phone: | 212-446-4800 |
| E-mail: | bschartz@kirkland.com |
| | |
| | Attn.:  Dan Latona |
| Address: | 300 North LaSalle Drive |
| | Chicago, Illinois 60654 |
| Phone: | 312-862-2000 |
| E-mail: | |
| | dan.latona@kirkland.com |

16.9    Notices if to a Liquidation Trust Beneficiary

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, on the fifth (5th) Business Day after deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended to the name and address as determined in accordance with the Trust Register.

16.10    <u>Survivability</u>

Notwithstanding any provision of the Plan to the contrary, the terms and provisions of this Agreement shall remain fully binding and enforceable notwithstanding any vacancy in the position of the Liquidation Trustee.

16.11    <u>Entire Agreement</u>

This Agreement (including the recitals hereof and, to the extent applicable, the Plan and the Confirmation Order) constitutes the entire agreement by and among the parties with respect to the subject matter hereof, and there are no representations, warranties, covenants, or obligations except as set forth herein, in the Plan, and in the Confirmation Order.  This Agreement (together with the Plan and the Confirmation Order) supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, if any, of the parties hereto relating to any transaction contemplated hereunder.  Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any Person other than the parties hereto and the Liquidation Trust Beneficiaries any rights or remedies under or by reason of this Agreement.  This Agreement shall be binding on the parties hereto and their successors, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases.

16.12    <u>No Relationships Created</u>

Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership, or joint venture of any kind, nor shall the Liquidation Trustee or the Liquidation Trust Beneficiaries be deemed to be or treated in any way whatsoever to be liable or responsible hereunder as partners or joint venturers.  The relationship of the Liquidation Trust Beneficiaries (on the one hand) to the Liquidation Trustee (on the other hand) shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Liquidation Trust Agreement.

16.13    <u>Headings</u>

The section headings contained in this Agreement are solely for the convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

16.14    <u>Conflicts with Plan Provisions</u>

If any of the terms and/or provisions of this Agreement conflict with the terms and/or provisions of the Plan, then the Plan shall govern.

*    *    *    *    *

## **Schedule 1**

**Fee Schedule**

**Schedule E-1**

**Redline to Liquidation Trust Agreement Filed on June 30, 2023**

## LIQUIDATION TRUST AGREEMENT

This Liquidation Trust Agreement, dated as of [  ], 2023, by and between SiO2 Medical Products, Inc. and its affiliated debtors and debtors in possession (the "Debtors")[1] in the Chapter 11 Cases (as defined below), and Peter Kravitz, of Province, Inc., not individually, but solely in its capacity as Liquidation Trustee, pertains to the administration of the Liquidation Trust pursuant to the terms of the Plan (as defined below), and is made effective as of the Effective Date thereof.

### R E C I T A L S:

(A)    On March 29, 2023, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Chapter 11 Cases").  The Chapter 11 Cases are jointly administered under Case Number 23-10366 (JTD).

(B)    On March 29, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtors Affiliates* [Docket No. 18].

(C)    On April 13, 2023, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee") [Docket No. 118].

(D)    On June 9, 2023, the Debtors filed the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtor Affiliates* [Docket No. 373].

(E)    On June 9, 2023, the Bankruptcy Court entered the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 378] (the "Disclosure Statement Order").

(F)    On June 9, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtor Affiliates*, [Docket No. 372] (as may be amended, modified, or supplemented in accordance with its terms, the "Plan").[2]

(G)    On July 19, 2023, the Bankruptcy Court entered the order confirming the Plan (the "Confirmation Order").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SiO2 Medical Products, Inc. (8467); Advanced Bioscience Labware, Inc. (1229); and Advanced Bioscience Consumables, Inc. (2510).  The location of the Debtors' principal place of business and service address in these chapter 11 cases is 2250 Riley Street, Auburn, Alabama 36832.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan.

(H)    The Plan and Confirmation Order provide for the creation of a Liquidation Trust, to be formed on the Effective Date to hold, administer, and distribute the Liquidation Trust Assets to the Liquidation Trust Beneficiaries, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement.   This Agreement is executed to establish the Liquidation Trust and to facilitate the implementation of the Plan.

(I)    The Liquidation Trust is created on behalf, and for the benefit, of the Liquidation Trust Beneficiaries.

(J)    The respective powers, authority, responsibilities, and duties of the Liquidation Trustee shall be governed by this Agreement, the Plan, the Confirmation Order, and other applicable orders issued by the Bankruptcy Court.

(K)    This Agreement is intended to supplement, complement, and implement the Plan; *provided*, *however*, that if any of the terms and/or provisions of this Agreement conflict with the terms and/or provisions of the Plan, then the Plan shall govern.

(L)    The Liquidation Trust has no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its purpose described in the Plan and set forth in this Agreement.

(M)    The Liquidation Trust is intended to qualify as a "liquidating trust" pursuant to Treasury Regulation § 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124 and as a "grantor trust" for federal income tax purposes, pursuant to Sections 671 through 679 of the IRC. Transfer of the Liquidation Trust Assets to the Liquidation Trust shall be treated as a transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Liquidation Trust Assets by the Liquidation Trust Beneficiaries to the Liquidation Trust in exchange for their beneficial interests in the Liquidation Trust.   For federal income tax purposes, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of the Liquidation Trust and, therefore, shall be responsible for the payment of tax on their respective allocable share of the taxable income of the Liquidation Trust.

(N)    The Liquidation Trust is intended to qualify as a "liquidating trust" for all purposes of the Investment Company Act of 1940, as amended.

(O)    In accordance with the Plan, the Beneficial Interests are intended to be exempt, to the extent applicable, from the requirements of the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein and in the Plan, the parties to this Agreement agree as follows:

## ARTICLE I
## DEFINITIONS:

Any capitalized term used, but not otherwise defined, herein shall have the meaning set forth in the Plan.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

"**Agreement**" means this Liquidation Trust Agreement.

"**Beneficial Interests**" means, in the aggregate, the interests in the Liquidation Trust.

"**Cause**" means, for purposes of removing the Liquidation Trustee, (a) the Liquidation Trustee's conviction of a felony or any other crime involving moral turpitude, (b) any act or failure to act by the Liquidation Trustee involving actual dishonesty, fraud, misrepresentation, theft, or embezzlement, (c) the Liquidation Trustee's willful and repeated failure to substantially perform his or her duties under this Agreement after written notice and an opportunity to cure, or (d) the Liquidation Trustee's incapacity, such that he or she is unable to substantially perform his or her duties under this Agreement for more than ninety (90) consecutive days.

"**Confidential Parties**" means, collectively, the Liquidation Trustee and each of its respective employees, members, agents, professionals, and advisors, including the Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals.

"**Confidential Party**" means the Liquidation Trustee or each of its respective employees, members, agents, professionals, or advisors, including the Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals.

"**IRC**" means, as amended, the Internal Revenue Code of 1986.

"**Liquidation Trust Beneficiaries**" means, collectively, holders of Liquidation Trust Class A Interests and Liquidation Trust Class B Interests.

"**Liquidation Trust Class A Interests**" means the class A beneficial interests in the Liquidation Trust.

"**Liquidation Trust Class B Interests**" means the class B beneficial interests in the Liquidation Trust.

"**Liquidation Trust Expenses**" means the costs and expenses of the Liquidation Trust, including, without limitation (a) all claims, fees, expenses, charges, bonds (if any), liabilities, and obligations of the Liquidation Trust, other than with respect to the Liquidation Trust Beneficiaries, as contemplated by this Agreement and as required by law, (b) the reasonable and documented fees and expenses incurred (or to be incurred) by, all Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals retained by the Liquidation Trustee in connection with the performance of the Liquidation Trustee's duties in connection with this Agreement, (c) all claims, fees, expenses, charges, liabilities, and obligations of the Liquidation Trust on account of its indemnification obligations as set forth in this Agreement for the benefit of any Trustee

Party, and (d) the fees and expenses as set forth in Section 4.1 hereof, which shall be paid from the Liquidation Trust Funding in accordance with the Plan and this Agreement.

"**Liquidation Trustee Non-Professionals**" means nonprofessionals retained by the Liquidation Trustee including, without limitation, employees, independent contractors, alternative dispute resolution panelists, or other agents as the Liquidation Trustee deems appropriate.

"**Liquidation Trustee Professionals**" means professionals retained by the Liquidation Trustee including, without limitation, disbursing and transfer agents, legal counsel, accountants, experts, investment, auditing, and forecasting and other consultants, and other agents or advisors, as the Liquidation Trustee deems appropriate.

"**Permitted Investments**" means the investments that a Liquidation Trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code.

"**Treasury Regulation**" means any regulation promulgated by the United States Department of the Treasury, including any temporary regulations from time to time promulgated under the IRC.

"**Trustee Parties**" means, collectively, the Liquidation Trustee, the Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals, and any other representatives, agents, employees, successors, or assigns of the Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals.

"**Trustee Party**" means, individually, the Liquidation Trustee, the Liquidation Trustee Professionals, the Liquidation Trustee Non-Professionals, or any other representatives, agents, employees, successors, or assigns of the Liquidation Trustee, the Liquidation Trustee Professionals, or Liquidation Trustee Non-Professionals.

"**Trust Register**" means the trust register reflecting the Beneficial Interest and Allowed Claim held by each Liquidation Trust Beneficiary.

## ARTICLE II
## NAME OF TRUST AND LIQUIDATION TRUSTEE

The name of the Liquidation Trust is the "SiO2 Liquidation Trust." In connection with the exercise of the Liquidation Trustee's powers under this Agreement, the Liquidation Trustee may use this name or such variation thereof as the Liquidation Trustee, in the Liquidation Trustee's discretion, may determine.

On the Effective Date, pursuant to Article [IV.M] of the Plan, the Reorganized Debtors (as defined in the Plan) shall transfer the Liquidation Trust Assets to the Liquidation Trust, for the benefit of the Liquidation Trust Beneficiaries, which Assets shall vest in the Liquidation Trust free and clear of all Liens, Claims, charges, or other encumbrances or interests. On the

Effective Date, the Liquidation Trust shall be authorized to make distributions to the Liquidation Trust Beneficiaries in accordance with the Plan and may commence the prosecution of the Liquidation Trust Claims.

The Liquidation Trustee shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The Liquidation Trustee shall be entitled to liquidate any and all of the Liquidation Trust Assets, and the Available Net Liquidation Proceeds shall be distributed to the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and this Agreement.

[   ]Peter Kravitz, of Province, Inc. is hereby appointed to serve as the Liquidation Trustee, and hereby accepts this appointment and agrees to serve in such capacity effective upon the Effective Date of the Plan and pursuant to the terms of the Plan and this Agreement.  A successor Liquidation Trustee shall be appointed as set forth in Section 11.1 hereof in the event the Liquidation Trustee is removed or resigns pursuant to this Agreement or if the Liquidation Trustee otherwise vacates the position.

## ARTICLE III
## DUTIES AND POWERS OF THE LIQUIDATION TRUSTEE

3.1    Generally

Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, the Liquidation Trustee shall control and exercise authority over the Liquidation Trust Assets and shall be responsible for administering and liquidating (or abandoning, as the case may be) the Liquidation Trust Assets and taking actions on behalf of, and representing, the Liquidation Trust, including prosecuting any and all Liquidation Trust Claims.  The Liquidation Trustee shall have the authority to bind the Liquidation Trust within the limitations set forth herein, in the Plan, and in the Confirmation Order, but shall for all purposes hereunder be acting in the capacity of Liquidation Trustee and not individually.

Except as otherwise specified in this Agreement or in the Plan, the Liquidation Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder or in the Plan.

3.2    Scope of Authority of Liquidation Trustee

The Liquidation Trustee shall have all duties, obligations, rights, and benefits assumed by, assigned to, or vested in the Liquidation Trust under the Plan, the Confirmation Order, and, subject to the Plan and the Confirmation Order, this Agreement.  Such duties, obligations, rights, and benefits include, without limitation, all duties, obligations, rights, and benefits relating to the collection, prosecution, settlement, administration, and liquidation of the Liquidation Trust Assets, making distributions to Liquidation Trust Beneficiaries, administration of the Liquidation Trust, and any other duties, obligations, rights, and benefits reasonably necessary to accomplish the purpose of the Liquidation Trust under the Plan, the Confirmation Order, and subject to the Plan and the Confirmation Order, this Agreement.  The Liquidation Trustee shall be responsible for all decisions and duties with respect to the Liquidation Trust and its assets.  In all circumstances, the Liquidation Trustee shall act in the best interests of the

Liquidation Trust Beneficiaries and in furtherance of the purpose of the Liquidation Trust, and all transactions concerning Liquidation Trust Assets shall be conducted on an arm's-length basis.

3.3     Fiduciary Duties of Liquidation Trustee

Pursuant to the Plan and this Agreement, the Liquidation Trustee will act in a fiduciary capacity on behalf of the Liquidation Trust Beneficiaries.

3.4     Additional Powers of Liquidation Trustee

In connection with the administration of the Liquidation Trust, subject to and except as otherwise set forth in this Agreement or the Plan, the Liquidation Trustee is hereby authorized to perform those acts necessary to accomplish the purposes of the Plan and of the Liquidation Trust and to otherwise protect the interests of Liquidation Trust Beneficiaries as contemplated in the Plan.  Without limiting, but subject to, the foregoing, the Liquidation Trustee shall be authorized, in its sole discretion, and subject to the limitations contained herein and in the Plan to:

(a)     hold legal title (on behalf of the Liquidation Trust as Liquidation Trustee, but not individually) to the Liquidation Trust Assets held by the Liquidation Trust and all assets transferred to the Liquidation Trust;

(b)     receive and take such action as may be necessary to take possession, custody, or control of all assets and property to be distributed to the Liquidation Trust pursuant to the Plan;

(c)     protect and enforce the rights to the Liquidation Trust Assets vested in the Liquidation Trust by the Plan through any method deemed appropriate in its sole discretion, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(d)     open and maintain bank accounts in the name of the Liquidation Trust, draw checks and drafts thereon on the sole signature of the Liquidation Trustee, and terminate such accounts as the Liquidation Trustee deems appropriate;

(e)     maintain the books and records of the Liquidation Trust

(f)     establish such funds, reserves, and accounts within the Liquidation Trust estate, as deemed necessary by the Liquidation Trustee in carrying out the purposes of the Liquidation Trust;

(g)     make distributions and pay any other obligations owed by the Liquidation Trust from the Available Net Litigation Proceeds as provided herein and in the Plan;

(h)     solely with respect to Class 5 General Unsecured Claims, (1) file, withdraw, or litigate to judgment objections to Claims; (2) file one or more motions to estimate any Disputed Claims; (3) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (4) administer and adjust the Claims Register to

reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court; *provided* that the Reorganized Debtors and other parties in interest, including Athos and any of its affiliates, shall have the right to object to and prosecute such objections to such General Unsecured Claims;

(i)       invest moneys received by the Liquidation Trust or otherwise held by the Liquidation Trust in accordance with Section 3.6 hereof;

(j)       prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle, in accordance with the terms hereof, claims against the Liquidation Trust or the Liquidation Trust Assets;

(k)       prosecute, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle, in accordance with the terms hereof, any and all claims and causes of action held by the Liquidation Trust, including the Liquidation Trust Claims;

(l)       pay expenses and make disbursements necessary to preserve, liquidate, and enhance the Liquidation Trust Assets;

(m)       purchase liability insurance coverage as the Liquidation Trustee, in its sole discretion, deems necessary and appropriate with respect to the Liquidation Trustee's duties pertaining to the Liquidation Trust Assets (in the form of an errors and omissions policy, fiduciary policy, or otherwise);

(n)       purchase such insurance coverage as the Liquidation Trustee, in its sole discretion, deems necessary and appropriate with respect to real and personal property which may be or may become Liquidation Trust Assets;

(o)       purchase such insurance coverage as the Liquidation Trustee, in its sole discretion, deems necessary and appropriate with respect to the Liquidation Trust Claims (in the form of a directors and officers policy or otherwise);

(p)       retain and pay, as applicable, Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals as provided in, and subject to the terms of, this Agreement;

(q)       incur any reasonable and necessary expenses in liquidating and converting the Liquidation Trust Assets to Cash, or otherwise administering the Liquidation Trust, as set forth in the Plan or this Agreement;

(r)       administer the Liquidation Trust's tax obligations, including (A) filing tax returns and paying tax obligations, (B) making distributions to Liquidation Trust Beneficiaries net of such taxes and applicable withholdings, and (C) representing the interest and account of the Liquidation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, or audit;

(s)       in the event that the Liquidation Trustee determines that the Liquidation Trust Beneficiaries or the Liquidation Trust may, will, or have become subject to adverse tax

consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences;

(t)     as soon as possible after the transfer of the Liquidation Trust Assets to the Liquidation Trust, value the Liquidation Trust Assets based on a good faith valuation of such Liquidation Trust Assets, and such valuation shall be used by all parties (including the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all U.S. federal income tax purposes; and

(u)     assume such other powers as may be vested in or assumed by the Liquidation Trustee pursuant to the Plan or Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of the Plan or this Agreement.

3.5     Limitation of Liquidation Trustee's Authority; No Ongoing Business

Notwithstanding anything to the contrary under applicable law, this Agreement or the Plan, the authority of the Liquidation Trustee is limited as follows:

(a)     For federal tax purposes and otherwise, the Liquidation Trustee shall not be authorized to engage in any trade or business with respect to the Liquidation Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

(b)     The Liquidation Trustee shall take such actions consistent with the prompt and orderly liquidation of the Liquidation Trust Assets as required by applicable law and consistent with the treatment of the Liquidation Trust as a "Liquidation Trust" pursuant to Treasury Regulation § 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124 and as a "grantor trust" for federal income tax purposes, pursuant to Sections 671 through 679 of the IRC to the extent such actions are permitted by this Agreement.  The Liquidation Trust shall in no event be dissolved later than three (3) years after the date hereof unless the Bankruptcy Court, upon motion of the Liquidation Trustee within the six (6) months prior to the third (3rd) anniversary hereof (or within the six (6) month period prior to the end of an extension period), determines that a fixed-period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the trust as a Liquidation Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets.

(c)     The Liquidation Trustee shall not take, or fail to take, any action that would jeopardize treatment of the Liquidation Trust as a "Liquidation Trust" and as a "grantor trust" (with the Liquidation Trust Beneficiaries as the grantors) for federal income tax purposes.

(d)     The Liquidation Trustee shall not have the power to guarantee any debt of other Persons.

(e)    The Liquidation Trustee shall not, and shall not be authorized to, take any action inconsistent with the Plan, including, without limitation, asserting or seeking to pursue any Claims or Causes of Action released by the Plan.

3.6    <u>Investment of Liquidation Trust Monies</u>

The Liquidation Trustee shall not invest any Liquidation Trust Assets, proceeds thereof, or any income earned by the Liquidation Trust unless such investment is a Permitted Investment.  The Liquidation Trustee shall not be liable for interest or obligated to produce income on any moneys received by the Liquidation Trust hereunder and held for distribution or payment, except as such interest or other income shall actually be received by the Liquidation Trustee.  Notwithstanding anything to the contrary herein, any investment shall be made in the manner investments are permitted to be made by a Liquidation Trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities, including Revenue Procedure 94-45, 1994-2 C.B. 684.

3.7    <u>Other Activities</u>

The Liquidation Trustee shall be entitled to be employed by third parties while performing the duties required under the Plan and this Agreement, so long as such other employment does not involve holding or representing any interest adverse to the interests of the Liquidation Trust, or otherwise preclude or impair the Liquidation Trustee from performing its duties under the Plan and this Agreement.  The Liquidation Trustee represents that, as of the Effective Date, the Liquidation Trustee does not hold or represent any interest adverse to the interests of Liquidation Trust by virtue of its employment with or engagement by any Liquidation Trust Beneficiaries, third parties or otherwise.

**ARTICLE IV**
**TERM AND COMPENSATION FOR LIQUIDATION TRUSTEE**

4.1    <u>Compensation</u>

The Liquidation Trustee shall be entitled to receive fair and reasonable compensation as provided on **Schedule 1** hereto (the "<u>Fee Schedule</u>") for services rendered on behalf of the Liquidation Trust and reimbursement of all reasonable, out-of-pocket expenses.  Fees and expenses incurred by the Liquidation Trustee shall be paid from the Liquidation Trust Assets and any proceeds therefrom.  The Fee Schedule may be modified at any time by a vote of holders of Beneficial Interests that represent a majority in amount of Liquidation Trust Class A Interests; *provided* that if all

Liquidation Trust Class A Interests have been paid in full, the Fee Schedule may be modified at any time by a vote of holders of Beneficial Interests that represent a majority in amount of Liquidation Trust Class B Interests.

4.2    Termination

The duties, responsibilities and powers of the Liquidation Trustee shall terminate in accordance with Section 14.1 hereof.

4.3    No Bond

Notwithstanding any state or other applicable law to the contrary, the Liquidation Trustee shall not be obligated to obtain a bond, but may do so, in its sole discretion, in which case the expense incurred by such bonding shall be paid by the Liquidation Trust.

4.4    Removal

If Cause for removal exists, the Liquidation Trustee may be removed at any time (a) by a vote of holders of Beneficial Interests that represent a majority in amount of Liquidation Trust Class A Interests; *provided* that if all Liquidation Trust Class A Interests have been paid in full, the Liquidation Trustee may be removed at any time by a vote of holders of Beneficial Interests that represent a majority in amount of Liquidation Trust Class B Interests, or (b) as determined by a court of competent jurisdiction, after notice and a hearing; *provided however*, that no such removal shall be effective until a successor Liquidation Trustee agrees to serve as Liquidation Trustee subject to all of the terms and conditions of this Agreement.

4.5    Resignation

The Liquidation Trustee may resign by giving not less than thirty (30) days' prior written notice thereof to the Liquidation Trust Beneficiaries, *provided*, *however*, that such resignation shall not become effective until a successor agrees to serve as Liquidation Trustee subject to all of the terms and conditions of this agreement.

**ARTICLE V**
**PROVISIONS REGARDING DISTRIBUTIONS**

5.1    Distribution Agent

The Liquidation Trustee shall distribute Available Net Litigation Proceeds in accordance with the Plan and may employ or contract with other Persons to assist in making such distributions.

5.2    Application of Liquidation Trust Assets

-10-

The Liquidation Trustee shall apply the Available Net Litigation Proceeds as follows ("the Liquidation Trust Waterfall"):

*First*: Pro Rata to the holders of Liquidation Trust Class A Interests until such holders have each received an amount equal to 100.00% of the amount of their respective Allowed General Unsecured Claims, as provided in the Plan;

*Second*: Pro Rata to the holders of Liquidation Trust Class B Interests until such holders have each received an amount equal to 100.00% of the amount of their respective Allowed Athos Subordinated Claims, as provided in the Plan.

5.3     Timing of Distributions

The Liquidation Trustee shall make distributions to Liquidation Trust Beneficiaries not less frequently than once annually, starting on the Effective Date, unless the Liquidation Trustee determines, in the Liquidation Trustee's reasonable discretion, that making such a distribution is impracticable in light of the anticipated Cash needs of the Liquidation Trust going forward, or that, in light of the Cash available for distribution, making a distribution would not warrant the incurrence of costs in making the distribution.

5.4     Unclaimed Property

In the event that any distribution to a Liquidation Trust Beneficiary remains unclaimed or is returned as undeliverable, no distribution to such Liquidation Trust Beneficiary shall be made unless and until the Liquidation Trust has determined the then-current address of such Liquidation Trust Beneficiary, at which time such distribution shall be made to such Liquidation Trust Beneficiary without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the later of: (a) the expiration of one (1) year from the Final Effective Date or (b) ninety (90) days from the date of such distribution. After such date, all unclaimed Available Net Litigation Proceeds shall be redistributed in accordance with the Plan and this Agreement.

Nothing contained in the Plan or this Agreement shall require the

-11-

Liquidation Trustee to attempt to locate any Liquidation Trust Beneficiary.

5.5     Plan Distribution to Holders of Claims Generally

(a)     No Plan Distribution in Excess of Allowed Claims.  Notwithstanding anything to the contrary herein, Liquidation Trust Beneficiaries will not receive, in respect of their Claims, distributions under the Plan and this Agreement in excess of the amount of their respective Allowed Claims.

(b)     Disputed Payments.  If any dispute arises as to the identity of a Liquidation Trust Beneficiary that is to receive any distribution, the Liquidation Trustee may, in lieu of making such distribution to such Liquidation Trust Beneficiary, make such distribution into an escrow account or otherwise hold such distribution until the disposition thereof is determined by a court of competent jurisdiction or by written agreement among the interested parties to such dispute, which written agreement is reasonably acceptable to the Liquidation Trustee.

(c)     Disputed Claims.  If an objection to a Class 5 General Unsecured Claim or Class 6 Athos Subordinated Claim, or portion thereof is filed as set forth in Article VII of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim and the holder of such Allowed Claim receives Beneficial Interests on account of its Allowed Claim in accordance with Section 9.2 of this Agreement.  As soon as reasonably practicable after that date, the Liquidation Trust shall provide to such Liquidation Trust Beneficiary the distribution (if any) to which it is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of its Claim, without any interest, dividends, or accruals to be paid on account of its Beneficial Interests unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.  The Debtors and the Reorganized Debtors shall work in good faith, expeditiously, and on a commercially reasonable basis with the Liquidation Trustee regarding the allowance or disallowance of Class 5 General Unsecured Claims or Class 6 Athos Subordinated Claims.

(d)     Withholding Taxes.  Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any distributions made pursuant to the Plan and this Agreement.  All Liquidation Trust Beneficiaries shall be required to provide to the Liquidation Trustee any information necessary to effect the withholding of such taxes.  Notwithstanding the foregoing, each Liquidation Trust Beneficiary that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution.

(e)     Plan Distributions After the Effective Date.  In accordance with the Plan and this Agreement, no interest shall accrue or be payable with respect to distributions made after the Effective Date.

(f)      Manner of Payments.  Unless the Person receiving a distribution agrees otherwise, any distribution under the Plan and this Agreement shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank, in the sole discretion of the Liquidation Trustee.

(g)      Delivery of Plan Distribution.   Distributions to Liquidation Trust Beneficiaries shall be made as follows: (1) to the signatory set forth on any of the Proofs of Claim filed by such Liquidation Trust Beneficiary or other representative identified therein (or at the last known addresses of such Liquidation Trust Beneficiary if no Proof of Claim is filed or if the Liquidation Trustee has been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Debtors, as applicable, or the Liquidation Trustee, as applicable, after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Reorganized Debtors or the Liquidation Trustee, as applicable, have not received a written notice of a change of address; (4) at the address set forth on a completed form W-9, received by the Liquidation Trustee after the date of any related Proof of Claim; or (5) on any counsel that has appeared in the Chapter 11 Cases on the Liquidation Trust Beneficiary's behalf.

(h)      Record Date for Plan Distributions.  The Liquidation Trustee shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed General Unsecured Claim or Allowed Athos Subordinated Claim.

5.6      De Minimis Distributions

Notwithstanding anything in the Plan or herein to the contrary, the Liquidation Trustee shall not be required to make distributions or payments of less than $50.00 until the earlier of (a) as soon as reasonably practicable after the aggregate distributions owed to such Liquidation Trust Beneficiary on account of Allowed General Unsecured Claims and Allowed Athos Subordinated Claims held by such Liquidation Trust Beneficiary exceed $50.00 and (b) the final distribution to Liquidation Trust Beneficiaries.

Whenever any distribution of a fraction of a dollar would be required, the Liquidation Trustee shall round such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

5.7      Final Plan Distribution

Notwithstanding anything in the Plan to the contrary, in the event that: (a) in the discretion of the Liquidation Trustee, the Liquidation Trust (i) has insufficient funds to make any further distributions to the Liquidation Trust Beneficiaries and (ii) has no remaining potential sources of funds; (b) all Liquidation Trust Beneficiaries have been paid in full; or (c) it is impractical or impossible for the Liquidation Trustee to make further distributions to the Liquidation Trust Beneficiaries, the Liquidation Trustee shall have the right to abandon or otherwise dispose of such assets, including by donation of such property to a charity qualifying under section 501(c)(3) of the IRC; *provided*, *however*, that the Liquidation Trustee shall be permitted to establish a reserve sufficient to pay all costs and expenses of the Liquidation Trust.

5.8     Requirement of Undertaking

The Liquidation Trustee may request any court of competent jurisdiction to require, and any such court may in its discretion require, in any suit for the enforcement of any right or remedy under the Plan, or in any suit against the Liquidation Trustee for any act taken or omitted by the Liquidation Trustee, that the filing party litigant in such suit undertake to pay the costs of such suit or post a bond, if required, and such court may in its discretion assess reasonable costs, including, without limitation, reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

## ARTICLE VI
## LIQUIDATION TRUST FUNDING

6.1     Liquidation Trust Funding

The Liquidation Trust Expenses shall be paid from the Liquidation Trust Funding in accordance with the Plan and this Agreement.  On the Effective Date, the Liquidation Trust Funding shall be $1,020,000 plus any amount of the Committee Fee Cap Amount (as defined in the *Stipulation Regarding Settlement Term Sheet* [Docket No. 343]) remaining after payment of all Allowed fees and expenses of the Committee for the period from execution of the Settlement Term Sheet through the Effective Date.

6.2     Liquidation Trust Assets

Notwithstanding any prohibition of assignability under applicable nonbankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors shall be deemed to have automatically distributed to the Liquidation Trust Beneficiaries, who will immediately thereafter be deemed to have automatically transferred to the Liquidation Trust, all of their right, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, encumbrances, and other liabilities, subject only to the Claims of the Liquidation Trust Beneficiaries as set forth in the Plan and the expenses of the Liquidation Trust and the Liquidation Trustee as set forth herein, with all proceeds of the Liquidation Trust to be distributed in accordance with the provisions of the Plan and this Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

6.3     Liquidation Trustee's Lien

The Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals shall have a first priority lien upon the Liquidation Trust Assets to secure the payment of any amounts payable to them pursuant to Sections 4.1, 6.1, or 13.2 hereof.

## ARTICLE VII
## LIABILITY AND EXCULPATION PROVISIONS

7.1    Liability, Indemnification of the Liquidation Trustee and the Liquidation Trustee Professionals

Except to the extent of any bond provided by the Liquidation Trustee, if any, or as otherwise provided in the Plan or this Agreement, no recourse shall ever be had, directly or indirectly, against the Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement whatsoever executed by the Liquidation Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidation Trustee under the Plan for any purpose authorized by the Plan.  All such liabilities, covenants, and agreements of the Liquidation Trustee, the Liquidation Trustee Professionals, and the Liquidation Trustee Non-Professionals or any other representatives, agents, employees, successors, or assigns of the Liquidation Trustee, whether in writing or otherwise, under the Plan shall be enforceable only against, and shall be satisfied only out of any such bond, if any, and the Liquidation Trust Assets or such part thereof as shall, under the terms of any such agreement, be liable therefor, or shall be evidence only of a right of payment out of the Liquidation Trust Assets.  Every undertaking, contract, covenant, or agreement entered into in writing by the Liquidation Trustee shall provide expressly against the personal liability of the Liquidation Trustee.

No Trustee Party shall be liable for any act or omission of one another, nor shall the Trustee Parties be liable for any act or omission taken or not taken in such capacity, including, but not limited to, in the performance of any of the duties and powers of the Liquidation Trustee set forth in Article III of this Agreement, other than for specific acts or omissions as determined by a final judgment of a court of competent jurisdiction to be resulting solely from such Trustee Party's own willful misconduct or fraud.  The Liquidation Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with the Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such entities, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, the Liquidation Trustee shall not be under any obligation to consult with the Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals, and the determination not to do so shall not result in the imposition of liability on the Trustee Parties, unless such determination is based on such Trustee Party's willful misconduct or fraud as determined by a final judgment of a court of competent jurisdiction.  The Liquidation Trust shall indemnify and hold harmless the Trustee Parties from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements, and related expenses), which such Persons may incur or to which such Persons may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Persons arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the

Plan or the discharge of their duties hereunder, *provided*, *however*, that no such indemnification shall be made to such Persons for actions or omissions as a result of their willful misconduct or fraud as determined by a final judgment of a court of competent jurisdiction.

All expenses, judgments, penalties, fines and amounts incurred by the Liquidation Trust in connection with this Article VII shall be born solely by the Liquidation Trust, payable from the Liquidation Trust Assets. The costs of administering the Liquidation Trust and all fees and expenses incurred by and on behalf of the Liquidation Trust shall be charged against the Liquidation Trust Assets. Notwithstanding anything herein or in the Plan to the contrary, the Reorganized Debtors shall have no obligation to provide any funds or financing to the Liquidation Trust, other than the obligation to contribute the Liquidation Trust Assets, and under no circumstances will the expenses of the Liquidation Trust be paid or reimbursed by the Debtors or the Reorganized Debtors, as applicable. The Reorganized Debtors are intended third-party beneficiaries of this Article VII, and this Article VII shall not be amended without the prior written consent of each of the Reorganized Debtors.

7.2    Reliance by Liquidation Trustee

Except as otherwise provided herein:

(a)    the Liquidation Trustee may rely, and shall be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments, or reports believed by it to be genuine and to have been signed or presented by the proper Person or Persons;

(b)    the Liquidation Trustee shall not be liable for any action reasonably taken or not taken by it in reasonable reliance upon the advice of a Liquidation Trustee Professional or Liquidation Trustee Non-Professional;

(c)    Persons providing services to the Liquidation Trustee shall look only to the Liquidation Trust Assets to satisfy any liability incurred by the Liquidation Trustee to such Person in carrying out the terms of this Agreement, and neither the Liquidation Trustee nor Liquidation Trust Beneficiaries shall have any personal obligation to satisfy any such liability, except to the extent that actions taken or not taken after the Effective Date by the Liquidation Trustee are determined by a final judgment of a court of competent jurisdiction to be solely due to the Liquidation Trustee's own willful misconduct or fraud;

(d)    whenever, in the administration of this Agreement, the Liquidation Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering, or omitting any action hereunder, the Liquidation Trustee (unless other evidence be herein specifically prescribed) may rely upon an opinion of counsel or certificate furnished to the Liquidation Trustee by or on behalf of the Liquidation Trust Beneficiaries;

(e)    the Liquidation Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, or other paper or document, but the Liquidation Trustee, in the Liquidation Trustee's discretion, may make such further inquiry or investigation into such facts or matters as the Liquidation Trustee may see fit, and, if the Liquidation Trustee

shall determine to make such further inquiry or investigation, the Liquidation Trustee shall be entitled to examine the books, records, and premises of the relevant Person or entity, personally or by agent or attorney; and

(f)    the Liquidation Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Liquidation Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by the Liquidation Trustee hereunder.

**ARTICLE VIII**
**ESTABLISHMENT OF THE LIQUIDATION TRUST**

8.1    <u>Transfer of Assets to Liquidation Trust; Assumption of Liabilities</u>

(a)    Pursuant to the Plan, the Debtors and the Liquidation Trustee hereby establish the Liquidation Trust on behalf of the Liquidation Trust Beneficiaries to be treated as the grantors and deemed owners of the Liquidation Trust Assets.  On the Effective Date, pursuant to the Plan, the Debtors or Reorganized Debtors, as applicable, shall transfer, assign, and deliver to the Liquidation Trust, on behalf of the Liquidation Trust Beneficiaries, notwithstanding any prohibition of assignability under applicable nonbankruptcy law, all of their right, title, and interest in and to the Liquidation Trust Assets.  The Liquidation Trust Assets shall include, among other claims and causes of action, any Avoidance Action held by the Debtors and their Estates to the extent not released under the Plan.  For the avoidance of doubt, Avoidance Actions shall exclude any Claims or Causes of Action against Zahoransky Automation and Molds GmbH. All of the proceeds received by the Liquidation Trust from the prosecution, settlement, or other liquidation or monetization of the Liquidation Trust Assets after deducting (a) all fees and expenses of administering the Liquidation Trust (including reasonable and documented fees and expenses incurred by the Liquidation Trustee and its professionals), and (b) a reasonable reserve for anticipated future expenses (including the prosecution or settlement of any Cause of Action; collectively, the "<u>Available Net Litigation Proceeds</u>") shall be added to the Liquidation Trust Assets and held as a part thereof (and title thereto shall be vested in the Liquidation Trust) and shall be distributed in accordance with the Liquidation Trust Waterfall.  Such transfer includes, but is not limited to, all rights to assert, waive, or otherwise exercise any attorney-client privilege, work product protection, or other privilege, immunity, or confidentiality provision vested in, or controlled by, the applicable Debtor.  The Liquidation Trustee agrees to accept and hold the Liquidation Trust Assets for the benefit of the Liquidation Trust Beneficiaries, subject to the terms of the Plan and this Agreement.

8.2    <u>Title to Assets</u>

(a)    Notwithstanding any prohibition of assignability under applicable nonbankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have automatically distributed to the Liquidation Trust Beneficiaries, who shall immediately thereafter be deemed to have automatically transferred to the Liquidation Trust, all of their right, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the

Liquidation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Liquidation Trust Beneficiaries as set forth in the Plan and the Liquidation Trust Expenses as set forth in the Plan and in this Agreement.  Thereupon, the Debtors shall not have any interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

(b)    For all federal income tax purposes, all parties to this Agreement, the Liquidation Trust and the Liquidation Trust Beneficiaries shall treat the transfer of the Liquidation Trust Assets by the Debtors or Reorganized Debtors, as applicable, to the Liquidation Trust, as set forth in the Plan and this Agreement, as a transfer of such assets by the applicable Debtor to the Liquidation Trust Beneficiaries, followed by a transfer by such Liquidation Trust Beneficiaries to the Liquidation Trust.  Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

**ARTICLE IX**
**BENEFICIAL INTERESTS**

9.1    <u>Allocation of Beneficial Interests to Holders of Claims</u>

On the Effective Date or as soon thereafter as practicable, each Liquidation Trust Beneficiary shall be allocated its Beneficial Interest as set forth in the Plan.

9.2    <u>Disputed Claims</u>

As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the Liquidation Trust shall provide to the Holder of such Allowed General Unsecured Claim and Allowed Athos Subordinated Claim (which are deemed Allowed under the Plan) the Beneficial Interests to which such holder is entitled under the Plan.

9.3    <u>Interests Beneficial Only</u>

The ownership of a Beneficial Interest shall not entitle any Liquidation Trust Beneficiary to any title in or to the Liquidation Trust Assets as such (which title shall be vested in the Liquidation Trust) or to any right to call for a partition or division of the Liquidation Trust Assets or to require an accounting.

9.4    <u>Transfer of Beneficial Interests</u>

The Beneficial Interests shall not be transferrable.  No transfer, assignment, pledge, hypothecation, or other disposition of a Beneficial Interest shall be effective or binding upon the Liquidation Trust or the Liquidation Trustee for any purpose.  Notwithstanding the foregoing, (i) any Liquidation Trust Beneficiary may transfer its Beneficial Interests to a wholly-owned subsidiary treated as a corporation for U.S. federal income tax purposes, which shall thereafter be the relevant Liquidation Trust Beneficiary, and (ii) any Liquidation Trust Beneficiary may transfer its Beneficial Interests if the Liquidation Trust has become a public reporting company and/or files periodic reports under the Exchange Act following a

determination set forth in the final sentence of Section 9.10 of this Agreement.

9.5    Effect of Death, Dissolution, Incapacity, or Bankruptcy of Liquidation Trust Beneficiary

The death, dissolution, incapacity, or bankruptcy of a Liquidation Trust Beneficiary during the term of the Liquidation Trust shall not operate to terminate the Liquidation Trust during the term of the Liquidation Trust, nor shall it entitle the representative or creditors of the deceased, incapacitated, or bankrupt Liquidation Trust Beneficiary to an accounting or to take any action in any court or elsewhere for the distribution of the Liquidation Trust Assets or for a partition thereof, nor shall it otherwise affect the rights and obligations of the Liquidation Trust Beneficiary under this Agreement or in the Liquidation Trust.

9.6    Tax Identification Number

The Liquidation Trustee may require any Liquidation Trust Beneficiary to furnish such Liquidation Trust Beneficiary's social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8 or Form W-9), and the Liquidation Trustee may condition any distribution to any Liquidation Trust Beneficiary upon the receipt of such information and the receipt of such other documents as the Liquidation Trustee reasonably requests. The Liquidation Trustee may require any such Liquidation Trust Beneficiary to furnish its social security number or employer or taxpayer identification number as assigned by the IRS and may condition any distribution to any Liquidation Trust Beneficiary upon receipt of such identification number. If a Liquidation Trust Beneficiary does not timely provide the Liquidation Trustee with its social security number or employer or taxpayer identification number in the manner and by the deadline established by the Liquidation Trustee, then the distribution to such Beneficiary shall be administered as an unclaimed distribution in accordance with Section 5.4 of this Agreement.

9.7    Register Entries Regarding Beneficial Interests

The Liquidation Trustee shall create and maintain a Trust Register.

9.8    Representation of Beneficial Interests

The Beneficial Interests shall be uncertificated. The Beneficial Interests shall be represented by appropriate book entries in the Trust Register.

9.9    Trust Register

(a)    Register of Beneficial Interests. The Liquidation Trustee shall cause the Trust Register to be kept at the office of the Liquidation Trustee or at such other place or places that shall be designated by the Liquidation Trustee from time to time. The Liquidation Trustee may rely on the Claims Register or creditor lists prepared by the Debtors or their representatives in preparing the Trust Register.

(b)    Access to Register by Liquidation Trust Beneficiaries. The Liquidation Trust Beneficiaries and their duly authorized representatives shall have the right, upon

reasonable prior written notice to the Liquidation Trustee, and in accordance with reasonable regulations prescribed by the Liquidation Trustee, to inspect, and at the expense of the Liquidation Trust Beneficiary make copies of, the Trust Register, in each case only for a purpose reasonable and related to such Liquidation Trust Beneficiary's Beneficial Interest in the Liquidation Trust.

(c)   Absolute Owners.  The Liquidation Trustee may deem and treat each Liquidation Trust Beneficiary of record as determined pursuant to this Agreement as the absolute owner of such Liquidation Trust Beneficiary's Beneficial Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

9.10   Securities Law

The parties hereto intend that the Beneficial Interests shall not be "securities" under applicable laws, but none of the parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws.  If such rights constitute securities, the parties hereto intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan. Subject to Section [9.4] hereof, the Liquidating Trustee may amend this Agreement in accordance with Section [15.1] hereof to make such changes as are deemed necessary or appropriate, with the advice of counsel, to ensure that the Liquidating Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA or the Investment Company Act.

**ARTICLE X**
**ADMINISTRATION**

10.1   Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the primary purpose of liquidating the Liquidation Trust Assets, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.  Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, compromise, settle, or litigate the Liquidation Trust Claims, liquidate and convert to Cash the Liquidation Trust Assets, make distributions to the Liquidation Trust Beneficiaries, and not unduly prolong the duration of the Liquidation Trust.  The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Plan.

10.2   Books and Records

The Liquidation Trustee shall maintain books and records relating to the administration of the Liquidation Trust Assets and the distribution by the Liquidation Trustee of the proceeds therefrom in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. The Liquidation Trustee shall also maintain books and records relating to the income and expenses of the Liquidation Trust, and the payment of expenses of and liabilities of, claims against or assumed by, the Liquidation Trust in such detail and for such period of time as may be

necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  Except as otherwise provided herein or in the Plan, nothing in this Agreement requires the Liquidation Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidation Trust, or as a condition for making any payment or distribution out of the Liquidation Trust Assets.

Subject to all applicable privileges, the Liquidation Trust Beneficiaries shall have the right, in addition to any other rights they may have pursuant to this Agreement, under the Plan, or otherwise, upon thirty (30) days' prior written notice to the Liquidation Trustee, to request a reasonable inspection of the books and records held by the Liquidation Trustee, *provided*, *however*, that all costs associated with such inspection shall be paid in advance by such requesting Liquidation Trust Beneficiary, and further, if so requested, such Liquidation Trust Beneficiary shall have entered into a confidentiality agreement satisfactory in form and substance to the Liquidation Trustee, and make such other arrangements as may be reasonably requested by the Liquidation Trustee.

The books and records maintained by the Liquidation Trustee may be disposed of by the Liquidation Trustee at the later of (i) such time as the Liquidation Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Liquidation Trust or the Liquidation Trust Beneficiaries or (ii) upon the termination and completion of the winding down of the Liquidation Trust.

10.3    Compliance with Laws

Any and all distributions made pursuant to this Agreement shall comply with all applicable laws and regulations, including, but not limited to, applicable federal and state tax and securities laws.

**ARTICLE XI**
**SUCCESSOR LIQUIDATION TRUSTEE**

11.1    Successor Liquidation Trustee

In the event the Liquidation Trustee is removed or resigns pursuant to this Agreement or the Liquidation Trustee otherwise vacates its position, a successor Liquidation Trustee shall be appointed by a majority vote of holders of Liquidation Trust Class A Interests; *provided* that if all Liquidation Trust Class A Interests have been paid in full, a successor Liquidation Trustee shall be appointed by a majority vote of holders of Liquidation Trust Class B Interests.  Thereupon, such successor Liquidation Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of its predecessor in the Liquidation Trust with like effect as if originally named herein; *provided*, *however*, that a removed or resigning Liquidation Trustee shall, nevertheless, when requested in writing by the successor Liquidation Trustee, execute and deliver any reasonable instrument or instruments conveying and transferring to such successor Liquidation Trustee all the estates, properties, rights, powers, and trusts of such removed or resigning Liquidation Trustee; *provided*, *further*, that no such appointment of a successor Liquidation Trustee shall be effective until such

successor agrees in writing to accept such appointment and to serve as Liquidation Trustee upon all of the terms and conditions of this Agreement.

## ARTICLE XII
## REPORTING

12.1    Annual Reports

(a)    As soon as reasonably practicable after the end of each calendar year, and as soon as practicable upon termination of the Liquidation Trust, the Liquidation Trustee shall send to each Liquidation Trust Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct each such Beneficiary to report such items on their federal income tax returns.

12.2    Federal Income Tax

(a)    Grantor Trust Status.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee shall file returns for the Liquidation Trustee as a grantor trust pursuant to Treas. Reg. § 1.671-4(a).

(b)    Allocations of Liquidation Trust Taxable Income.  Subject to the provisions of Section 12.2(a) hereof, allocations of Liquidation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to Liquidation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust.  Similarly, taxable losses of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidation Trust Assets.  The tax book value of the Liquidation Trust Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidation Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)    Tax Compliance.  The Liquidation Trustee shall administer the Liquidation Trust's tax obligations, including (A) filing tax returns and paying tax obligations of the Liquidation Trust, *provided*, *that*, for the avoidance of doubt, any such tax obligations shall be paid from the Liquidation Trust Assets, (B) making distributions to Liquidation Trust Beneficiaries net of such taxes and applicable withholdings, (C) representing the interest and account of the Liquidation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, or audit.

(d)    Valuation for Tax Purposes.  As soon as possible after the transfer of the Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trustee shall perform a good

faith valuation of such Liquidation Trust Assets, shall promptly notify the Debtors, the Reorganized Debtors, and the Liquidation Trust Beneficiaries of such valuation, and such valuation shall be used by all parties (including the Debtors, the Reorganized Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all U.S. federal income tax purposes (and state and local tax purposes, to the extent applicable).

(e)    <u>Determination of Taxes</u>.  The Liquidation Trust may request an expedited determination of taxes of the Liquidation Trust under Section 505(a) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidation Trust for all taxable periods through the dissolution of the Liquidation Trust.

(f)    <u>Tax Treatment of Reserves for Disputed General Unsecured Claims</u>.  The Trustee may, in the Trustee's sole discretion, determine the best way to report for tax purposes with respect to any reserve for Disputed General Unsecured Claims, including (i) filing a tax election to treat any and all reserves for Disputed General Unsecured Claims as a Disputed Ownership Fund ("<u>DOF</u>") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Trust or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report any reserve for disputed claims as a DOF, the Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal tax return for the DOF and the payment of federal and/or state income tax due.

12.3    <u>Other</u>

The Liquidation Trustee shall file (or cause to be filed) any statement, returns, or disclosures relating to the Liquidation Trust or the Liquidation Trust Assets, that are required by any governmental unit.

**ARTICLE XIII**
**LIQUIDATION TRUSTEE PROFESSIONALS AND NONPROFESSIONALS**

13.1    <u>Retention of Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals</u>

The Liquidation Trustee shall have the right to retain Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals, each on such terms as the Liquidation Trustee deems appropriate. It is contemplated that the law firm of [ ]White & Case LLP will be retained as general counsel to the Liquidation Trust. The Liquidation Trustee Professionals and the Liquidation Trustee Non-Professionals shall be compensated in accordance with Section 13.2 hereof and need not be

"disinterested" as that term is defined in the Bankruptcy Code.

13.2   Payment to Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals

After the Effective Date, the Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Liquidation Trustee, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of each such Person, plus an itemized statement of expenses.  The Liquidation Trustee shall pay those invoices within ten (10) days after receipt, without Bankruptcy Court approval, unless the Liquidation Trustee objects in writing specifying the reasons for such objection and identifying the specific fees or expenses to which objection is made.  If there is a dispute as to a portion of an invoice, the Liquidation Trustee shall pay the undisputed portion. All payments to Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals shall be paid out of the Liquidation Trust Assets.

**ARTICLE XIV**
**TERMINATION OF LIQUIDATION TRUST**

14.1   Duration and Extension

The Liquidation Trustee and the Liquidation Trust shall be discharged or dissolved, as the case may be, on the earlier of (a) such time as (i) all of the Liquidation Trust Assets have been liquidated and (ii) all distributions required to be made by the Liquidation Trustee under the Plan and this Agreement have been made, and (b) three (3) years after the date hereof, unless the Bankruptcy Court, upon motion of the Liquidation Trustee within the six (6) months prior to the third (3rd) anniversary hereof (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the trust as a Liquidation Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation

-24-

Trust Assets.  After the final distribution of the balance of the Liquidation Trust Proceeds pursuant to the Plan and this Agreement, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

14.2    Diligent Administration

The Liquidation Trustee shall (a) not unduly prolong the duration of the Liquidation Trust; (b) at all times endeavor to resolve, settle, or otherwise dispose of all claims that constitute Liquidation Trust Assets; (c) consult and confer with the Liquidation Trust Beneficiaries and keep them fully advised of its activities; and (d) effect the liquidation of the Liquidation Trust Assets and distribution of the Available Net Litigation Proceeds to the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and this Agreement.

**ARTICLE XV**
**AMENDMENT AND WAIVER**

15.1    Amendment and Waiver

Any substantive provision of this Agreement may be materially amended or waived by order of the Bankruptcy Court if necessary to implement the Plan; *provided*, *however*, that no change may be made to this Agreement that would adversely affect the federal income tax status of the Liquidation Trust as a "grantor trust"; and *provided*, *further*, that no such amendment or waiver be inconsistent with the Plan.  Technical or nonmaterial amendments to or waivers of portions of this Agreement may be made as necessary to clarify this Agreement or to enable the Liquidation Trust to effectuate the terms of this Agreement, with the consent of the Liquidation Trustee; *provided*, *however*, that no such amendment or waiver be inconsistent with the Plan.

**ARTICLE XVI**
**MISCELLANEOUS PROVISIONS**

16.1    Intention of Parties to Establish Grantor Trust

This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

16.2    Debtors' Further Assurances

The Debtors, the Reorganized Debtors, and their respective officers, directors, professionals, and agents shall take such actions and execute such documents as are reasonably requested by the Liquidation Trustee to implement the provisions of this Agreement; *provided*, *however*, that nothing provided in this Section 16.2 shall limit the generality of Section 6.2.

16.3    Preservation of Privilege

In connection with the vesting and transfer of the Liquidation Trust Assets, any attorney-client privilege, work-product protection, or other privilege or immunity attaching or

relating to any documents or communications (of any kind, whether written or oral, electronic, or otherwise) held by the Debtors shall be transferred to the Liquidation Trust and shall vest in the Liquidation Trust for the limited purpose set forth herein.  Accordingly, in connection with the prosecution and/or investigation of claims held by the Liquidation Trustee, no directors, officers, employees, counsel, agents, or attorneys-in-fact of the Debtors, may assert any attorney-client privilege, work product protection, or other privilege or immunity attaching or relating to any documents or communications (of any kind, whether written or oral, electronic, or otherwise) held by the Debtors or otherwise prevent, hinder, delay, or impede production or discussion of documents or communications requested by the Liquidation Trustee in discovery (whether formal or informal, and including without limitation, depositions, written discovery, and interviews).  The Debtors and the Liquidation Trustee shall take all necessary actions to protect the transfer of such privileges, protections, and immunities.

16.4    Prevailing Party

Except in connection with any action to enforce the Plan, the prevailing party in a dispute regarding the provisions of this Agreement or the enforcement thereof shall be entitled to collect any and all costs, expenses, and fees, including attorneys' fees, from the nonprevailing party incurred in connection with such dispute or enforcement action.

16.5    Confidentiality

The Confidential Parties shall hold strictly confidential and not use for personal gain any material, nonpublic information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Entity to which any of the Liquidation Trust Assets relates; *provided*, *however*, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties, or (b) such disclosure is required of the Confidential Parties pursuant to legal process, including, but not limited to, subpoena or other court order or other applicable laws or regulations.  In the event that any Confidential Party is requested to divulge confidential information pursuant to clause (b) above, such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Liquidation Trustee to allow it sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Liquidation Trustee in making any such objection, including, but not limited to, appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

16.6    Laws as to Construction; Enforcement of Agreement

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law.  Any action to enforce or interpret this Agreement shall be brought in the Bankruptcy Court unless and until a final decree has been entered in the Chapter 11 Cases, and thereafter in any court of competent jurisdiction.

16.7    Severability

Except with respect to provisions herein that are contained in the Plan, if any provision of this Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

16.8    <u>Notices</u>

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, on the third (3rd) Business Day after such notice is delivered by facsimile (at the number set forth below with proof of confirmation), overnight delivery, or electronic mail and mailed by certified mail, with return receipt requested at the address as set forth below, or such other addresses as may be filed with the Bankruptcy Court:

**<u>As to the Liquidation Trustee:</u>**

| | |
|---|---|
| Contact Name: | Province, Inc.<br>c/o Peter Kravitz |
| Address: | 2360 Corporate Circle Ste 330<br>Henderson, NV 89074 |
| Phone: | 702-685-5555 |
| E-mail: | admin@provincefirm.com |

with copies to:

White & Case LLP

Attn.:  Gregory F. Pesce, Andrew F. O'Neill, Erin Rosenberg

| | |
|---|---|
| Address: | 111 South Wacker Drive, Suite 5100<br>Chicago, Illinois 60606 |
| Phone: | 312-881-5400 |
| E-mail: | gregory.pesce@whitecase.com<br>aoneill@whitecase.com<br>erin.rosenberg@whitecase.com |

**<u>As to the Debtors:</u>**

| | |
|---|---|
| Contact Name: | SiO2 Medical Products, Inc.<br>Attn.:  Legal Department |
| Address: | 2250 Riley Street<br>Auburn, Alabama 36832 |

with copies to:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP

|           |                                    |
|-----------|------------------------------------|
|           | Attn.:  Brian Schartz, P.C.        |
| Address:  | 601 Lexington Avenue               |
|           | New York, New York 10022           |
| Phone:    | 212-446-4800                       |
| E-mail:   | bschartz@kirkland.com              |

|           |                                    |
|-----------|------------------------------------|
|           | Attn.:  Dan Latona                 |
| Address:  | 300 North LaSalle Drive            |
|           | Chicago, Illinois 60654            |
| Phone:    | 312-862-2000                       |
| E-mail:   |                                    |
|           | dan.latona@kirkland.com            |

16.9  <u>Notices if to a Liquidation Trust Beneficiary</u>

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, on the fifth (5th) Business Day after deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended to the name and address as determined in accordance with the Trust Register.

16.10  <u>Survivability</u>

Notwithstanding any provision of the Plan to the contrary, the terms and provisions of this Agreement shall remain fully binding and enforceable notwithstanding any vacancy in the position of the Liquidation Trustee.

16.11  <u>Entire Agreement</u>

This Agreement (including the recitals hereof and, to the extent applicable, the Plan and the Confirmation Order) constitutes the entire agreement by and among the parties with respect to the subject matter hereof, and there are no representations, warranties, covenants, or obligations except as set forth herein, in the Plan, and in the Confirmation Order.  This Agreement (together with the Plan and the Confirmation Order) supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, if any, of the parties hereto relating to any transaction contemplated hereunder.  Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any Person other than the parties hereto and the Liquidation Trust Beneficiaries any rights or remedies under or by reason of this Agreement.  This Agreement shall be binding on the parties hereto and their successors, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases.

16.12  <u>No Relationships Created</u>

Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership, or joint venture of any kind, nor shall the Liquidation Trustee or the Liquidation Trust Beneficiaries be deemed to be or treated in any way

whatsoever to be liable or responsible hereunder as partners or joint venturers.  The relationship of the Liquidation Trust Beneficiaries (on the one hand) to the Liquidation Trustee (on the other hand) shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Liquidation Trust Agreement.

16.13   <u>Headings</u>

The section headings contained in this Agreement are solely for the convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

16.14   <u>Conflicts with Plan Provisions</u>

If any of the terms and/or provisions of this Agreement conflict with the terms and/or provisions of the Plan, then the Plan shall govern.

*    *    *    *    *

**<u>Schedule 1</u>**

**Fee Schedule**

**<u>Exhibit F</u>**

**Restructuring Transactions Memorandum**

This <u>Exhibit F</u> and the Plan Supplements remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan, to amend, revise, or supplement the Plan Supplements, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplements or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Restructuring Support Agreement.

## Restructuring Transactions Memorandum

Capitalized terms used but not otherwise defined herein have the meanings as given to them in the *Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and its Debtor Affiliates* confirmed at Docket No. 478-1, as it may be altered, amended, modified, or supplemented from time to time.

Pursuant to the Plan, the Debtors intend to implement the following Restructuring Transactions on the Effective Date (unless otherwise indicated below):

*On the Effective Date*:

**Step 1** – The Debtors transfer the Liquidation Trust Assets to the Liquidation Trust and execute the Liquidation Trust Agreement.

**Step 2** – SiO2 Medical Products, Inc. abandons the equity of SiO2 Material Science Europe AG.

**Step 3** – Pursuant to the Plan:

(a) Intercompany Claims are Reinstated, set off, settled, distributed, contributed, cancelled, released, or otherwise addressed, at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor, without any distribution. Intercompany Interests are Reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor, without any distribution.

(b) In full and final satisfaction, settlement, release, and discharge of and in exchange for each of their Claims:

(i) each Holder of an Allowed DIP Claim receives its Pro Rata share of New Common Stock and/or its Pro Rata share of the Exit Financing; and

(ii) each Holder of an Allowed First Lien Term Loan Claim receives its Pro Rata share of New Common Stock and/or its Pro Rata share of the Exit Financing.

(c) All Interests in SiO2 are cancelled, released, extinguished, and discharged and are of no further force or effect. Holders of Interests receive no recovery or distribution on account of their Interests in SiO2.

**<u>Schedule F-1</u>**

**Redline to Restructuring
Transactions Memorandum Filed on June 30, 2023**

**Restructuring Transactions Memorandum**

Capitalized terms used but not otherwise defined herein have the meanings as given to them in the [*Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and its Debtor Affiliates*] confirmed at Docket No. 478-1, as it may be altered, amended, modified, or supplemented from time to time.

~~The Restructuring Transactions may be structured as a recapitalization of the Debtors (a "**Recapitalization Transaction**") or as the sale of certain of the assets of SiO2 to newly formed entities formed on behalf of the First Lien Term Lenders (either directly or following a contribution to one or more newly formed subsidiaries formed on behalf of the Debtors) (a "**Taxable Transaction**"). It has not yet been determined how the Restructuring Transactions will be structured. The Debtors reserve the right to modify this Restructuring Transactions Memorandum at any time.~~

Pursuant to the Plan, the ~~Reorganized~~ Debtors intend to implement the following Restructuring Transactions ~~prior to,~~ on, ~~or after~~ the Effective Date (unless otherwise indicated below):

## ~~*1. Alternative 1 - Recapitalization Transaction*~~

~~**If the Restructuring Transactions are structured as a Recapitalization Transaction,** the immediately following steps will be performed.~~

*On ~~or before~~ the Effective Date*:

~~**Step 1** – SiO2 forms [SiO2 Switzerland Holdings, LLC] ("**Swiss LLC**"), a Delaware limited liability company, and contributes the equity of SiO2 Material Science AG to it.~~

~~*On the Effective Date*:~~

~~**Step 2** – The Debtors form [SiO2 Operations, LLC], a Delaware limited liability company ("**Operations**").~~

**Step ~~3~~1** – The Debtors transfer the Liquidation Trust Assets to the Liquidation Trust and execute the Liquidation Trust Agreement.

**Step ~~4~~2** – SiO2 Medical Products, Inc. abandons the equity of ~~Swiss LLC~~SiO2 Material Science Europe AG.

**Step ~~5~~3** – Pursuant to the Plan:

~~(a) SiO2 contributes substantially all assets of its assets to Operations, and Operations assumes certain liabilities of the Debtors.~~

~~(b) Operations files an IRS Form 8832 electing to be taxed as a corporation for United States federal income tax purposes.~~

~~(c) SiO2 converts to a Delaware limited liability company.~~

**Step 6** – Pursuant to the Plan:

(a) Intercompany Claims are Reinstated, set off, settled, distributed, contributed, cancelled, released, or otherwise addressed, at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor, without any distribution. Intercompany Interests are Reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor, without any distribution.

(b) In full and final satisfaction, settlement, release, and discharge of and in exchange for each of their Claims:

(i) each Holder of an Allowed DIP Claim receives from the Reorganized Debtors its Pro Rata share of New Common Stock and/or its Pro Rata share of the Exit Financing; and

(ii) each Holder of an Allowed First Lien Term Loan Claim receives from the Reorganized Debtors its Pro Rata share of New Common Stock and/or its Pro Rata share of the Exit Financing.

(c) All Interests in SiO2 are cancelled, released, extinguished, and discharged and are of no further force or effect. Holders of Interests receive no recovery or distribution on account of their Interests in SiO2.

\*\*\*

## 2. Alternative 2 - Taxable Transaction

**If the Restructuring Transactions are structured as a Taxable Transaction**, the immediately following steps will be performed.

*On or before the Effective Date*:

**Step 1** – SiO2 forms [SiO2 Switzerland Holdings, LLC] ("**Swiss LLC**"), a Delaware limited liability company, and contributes the equity of SiO2 Material Science AG to it.

**Step 2** – An agent for the Holders of First Lien Term Loan Claims forms [Grandparent, LLC] ("**Grandparent**"), a Delaware limited liability company which elects to be treated as a corporation for U.S. federal income tax purposes.

**Step 3** – Grandparent forms [Parent, Inc.] ("**Parent**"), a Delaware corporation.

**Step 4** – Parent forms [Buyer, Inc.] ("**Buyer**"), a Delaware corporation.

*On the Effective Date*:

**Step 5** – Pursuant to a contribution agreement among Grandparent, Parent, and Buyer (the "**Contribution Agreement**"), Grandparent issues and contributes 100% of the New Common Stock to Parent, and Parent contributes the New Common Stock to Buyer.

**Step 6** – SiO2 abandons the equity of Swiss LLC.

**Step 7** – SiO2 forms [SiO2 Operations, LLC], a Delaware limited liability company ("**Operations**"), and contributes certain operating assets of the business and the equity interests of each of SiO2's subsidiaries, other than SiO2 Material Science AG, to Operations. Operations assumes certain liabilities of SiO2 that will survive post-emergence.

**Step 8** – The Debtors transfer the Liquidation Trust Assets to the Liquidation Trust and execute the Liquidation Trust Agreement.

**Step 9** – Buyer purchases 100% of the equity of Operations ("**Operations Equity**") from SiO2 in exchange for (i) the Exit Financing, (ii) New Common Stock, and (iii) if applicable, other consideration.

**Step 10** – Pursuant to the Plan:

    (a) Intercompany Claims are Reinstated, set off, settled, distributed, contributed, cancelled, released, or otherwise addressed, at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor, without any distribution. Intercompany Interests are Reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor, without any distribution.

(b) In full and final satisfaction, settlement, release, and discharge of and in exchange for each of their Claims:

(i) each Holder of an Allowed DIP Claim receives ~~from the Reorganized Debtors~~ its Pro Rata share of New Common Stock and/or its Pro Rata share of the Exit Financing; and

(ii) each Holder of an Allowed First Lien Term Loan Claim receives ~~from the Reorganized Debtors~~ its Pro Rata share of New Common Stock and/or its Pro Rata share of the Exit Financing.

(c) All Interests in SiO2 are cancelled, released, extinguished, and discharged and are of no further force or effect. Holders of Interests receive no recovery or distribution on account of their Interests in SiO2.

## Schedule G

### Identities of the Members of the New Board

The members of the New Board will be as follows:

**Aman Kumar**:  Mr. Kumar is a managing director within Oaktree's Global Private Debt strategy.  He also serves as a co-portfolio manager for the strategy's Life Sciences Lending platform which focuses on investment opportunities across the healthcare spectrum from biotechnology and pharmaceuticals to medical devices and healthcare services.  Prior to joining Oaktree in 2014, Mr. Kumar spent three years at Deutsche Bank in London working on the Global Credit team, most recently as a vice president on the European High Yield trading desk.  He received an M.B.A. from the Wharton School at the University of Pennsylvania and holds a Bachelor of Medicine, Bachelor of Surgery degree from King's College London.  Prior to Wharton, Mr. Kumar worked as a surgeon in the UK National Health Service (NHS).  He is a member of the Royal College of Surgeons of England.

**Steven DeNelsky**:  Mr. DeNelsky is a managing director within Oaktree's Global Private Debt strategy, with a primary focus on the Life Sciences Lending platform.  Over his 30-year career, Mr. DeNelsky has worked across all sectors and sub-sectors of healthcare, including pharmaceuticals, services and devices.  Prior to joining Oaktree in 2022, Mr. DeNelsky was a managing director at Marathon Asset Management where he was responsible for sourcing and evaluating investments in the healthcare space.  Prior thereto, Mr. DeNelsky was president and co-founder of Life Sciences Alternative Funding.  There, he led the joint venture with Perella-Weinberg to provide mezzanine growth capital via debt instruments to life sciences and healthcare companies.  Mr. DeNelsky has also held senior positions at 11:11 Capital Management, Avenue Capital Group and Sapphire Capital Management.  He received a B.A. degree in economics from American University and his M.B.A. with a concentration in finance from the University of Maryland.  Mr. DeNelsky has served on the board of directors of Integrated Diagnostics, Visioncare Inc. and AMICAS (NASDAQ: AMCS).